ORAL ARGUMENT SCHEDULED MARCH 9, 2026

No. 25-5473

---

*In the*

# United States Court of Appeals

*for the*

## District of Columbia Circuit

---

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and
ASSOCIATION OF AMERICAN UNIVERSITIES,
*Plaintiffs-Appellants*,

- v. -

UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-3675, Hon. Beryl A. Howell

---

### APPELLANTS' REPLY BRIEF

---

ADAM G. UNIKOWSKY
ELIZABETH HENTHORNE
ISHAN K. BHABHA
LINDSAY C. HARRISON
ZACHARY C. SCHAUF
  *Jenner & Block LLP*
  *1099 New York Ave. NW*
  *Washington, DC 20001*
  *(202) 637-6000*

*Counsel for Appellant*
*Association of American*
*Universities*

PAUL D. CLEMENT
JAMES Y. XI
JEFFREY C. THALHOFER
  *Clement & Murphy, PLLC*
  *706 Duke Street*
  *Alexandria, VA 22314*
  *(202) 742-8900*

*Counsel for Appellants*
*Chamber of Commerce of*
*the United States of*
*America and Association*
*of American Universities*

PAUL W. HUGHES
ALEX BOOTA
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

DARYL L. JOSEFFER
  *U.S. Chamber Litigation Center*
  *1615 H Street NW*
  *Washington, DC 20062*
  *(202) 463-5337*

*Counsel for Appellant*
*Chamber of Commerce of the*
*United States of America*

## TABLE OF CONTENTS

Introduction ................................................................................1

Argument ....................................................................................3

I.   The Proclamation is unlawful. .................................................3

     A.   The government's brief inverts the governing background
          principles. ...................................................................3

     B.   The Proclamation conflicts with the INA.......................7

          1.   The Proclamation conflicts with the INA's
               comprehensive scheme for fees..............................8

          2.   The Proclamation conflicts with the H-1B eligibility
               requirements...........................................................10

     C.   Congress has not authorized the Proclamation's exercise of
          Congress' taxing power. ...........................................11

II.  Appellants' claims are justiciable. .......................................17

     A.   Consular nonreviewability is inapplicable....................17

     B.   Appellants properly seek both *ultra vires* and APA contrary-
          to-law review.............................................................19

          1.   Ultra vires review is available.................................19

          2.   APA review is available. ........................................22

III. Prompt injunctive or set-aside relief is imperative. ............26

Conclusion................................................................................30

# TABLE OF AUTHORITIES[†]

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996) ...................................................................13

*Alcresta Therapeutics, Inc. v. Azar*,
  755 F. App'x 1 (D.C. Cir. 2018).................................................27

*American Foreign Service Association v. Trump*,
  2025 WL 1742853 (D.C. Cir. June 20, 2025) ...........................19

*American Forest Resource Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023)....................................................20

*Ancient Coin Collectors Guild v. CBP*,
  801 F. Supp. 2d 383 (D. Md. 2011) ...........................................23

*Bailey v. Drexel Furniture Co.*,
  259 U.S. 20 (1922) .......................................................................5

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................23

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ...................................................................16

*Bradford v. United States DOL*,
  101 F.4th 707 (10th Cir. 2024)...................................................25

*Castaneda-Gonzalez v. INS*,
  564 F.2d 417 (D.C. Cir. 1977) ...................................................18

*CC Distribs., Inc. v. United States*,
  883 F.2d 146 (D.C. Cir. 1989) ...................................................28

*\*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ....................... 2, 19, 20, 21, 22, 24

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ...................................................30

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..............................................................20, 26

---

[†]    Authorities marked with an asterisk are those primarily relied upon.

## Cases—continued

*Dep't of State v. Muñoz*,
602 U.S. 899 ...................................................................3, 18

*Detroit Int'l Bridge Co. v. Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ...................................23, 25

*Dunlop v. Bachowski*,
421 U.S. 560 (1975) .................................................................21

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
980 F.3d 123 (D.C. Cir. 2020) ................................................25

*Fiallo v. Bell*,
430 U.S. 787 (1977) .................................................................18

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ....................................................22, 23, 24

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012) .................................................................11

*Galvan v. Press*,
347 U.S. 522 (1954) ...................................................................3

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025).....................................................21

*Halverson v. Slater*,
129 F.3d 180 (D.C. Cir. 1997) ...................................................8

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ...................................................................3

*Henderson v. Mayor of New York*,
92 U.S. 259 (1875) .....................................................................6

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
761 F.2d 798 (D.C. Cir. 1985) .................................................18

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) ..............................................................3, 18

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .....................................................29

*Learning Res., Inc. v. Trump*,
784 F. Supp. 3d 209 (D.D.C. 2025) ........................................14

## Cases—continued

*Make The Rd. New York v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ................................................25

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ..............................................5

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025) .........................................................27

*Nat'l Venture Cap. Ass'n v. Duke*,
  291 F. Supp. 3d 5 (D.D.C. 2017) ...........................................28

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ...........................................................5, 6

*Nicol v. Ames*,
  173 U.S. 509 (1899) .............................................................12

*Nuclear Regulatory Commission v. Texas*,
  605 U.S. 665 (2025) .............................................................21

*Oceanic Steam Nav. Co. v. Stranahan*,
  214 U.S. 320 (1909) ...............................................................3

*Pietersen v. U.S. Department of State*,
  138 F.4th 552 (D.C. Cir. 2025) .......................................17, 18

*Pub. Citizen v. U.S. Trade Representative*,
  5 F.3d 549 (D.C. Cir. 1993) ..................................................24

*RAICES v. Noem*,
  793 F. Supp. 3d 19 (D.D.C. 2025) .........................................26

*Safari Club Int'l v. Salazar*,
  852 F. Supp. 2d 102 (D.D.C. 2012) .......................................27

*Sekhar v. United States*,
  570 U.S. 729 (2013) ...............................................................5

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ..............................................25

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) ................................................25

