APPEAL,CLOSED,TYPE−C

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:25−cv−03675−BAH</u>

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA v. UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al
Assigned to: Judge Beryl A. Howell
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 10/16/2025
Date Terminated: 12/29/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA**

represented by **Alex Christopher Boota**
MCDERMOTT, WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
202−756−8998
Email: aboota@mwe.com
*ATTORNEY TO BE NOTICED*

**Daryl Langdon Joseffer**
U.S. CHAMBER OF COMMERCE
1615 H Street, NW
Washington, DC 20062
202−463−5495
Email: djoseffer@uschamber.com
*ATTORNEY TO BE NOTICED*

**Emmett Witkovsky−Eldred**
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202−756−8223
Email: ewitkovsky−eldred@mwe.com
*ATTORNEY TO BE NOTICED*

**Grace Wallack**
MCDERMOTT, WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
202−756−8503
Email: gwallack@mwe.com
*ATTORNEY TO BE NOTICED*

**Mary Schnoor**
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202−756−8181

1

Email: mschnoor@mwe.com
*ATTORNEY TO BE NOTICED*

**Sarah Patricia Hogarth**
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202−756−8354
Fax: 202−756−8087
Email: shogarth@mwe.com
*ATTORNEY TO BE NOTICED*

**Paul Whitfield Hughes , III**
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202−756−8988
Email: phughes@mwe.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ASSOCIATION OF AMERICAN**                represented by    **Lindsay C. Harrison**
**UNIVERSITIES**                                            JENNER & BLOCK LLP
                                                            1099 New York Avenue, NW
                                                            Suite 900
                                                            Washington, DC 20001−4412
                                                            (202) 639−6865
                                                            Email: LHarrison@jenner.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Paul Whitfield Hughes , III**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Adam Granich Unikowsky**
                                                            JENNER & BLOCK LLP
                                                            1099 New York Avenue, NW
                                                            Suite 900
                                                            Washington, DC 20001−4412
                                                            (202) 639−6041
                                                            Email: AUnikowsky@jenner.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Elizabeth Henthorne**
                                                            JENNER & BLOCK LLP
                                                            1099 New York Ave., NW
                                                            Suite 900
                                                            Washington, DC 20001
                                                            202−637−6367
                                                            Fax: 202−847−4005

Email: BHenthorne@jenner.com
*ATTORNEY TO BE NOTICED*

**Ishan Kharshedji Bhabha**
JENNER AND BLOCK, LLP
1099 New York Ave NW
Suite 900
Washington, DC 20001
202−637−6327
Email: ibhabha@jenner.com
*ATTORNEY TO BE NOTICED*

**Zachary Charles Schauf**
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001−4412
202−639−6025
Email: zschauf@jenner.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

UNITED STATES DEPARTMENT
OF HOMELAND SECURITY

represented by **Alexandra McTague**
U.S. DEPARTMENT OF JUSTICE
PO Box 868
Ben Franklin Station
Washington, DC 20044
202−718−0483
Email: alexandra.mctague2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn M. Girdharry**
U.S. DEPARTMENT OF JUSTICE
Immigration Litigation
Ben Franklin Station
P.O. Box 868
Washington, DC 20044
(202) 532−4807
Fax: (202) 305−7000
Email: glenn.girdharry@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
U.S. DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue
Suite 400

Washington, DC 20530−0001
202−514−4357
Email: tiberius.davis@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF STATE**                represented by  **Alexandra McTague**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn M. Girdharry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTI L. NOEM**
*in her official capacity as Secretary of Homeland Security*                represented by  **Alexandra McTague**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn M. Girdharry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO A. RUBIO**
*in his official capacity as Secretary of State*                represented by  **Alexandra McTague**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn M. Girdharry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)

4

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**TAMARA SANDERFIELD**          represented by   **TAMARA SANDERFIELD**
*Dr.*                                            11000 W. McNichols Rd.
                                                 Suite 323−1252
                                                 Detroit, MI 48221
                                                 918−480−3873
                                                 PRO SE

**Amicus**

**FEDERATION FOR AMERICAN**      represented by   **Matt A. Crapo**
**IMMIGRATION REFORM**                            FEDERATION FOR AMERICAN
                                                 IMMIGRATION REFORM
                                                 25 Massachusetts Ave., NW
                                                 Suite 330
                                                 Washington, DC 20001
                                                 571−435−3582
                                                 Fax: 202−387−3447
                                                 Email: mcrapo@fairus.org
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/16/2025 | 1 | COMPLAINT against UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE, KRISTI NOEM, and MARCO A. RUBIO ( Filing fee $ 405 receipt number ADCDC−12025448) filed by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Dept of Homeland Security, # 3 Summons to Dept of State, # 4 Summons to Noem, # 5 Summons to Rubio, # 6 Summons to USAO, # 7 Summons to AG)(Hughes, Paul) Modified docket text on 10/17/2025 (mg). (Entered: 10/16/2025) |
| 10/16/2025 | 2 | NOTICE of Appearance by Sarah Patricia Hogarth on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Hogarth, Sarah) (Entered: 10/16/2025) |
| 10/16/2025 | 3 | NOTICE of Appearance by Grace Wallack on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Wallack, Grace) (Entered: 10/16/2025) |
| 10/16/2025 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Hughes, Paul) (Entered: 10/16/2025) |
| 10/16/2025 |  | Case Assigned to Judge Beryl A. Howell. (zmtm) (Entered: 10/16/2025) |
| 10/16/2025 | 5 | SUMMONS (6) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 10/16/2025) |
| 10/17/2025 | 6 | STANDING ORDER. Signed by Judge Beryl A. Howell on October 17, 2025. (lcbah4) (Entered: 10/17/2025) |

| 10/23/2025 | 7 | NOTICE of Appearance by Daryl Langdon Joseffer on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Joseffer, Daryl) (Entered: 10/23/2025) |
|---|---|---|
| 10/24/2025 | 8 | AMENDED COMPLAINT against All Defendants filed by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ASSOCIATION OF AMERICAN UNIVERSITIES. (Attachments: # 1 Exhibit)(Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 9 | NOTICE of Appearance by Adam Granich Unikowsky on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Unikowsky, Adam) (Entered: 10/24/2025) |
| 10/24/2025 | 10 | NOTICE of Appearance by Elizabeth Henthorne on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Henthorne, Elizabeth) (Entered: 10/24/2025) |
| 10/24/2025 | 11 | NOTICE of Appearance by Ishan Kharshedji Bhabha on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Bhabha, Ishan) (Entered: 10/24/2025) |
| 10/24/2025 | 12 | NOTICE of Appearance by Lindsay C. Harrison on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Harrison, Lindsay) (Entered: 10/24/2025) |
| 10/24/2025 | 13 | NOTICE of Appearance by Zachary Charles Schauf on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Schauf, Zachary) (Entered: 10/24/2025) |
| 10/24/2025 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/17/2025. Answer due for ALL FEDERAL DEFENDANTS by 12/16/2025. (Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARCO A. RUBIO served on 10/23/2025 (Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF HOMELAND SECURITY served on 10/22/2025 (Attachments: # 1 Exhibit Certified Mail Receipt, # 2 Exhibit USPS Tracking and Proof of Delivery)(Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 17 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KRISTI NOEM served on 10/22/2025 (Attachments: # 1 Exhibit Certified Mail Receipt, # 2 Exhibit USPS Tracking and Proof of Delivery)(Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 18 | MOTION for Preliminary Injunction *or, in the alternative*, MOTION for Summary Judgment by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Exhibit Index of Exhibits, # 4 Declaration Shen, # 5 Declaration Daniels, # 6 Declaration Poser, # 7 Declaration Snyder, # 8 Declaration CMU, # 9 Declaration UIUC, # 10 Declaration Hopkins, # 11 Declaration Michigan, # 12 Declaration Minnesota, # 13 Declaration Pitt, # 14 Declaration Utah, # 15 Declaration WashU, # 16 Declaration Wisconsin, # 17 Declaration Gonzales, # 18 Declaration Hughes, # 19 Exhibit 1 − Proclamation, # 20 Exhibit 2 − USCIS Memo, # 21 Exhibit 3 − USCBP Memo, # 22 Exhibit 4 − USDOS FAQ, # 23 Exhibit 5 − USCIS H−1B Website, # 24 Exhibit 6 − USCIS Fee Schedule, # 25 Exhibit 7 − FWD.us Article, # 26 Exhibit 8 − Chamber − Labor Shortag, # 27 Exhibit 9 − AAMC Article, # 28 Exhibit 10 − Kahn Article, # 29 Exhibit 11 − AIC Article, # 30 Exhibit 12 − Peri Article, # 31 Exhibit 13 − Mahajan Article, # 32 Exhibit 14 − Jiang Article, # 33 Exhibit 15 − Morales Article, # 34 Exhibit 16 − Gunadi |

| | | |
|---|---|---|
| | | Article, # <u>35</u> Exhibit 17 − Chamber Litigation Center, # <u>36</u> Exhibit 18 − Chamber − Immigration, # <u>37</u> Exhibit 19 − Chamber Comment 1, # <u>38</u> Exhibit 20 − Chamber Comment 2, # <u>39</u> Exhibit 21 − Almasalkhi Article, # <u>40</u> Exhibit 22 − NASEM Excerpt, # <u>41</u> Exhibit 23 − Nowrasteh Article, # <u>42</u> Exhibit 24 − Zakrewski Article, # <u>43</u> Exhibit 25 − Chamber − America Works Initiative, # <u>44</u> Exhibit 26 − USCIS Registrations, # <u>45</u> Exhibit 27 − Dimmock Article, # <u>46</u> Exhibit 28 − Santamaria CRS Report, # <u>47</u> Text of Proposed Order)(Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | <u>19</u> | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ASSOCIATION OF AMERICAN UNIVERSITIES (Harrison, Lindsay) (Entered: 10/24/2025) |
| 10/24/2025 | <u>20</u> | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF STATE served on 10/23/2025 (Attachments: # <u>1</u> Exhibit Certified Mail Receipt, # <u>2</u> Exhibit USPS Tracking and Proof of Delivery)(Hughes, Paul) (Entered: 10/24/2025) |
| 10/27/2025 | <u>21</u> | NOTICE of Appearance by Alexandra McTague on behalf of All Defendants (McTague, Alexandra) (Entered: 10/27/2025) |
| 10/27/2025 | <u>22</u> | MOTION to Stay re <u>18</u> MOTION for Preliminary Injunction *or, in the alternative* MOTION for Summary Judgment by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # <u>1</u> Proposed Order)(McTague, Alexandra) (Entered: 10/27/2025) |
| 10/28/2025 | <u>23</u> | Memorandum in opposition to re <u>22</u> MOTION to Stay re <u>18</u> MOTION for Preliminary Injunction *or, in the alternative* MOTION for Summary Judgment filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # <u>1</u> Text of Proposed Order)(Hughes, Paul) (Entered: 10/28/2025) |
| 10/28/2025 | <u>24</u> | Cross MOTION for Briefing Schedule by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # <u>1</u> Text of Proposed Order)(Hughes, Paul) (Entered: 10/28/2025) |
| 10/29/2025 | <u>25</u> | REPLY to opposition to motion re <u>22</u> Motion to Stay, filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (McTague, Alexandra) (Entered: 10/29/2025) |
| 10/29/2025 | <u>26</u> | Memorandum in opposition to re <u>24</u> Cross MOTION for Briefing Schedule filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (McTague, Alexandra) (Entered: 10/29/2025) |
| 10/29/2025 | <u>27</u> | REPLY to opposition to motion re <u>24</u> Motion for Briefing Schedule filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Hughes, Paul) (Entered: 10/29/2025) |
| 10/29/2025 | | MINUTE ORDER (paperless), upon consideration of defendants' <u>22</u> Motion to Stay ("Defs.' Stay Mot."), plaintiffs' <u>23</u> Memorandum in Opposition to the Motion to Stay ("Pls.' Opp'n to Stay") and <u>24</u> Cross Motion for Briefing Schedule ("Pls.' Cross Mot. for Briefing Schedule"), defendants' <u>25</u> Reply in Support of Motion for Stay ("Defs.' |

Stay Reply") and 26 Memorandum in Opposition to Cross Motion for Briefing Schedule, and plaintiffs' 27 Reply in Support of Cross Motion to Set Briefing Schedule, DENYING defendants' 22 Motion to Stay and GRANTING IN PART and DENYING IN PART plaintiffs' 23 Cross−Motion for Briefing Schedule, both of which motions became ripe today, for the following reasons.

Defendants raise three principal reasons for why a stay of any briefing schedule is required, but none is persuasive. First, defendants argue that attorneys at the Department of Justice "are prohibited from working, even on a voluntary basis, except in very limited circumstances, including 'emergencies involving the safety of human life or the protection of property.'" Defs.' Stay Mot. &para 6 (quoting 31 U.S.C. &sect 1342). To the contrary, the Department of Justice's own Contingency Plan obliges employees to work "[i]f a court denies [a stay] request and orders a case to continue" because such order "would constitute express legal authorization for the activity to continue." FY 2026 Contingency Plan at 3 (Sept. 29, 2025), https://www.justice.gov/jmd/media/1377216/dl. Moreover, defendants contend that "the stay proceedings ordered by Chief Judge Boasberg[] applies to this case and is still in effect." Defs.' Stay Mot. &para 5 (citing D.D.C. Standing Order, No. 25−55 (Oct. 1, 2025) (Boasberg, C.J.)). Such reliance is misplaced. D.D.C. Standing Order, No. 25−55, imposes, by default, a stay of deadlines imposed upon the United States in a summary judgment action, and permits such deadlines to apply in individual cases by "further order of the Court," D.D.C. Standing Order No. 25−55, in the discretion of the presiding Judge.

Second, defendants contend that federal government attorneys will have difficulty communicating with other federal government employees of defendants, many of whom may be furloughed. Consequently, "because of the lapse in appropriations, the [defendants'] attorney has not been able to work with the appropriate agency counsel to determine whether and to what extent there may be an administrative record necessary for the Court to review and resolve this case." Defs.' Stay Reply &para 4. While appreciating that the federal government attorneys are furloughed and face challenges in responding to the pending substantive motion in this case given the lapse in federal appropriations and the furloughs of employees of the executive branch and its agencies, "good cause" for denial of stay may be found for reasons broader than an emergency posing imminent and irreparable harm, as defendants seem to urge. Defs.' Stay Reply &para 1 ("There is no emergency and this alone is good cause to stay the briefing at this time."). Even if the alleged direct harm from the presidential proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, Proclamation 10973, 90 Fed. Reg. 46207 (Sept. 19, 2025), does not manifest for some members within an association "until March 2026," Defs.' Stay Reply &para 1, other members of the Chambers of Commerce not subject to the H−1B visa cap and all of the Association of American Universities' members, do allege present harm and are entitled to prompt adjudication of their claims. Pls.' Opp'n to Stay 5−6. For instance, the Vice Chancellor for Clinical Affairs and CEO for Wash U Medicine at Washington University in St. Louis represented that the Department of Anesthesiology had planned to file an application for an H1−B visa to fill a vacancy during the week of September 21st and two more soon thereafter but for the proclamation. *See* Pls.' Opp'n to Stay 6 (citing ECF 18−15 &para 10 (Scheel Decl.)). In short, the executive branch cannot rely on the lapse of appropriations to insulate itself from meaningful judicial review sought by those who allege that the executive branch's continuing actions exceed constitutional limitations and frustrate their ability, as private entities, to make plans for talent recruitment and resource allocation.

Third, defendants contend that plaintiffs sought a preliminary injunction as "an effort to side step" D.D.C. Standing Order, No. 25−55, Defs.' Stay Mot. &para 5, and "to sandbag the government and force Defendants into a quick response using skeletal staff," Defs.' Stay Reply &para 1, by having to respond to both a preliminary injunction and a summary judgment motion during a lapse in appropriations. Defendants posit that "[i]t is not clear how the government should proceed in addressing Plaintiffs' combined motion&nbsp.&nbsp.&nbsp.&nbsp. Plaintiffs simply assume both should be addressed." Defs.' Stay Reply &para 3. To further their point, defendants claim that the harms alleged by plaintiffs "amount to either a U.S. employer's decision not to participate in a regulatory program or [to] pay a program fee−−neither of which is irreparable." Defs.' Stay Reply &para 1. To ameliorate defendants' concerns about the complexities of responding to two motions filed during a lapse in appropriations, and given the lack of any objection from the parties, the motion for a preliminary injunction will be converted to a motion for summary judgment on an expedited schedule.

Plaintiffs proposed a briefing schedule that would require defendants to file an opposition on November 10, 2025. Pls.' Cross Mot. for Briefing Schedule 11. Defendants request that, should the Court deny its motion for a stay, the deadline to submit an opposition shall be thirty days from the time of the order−−or November 28. Defs.' Stay Reply &para 5. The following SCHEDULING ORDER shall control further proceedings:

&nbsp &nbsp &nbsp &nbsp (1) By November 28, 2025, defendants shall file any opposition to plaintiffs' <u>18</u> Motion for a Preliminary Injunction or in the Alternative, Summary Judgment; and

&nbsp &nbsp &nbsp &nbsp (2) By December 8, 2025, plaintiffs shall file any reply;

&nbsp &nbsp &nbsp &nbsp (3) As necessary, any hearing will be set following completion of briefing on the pending summary judgment motion.

