**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5473**

---

*In the*

# United States Court of Appeals

*for the*

# District of Columbia Circuit

---

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and
ASSOCIATION OF AMERICAN UNIVERSITIES,
*Plaintiffs-Appellants*,

- v. -

UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-3675, Hon. Beryl A. Howell

---

## APPELLANTS' OPENING BRIEF

---

ADAM G. UNIKOWSKY
ELIZABETH HENTHORNE
ISHAN K. BHABHA
LINDSAY C. HARRISON
ZACHARY C. SCHAUF
  *Jenner & Block LLP*
  *1099 New York Ave. NW*
  *Washington, DC 20001*
  *(202) 637-6000*

*Counsel for Appellant*
*Association of American*
*Universities*

PAUL D. CLEMENT
JAMES Y. XI
JEFFREY C. THALHOFER
  *Clement & Murphy, PLLC*
  *706 Duke Street*
  *Alexandria, VA 22314*
  *(202) 742-8900*

*Counsel for Appellants*
*Chamber of Commerce of*
*the United States of*
*America and Association*
*of American Universities*

PAUL W. HUGHES
ALEX BOOTA
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

DARYL L. JOSEFFER
  *U.S. Chamber Litigation Center*
  *1615 H Street NW*
  *Washington, DC 20062*
  *(202) 463-5337*

*Counsel for Appellant*
*Chamber of Commerce of the*
*United States of America*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici**. The parties before the Court are plaintiff-appellant Chamber of Commerce of the United States of America; plaintiff-appellant Association of American Universities; defendant-appellee United States Department of Homeland Security; defendant-appellee United States Department of State; defendant-appellee Kristi L. Noem, in her official capacity as Secretary of Homeland Security; and defendant-appellee Marco A. Rubio, in his official capacity as Secretary of State. The Federation for American Immigration Reform appeared as *amicus curiae* in the district court. There are no other parties or *amici* at this time.

**Rulings under review.** The ruling under review is the opinion and order signed on December 23, 2025, by the United States District Court for the District of Columbia, Hon. Beryl A. Howell, denying Appellants' motion for a preliminary injunction, or in the alternative, summary judgment and granting the government's motion for summary judgment. The opinion is reproduced at JA423. The opinion is available at 2025 WL 3719234 (D.D.C. Dec. 23, 2025).

**Related cases.** This case has not previously been before this Court. Counsel is aware of no related cases pending in this Court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Appellants certify the following:

The Chamber of Commerce of the United States of America (U.S. Chamber) is a registered 501(c)(6) non-profit corporation and has no parent company. No publicly held corporation or entity owns any interest in the U.S. Chamber.

*/s/ Paul W. Hughes*

The Association of American Universities (AAU) is a registered 501(c)(3) non-profit corporation and has no parent company. No publicly held corporation or entity owns any interest in AAU.

*/s/ Lindsay C. Harrison*

# TABLE OF CONTENTS

Introduction ................................................................................................1

Jurisdiction ................................................................................................4

Issue Statement ........................................................................................4

Statutes .....................................................................................................4

Statement of the Case .............................................................................4

    A.   Legal and Regulatory Background ..................................................4

        1.   The H-1B Program ............................................................4

        2.   H-1B Fees .........................................................................7

        3.   The President's INA authorities .......................................9

    B.   Factual Background ..........................................................................9

        1.   The Proclamation .............................................................9

        2.   Impacts of the Proclamation for American employers..........10

    C.   Procedural Background....................................................................11

Summary of Argument.............................................................................12

Standard of Review .................................................................................15

Argument ..................................................................................................15

I.   The Proclamation is unlawful. ..........................................................15

    A.   The Proclamation exercises two core congressional powers........16

        1.   Congress has plenary power over immigration and exercised it with the H-1B program.....................................16

        2.   Congress's power to levy taxes is exclusive............................17

    B.   The Proclamation conflicts with congressional choices embodied in the INA.......................................................................21

        1.   The Proclamation conflicts with the INA's fee provisions.............................................................................24

        2.   The Proclamation conflicts with the H-1B eligibility requirements......................................................................29

    C.   Congress has not authorized the Proclamation's exercise of its taxing power. ..........................................................................34

        1.   Section 212(f) does not authorize the Proclamation's tax.....................................................................................35

        2.    Section 215(a)(1) does not save the Proclamation.................44

II.   Appellants' claims are justiciable. ......................................................47

    A.   Courts have the authority to enjoin or set aside
        implementation of the Proclamation.............................................48

        1.    Consular nonreviewability does not bar review...................48

        2.    Ultra vires review is available. .............................................48

        3.    APA review is available. .......................................................51

III.  Prompt injunctive or set-aside relief is imperative. ...........................53

    A.   The Court should direct the entry of an injunction as to
        Appellants' members. ....................................................................54

        1.    The Proclamation is causing irreparable harm....................54

        2.    The remaining equitable factors favor relief. .......................57

    B.   The Court should direct the entry of APA injunctive and set-
        aside relief. ....................................................................................58

Conclusion.......................................................................................................59

# TABLE OF AUTHORITIES

## Cases

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
41 F.4th 586 (D.C. Cir. 2022) .................................................................47

*Alcresta Therapeutics, Inc. v. Azar*,
755 F. App'x 1 (D.C. Cir. 2018) ............................................................57

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) ....................................................48, 49, 50

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ...............................................................................58

*Associated Builders & Contractors of Se. Texas v. Rung*,
2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ........................................53

*Ayuda, Inc. v. Attorney General*,
661 F. Supp. 33 (D.D.C. 1987) ..............................................................29

*Barrick Goldstrike Mines Inc. v. Browner*,
215 F.3d 45 (D.C. Cir. 2000) .................................................................51

*Biden v. Nebraska*,
600 U.S. 477 (2023) .........................................................................41, 42

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
172 F. Supp. 2d 67 (D.D.C. 2001) .........................................................53

*Bond v. United States*,
564 U.S. 211 (2011) ...........................................................................3, 36

*CC Distribs., Inc. v. United States*,
883 F.2d 146 (D.C. Cir. 1989) ...............................................................48

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ....................................................49, 50, 51

*Cigar Ass'n of Am. v. FDA*,
964 F.3d 56 (D.C. Cir. 2020) .................................................................15

*Clinton v. City of New York*,
524 U.S. 417 (1998) .................................................................................3

*Detroit Int'l Bridge Co. v. Government of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) .........................................................53

## Cases—continued

*Doe #1 v. Trump*,
  423 F. Supp. 3d 1040 (D. Or. 2019) ..........................................................53

*Doe #1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020) ...........................................................22, 44

*East Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (2018) ....................................................................................53

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ...................................................................................54

*Eidman v. Martinez*,
  184 U.S. 578 (1902) ...................................................................................18

*Epic Systems Corp. v. Lewis*,
  584 U.S. 497 (2018) ...................................................................................36

*Ethyl Corp. v. EPA*,
  51 F.3d 1053 (D.C. Cir. 1995) ..............................................................28

*FCC v. Consumers' Rsch.*,
  606 U.S. 656 (2025) ............................................................................19, 43

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
  980 F.3d 123 (D.C. Cir. 2020) ..............................................................58

*Fed. Express Corp. v. United States Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022)................................................................50

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ...................................................................................17

*Freeman v. Quicken Loans, Inc.*,
  566 U.S. 624 (2012) ...................................................................................33

*Galvan v. Press*,
  347 U.S. 522 (1954) ...................................................................................16

*Genus Med. Techs. LLC v. FDA*,
  994 F.3d 631 (D.C. Cir. 2021) ..............................................................15

*Giri v. Nat'l Bd. of Med. Examiners*,
  718 F. Supp. 3d 30 (D.D.C. 2024) ........................................................55

*Gould v. Gould*,
  245 U.S. 151 (1917) ............................................................................18, 36

## Cases—continued

*Haig v. Agee,*
  453 U.S. 280 (1981) ....................................................46

*Halverson v. Slater,*
  129 F.3d 180 (D.C. Cir. 1997) ...........................27, 29

*The Head Money Cases,*
  112 U.S. 580 (1884) ...................................................39

*In re Hechinger Inv. Co. of Delaware,*
  335 F.3d 243 (3d Cir. 2003)........................................45

*Henderson v. Mayor of City of New York,*
  92 U.S. 259 (1875) .....................................................20

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
  626 F.3d 84 (D.C. Cir. 2010) .....................................25

*U.S. ex rel. Knauff v. Shaughnessy,*
  338 U.S. 537 (1950) ...................................................49

*League of Women Voters of United States v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) .......................................57

*Learning Res., Inc. v. Trump,*
  784 F. Supp. 3d 209 (D.D.C. 2025) ......................19, 38

*Leedom v. Kyne,*
  358 U.S. 184 (1958) ...................................................50

*Luokung Tech. Corp. v. Dep't of Def.,*
  538 F. Supp. 3d 174 (D.D.C. 2021) ...........................55

*Massachusetts v. United States,*
  435 U.S. 444 (1978) ...................................................21

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819).....................................18

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ...................................................58

*Nalco Co. v. U.S. E.P.A.,*
  786 F. Supp. 2d 177 (D.D.C. 2011) ...........................57

## Cases—continued

*Nat'l Ass'n of Mfrs. v. DHS,*
491 F. Supp. 3d 549 (N.D. Cal. 2020) ........................................41

*Nat'l Cable Television Ass'n, Inc. v. United States,*
415 U.S. 336 (1974) ...............................................18, 19, 29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998) ..............................................58

*Nat'l Venture Cap. Ass'n v. Duke,*
291 F. Supp. 3d 5 (D.D.C. 2017) ..........................................47, 55

*Nicol v. Ames,*
173 U.S. 509 (1899) ..........................................................17, 18

*Nishimura Ekiu v. United States,*
142 U.S. 651 (1892) ......................................................16, 17, 24

*Nken v. Holder,*
556 U.S. 418 (2009) ........................................................54, 57

*NRC v. Texas,*
605 U.S. 665 (2025) ..............................................................50

*Oceanic Steam Nav. Co. v. Stranahan,*
214 U.S. 320 (1909) ...............................................................17

*People for the Ethical Treatment of Animals v. Tabak,*
109 F.4th 627 (D.C. Cir. 2024) ..................................................15

*Peter v. NantKwest, Inc.,*
589 U.S. 23 (2019) ................................................................38

*Pietersen v. United States Dep't of State,*
138 F.4th 552 (D.C. Cir. 2025) ..................................................48

*Powerex Corp. v. Reliant Energy Servs., Inc.,*
551 U.S. 224 (2007) ..............................................................46

*President and Fellows of Harvard College v. DHS,*
788 F. Supp. 3d 182 (D. Mass. June 23, 2025) .................................22

*Pub. Citizen v. U.S. Trade Representative,*
5 F.3d 549 (D.C. Cir. 1993) .....................................................52

*Rainbow Nav., Inc. v. Dep't of Navy,*
783 F.2d 1072 (D.C. Cir. 1986) ..................................................49

## Cases—continued

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
  793 F. Supp. 3d 19 (D.D.C. 2025) ....................................22, 23, 53

*\*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
  No. 25-5243 (D.C. Cir. Aug. 1, 2025)...........................................23, 39, 45

*Rudisill v. McDonough*,
  601 U.S. 294 (2024) ...................................................................45

*Rural Cellular Ass'n v. FCC*,
  685 F.3d 1083 (D.C. Cir. 2012) ...............................................19

*SAS Inst., Inc. v. Iancu*,
  584 U.S. 357 (2018) ...................................................................30

*SEC v. Jarkesy*,
  603 U.S. 109 (2024) .............................................................16, 23