*Skinner v. Mid-American Pipeline Co.*,
  490 U.S. 212 (1989) ...........................................................4, 5

## Cases—continued

*Smith v. Turner*,
  48 U.S. 283 (1849) ....................................................................6

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ...............................................19

*\*Trump v. Hawaii*,
  585 U.S. 667 (2018) ......................................... 7, 9, 10, 12, 15

*Trump v. Orr*,
  146 S. Ct. 44 (2025) ...............................................................25

*Tulare County v. Bush*,
  185 F. Supp. 2d 18 (D.D.C. 2001) .........................................23

*\*V.O.S. Selections, Inc. v. Trump*,
  149 F.4th 1312 (Fed. Cir. 2025) ............................................14

*Webster v. Doe*,
  486 U.S. 592 (1988) ...............................................................20

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ...............................................................15

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ...............................................28

*Wrenn v. D.C.*,
  864 F.3d 650 (D.C. Cir. 2017) ...............................................29

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .................................................................4

## Statutes and constitutional provisions

*U.S. Const. art. I, § 7, cl. 1 .........................................................12

5 U.S.C.
  § 703 ........................................................................................25
  § 706(2)(A) ..............................................................................22
  § 706(2)(C) ..............................................................................22

## Statutes and constitutional provisions—continued

8 U.S.C.

    § 1153(b)(1)(A) ................................................................10

    § 1153(b)(2)(A) ...............................................................10

    § 1182 ...............................................................................17

    *§ 1182(f) ................................................ 2, 7, 9, 11-17, 20, 21, 26

    § 1184(a)(1) ....................................................................13

    § 1184(g)(3) ....................................................................10

    § 1184(g)(5)(C) ..............................................................10

    *§ 1185(a)(1) .......................................... 2, 14, 16, 17, 20, 21

    § 1356(m) ......................................................................8, 9

Pub. L. 82-414, § 281, 66 Stat. .................................................13

## Regulations and agency materals

8 C.F.R. § 214.2(h)(8)(iii)(D)(3) .............................................28

83 Fed. Reg. 57661 (Nov. 15, 2018) ....................................15

84 Fed. Reg. 53991 (Oct. 9, 2019) .......................................15

85 Fed. Reg. 23441 (Apr. 27, 2020) .....................................15

85 Fed. Reg. 38263 (June 25, 2020) .....................................15

89 Fed. Reg. 48487 (June 7, 2024) .......................................15

## Other authorities

Declaration of Independence, 1 Stat. 1 (1776) ........................12

*Proposed Interdiction of Haitian Flag Vessels*,
    5 Op. O.L.C. 242 (1981) ....................................................4

USCIS, Press Release (Jan. 30, 2026) ...................................23

## INTRODUCTION

The government's brief only confirms that the Proclamation is fundamentally inconsistent with the separation of powers. The Proclamation is an undisguised attempt by the Executive to exercise legislative power. And not just any legislative power, but the power to tax, *i.e.*, the power that most concerned the Framers and that they vested uniquely in the political branch most directly accountable to local constituents. The Proclamation fundamentally rewrites the H-1B system Congress created and converts it into a revenue raising scheme that limits H-1B visas to the "best of the best" and substantially augments the federal fisc on the backs of U.S. taxpayers. Congress plainly could refashion the H-1B program in this manner. The Executive, acting unilaterally, just as plainly cannot.

None of the government's contrary arguments justifies the Proclamation or shields it from judicial review. On the merits, the government inverts the relevant separation-of-powers principles at every turn. From the principle that Congress has plenary policymaking authority over immigration, allowing it to delegate discretionary authority to the Executive, the government divines a rule that allows the Executive to do anything involving "restrictions on the entry of aliens," Resp.Br.33, as long as the particular means used are not specifically forbidden by statute. As for the clear-statement rule that prevents inadvertent (or wholly imagined) delegations of the

taxing power, the government first denies the rule's existence and then argues it is somehow inapplicable to truly onerous and destructive taxes. None of those arguments is remotely persuasive, and the government's effort to shield the Proclamation from judicial review is squarely foreclosed by circuit precedent—namely *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) and its progeny—that the government conveniently ignores.

Even the government does not dispute that the sum total of its arguments for Executive discretion and against judicial review produces a "parade of horribles." Resp.Br.33. Contrary to the government's hope, that parade is truly horrible and squarely before this Court. If the Executive can convert a carefully calibrated cost-recovery fee system for H-1B visas into a $100,000-a-head privilege, limited to the "best of the best" measured by the willingness of U.S. employers to pay taxes Congress never imagined or imposed, then there are no limits on what the Executive can accomplish via unilateral proclamations invoking Sections 212(f) and 215(a). That is not the law. This Court should make that clear, reverse the decision below, and enter prompt injunctive relief.

## ARGUMENT

## I.    THE PROCLAMATION IS UNLAWFUL.

### A.    The government's brief inverts the governing background principles.

The government's brief—filled with generalities about inherent executive power over exclusion and foreign affairs, *e.g.*, Resp.Br.17-18—does not grapple with the fundamental question here: May the President unilaterally transform a detailed statutory visa program into a revenue center? No, he may not. Doing so is a legislative act.

***Immigration power.*** The government's paeans to executive authority, largely drawn from *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), are irrelevant. *Knauff* involved a challenge to the discretionary decision to exclude a noncitizen at the border under an *express delegation*. *Id.* at 539-40, 543. That decision, like *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), stands only for the proposition that "*Congress may delegate* to executive officials *the discretionary authority to admit noncitizens*." *Dep't of State v. Muñoz*, 602 U.S. 899, 907 (emphases added). Nothing in those cases undermines Congress' power over immigration or the bedrock principle that, when Congress has exercised its "exclusive[]" power to "formulat[e] … policies" governing "entry of aliens," *Galvan v. Press*, 347 U.S. 522, 531 (1954), including  to "prescrib[e] the terms and conditions on which [noncitizens] may come in" to the United States, *Oceanic*

3

*Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 335 (1909) (citations omitted), the President may not contravene that legislative judgment, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring). Even the Executive has recognized that, "where Congress has acted, the regulation of immigration is an area in which Congress exercises plenary power." Theodore B. Olson, *Proposed Interdiction of Haitian Flag Vessels*, 5 Op. O.L.C. 242, 244 (1981).