Signed by Judge Beryl A. Howell on October 29, 2025. (lcbah4) (Entered: 10/29/2025)

| | | |
|---|---|---|
| 10/30/2025 | | Set/Reset Deadlines: Defendant Opposition To Plaintiffs' <u>18</u> Motion for a Preliminary Injunction or in the Alternative, Summary Judgment Responses due by 11/28/2025. Plaintiffs Reply due by 12/8/2025. (mac) (Entered: 10/30/2025) |
| 11/13/2025 | <u>28</u> | MOTION to Intervene by TAMARA SANDERFIELD. (Attachments: # <u>1</u> Text of Proposed Order)(mg) (Entered: 11/17/2025) |
| 11/18/2025 | | MINUTE ORDER (paperless) DENYING <u>28</u> Motion to Intervene as Plaintiff of Tamara Sanderfield, which *pro se* motion was docketed on November 17, 2025, at 10:31 P.M., for failure to comply with Federal Rule of Civil Procedure 24(c) and D.D.C. Local Rule of Civil Procedure 7(j).<br><br>Federal Rule of Civil Procedure 24(c) requires that all motions for intervention "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Likewise, Local Rule of Civil Procedure 7(j) obliges "[a] motion to intervene as a party" to be "accompanied by an original of the pleading setting forth the claim or defense for which intervention is sought." Here, "[m]ovant has not filed such a pleading, and the Court could deny the motion based on that failure to comply with the federal rules alone." *Friends of the Earth v. U.S. Env't Prot. Agency*, No. 12−cv−363 (ABJ), 2012 WL 13054264, *2 |

| | | |
|---|---|---|
| | | (D.D.C. Apr. 11, 2012). Although "[d]ocuments filed by *pro se* litigants... are 'to be liberally construed,'" "even *pro se* litigants must comply with the Federal Rules of Civil Procedure." *Id.* at n.4 (first quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); and then quoting *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987)); *see also Hedrick v. Fed. Bureau of Investigation*, 216 F. Supp. 3d 84, 93 (D.D.C. 2016) ("[E]ven a pro se plaintiff must comply with the Federal Rules of Civil Procedure and this Court's local rules[.]"). For failure to comply with the federal rules and local rules, the <u>28</u> Motion to Intervene is denied. <br><br> Signed by Judge Beryl A. Howell on November 18, 2025. (lcbah4) Modified on 11/19/2025. (zalh) (Entered: 11/18/2025) |
| 11/24/2025 | <u>29</u> | MOTION for Extension of Time to File Response/Reply *to Motion for Summary Judgment (opposed)* by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # <u>1</u> Text of Proposed Order)(McTague, Alexandra) (Entered: 11/24/2025) |
| 11/25/2025 | <u>30</u> | Memorandum in opposition to re <u>29</u> MOTION for Extension of Time to File Response/Reply *to Motion for Summary Judgment (opposed)* filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # <u>1</u> Text of Proposed Order)(Hughes, Paul) (Entered: 11/25/2025) |
| 11/25/2025 | | MINUTE ORDER (paperless), upon consideration of defendants' <u>29</u> Motion for Extension of Time and plaintiffs' <u>30</u> Opposition to Defendants' Motion for Extension of Time, GRANTING IN PART and DENYING IN PART defendants' <u>29</u> motion; and ORDERING defendants to file any opposition to plaintiffs' <u>18</u> Motion for a Preliminary injunction or in the Alternative, Summary Judgment by December 1, 2025; and plaintiffs to file any reply by December 10, 2025. Signed by Judge Beryl A. Howell on November 25, 2025. (lcbah4) (Entered: 11/25/2025) |
| 11/26/2025 | | Set/Reset Deadlines: Defendants Opposition To Plaintiffs' <u>18</u> Motion for a Preliminary injunction or in the Alternative, Summary Judgment due by 12/01/2025. Plaintiffs Reply due by 12/10/2025. (mac) (Entered: 11/26/2025) |
| 11/26/2025 | <u>31</u> | NOTICE of Appearance by Tiberius T Davis on behalf of All Defendants (Davis, Tiberius) (Entered: 11/26/2025) |
| 12/01/2025 | <u>32</u> | NOTICE of Appearance by Glenn M. Girdharry on behalf of All Defendants (Girdharry, Glenn) (Entered: 12/01/2025) |
| 12/01/2025 | <u>33</u> | NOTICE of Appearance by Mary Schnoor on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Schnoor, Mary) (Entered: 12/01/2025) |
| 12/01/2025 | <u>34</u> | NOTICE of Appearance by Emmett Witkovsky−Eldred on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Witkovsky−Eldred, Emmett) (Entered: 12/01/2025) |
| 12/01/2025 | <u>35</u> | NOTICE of Appearance by Alex Christopher Boota on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Boota, Alex) (Entered: 12/01/2025) |
| 12/01/2025 | <u>36</u> | Memorandum in opposition to re <u>18</u> MOTION for Preliminary Injunction *or, in the alternative* MOTION for Summary Judgment filed by KRISTI NOEM, MARCO A. |

| | | |
|---|---|---|
| | | RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Statement of Facts, # 2 Declaration Jackson, # 3 Declaration McTague, # 4 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/01/2025) |
| 12/01/2025 | 37 | Cross MOTION for Summary Judgment by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Statement of Facts, # 2 Declaration Jackson, # 3 Declaration McTague, # 4 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/01/2025) |
| 12/01/2025 | 38 | MOTION Relief from LR 7(n) by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/01/2025) |
| 12/02/2025 | 39 | RESPONSE re 38 MOTION Relief from LR 7(n) filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Hughes, Paul) (Entered: 12/02/2025) |
| 12/02/2025 | 40 | Cross MOTION to Hold in Abeyance re 37 Cross MOTION for Summary Judgment , 38 MOTION Relief from LR 7(n) by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Hughes, Paul) (Entered: 12/02/2025) |
| 12/03/2025 | | MINUTE ORDER (paperless) DIRECTING, upon consideration of defendants' 38 Motion for Relief from Local Rule 7(n) and plaintiffs' 39 Opposition to Defendants' Motion for Relief from Local Rule 7(n) and Cross−Motion to Hold Defendants' Motion for Summary Judgment in Abeyance, defendants to file by December 4, 2025, at 2 P.M., any reply in support of its 38 motion for relief from Local Rule 7(n) and any opposition to plaintiffs' 39 cross−motion to hold defendants' motion for summary judgment in abeyance. Signed by Judge Beryl A. Howell on December 3, 2025. (lcbah4) (Entered: 12/03/2025) |
| 12/04/2025 | | Set/Reset Deadlines: Defendants Reply In Support Of Its 38 Motion For Relief From Local Rule 7(n) And Any Opposition To Plaintiffs' 39 Cross−Motion To Hold Defendants' Motion For Summary Judgment In Abeyance due by 12/4/2025. (mac) (Entered: 12/04/2025) |
| 12/04/2025 | 41 | Memorandum in opposition to re 40 Cross MOTION to Hold in Abeyance re 37 Cross MOTION for Summary Judgment , 38 MOTION Relief from LR 7(n) filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/04/2025) |
| 12/04/2025 | 42 | REPLY to opposition to motion re 38 Motion for Miscellaneous Relief *from LCvR 7(n)* filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/04/2025) |
| 12/04/2025 | | MINUTE ORDER (paperless) DENYING, upon consideration of defendants' 38 Motion for Relief from Local Rule 7(n) ("Defs.' Mot."), their 42 Reply to Opp'n to |

Mot. re Mot. for Misc. Relief ("Defs.' Reply"), and plaintiffs' <u>39</u> Opposition to Defendants' Motion for Relief from Local Rule 7(n) and Cross−Motion to Hold Defendants' Motion for Summary Judgment in Abeyance, defendants' <u>38</u> motion for relief from Local Rule 7(n); ORDERING defendants to file the administrative record by December 5, 2025; and DENYING, as moot and for failure to comply with Local Rule 7(m), plaintiffs' <u>39</u> cross−motion to hold defendants' motion for summary judgment in abeyance.

Local Rule 7(n) states that "[i]n cases involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record... *simultaneously* with the filing of a dispositive motion." D.D.C. Local Rule 7(n)(1) (emphasis added). Though filing a dispositive motion, *see* Defs.' <u>37</u> Cross Mot. for Summ. J., defendants declined to file a certified list of the contents of the administrative record, explaining that "[t]he administrative record is not required to resolve the pending motions" and that "there is no legitimate reason to burden the Defendants with production of an index of the administrative record at this time." Defs.' Mot. at 3, 5. The time for defendants to request such relief was before filing their dispositive motion. Further, production of the administrative record would not create a "burden" for defendants, given their representation that "because there is no final agency action, there is no record to produce." Defs.' Mot. at 5; *see also* Defs.' Reply at 6 ("These are not final agency actions requiring a record. Indeed, without a final agency action, there *is no record*." (emphasis original)). If no administrative record exists, defendants may easily say so.

Defendants' requests so far in this case have been amply accommodated. Plaintiffs' first dispositive motion was originally styled as a preliminary injunction, which would have provided defendants with just seven days to respond. *See* <u>18</u> Mot. for Prelim. Inj. or, in the Alternative, Mot. for Summ. J.; D.D.C. Local Rule 65.1(c). Defendants moved for the Court to stay, or, in the alternative, give them thirty days from the time of the Court's order to file their opposition, which motion was granted over plaintiffs' objection that defendants' time for response be limited to November 10, seventeen days after receiving the preliminary injunction. With the parties' consent, the Court converted the preliminary injunction into a motion for summary judgment and gave defendants the thirty days for which they had asked. *See* Minute Order (Oct. 29, 2025) ("To ameliorate defendants' concerns about the complexities of responding to two motions filed during a lapse in appropriations, and given the lack of any objection from the parties, the motion for a preliminary injunction will be converted to a motion for summary judgment on an expedited schedule."). Defendants subsequently requested an extension of their proposed and adopted deadline and, again over plaintiffs' objection, defendants were granted an additional three days to file opposition. *See* Minute Order (Nov. 25, 2025). During none of this prior briefing did defendants indicate that they did not intend to follow Local Rule 7(n), and they did not do so until they had already broken Local Rule 7(n) by filing a dispositive motion in this matter, without the required administrative record. Defendants are ORDERED to comply with Local Rule 7(n) by December 5, 2025.

Signed by Judge Beryl A. Howell on December 4, 2025. (lcbah4) (Entered: 12/04/2025)

| | |
|---|---|
| 12/05/2025 | Set/Reset Deadlines: Defendants Administrative Record due by 12/5/2025. (mac) (Entered: 12/05/2025) |

| 12/05/2025 | 43 | NOTICE of Appearance by Matt A. Crapo on behalf of FEDERATION FOR AMERICAN IMMIGRATION REFORM (Crapo, Matt) (Entered: 12/05/2025) |
| 12/05/2025 | 44 | Unopposed MOTION for Leave to File Amicus Brief by FEDERATION FOR AMERICAN IMMIGRATION REFORM. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit [Proposed] Order Granting Motion For Leave)(Crapo, Matt) (Entered: 12/05/2025) |
| 12/05/2025 | | MINUTE ORDER (paperless) GRANTING the Federation for American Immigration Reform's 44 Unopposed Motion for Leave to File Amicus Brief to which all parties consent. Signed by Judge Beryl A. Howell on December 5, 2025. (lcbah4) (Entered: 12/05/2025) |
| 12/05/2025 | 45 | NOTICE of Compliance with LCvR 7(n) and Court Order by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE (Attachments: # 1 Exhibit State, # 2 Exhibit CBP, # 3 Exhibit USCIS)(McTague, Alexandra) (Entered: 12/05/2025) |
| 12/05/2025 | 46 | AMICUS BRIEF by FEDERATION FOR AMERICAN IMMIGRATION REFORM. (mg) (Entered: 12/08/2025) |
| 12/05/2025 | 49 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: NICHOLAS HAYS, NON−PARTY'S Letter. Reason(s): Other− NON−PARTY. (mg) (Entered: 12/11/2025) |
| 12/10/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' request for a hearing, *see* Pls.' 18 Mot. for Preliminary Injunction *or, in the alternative*, MOTION for Summary Judgment at 2, and the fact that briefing on plaintiffs' pending motion and defendants' pending 37 Cross−Motion for Summary Judgment, will only be completed on December 17, 2025, due to extensions granted at defendants' request, *see* Minute Order (Oct. 29, 2025) (giving defendants thirty days to oppose plaintiffs' motion instead of the default of seven days provided by the local rules); Minute Order (Nov. 25, 2025) (granting defendants additional three days to file an opposition), the parties are DIRECTED to appear in Courtroom 26A for a hearing on the pending motions on December 19, 2025, at 10 A.M. Signed by Judge Beryl A. Howell on December 10, 2025. (lcbah4) (Entered: 12/10/2025) |
| 12/10/2025 | 47 | Memorandum in opposition to re 37 Cross MOTION for Summary Judgment filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Supplemental Declaration of Condrad Daniels, # 2 Response to Defendants' Statement of Material Facts, # 3 Text of Proposed Order)(Hughes, Paul) (Entered: 12/10/2025) |
| 12/10/2025 | 48 | REPLY to opposition to motion re 18 Motion for Preliminary Injunction,,,,,,,, Motion for Summary Judgment,,,,,,, filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Supplemental Declaration of Condrad Daniels, # 2 Response to Defendants' Statement of Material Facts, # 3 Text of Proposed Order)(Hughes, Paul) (Entered: 12/10/2025) |
| 12/11/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for December 19, 2025 at 10:00AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires |

| | | adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB). **Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 12/11/2025)** |
|---|---|---|
| 12/15/2025 | 50 | MOTION to Dismiss *Amended Complaint* by KRISTI L. NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/15/2025) |
| 12/16/2025 | | Set/Reset Hearings: Motion Hearing set for 12/19/2025 at 10:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 12/16/2025) |
| 12/17/2025 | 51 | REPLY to opposition to motion re 37 Motion for Summary Judgment, filed by KRISTI L. NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (McTague, Alexandra) (Entered: 12/17/2025) |
| 12/19/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 12/19/2025 re 18 Motion for Preliminary Injunction. The Court Heard Oral Arguments From The Parties. The Court Reserves Judgment. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 12/19/2025) |
| 12/23/2025 | 52 | TRANSCRIPT OF PROCEEDINGS before Judge Beryl A. Howell, held on 12−19−2025; Page Numbers: 1 − 112. Date of Issuance: 12−23−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/13/2026. Redacted Transcript Deadline set for 1/23/2026. Release of Transcript Restriction set for 3/23/2026.(Davila, Elizabeth) (Entered: 12/23/2025) |
| 12/23/2025 | 53 | ORDER DENYING plaintiffs' 18 Motion for Preliminary Injunction or, in the Alternative, Motion for Summary Judgment; GRANTING defendants' 37 Cross Motion for Summary Judgment; and DENYING as moot defendants' 50 Motion to Dismiss Amended Complaint. See Memorandum Opinion for further details. The Clerk of the Court is directed to close this case. Signed by Judge Beryl A. Howell on December 23, 2025. (lcbah4) (Entered: 12/23/2025) |
| 12/23/2025 | 54 | |

| | | |
|---|---|---|
| | | MEMORANDUM OPINION regarding plaintiffs' 18 Motion for Preliminary Injunction or, in the Alternative, Motion for Summary Judgment; defendants' 37 Cross Motion for Summary Judgment; and defendants' 50 Motion to Dismiss Amended Complaint. Signed by Judge Beryl A. Howell on December 23, 2025. (lcbah4) (Entered: 12/23/2025) |
| 12/29/2025 | 55 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 54 Memorandum & Opinion, 53 Order on Motion for Summary Judgment,, Order on Motion to Dismiss,, Order on Motion for Preliminary Injunction,,, by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. Filing fee $ 605, receipt number ADCDC−12156980. Fee Status: Fee Paid. Parties have been notified. (Hughes, Paul) (Entered: 12/29/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>                    Plaintiffs,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>                    Defendants. | Case No. 1:25-cv-3675-BAH |

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs Chamber of Commerce of the United States of America and Association of American Universities appeal to the United States Court of Appeals for the District of Columbia Circuit from the December 23, 2025, final order denying Plaintiffs' Motion for a Preliminary Injunction or, in the Alternative, Summary Judgment and granting Defendants' Cross-Motion for Summary Judgment (Dkt. No. 53), along with all other orders and decisions that merge therein, including the Court's memorandum opinion (Dkt. No. 54).