*\*Skinner v. Mid-American Pipeline Co.*,
  490 U.S. 212 (1989) ...................................... 2, 19, 21, 34, 38, 43

*Smith v. Turner*,
  48 U.S. 283 (1849) ...............................................................20, 21

*SSM Litig. Grp. v. EPA*,
  150 F.4th 593 (D.C. Cir. 2025)..............................................47

*Tierney v. Schweiker*,
  718 F.2d 449 (D.C. Cir. 1983) ................................................54

*TikTok Inc. v. Trump*,
  490 F. Supp. 3d 73 (D.D.C. 2020) ..........................................55

*Treat v. White*,
  181 U.S. 264 (1901) ..................................................................19

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) .................................................49

*\*Trump v. Hawaii*,
  585 U.S. 667 (2018) .......... 2-3, 13, 15-16, 21-23, 26, 32-35, 41, 43, 44, 49

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ...................................................................42

*United States v. Isham*,
  84 U.S. 496 (1873) ................................................................2, 18

## Cases—continued

*United States v. Laub,*
  385 U.S. 475 (1967) ................................................................46

*United States v. Merriam,*
  263 U.S. 179 (1923) ................................................................19

*United States v. Rapone,*
  131 F.3d 188 (D.C. Cir. 1997) ...............................................21

*United States v. Sperry Corp.,*
  493 U.S. 52 (1989) ................................................................21

*United States v. Williams,*
  553 U.S. 285 (2008) ................................................................46

*United States v. Witkovich,*
  353 U.S. 194 (1957) ................................................................45

*United States v. Yong Jun Li,*
  643 F.3d 1183 (9th Cir. 2011) ...............................................37

*V.O.S. Selections, Inc. v. Trump,*
  149 F.4th 1312 (Fed. Cir. 2025).................... 19, 20, 35, 38, 44

*W. Virginia Univ. Hosps., Inc. v. Casey,*
  499 U.S. 83 (1991) ................................................................47

*W. Virginia v. EPA,*
  597 U.S. 697 (2022) ................................................................3, 41

*Webster v. Doe,*
  486 U.S. 592 (1988) ................................................................49

*Whitman-Walker Clinic, Inc. v. HHS,*
  485 F. Supp. 3d 1 (D.D.C. 2020) ...........................................55

*Wisconsin Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ...............................................57

*WorldVue Connect Glob., L.L.C. v. Szuch,*
  155 F.4th 472 (5th Cir. 2025)................................................55

*Wrenn v. D.C.,*
  864 F.3d 650 (D.C. Cir. 2017) ...............................................53

## Constitutional Provisions and Statutes

Declaration of Independence, 1 Stat. 1 (1776)..............................................18

U.S. Const., art. I, § 7.................................................................1, 18

*U.S. Const. art. I, § 8, cl. 1 ..................................... 12, 17, 20, 35

5 U.S.C.

§ 703 ...............................................................................58

§ 704 ...............................................................................51

§ 706(2) .......................................................................53, 58

8 U.S.C.

§ 1101 ...............................................................................4

§ 1101(a)(15).................................................................4, 17

§ 1101(a)(15)(H)(i)(b) ....................................................5, 17

§ 1103(a) .....................................................................27, 52

§ 1104(a) ..........................................................................52

§ 1153(b)(1)(A)..................................................................30

§ 1153(b)(2)(A)..................................................................30

§ 1182(a)(5)(A)(i)...............................................................32

*§ 1182(f)............................... 1-3, 9-10, 12-13, 16, 22-23, 27, 29, 34-47, 49

§ 1182(n)(1) ..................................................................6, 32

§ 1182(n)(2)(C) ...................................................................6

§ 1184 ..............................................................................5

*§ 1184(a)(1).....................................................................39

§ 1184(c)(1) .......................................................................5

§ 1184(c)(9) ...................................................................8, 24

§ 1184(c)(12) ..................................................................8, 24

§ 1184(g) ...........................................................................7

§ 1184(g)(3) ......................................................................30

§ 1184(g)(5) ...................................................................7, 31

§ 1184(i) .......................................................................5, 30

§ 1185 .............................................................................46

*§ 1185(a)(1)..................................1-3, 9-10, 13, 16, 27. 34, 44-47, 49

§ 1185(b) ..........................................................................46

§ 1201(a) ..........................................................................52

**Constitutional Provisions and Statutes—continued**

8 U.S.C.

    \*§ 1356(m) ...................................................... 8, 25, 26, 27, 28, 29

    § 1356(u)(3) ...............................................................................8, 24

28 U.S.C.

    § 1291 .............................................................................................4

    § 1331 .............................................................................................4

31 U.S.C. § 9701 ...............................................................................29

47 U.S.C. § 1451(b)(1)(B) ...............................................................31

49 U.S.C. § 10101 ............................................................................24

50 U.S.C. § 1702(a)(1)(B) ...............................................................19

Act of May 22, 1918, 40 Stat. 559....................................................46

An Act to Regulate Immigration, 22 Stat. 214 (1882) ....................39

Pub. L. No. 68-139, 43 Stat. 153.......................................................39

Pub. L. 82-414, 66 Stat. 163 (1952).................................... 4, 31, 37, 40

Pub. L. 95-426, 99 Stat. 963 (1978) ..................................................46

Pub. L. 101-649, 104 Stat. 4978 (1990) ..............................................5

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ....................................37

Pub. L. No. 114-113, 129 Stat. 2242 (2015) ..................................8, 26

**Legilsative Materials**

H.R. Rep. 101-723 (Sept. 19, 1990) ...........................................6, 32

S. Rep. No. 68-1056 (1925)...............................................................46

**Regulations**

8 C.F.R.

    § 106.2 (a)(3).....................................................................................8

    § 106.2(c)(11) ...................................................................................8

    § 106.2(c)(13) ...................................................................................8

    § 214.2(h)(8)(iii)(A)(1) ....................................................................7

**Agency Materials**

51 Fed. Reg. 30470 (Aug. 26, 1986) ........................................................40

56 Fed. Reg. 11,705 (Mar. 20, 1991) .......................................................6

59 Fed. Reg. 24337 (May 10, 1994) .........................................................40

63 Fed. Reg. 2871 (Jan. 16, 1998) ............................................................40

76 Fed. Reg. 49277 (Aug. 9, 2011) ..........................................................40

84 Fed. Reg. 53991 (Oct. 9, 2019) ...........................................................41

85 Fed. Reg. 34353 (June 4, 2020) ...........................................................40

85 Fed. Reg. 38263 (June 25, 2020) .........................................................41

86 Fed. Reg. 59603 (Oct. 25, 2021) ..........................................................41

88 Fed. Reg. 86541 (Dec. 14, 2023) .........................................................40

90 Fed. Reg. 59717 (Dec. 16, 2025) .........................................................40

90 Fed. Reg. 60,864 (Dec. 29, 2025) ........................................................30

**Dictionaries**

Duties, *Black's Law Dictionary* 402 (1st ed. 1891).....................................20

Entry, *Oxford English Dictionary* (Rev. 2018) ...........................................37

Imposts, *Black's Law Dictionary* 596 (1st ed. 1891) ...................................20

Restrict, *Black's Law Dictionary* 1478 (4th ed. 1951)................................37

Restrict, *Webster's New Int'l Dictionary* 2125 (2d ed. 1947).......................37

## INTRODUCTION

This case involves a blatant violation of the separation of powers. The President has attempted to fundamentally transform the H-1B visa system into a revenue center, creating a stark conflict with Congress's judgments regarding the H-1B program's parameters. That effort is unlawful and violates the separation of powers several times over.

Congress created the H-1B program and specified the appropriate associated fees. By the Proclamation challenged here, the President seeks to remake this system of modest fees into a revenue-raising scheme where H-1B visas are allocated to employers willing and able to pay $100,000, a tax that is 25 times the typical statutory H-1B petition fee, and 10 times the maximum fee permitted by statute. That transformation is a fundamentally legislative act. Congress could decide to convert the H-1B visa system into a revenue source more akin to an FCC spectrum auction (though any taxation legislation would need to originate in the House of Representatives, U.S. Const. art. I, §7, cl. 1). But the President has no authority to effectuate unilaterally this kind of legislative act, let alone to wrest the power of the purse from Congress.

The President purports to locate his authority to strike a new legislative bargain—and to lay new taxes that originate in the White House rather than the House of Representatives—in Sections 212(f) and 215(a) of the

1

INA. But those provisions address different issues entirely. Section 212(f) governs the exclusion of noncitizens whose entry would be detrimental to the national interest. Section 215(a) relates to the integrity of the travel control process. Neither provision authorizes raising revenue from U.S. institutions and businesses based on noncitizens the government is happy to let in pursuant to a statutory visa program. On its face, the Proclamation is avowedly all about the latter. That is doubly problematic. The H-1B program is the opposite of the kind of entry restriction authorized by Sections 212(f) and 215(a); it is a program for getting selected workers *into* the country. More to the point: The metes and bounds of the program, and the associated fees, are all questions specifically addressed elsewhere in the INA.

Nothing in *Trump v. Hawaii*, 585 U.S. 667 (2018), allows the President to use Sections 212(f) or 215(a) to displace other provisions of the INA, let alone transform cost-recovery fees into taxes that outstrip costs by orders of magnitude. To the contrary, bedrock separation-of-powers principles prohibit any such conversion. Indeed, Congress must speak clearly when imposing taxes or delegating that power to the Executive (*see, e.g.*, *United States v. Isham*, 84 U.S. 496, 504 (1873); *Skinner v. Mid-American Pipeline Co.*, 490 U.S. 212 (1989)) and neither Section 212(f) nor Section 215(a)(1) includes anything approaching a clear statement. Moreover, the kind of extreme deference the government seeks (and the district court afforded) is

2

especially inappropriate because nothing in the Proclamation keeps any particular individuals or class of noncitizens out of the country categorically, as opposed to admitting them only if the price is right.

As the government conceded below, no President has ever used Section 212(f) or 215(a)(1) as the Proclamation does. That itself is a damning admission, because when it comes to the separation of powers, a prolonged failure to assert "a highly attractive power" is compelling evidence that no such power exists. *W. Virginia v. EPA*, 597 U.S. 697, 731-732 (2022). Here, it is not hard to see why the asserted power was withheld: The separation of powers exists to protect liberty (*see Bond v. United States*, 564 U.S. 211, 222 (2011)) and few of its aspects do so more obviously than vesting the power to tax in the People's representatives. Just as plainly, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The President's authority under Section 212(f) may be broad within its "sphere" (*Hawaii*, 585 U.S. at 695), but the power to radically alter a statutory scheme through a revenue-raising order is well outside that remit. This Court should reverse.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. It entered judgment on December 23, 2025. Appellants noticed their appeal on December 29, 2025. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE STATEMENT

Whether the Proclamation is unlawful and thus Appellees' implementation of it should be enjoined under the Court's inherent equitable powers and set aside under the Administrative Procedure Act.

## STATUTES

The addendum contains the relevant statutory provisions.

## STATEMENT OF THE CASE

### A.    Legal and Regulatory Background

#### 1.    *The H-1B Program*

Congress in the Immigration and Nationality Act (INA) exercised its undoubted authority over immigration to set rules governing the admission of noncitizens into the United States. *See* 8 U.S.C. §§ 1101 et seq. Among other things, it provides for various nonimmigrant visas for noncitizens to enter the United States temporarily for specific purposes. *See id.* §§ 1101(a)(15), 1184.

**a.** Congress created a nonimmigrant visa for temporary specialty workers in 1952, in the original INA. Pub. L. 82-414, § 101(a)(15)(H)(i), 66

4

Stat. 163, 168 (1952). It codified the H-1B program in essentially its current form in 1990. Pub. L. 101-649, 104 Stat. 4978 (1990).