***Taxing power.*** The Executive effort to transform the H-1B program usurps not just Congress's plenary power over immigration, but the one legislative power the Framers most wanted wielded only by the People's representatives in Congress: the taxing power. Unable to contend with clear-statement rules forbidding such efforts, the government first denies their existence and then contorts precedent. But claiming that "*Skinner* stated that" no clear-statement rule applies to delegations of taxing authority is pure invention. Resp.Br.29; *cf.* Br.19 (further cases recognizing rule). True, the *substantive nondelegation standard*—whether Congress has provided an intelligible principle for the Executive to follow—is not "different and stricter… *where Congress delegates* … taxing power," *Skinner v. Mid-American Pipeline Co.*, 490 U.S. 212, 222-23 (1989), but that is because the clear-statement rule ensures that the taxing power will not be *inadvertently* delegated at all. And crucially, *Skinner* demonstrates the clear-statement rule

4

applies *regardless* of whether charges the government imposes are "characterized as 'fees' or 'taxes,'" *id.* at 224—a point the government ignores.

The government next argues that "excessive" and "ruinous" exactions like Proclamation's are "not a tax" at all and thus do not implicate the clear-statement rule. Resp.Br.26-27. No case remotely supports that backwards claim. The power to tax was given to Congress, and the People's House in particular, precisely because "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819). The notion that there would be an exception to *Skinner* for especially ruinous taxes "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). And the government concedes that the sole actual exception to *Skinner*—for user fees covering "costs … inuring directly to the benefit of regulated parties," 490 U.S. at 224—is inapplicable, *see* Resp.Br.23 ("[T]he Proclamation does not impose a fee to cover costs.").

The government is thus left attempting to relabel the Proclamation's exaction a "penalty," Resp.Br.27, under *NFIB v. Sebelius*, 567 U.S. 519 (2012) and *Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922). That gets the government nowhere. To begin, the government cannot ignore *Skinner*'s clear-statement rule by labeling its exaction a penalty. *See Skinner*, 490 U.S. at 224. *Drexel*, discussed in *NFIB*, is an anachronism that "policed …

5

limits" on "Congress's ability to use its taxing power" to enact "punitive exactions" that effectively "regulate[d] behavior otherwise regarded at the time as beyond federal authority." *NFIB*, 567 U.S. at 572. Here there is no doubt that Congress possesses the power to regulate immigration and visas and to lay taxes. Regardless, "if the concept of penalty means anything, it means punishment for an unlawful act or omission," *NFIB*, 567 U.S. at 567, and the $100,000 fee is not a punishment for an unlawful act. Indeed, the fee purports to be the only lawful way to sponsor an H-1B visa. *NFIB*, moreover, refutes the government's claim, Resp.Br.27, that a "regulatory purpose" renders an exaction something other than a tax. 567 U.S. at 574.

Nor can the government answer the cases confirming that, as a matter of original public meaning, charges on arriving noncitizens are taxes. Yes, in *Smith v. Turner*, 48 U.S. 283 (1849), and *Henderson v. Mayor of New York*, 92 U.S. 259 (1875), the charges were unlawful in part because, as state laws, they impinged on Congress's foreign-commerce power. Resp.Br.27. But a majority of Justices *also* held the charges unlawful because, *as taxes*, they "conflict[ed] with" the requirement of Article I, § 8 "that all duties, imposts, and excises shall be uniform throughout the United States." *Smith*, 48 U.S. at 414 (opinion of Wayne, J.).

6

**B.    The Proclamation conflicts with the INA.**

Section 212(f) "does not allow the President to expressly override particular provisions of the INA." *Trump v. Hawaii*, 585 U.S. 667, 689 (2018). The government does not contest this—nor could it. *Cf.* Resp.Br.21-22 & n.2. Instead, the government says the Proclamation does nothing more than "impose entry restrictions in addition to those elsewhere enumerated in the INA," *id.* at 21-22 (quoting *Hawaii*, 585 U.S. at 684), without running afoul of any INA provision expressly precluding new exactions, such that Appellants' argument is "the exact same" argument rejected in *Hawaii*, *id.* Not so. *Hawaii* recognized that where "Congress has stepped into the space and solved the exact problem," *Hawaii*, 585 U.S. at 691, the Executive cannot cut in to rewrite the solution. The Court did not limit that principle to situations where Congress anticipated Executive rewriting efforts and expressly forbade them. Rather, in *Hawaii*, the Court reasoned that Congress had "not address[ed]" the issue of deficient vetting at all. 585 U.S. at 689-90; *see* Br.33-34. That is nothing like the conflict here, where Congress has specifically decided the cost and qualifications for H-1B visas and declined to treat them as something more akin to an FCC spectrum auction. Br.33-34.

1.     *The Proclamation conflicts with the INA's comprehensive scheme for fees.*

Congress decided how much an H-1B petition should cost, and how those costs should be determined, through a limited delegation of fee-setting authority, 8 U.S.C. § 1356(m), and an enumeration of specific fees. *See* Br.24. The government has no meaningful response for the Proclamation's clear conflicts with that statutory scheme.

First, the government ignores that Section 1356(m) would be a nullity if the Executive already had free-floating authority to impose whatever fees it wanted. Br.27. While Section 1356(m) is a "general provision, not a fee schedule specific to H-1B petitions," Resp.Br.23-24, the government does not explain why that matters given Section 1356(m) is the *sole* source of the Executive's fee-setting authority for *any* visa program and given Congress *did* establish several H-1B-specific fees.