1

Dated:  December 29, 2025

/s/ *Lindsay C. Harrison*
Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of American Universities*

Respectfully submitted,

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Grace Wallack (Bar No. 1719385)
Alex Boota (Bar No. 90001014)
Emmett Witkovsky-Eldred (Bar No. 90012725)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 25-cv-3675 (BAH) |
| v. | Judge Beryl A. Howell |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

## **MEMORANDUM OPINION**

On September 19, 2025, the President signed a Proclamation adding a $100,000 payment requirement before processing employers' petitions for new H-1B visas. *See* Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sept. 19, 2025). The H-1B program has, for over three decades, permitted employers to bring nonimmigrant foreign workers into the United States to perform services in "specialty occupation[s]" requiring "highly specialized knowledge" and advanced education. *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(c)(1), (i)(1); *see also* Immigration Act of 1990, Pub. L. No. 101-649, § 205(c), 104 Stat. 4978, 5020 (1990) (creating the H-1B program). In response to the Proclamation, plaintiffs the Chamber of Commerce of the United States (the "Chamber")—the world's largest business federation with approximately 300,000 direct members—and the Association of American Universities ("AAU")—an organization representing 69 U.S.-based research universities—filed this instant action.

Plaintiffs assert two claims against defendants, the Department of Homeland Security ("DHS"), the Department of State, and their respective Secretaries: first, that the Proclamation and its implementation are *ultra vires*, as beyond defendants' legal authority, Am. Compl. ¶¶ 190-196,

1

ECF No. 8; and second, that the Proclamation's *implementation* violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, *id.* ¶¶ 197-206.  As support for their claims, plaintiffs also expend considerable ink extolling the benefits to the country from H-1B workers, arguing that "[t]hese workers contribute enormously to American productivity, prosperity, and innovation."  *Id.* ¶ 64; *see also id.* ¶¶ 63-79, 93-102.  The H-1B program, plaintiffs assert, helps hospitals, universities, and firms in manufacturing and science, technology, engineering and mathematics (STEM) fields overcome purported domestic labor shortages, *id.* ¶¶ 66-68; creates domestic jobs by "allow[ing] American employers to continue basing individual operations or offices in the United States," *id.* ¶ 69 (citation omitted); results in "higher rates of new product innovation," *id.* ¶ 72; enables the "manufacturing sector to be competitive on the global stage," *id.* ¶ 76 (internal quotation marks omitted); and "has a positive effect on American trade with foreign nations," *id.* ¶ 77 (citation omitted).

Now pending before the Court, on an expedited basis, are three motions: plaintiffs have moved for summary judgment, Pls.' Mot. for Prelim. Inj. or, in the Alternative, Mot. for Summ. J. ("Pls.' Mot."), ECF No. 18, and defendants have both cross-moved for summary judgment, Defs.' Cross Mot. for Summ. J., ECF No. 37, and, most recently, to dismiss plaintiffs' complaint for failure to state a claim, Defs.' Mot. to Dismiss, ECF No. 50.

Defendants have the stronger position.  The lawfulness of the Proclamation and its implementation rests on a straightforward reading of congressional statutes giving the President broad authority to regulate entry into the United States for immigrants and nonimmigrants alike. As instructed by binding precedent, when the executive "exercises authority expressly delegated to it by Congress[,] it is at the zenith of its powers."  *Am. Trucking Ass'ns, Inc. v. United States*, 627 F.2d 1313, 1320 (D.C. Cir. 1980); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343

2

U.S. 579, 635 (1952) (Jackson, J., concurring in the judgment and opinion of the Court) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."). Here, the Proclamation was issued pursuant to such an express statutory grant of authority to the President and, as such, is not *ultra vires*. The lawfully authorized nature of the Proclamation, which directed immediate implementation, carries over to the limited, ministerial actions taken to date by defendants to comply with its terms and, as such, those actions are not in violation of the APA.

To be clear, this decision in favor of defendants is not to dismiss or discount the past and ongoing contributions of H-1B workers to the American economy that plaintiffs highlight. Important as those contributions may be, the effects of the H-1B program on the American economy or national security, whether positive or negative, are simply not at issue in this case. The Supreme Court has long maintained that matters of economic and foreign policy are generally entrusted to the political branches of government and "rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981); *see also Green v. Frazier*, 253 U.S. 233, 240 (1920). Here, Congress has decided to delegate broad power to the President to restrict entry of noncitizens "[w]henever the President finds that" such entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f); *see also* 8 U.S.C. § 1185(a) (similarly conferring on the President broad authority to "order[]" restrictions and prohibitions on entry and to adopt "reasonable rules, regulations, and orders" governing entry or removal of noncitizens). The President, in turn, has exercised the discretion Congress gave him to find that the Proclamation is "necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of the program while still permitting companies to hire the best of the best

temporary foreign workers."  Proclamation, 90 Fed. Reg. at 46028.  Among other findings, the
President explained that "[t]he high numbers of relatively low-wage workers in the H-1B
program . . . are detrimental to American workers' wages and labor opportunities, especially at the
entry level, in industries where such low-paid H-1B workers are concentrated," and "present[s] a
national security threat by discouraging Americans from pursuing careers in science and
technology." *Id.*  The parties' vigorous debate over the ultimate wisdom of this political judgment
is not within the province of the courts—so long as the actions dictated by the policy decision and
articulated in the Proclamation fit within the confines of the law, the Proclamation must be upheld.

Accordingly, for the reasons explained more fully below, plaintiffs' motion for summary
judgment is denied, *see* ECF No. 18, defendants' cross-motion for summary judgment is granted,
*see* ECF No. 37, and defendants' motion to dismiss is denied as moot, *see* ECF No. 50.

## I.    BACKGROUND

Set out below is an overview of the relevant statutory framework for resolving the parties'
pending cross-motions for summary judgment and defendants' pending motion to dismiss,
followed by the factual and procedural background for this case.

### A.    The Executive's Broad Authority Under the INA

Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, noncitizens
wishing to enter the United States typically must have a valid visa or other travel document.  *See*
8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203.  In addition to presenting a valid visa, the
noncitizen must separately also be found admissible upon inspection at a port of entry.  *See* 8
U.S.C. §§ 1201(h), 1185(d), 1225(a); *see* 8 U.S.C. § 1101(a)(4).

"The INA establishes numerous grounds on which an alien abroad may be inadmissible to
the United States and ineligible for a visa."  *Trump v. Hawaii*, 585 U.S. 667, 683 (2018); *see, e.g.*,
8 U.S.C. §§ 1182(a), 1201(g).  Congress has also accorded the President "broad discretion to

4

suspend the entry of aliens into the United States." *Hawaii*, 585 U.S. at 683-84 (citing 8 U.S.C.

§ 1182(f)). Specifically, the INA's § 212(f), codified at 8 U.S.C. § 1182(f), states, in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). The Supreme Court has observed that, "[b]y its terms, § 1182(f) exudes

deference to the President in every clause," *Hawaii*, 585 U.S. at 684, "entrust[ing] to the President

the decisions whether and when to suspend entry ('[w]henever [he] finds that the entry' of aliens

'would be detrimental' to the national interest); whose entry to suspend ('all aliens or any class of

aliens'); for how long ('for such period as he shall deem necessary'); and on what conditions ('any

restrictions he may deem to be appropriate')," *id.* (quoting 8 U.S.C. § 1182(f)).

Section 1182(f) is not the only INA provision that expressly mentions the President and his

authority in regulating entry into the United States. Section 1185(a) enumerates certain restrictions

and prohibitions on travel of both citizens and aliens into the United States, "[u]nless otherwise

ordered by the President," and then further grants the President the authority to adopt "reasonable

rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations

and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

These two provisions, 8 U.S.C. §§ 1182(f) and 1185(a)(1), granting the President broad

authority, are both located in the INA's same subpart addressing "Admission Qualifications for

Aliens; Travel Control of Citizens and Aliens." *See* 8 U.S.C. Chapter 12, Subchapter II

("Immigration"), Part II ("Admission Qualifications for Aliens; Travel Control of Citizens and

Aliens," encompassing §§1181 to 1189). The statutory authorization for the H-1B visa program

falls within this same subpart, as described below.

### 1.    *The H-1B Program*

The INA authorizes U.S. employers to "petition" for non-immigrant foreign workers to perform services in "specialty occupation[s]" through the H-1B visa program.  *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b) (defining "nonimmigrant alien"), 1184(c)(1).  A specialty occupation is one that requires "(A) theoretical and practical application of a body of highly specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States."  *Id.* § 1184(i)(1). "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States."  *H-1B Program*, Dep't of Lab., https://www.dol.gov/agencies/whd/immigration/h1b [https://perma.cc/NR4Z-U4LA] (last visited Dec. 22, 2025).

The H-1B program makes some effort to ensure that the "working conditions for [an H-1B] nonimmigrant . . . will not adversely affect the working conditions of workers similarly employed" in the United States.  *Id.* § 1182(n)(1)(A)(ii) (requiring employer to make such an attestation).  To that end, the INA requires that employers who participate in the H-1B program "promise to pay the higher of either (I) the actual wage that it pays to similarly skilled employees or (II) the prevailing wage for such employees in the local area."  *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1031 (D.C. Cir. 2023) (citing 8 U.S.C. § 1182(n)(1)(A)(i)). Employers with a history of willful certification violations or a large percentage of existing H-1B workers must additionally certify that the company has tried and failed to fill the position with an American worker and that it has not and will not displace an American worker within the 180-day period surrounding the date of the application.  8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A). Employment through the H-1B visa program is temporary: H-1B visas are valid for a period of up

6

to three years and eligible for one extension of the same duration.  *See id.* § 1184(g)(4); 8 C.F.R.

§ 214.2(h)(13)(iii)(A).

### 2.    *H-1B Visa Caps*

The INA imposes a limit, or cap, on the number of H-1B visas for most U.S. employers,

including private businesses and federal, state, and local governments, with some exceptions.  The

limit on the number of H-1B visas to be issued for most employers is 65,000 per year, with an

additional 20,000 H-1B visas available to aliens who have earned an advanced degree from a

United States institution of higher education, for a total annual allocation of 85,000 H-1B visas.  8

U.S.C.  §§ 1184(g)(1)(A)(vii), (g)(5)(C).  Since the demand for H-1B visas always exceeds the

statutory cap, DHS regulations provide for a "lottery" process to determine which cap-subject H-

1B employers registered to petition for entry of nonimmigrant beneficiaries on H-1B visas would

be able to file such petitions.  *See* generally 8 C.F.R. § 214.2(h)(8)(iii).  Among the employers

exempt from the numerical limit on H-1B visas are universities, nonprofit research organizations,

and government research organizations.  *See* 8 U.S.C. § 1184(g)(5)(A)-(B).

Before a cap-subject employer may submit an H-1B petition on behalf of a prospective

worker, who is a noncitizen, the employer must first "register" for the H-1B lottery through the

U.S. Citizenship and Immigration Services ("USCIS") website.  8 C.F.R. § 214.2(h)(8)(iii)(A)(1).

An employer selected in the lottery can submit an H-1B petition (Form I-129), which USCIS may

approve or deny.  *Id.*  If the employer's H1-B visa petition is approved, and the noncitizen

beneficiary of the approved H-1B petition resides outside the United States, the beneficiary must

typically then apply for a visa at a U.S. embassy or consulate abroad before traveling to the United

States.  *See* 8 U.S.C. § 1184(c)(1); *id.* § 1201(a)(1).  If the noncitizen already resides in the United

States and is granted a change of status to H-1B status, the change is generally effective upon grant

of the H-1B petition "without the requirement of filing a separate application."  8 C.F.R. § 248.3(f).

Employers petitioning for an H-1B worker are required to pay certain fees. Some fees are statutory, *see generally* 8 U.S.C. § 1356(m); *id.* § 1184(c)(9)-(13), and include a $1,500 filing fee, 8 U.S.C. § 1184(c)(9)(A)-(C), and a $500 fraud-prevention fee, *id.* § 1184(c)(12)(A)-(C). Another set of fees are regulatory and set by USCIS, historically through notice-and-comment rulemaking, to ensure recovery of the full administrative costs to provide services. *See* 8 U.S.C. § 1103(a)(3); *id.* § 1356(m) (authorizing DHS to assess "fees for providing adjudication and naturalization services," which "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants"). All in, prior to the challenged Proclamation, an employer petitioning for an H-1B visa could pay upwards of several thousands of dollars in statutory and regulatory fees. *See* Pls.' Mot., Ex. 24, U.S. Citizenship & Immigr. Servs., Dep't of Homeland Sec., Fee Schedule 36-37, ECF No. 18-24.

### B. Factual Background

As described in more detail below, Proclamation 10973 begins with a recitation of reports and labor and employment statistics detailing the effects of the H-1B program on the American workforce. The Proclamation then makes findings that support both economic and national security rationales to curb overuse of the H-1B program before issuing directives and other guidance grouped into five sections. This overview of the Proclamation is followed by a discussion of the actions taken by agencies to effectuate its directives.

#### 1. *Presidential Proclamation 10973*

Presidential Proclamation 10973, titled "*Restriction on Entry of Certain Nonimmigrant Workers*," became effective on September 21, 2025. *See* Proclamation , 90 Fed. Reg.at 46028. In a multi-paragraph prefatory section, the Proclamation sets out reasons for the actions directed, explaining that "[t]he H-1B nonimmigrant visa program was created to bring temporary workers

8

into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor." *Id.* at 46027. Elaborating on this critique of the H-1B program, the Proclamation states that, "[s]ome employers, using practices now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields." *Id.* This situation then leads to the overarching finding that "[t]he large-scale replacement of American workers through systemic abuse of the program has undermined both our economic and national security." *Id.*

To bolster this finding, the Proclamation recites a series of reports and statistics, including: (1) that "[t]he number of foreign STEM workers in the United States has more than doubled between 2000 and 2019, increasing from 1.2 million to almost 2.5 million, while overall STEM employment has only increased 44.5 percent during that time," *id.*; (2) "[t]he share of IT workers in the H-1B program grew from 32 percent in Fiscal Year (FY) 2003 to an average of over 65 percent in the last 5 fiscal years," *id.*; (3) "among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively—more than double the unemployment rates of recent biology and art history graduates," *id.*; (4) "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers," *id.*, citing the examples of four unnamed companies that in recent years had, collectively, laid off approximately 45,400 thousands of employees, while simultaneously being approved for approximately 32,800 H-1B workers, *id.* at 46027-28; (5) "American IT workers have reported

9

they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance," *id.* at 46028; and (6) a 2017 study showing "that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field," *id.*

Based on these labor and employment reports and statistics, the Proclamation makes specific findings that: (1) "H-1B visas are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States," *id.*; (2) "high numbers of relatively low-wage workers in the H-1B program . . . are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated," *id.*; and (3) abuse of the program "prevent[s] American employers in other industries from utilizing the H-1B program in the manner in which it was intended: to fill jobs for which highly skilled and educated American workers are unavailable," *id.* These findings also provide the economic and national security rationales to curb "abuse of the H-1B program," which "harm[s] American workers, including by undercutting their wages," *id.*, and "present[s] a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields," *id.*

The Proclamation divides its orders and guidance into five sections. Invoking presidential authority under "the Constitution and the laws of the United States," and more specifically citing 8 U.S.C. §§ 1182(f) and 1185(a), the first section, titled "*Restriction on Entry*," directs that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation . . . is restricted, except for those aliens whose petitions are accompanied or

10

supplemented by a payment of $100,000," unless certain exceptions set forth in Subsection 1(c) apply. *Id.*, Proclamation § 1(a). This supplemental payment obligation is sunset twelve months after the Proclamation's effective date of September 21, 2025. *Id.*

Next, the Secretary of Homeland Security is directed to "restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers . . . who are currently outside the United States." *Id.*, Proclamation § 1(b). In addition, "[t]he Secretary of State shall also issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H–1B petitions that have an employment start date beginning prior to October 1, 2026." *Id.* at 46029.

The Secretary of Homeland Security is further authorized to grant waivers of the $100,000 payment obligation, subject to the general parameters described as follows: the payment obligation imposed under the Proclamation "shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.*, Proclamation § 1(c).

Section 2, titled "*Compliance*," sets out mechanisms to ensure compliance with the Proclamation, with requirements imposed on employers, DHS and the Department of State. Employers are directed to "obtain and retain documentation showing that the [$100,000] payment . . . has been made" before "filing an H-1B petition on behalf of an alien outside the United States." *Id.*, Proclamation § 2(a). "The Secretary of State shall verify receipt of [the $100,000] payment . . . during the H-1B visa petition process and shall approve only those visa petitions for which the filing employer has made the payment[.]" *Id.*, Proclamation § 2(b).

11

Additionally, "[t]he Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment." *Id.*, Proclamation § 2(c).

Section 3, titled "*Scope and Implementation of Restrictions on Entry*," limits the scope of the supplemental payment obligation to "apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation," *id.*, Proclamation § 3(a), and directs submission, after the next H–1B lottery, by the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security of a joint recommendation "on whether an extension or renewal of the restriction on entry pursuant to section 1 of this proclamation is in the interests of the United States," *id.*, Proclamation § 3(b).