H-1B visas are available to noncitizens "coming temporarily to the United States to perform services … in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b). A "specialty occupation" requires "theoretical and practical application of a body of highly specialized knowledge, and … attainment of a bachelor's or higher degree in the specific specialty." *Id.* § 1184(i)(1).

Congress addressed the process for applying for an H-1B visa in 8 U.S.C. § 1184. An "importing employer" must submit a petition for a nonimmigrant visa "in such form and contain[ing] such information as the [Secretary of Homeland Security] shall prescribe." 8 U.S.C. § 1184(c)(1). This petition must be "made and approved before the visa is granted." *Id.*

**b.** Congress crafted protections to ensure the H-1B program aligns with the needs of the domestic economy. An employer intending to hire an H-1B worker must complete a Labor Condition Application certifying that the employer will offer H-1B workers "wages that are at least" the greater of "the actual wage level paid by the employer to all other" similarly qualified workers or the "prevailing wage level for the occupational classification

5

in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i). An incorrect certification may result in monetary fines and a ban on future petitions. *Id.* § 1182(n)(2)(C).

Employers with a history of willful certification violations or a large percentage of H-1B workers must certify that they have tried and failed to fill the position with a domestic worker and will not displace a U.S. worker for months after the application. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A). Specific protections apply when one employer hires an H-1B employee to perform duties at a different employer's worksite. *Id.* § 1182(n)(1)(F), (2)(E).

Congress thus balanced the goal of preserving well-paying, high-skilled jobs for U.S. citizens with "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found." H.R. Rep. 101-723, pt. 1, at 41 (Sept. 19, 1990); *see Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705, 11,706-11,707 (Mar. 20, 1991) ("[T]he broad intent of the Act is … to make the immigration system more efficient and responsive to the needs of employers experiencing labor shortages, while at the same time providing greater safeguards and protections for both U.S. and alien workers.").

**c.** Since 1990, Congress has imposed a cap limiting the annual number of H-1B visas. Currently, the cap is 65,000, plus 20,000 for individuals with advanced degrees from U.S. institutions. 8 U.S.C. § 1184(g). Universities and affiliated nonprofit entities (such as university health systems) and nonprofit and government research organizations are exempt from the cap. *Id.* § 1184(g)(5)(A), (B).

Because demand for H-1B visas outpaces the cap-limited supply, U.S. Citizenship and Immigration Services (USCIS) maintains a "lottery" to determine who will be awarded visas. An employer "registers" for the lottery, and, if selected, may submit a petition. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). The lottery occurs every March. Cap-exempt employers are not subject to the lottery and may file petitions at any time.

Decades of research substantiate what Congress found in establishing the program: H-1B workers make invaluable contributions, boosting productivity, sparking economic advancements, creating jobs, and training the next generation of American scientists and innovators. Dkts. 18-27 through 18-34; 18-39 through 18-41; and 18-45 through 18-46 (collecting such studies).

### 2. *H-1B Fees*

Congress has specified the fees that apply to H-1B petitions, and the process for the Executive to impose additional fees.

7

*First*, Congress enumerated several H-1B-specific fees. Most employers must pay a filing fee of $1,500 (8 U.S.C. § 1184(c)(9)(A)-(C)) and an additional $500 for fraud prevention measures (*id.* § 1184(c)(12)(A)-(C)). Congress also established a $4,000 fee for employers with 50+ workers, more than half of whom are H-1B or L-1 employees. Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015). Finally, Congress provided for "premium processing" fees entitling employers to speedier decisions. 8 U.S.C. § 1356(u)(3).

*Second*, Congress delegated fee-setting authority to USCIS. 8 U.S.C. § 1356(m). USCIS may "in regulations" assess "fees for providing adjudication and naturalization services," which "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.*

Under Section 1356(m), USCIS has, through notice-and-comment rulemaking, promulgated several fees pertaining to H-1B visas. These include the fees to register for the annual lottery (8 C.F.R. § 106.2(c)(11)) and file the H-1B petition (*id.* § 106.2 (a)(3)) and an "asylum program fee" (*id.* § 106.2(c)(13)). These fees can total up to $1,595.

Before the Proclamation, the total statutory and USCIS-set fees associated with filing a typical H-1B petition were approximately $3,600. *See* JA198; JA231-232.

8

### 3.    *The President's INA authorities*

Congress has delegated some portions of its plenary authority over immigration to the President. Section 212(f) authorizes the President by proclamation, and upon "find[ing] that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Section 215(a)(1) makes it unlawful "for any alien to … enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

### B.    Factual Background

### 1.    *The Proclamation*

The President issued the Proclamation on September 19, 2025. JA168. It is unprecedented on multiple dimensions.

The Proclamation cites an alleged "large-scale replacement of American workers through systemic abuse of the [H-1B] program" purportedly allowing employers to "artificially suppress wages resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers." JA168. It concludes that it is "necessary to impose higher costs on

9

companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." JA169.

The Proclamation attempts to create this new "best of the best" program by imposing a $100,000 per-petition exaction on employers, and instructs various agencies and officials to implement it. Section 1(a), invoking Sections 212(f) and 215(a), declares that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under [the H-1B program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000," subject to certain exceptions. JA169.[1]

The Proclamation took effect September 21, 2025, and expires 12 months thereafter, unless extended. JA170. The first lottery since the Proclamation's effective date is scheduled for March 2026.

### 2.    *Impacts of the Proclamation for American employers*

The Proclamation has profoundly affected American employers, including Appellants' members.

---

[1]    Although unstated in the Proclamation, the government later clarified that the fee applies only to future petitions for *new* H-1B visas, and does not affect current H-1B visa-holders, renewals, or successful change-of-status petitions. JA181; *see also* JA173.

Employers hire H-1B workers "[w]hen they cannot find a sufficient number of talented individuals for the positions they need to fill domestically." JA79. "The Proclamation will force AAU members to make an impossible decision between curtailing their employment of H-1B visa holders, on the one hand, and making cuts to their teaching, staff, patient care capacity in their affiliated medical centers, and other programs to offset the increased cost of H-1B applications, on the other." JA101; *see, e.g.*, JA112 (each outcome "would negatively affect [the University of Illinois Urbana-Champaign's] mission and operations"). AAU documented how the Proclamation is blocking or complicating the fulfillment of multiple critical jobs. *E.g.*, JA125-126 (researchers at the University of Michigan); JA106 (senior scientist at Carnegie Mellon University); JA160 (teaching faculty at Arizona State University). And "[d]ozens of specific U.S. Chamber members who were planning to hire H-1B workers through the upcoming H-1B visa lottery now anticipate, after the announcement of the Proclamation, hiring fewer or no H-1B workers." JA81.

## C.     Procedural Background.

Appellants sued, arguing the Proclamation is *ultra vires* and its implementation violates the Administrative Procedure Act (APA).

11

Citing the need for urgent relief, Appellants moved for a preliminary injunction or, alternatively, summary judgment. After expedited consideration, the district court denied Appellants' motion and awarded summary judgment to Appellees. JA423-478. The court held that Appellants have standing (JA440-442) and assumed their challenge was justiciable (JA442-444; JA469-476). But it concluded their claims failed on the merits, holding that Section 212(f) confers authority to impose a payment requirement (JA444-463) and that the Proclamation does not conflict with other INA provisions. (JA463-469).

Appellants immediately appealed. This Court granted their consented-to motion to expedite.

## SUMMARY OF ARGUMENT

**I.** The Proclamation is an obvious affront to the separation of powers. The Constitution vests in Congress the power to define the conditions under which noncitizens may enter the United States. And it confers on Congress the power to lay "Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1. Here, the Proclamation transforms Congress's H-1B visa program by massively taxing U.S. institutions and businesses. It is doubly unlawful.

*First*, the Proclamation conflicts with how Congress unambiguously exercised its own exclusive powers in fashioning the H-1B program. Congress set specific statutory fees that reflect its judgment on how much an H-

1B visa should cost. And Congress delegated precise—and limited—fee-set-ting authority to the Executive, defining both the procedure and substance for how agencies may set "adjudication fees" for immigration benefits. Meanwhile, Congress meticulously defined which noncitizens should be eligible for H-1B visas (those in "specialty occupations," not the "best of the best"—who are covered by separate visa categories specifically reserved for those with "exceptional" or "extraordinary" abilities, *see infra* 30), how to meter demand that exceeds the statutory limits on supply (first come, first served; not who can pay the most), and how to balance deterring misuse of the program with assuring its availability for employers that depend on it (via a reticulated system of fees and sanctions). Congress thus already addressed "the exact problem" at issue in the Proclamation. *Hawaii*, 585 U.S. at 691. The Executive may not employ Sections 212(f) or 215(a)(1) to nullify the program Congress created and the choices it expressly made elsewhere in the statute.

*Second*, Sections 212(f) and 215(a)(1) are addressed to different issues and do not provide backdoor authority to override the H-1B program, let alone impose substantial new taxes that avowedly seek to deter U.S. employers' use of Congress's program. That is true as a matter of ordinary statutory construction, and even truer under the clear-statement rule that applies to delegations of Congress's taxing power. Sections 212(f) and 215(a)(1)

13

are about suspending, restricting, and regulating entry, not taxing U.S. employers based on the entry of noncitizens whom the Executive is perfectly happy to admit at the right price point.

History confirms the point: Although these Sections have been invoked nearly 100 times, they have never been employed to transform a visa program or seize Congress's exclusive taxing authority. And although the Proclamation is the first of its kind, if it stands, it will not be the last. It will be an open invitation for this and future Presidents to turn a reticulated visa scheme and modest fee provisions into revenue centers—all via provisions designed to keep certain foreign nationals out, not find the market-clearing price for letting them in.

**II.** These claims are justiciable. Circuit precedent forecloses the government's consular non-reviewability argument. And Appellants appropriately assert both *ultra vires* and APA claims. Indeed, the only thing more troubling than the unilateral power asserted here is the notion that there would be zero judicial review to police future efforts to extend that power.

**III.** The Court should direct the entry of prompt injunctive relief, among other remedies. The stakes are high, and the equities are not close. Appellants have vested interests in the program Congress created. Although Congress would have the power to change that system while consid-

14

ering reliance interests and perhaps providing transition rules, the President does not have the power unilaterally to transform the program, and destroy those reliance interests, via Proclamation.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of summary judgment in favor of the government *de novo*" and has an "obligation to 'make an independent examination of the whole record.'" *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 632 (D.C. Cir. 2024). Likewise, "[w]hen a district court reviews agency action under the APA," this Court "review[s] the district court's decision de novo" (*Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020)), and "give[s] no particular deference to the District Court's views" (*Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 636 (D.C. Cir. 2021)).

## ARGUMENT

## I.     THE PROCLAMATION IS UNLAWFUL.

The Proclamation offends our separation of powers. Congress, not the President, has exclusive power to define the contours of visa programs and impose taxes on U.S. entities. The Proclamation, however, commandeers the second power in order to exercise the first, imposing a massive $100,000 flat tax to fundamentally rewrite the H-1B program to the President's liking. The Proclamation both "conflict[s]" with the choices Congress made when it exercised core powers (*Hawaii*, 585 U.S. at 691) and exceeds the

15

"textual limits" on the authorization to restrict and regulate "entry" in Sections 212(f) and 215(a)(1) (*id.* at 669).

## A. The Proclamation exercises two core congressional powers.

The essential starting point—which the district court largely disregarded—is that the Proclamation purports to exercise two powers the Constitution entrusts solely to Congress: the power to make rules under which noncitizens may enter, and the power to levy taxes.