Second, the government repeats the canard that Section 1356(m) implies no limitation because it (1) uses the word "may" and (2) was enacted to replace an appropriations-funded structure. Resp.Br.23-24. But the word "may" "does not lead to the conclusion that [the statute] permits *everything*." *Halverson v. Slater*, 129 F.3d 180, 187 (D.C. Cir. 1997); Br.27-28. And the fact that Congress delegated *limited* fee-setting authority when it switched from an appropriation-funded system supports Appellants' point, not the government's. Br.28-29.

8

Third, the government claims the Proclamation is consistent with the H-1B-specific fee scheme either as an "other fee[] authorized by law" or because the statutory fees do not "address the particular harms stated in the Proclamation." Resp.Br.24. The first response is question-begging; the fee is not authorized by law. Br.34-47; *infra* pp.11-17. The second response is meritless, as "Congress has stepped into the space and solved" the problems of what an H-1B visa should cost and how to address program abuse. *Hawaii*, 585 U.S. at 691; Br.24-29. The Executive is not free to displace that judgment because it prefers a radically different solution.

Finally, the government protests that the Proclamation does not "override these precise fees." Resp.Br.25. The seeming upshot is that, so long as an Executive exaction addressing the same issue as a statutory fee merely adds to the existing fee, rather than "fully displac[ing]" it, Resp.Br.22, there is no conflict. That is a fallacy. Congress decided that the cost of an H-1B visa should be the sum of the fees imposed by Congress, plus cost-recovery fees promulgated by regulation under Section 1356(m). By going well beyond cost-recovery and intentionally dwarfing the fees Congress authorized to depress H-1B hiring, the Proclamation "countermand[s] Congress's considered policy judgments." *Hawaii*, 585 U.S. at 688.[1]

---

[1]   The Proclamation's temporary nature is immaterial, Resp.Br.25, because all Section 212(f) proclamations must be temporary. *Hawaii*, 585 U.S. at 687.

2.    ***The Proclamation conflicts with the H-1B eligibility requirements.***

The Proclamation also effectively rewrites the H-1B program's eligibility criteria, using the $100,000 fee to impose such "high[] costs" that it will "permit[] companies to hire" only "the best of the best temporary foreign workers." JA169; *see* Br.29-34. Congress, by contrast, intentionally did not limit H-1B visa eligibility to "exceptional" or "extraordinary" candidates, unlike other programs, *e.g.*, 8 U.S.C. §§ 1153(b)(1)(A), (b)(2)(A), and used a first-come-first-served approach to allocate slots while exempting certain workers from the cap altogether. *See id*. §§ 1184(g)(3), (5)(C); *see* Br.30-32.

The government claims "the Proclamation makes no changes to [these] statutory requirements" because "entry level aliens can still petition" and the Proclamation "does not change the caps." Resp.Br.25. But the question is not whether the Proclamation purports to line-edit the U.S. Code; it is whether Congress has made a "considered policy judgment[]" on the specific issue the Proclamation addresses. *Hawaii*, 585 U.S. at 688. The Proclamation explains—as a matter of formal findings, not "rhetoric" (*contra* Resp.Br.25)—that it intends to solve the "problem" of "large-scale" use of foreign labor by "impos[ing] higher costs" so companies will petition only for the "best of the best." JA169. Congress could have adopted that approach

but instead struck a different balance. The resulting statutory scheme represents the "particular means" by which Congress's ends are to be achieved. *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012).

### C.    Congress has not authorized the Proclamation's exercise of Congress' taxing power.

***Section 212(f).*** The Proclamation's exaction is not, as a matter of ordinary English, a "restriction[]" "on the entry of aliens." 8 U.S.C. § 1182(f). It is a *tax* that does not prevent the entry of any noncitizen but demands payment for *U.S. employment* from *U.S. employers*. The government does not deny that its theory—that Section 212(f) authorizes the fee because covered noncitizens literally "cannot enter" "unless the payment is made," Resp.Br.29—would authorize a shocking array of regulations, including a $1 million fee, or a fee pegged to the income or net worth of U.S. relatives or associates, among others, Br.42-43. As the government concedes, its theory would render these measures lawful because they "rely on restrictions on the entry of aliens," as the government defines it. Resp.Br.33. That concession means, contra the government, this "parade of horribles *is* … before this Court." *Id.* (emphasis added). The question is: Does Section 212(f) convey this near-unlimited authority?

Fortunately, these horrible results are not statutorily authorized, as Section 212(f)'s text shows. Section 212(f)'s authority to "suspend" or impose "restrictions" on entry does not by its terms confer the power to impose

11

"taxes," "duties," "imposts," or other such charges. That plain-text limita-tion, reinforced by clear-statement requirements, *supra* pp.3-6, is disposi-tive. And Section 212(f)'s "sphere" is "admissibility," not taxation—or even "visa issuance," which the Proclamation also regulates. *Hawaii*, 585 U.S. at 695. Nor does the word "any"—which the government features, Resp.Br.18-19, 28—change matters. It does not authorize charges, like the one here, that are not "restrictions" "on the entry of aliens" but allow any alien to enter as long as a U.S. taxpayer is willing to pay the sizable bill. Br.38.