Section 4, titled "*Amending the Prevailing Wage Levels*," prescribes two rulemakings. First, the Secretary of Labor is directed to "initiate a rulemaking to revise the prevailing wage levels to levels consistent with the policy goals of this proclamation." *Id.*, Proclamation § 4(a). The prevailing wage level is set pursuant to 8 U.S.C. § 1182(n) and can serve as the floor above which prospective employers must pay newly admitted H-1B holders. Second, the Secretary of Homeland Security is directed to "initiate a rulemaking to prioritize the admission as nonimmigrants of high-skilled and high-paid aliens." *Id.*, Proclamation § 4(b).

The last section, Section 5, titled "*General Provisions*," contains provisions expressing the intent, *inter alia*, that the Proclamation "be construed" not "to impair or otherwise affect . . . the authority granted by law" to federal agencies or their heads and that the "proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.*, Proclamation § 5(a)-(c).

12

Subsequently, defendants and their components took various actions to implement the Proclamation, as briefly summarized next.

### 2.    *Defendants' Actions Implementing the Proclamation*

As identified by plaintiffs, defendants have taken four meaningful steps to implement the Proclamation.  *See* Pls.' Mem. Supp. Summ. J. ("Pls.' Mem.") at 35-36 & n.13, ECF 18-1.  Each of these actions is included in the administrative record, totaling 46 pages, produced by defendants. *See* Defs.' Notice of Compliance with LCvR 7(n) & Court Order, ECF No. 45; Dep't of State Admin. Rec. ("AR"), ECF No. 45-1; U.S. Customs & Border Prot. ("CBP") AR, ECF No. 45-2; USCIS AR, ECF No. 45-3.

First, on September 20, 2025, the day after the Proclamation issued, the Director of USCIS issued a memorandum clarifying that the Proclamation "only applies prospectively to petitions that have not been filed," and stating that "[a]ll officers . . . shall ensure that their decisions are consistent with this guidance."  USCIS AR at 3, Mem. from Joseph B. Edlow, Dir. USCIS, to Assoc. Dirs., Deputy Assoc. Dirs., & Program Off. Chiefs ("USCIS Sept. 2025 Memo") (Sept. 20, 2025); Pls.' Mem., Ex. 2, ECF 18-20 (same).

Second, also on September 20, 2025, the Executive Director for Admissibility and Passenger Programs of CBP issued a similar memorandum clarifying that the Proclamation "only applies prospectively to petitions that have not yet been filed," and notifying CBP personnel of the instruction to "begin implementing the new monetary requirements for employers submitting petitions on behalf of aliens outside the United States for new H-1B petitions only."  CBP AR at 11, Mem. from Matthew S. Davies, Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, to Exec. Dirs., Dirs. of Field Operations, Off. of Field Operations ("CBP September 2025 Memo") (Sept. 20, 2025); Pls.' Mem., Ex. 3, ECF 18-21 (same).

13

Third, on September 21, 2025, the State Department updated its "Frequently Asked Questions" webpage to summarize the Proclamation, clarifying that the payment requirement only applies prospectively, and advising that "[f]urther steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include: A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers[;] [a] rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels." Dep't of State AR at 9-11, *H-1B FAQ—United States Department of State*, U.S. Dep't of State (Sept. 21, 2025), http://www.state.gov/h-1b-faq [https://perma.cc/9SUH-WJBJ]; *see also* Pls.' Mem., Ex. 4, ECF 18-22 (same).

Fourth, on October 20, 2025, USCIS revised its website about the H-1B program to include additional clarification as to "[w]ho is subject to the $100,000 payment," "[h]ow to pay" it, "[w]hen to pay" it, and the "[e]xceptions granted by the Secretary of Homeland Security." USCIS AR at 6-8, *H-1B Specialty Occupations*, USCIS (Oct. 20, 2025), https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations [https://perma.cc/XN3K-TDSL] ("USCIS Guidance"); Pls.' Mem., Ex. 5, ECF 18-23 (same).

### C.    Procedural Background

The Chamber filed the instant suit on October 16, 2025, *see* Compl., ECF No. 1, and with the AAU joining as a plaintiff, filed the operative Amended Complaint, ECF No. 8, on October 24, 2025. Based on allegations that the Proclamation "blatantly contravenes the fees Congress has set for the H-1B program and countermands Congress's judgment that the program should provide a pathway for up to 85,000 people annually to contribute their talents to the United States," Am. Compl. ¶ 7, plaintiffs bring two claims for relief: first, that "the Proclamation is in excess of the President's authority under [8 U.S.C. §§ 1182(f) and 1185(a)], and any executive action

14

implementing it is therefore in excess of executive branch authority under the Constitution and laws of the United States," *id.* ¶ 192, and second, that "agency actions taken to implement the Proclamation are substantially invalid and must be set aside under the APA," *id.* ¶ 184. Plaintiffs seek a declaration "that the Proclamation and any implementing agency action exceed the executive branch's lawful authority," an injunction barring defendants "from implementing, enforcing, or otherwise carrying out the provisions of the Proclamation as to Plaintiffs and each of their members," vacatur under the APA of "any agency actions taken to implement the Proclamation," award of "attorneys' fees and costs," and "further relief as the Court may deem just and proper." *Id.* at 51.

Contemporaneously with filing the Amended Complaint, plaintiffs moved for either a preliminary injunction "blocking the enforcement of the [Proclamation] . . . and any agency action implementing the Proclamation against Plaintiffs' respective members" or summary judgment to the same effect. Pls.' Mot. at 1. Following briefing on defendants' motion to stay the litigation due to the lapse in federal appropriations between October 1 and November 12, 2025, plaintiffs' motion was converted, with the parties' consent, into a motion for summary judgment on an expedited schedule. Oct. 29, 2025 Minute Order ("To ameliorate defendants' concerns about the complexities of responding to two motions filed during a lapse in appropriations, and given the lack of any objection from the parties, the motion for a preliminary injunction will be converted to a motion for summary judgment on an expedited schedule.").

On December 1, 2025, defendants filed a cross-motion for summary judgment, along with a motion, opposed by plaintiffs, to be excused from filing an administrative record, as typically required, under local procedural rules, for cases "involving the judicial review of administrative agency actions." Defs.' Cross Mot. for Summary Judgment ("Defs.' Opp'n"), ECF No. 37; Defs.'

Mot. for Relief from Local Rule 7(n), ECF No. 38; *see also* D.D.C. Local Rule 7(n).  Following

briefing, defendants were ordered to comply with the local rule by filing the administrative record.

*See* Minute Order (Dec. 4, 2025).  Defendants filed the administrative record, consisting of fewer

than fifty pages, on December 5, 2025.  *See* Defs.' Notice of Compliance (noting that "compliance

with the Court's order . . . does not constitute a waiver of any of Defendants' arguments including

that there is no final agency action in this case nor that an administrative record is not require[d]

to decide the issues presented").

On December 15, 2025, defendants filed a motion to dismiss the amended complaint for

the same reasons provided in support of their cross-motion for summary judgment.  *See* Defs.'

Mot. to Dismiss Am. Compl.  A hearing was held on the pending motions four days later, on

December 19, 2025.  At the hearing, plaintiffs orally opposed defendants' motion to dismiss by

incorporating the arguments presented in their briefing on the cross-motions for summary

judgment.  Motions Hr'g  (Dec. 19, 2025) Tr. 8:4-8.  Thus, all three pending motions are now ripe

for review.

## II.    LEGAL STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R.

CIV. P. 56(a).  "'The mere existence of some alleged factual dispute between the parties' will not

defeat summary judgment; 'the requirement is that there be no genuine issue of material fact.'"

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (emphasis omitted) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).  "Material" facts are those that "might affect the

outcome of the suit under the governing law," and "genuine" issues are those in which "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*,

16

477 U.S. at 248. Any "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

When assessing a motion for summary judgment with respect to an APA claim, "the district judge sits as an appellate tribunal," *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009), since the "'entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action,'" *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)). Under the APA, a court "shall" "hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). This standard "'requires agencies to engage in reasoned decisionmaking,' and . . . reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (citations omitted). The scope of a court's review under the APA is "narrow." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court may not "second guess an agency decision or question whether the decision made was the best one." *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1565 (D.C. Cir. 1991). Rather, the court's role is merely to determine whether an agency action is "rational and consistent with the authority delegated to it by Congress." *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016).

17

## III.    DISCUSSION

Despite plaintiffs' vigorous efforts to overcome the hurdles presented by congressional statutes affording broad latitude to the President to control entry at the border, their challenge to the Proclamation as *ultra vires* fails.  Additionally, assuming in plaintiffs' favor that the challenged agency actions to carry out the President's directions set out in the Proclamation are subject to APA review, plaintiffs' statutory challenge nonetheless fails because defendants' mere implementation of a legally permissible Proclamation is not arbitrary or capricious or contrary to law, and defendants' lack of discretion to deviate from the President's directives renders any failure to engage in notice-and-comment rulemaking harmless error.  Consequently, plaintiffs' motion for summary judgment must be denied and defendants' cross-motion for summary judgment granted.

### A.    Standing

Though not contested by defendants, the Court is obliged to assure itself that plaintiffs have standing to exercise subject matter jurisdiction and review the claims presented.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To establish standing, plaintiffs "must show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Plaintiffs do not claim organizational standing to sue in their own right, but instead seek standing to sue on behalf of their members.  "An association has standing to sue on behalf of its members if: '(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.'"  *Chamber of Com. of the U.S. v. Env't Prot. Agency*, 642 F.3d 192, 199 (D.C. Cir.

18

2011) (quoting *Sierra Club v. Env't Prot. Agency*, 292 F.3d 895, 898 (D.C. Cir. 2002)).  Moreover, as here, where an organization "claims associational standing, it is not enough to aver that unidentified members have been injured," *id.*, but instead the organization "must specifically 'identify members who have suffered the requisite harm,'" *id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).[1]

Arizona State University ("ASU") is an identified member of both plaintiffs and satisfies the first prong of demonstrating standing to sue in its own right.  Pls.' Mot., Decl. of ASU's Exec. Vice President & Univ. Provost, Nancy A. Gonzalez ("Gonzalez Decl.") ¶ 4, ECF No. 18-17 (stating ASU "is a member of the Chamber of Commerce of the United States of America and of the Association of American Universities," without indicating duration of ASU's membership in in the Chamber or AAU); *see* Motions Hr'g Tr. at 21:25-26:1 (Chamber's counsel indicating he was unaware of how long ASU had been member of Chamber).  As a public university, ASU is "not subject to the statutory cap on H-1B visas and thus can and do[es] file H-1B petitions on a

---

[1]     At the hearing, the Chamber's counsel urged that standing had been established for its cap-subject members based on a declaration submitted by the Chamber's Vice President for Immigration Policy, Patrick Shen.  Motions Hr'g Tr. at 19:15-22; *see* Pls.' Mot., Decl. of Vice President for Immigr. Pol'y for Chamber of Com. of the U.S., Patrick Shen ("Shen Decl."), ECF No. 18-4.  Mr. Shen attested that "numerous" cap-subject members would face multiple harms from the obligation to make the $100,000 payment required for new H-1B visas under the Proclamation, Shen Decl. ¶¶ 15-20.  Notably, however, nowhere were these many cap-subject members identified or named in any way, nor did they submit supporting declarations, other than a single member, HJI Supply Chain Solutions, based in Louisville, Kentucky, which expressed interest in recruiting a single H-1B worker for a single job opening for an "Integrations Engineer role," Pls.' Mot., Decl. of President of HJI, Conrad Daniels ¶¶ 6, 9, ECF No. 18-5, and ultimately hired a "domestic, non-H1-B [sic] employee" for the role, Pls.' Reply, Reply Decl. of Conrad Daniels ¶ 3, ECF No. 47-1, leading defendants, correctly, to credit the Proclamation as "already working" as intended, Defs.' Reply at 3-4.  In contrast, AAU produced ten declarations from AAU members, rather than relying on unnamed members.  Such anonymity among the Chamber's cap-subject members claiming harm from the Proclamation may "fall short of establishing certainly impending dangers for any particular member of the [Chamber's] association[]." *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 819 (D.C. Cir. 2006).  At the hearing, the Chamber's counsel explained, "I think in the current environment, there are significant pressures from entities to decide whether they provide their information to the Chamber, and the Chamber can represent them in associational standing capacity and present that information to the Court," Motions Hr'g Tr. at 20:2-6, and further acknowledged that "[t]he universities are very brave, Your Honor," *id.* at 20:17-18.  That Chamber members in the business community are reluctant to be identified by name in a court proceeding as challenging actions by the current administration is startling.  Fortunately for them, the Chamber's Article III standing is otherwise clearly established by a "brave" university member.  *See* Shen Decl. ¶ 21 (stating that Arizona State University, which is "cap-exempt," is a Chamber member).

19

rolling basis throughout the year." Pls.' Mot., Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF") ¶ 17, ECF No. 18-2. "Since 2022, ASU has submitted forty-one H-1B visa petitions on behalf of international faculty that would have been subject to the $100,000 fee," Gonzalez Decl. ¶ 6, and "reasonably expects that, but for the Proclamation, it would submit approximately a dozen new H-1b [sic] petitions over the next 12 months in order to employ new teaching faculty who are presently outside the U.S.," *id.* ¶ 8.

As for the remaining prongs for associational standing, the interests that the organizations seek to protect are germane to their purposes. The Chamber "advocate[s] for pro-business policies," Shen Decl. ¶ 3, and its members "currently employ, in the aggregate, tens or hundreds of thousands of H-1B visa holders," *id.* ¶ 23. The "central" mission of AAU is to "ensure that its members are able to conduct research that improves public health, addresses national challenges, and contributes significantly to America's economic strength," 4, Decl. of AAU President Barbara R. Snyder ¶ 4, ECF No. 18-7, and "[i]n 2025 alone, AAU members [have] submitted thousands of H-1B visa petitions," *id.* ¶ 6. This lawsuit accords with both missions and neither the claims asserted nor the relief requested would require any member to sue individually. Accordingly, plaintiffs have standing to bring the claims at issue here.

### B.    Plaintiffs' *Ultra Vires* Claim

In broad terms, plaintiffs' principal argument in support of their *ultra vires* claim is that "Congress did not delegate to the President authority to impose payment obligations on U.S. employers, particularly when those fees directly contradict the INA's comprehensive scheme for the H-1B program" and, consequently, the Proclamation is "*ultra vires* and cannot be lawfully enforced against" plaintiffs. Pls.' Mem. at 15. Survival of this *ultra vires* claim turns on three distinct legal inquiries: whether the Proclamation is susceptible to *ultra vires* review at all; whether the Proclamation falls outside the broad grants of authority Congress has delegated to the President

20

in 8 U.S.C. §§ 1182(f) and 1185(a)(1); and whether the Proclamation contravenes other statutory limitations imposed by the INA, including the statutorily authorized fees provided in 8 U.S.C. § 1356(m).

The first inquiry raises complex separation of powers concerns carrying implications for the permissible exercise of unilateral and unreviewable presidential power, with defendants arguing for *carte blanche* authority in the immigration context presented here, due to judicial nonreviewability of consular decisions, Defs.' Opp'n at 11-14, as well as presidential action being insulated from *ultra vires* challenges, *id.* at 19-24, while plaintiffs strongly contend that consular nonreviewability does not apply to prospective challenges, Pls.' Reply at 22-24, and that "a federal district court has the inherent authority to enjoin an *ultra vires* act of the executive," Pls.' Mem. at 34. Parties spar on the treatment of justiciability in three precedents: the Supreme Court's decision in *Trump v. Hawaii*, 585 U.S. 667 (2018), and two D.C. Circuit cases, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), and *American Foreign Service Association v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) (per curiam). In *Reich*, a case outside of the immigration context, the D.C. Circuit found *ultra vires* review available where "presidential action . . . independently violates" another statute. 74 F.3d at 1332. In the other two cases, the courts presumed justiciability to reach the merits of the plaintiffs' statutory claims, which were rejected. *Hawaii*, 585 U.S. at 683 ("[W]e may assume without deciding that plaintiffs' statutory claims are reviewable[.]"); *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *3 ("Even assuming this case is justiciable, our review must be exceedingly deferential."). As defendants accurately summarize, in *American Foreign Service Association*, the D.C. Circuit "found for the government in an alternate way, thus sidestepping the issue, just as the Supreme Court did in *Hawaii*." Defs.' Reply at 7.

Rather than dive unnecessarily into defendants' arguments regarding the applicability of the doctrine of consular nonreviewability and the extent to which the President is insulated from *ultra vires* challenges, this Court takes the same "side-step" employed by appellate courts and assumes that plaintiffs' claims challenging the Proclamation are justiciable. Notwithstanding the assumption of justiciability to reach the merits of plaintiffs' claims, the following analysis demonstrates that the Proclamation is consistent with congressional grants of authority to the President, without contravening limitations set out in other statutory provisions, and thus plaintiffs' *ultra vires* claim does not survive.[2]

### 1.    *The Proclamation Falls Within Authority Granted by 8 U.S.C. §§ 1182(f) and 1185(a)(1)*

The President invokes authority for issuance of the Proclamation under both the Constitution and the INA provisions codified at 8 U.S.C. §§ 1182(f) and 1185(a)(1). 90 Fed. Reg. at 46027. While plaintiffs focus largely on § 1182(f), the interplay of this subsection with § 1185(a)(1) illuminates the full breadth of the authority handed to the President over time by Congress to regulate entry into the United States.