### 1. Congress has plenary power over immigration and exercised it with the H-1B program.

The Constitution gives Congress "plenary power over immigration." *SEC v. Jarkesy*, 603 U.S. 109, 129 (2024); *see also Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) (Congress's "power to regulate commerce with foreign nations[] includ[es] … the bringing of persons into the ports of the United States"). This principle is "as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government." *Galvan v. Press*, 347 U.S. 522, 531 (1954). There is "not merely 'a page'" but "a whole volume" of history confirming that "the formulation of … policies" concerning "the entry of aliens and their right to remain here …. is entrusted exclusively to Congress." *Id.* The Executive is tasked merely with "enforcement of these policies." *Id*.

16

Congress's plenary power "to prescribe the terms and conditions on which [noncitizens] may come in" to the United States as well as to "expel aliens or classes of aliens from" the country (*Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 335-36 (1909) (citations omitted)), naturally includes the power to delimit the particular purposes for which noncitizens may enter and to impose conditions upon their continued presence (*see, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 794 (1977) ("Congress has … exceptionally broad power to determine which classes of aliens may lawfully enter the country."); *Nishimura Ekiu*, 142 U.S. at 659 (Congress has "power … to admit [noncitizens] only in such cases and upon such conditions as it may see fit.")).

In exercising this plenary power, Congress via the INA created a host of visa classifications under which noncitizens may enter and remain only under specified conditions—including the H-1B program. 8 U.S.C. § 1101(a)(15)(H)(i)(b); *see id.* § 1101(a)(15)(A)-(V).

### 2. *Congress's power to levy taxes is exclusive.*

The Constitution also vests in Congress exclusive "Power To lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1. The taxing power "is the one great power upon which the whole national fabric is based." *Nicol v. Ames*, 173 U.S. 509, 515 (1899). Indeed, it "is the most

17

important of the authorities proposed to be conferred upon the Union." Federalist No. 33 (Hamilton). But this power also "involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431-32 (1819). To prevent abuse, the Framers ensured only *Congress* would "ha[ve] access to the pockets of the people." Federalist No. 48 (Madison).

Article I thus vests "the whole power of taxation … [in] congress." *Nicol*, 173 U.S. at 515. It further specifies that "[a]ll Bills for raising Revenue shall originate in the House," the national body most responsive to the people and most attuned to local sensibilities. U.S. Const., art. I, § 7; *accord Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974). It does so to vindicate one of our Revolution's animating purposes: To ensure that "taxes" could no longer be "impos[ed] … without our consent," particularly by an unconstrained far-removed executive. Declaration of Independence, 1 Stat. 1, 2 (1776). The Framers understood that a tax may look very different in some legislative districts than others, and they put an end to a national executive imposing taxes by fiat.

Because this power is so fundamental, "a tax cannot be imposed without clear and express words for that purpose." *United States v. Isham*, 84 U.S. 496, 504 (1873); *accord Eidman v. Martinez*, 184 U.S. 578, 583 (1902) (similar). So too, "statutes levying taxes" are "not to [be] extend[ed] … , by implication, beyond the clear import of the language used." *Gould v. Gould*,

18

245 U.S. 151, 153 (1917); *see United States v. Merriam*, 263 U.S. 179, 187-88 (1923) (similar); *Treat v. White*, 181 U.S. 264, 267 (1901) (similar). Accordingly, though Congress may "delegate" its taxing power "to the Executive," Congress must "indicate clearly its intention" to do so. *Skinner v. Mid-American Pipeline Co.*, 490 U.S. 212, 224 (1989); *see Nat'l Cable Television Ass'n*, 415 U.S. at 341 (declining "to conclude that Congress had bestowed on a federal agency the taxing power" absent a clear statement); *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1091 (D.C. Cir. 2012) ("correct" that clear-statement rule applied). This is true whether payments are "characterized as 'fees' or 'taxes.'" *Skinner*, 490 U.S. at 224; *see FCC v. Consumers' Rsch.*, 606 U.S. 656, 677 (2025).

Courts recently applied this principle to reject the government's assertion that Congress, by empowering the President to "regulate … importation" (50 U.S.C. § 1702(a)(1)(B)), authorized him to impose wide-ranging tariffs. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1332-33 (Fed. Cir. 2025), *cert. granted*, 222 L. Ed. 2d 1231 (Sept. 9, 2025); *see id.* at 1342-43 (additional views of Cunningham, J.) (relying on *Skinner*); *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209, 222-26 (D.D.C. 2025), *cert. granted*, 222 L. Ed. 2d 1231 (Sept. 9, 2025).

As these cases recognize, "when Congress delegates [the taxing] power in the first instance, it does so clearly and unambiguously." *V.O.S.*, 149

F.4th at 1332. And they confirm that this principle applies equally where the charge implicates national boundaries or foreign affairs. *Id.* at 1333. After all, Congress has the power to lay "Taxes, *Duties*, [or] *Imposts*" (U.S. Const. art. I, § 8, cl. 1 (emphases added))—the latter two of which inherently involve the border. *See, e.g.*, Imposts, *Black's Law Dictionary* 596 (1st ed. 1891); Duties, *id.* at 402.

Charges on arriving noncitizens are taxes under Article I, Section 8. In *Smith v. Turner*, a New York statute required that "every vessel from a foreign port" pay $1.50 per "passenger." 48 U.S. 283, 392 (1849) (opinion of McLean, J.). The Supreme Court held the provision unlawful because it imposed a "tax … acting upon the commerce of the United States." *Id.* at 411 (opinion of Wayne, J.). Although the Justices in the majority differed on precisely how to *label* the tax, all agreed the charge was unlawful *because it was a tax* under Article I. *See id.* at 412-15. The Court reached the same conclusion in *Henderson v. Mayor of City of New York*, which concerned another state law "exacting headmoney for immigrants." 92 U.S. 259, 263 (1875) (appellant's argument). The charge was unlawful, as a fee charged to a "ship-master as a prerequisite to his landing his passengers … *is a tax* on the ship-owner." 92 U.S. 259, 265 (1875) (emphasis added).[2]

---

[2]   The district court missed the importance of *Smith*—that the Court for nearly 200 years has understood that per-passenger charges on arriving noncitizens are "taxes," "duties," or "imposts" under the Constitution. JA458

Nor does the Proclamation's exaction fall within the sole exception to the clear-statement requirement: "[M]easures that operate only to compensate a government for benefits supplied" (*Massachusetts v. United States*, 435 U.S. 444, 462 (1978)), reflecting "a 'fair approximation of the cost'" (*United States v. Sperry Corp.*, 493 U.S. 52, 60-62 (1989)), are not taxes but user fees. *Skinner*, 490 U.S. at 224. The $100,000 exaction here is decidedly not a user fee.

## B.    The Proclamation conflicts with congressional choices embodied in the INA.

The Proclamation is unlawful because it is a blatant effort to transform the H-1B program; that is, it "expressly override[s] particular portions of the INA." *Hawaii*, 585 U.S. at 689.

To be clear, Congress *could have* crafted the H-1B program as an FCC-style auction with visas allocated to the highest bidder, filling the treasury and limiting access to those employers with the highest willingness and ability to pay. But Congress created a different program, with statutory caps on the number of visas issued annually and manageable fees that permit a

---

n.7. Nor is there any question of waiver simply because Appellants first cited *Smith* at oral argument. *See United States v. Rapone*, 131 F.3d 188, 196 (D.C. Cir. 1997) (parties may raise new authorities in support of preserved arguments). Appellants have consistently argued that the Proclamation usurps Congress's taxing power. *E.g.*, Dkt. 8, ¶ 162 (Amended Complaint); Dkt. 18-1 at 25-26 & n.8 (preliminary-injunction memorandum); Dkt. 48 at 4, 14-17 & n.8, 21 (reply).

broad range of employers to fill a broad range of positions. The President believes that Congress, in designing a program not limited to "the best of the best" (JA169), went astray. But that policy was Congress's to set and the President's to implement. The President may not invoke his important-but-limited power to restrict "entry" to effectuate a radical change in Congress's legislative scheme, especially not via a massive tax that usurps Congress's taxing power.

*Hawaii* involved an executive effort to keep whole classes of noncitizens from designated countries out of the U.S. While ultimately approving that effort, the Court "assumed that § 1182(f) does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 689. Other courts have not just assumed but held as much: A Section 212(f) proclamation cannot "effectively rewrit[e] provisions of the INA" or "eviscerate the statutory scheme." *Doe #1 v. Trump*, 957 F.3d 1050, 1064, 1067 (9th Cir. 2020); *see Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 80 (D.D.C. 2025) (*RAICES*) (Section 212(f) "cannot plausibly be read to authorize the President … to supplant" provisions of the INA)), *stay denied in relevant part and granted in part*, No. 25-5243 (D.C. Cir. Aug. 1, 2025); *President and Fellows of Harvard College v. DHS*, 788 F. Supp. 3d 182, 196-97 (D. Mass. June 23, 2025).

22

In *RAICES*, all three judges of this Court agreed that Section 212(f) grants "[t]he executive … no power to override" the "balance that Congress struck" under the INA. *RAICES*, No. 25-5243, Slip. Op. at 50 (Aug. 1, 2025) (Pillard, J.); *see also id.* at 18 (Millett, J.); *id.* at 55 (Katsas, J.).

*Hawaii* shows how courts decide whether a Section 212(f) proclamation permissibly "supplement[s] the INA," or impermissibly "supplant[s] it." 585 U.S. at 688. The Court considered whether the proclamation "expressly over[rode] particular provisions of the INA" and whether there was "any conflict between the statute and the Proclamation that would implicitly bar the President from addressing" the matter. *Id.* at 689. To both questions, the Court answered no; Congress simply "[had] not address[ed]" the circumstances at issue. *Id.* at 689-90. But the Court suggested a different result "where Congress *has* stepped into the space and solved the exact problem" (*id.* at 691 (emphasis added))—where, in other words "Congress exercised its "plenary power over immigration" (*Jarkesy*, 603 U.S. at 129) to "implicitly foreclose" the President's course (*Hawaii*, 585 U.S. at 690).

This case presents precisely that issue: Congress expressly addressed the H-1B program's metes and bounds, and it was not in Sections 212 or 215. The Proclamation cannot invoke those inapposite provisions to flout Congress's express choices on both (1) fees and (2) eligibility requirements for H-1B visas.

23

### 1.     The Proclamation conflicts with the INA's fee provisions.

The Proclamation is unlawful, first, because Congress—weighing the program's costs and benefits—has determined how much an H-1B petition should cost. It "s[aw] fit to prescribe," as a "condition[]" of obtaining an H-1B visa (*Nishimura Ekiu*, 142 U.S. at 659), a set of fees totaling no more than $10,400 (*supra* 8). That scheme reflects Congress's determination of the optimal cost of an H-1B petition to reap the program's public benefits while funding certain programs and deterring abuse. The Proclamation upends that calibration by imposing a surcharge that is 25 times the typical fee and 10 times the maximum fee. The Proclamation does not hide its attempt to displace Congress's judgment; its express purpose is to "impose higher costs on companies seeking to use the H-1B program" as Congress designed it. JA169. But the President may not unilaterally overrule Congress's choice.

**a.** Congress paid close attention to the appropriate fees for H-1B visas, enumerating several such fees, including a $1,500 filing fee (8 U.S.C. § 1184(c)(9)(A)-(C)); a $500 fraud prevention and detection fee (*id.* § 1184(c)(12)(A), (C)); a $4,000 fee on employers with 50% or more foreign workers (49 U.S.C. § 10101 note); and an optional "premium processing" fee of $2,805 (8 U.S.C. § 1356(u)(3)).