Much of the government's brief reduces to a greater-includes-the-lesser argument: Because the President could bar covered noncitizens from entering altogether, he may condition entry on a fee. Resp.Br.29. But that conclusion does not follow. Our entire tradition, from the Boston Tea Party to the present, teaches that the power to tax Americans is different and no "lesser" a power. It "is the one great power upon which the whole national fabric is based," *Nicol v. Ames*, 173 U.S. 509, 515 (1899), and over which we fought a Revolution, Declaration of Independence, 1 Stat. 1, 2 (1776). And it is the sole power in Article I that must be initiated by the People's Repre-sentatives in the House. U.S. Const. art. I, § 7, cl. 1. Greater-includes-the-lesser arguments are wholly misplaced when the supposedly included power

12

is the most jealously guarded of all. *E.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 511 (1996).[2]

Nor does the government grapple with how its position would destroy the INA's detailed balance. The point is not just that the INA expressly addresses fees elsewhere. *Supra* pp.8-9. It is that the same 1952 INA that created Section 212(f) elsewhere outlined a specific schedule of visa- and entry-related fees for immigrants and granted the Secretary of State cabined discretion to set fees for nonimmigrants. Pub. L. 82-414, § 281, 66 Stat. at 230-231. The government does not explain why the Congress that so carefully limited this authority would have granted the President unlimited power to do the same thing. Nor does the government reconcile its assertion of uncabined authority with 8 U.S.C. § 1184(a)(1), which conveys limited authority to impose bonds and conditions on entry, and which its position also makes irrelevant. *See* Br.38-39. Although the government emphasizes that Section 212(f) authorizes only "temporary measure[s]," Resp.Br.3, that distinction is no help because the government resists any enforceable time

---

[2]  Appellants' position does not imply that "no visa that relies on a domestic sponsor could ever be restricted because it would impact domestic entities." *Contra* Resp.Br.32. Proclamations targeting specific visa programs indeed raise significant questions, given visa programs are bound up with domestic conduct and embody Congress's statutory policy. But because this case involves a *tax* on U.S. entities, those are questions for another day.

limit on the length of its Section 212(f) proclamations, and its Section 215(a)(1) authority is not time-restricted at all.

The government's response to the tariff cases is telling. Those cases hold that a statute granting the President power to "regulate" the importation of goods "does not in and of itself imply the authority to impose tariffs" on imports—particularly when a broader interpretation would upend the specific limits imposed where Congress *did* confer that authority. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1332 (Fed. Cir. 2025); *see Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209, 222-26 (D.D.C. 2025). And they apply the rule that "when Congress delegates [the taxing] power in the first instance, it does so clearly and unambiguously." 149 F.4th at 1332. The government responds that those cases involve a different statute. But the statutes are the same in the one way that matters: Neither authorizes the imposition of taxes. And although those cases are "actively being litigated," Resp.Br.34-35, they are persuasive authority until the Supreme Court rules. Even if the Supreme Court reversed, that would not be dispositive here, for the reasons set out above.

The government never disputes that no President has ever invoked Section 212(f) to impose a tax, much less one on U.S. businesses for domestic activity, or that the failure to assert such a highly attractive power speaks

volumes. *See West Virginia v. EPA*, 597 U.S. 697, 725 (2022). The government halfheartedly objects that no president has faced "harms that could readily be corrected by a payment." Resp.Br.33. That is a strange suggestion. Complaints about the H-1B program are nothing new, and restricting entry via enormous fees would have been a potential option to mitigate all manner of policy concerns addressed by past proclamations—including COVID-driven labor-market disruptions,[3] burdens on healthcare from uninsured noncitizens,[4] conduct of foreign governments,[5] or a wave of asylum applications.[6]

The major-questions doctrine reinforces this conclusion. The government's claim that the power asserted in the Proclamation is not major because it "only applies (1) temporarily to (2) aliens (3) whose entry would be (4) detrimental to the United States," Resp.Br.33, cannot be squared with the rest of its brief, which advances the maximalist position that Section 212(f) contains no real limits (and only the President decides those lim-

---

[3]  *See* Proclamation No. 10014, 85 Fed. Reg. 23441 (Apr. 27, 2020); Proclamation No. 10052, 85 Fed. Reg. 38263 (June 25, 2020).

[4]  *See* Proclamation No. 9945, 84 Fed. Reg. 53991 (Oct. 9, 2019).

[5]  *See Hawaii*, 585 U.S. at 693.

[6]  *See* Proclamation No. 9822, 83 Fed. Reg. 57661 (Nov. 15, 2018); Proclamation No. 10773, 89 Fed. Reg. 48487 (June 7, 2024).

its). And even if the major-questions doctrine applies differently "in 'the national security or foreign policy contexts,'" Resp.Br.32 (quoting *FCC v. Consumers' Rsch.*, 606 U.S. 656, 706-07 (2025) (Kavanaugh, J., concurring)), this case is not about foreign policy but concerns a domestic tax on U.S. entities based on U.S. conduct.[7]

***Section 215(a).*** For much the same reasons, there is no merit to the government's fallback argument that Section 215(a)(1) separately authorizes the Proclamation. The government does not dispute that no President has ever invoked that provision to promulgate an entry restriction unauthorized by Section 212(f). And the power to impose "reasonable rules, regulations, and orders" governing "ent[ry]," 8 U.S.C. § 1185(a)(1), is not the power to tax domestic entities or to rewrite Congress's visa programs. Indeed, it is hard to see how the government finds a clear statement authorizing Executive taxation in a provision that it says "provides no baseline or metric," Resp.Br.39, for the President's exercise of power.

---

[7] Appellants did not forfeit their major-questions argument. Resp.Br.32.n.4. Appellants below devoted a page in their opening brief to this argument, the government responded, and Appellants devoted another page in reply—citing the doctrine's classic cases. Dkt.18-1, at 26-27; Dkt. 36 at 33; Dkt. 48 at 15. Moreover, the doctrine provides another arrow in the statutory-interpretation quiver, *see Biden v. Nebraska*, 600 U.S. 477, 511-20 (2023) (Barrett, J., concurring), and the statutory-interpretation question was front and center below.

The government claims that Section 215(a)(1) cannot be narrower than Section 212(f) because that "would impermissibly render [it] superfluous." Resp.Br.19. But the provisions simply address different subjects: Section 212(f) conveys power to suspend or restrict entry and so add new categories of noncitizens to the list of "Inadmissible aliens." 8 U.S.C. § 1182. Section 215(a)(1) governs the more specific subject of travel control—procedures at the border, travel documents, and the like. And tellingly, the government nowhere argues that Section 215(a)(1) is broader than travel control. Nor could it, given the textual, structural, and historical evidence demonstrating this narrow focus—which the government ignores. Br.45-47.