The older of these two sections, 8 U.S.C. § 1185(a)(1), was first enacted in 1918 and provided that, during wartime, "if the President shall find that the public safety requires that restrictions and prohibitions in addition to those provided otherwise," he may announce through proclamation "reasonable rules, regulations, and orders," for "any alien to depart from or enter"

---

[2]    Defendants argue that the Proclamation was authorized under both statutory authority and the inherent constitutional powers of the President. *See* Defs.' Opp'n at 12. The INA grants the president sufficient authority to issue the Proclamation, rendering analysis of the President's inherent powers unnecessary. *See Blum v. Bacon*, 457 U.S. 132, 137 (1982) ("Where a party raises both statutory and constitutional arguments . . . ordinarily [courts] first address the statutory argument in order to avoid unnecessary resolution of the constitutional issue.").

22

the United States.  Act of May 22, 1918, ch. 81, §1 (a), 40 Stat. 559, 559.[3]  In 1941, the section was expanded to encompass not just times of war but also the then-contemporary national emergency announced by President Roosevelt in response to Germany's threats of world domination.  Act of June 21, 1941, ch. 210, § 1, 55 Stat. 252, 252-53.  In the next decade, when enacting the INA, Congress kept these historical conditions present in the grant of authority to the President and recodified this section to be effective "[w]hen the United States is at war or during the existence of any national emergency proclaimed by the President."  INA § 215(a)(1), Pub. L. No. 82-414, 66 Stat. 163, 190 (1952).  In 1978, however, Congress significantly amended the provision by striking the text limiting the President's authority to wartime or national emergencies, leaving the current language.  Foreign Relations Authorization Act, Fiscal Year 1979, § 707, Pub. L. No. 95-426, 92 Stat. 963, 992-93 (1978).  Today, 8 U.S.C. § 1185(a)(1), states, in pertinent part:

> "Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe[.]"

Over thirty years after enactment of the first iteration of § 1185(a)(1), Congress passed, in 1952, the INA, which included § 1182(f) with the same text as today, providing, in its first sentence, that:

> "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."

INA § 212(e), Pub. L. No. 82-414, 66 Stat. 163, 188 (1952).

---

[3]    The original Act provided, in relevant part: "That when the United States is at war, if the President shall find that the public safety requires that restrictions and prohibitions in addition to those provided otherwise than by this Act be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or Congress, be unlawful . . . [f]or any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe[.]"  *Id.*

23

As reflected in the text, § 1185(a)(1) provides a general delegation of authority to the President to prescribe "limitations and exceptions" on entry by aliens to the United States—without any predicated finding or duration consideration—whereas § 1182(f) constrains the President's authority to suspend or otherwise impose restrictions on entry by aliens by requiring a presidential finding that such entry "would be detrimental to the interests of the United States," and implicitly indicating the temporary duration of presidential action only "for such period as he shall deem necessary." Thus, § 1182(f) provides a narrower grant of authority to the President than does § 1185(a)(1), prompting the question of whether the limitations in the former INA provision must govern any exercise of authority under the latter INA provision. *See* Motions Hr'g Tr. at 76:24-77:3 (defendants' counsel acknowledging narrower grant of authority in §1182(f) than § 1185(a)(1)).

The Supreme Court has instructed that when federal courts "can easily read Congress's statutes to work in harmony, that is where our duty lies." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 525 (2018). A traditional rule of statutory construction dictates that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550-51 (1972); *see also Am. Fed'n of Gov't Emps., Local 3882 v. Fed. Lab. Rels. Auth.*, 944 F.2d 922, 932 (D.C. Cir. 1991) ("Moreover, it is a cardinal rule of statutory construction that, to the extent possible, a legislative enactment is to be so read as to give operation to all of its parts, and we are not prepared to disregard this salutary canon of interpretation." (footnote omitted)). For this reason, satisfaction of the statutory criteria laid out in 8 U.S.C. § 1182(f) is considered as having *a fortiori* satisfied the conditions of 8 U.S.C. § 1185(a)(1) as well. *Cf. Hawaii*, 585 U.S. at 683 n.1 ("Because [8 U.S.C. § 1185(a)(1)] 'substantially overlap[s]' with § 1182(f), we agree with the Government that

24

we 'need not resolve . . . the precise relationship between the two statutes' in evaluating the validity of the Proclamation." (citation omitted)).

Plaintiffs argue that the Proclamation is *ultra vires* and not authorized under § 1182(f) because two textual preconditions in that statutory provision remain unsatisfied. Pls.' Mem. at 28-30; Pls.' Reply at 18-20. A simple comparison of the Proclamation's textual findings and scope limitations with the requirements of § 1182(f) makes clear this presidential action meets the statutory requirements for the authority exercised in the directives.

First, plaintiffs contend that "the Proclamation does not make the findings that Section [1182](f) requires as a predicate—namely, 'that the entry of any [noncitizen] or class of [noncitizens]' as immigrants or nonimmigrants would be detrimental to the interests of the United States." Pls.' Mem. at 29 (alterations in original) (quoting 8 U.S.C. § 1182(f)). In plaintiffs' reading, the Proclamation falls short by making "findings about U.S. *employers*, describing alleged 'abuse of the H-1B visa program' by certain employers" instead of "findings about *any* noncitizens." Pls.' Mem. at 29 (emphases in original); *see* Motions Hr'g Tr. at 53:2-5 (AAU's counsel stating, "[T]he proclamation is very express . . . that the [reason the] proclamation has issued is in order to shift the incentives of businesses and institutions in the United States[.]"). The purported defect plaintiffs identify in the Proclamation appears based on a strained segregation of cause and effect that glosses over the continuum in reasoning set out in the Proclamation to reach the requisite finding under § 1182(f): the Proclamation identifies domestic employers' perceived abuses of the H-1B program as facilitating the importation, or entry, of nonimmigrant workers with certain skill sets and the concomitant effect of displacing American workers, all of which activity results in the perceived detriment to the economic and national security interests of the United States. *See, e.g.*, Proclamation, 90 Fed. Reg. at 46027 ("Some employers, using practices

25

now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.").

The Proclamation explicitly makes the requisite presidential findings under § 1182(f), stating that "I therefore find that the unrestricted entry into the United States of certain foreign workers who are described in section 1 of this proclamation would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." Proclamation, 90 Fed. Reg. 46028. Not only is the requisite finding under § 1182(f) clearly articulated, but the Proclamation provides support for this finding by recounting a series of reports and statistics, *see supra* I.B.1, including "that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers," *id.*, and examples of four companies that, collectively, announced layoffs of approximately 45,400 employees while simultaneously petitioning and receiving approval to employ approximately 32,800 H-1B employees, *id.*[4]  Based on these and other reports and

---

[4]    While plaintiffs characterize these reports and statistics as "quite misleading" by failing to take account of "the broader picture [] and how the H-1B program provides economic benefits to the United States as a whole," Motions Hr'g Tr. at 26:6-8, plaintiffs' own declarations confirm a heavy reliance on H-1B employees.  For instance, nine of AAU's members submitted declarations on behalf of their universities disclosing that they employed, in total, *approximately 4,500 H-1B employees*, including as faculty and in research positions, *see* ECF Nos. 18-8 to 18-16—raising puzzling questions about why these same academic institutions are not producing sufficient numbers of adequately skilled American faculty and researchers—or whether other factors are at play—but those questions range far beyond the purview of the current case to answer.  These nine universities represent but a small fraction of AAU's 69 U.S.-based members and an even smaller fraction of the thousands of universities in the United States.  Some declarations further reported that, every year, between 5% to 20% of the universities' H-1B petitions were filed for individuals who live outside the United States and thus would be subject to the $100,000 payment.  *See* Decl. of James H. Garrett, ECF No. 18-8 (Carnegie Mellon, 5%); Decl. of Dr. Charles L. Isbell, Jr., ECF No. 18-9 (University of Illinois, 15%); Decl. of Stephen J. Gange, ECF No. 18-10 (Johns Hopkins University, 10%); Decl. of Arthur Lupia and Judith Pennywell, ECF No. 18-11 (University of Michigan, 20%); Decl. of Gretchen Ritter, ECF No. 18-12 (University of Minnesota, 10%); Decl. of Paul J. Scheel, ECF No. 18-15 (Washington University in St.

statistics, the Proclamation reached the conclusion that "[i]t is therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.*

The evidentiary support and justification offered in the Proclamation for the findings made and actions directed is more extensive than that offered in other presidential proclamations. As described by the Supreme Court, for instance, President Clinton "explain[ed] in one sentence why suspending entry of members of the Sudanese Government and armed forces 'is in the foreign policy interests of the United States'" and President Reagan "explain[ed] in five sentences why measures to curtail 'the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States' are 'necessary.'" *Hawaii*, 585 U.S. at 686; *see* Defs.' Opp'n at 27 (emphasizing this point); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 182 (D.D.C. 2020) (determining that the findings of a different proclamation, issued pursuant to § 1182(f), "are more than adequate" because "although the findings here may not be as robust as those in *Trump v. Hawaii* or supported by any evident 'worldwide, multi-agency review,' the Court surely did not mean for the findings and administrative efforts in that case to set a floor for future presidential actions under § 1182(f)").

Moreover, to the extent plaintiffs take issue with the reports and statistics described in the Proclamation and identify any mismatch between such evidence and the findings made, that is not

---

Louis, 12%). These universities assert that, but for the $100,000 payment requirement, they would expect to submit H-1B petitions at roughly the same rate as they had in the past recent years. *See, e.g.*, Garrett Decl. ¶ 8; Ritter Decl. ¶ 10; Shekhar Decl. ¶ 7; Scheel Decl. ¶ 8.

Similarly, Chamber member, GoRural, which is not an employer of H-1B workers itself but recruits such workers for domestic employers, attests that it has "placed approximately 100 international candidates—almost all of whom require an H-1B visa—with" rural hospitals. Poser Decl. ¶ 9. GoRural reports that many of its "rural healthcare clients . . . are critically understaffed" and "need physicians, radiologists, nurses, medical technologists, radiologic technologists, and physical therapists" with "entire departments operating at just 40% of a full staff. *Id.* ¶ 5. The record does not provide any answer as to why this country's education system is not producing enough skilled medical professionals to fill these roles with domestic labor, but the answer to that question is also beyond the purview of the current case to answer.

sufficient to overcome the "exceeding[] deferen[ce]" owed to the President in this realm. *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, *3. Indeed, the Supreme Court found "questionable" "that § 1182(f) requires the President to *make* a finding that entry 'would be detrimental to the interests of the United States,' but also to explain that finding with sufficient detail to enable judicial review." *Hawaii*, 585 U.S. at 686 (quoting 8 U.S.C. § 1182(f)) (emphasis in original). The Supreme Court determined that "'[w]hether the President's chosen method' of addressing perceived risks is justified from a policy perspective is 'irrelevant to the scope of his [§ 1182(f)] authority,'" and so "when the President adopts 'a preventative measure . . . in the context of international affairs and national security,' he is 'not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions'" *Id.* at 686-87 (first alteration added) (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187-88 (1993), and *Holder v. Humanitarian L. Project*, 561 U.S. 1, 35 (2010)).

In short, contrary to plaintiffs' critique, the Proclamation provides ample support for the clear findings articulated as the basis for the action taken to suspend or impose restrictions on new H-1B visa holders, and this meets the prerequisite for invocation of § 1182(f) authority.

Second, plaintiffs raise a separate challenge to the invocation of authority under 8 U.S.C. § 1182(f), namely that "the Proclamation does not operate on a valid 'class of aliens.'" Pls.' Mem. at 28 (quoting 8 U.S.C. § 1182(f)). As plaintiffs read § 1182(f), the "class of aliens" contemplated by the statute "encompasses a group of people linked by nationality" or at the very least by "common characteristics or attributes." *Id.* at 29 (emphasis omitted) (quoting *Hawaii*, 585 U.S. at 688, and Class, *Black's Law Dictionary* (12th ed. 2024)). Rather than such a class, the Proclamation covers noncitizens "linked only by the circumstance that their U.S. employers are

either unwilling or unable to pay $100,000 to the government to sponsor their immigration status," and this does not conform to plaintiffs' definition of "class". *Id.*

This reading misapprehends the structure of § 1182(f), which permits the President to undertake three different actions: he may (1) "suspend the entry of all aliens . . . as immigrants or nonimmigrants," (2) "suspend the entry of . . . any class of aliens as immigrant or nonimmigrants" or (3) "impose on the entry of aliens any restrictions he may deem to be appropriate." The "class of aliens" language appears as part of the object of the preposition relating to the discussion of presidential power to suspend entry whereas no similar language mentioning "class" appears in the portion of the statute discussing presidential power to impose restrictions. In this case, the Proclamation imposes a restriction, a supplemental $100,000 payment obligation on domestic employers, on the entry of certain aliens. After all, the Proclamation literally titles its first section "*Restriction on Entry*," Proclamation §1, 90 Fed. Reg. at 46028 (emphasis in original), and goes on to say, "*entry into the United States of aliens . . . is restricted*, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000," *id.* (emphasis added). [5] Consequently, plaintiffs' urging that some form of "class of aliens" must be properly defined for the Proclamation to comply with § 1182(f) is untethered to the actual text of the statute. In short, the Proclamation need not define a "class of aliens" as the target of the restrictions set out in the directives to fall within this statutory grant of authority to the President.

Regardless, even if plaintiffs were correct about the necessity of a defined "class of aliens" under § 1182(f), their argument would still fail. The Supreme Court has previously rejected the

---

[5]    Defendants describe the Proclamation as imposing a suspension on entry because "aliens subject to the Proclamation are literally suspended from entering for a year or unless the employer pays $100,000." Defs.' Reply at 15. Alternatively, defendants posit that "[a]t a minimum, the $100,000 payment is a restriction on entry." *Id.* at 16; Motions Hr'g Tr. at 79:25-80:10 (defendants' counsel stating, "I think it can be both [a suspension or a restriction on entry]. . . . [E]ven if you want to see it as a restriction or a regulation, I think it's well-encompassed within the statute."). The latter view of the $100,000 payment is the more natural reading of the Proclamation, as discussed in the text. Under either construction, the textual prerequisites for invocation of § 1182(f) are satisfied.

challenge that a presidential proclamation improperly defined an "overbroad" class. *Hawaii*, 585 U.S. at 688. The Supreme Court reasoned that an overbreadth challenge on the class definition "simply amounts to an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only 'any class of aliens' but 'all aliens.'" *Id.*

Indeed, broadly and generally defined classes of aliens in past presidential proclamations have received repeated judicial approval. In 1992, for instance, President H.W. Bush signed Executive Order 12807, pursuant to 8 U.S.C. §§ 1182(f) and 1185(a)(1), obliging the Coast Guard to "enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens." Exec. Order No. 12807, 57 Fed. Reg. 23133, 23133 (May 24, 1992). The phrase "defined vessel" encompassed vessels "numbered pursuant to the laws of the United States," "[v]essels without nationality," and "[v]essels of foreign nations with whom we have arrangements authorizing the United States to stop and board such vessels." *Id.* The Supreme Court upheld this executive order in *Sale v. Haitian Centers. Council, Inc.*, 509 U.S. 155, 172 (1993), even though the "class of aliens" only shared the common characteristic of entering the country on certain vessels. More recently, in 2020, President Trump signed Presidential Proclamation 10014, again pursuant to 8 U.S.C. §§ 1182(f) and 1185(a)(1), declaring that "[t]he entry into the United States of aliens as immigrants is hereby suspended and limited subject to" certain limitations including that they were not then-present visa holders. Proclamation No. 10014, 85 Fed. Reg. 23441, 23442 (Apr. 22, 2020). This proclamation was upheld and an *ultra vires* challenge rejected, on the basis that all noncitizens constituted a class. *See Gomez*, 485 F. Supp. 3d at 178-83.

In sum, contrary to plaintiffs' arguments, the Proclamation adequately satisfies the preconditions for invocation of presidential authority under § 1182(f) by making an explicit finding

about the detriment to the interests of the United States and the resultant "necess[ity]" of and "demand[]" for imposition of the restriction on the entry of certain aliens, as directed in Section 1(a), *see* Proclamation, 90 Fed. Reg. at 46028, and, further, applying the restriction to all nonimmigrant beneficiaries of petitions for new H-1B visas, regardless of whether these aliens constitute a "class of aliens" on terms other than their status as nonimmigrant beneficiaries of new H-1B visas.