24

Separately, in 8 U.S.C. § 1356(m), Congress delegated to the Executive a carefully circumscribed authority to set certain immigration-related "adjudication fees." Procedurally, fees must be set "in regulations"—*i.e.* through notice-and-comment rulemaking (*id.*), "ensur[ing] that agency regulations are tested via exposure to diverse public comment," promoting "fairness to regulated parties," and "enhanc[ing] the quality of judicial review" (*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 95 (D.C. Cir. 2010)). Substantively, fees may be set no higher than "a level that will ensure recovery of the full costs of providing [adjudication and naturalization] services" and of "any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). USCIS has set these additional adjudication fees at $1,595 (*supra* 8) yielding a range of costs from $3,595 for an ordinary H-1B petition to $10,400 for a high-volume employer who opts for premium processing.

**b.** The Proclamation runs roughshod over these provisions. When Congress wanted to authorize the Executive to impose charges for visas, it spoke clearly, as in Section 1356(m). But the government has never argued that Section 1356(m) authorizes this action (nor could it), and it cannot identify any other applicable authority. And the very fact that Congress specifically authorized the assessment of only modest user fees refutes the notion

25

that Congress meant to authorize by implication the far greater power to assess taxes.

Here, unlike in *Hawaii*, Congress "did ... address" the question at issue. 585 U.S. at 690. Congress, as explained, decided how much an H-1B petition should cost: the sum of the specific fees imposed directly by Congress plus whatever cost-recovery fees the agency promulgates by regulation. And while the Proclamation's core finding of "detriment" involves supposed abuse of the H-1B program, Congress already has addressed that problem, and did so differently: In addition to direct program-integrity measures such as fines and potential debarment from future participation for incorrect compliance certifications (*see* pages 5-6, *supra*), Congress also designed *fees* meant to meter use and deter abuse. Specifically, Congress enacted a $4,000 surcharge on large employers whose workforce consists of more than 50% nonimmigrant noncitizen employees. Pub. L. No. 114-113 § 402(g), 129 Stat. at 3006.

In this way, too, the Proclamation's fee targets "the exact problem" Congress has already addressed (and addressed far differently). *Hawaii*, 585 U.S. at 691. The Proclamation thus substitutes the President's judgment for Congress's, does so without regard to the procedural and substantive limits Congress erected, and does not even pretend to respect Congress's calibrated delegation of fee-generating authority in Section 1356(m).

26

**c.** The district court reasoned that the word "may" in Section 1356(m) indicates that Congress in fact did not wish to limit the Executive's authority. JA465. This gets the fundamental law backwards. *Congress* decides how visa programs work and what fees must be paid, including when the Executive can augment the fees Congress has set. *See supra*, 16-21. Congress did so in Section 1356(m). But not in Section 212(f) or 215(a)(1).

Nor did the district court's analysis account for context. If Section 1356(m) does not limit the Executive's authority, then the entire provision, along with its precise procedural and substantive protections, is meaningless, because the Executive can charge any fee it wants via Section 212(f), Section 215(a)(1), or some other general authority. *See, e.g.*, 8 U.S.C. § 1103(a)(3), (g). Likewise, Section 1356(m)'s separate carve-out permitting fees to pay for "asylum applicants" and "costs associated with … administration" would be pointless, because the Executive simply could impose such fees at will.

The district court's interpretation is not a reasonable reading of the text Congress enacted, nor does it respect the balance that Congress—exercising its core powers—struck. "To say that 'may' is permissive does not lead to the conclusion that it permits *everything*, irrespective of other unambiguous words of limitation included in the sentence in which the term is used." *Halverson v. Slater*, 129 F.3d 180, 187-188 (D.C. Cir. 1997). Rather, "may"

indicates that the Executive *can*—but need not—charge noncitizens fees for cost recovery. It does not mean the Executive can also charge any additional fees it pleases, irrespective of costs, rendering the balance of Section 1356(m) pointless. *See Ethyl Corp. v. EPA*, 51 F.3d 1053, 1059 (D.C. Cir. 1995) (where statute provided that EPA Administrator "may" act based on certain factors, "[t]he use of the word 'may' in this context refers to the Administrator's discretion to either act affirmatively … or not to act"; it does not "open the door for the Administrator to consider any factor she deems 'in the public interest'").

The statutory and legislative history the district court invoked supports Appellants' position, not the government's. *Cf.* JA467. As the Court noted, Congress enacted Section 1356(m) in 1988, before which the Immigration and Naturalization Service (INS) was funded by appropriations. The district court took this to mean that Section 1356(m) is only "designed to ensure that immigration services may be operated without requiring funding from Congressional funds" and Congress did not "simultaneously … impose a cap" on the fees the Executive may impose. *Id*.

But as explained, Section 1356(m) does more than one thing: It both makes visa programs self-supporting through fees and, on its face, *does* impose a cap—one that squarely applies to "adjudication fees." And insofar as the district court attributed significance to the fact that Section 1356(m)

does not expressly "limit the broad power delegated to the President in" Section 212(f) (*id.*), Congress has no *reason* to do so: No President had ever dreamed of using that provision to extract massive fees to rewrite a visa program. That is not surprising, given Section 212(f) governs the exclusion of certain noncitizens and has nothing to do with visa fees. Nothing in the history of 1356(m) thus changes the key point: When Congress delegated limited authority to charge adjudication fees, it meant for the textual limits it imposed on such delegation to have force. *Cf. Halverson*, 129 F.3d at 187-188.[3]

### 2. *The Proclamation conflicts with the H-1B eligibility requirements.*

The Proclamation compounds its violation of the INA, and its disregard for the separation of powers, by using its unauthorized tax to transform the H-1B program's substantive eligibility criteria. The Proclamation, again, does not hide this aim, stating that it seeks to refashion the H-1B program into one available only to the "best of the best"—as measured by employers' ability and willingness to pay an exorbitant new tax—rather

---

[3]   Prior to 1988, the INS occasionally promulgated user fees pursuant to a separate, government-wide delegation—the Independent Offices Appropriations Act (IOAA)—which also cannot authorize the Proclamation's fee. 31 U.S.C. § 9701; *see Nat'l Cable Television*, 415 U.S. at 342-43 (fees under IOAA must be based on costs and value to the recipient); *Ayuda, Inc. v. Attorney General*, 661 F. Supp. 33 (D.D.C. 1987) (holding that the IOAA authorized immigration fees).

than to all workers in "specialty occupations," with visas awarded on a first-come-first-served basis, as Congress intended. Only Congress can so radically remake the H-1B program.

**Text.** The INA does not limit the H-1B program to "the best of the best." Congress decided the program should be open to all employed in what it deemed "specialty occupation[s]." 8 U.S.C. § 1184(i). This language contrasts with other INA visa categories, which limit eligibility to "exceptional" or "extraordinary" candidates. *Id.* § 1153(b)(1)(A), (b)(2)(A). If Congress wanted to limit H-1B visas only to exceptionally qualified workers, "it knew exactly how to do so." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).

**Structure.** The statute calls for petitions to be approved "in the order in which petitions are filed." 8 U.S.C. § 1184(g)(3).[4] It does not authorize extra-statutory eligibility criteria tied to a prospective employee's supposed merit or the prospective employers' ability and willingness to pay a massive

---

[4] The government has implemented this requirement through the H-1B lottery, given the number of petitions that otherwise would arrive at the same time. *Registration Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap-Subject Aliens*, 83 Fed. Reg. 62,406, 62,412 (Dec. 3, 2018). Recently, the government announced "a weighted selection process that will generally favor the allocation of H-1B visas to higher-skilled and higher-paid" noncitizens. *Weighted Selection Process for Registrants and Petitioners Seeking To File Cap-Subject H-1B Petitions*, 90 Fed. Reg. 60,864, 60,920 (Dec. 29, 2025). Though not at issue here, that approach—which abandons Congress's substantively neutral first-come-first-served standard in favor of substantive, merit-based criteria—appears to similarly contradict the statute.

tax. Additionally, Congress reserved 20,000 spots for candidates with advanced degrees from U.S. institutions. *Id.* § 1184(g)(5)(C). That is, Congress already has decided how to promote the hiring of H-1B workers with additional qualifications beyond the baseline eligibility criteria.

Further, Congress exempted some employers from the cap altogether (8 U.S.C. § 1184(g)(5)(A)-(B)), determining that *any* prospective H-1B worker intending to work for such an employer who satisfies the statutory eligibility criteria—not just the best of the best—should receive an H-1B visa. Finally, since Congress itself created the cap, and Congress itself has the exclusive power to tax, it is particularly significant that Congress did not view the cap—and the resulting excess of demand over supply—as a revenue source. In other contexts, such as the allocation of scarce spectrum, Congress has reached a different judgment. *See* 47 U.S.C. § 1451(b)(1)(B). The Executive lacks the power to contradict the terms Congress set forth for the H-1B program and convert it into a revenue-raiser.

**History.** The predecessor to the modern H-1B program required noncitizen workers to demonstrate "distinguished merit and ability." Pub. L. No. 82-414, § 101(a)(15)(H)(i), 66 Stat. 163, 168 (1952). Although the government maintained that this language encompassed entry-level members of professions, Congress eliminated all doubt in 1990 by amending the stat-

31

ute to replace the "distinguished merit and ability" standard with the "specialty occupation" standard. Hence, in fashioning the current H-1B program, Congress expressly adopted a *lower* eligibility standard, confirming its intent to allow "certain entry-level workers with highly specialized knowledge" to obtain H-1B visas. H.R. Rep. 101-723 pt.1, at 67 (Sept. 19, 1990). The Proclamation overrides these choices, too.

The district court concluded that the Proclamation does not "contravene statutory terms in the INA nor even congressional policy" because "[t]he same concern about protecting the American workers from displacement by imported labor animating the Proclamation is, in fact, a predominant theme in the INA and for the H-1B program specifically." JA467-468. But that favors *Appellants'* position, not Appellees'.

As the court noted, several INA provisions already "solve[] the exact problem" addressed by the Proclamation. *Hawaii*, 585 U.S. at 691; *see* JA468. These include the Labor Condition Application process (*supra* 5-6), which requires employers to certify that they pay the prevailing wage or higher (8 U.S.C. § 1182(n)(1)(A)(i)), and certain employers to further certify that they have tried and failed to hire a U.S.-based worker (*id.* § 1182(a)(5)(A)(i)(I) and (II)). Further, employers who abuse the system by submitting false certifications can be barred from using the program. *Id.*

32

§ 1182(n)(2)(C). Congress also targeted the same problem via the cap itself, which prevents H-1B workers from overwhelming the labor market.

In cataloguing the ways Congress already has "stepped into the space" (*Hawaii*, 585 U.S. at 691), the district court thus showed why the Proclamation *does* create a conflict. The Executive cannot alter the legislative bargain by rewriting the H-1B program's anti-abuse provisions; after all, "no legislation pursues its purposes at all costs, and every statute purposes, not only to achieve certain ends, but also to achieve them by particular means." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012) (citations omitted). The district court's reasoning is especially puzzling given that these anti-abuse provisions are the statute's secondary concern—its animating policy, of course, is the *admission* of qualified workers. The Proclamation's entire basis is the Executive's judgment that the H-1B program designed by Congress yielded too many (or the wrong kind of) workers. That judgment is irreconcilable with Congress's decisions in the INA.

The multiple conflicts here, moreover, differ fundamentally from those asserted by the challengers in *Hawaii*. The President there had not rewritten a visa program, much less via a massive tax. Nor had Congress addressed the subject of the proclamation at issue—*i.e.*, purported "deficiencies in the Nation's vetting system." 585 U.S. at 689. Respondents alleged a

33

conflict based on a statutory program that waived visas for short-term visitors from specific countries, as well as, more generally, the INA's "individualized approach for determining admissibility." *Id.* But Congress had "not address[ed] what requirements should govern the entry of nationals" from countries outside the visa waiver program, like those covered by the proclamation. *Id.* at 690. And *Hawaii* found that the proclamation there "*support[ed]* Congress's individualized approach" to admissibility by restricting the entry of noncitizens who could not be vetted with adequate information. *Id.* at 689 (emphasis added).