The government's only response is that the Proclamation is a "travel control" provision or a "regulation … on … travel document[s]" because the President has declared certain noncitizens cannot enter unless domestic employers pay the fee. Resp.Br.20-21. But if that makes the Proclamation a Section 215(a)(1) border-control procedure, then, like the government's construction of Section 212(f), Section 215(a)(1) would swallow much of the rest of the INA (and, indeed, Section 212(f) itself).

## II.    APPELLANTS' CLAIMS ARE JUSTICIABLE.

### A.    Consular nonreviewability is inapplicable.

Precedent forecloses the government's consular-nonreviewability argument. Resp.Br.35-37. That precedent includes not just *Pietersen v. U.S.*

17

*Department of State*, 138 F.4th 552, 560 (D.C. Cir. 2025), but decades of caselaw before, *e.g.*, *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985); *Castaneda-Gonzalez v. INS*, 564 F.2d 417, 428 n.25 (D.C. Cir. 1977). The government's distinction—that these cases involved agencies, not "a presidential Proclamation," Resp.Br.37—is a red herring. The government would be the first to insist that every consular official is exercising the President's executive power, as the government itself says, when consular nonreviewability applies, "it can apply to any executive official involved in entry determinations." Resp.Br.36 n.5. Presidential involvement does not transform a "forward-looking challenge[] to the lawfulness of" a policy (which may proceed) into a retrospective challenge to an individual determination (forbidden). *Pietersen*, 138 F.4th at 560.

The government's cases—unlike this one—involved challenges to individual determinations. *See Muñoz,* 602 U.S. at 908; *Knauff*, 338 U.S. at 543. *Fiallo v. Bell*, for its part, did not involve consular nonreviewability at all. 430 U.S. 787 (1977). The government argues that *Pietersen* was wrong, Resp.Br.37 n.6, but this Court must follow it. And *Pietersen* is entirely correct. Consular nonreviewability avoids putting courts in the difficult position of ordering the admission of a specific alien the Executive wants to exclude. Such concerns are not implicated here.

18

### B.      Appellants properly seek both *ultra vires* and APA contrary-to-law review.

Appellants have both *ultra vires* and APA causes of action. The government's contrary arguments lack merit.

### 1.      *Ultra vires review is available.*

The government's claim that "it is doubtful that *ultra vires* review is available to challenge presidential actions," Resp.Br.37, runs headlong into *Chamber of Commerce v. Reich*, which explained that it is "well established" that "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." 74 F.3d 1322, 1328 (D.C. Cir. 1996). The government never even acknowledges *Reich*, even though it is binding and forecloses most of the government's justiciability arguments. Br.49-51. Meanwhile, the stay opinion in *American Foreign Service Association v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam), which the government cites, merely expressed doubt that *ultra vires* injunctive relief lies *directly against the President*, which is not at issue here. *Cf. Swan v. Clinton*, 100 F.3d 973, 989 (D.C. Cir. 1996) (Silberman, J., concurring) (emphasizing that the judiciary possesses sufficient flexibility and creativity to fashion injunctive relief against Executive officials without directly enjoining the President).

*Reich* thoroughly debunks the government's argument that *ultra vires* review is unavailable because Sections 212(f) and 215(a) "commit[] the decision to the [President's] discretion." Resp.Br.37-40 (citing *Dalton v. Specter*, 511 U.S. 462, 474 (1994)). *Dalton* merely holds "that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Reich*, 74 F.3d at 1331. Appellants do not challenge the Proclamation as an "abuse of discretion." This case thus is entirely unlike *Webster v. Doe,* 486 U.S. 592, 600 (1988), which deemed nonreviewable the CIA Director's discretionary decision that a termination was "advisable in the interests of the United States." Appellants' argument is instead about (to use the government's phrase) "a want of [Presidential] power," Resp.Br.40 (quoting *Dalton*, 511 U.S. at 476)—namely, that Sections 212(f) and 215(a)(1) do not authorize the Proclamation. That is reviewable, as *American Forest Resource Council v. United States* confirms. 77 F.4th 787, 797 (D.C. Cir. 2023). The government's attempted distinction—that the statute there contained limits that Sections 212(f) and 215(a)(1) do not, Resp.Br.38—is just a rerun of its merits argument.

*Reich* likewise forecloses the government's argument, Resp.Br.42-44, that a heightened standard governs. Per *Reich*, a heightened standard ap-

20

plies only where some aspect of the statutory scheme "implied[ly] pre-clu[des]" judicial review. 74 F.3d at 1330. *NRC* applied that same rule, declining to authorize *ultra vires* review as "an easy end-run around the limitations of the Hobbs Act." 605 U.S. at 681. The government's only other case, *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), likewise involved implied preclusion: where "Congress … craft[ed] a complex scheme" under the Impoundment Control Act, Congress did not intend to "provide a backdoor for citizen suits to enforce" the statute, *id.* at 19-20. There is no such implied preclusion here. Nor is there anything to the government's citation-free suggestion, Resp.Br.42-43, that when Congress delegates broad power, it has impliedly precluded review of the *limits* on that delegation—a bizarre claim flouting the "strong presumption that Congress did not mean to prohibit all judicial review of [Executive] decision[s]," *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975).

The Proclamation, moreover, is unlawful under any standard. Appellants do not allege a "routine error in statutory interpretation." Resp.Br.43. They claim the Proclamation goes far beyond the President's powers to restrict and regulate entry—by rewriting a congressionally enacted visa program and imposing a tax. Because neither Section 212(f) nor 215(a)(1) provides the necessary clear statement, the Proclamation is "obviously beyond the terms of the statute[s]" invoked and "far outside the scope of the task

21

that Congress gave [the President].” *Id.* (quoting *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020)).