### 2.    *Whether the Proclamation Exceeds the President's Delegation of Authority Under 8 U.S.C. § 1182(f)*

Having determined that the Proclamation satisfies the prerequisites for invocation of 8 U.S.C. § 1182(f), the analysis now turns to whether the directives required by the Proclamation exceeded the congressional delegation of authority.  Given that "[b]y its plain language § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States" and "exudes deference to the President in every clause" by "vest[ing] the President with 'ample power' to impose entry restrictions in addition to those enumerated in the INA," *Hawaii*, 585 U.S. at 683-84 (quoting *Sale*, 509 U.S. at 187),  this is a high hurdle for plaintiffs to overcome.

In support of their position that the Proclamation exceeds the authority granted to the President by § 1182(f), plaintiffs assert three arguments.  First, plaintiffs argue that "[t]he Proclamation does not 'suspend . . . entry' or impose 'restrictions' 'on the entry of aliens.'"  Pls.' Mem. at 23 (quoting  8 U.S.C.  § 1182(f)).  Instead, plaintiffs characterize the Proclamation's restriction on entry as merely a pretense to regulate domestic conduct, so the President's discretion should be limited accordingly.  *See* Pls.' Mem. at 30 ("Section 212(f) does not empower the President to impose entry restrictions *as a penalty* for domestic employers' alleged misconduct; the detriment to the interests of the United States must instead arise from 'the entry' of a 'class of aliens' into the United States." (emphasis in original) (quoting 8 U.S.C. § 1182(f)).  The

Proclamation does not "suspend" entry, according to plaintiffs, because "[a]ny noncitizen remains free to enter, consistent with other admission requirements, so long as he or she does not require an H-1B visa, or if a U.S. employer pays the $100,000 fee." *Id.* at 24. Plaintiffs then string together a series of definitions to interpret the phrase "impose on the entry of aliens any restrictions" to mean that the provision "authorizes the President to impose *prohibitions* that operate *at the border* on *noncitizens*." *Id.* at 24-25 (emphases in original). According to plaintiffs, "the Proclamation does not impose a negative or prohibitory limit at the border[; r]ather, it leverages [§ 1182(f)] to require U.S. employers to comply with affirmative, non-statutory mandates." *Id.* at 25.

Plaintiffs' argument suffers the same flaw, again, of straining to segregate the perceived cause from the effect and resultant remedy as directed in the Proclamation, but just because the President identifies domestic employers as the cause of the problem of American workers being displaced with H-1B workers does not put the remedy beyond his reach, when that remedy takes the form of entry restrictions designed and intended to make H-1B workers more costly. The text of § 1182(f) makes this clear: Congress delegated to the President authority to "impose on the entry of aliens *any restrictions* he may deem to be appropriate." 8 U.S.C. § 1182(f) (emphasis added); *see also* 8 U.S.C. § 1185(a)(1) ("[I]t shall be unlawful . . . for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."). Congress could have, but did not, impose the limit on presidential authority that plaintiffs' urge. For example, Congress could have added text to § 1182(f) that the restrictions the President was authorized to impose could not take the form of a monetary payment or, even more specifically, a monetary payment on domestic employers. Such text is simply not there nor even implied.

32

The D.C. Circuit has repeatedly emphasized the expansive scope of "any," reminding that "any . . . means any." *United States v. Haynes*, No. 23-3065, 2024 WL 1591589, *2 (D.C. Cir. 2024) (per curiam) (quoting *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010)); *see also Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999) ("[T]he adjective 'any' is not ambiguous . . . . [It] has an expansive meaning, that is, one or more indiscriminately of whatever kind . . . . [A]ny means all." (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997)); *United States v. Cullen*, 499 F.3d 157, 163 (2d Cir. 2007) ("The word 'any' means 'without restriction or limitation.'" (quoting *Tambe v. Bowen*, 839 F.2d 108, 110 (2d Cir. 1988))).  Just as "any restriction" has been upheld when that restriction took the form of "additional scrutiny" for Somalia nationals seeking nonimmigrant visas, *Hawaii*, 585 U.S. at 680, a restriction may also take the form of an additional monetary payment.  To be sure, as defendants' counsel confirmed, § 1182(f) has not been previously invoked to restrict entry into the United States using monetary mechanisms.  *See* Motions Hr'g Tr. at 74:19-23 (defendants' counsel stating, "I don't believe 1182(f) has [ever been invoked to impose a monetary form of restriction].").  Nonetheless, the Supreme Court has held that "§ 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA" and to "supplement the other grounds of inadmissibility in the INA."  *Hawaii*, 585 U.S. at 684; *see* Defs.' Opp'n at 31 (citing *Hawaii*).  The President, evoking authority pursuant to § 1182(f), has merely "supplement[ed] the other grounds of inadmissibility in the INA" by requiring a payment before an H-1B petition is processed.  *See Hawaii*, 585 U.S. at 684 (citing *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)).

As support for the proposition that imposing a payment obligation on domestic business as a means of restricting entry of H-1B visa workers is an impermissible re-writing of the INA, or, in

33

other words, outside the scope of § 1182(f), Pls.' Mem. at 15, plaintiffs rely on the same reasoning as that of the Ninth Circuit in *Doe #1 v. Trump*, 957 F.3d 1050, 1056, 1067 (9th Cir. 2020).[6]  In that case, the Ninth Circuit denied "the government's motion to stay the district court's preliminary injunction enjoining a Presidential Proclamation restricting family-sponsored immigrants from entering the United States without acquiring specific health insurance," thereby preventing implementation of the Proclamation at issue, *id.* at 1056; in so holding, the court previewed findings on the merits, reasoning that the authority granted to the President under § 1182(f) "is more circumscribed when he addresses a purely domestic economic issue" since, in the domestic context, "the national security and foreign affairs justifications for policy implementations disappear, and the normal policy-making channels remain the default rules of the game," *id.* at 1067.  As another Judge on this Court persuasively observed regarding this reasoning, however, the distinction between foreign and domestic policy "finds no support in the statutory text" which "simply speaks in terms of restricting entry of aliens 'detrimental to the United States'" and contains no limitation "to any particular sphere, foreign or domestic." *Gomez*, 485 F. Supp. 3d at 180 (quoting 8 U.S.C. § 1182(f)).  Nor does the Ninth Circuit's distinction conform to Supreme Court case law which has recognized that "'[t]he exclusion of aliens is a fundamental act of sovereignty' that 'is inherent in the executive power to control the foreign affairs of the nation,'"

---

[6]      This Ninth Circuit case relied on by plaintiffs has a circuitous history.  Following the decision cited by plaintiffs and referred in the text, a Ninth Circuit panel later reversed, on the merits, the district court's order and vacated the preliminary injunction, finding that "the Proclamation's restrictions rest on a valid exercise of the authority delegated in § 212(f)" and that "[t]he district court identified no coherent basis for insisting that, in delegating authority to impose additional restrictions on who may immigrate into this country from another nation, Congress must provide greater guidance when the asserted detrimental impact of such aliens is based on 'domestic' policy concerns." *Doe #1 v. Trump*, 984 F.3d 848, 869-70 (9th Cir. 2020).  This merits panel decision thus seems to disavow the distinction regarding domestic matters.  In any event, on May 14, 2021, the new President revoked Proclamation 9945, *see* Proclamation No. 10209, 86 Fed. Reg. 27015 (May 14, 2021), and, consequently, the en banc Ninth Circuit vacated the panel's merits opinion and remanded the matter to the district court with instructions to vacate the preliminary injunction of the now-revoked proclamation as moot, *Doe #1 v. Biden*, 2 F.4th 1284, 1285 (Mem.) (9th Cir. 2021) (en banc).

34

as well as that "*any policy* towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Id.* (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), and *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) (alteration and emphasis original)). Even if the purported distinction plaintiffs urge were "a practically feasible one, it does not follow that judicial deference is any less" because, as the Supreme Court has explained, entry restrictions may "implicate 'relations with foreign powers,' *or* involve 'classifications defined in the light of changing political and *economic circumstances*,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Id.* at 180-81 (quoting *Hawaii*, 585 U.S. 702) (emphases original).

Second, plaintiffs contend that, by taking the form of a "payment requirement," the restriction imposed by the Proclamation exceeds the statutory delegation since "[r]aising revenue is a core power reserved by the Constitution for Congress." Pls.' Mem. at 25. For this contention, plaintiffs rest heavily on *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212 (1989), where the Supreme Court upheld rulemaking by the Department of Transportation on setting "fees to cover the costs of administering certain federal pipeline safety programs" against a challenge that the act providing for such rulemaking represented "an unconstitutional delegation of the taxing power." *Skinner*, 490 U.S at 214. The Supreme Court observed that "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties." *Id.* at 224. According to plaintiffs here, Congress provided no such clear indication in § 1182(f), in contrast to "many other provisions of the INA that *do* expressly empower the executive to impose fees, collect bond payments from noncitizens, and the like." Pls.' Mem. at 25 (emphasis in original). To bolster this

35

argument, plaintiffs stress that, in seventy years of practice, no other president has used § 1182(f) to impose required payments.  Pls.' Mem. at 26.[7]  Permitting such a mechanism for restricting entry by aliens to the United States would, according to plaintiffs, amount to "find[ing] the proverbial elephant in a textual mousehole."  Pls.' Mem. at 27 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).[8]

The Supreme Court recently explained, however, that *Skinner* was an instance where the Court declined the "request to create a special nondelegation rule for revenue-raising legislation." *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025).  Likewise, here, the Taxing Clause does not impose on Congress a heightened requirement to make a valid delegation to the President, and Congress was clear in its delegation.  Section 1182(f) uses exceeding broad language, including that the regulation might occur "for such period as he shall deem necessary" and may entail "any restrictions he may deem to be appropriate."  8 U.S.C. § 1182(f).  This language—"any regulation"—is sufficiently broad to encompass a regulation requiring an

---

[7]    At the hearing, plaintiffs also supported this argument by referring to the "*Passenger* Cases," though acknowledging these cases were not cited in briefing by either side.  Motions Hr'g Tr. at 48:8-13 (AAU's counsel citing *Smith v. Turner*, 48 U.S. (7 How.) 283 (1849)).  While this argument not raised in briefing may be deemed waived, regardless, the *Smith* plurality opinion stands for the proposition that "a State cannot do . . . indirectly which she is forbidden by the Constitution to do directly."  *Smith*, 48 U.S. at 458.  States may not "lay any Duty on Tonnage," U.S. Const. art. 1, § 10, cl. 3, so the Supreme Court held that States also may not charge a tax based on "the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers which [a vessel] carries," *Smith*, 48 U.S. at 458-59.  In contrast, the instant case does not require a determination of whether a constitutional limitation has been violated, *see supra* n.2, and focuses instead on whether the presidential action exceeds the scope of delegated statutory authority.  *Smith* is thus inapposite and does not aid in resolution of the instant case.

[8]    This argument seems to allude to the major questions doctrine.  *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring) ("That major questions canon reflects both background separation of powers understandings and the commonsense interpretive maxim that Congress does not usually 'hide elephants in mouseholes' when granting authority to the President." (quoting *Whitman*, 531 U. S. at 468)).  Yet, plaintiffs devote only one sentence to the major questions doctrine in their opening brief, *see* Pls.' Mem. at 27, and four sentences in their reply brief, *see* Pls.' Reply at 15.  During the hearing, which lasted over two hours, the major questions doctrine was not mentioned once.  Any argument that a substantive version of the major questions doctrine is relevant to this issue has thereby been forfeited; however, consideration is given to the context in which the delegation was made and how that context informs the proper interpretation of the statute.

additional payment obligation for entry of a nonimmigrant H-1B visa worker when the additional prerequisites in § 1182(f) are met.[9]

Third, plaintiffs claim that "certain of the Proclamation's provisions go beyond any possible conception of an entry restriction," including the key directive in Section 1(b) that the Secretary of Homeland Security should not approve petitions for H-1B visas unless they are accompanied by the $100,000 payment. Pls.' Mem. at 27-28; *see* Proclamation § 1(b), 90 Fed. Reg. at 46028 (directing that DHS Secretary "shall restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers . . . , who are currently outside the United States, for 12 months following the effective date of this proclamation . . . . The Secretary of State shall also issue guidance, as necessary . . . to prevent misuse of a B visas by alien beneficiaries of approve H-1B petitions that have an employment start date beginning prior to October 1, 2026."). Defendants characterize this argument as "disingenuous because although the visa is the entry document presented at the port, the INA specifically requires that other documents are required for entry," Defs.' Opp'n at 33-34, and that the INA places the burden of proof of being permitted to enter the country on the noncitizen, *id.* at 34 (citing 8 U.S.C. § 1361).

Plaintiffs' challenge to the Proclamation on this basis takes a myopic view of the process for legally entering the United States, with a focus solely on the visa approval part of this process, when more is necessary. The process for legal entry into the United States is comprised of two

---

[9]     Defendants respond that "the payment here operates as a 'regulation' rather than 'revenue production,'" Defs.' Opp'n at 32 (quoting *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922)), but, as plaintiffs correctly point out, reliance on *Drexel Furniture* is misplaced here. That case concerned the division of powers between two sovereigns, states and the federal government "whe[re] one sovereign can impose a tax only, and the power of regulation rests in another." 259 U.S. at 28. The Supreme Court held that Congress could not use taxes for "the purpose to regulate matters of state concern." *Id.* at 41. Here, the question concerns whether the congressional authority to implement a monetary obligation requirement has been sufficiently delegated to the President, who may appropriately exercise such properly delegated power. *See* Pls.' Reply at 16 ("Instead, *Drexel Furniture* held that Congress could *not* 'use its taxing power . . . to regulate behavior otherwise regarded at the time as beyond federal authority.'" (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 572 (2012) (emphasis original)).

37

inter-related but distinct steps, requiring both visa approval and issuance and then a determination of eligibility for admission.  The Supreme Court has confirmed "the basic distinction between admissibility determinations and visa issuance that runs throughout the INA."  *Hawaii*, 585 U.S. at 694.  While essential for admission to work in the United States, a work-related visa, alone, is not sufficient to gain entry.  As another Judge on this Court succinctly explained, "[a] visa is a travel document that allows its holder to travel to a port of entry and request permission to enter the United States, but it does not guarantee the right to enter the country."  *Gomez*, 485 F. Supp. 3d at 158; *id.* at 191 (relying on distinction between visa issuance and admissibility determination to find that INA's "Subsection 1201(g) precludes the issuance of visas only as to persons who are 'ineligible to receive a visa' under Section 1182, not to persons who are only ineligible to enter under that provision" (emphasis omitted)); *see also Milligan v. Pompeo¸* 502 F. Supp. 3d 302, 315 (D.D.C. 2020) (expressly following *Gomez*); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 145 (D.D.C. 2021) (BAH) ("Because § 1182(f) concerns itself only with entry, a person subject to a Presidential Proclamation relying on § 1182(f) is only ineligible to enter, but not ineligible for a visa."); *Thein v. Trump*, 25-cv-2369, 2025 WL 2418402, at *15 (D.D.C. Aug. 21, 2025) ("Several other courts in this District have held that the Department of State cannot rely on proclamations issued pursuant to 8 U.S.C. § 1182(f) to deny visa applications. . . .  Today, this Court joins that chorus.").  The INA makes this distinction between visa approval and admissibility determinations plain.  *See, e.g.*, 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law.  The substance of this subsection shall appear upon every visa application.").

38

This distinction between visa approval and admissibility determination carries over into the H-1B visa worker context, and both parts of this inter-related process are necessary for a nonimmigrant worker in a specialty occupation to enter the United States. The process of applying for H-1B visas proceeds in several phases. Employers who seek to file petitions for H-1B visa workers must file a Labor Condition Application ("LCA") with the Secretary of Labor stating, among other things, "the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed." 8 U.S.C. § 1182(n)(1)(D); *see also* 20 C.F.R. § 655.730. Next, employers subject to the H-1B visa cap "must electronically submit a separate registration for each beneficiary it seeks to register" for the H-1B visa lottery. 8 C.F.R. § 214.2(h)(8)(iii)(A)(2). For those employers whose beneficiaries are selected by the lottery or are cap-exempt, the next step is for the "importing employer" to complete an H-1B petition to receive authorization to employ the beneficiary. 8 U.S.C. § 1184(c); *see* § 214.2(h)(8)(iii)(A)(1). USCIS reviews the petition to determine whether the beneficiary qualifies as a member of a specialty occupation and whether the profession involves a specialty occupation; the statute defines "specialty occupation" as a job that requires "theoretical and practical application of a body of highly specialized knowledge" and the "attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); *see also All Aboard Worldwide Couriers, Inc. v. Attorney General*, 8 F. Supp. 2d 379, 381 (S.D.N.Y. 1998) ("The statutory and regulatory framework of the H-1B visa obliges the INS to examine the interplay among the petitioner, the job, and the industry."). If their petitions are approved, those beneficiaries who are outside of the United States typically must apply for a visa at a U.S. consulate before seeking admission. *See* 8 U.S.C. §§ 1184(c)(1), 1201(a)(1).