Here, by contrast, Congress has affirmatively addressed the exact subject of the Proclamation—defining the terms of the H-1B program and setting related fees. *See supra* 24-26. And instead of supporting the program as enacted by Congress, the Proclamation undermines Congress's "considered policy judgments." *Hawaii*, 585 U.S. at 689; *supra* 29-33.

### C. Congress has not authorized the Proclamation's exercise of its taxing power.

The Proclamation is independently unlawful because Congress never authorized the President to impose the massive tax that serves as the vehicle for rewriting the H-1B program. Because the Proclamation exercises Congress's taxing power, Congress must have "indicate[d] clearly its intention" to authorize the Executive to do so. *Skinner*, 490 U.S. at 224. But neither Section 212(f) nor Section 215(a)(1) even suggests revenue raising, let

34

alone clearly delegates that authority. Those provisions address a different issue entirely—suspending, restricting, and regulating entry, not imposing a tax on U.S. institutions and businesses.

### 1. *Section 212(f) does not authorize the Proclamation's tax.*

**a.** Text, structure, and history show that Section 212(f) does not authorize the Proclamation's tax.

**Text.** Section 212(f) does not delegate taxing power. It first authorizes the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants." 8 U.S.C. § 1182(f). The Proclamation does not invoke that authority, nor could it: It does not "defer[] [entry] till later" (*Hawaii*, 585 U.S. at 667 (citation omitted)), but bases its tax on Section 212(f)'s separate grant of authority to "impose on the entry of aliens any restrictions he may deem appropriate." 8 U.S.C. § 1182(f).

This provision, though broad within its "sphere[]" (*Hawaii*, 585 U.S. at 695), does not by its plain terms confer the power to impose "taxes," "duties," "imposts," or other such charges. U.S. Const. art. I, § 8, cl. 1. Section 212(f) says nothing whatsoever about those powers. And what *Hawaii* identified as Section 212's "sphere"—"defin[ing] the universe of aliens who are admissible" (585 U.S. at 695)—does not encompass taxing U.S. institutions and businesses. *Cf. V.O.S. Selections*, 149 F.4th at 1330 ("[T]he statute be-

stows significant authority on the President to undertake a number of actions … but none of those actions explicitly include the power to impose tariffs, duties, or the like, or the power to tax"). The provision is designed to keep certain noncitizens out of the country, not let them in on the terms that will maximize revenue.

Section 212(f) does not even hint at conferring taxing power, and the clear statement required is certainly absent. Nor can this absence be remedied by Appellees' assertion, accepted below, that the $100,000 charge is a "restriction on … entry" because H-1B workers cannot enter unless the fee is paid. JA454-455. Simply put: The power to impose "restrictions on … entry" is not the power to tax. And when it comes to this power in particular, there is ample reason to apply the Supreme Court's caution against adopting "vast constructions" based "solely on the broadest imaginable 'definitions of its component words.'" *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523 (2018); *see Gould*, 245 U.S. at 153; *cf. Bond*, 572 U.S. at 862 (rejecting broad interpretation of "chemical weapon" encompassing household detergent and stain remover because "no one would ordinarily describe those substances as 'chemical weapons'").

36

"To restrict" meant the same thing in 1952 that it means today: to "limit" or "confine."[5] In the INA, Congress defined "entry" to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession." Pub. L. No. 82-414, § 101(a)(13), 66 Stat. at 167.[6] Section 212(f)'s authority to "impose … restrictions" on "entry" is thus a power to impose negative or prohibitory limits at the border, not to impose taxes. It certainly is not a power to impose taxes or exactions that—in substance—are based not on a noncitizen's entry but on U.S. conduct (employing workers in the United States) and that seek to alter the domestic employment practices of domestic institutions and companies. That unmoored reading would turn Section 212(f) into a truly staggering imposition on both of the core congressional powers described above—to decide both what noncitizens may and may not do under visa programs and what taxes U.S. entities must pay.

---

[5]    *See, e.g.*, Restrict, *Webster's New International Dictionary* 2125 (2d ed. 1947) ("To restrain within bounds; to limit; to confine."); Restrict, *Black's Law Dictionary* 1478 (4th ed. 1951) (same).

[6]    Although Congress later repealed the INA's definition of entry (IIRIRA, Pub. L. No. 104-208, § 301(a), 110 Stat. 3009), this definition accords with ordinary usage. *E.g.*, Entry, *Oxford English Dictionary* (Rev. 2018) ("The action or an act of entering a place, area, building, etc."); *see United States v. Yong Jun Li*, 643 F.3d 1183, 1188 (9th Cir. 2011) ("[B]ecause Congress did not provide a new definition of 'entry' in [IIRIRA], the prior judicial construction of 'entry' continues to govern.").

37

Nor does the inclusion of "any" before "restriction"—which the district court emphasized (JA455)—change matters. That word simply ensures that Section 212(f) authorizes all measures qualifying as "restrictions on … entry." It "cannot transform [the phrase] to reach [something] it would not otherwise include." *Peter v. NantKwest, Inc.*, 589 U.S. 23, 31 (2019). And it certainly is no "clear[]" "indicat[ion]" of taxing power. *Skinner*, 490 U.S. at 224.

The courts in the tariff cases emphatically rejected the government's near-identical arguments. There, too, the government unsuccessfully argued the power to "regulate" confers tariff authority because goods cannot enter unless the tariff is paid. *Learning Resources*, 784 F. Supp. 3d at 223-24; *V.O.S. Selections*, 149 F.4th at 1332 ("Contrary to the Government's assertion, the mere authorization to 'regulate' does not in and of itself imply the authority to impose tariffs.").

**Structure.** When Congress wished to authorize the Executive to impose fees on visas, Congress spoke clearly. S*upra* 24-26. As noted, Congress set some fees itself and conferred on the Executive cabined discretion to set others. *Id*. Congress also separately authorized DHS to prescribe "conditions" under which nonimmigrants may enter, requiring DHS to act "by regulation[]" and authorizing one specific type of financial measure: a "bond with sufficient surety in such sum and containing such conditions as [DHS]

38

shall prescribe." *Id.* § 1184(a)(1). All these provisions render implausible the government's claim that Congress, without saying a word about fees or taxes, implicitly authorized the President unilaterally to impose charges that are vastly greater in amount, are of an entirely different type, and fall directly on U.S. institutions and businesses, all with no process whatsoever.

**History.** History confirms that Section 212(f) does not convey the power to tax. When the federal government began regulating immigration in the 19th Century, Congress—not the Executive—established fees governing immigration. *See, e.g.*, An Act to Regulate Immigration, 22 Stat. 214, 214 (1882); *The Head Money Cases*, 112 U.S. 580, 586 (1884); Immigration Act of 1924, Pub. L. No. 68-139, §§ 2(h), 7(h), 43 Stat. 153, 154, 157.

When Congress in 1952 enacted Section 212(f), it nowhere suggested an intent to jettison that approach. Not one line of statutory text or legislative history suggests Congress understood that the President could use Section 212(f) to impose exactions, much less on U.S. institutions and businesses. And for good reason: Congress delegated broad power to the President so he could respond to fast-breaking situations by keeping people out of the country, leveraging the Executive's nimbleness and foreign-policy expertise. *See RAICES*, No. 25-5243, slip op. at 22 (Millett, J.). It had no reason to—and did not—delegate to the President authority to raise revenue from American companies based on the admission of noncitizens whom the

39

Executive was content to admit. To the contrary, when Congress enacted Section 212(f), it outlined a specific schedule of visa- and entry-related fees for immigrants and granted the Secretary of State cabined discretion to set fees for nonimmigrants. Pub. L. 82-414, § 281, 66 Stat. at 230-231.

Moreover, although presidents have invoked Section 212(f) more than 90 times (*see* JA263-281), none ever employed it to impose a fee, much less one on U.S. institutions and businesses. Historically, presidents have suspended entry of persons from specific countries[7] or targeted specified groups engaged in misconduct abroad.[8] More recently, Presidents have targeted particular classes of persons seeking immigrant or nonimmigrant visas,[9] or

---

[7]    *E.g.*, Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025); Proclamation No. 5517, 51 Fed. Reg. 30470 (Aug. 26, 1986).

[8]    *E.g.*, Proclamation No. 10685, 88 Fed. Reg. 86541 (Dec. 14, 2023); Proclamation No. 8697, 76 Fed. Reg. 49277 (Aug. 9, 2011); Proclamation No. 7062, 63 Fed. Reg. 2871 (Jan. 16, 1998); Proclamation No. 6685, 59 Fed. Reg. 24337 (May 10, 1994).

[9]    *E.g.*, Proclamation No. 10998, 90 Fed. Reg. at 59724 (individuals from specified countries under specified visa categories); Proclamation No. 10043, 85 Fed. Reg. 34353 (June 4, 2020).

imposed COVID vaccination or health insurance mandates[10] and/or suspended entire visa programs during a public health emergency.[11] These recent proclamations have been contested, with courts reaching different conclusions and invalidating many. Never, however, did a President use Section 212(f) to exercise Congress's power of the purse or to *rewrite* a visa program.

"[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *W. Virginia*, 597 U.S. at 725. The Supreme Court has found particular "reason to hesitate" where the Executive "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority'" (*id. at* 724-25)—and one that carries immense "economic and political significance" (*Biden v. Nebraska*, 600 U.S. 477, 503 (2023)). *Cf. Hawaii*, 585 U.S. at 692-93 (upholding proclamation that *was* consistent with prior "executive practice").

---

[10] *E.g.*, Proclamation No. 10294, 86 Fed. Reg. 59603 (Oct. 25, 2021); Proclamation No. 9945, 84 Fed. Reg. 53991 (Oct. 9, 2019).

[11] Proclamation No. 10052, 85 Fed. Reg. 38263 (June 25, 2020) (persons seeking to enter on H-1B, H-2B, J, and L visas during COVID-19); *but see Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 558 (N.D. Cal. 2020) (enjoining enforcement of this proclamation).

Those cautions apply here. If the Proclamation stands, Presidents will gain a vast power to impose exactions whenever noncitizens must cross the border and to "abolish[]" visa regimes that Congress created via statute and "supplant[] [them] with a new regime" of the President's own making. *Nebraska*, 600 U.S. at 496. Next time, the fee may be $1 million, and imposed only on institutions whose activities are deemed detrimental to U.S. interests—perhaps because a company participates in production of fossil fuels (in one administration), or in renewable energy (in another). Or perhaps the President will bar the entry of noncitizens entirely, unless U.S.-based relatives pay fees pegged to their income or net worth. What is more, future proclamations, like this one, may carve out a broad, amorphous exception based on the Executive's unfettered discretion to decide what is in "the national interest" (JA170), meaning the burden will selectively fall only on the individuals and entities the Executive then in power decides should pay.

More still: If Section 212(f) conferred taxing authority, there would be real questions about whether it could benefit from the more lenient nondelegation test that applies when the President acts pursuant to his inherent Article II powers in the foreign realm (*see, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-22 (1936)), and whether the "detri-

mental to the interests of the United States" standard provides the "intelligible principle" otherwise required—further militating against the government's boundless reading.