### 2.    *APA review is available.*

*Reich* also rejected the government's argument that “[m]ere agency implementation of a presidential proclamation cannot be challenged” under the APA, Resp.Br.44-46. *Reich* doubted whether the fact that “regulations are based on the President's Executive Order … insulate[s] them from judicial review under the APA, even if the validity of the Order were thereby drawn into question.” 74 F.3d at 1327. That conclusion follows from the APA's text, which directs that “reviewing court[s] *shall* . . . hold unlawful and set aside agency action . . . not in accordance with law.” 5 U.S.C. § 706(2)(A) (emphasis added); *see id.* § 706(2)(C).

Because Appellants challenge agency action, the government gets nowhere by saying “the President is not an agency, and his actions are not subject to APA review.” Resp.Br.44. True, litigants cannot challenge the President's actions as *arbitrary and capricious. See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (“[W]e hold that [presidential actions] are not reviewable *for abuse of discretion* under the APA.” (emphasis added)). But because Appellants do not seek arbitrary-and-capricious review of *the President's actions*, this case would not “circumvent *Franklin*.” Resp.Br.45.

The government's district-court cases extend *Franklin* to hold that such review remains unavailable even when the President delegates discretionary authorities to agencies. *See Tulare County v. Bush*, 185 F. Supp. 2d 18, 29 (D.D.C. 2001); *Ancient Coin Collectors Guild v. CBP,* 801 F. Supp. 2d 383, 403 (D. Md. 2011); *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016). But none of those cases holds agency action that is contrary to statute unreviewable just because it originated with the President—a proposition that, especially paired with the government's *ultra vires* arguments, would permit the Executive Branch to flout statutory limitations with impunity.

The government fares no better arguing that the Proclamation's implementation is not "final agency action." Resp.Br.46-49. Defendants "have . . . been implementing" the Proclamation, Dkt.36 at 17 (for example, setting visa lottery dates),[8] and the guidance documents doing so "mark the 'consummation' of the agenc[ies'] decisionmaking process," determine "rights or obligations," and produce "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). No more is required, and the government simply invents the requirement that challengeable actions must reflect additional, independent "decision-making by the agencies." Resp.Br.47. An agency action

---

[8] USCIS, Press Release (Jan. 30, 2026), https://www.uscis.gov/newsroom/alerts/fy-2027-h-1b-cap-initial-registration-period-opens-on-march-4

can satisfy the "final agency action" requirements even if compelled by the President. *See Reich*, 74 F.3d at 1329.

And any claim that the APA disappears because agencies are "bound to abide by the President's directives," Resp.Br.47, would be the APA's death knell, particularly given the government's views on the unitary executive. *E.g.*, *Trump v. Slaughter*, No. 25-332 (U.S.), Reply Brief of Petitioner at 4. That is why "*Franklin* is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993). That is not true here, which is why the agencies needed to issue guidance directing implementation under their organic authorities. Br.52.

The government's claim that Appellants lack standing to challenge guidance narrowing the Proclamation, Resp.Br.48, is misdirection. Every application of the Proclamation represents the Secretary's withholding of an exception—exceptions that are nearly impossible to get only because DHS via guidance has *said so*, Dkt.45-3 at 7-8. Thus, even if "final agency action" required more than "merely" implementing the Proclamation, Resp.Br.44, such as independent "decision-making," Resp.Br.46, that requirement would be satisfied. The government's claim that "one must seek an exception for it to be denied," Resp.Br.46, is invented. And far from being

24

"waived," *id.*, Appellants made this argument nearly verbatim below. Dkt.48 at 30-31.[9]

Nor is there anything to the assertion that the Proclamation would continue to exist even if agency guidance "were vacated." Resp.Br.47. Agency officials today apply the Proclamation because this guidance instructs them to do so, and the APA authorizes injunctions against that guidance. 5 U.S.C. § 703; *see In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020) (similar). To the extent that the government suggests it would continue to apply the Proclamation even if this Court holds that its implementation is contrary to law, that startling claim only underscores why this Court should follow decades of precedent making clear that presidential actions are not free of legal constraints. *See* Resp.Br.47 ("Even if the memoranda were vacated, the Proclamation, which is lawful, would still exist and have the exact same impact on Plaintiffs.").

---

[9]   The government's cases, Resp.Br.47, provide no support. Three held *arbitrary-and-capricious* review unavailable where an agency implemented Presidential directives, *see Trump v. Orr*, 146 S. Ct. 44, 46 (2025); *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012); *Bradford v. United States DOL*, 101 F.4th 707, 731 (10th Cir. 2024), and a fourth addressed issues with no discernible application here, *Make The Rd. New York v. Wolf*, 962 F.3d 612, 633-34 (D.C. Cir. 2020). Of the two cases that *did* address finality, *Detroit International Bridge Co.* supports Appellants: en route to holding (irrelevantly here) that arbitrary-and-capricious review is unavailable, it noted that such action "undoubtedly" *is* "final." 189 F. Supp. 3d at 98. And *Sierra Club v. EPA* concerned guidance that authorities could "completely ignore." 955 F.3d 56, 65 (D.C. Cir. 2020).

Indeed, a district court in this Circuit entered APA injunctive relief against the implementation of a different Section 212(f) proclamation—prohibiting agencies from implementing that proclamation after vacating related guidance—for just that reason. *See RAICES v. Noem*, 793 F. Supp. 3d 19, 109-10 (D.D.C. 2025) (government "expressed doubt that an order merely setting aside the guidance would be effective" because the Proclamation would "continue to compel immigration officials to operate outside the ordinary bounds of the INA").

Finally, the government's "committed to agency discretion by law" argument, Resp.Br.49-50, merely repackages its merits and *Dalton* arguments and fails for the same reasons.

## III. PROMPT INJUNCTIVE OR SET-ASIDE RELIEF IS IMPERATIVE.

The Court should direct entry of injunctive relief. The traditional equitable factors support it; in particular, Appellants' members are irreparably harmed by the Proclamation's disruptions to recruitment and hiring. Br.53-58. An injunction is urgently needed, making remand inadequate.