39

As this description makes clear, the "importing employer" plays a critical role for entry of an H-1B worker, since the "petition of the importing employer . . . . shall be made and approved before the visa is granted." 8 U.S.C. § 1184(c)(1). Yet, even then, "[t]he approval of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant." *Id.* Put another way, the fallacy in plaintiffs' argument that imposition of the $100,000 payment obligation on the "importing employer" is somehow not part of an entry restriction authorized under § 1182(f) blithely ignores the necessity of a compliant petition by an "importing employer" before an entry visa for the qualifying H-1B worker may be approved.

In a last gasp effort to support their *ultra vires* claim, plaintiffs assert that "the Proclamation's unprecedented invocation of [§ 1182(f)] knows no limiting principle." Pls.' Mem. at 26. They are certainly right that this congressional grant of authority to the President is so broad that outer limits on his authority to impose restrictions on entry into the United States are, in fact, quite limited. One such limiting principle is that such proclamations must be temporary, though even this limit "does not mean that the President is required to prescribe in advance a fixed end date for the entry restrictions." *Hawaii*, 585 U.S. at 687. Additionally, presidential actions, as here, reflected in proclamations relying on the statutory authority in § 1182(f), may only apply to aliens who are outside of the United States upon their entry. *See* 8 U.S.C. § 1182(f) (permitting the President to "suspend the entry of all aliens or any class of aliens . . . or impose on the entry of aliens any restrictions"). The Proclamation complies fully with both of those limits, since temporally the directives are in effect for "twelve months" and only apply to new petitions for H-1B workers "who are currently outside the United States." Proclamation, § 1(b), 90 Fed. Reg. at 46028. Finally, the Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Hawaii*, 585 U.S. at 689; *see* Motions

40

H'rg Tr. at 81:4-12 (defendants' counsel acknowledging these three limits on § 1182(f)'s grant of authority to President, stating: "1182(f), again, has to be temporary. . . . I don't think—if there is a specific prohibition in the INA, it could necessarily overcome that specific prohibition. It, obviously, can't apply to citizens; it's only aliens, and it's only on entry."). This leads to the next inquiry to analyze whether the Proclamation "expressly override[s]" or otherwise contravenes INA provisions.

### 3.    *Whether the Proclamation Contravenes INA Provisions*

Plaintiffs claim that the Proclamation's imposition of the $100,000 payment obligation on U.S. employers filing petitions to import H-1B workers "clashes" with "the statutory design of the H-1B program," Am. Compl. ¶ 116, in two different ways. First, in plaintiffs' view, the Proclamation imposes an obligation in "direct contradiction of the fees authorized by Congress," *id.*, thereby "dramatically upend[ing] Congress's deliberate decisions about how much a visa (and in particular, an H-1B visa) should cost and flout[ing] the cost-recovery principle of Section 1356(m)," *id.* ¶ 136. Second, plaintiffs describe the Proclamation's practical impact as "sit[ting] uneasily with other specific congressional determinations," *id.* ¶ 139, regarding the number of H-1B petitions received, with the Proclamation having the effect of reducing that number, *id.* ¶ 140, since the cost of the H-1B program is "likely prohibitive to many, particularly small businesses, universities, and nonprofits across the country that hire H-1B workers," *id.* ¶ 136. These bases for plaintiffs' challenge to the Proclamation as contravening the INA are addressed *seriatim*.

First, plaintiffs are correct that the INA provision codified at 8 U.S.C. § 1356(m), sets out a "statutory requirement" for the H-1B program, Pls., Mem. at 16, providing, *inter alia*, that (1) "all adjudication fees as are designated by the Attorney General in regulations shall be deposited as offsetting receipts into a separate account entitled 'Immigration Examinations Fee Account' in the

41

Treasury of the United States," *id.* § 1356(m); (2) "[t]hat fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," *id.*; and (3) that "[s]uch fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected," *id.*; *see* Pls.' Mem. at 16-18 (discussing these three provisions in § 1356(m)).[10] According to plaintiffs, in this statutory scheme, Congress intentionally made "deliberate decisions about how much a visa (in particular, an H-1B visa) should cost overall," Pls.' Mem. at 18, by setting an initial $1,500 fee and a $500 "fraud prevention and detection fee" for filing an H-1B petition, *id.* (citing 8 U.S.C. §§ 1184(c)(9), (c)(12)). In addition, Congress added a $4,000 fee if the company has more than fifty employees, over half of whom are nonimmigrant workers, and a "premium processing" fee for companies seeking to reduce the timeframe to have their H-1B petitions considered. *Id.* at 18-19 (citing 49 U.S.C. § 10101 (note) and 8 U.S.C. § 1356(u)(3)). Plaintiffs contend that this statutory language bars presidential action in the form of the supplemental $100,000 payment obligation because Congress has already set the allowable fees and "fees may *not* be set at a level that bears no relationship whatsoever to relevant costs." Pls.' Mem. at 16 (emphasis original).

As a threshold matter, no matter the number of times plaintiffs call the Proclamation's new $100,000 payment obligation a "fee," this supplemental payment is not an adjudication or cost

---

[10]    The text of 8 U.S.C. § 1356(m) provides that adjudication fees will be set by the "Attorney General," but this reference is "a minor anachronism" because "[r]egulatory authority (for purposes of § 1356) transferred from the Attorney General to the Secretary [of the Department of Homeland Security] in 2003 with the formation of DHS (which subsumed the functions of the Immigration and Naturalization Service)." *Paz v. Mayorkas*, 767 F. Supp. 3d 368, 375 n.9 (E.D. Tex. 2025) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002)); *see also Astakhov v. U.S. Citizenship & Immigr. Servs.*, 698 F. Supp. 3d 135, 142–43 (D.D.C. 2023) (JEB) ("Plaintiff here alleges that the agency (USCIS) unlawfully charged her a fee (to apply for employment authorization) and that she is now entitled to get her money back. The relevant statutes and regulations, too, look exactly the same. There is a statutory provision that empowers Defendants to charge 'fees for providing adjudication and naturalization services.'" (quoting 8 U.S.C. § 1356(m))).

recovery fee, as contemplated by 8 U.S.C. § 1356(m). The fees set by § 1356(m) "are designated by the [DHS Secretary] in regulations" and "deposited as offsetting receipts into a separate account entitled 'Immigration Examinations Fee Account' in the Treasury," for the purpose of cost recovery. In contrast to the statutory scheme, the $100,000 payment obligation set by the President to be paid by importing employers for H-1B visa workers is established in the Proclamation for a totally different purpose, namely: "to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." Proclamation, 90 Fed. Reg. at 46028. Thus, payments under the Proclamation go not to the Immigration Examinations Fee Account, but to a General Fund Receipt Account created "for the purpose of receiving and accounting for collections not defined by law for a specific purpose," and then deposited "into the General Fund of the U.S. Treasury at the end of the fiscal year." Defs.' Opp'n, Decl. of Branch Manager of the Budget Reporting Branch in the Cent. Acct. & Reporting Div. at the Bureau of the Fiscal Serv. at the U.S. Dep't of Treasury, Jerome Jackson ¶¶ 4-7, ECF No. 36-2.

Contrary to plaintiffs' argument, Congress in §1356(m) neither precludes the imposition of other payment obligations, nor cross-references or otherwise bars the President from acting to regulate entry, pursuant to §§ 1182(f) or 1185(a)(1). To start, the statutory text in § 1356(m) uses the permissive modal verb "may," and the Supreme Court "has 'repeatedly observed' that 'the word 'may' *clearly* connoted discretion.'" *Biden v. Texas*, 597 U.S. 785, 802 (2022) (quoting *Opati v. Republic of Sudan*, 590 U.S. 418, 428 (2018), and collecting cases); *see* Defs.' Opp'n at 36 (quoting *Biden*). More to the point, nowhere in § 1356(m) is there a prohibition against any

43

executive branch agency creating or collecting other fees related to the H-1B visa program or for payment obligations to be imposed for purposes other than cost-recovery.[11]

Section 1356(m) also does not mention the President, let alone hint at constraining his power to impose entry regulations under other INA provisions by barring his use of monetary payments. Plaintiffs' contravention argument would have more force if, for example, the President in the Proclamation had waived statutorily mandated fees or directed accelerated processing without payment of the "premium processing" fee, since such waivers of statutorily mandated fees would have exceeded the authority granted under § 1182(f) by "expressly overrid[ing] particular provisions of the INA." *Hawaii*, 585 U.S. at 689. That has not occurred here: the statutorily imposed fees are still being collected. *See* Motions Hr'g Tr. at 72:23-73:2 (Defendants' counsel stating, "I think the most fundamental point here is that those fees are not being displaced, they still apply, we are not overriding them; and that they don't have anything that excludes the possibility of other payments or that limits the President's power."); Defs.' Opp'n at 36 ("It would be a significant limit to suggest this foreclosed any payment restriction under 1182(f) or 1185(a)(1) absent an express prohibition. Yet nothing in that section limits the possibility of any other payments.").

The legislative history for § 1356(m) bolsters reading this provision as neither designed nor intended as a limitation to the President's authority under §§ 1182(f) or 1185(a)(1). Before 1988, the costs of "administration of immigration and naturalization benefits was funded entirely by Congressional appropriations." *Barahona v. Napolitano*, No. 20-cv-1574, 2011 WL 4840716, at *2 (S.D.N.Y. Oct. 11, 2011). Then, in 1988, Congress enacted § 1356(m) and (n), providing

---

[11]    Since the $100,000 payment is not an adjudicatory fee, plaintiffs' corollary argument that any changes to the level of adjudication fees may only occur through notice-and-comment rulemaking, *see* Pls.' Mem. at 19-20; Pls.' Reply at 6-7, is not reached.

44

that "fees deposited in the [Immigration Examinations Fee Account] were to be used to fund the 'expenses in providing immigration adjudication and naturalization services.'" *Id.* Two years later, § 1356(m) was amended, and the "House Appropriations Committee recognized that the purpose of the 1990 amendment was to ensure that the IEFA funds would fund 'the entire cost of operating the Adjudications and Naturalization program.'" *Id.* at *3. In short, § 1356(m) is designed to ensure that immigration services may be operated without requiring funding from Congressional funds, for which purpose, the statute sets suggested fee levels to ensure that additional congressional funds are not needed. The argument that Congress intended simultaneously to impose a cap on the fees imposed or intended to limit the broad power delegated to the President in § 1182(f), as plaintiffs urge, would be passing strange.

Second, plaintiffs also point to the practical impact of the supplemental $100,000 payment obligation under the Proclamation to argue this "disrupts Congress's carefully calibrated scheme" thus overriding the "particular provisions of the INA." Pls' Mem. at 19 (quoting *Hawaii*, 585 U.S. at 689). Plaintiffs anticipate that "the Proclamation [will] fundamentally transform[] the visa category that Congress by statute created," Pls.' Reply at 1, by reducing "the number of petitions far below what Congress provided" with the cap on H-1B visas, Pls.' Mem. at 22, and limiting the availability of the H-1B visa program to those domestic employers able to afford the supplemental payment, and to certain types of H-1B workers, who are "the best of the best" when the INA "imposes no such requirement on the H-1B program," *id.* at 20.

While plaintiffs' predictions about the practical impact of the Proclamation may be accurate, including a reduction below the annual cap in the number of H-1B petitions and the number and types of employers able to afford the cost of importing H-1B workers, this does not contravene statutory terms in the INA nor even congressional policy. The Proclamation is intended

45

to provide a remedy for the perceived displacement of American workers by imported H-1B workers and the adverse effects this poses for the economic and national security interests of the United States.  The same concern about protecting the American workers from displacement by imported labor animating the Proclamation is, in fact, a predominant theme in the INA and for the H-1B program specifically.  Thus, Congress conditioned participation in the H-1B program by requiring importing employers, for example, to file an LCA identifying the specialty occupation position at issue and confirming that they will comply with the requirements of the program, by paying the prospective nonimmigrant worker the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or "the prevailing wage level for the occupational classification in the area of employment."  8 U.S.C. § 1182(n)(1)(A)(i); 8 C.F.R. § 214.2(h)(4); *see supra* Part I.A.1. In addition, before filing an H-1B petition, certain importing employers must obtain certification from the Department of Labor that "there are not sufficient workers who are able, willing, qualified . . . and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor," and "the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed."  8 U.S.C. § 1182(a)(5)(A)(i)(I) and (II).

Indeed, protecting American workers against displacement is an underlying congressional policy reason for a cap on the number of H-1B visas awarded annually.  The H-1B visa cap sets a number above which "[t]he total number of aliens who may be issued visas . . . may not exceed," 8 U.S.C. §§ 1184(g)(1)(A)(vii), but the INA is devoid of a requirement or even a goal for a minimum number of such visas to issue.  Thus, a reduction in numbers of H-1B visa petitions and

46

workers resulting due to operation of the Proclamation would not contravene any INA requirement or prohibition.

Furthermore, the Proclamation does nothing to upset the statutory requirement that individuals receiving H-1B visas need to be "engaged in a specialty occupation," meaning an occupation requiring "theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty." 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(i)(1). Employers will still be able to seek H-1B visas on behalf of individuals who are not the "best of the best," but the cost for employers to do so will be higher.

In sum, plaintiffs have not persuasively identified a single manner in which the Proclamation expressly conflicts with or overrides another provision of the INA. Having determined that the Proclamation satisfies the textual prerequisites of § 1182(f) and reflects the exercise of authority within the broad discretion afforded to the President under § 1182(f), plaintiffs' *ultra vires* challenge fails.[12]

### C.    Plaintiffs' Administrative Procedure Act Claim

Separately, plaintiffs seek review under the APA of "the agencies' implementing actions," Pls.' Mem. at 35; *see also supra* Part I.B.2, arguing that "[t]he agency implementation of the Proclamation fee . . . is arbitrary and capricious and 'without observance of procedure required by law,' given that the fee rests on no lawful basis and was not promulgated through notice-and-comment rulemaking," Pls.' Reply at 43 (quoting 5 U.S.C. § 706(2)).

Defendants raise a number of threshold reasons to bar judicial review of this APA claim, with the primary argument being that "Plaintiffs have not identified an 'agency action' at all, much

---

[12]    At the hearing, plaintiffs clarified that their *ultra vires* claim is also asserted against agency implementation of the Proclamation. Motions Hr'g Tr. at 36:5-6 (Chamber's counsel stating, "[The ultra vires claim] is targeting the proclamation as well as the agency implementation of it."). As the foregoing analysis makes clear, the Proclamation is not *ultra vires*, so the *ultra vires* challenge against agency implementation fails.

less a final one," because the challenge is effectively to the President's Proclamation and not to any agency decisionmaking.  Defs.' Opp'n at 15-18; *see also id.* at 18-19 (also arguing, alternatively, that "[a]ny agency action would be committed to agency discretion").  Defendants begin with the undisputed proposition that "[t]he President is not an agency, and his actions are not subject to APA review."  Defs.' Opp'n at 15 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), and *Dalton v. Specter*, 511 U.S. 462, 470 (1994)).  Defendants next point out that, as a matter of practicality, "agencies must implement the Proclamation" because "the President cannot deny each entry on his own."  *Id.* at 15.  "If the fact that an agency is simply enacting the President's Proclamation allowed for an APA challenge," defendants argue, "this would effectively nullify the President's exemption from the APA."  *Id.*  Plaintiffs disagree, contending that if defendants' position were accurate, "presidents could 'insulate' from judicial review any future agency actions 'with the single stroke of an executive pen.'"  Pls.' Reply at 31 (quoting *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024)).  Both sides make valid points, with this debate raising the troubling specter of executive officers presenting proposed agency actions in a form that otherwise would be subject to notice-and-comment rulemaking to the President for signature and issuance in the form of an executive order or presidential proclamation to avoid APA review altogether.[13]

---

[13]     At the hearing, plaintiffs' counsel elaborated on the concerns about the potential scope of the President's authority, as compounded by its "feature," in Proclamation § 1(c), of "an open-ended discretionary exemption from" the $100,000 payment obligation, Motions Hr'g Tr. at 43:17-25, using as examples the possibility that H-1B visa petitions may only be approved if "the petitioning employer has to attach . . . an enforceable covenant" not "to engage in layoffs, off-shoring, or some other conduct that the administration identifies for five years" or the President "may just bar all immigration entirely unless noncitizens entering the country agree to follow a new migrant code promulgated by the President," *id.* at 44:14-20.  Plaintiffs also expressed concerns about the exercise of discretion to grant waivers of the $100,000 payment obligation on a "quid pro quo" basis, *id.* at 33:17-22 (Chamber's counsel, confirming whether members have such concern, "Absolutely, Your Honor."), or on the basis of whether a company seeking such a waiver was located in a State or locality with elected political officials favored by the current Administration, *id.* at 34:16-35:16 (in response to Court's query, citing stipulation by federal agency defendants in another case that grant termination decisions have been "influenced by whether a grantee's address was located in a

Whether an agency's implementation of a presidential directive constitutes "final agency action" reviewable under the APA, *see* 5 U.S.C. § 704, remains an open question in the D.C. Circuit. *See Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 120 (D.D.C. 2020) (noting that "this circuit has not clearly determined whether action taken pursuant to [a] Proclamation is reviewable"); *Milligan*, 502 F. Supp. 3d at 313-14 (noting that "the Circuit has not been perfectly clear on where to draw the line as to which agency actions are reviewable" when it concerns the "implementation of . . . Proclamations"). The Circuit has, in *dicta* in a non-APA case, "expressed doubt that regulations promulgated by an executive agency to 'flesh out' an executive order would be unreviewable [under the APA] simply because they are based on an executive order." *Tate*, 513 F. Supp. 3d at 142-43 (BAH) (quoting *Reich*, 74 F.3d at 1327). When confronted with the question in a later APA case, however, the Circuit declined to reach the issue and ruled on other grounds instead. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 903 (D.C. Cir. 2018) (declining to decide whether "the issuance of a Presidential Permit by the Secretary of State is final agency action" under the APA, because "even if the Presidential Permit issuance were agency action, it is unreviewable under the APA because it is 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2)").