**b.** The district court failed to grapple with the most important aspect of this case. First, the court observed that Section 212(f)'s restrictions power is "broad" (JA458), disregarding that authority to impose "restrictions on … entry" is not the power to tax. *Supra* 35-38. *Hawaii*, on which the court placed much weight, did not involve a proclamation asserting taxing authority and, if anything, undermines the government's claim that taxation falls within Section 212(f)'s "sphere[]." *Hawaii*, 585 U.S. at 695. And the deference *Hawaii* applied to the Executive's foreign policy judgments there (*id.* at 686-87, 708) is utterly out of place where, as here, the President uses Section 212(f) to impose a massive tax and thereby rewrite Congress's considered choices in a visa program—without categorically barring a single noncitizen from entering the country.

Second, the court incorrectly dismissed *Skinner* as solely rejecting a "special nondelegation rule" for "revenue-raising legislation" (JA458) (quoting *Consumers' Resch.*, 606 U.S. at 674)), disregarding that *Skinner* also reiterated a rule of *interpretation* (*see* 490 U.S. at 224). That rule, based on centuries of precedent enforcing basic constitutional structure, requires a

43

clear statement before courts will find that Congress delegated taxation authority; delegations like Section 212(f) will not suffice. *Supra* 17-21.

Third, the court rejected an argument that Section 212(f) does not convey authority to enact restrictions in response to "purely domestic economic issues" (JA456) (quoting *Doe #1*, 957 F.3d at 1056, 1067)), disregarding that this case does not present that general question. Rather, the Proclamation imposes a tax on U.S. institutions and businesses, and does so to rewrite a carefully crafted statutory visa program.

### 2.    *Section 215(a)(1) does not save the Proclamation.*

These same points dispose of Section 215(a)(1). At best for the government, Section 215(a)(1) "substantially overlaps" with Section 212(f). *Hawaii*, 585 U.S. at 683 n.1. Like Section 212(f), Section 215(a)(1) does not hint at delegating Congress's power of the purse, much less clearly grant revenue-raising authority. The authority to establish "reasonable rules, regulations, and orders" for noncitizens to "depart from or enter the United States" does not encompass the power to impose "taxes," "duties," "imposts," or other charges. *V.O.S. Selections*, 149 F.4th at 1332-33 ("The power to 'regulate' has long been understood to be distinct from the power to 'tax.'"). And the statute's mention of "limitations and exceptions" from "reasonable rules, regulations, and orders" is not a freestanding grant of power.

44

If anything, Section 215(a)(1) is narrower than Section 212(f). First, it specifies the President may impose only "reasonable" regulations. 8 U.S.C. § 1185(a)(1); *see RAICES*, No. 25-5243, slip op. at 27 (Millett, J.). It is not "reasonable" for the President to invoke this general grant of authority to exercise Congress's core power of the purse. Nor is a regulation "reasonable" if it conflicts with Congress's express or implicit choices. *See United States v. Witkovich*, 353 U.S. 194, 199-200 (1957) (interpreting "limitation of 'reasonableness'" consistent with the overarching "legislative scheme").

Second, the power Section 215(a)(1) confers—making it unlawful for noncitizens to "depart from or enter the United States except under" regulations issued by the President (8 U.S.C. § 1185(a)(1))—is best read as travel-control authority, not taxation authority. The operative text grants authority to promulgate regulations "under" which noncitizens "depart from or enter," connoting travel control. *See, e.g.*, *In re Hechinger Inv. Co. of Delaware*, 335 F.3d 243, 252 (3d Cir. 2003) ("When an action is said to be taken 'under' a provision of law … , what is generally meant is that the action is 'authorized' by the provision of law or legal document.").

Context confirms that view. To begin, titles "supply cues as to" Section 215(a)(1)'s scope. *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (quotation marks omitted). Section 215's enacted heading is "travel documentation of aliens and citizens" (Foreign Relations Authorization Act, Fiscal Year

45

1979 (FRAA), Pub. L. 95-426, § 707(e), 99 Stat. 963, 992-93 (1978)), and the codified heading is "Travel control of citizens and aliens." 8 U.S.C. § 1185. Every other paragraph under Section 215(a) relates to the integrity of travel control. 8 U.S.C. § 1185(a)(2)-(7). That indicates, via "the commonsense canon of *noscitur a sociis*" (*United States v. Williams*, 553 U.S. 285, 294 (2008)), that subsection (a)(1) addresses the same subject. And Section 215(b), which mirrors Section 215(a)(1) in regulating the travel of U.S. citizens (*see* 8 U.S.C. § 1185(b)) "speaks … in the language of 'border control statutes regulating departure from and entry into the United States.'" *United States v. Laub*, 385 U.S. 475, 480 (1967). The identical language in 215(a)(1) ("depart from or enter") should "be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).

History teaches the same lesson. A version of what is now Section 215(a)(1) was enacted in 1918 within "the first travel control statute." *Haig v. Agee*, 453 U.S. 280, 296 (1981) (citing Act of May 22, 1918, 40 Stat. 559). Congress expressly recognized that additional legislation was needed to delegate fee-setting authority.[12] Then in 1952, Congress enacted Section 212(f)

---

[12] *See* S. Rep. No. 68-1056, at 1 (1925) (recognizing the President's authority under the 1918 statute to issue regulations "requir[ing] aliens … to present passports viséed by American consuls," while proposing new legislation "authoriz[ing] the President in certain cases to modify visé fees").

granting the President express authority to impose entry restrictions. And in a 1978 amendment, Congress dropped Section 215(a)'s prefatory language concerning "restrictions and prohibitions"—language reminiscent of Section 212(f)—that previously had appeared in Section 215(a)(1), leaving only the current, narrower travel-control language. FRAA, Pub. L. No. 95-426, § 707(a), 92 Stat. at 992. So especially today, Section 215(a)(1) is best read not to confer the type of restriction authority that Section 212(f) conveys—especially because the alternative would authorize the President to enact the same restrictions under Section 215(a)(1) without complying with Section 212(f)'s limits. *See W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991) (Scalia, J.) (courts should choose "that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law").

## II.    APPELLANTS' CLAIMS ARE JUSTICIABLE.

Appellants' claims are justiciable. The government's contrary arguments—which the district court did not reach—lack merit.[13]

---

[13] The district court correctly determined that Appellants have associational standing. JA440-442. Although the court noted that many of the U.S. Chamber's cap-subject members remained anonymous (*id.* at 19 n.1), this Court repeatedly has held that preserving members' anonymity does *not* undermine associational standing. *See SSM Litig. Grp. v. EPA*, 150 F.4th 593, 598 (D.C. Cir. 2025); *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022). And an employer who is unfairly deprived of the opportunity to participate in the visa lottery has suffered a concrete injury. *E.g.*, *Nat'l Venture Cap. Ass'n v. Duke*, 291 F.

**A.     Courts have the authority to enjoin or set aside implementation of the Proclamation.**

**1.     *Consular nonreviewability does not bar review.***

Circuit precedent forecloses the government's claim below that consular nonreviewability bars review. Dkt. 36 at 11. That doctrine applies only to "particular visa determinations [made] by a consular officer," and "does not foreclose … forward-looking challenges to the lawfulness of regulations or policies governing [such] consular decisions." *Pietersen v. United States Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025). Here, Appellants have "confine[d] their challenge to the lawfulness of the … policy" embodied in the Proclamation. *Pietersen*, 138 F.4th at 560. Consular nonreviewability is irrelevant.

**2.     Ultra vires *review is available.***

Appellants can challenge the Proclamation's legality via *ultra vires* review. "[A] claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796

---

Supp. 3d 5, 13-14 (D.D.C. 2017) (standing based on lost opportunity to obtain discretionary immigration benefit); *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("loss of a statutorily conferred opportunity to compete for a contract" was injury in fact) (collecting cases). Regardless, as the district court correctly concluded, both Appellants "clearly" have standing by virtue of the certain (and ongoing) injury to their cap-exempt members. JA440-441 & n.1.

(D.C. Cir. 2023); *see also Trudeau v. FTC*, 456 F.3d 178, 189-90 (D.C. Cir. 2006). It is "well established that [r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). Those principles authorize review here.

The sole exception—"when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority" (*Reich*, 74 F.3d at 1331)—does not apply. Although Section 212(f) "grants the President broad discretion" (*Hawaii*, 585 U.S. at 683), this Court has rejected the argument that another grant of "broad discretion" to the President—in the Antiquities Act—precluded courts from enforcing statutory limits (*Am. Forest Res. Council*, 77 F.4th at 797). So too here.

Doubly so for Section 215(a)(1). That authorization of "reasonable" measures is the opposite of language withdrawing judicial review. *Compare, e.g.*, *Webster v. Doe*, 486 U.S. 592, 600 (1988) (judicial review barred when statute authorized terminations "necessary or advisable in the interests of the United States"), *with U.S. ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 544 (1950) (reviewing whether regulations were "reasonable" under predecessor to Section 215(a)(1)); *Rainbow Nav., Inc. v. Dep't of Navy*, 783 F.2d

49

1072, 1080 (D.C. Cir. 1986) (Scalia, J.) ("reasonable profit" furnished a "meaningful standard" for judicial review).

Circuit precedent also forecloses Appellees' alternative argument, pressed below, that the heightened standard in *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958), applies. *Kyne* applies only when Congress has impliedly precluded judicial review. In those circumstances, courts nonetheless assess whether the government "'exercise[d] [a] power … specifically withheld,' and … violated a 'specific prohibition' in the [statute]." *NRC v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Kyne*, 358 U.S. at 188-89). Thus, as *Reich* explained, *Kyne* "stand[s] for the proposition" that this narrow form of review remains available despite an "implied preclusion." 74 F.3d at 1330. Here, no such implied preclusion exists. So *Kyne* does not apply. *See id.* at 1332-39; *Am. Forest Res. Council*, 77 F.4th at 796-98.

Regardless, Appellants would satisfy the *Kyne* standard. Relief is available where the action "clear[ly] depart[s] … from [the] statutory mandate." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (quotation marks omitted). The Proclamation fits the bill: The government's statutory argument is "patently a misconstruction." *id.* at 764 (citation omitted); *supra* 21-47.

### 3. *APA review is available.*

The APA authorizes review of "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. Even when agencies implement presidential action, the Court has "doubt[ed] the … unsupported interpretation of the APA" that would "insulate" those actions "from judicial review … , even if the validity of the [presidential] Order were thereby drawn into question." *Reich*, 74 F.3d at 1327.

The agencies have made clear decisions to implement the Proclamation.[14] *See, e.g.*, *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) (reaffirming "[t]hat the issuance of a guideline or guidance may constitute final agency action" (collecting cases)). Those decisions are not tentative or interlocutory, and legal consequences are flowing: As the government admits, the agencies "have … been implementing" the Proclamation via these guidance documents and decisions made daily. Dkt. 36 at 17.

---

[14]  *E.g.*, JA390 (USCIS memorandum stating that Proclamation "only applies prospectively" and "does not impact the ability of any current visa holder to travel," and mandating that "[a]ll officers of [USCIS] shall ensure that their decisions are consistent with this guidance"); JA366 (State Department email "instruct[ing]" consular posts "to immediately implement the … operational guidance" contained therein); *see also* JA393-395; JA387; JA372-373.

It does not matter that some aspects of these decisions implement the Proclamation. The agency actions carry the force of law; the agencies are implementing the Proclamation pursuant to their authorities over entry and visa issuance. *E.g.*, 8 U.S.C. §§ 1103(a), 1184(a), (c) (DHS); *id.* §§ 1104(a), 1201(a) (State Department). When agency personnel do so, they will apply agency guidance, not the Proclamation. Although APA review may be unavailable when "the President has final constitutional or statutory responsibility for *the final step* necessary for the agency action directly to affect the parties" (*Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (emphasis added)), that is not true here.