The government says little against the robust authority holding irreparable harms to employers' inability to recruit talent or pursue their missions. *See* Br.55-56 (collecting cases). Nonetheless, it claims that there is no irreparable harm because members "can continue to recruit and retain H-1B talent as they had before," if they pay the $100,000 fee. Br.51-52. But

26

that is just the point: Many members cannot pay, as the record demonstrates. See Br.54-56 (collecting record evidence). The government cannot blink away this undisputed record evidence by calling it not "plausibl[e]." Resp.Br.51.

Nor is members' inability to pay the fee somehow "harm[] … of their own making." *Cf.* Resp.Br.52. *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012), involved failure to obtain a simple permit, not failure to remit an unauthorized $100,000-per-head payment designed to make the program prohibitively expensive. And members testified they cannot rely solely on "H-1Bs for aliens already within the country" or "Americans" (*Cf.* Resp.Br.52)—they have workforce gaps precisely because the domestic labor pool is inadequate.

The government argues that any harm is mere "economic loss" which is not irreparable. Resp.Br.51. But economic harm is irreparable where—as here—it is "highly unlikely that [the injured party] would be able to recover from the government its lost revenues." *Alcresta Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 5 (D.C. Cir. 2018) (per curiam); *see Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) ("loss of money" is irreparable "if the funds 'cannot be recouped'"). Appellants' claimed harm is not simply the payment of the $100,000 fee (which could potentially be recouped in an unlawful exaction claim), but the consequences for members'

recruitment and activities (for which there is no possible monetary remedy). Nor does the government acknowledge that economic harm is irreparable—as for GoRural—where it threatens a business's "very existence." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Finally, the government suggests that cap-subject employers cannot obtain relief because "this case is unlikely to be decided before the lottery occurs in March 2026." Resp.Br.52. True, many cap-subject employers may forgo the lottery absent relief. But others may enter the lottery in hopes that the $100,000 fee will be enjoined before the June 17 deadline. 8 C.F.R. § 214.2(h)(8)(iii)(D)(3). That is not the kind of "eligibility cutoff" at issue in the cases cited by the government. Resp.Br.52. (Moreover, the government's argument is wholly inapplicable to AAU's members, who are exempt from the cap.)

Nor is any harm speculative because of the lottery. *Cf.* Resp.Br.52. Some cap-subject members hire numerous H-1B workers (dozens or hundreds, *see* JA83)—so their success, on at least some of their entries, is practically certain. Further, "the lost opportunity to obtain" H-1B visas is itself cognizable harm. *Nat'l Venture Cap. Ass'n v. Duke*, 291 F. Supp. 3d 5, 13-14 (D.D.C. 2017); *accord CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989).

28

The government claims the payment is "refundable" and thus "Plaintiffs that pay may have an adequate monetary remedy." Resp.Br.51. Its argument is disingenuous at best. As the government has explained, this potential refund is available only where the "visa is not ultimately awarded." Dkt.36 at 43. It is no recourse for an employer who pays the fee and receives a visa. Nor does the possibility of reimbursement do anything for an employer who cannot afford the fee. The government suggests narrowing any relief to members within this latter category, Resp.Br.51, but cites no authority for that novel proposition. The government's cited remedy would apply in, at most, limited circumstances that are not predictable. Injunctive relief encompassing all members is proper.

As for the remaining equitable factors, the government relies on the Proclamation's findings. Resp.Br.53-54. But the public interest always favors "having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The government, moreover, has no answer for the extensive evidence demonstrating the immense public benefits from the H-1B program as Congress designed it. Resp.Br.57.

Finally, remand would be wasteful and unnecessary under the circumstances. *Cf.* Resp.Br.50. This Court can issue an injunction without remand, *e.g., Wrenn v. D.C.*, 864 F.3d 650, 668 (D.C. Cir. 2017), and relief

must come swiftly to prevent ongoing harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 305 (D.C. Cir. 2006), is not to the contrary, as the Court acknowledged "the absence of legal findings does not necessarily preclude us from undertaking appellate review." 454 F.3d at 305. Although, there, "remand would … effect greater development of the remaining preliminary injunction factors," *id.*, here, the equities have been exhaustively briefed. Further delay will serve no purpose other than to inflict greater harm.

## CONCLUSION

The government's brief confirms that the Proclamation is a grave threat to the separation of powers. This Court should reverse the decision below, direct entry of summary judgment in Appellants' favor, and direct the issuance of prompt injunctive and set-aside relief.

Dated: February 6, 2026

Respectfully submitted,

/s/ *Paul D. Clement*
PAUL D. CLEMENT
JAMES Y. XI
JEFFREY C. THALHOFER
  *Clement & Murphy, PLLC*
  *706 Duke Street*
  *Alexandria, VA 22314*
  *(202) 742-8900*

/s/ *Paul W. Hughes*
PAUL W. HUGHES
ALEX BOOTA
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Appellants*
*Chamber of Commerce of*
*the United States of*
*America and Association*
*of American Universities*

DARYL L. JOSEFFER
  *U.S. Chamber Litigation Center*
  *1615 H Street NW*
  *Washington, DC 20062*
  *(202) 463-5337*

/s/ *Lindsay C. Harrison*
ADAM G. UNIKOWSKY
ELIZABETH HENTHORNE
ISHAN K. BHABHA
LINDSAY C. HARRISON
ZACHARY C. SCHAUF
  *Jenner & Block LLP*
  *1099 New York Avenue NW*
  *Suite 900*
  *Washington, DC 20001-4412*
  *(202) 637-6000*

*Counsel for Appellant Chamber of*
*Commerce of the United States of*
*America*

*Counsel for Appellant*
*Association of American*
*Universities*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 6,499 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: February 6, 2026          */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2026, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: February 6, 2026          */s/ Paul W. Hughes*