Other Judges on this Court have thoughtfully considered, and landed on either side of, the question, yielding no clear majority view on the answer. *See, e.g.*, *Detroit Int'l Bridge Co. v. Gov't*

---

State that tends to elect and/or has recently elected Democratic candidates in state and national elections (so-called 'Blue States')," Joint Supplemental Filing at 8-9, *City of St. Paul v. Wright*, No. 25-cv-3899 (APM), ECF No. 17, Chamber's counsel confirming, "I think that that is a distinct problem with, first, imposing an unlawful $100,000 fee and then having a discretionary way to get around an unlawful fee in the first place. . . . I think there are concerns, yes, Your Honor. There are concerns."); *id.* at 43:17-18 (AAU's counsel confirming, "So I agree entirely with what Mr. Hughes said. You know, yes, it's a concern."). That waivers of the $100,000 payment obligation might be influenced by whether employers are located in a "so-called 'Blue State[]'" or are engaged in activities deemed to be consistent with, or contrary to, the interests of the current Administration, may sound far-fetched, but no matter how concerning to plaintiffs, as expressed in response to queries at the motions hearing, plaintiffs have not presented that concern as part of their challenge here. *See infra* n.17.

*of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (RMC) (agreeing with "several cases['] . . . conclu[sion] that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA") (collecting cases); *Nat. Res. Def. Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (RJL) (holding that State Department's issuances of presidential permits for cross-border oil pipeline were not reviewable under the APA because the Department was "acting solely on behalf of the President"); *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001) (RMU) (extending the bar on APA review of presidential actions to agency actions where the agency is "merely carrying out directives of the President"), *aff'd on other grounds*, 306 F.3d 1138 (D.C. Cir. 2002).  *But see, e.g.*, *Moghaddam*, 424 F. Supp. 3d at 120 (CKK) (finding "persuasive" the argument that "officer suits against executive branch officials charged with carrying out the instructions contained in [a] Proclamation" are APA-reviewable); *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 468 (D.D.C. 2020) (APM) (finding APA challenge to an agency's implementation of a visa-related waiver program governed by a Proclamation reviewable, because plaintiffs "do not challenge the President's actions[,] and instead challenge agency adherence to the Proclamation itself and agency guidance" (internal quotation marks omitted)); *O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) (RDM) ("The fact that the Rule defines those who are ineligible for asylum by reference to a presidential proclamation or other presidential order . . . does not insulate the Rule from APA review . . . ." (internal quotation marks omitted)).[14]

---

[14]     Courts in other circuits are similarly split.  *See, e.g.*, *White Earth Nation v. Kerry*, No. 14-cv-4726, 2015 WL 8483278, at *6-7 (D. Minn. Dec. 9, 2015) (finding that State Department's letters interpreting the scope of a presidential permit were not "an agency action that is reviewable under the APA" because the Department "was carrying out the directives of the President as set forth in [Executive Order] 13337"); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) ("[T]he State Department and Assistant Secretary were acting on behalf of the President [via delegated authority], and therefore their actions are not reviewable under the APA."); *Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009) (finding that State Department's issuance of environmental impact statement was "presidential in nature" so no

50

The line-drawing on whether APA review is available, or not, may depend on whether an agency's actions involved "mere ministerial implementation of presidential action," which might be shielded from APA review, or independent decisionmaking that "flesh[ed] out" a presidential directive, which might not be. *See Tate*, 513 F. Supp. 3d at 142-43 (BAH) (internal quotation marks omitted) (first discussing *Detroit International Bridge* and then discussing *Reich*); *see also Gomez*, 485 F. Supp. 3d at 178 (similar conclusion); *Milligan*, 502 F. Supp. 3d at 314 (similar conclusion); Pls.' Opp'n at 29 (appearing to concede that "plaintiffs may not obtain APA arbitrary-and-capricious review of an agency's ministerial implementation of a Presidential action that is concededly within the President's authority"). Such line-drawing as to what qualifies as a "ministerial implementation" may not always be a simple exercise.[15]

Fortunately, the resolution of plaintiffs' APA claim does not require wading into this uncertain terrain because a more straightforward resolution exists: Even if defendants' implementation of the Proclamation constituted "final agency action" under 5 U.S.C. § 704, defendants' actions would not run afoul of the APA. *See Ancient Coin Collectors Guild v. U.S.*

---

viable APA claim). *But see, e.g.*, *Su*, 121 F.4th at 15 (holding agency actions are subject to APA review "even if implementing an executive order"); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1157 (D. Minn. 2010) (holding that State Department's issuance of a presidential permit for cross-border oil pipeline constitutes agency action reviewable under the APA).

[15]    Whether an agency's actions are "ministerial" can be an important consideration informing APA reviewability, but relying solely on that factor raises concern. For example, if the bar on APA review applied whenever a presidential directive required only "ministerial" agency action, could an agency circumvent APA review simply by bringing proposed regulations to the President to sign as an executive order? After all, in this hypothetical, any actions taken by the agency consistent with the executive order could arguably be considered "ministerial." Yet creating such a loophole to APA review would eviscerate the right to judicial review of agency action as established by Congress. *See* Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2350-51 (2001) ("It is true that the Supreme Court held in *Franklin v. Massachusetts* that the President is not an 'agency' as defined in the APA and his actions therefore are not subject to the judicial review provisions of that statute. . . . [However,] [w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern. . . . [S]o long as the courts remain open to legal challenges, the use of presidential directive authority cannot too greatly displace the clear preferences of . . . Congress with respect to agency action."). The lack of clarity in the case law, the concerns with line-drawing, and the availability of a more straightforward resolution on the merits all counsel against deciding the threshold APA issues raised by defendants in this case.

*Customs & Border Prot.*, 698 F.3d 171, 183-84 (4th Cir. 2012) (declining to decide whether agency's actions "at the behest of the President" were shielded from APA review, because, "[e]ven were we to assume that [the agency] was fully subject to the APA, none of its actions were remotely arbitrary or capricious").

  Plaintiffs concede that if issuance of the Proclamation is not *ultra vires*, then their APA claim would similarly fail. *See* Motions Hr'g Tr. at 56:13-14 (AAU's counsel stating, "[The APA] claims would not work if you thought the proclamation was lawful."). As determined above, the dictates of the Proclamation fall within the President's discretionary authority, under 8 U.S.C. §§ 1182(f) and 1185(a)(1). *See supra* Part III.B. Plaintiffs' challenge to defendants' implementation of the Proclamation as "contrary to law and arbitrary and capricious" is thus unpersuasive. Pls.' Mot. at 2; *see also* Pls.' Mem. at 19-20. Since defendants' challenged implementing memoranda merely carry out the Proclamation, defendants plainly do not act "arbitrarily and capriciously" or "contrary to law" in implementing a legally permissible presidential directive. Indeed, defendants here had no other course of action: As the D.C. Circuit has held, an agency "may not simply disregard" a binding presidential directive. *See Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012) (finding agency did not act arbitrarily and capriciously by adhering to the directives of a legally valid Executive Order without considering alternative policy options, because the agency "may not simply disregard an Executive Order"). As "agenc[ies] under the direction of the executive branch, [defendants] must implement the President's policy directives to the extent permitted by law." *Id.* (citing *Bldg. & Const. Trades Dep't. v. Allbaugh*, 295 F.3d 28, 32-33 (D.C. Cir. 2002)); *see also Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 731 (10th Cir. 2024) (holding that an agency action cannot "be[ ] an arbitrary and capricious exercise of agency discretion [where] the agency ha[s] *no discretion* to act otherwise"

under a "2021 executive order" (emphasis original)).  Given that defendants' implementing

memoranda summarizing and clarifying the Proclamation properly adhere to the President's

directive—which directive is permitted by law—defendants' actions are not arbitrary or capricious

or contrary to law.[16]

Likewise, plaintiffs' related contention that defendants' imposition of the $100,000

payment obligation is "procedurally unlawful" for failure to "set fees for visas pursuant to notice-

and-comment rulemaking" is not persuasive for two inter-related reasons.  Pls. Mem. at 19.  First,

any failure by defendants to engage in notice-and-comment rulemaking in implementing the

Proclamation is harmless error.  In administrative law, "error can be harmless if notice-and-

comment would not alter the legal conclusion of the rule." *Ctr. for Biological Diversity v. U.S.

Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023); *Ass'n of Am. Physicians & Surgeons v.

Sebelius*, 746 F.3d 468, 471-72 (D.C. Cir. 2014) (rejecting notice-and-comment claim when "the

statute itself" foreclosed the plaintiffs' position, and thus "all the procedure in the world" could

not lead the agency to a different conclusion).  "As incorporated into the APA, the harmless error

rule requires the party asserting error to demonstrate prejudice from the error." *First Am. Disc.

Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (citation

omitted).  Here, plaintiffs have not met their burden to show that they could have "mount[ed] a

---

[16]    Some courts have expressed concern that, where the law provides the President discretion over a decision, exposing the President's policy choices to APA review via challenges against the implementing agency "would run afoul of the separation of powers." *Nat. Res. Def. Council*, 658 F. Supp.2d at 111 (internal quotation marks omitted); *see also Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 403 (reasoning that when "agencies act on behalf of the President, the separation of powers concerns ordinarily apply with full force—especially in an area as sensitive and complex as foreign affairs" where the president has "inherent constitutional authority").  These separation of powers concerns about judicial review under the APA of such implementing agency actions may be overblown: a successful APA challenge would be difficult to mount against an agency's implementation of a presidential directive so long as the agency adheres closely to the directive and the President acted in a constitutional manner, pursuant to his inherent powers or under an enabling statute.  *See Sherley*, 689 F.3d at 784-85 (holding that, where "the President's policy directives . . . [are] permitted by law," an agency—"[b]ound as it is to carry out" the directives—does not act arbitrarily and capriciously in adhering to presidential orders).

credible challenge" to the defendants' memoranda with notice and an opportunity to comment. *See Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002).

This is related to the second reason: defendants lacked any discretion to deviate from the Proclamation's $100,000 payment requirement, and thus "no amount of procedure would have remedied [plaintiffs'] alleged harm" stemming from the Proclamation. *See Ctr. for Biological Diversity*, 77 F.4th at 685; *see also Bradford*, 101 F.4th at 731 ("[T]he 2021 executive order . . . left [the agency] no discretion . . . . Thus, it would have been futile for [the agency] to have considered comments advocating alternatives that it lacked discretion to adopt.").[17]

Plaintiffs' motion for summary judgment as to their APA claim is thus denied, and defendants' cross-motion is granted.

---

[17] Plaintiffs do not challenge the Proclamation's conferral, in Subsection (1)(c), of discretion to the Secretary of Homeland Security to waive the $100,000 payment requirement upon her determination that the hiring of "any individual alien, all aliens working for a company, or all aliens working for an industry . . . is in the national interest and does not pose a threat to the security or welfare of the United States," Proclamation, § 1(c), 90 Fed. Reg. at 46029, nor the Secretary's current position that such waiver would only be granted in consideration of "a particular alien worker," and not on a company-wide or industry-wide basis, *see* USCIS Guidance; *see also* Motions Hr'g Tr. at 33:9-12 (responding to Court's query about lack of argument about implementation of waiver discretion provided to Secretary in § 1(c), Chamber's counsel explained: "Well, your Honor, I think that would be just a Band-Aid on an otherwise flatly unlawful policy.  So we have focused on the fact that the proclamation as a whole is flatly unlawful . . . ."); *id.* at 83:4-10 (Defendants' counsel stating: "[I]t makes sense that plaintiffs didn't focus on the waiver piece . . . because it doesn't harm them that there is a possible waiver.  And if that's really the way to . . . backdoor attack the entire proclamation, . . . the President could, frankly, just pass another proclamation and just get rid of the waiver all together.").  Plaintiffs also offer no reason to consider whether any discretionary determination by the Secretary to deny a waiver may be subject to APA review.  On this point, defendants' counsel suggested that APA review might be available for waiver decisions if some policy or rule, written or unwritten, guided the Secretary's decisions.  Motions Hr'g Tr. at 84:20-85:1 ("I think, [as] plaintiff said, like, if these waiver decisions start coming and we think there is a policy or something[,] that that would be a separate claim they can bring, and that does seem like a possible separate claim.  Again, like, if there is a policy written or unwritten [informing waiver grants], I think that that could be separately, possibly, challenged."); *id.* at 85:12-15 (defendants' counsel further stating: "[T]he proclamation does tell the agencies to engage in some rulemaking, those rulemaking haven't happened; but if they did, that would separately be challengeable.").  While defendants' position is consistent with the reasoning in this case—that APA reviewability depends in part on how much independent decisionmaking an agency employs in carrying out a lawful presidential directive—an argument not pressed by plaintiffs need not be reached.  *See Anglers Conserv. Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.10 (D.D.C. 2010) (noting that "an argument not raised in an opening brief is forfeited" (citing *Fox v. Gov't of D.C.*, 794 F.3d 25, 29 30 (D.C. Cir. 2015))).

54

## IV. CONCLUSION

Plaintiffs' arguments have some force that the Proclamation's imposition of a $100,000 payment for processing new H-1B visas "would inflict significant harm on American businesses and institutions of higher education, which would be forced to either dramatically increase their labor costs or hire fewer highly skilled employees for whom domestic replacements are not readily available," and that the Proclamation has ignored that "[t]hese harms to American businesses and higher education will also be a boon to America's economic rivals, who will surely welcome the talent no longer able to accept work in the United States." Compl. ¶¶ 4-5; *see also* Pls.' Mem. at 8-11 ("Years of research confirms that these workers make invaluable contributions to the Nation, boosting productivity, sparking advancements across the domestic economy, creating jobs, and helping to train the next generation of American scientists and innovators."). Indeed, plaintiffs point out that during the pendency of this litigation, the President has apparently acknowledged a need for high-skilled foreign workers to train domestic workers, saying in an interview that the country does not "have certain talents and people have to learn. You can't take people off an unemployment line and say, 'I'm going to put you into a factory where we're going to make missiles.'" Pls.' Reply at 2, 40 n.19 (quoting Brett Samuels, *Trump on H1-B Visas: US Lacks Enough 'Talented People,'* The Hill (Nov. 12, 2025)).

Regardless of the force of plaintiffs' arguments and concerns, however, the relevant analysis focuses on constitutional and statutory *powers*, not economic *policy*. After all, the "Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of *laissez faire*." *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting). Here, Congress has granted the President broad statutory authority, which he has used to issue the Proclamation addressing, in the manner he sees fit, a

55

problem he perceives to be a matter of economic and national security.  The Proclamation and its implementation are lawful and therefore withstand plaintiffs' challenges as *ultra vires* and violative of the APA.

For the foregoing reasons, plaintiffs' motion for summary judgment is denied,  defendants' cross-motion for summary judgment is granted, and defendants' motion to dismiss is denied as moot.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  December 23, 2025

_____
**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, <br><br>                  Plaintiffs, <br><br>                  v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br>                  Defendants. | Civil Action No. 25-cv-3675 (BAH) <br><br> Judge Beryl A. Howell |

## ORDER

Upon consideration of plaintiffs the Chamber of Commerce of the United States and the Association of American Universities' Motion for a Preliminary Injunction or, in the Alternative, Summary Judgment, ECF No. 18; defendants the Department of Homeland Security, the Department of State, and their respective Secretaries in their official capacities' Cross-Motion for Summary Judgment, ECF No. 37; defendants' Motion to Dismiss the Complaint, ECF No. 50; the memoranda and exhibits submitted in support and opposition; and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that plaintiffs' Motion for a Preliminary Injunction or, in the Alternative, Summary Judgment, ECF No. 18, is **DENIED**; it is further

**ORDERED** that defendants' Cross-Motion for Summary Judgment, ECF No. 37, is **GRANTED**; it is further

**ORDERED** that defendants' Motion to Dismiss the Complaint, ECF No. 50, is **DENIED** as moot; it is further

**ORDERED** that judgment is entered in favor of defendants; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

*This is a final and appealable order.*

Date:   December 23, 2025

**BERYL A. HOWELL**
United States District Judge