Although these agency actions would be reviewable even if they only implemented the Proclamation, reviewability here is even clearer because the guidance does *more*. Appellees emphasized below that the $100,000 fee does not apply to renewals or change-of-status petitions—limitations appearing only in regulatory actions. *See* JA354-369; JA391; JA394 (Proclamation does not apply to pre-Proclamation petitions or prevent current holders of H-1B visas from international travel). Meanwhile, every application of the Proclamation is also a decision *not* to invoke its near-standardless exception for "the national interest." JA170; *see also* JA395 (explaining "extraordinarily rare circumstances" where DHS will apply the exception).

More, Appellants' claims do not sound in APA abuse-of-discretion review, and thus do not conflict with any "discretionary authority vested in the President by law." *Detroit Int'l Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016). Here, the agency actions violate limits that Congress imposed. Withholding review in those circumstances would carve a massive, nontextual hole in the APA's command that courts must set aside agency action "not in accordance with law." 5 U.S.C. § 706(2)(B). Courts thus regularly conduct APA contrary-to-law review of agency actions to implement presidential directives.[15]

## III.   PROMPT INJUNCTIVE OR SET-ASIDE RELIEF IS IMPERATIVE.

Appellants' members require urgent relief. Most U.S. Chamber members need relief before the March 2026 H-1B lottery to hire H-1B workers this year. And Appellants' cap-exempt members are suffering escalating harm. The Court should direct the district court to immediately enjoin and set aside implementation of the Proclamation against Appellants' members. *See, e.g.*, *Wrenn v. D.C.*, 864 F.3d 650, 668 (D.C. Cir. 2017) (reversing and ordering permanent injunction).

---

[15]   *See, e.g., RAICES*, 793 F. Supp. 3d at 94; *Doe #1 v. Trump*, 423 F. Supp. 3d 1040, 1045 (D. Or. 2019); *Bldg. & Const. Trades Dep't v. Allbaugh*, 172 F. Supp. 2d 67, 75 (D.D.C. 2001); *Associated Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *5-8 (E.D. Tex. Oct. 24, 2016); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018).

### A.   The Court should direct the entry of an injunction as to Appellants' members.

The proper remedy for the *ultra vires* implementation of the unlawful Proclamation is a permanent injunction based on the traditional equitable factors. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Nken v. Holder,* 556 U.S. 418, 435 (2009).[16]

### 1.   The Proclamation is causing irreparable harm.

If fully implemented against Appellants' members, the Proclamation will result in—indeed, already is causing—irreparable harm.

**a.** The Proclamation harms Appellants' members by rendering them unable to recruit and hire H-1B workers. The U.S. Chamber's members collectively hire thousands of H-1B workers annually. JA81; JA84. AAU's members, similarly, submit thousands of H-1B petitions each year. JA100.

For many employers, the Proclamation means all or much of that hiring will not happen. *E.g.,* JA82. In some cases, companies that normally hire *hundreds* of H-1B workers will hire none. JA83. Many AAU members already have had to indefinitely suspend H-1B hiring. That includes Washington University in St. Louis (WashU), which had to suspend all H-1B hiring, including urgently needed anesthesiologists. JA148-149; *see also, e.g.,*

---

[16] Appellants also are entitled to declaratory relief, which will "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Tierney v. Schweiker*, 718 F.2d 449, 456 (D.C. Cir. 1983)

JA117 (Johns Hopkins' H-1B recruitment is "in a holding pattern"); JA144 (H-1B recruitment at the University of Utah is in "disarray"); JA128 (Proclamation is "inhibiting the [University of Minnesota's] recruitment efforts").

The Proclamation's disruption to H-1B hiring causes direct, irreparable harm to Appellants' members. *First*, it destroys their ability to "recruit and retain employees"—a well-recognized irreparable harm. *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) (quoting *Tik-Tok Inc. v. Trump*, 490 F. Supp. 3d 73, 83-85 (D.D.C. 2020)); *see also, e.g., WorldVue Connect Glob., L.L.C. v. Szuch*, 155 F.4th 472, 485 (5th Cir. 2025). *Second*, the Proclamation causes the "lost opportunity to obtain" H-1B visas—particularly for cap-subject employers, who have only one chance each year to hire H-1B workers. *Nat'l Venture Cap. Ass'n*, 291 F. Supp. 3d at 13-14; *see Giri v. Nat'l Bd. of Med. Examiners*, 718 F. Supp. 3d 30, 44 (D.D.C. 2024) (inability to participate in medical resident-match program constituted irreparable harm).

**b.** The Proclamation causes additional harm through its impact on employers' ability to innovate and fulfill their missions. *See Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 57 (D.D.C. 2020) (irreparable harm demonstrated "where agency action threatened to 'frustrate[]' organization's mission"). Some U.S. Chamber members already have undertaken

resource-intensive workforce planning responses that cannot easily be un-wound. JA83. Others will be forced either to leave positions unfilled, relocate them outside of the United States, or hire less qualified candidates. JA81. And AAU's members have been unable to fill positions critical to their public missions, including in the medical field. JA149-151 (WashU is unable to fill critical teaching and patient-care roles); JA157 (University of Wisconsin-Madison will "lose the opportunity to benefit from [H-1B workers'] human capital in making medical breakthroughs, research innovations, and academic advancements").

**c.** Even the small subset of employers who manage to pay the Proclamation's fee will face irreparable harm. The added cost will put them at a competitive disadvantage in the global marketplace for specialized workers (*see, e.g.* JA83; JA157), and divert resources from other hiring, projected development, and the like—impairing "productivity, efficiency, and innovation." JA85; *see, e.g.*, JA119 (for Johns Hopkins University, paying $100,000 fee would "necessarily require redirecting funds away from the institution's educational and research mission"); JA136-137.

For some members, the threat is existential: The revenue of U.S. Chamber member GoRural—a small company that helps understaffed rural healthcare facilities recruit workers (JA93-94)—is evaporating (JA95). Such economic harms are irreparable where, as here, it is "highly unlikely that

[the injured party] would be able to recover from the government its lost revenues" (*Alcresta Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 5 (D.C. Cir. 2018) (per curiam)) because of "the defendants' sovereign immunity." *Nalco Co. v. U.S. E.P.A.*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011)*; see Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (irreparable harm where "the very existence of [a] business" is "threaten[ed]").

### 2.    *The remaining equitable factors favor relief.*

*First*, there is no other adequate remedy. The government says the only scenario in which the Proclamation fee is recoverable is if the fee is paid but a "visa is ultimately not awarded." *See* Dkt. 36 at 43. That possibility provides no relief for employers who cannot hire the H-1B workers they need because they cannot afford the $100,000 fee.

*Second*, the public interest (merged with the government's interest, *see Nken,* 556 U.S. at 435) strongly favors an injunction. The public interest always favors "having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And the district court record collects sources demonstrating the immense public benefit derived from the H-1B program. *See* Dkts. 18-27 through 18-34; 18-39 through 18-41; 18-45 through 18-46.

\*    \*    \*

57

Alternatively, for the same reasons, the Court should direct entry of a preliminary injunction, reversing the denial of that requested relief. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction."). Such relief is particularly warranted given the imminency of the March 2026 lottery.

**B.    The Court should direct the entry of APA injunctive and set-aside relief.**

Appellants are entitled to vacatur of agency implementation of the Proclamation. 5 U.S.C. § 706(2); *see Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). The Court also should enter an injunction on Appellants' APA claims. 5 U.S.C. § 703; *see In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020). Such relief is warranted to ensure government officials do not attempt to enforce the Proclamation post-vacatur. *Cf. Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

58

## CONCLUSION

The Proclamation is a grave threat to the separation of powers. It transforms a carefully crafted visa scheme into a tax Congress never authorized. It does not keep any particular noncitizens out of the country, but simply ensures they come based on a tax dictated by the President rather than a fee dictated by Congress. The extreme deference applied by the district court is as misplaced as this unprecedented effort to relocate the taxing power in the President. This Court should reverse the decision below, direct entry of summary judgment in Appellants' favor, and direct the issuance of prompt injunctive and set-aside relief.

Dated: January 9, 2026                         Respectfully submitted,

/s/ *Paul D. Clement*                          /s/ *Paul W. Hughes*
PAUL D. CLEMENT                                PAUL W. HUGHES
JAMES Y. XI                                    ALEX BOOTA
JEFFREY C. THALHOFER                           EMMETT WITKOVSKY-ELDRED
  *Clement & Murphy, PLLC*                       *McDermott Will & Schulte LLP*
  *706 Duke Street*                              *500 North Capitol Street NW*
  *Alexandria, VA 22314*                         *Washington, DC 20001*
  *(202) 742-8900*                               *(202) 756-8000*

*Counsel for Appellants*                       DARYL L. JOSEFFER
*Chamber of Commerce of*                         *U.S. Chamber Litigation Center*
*the United States of*                           *1615 H Street NW*
*America and Association*                        *Washington, DC 20062*
*of American Universities*                       *(202) 463-5337*

/s/ *Lindsay C. Harrison*                       *Counsel for Appellant Chamber of*
ADAM G. UNIKOWSKY                               *Commerce of United States of*
ELIZABETH HENTHORNE                             *America*
ISHAN K. BHABHA
LINDSAY C. HARRISON
ZACHARY C. SCHAUF
  *Jenner & Block LLP*
  *1099 New York Ave. NW Ste. 900*
  *Washington, DC 20001-4412*
  *(202) 637-6000*

*Counsel for Appellant*
*Association of American*
*Universities*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 12,911 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: January 9, 2026                    */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2026, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: January 9, 2026                    */s/ Paul W. Hughes*

**ADDENDUM**

# Addendum
## Table of Contents

8 U.S.C. § 1182(f).......................................................................................Add. 1

8 U.S.C. § 1185(a).......................................................................................Add. 2

8 U.S.C. § 1356(m).......................................................................................Add. 3

**8 U.S.C. § 1182(f) provides:**

(f) Suspension of entry or imposition of restrictions by President

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

**8 U.S.C. § 1185(a) provides:**

(a) Restrictions and prohibitions

Unless otherwise ordered by the President, it shall be unlawful--

(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe;

(2) for any person to transport or attempt to transport from or into the United States another person with knowledge or reasonable cause to believe that the departure or entry of such other person is forbidden by this section;

(3) for any person knowingly to make any false statement in an application for permission to depart from or enter the United States with intent to induce or secure the granting of such permission either for himself or for another;

(4) for any person knowingly to furnish or attempt to furnish or assist in furnishing to another a permit or evidence of permission to depart or enter not issued and designed for such other person's use;

(5) for any person knowingly to use or attempt to use any permit or evidence of permission to depart or enter not issued and designed for his use;

(6) for any person to forge, counterfeit, mutilate, or alter, or cause or procure to be forged, counterfeited, mutilated, or altered, any permit or evidence of permission to depart from or enter the United States;

(7) for any person knowingly to use or attempt to use or furnish to another for use any false, forged, counterfeited, mutilated, or altered permit, or evidence of permission, or any permit or evidence of permission which, though originally valid, has become or been made void or invalid.

Add. 2

**8 U.S.C. § 1185(a) provides:**

(m) Immigration Examinations Fee Account

Notwithstanding any other provisions of law, all adjudication fees as are designated by the Attorney General in regulations shall be deposited as offsetting receipts into a separate account entitled "Immigration Examinations Fee Account" in the Treasury of the United States, whether collected directly by the Attorney General or through clerks of courts: *Provided, however,* That all fees received by the Attorney General from applicants residing in the Virgin Islands of the United States, and in Guam, under this subsection shall be paid over to the treasury of the Virgin Islands and to the treasury of Guam: *Provided further*, That fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.