*In the*

# United States Court of Appeals

### *for the*

## District of Columbia Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and ASSOCIATION OF AMERICAN UNIVERSITIES,
*Plaintiffs-Appellants,*

— v. —

UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-3675, Hon. Beryl A. Howell

## JOINT APPENDIX

LINDSAY C. HARRISON
  *Jenner & Block LLP*
  *1099 New York Ave. NW*
  *Washington, DC 20001*
  *(202) 637-6000*

*Counsel for Appellant*
*Association of American*
*Universities*

TIBERIUS T. DAVIS
  *U.S. Department of Justice*
  *Civil Division*
  *P.O. Box 868*
  *Washington, DC 20044*
  *(202) 514-4357*

*Counsel for Appellees*

PAUL D. CLEMENT
  *Clement & Murphy, PLLC*
  *706 Duke Street*
  *Alexandria, VA 22314*
  *(202) 742-8900*

*Counsel for Appellants*
*Chamber of Commerce of*
*the United States of*
*America and Association*
*of American Universities*

PAUL W. HUGHES
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Appellant*
*Chamber of Commerce of the*
*United States of America*

# TABLE OF CONTENTS

District Court Docket Entries .................................................................JA1

Amended Complaint (Dkt. 8).............................................................JA15

Plaintiffs' Statement of Undisputed Material Facts (Dkt. 18-2)............JA68

Index of Exhibits (Dkt. 18-3) ............................................................JA74

Declaration of Patrick Shen (Dkt. 18-4)..............................................JA77

Declaration of Condrad Daniels (Dkt. 18-5) ........................................JA88

Declaration of Torie Poser (Dkt. 18-6)................................................JA93

Declaration of AAU President Barbara R. Snyder (Dkt. 18-7)..............JA99

Declaration of James H. Garrett (Dkt. 18-8) .....................................JA104

Declaration of Dr. Charles L. Isbell, Jr. (Dkt. 18-9)...........................JA109

Declaration of Stephen J. Gange (Dkt. 18-10) ...................................JA115

Declaration of Dr. A. Lupia and Dr. J. Pennywell (Dkt. 18-11)...........JA122

Declaration of Gretchen Ritter (Dkt. 18-12).......................................JA128

Declaration of Dr. Anantha Shakhar (Dkt. 18-13) ..............................JA135

Declaration of Phyllis J. Vetter (Dkt. 18-14)......................................JA142

Declaration of Washington University in St. Louis (Dkt. 18-15)..........JA145

Declaration of Frances Vavrus (Dkt. 18-16)........................................JA152

Declaration of Nancy A. Gonzales (Dkt. 18-17) .................................JA159

Declaration of Paul W. Hughes (Dkt. 18-18) ......................................JA161

Exhibit 1, The Proclamation (Dkt. 18-19) ..........................................JA167

Exhibit 2, USCIS Memo (Sept. 20, 2025) (Dkt. 18-20).......................JA172

Exhibit 3, USCBP Memo (Sept. 20, 2025) (Dkt. 18-21).......................JA174

Exhibit 4, *H-1B FAQ* (Sept. 21, 2025) (Dkt. 18-22) .............................. JA176

Exhibit 5, *H-1B Specialty Occupations* (Dkt. 18-23) ............................ JA179

Exhibit 6, USCIS Fee Schedule (Dkt. 18-24) ........................................ JA192

Exhibit 17, *Chamber Litigation Center* (Dkt. 18-35) ............................ JA253

Exhibit 18, *Immigration* (Dkt. 18-36) .................................................. JA256

Exhibit 28, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (Dkt. 18-46) ....................................................... JA259

Defendants' Response and Cross-Motion for Summary Judgment (Dkt. 36) .................................................................................................. JA283

Defendants' Statement of Undisputed Material Facts (Dkt. 36-1) ...... JA341

Declaration of Jerome Jackson (Dkt. 36-2) .......................................... JA356

Declaration of Alexandra McTague (Dkt. 36-3) .................................... JA359

Certification of Administrative Record, Dep't of State (Dkt. 45-1) ...... JA364

Certification of the Administrative Record, USCBP (Dkt. 45-2) .......... JA377

Certification of Index to Administrative Record, USCIS (Dkt. 45-3) ... JA388

Supplemental Declaration of Condrad Daniels (Dkt. 47-1) ................. JA410

Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts (Dkt. 47-2) ....................................................................... JA412

Order (Dkt. 53) ...................................................................................... JA422

Memorandum Opinion (Dkt. 54) ........................................................... JA423

Notice of Appeal (Dkt. 55) .................................................................... JA479

APPEAL,CLOSED,TYPE-C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-03675-BAH

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA v. UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al<br>Assigned to: Judge Beryl A. Howell<br>Case in other court: USCA, 25-05473<br>Cause: 05:0706 Judicial Review of Agency Actions | Date Filed: 10/16/2025<br>Date Terminated: 12/29/2025<br>Jury Demand: None<br>Nature of Suit: 890 Other Statutory Actions<br>Jurisdiction: Federal Question |

**Plaintiff**

**CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA**

represented by **Alex Christopher Boota**
MCDERMOTT, WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
202-756-8998
Email: aboota@mwe.com
*ATTORNEY TO BE NOTICED*

**Daryl Langdon Joseffer**
U.S. CHAMBER OF COMMERCE
1615 H Street, NW
Washington, DC 20062
202-463-5495
Email: djoseffer@uschamber.com
*ATTORNEY TO BE NOTICED*

**Emmett Witkovsky-Eldred**
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202-756-8223
Email: ewitkovsky-eldred@mwe.com
*ATTORNEY TO BE NOTICED*

**Grace Wallack**
MCDERMOTT, WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
202-756-8503
Email: gwallack@mwe.com
*ATTORNEY TO BE NOTICED*

**Mary Schnoor**
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.

JA1

Washington, DC 20001
202-756-8181
Email: mschnoor@mwe.com
*ATTORNEY TO BE NOTICED*

**Sarah Patricia Hogarth**
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202-756-8354
Fax: 202-756-8087
Email: shogarth@mwe.com
*ATTORNEY TO BE NOTICED*

**Paul Whitfield Hughes , III**
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202-756-8988
Email: phughes@mwe.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**ASSOCIATION OF AMERICAN UNIVERSITIES**     represented by     **Lindsay C. Harrison**
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6865
Email: LHarrison@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Whitfield Hughes , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Granich Unikowsky**
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6041
Email: AUnikowsky@jenner.com
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
202-637-6367
Fax: 202-847-4005

Email: BHenthorne@jenner.com
*ATTORNEY TO BE NOTICED*

**Ishan Kharshedji Bhabha**
JENNER AND BLOCK, LLP
1099 New York Ave NW
Suite 900
Washington, DC 20001
202-637-6327
Email: ibhabha@jenner.com
*ATTORNEY TO BE NOTICED*

**Zachary Charles Schauf**
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001-4412
202-639-6025
Email: zschauf@jenner.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

| | | |
|---|---|---|
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY** | represented by | **Alexandra McTague** |

U.S. DEPARTMENT OF JUSTICE
PO Box 868
Ben Franklin Station
Washington, DC 20044
202-718-0483
Email: alexandra.mctague2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn M. Girdharry**
U.S. DEPARTMENT OF JUSTICE
Immigration Litigation
Ben Franklin Station
P.O. Box 868
Washington, DC 20044
(202) 532-4807
Fax: (202) 305-7000
Email: glenn.girdharry@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
U.S. DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC 20530-0001
202-514-4357

Email: tiberius.davis@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF STATE**

represented by **Alexandra McTague**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn M. Girdharry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTI L. NOEM**
*in her official capacity as Secretary of Homeland Security*

represented by **Alexandra McTague**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn M. Girdharry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO A. RUBIO**
*in his official capacity as Secretary of State*

represented by **Alexandra McTague**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn M. Girdharry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

| | | |
|---|---|---|
| **TAMARA SANDERFIELD**<br>*Dr.* | represented by | **TAMARA SANDERFIELD**<br>11000 W. McNichols Rd.<br>Suite 323-1252<br>Detroit, MI 48221<br>918-480-3873<br>PRO SE |
| <u>**Amicus**</u> | | |
| **FEDERATION FOR AMERICAN<br>IMMIGRATION REFORM** | represented by | **Matt A. Crapo**<br>FEDERATION FOR AMERICAN<br>IMMIGRATION REFORM<br>25 Massachusetts Ave., NW<br>Suite 330<br>Washington, DC 20001<br>571-435-3582<br>Fax: 202-387-3447<br>Email: mcrapo@fairus.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 10/16/2025 | 1 | COMPLAINT against UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE, KRISTI NOEM, and MARCO A. RUBIO ( Filing fee $ 405 receipt number ADCDC-12025448) filed by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Dept of Homeland Security, # 3 Summons to Dept of State, # 4 Summons to Noem, # 5 Summons to Rubio, # 6 Summons to USAO, # 7 Summons to AG) (Hughes, Paul) Modified docket text on 10/17/2025 (mg). (Entered: 10/16/2025) |
| 10/16/2025 | 2 | NOTICE of Appearance by Sarah Patricia Hogarth on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Hogarth, Sarah) (Entered: 10/16/2025) |
| 10/16/2025 | 3 | NOTICE of Appearance by Grace Wallack on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Wallack, Grace) (Entered: 10/16/2025) |
| 10/16/2025 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Hughes, Paul) (Entered: 10/16/2025) |
| 10/16/2025 | | Case Assigned to Judge Beryl A. Howell. (zmtm) (Entered: 10/16/2025) |
| 10/16/2025 | 5 | SUMMONS (6) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 10/16/2025) |
| 10/17/2025 | 6 | STANDING ORDER. Signed by Judge Beryl A. Howell on October 17, 2025. (lcbah4) (Entered: 10/17/2025) |
| 10/23/2025 | 7 | NOTICE of Appearance by Daryl Langdon Joseffer on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Joseffer, Daryl) (Entered: 10/23/2025) |
| 10/24/2025 | 8 | AMENDED COMPLAINT against All Defendants filed by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ASSOCIATION OF AMERICAN UNIVERSITIES. (Attachments: # 1 Exhibit)(Hughes, Paul) (Entered: 10/24/2025) |

| 10/24/2025 | 9 | NOTICE of Appearance by Adam Granich Unikowsky on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Unikowsky, Adam) (Entered: 10/24/2025) |
|---|---|---|
| 10/24/2025 | 10 | NOTICE of Appearance by Elizabeth Henthorne on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Henthorne, Elizabeth) (Entered: 10/24/2025) |
| 10/24/2025 | 11 | NOTICE of Appearance by Ishan Kharshedji Bhabha on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Bhabha, Ishan) (Entered: 10/24/2025) |
| 10/24/2025 | 12 | NOTICE of Appearance by Lindsay C. Harrison on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Harrison, Lindsay) (Entered: 10/24/2025) |
| 10/24/2025 | 13 | NOTICE of Appearance by Zachary Charles Schauf on behalf of ASSOCIATION OF AMERICAN UNIVERSITIES (Schauf, Zachary) (Entered: 10/24/2025) |
| 10/24/2025 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/17/2025. Answer due for ALL FEDERAL DEFENDANTS by 12/16/2025. (Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARCO A. RUBIO served on 10/23/2025 (Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF HOMELAND SECURITY served on 10/22/2025 (Attachments: # 1 Exhibit Certified Mail Receipt, # 2 Exhibit USPS Tracking and Proof of Delivery)(Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 17 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KRISTI NOEM served on 10/22/2025 (Attachments: # 1 Exhibit Certified Mail Receipt, # 2 Exhibit USPS Tracking and Proof of Delivery)(Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 18 | MOTION for Preliminary Injunction *or, in the alternative*, MOTION for Summary Judgment by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Exhibit Index of Exhibits, # 4 Declaration Shen, # 5 Declaration Daniels, # 6 Declaration Poser, # 7 Declaration Snyder, # 8 Declaration CMU, # 9 Declaration UIUC, # 10 Declaration Hopkins, # 11 Declaration Michigan, # 12 Declaration Minnesota, # 13 Declaration Pitt, # 14 Declaration Utah, # 15 Declaration WashU, # 16 Declaration Wisconsin, # 17 Declaration Gonzales, # 18 Declaration Hughes, # 19 Exhibit 1 - Proclamation, # 20 Exhibit 2 - USCIS Memo, # 21 Exhibit 3 - USCBP Memo, # 22 Exhibit 4 - USDOS FAQ, # 23 Exhibit 5 - USCIS H-1B Website, # 24 Exhibit 6 - USCIS Fee Schedule, # 25 Exhibit 7 - FWD.us Article, # 26 Exhibit 8 - Chamber - Labor Shortag, # 27 Exhibit 9 - AAMC Article, # 28 Exhibit 10 - Kahn Article, # 29 Exhibit 11 - AIC Article, # 30 Exhibit 12 - Peri Article, # 31 Exhibit 13 - Mahajan Article, # 32 Exhibit 14 - Jiang Article, # 33 Exhibit 15 - Morales Article, # 34 Exhibit 16 - Gunadi Article, # 35 Exhibit 17 - Chamber Litigation Center, # 36 Exhibit 18 - Chamber - Immigration, # 37 Exhibit 19 - Chamber Comment 1, # 38 Exhibit 20 - Chamber Comment 2, # 39 Exhibit 21 - Almasalkhi Article, # 40 Exhibit 22 - NASEM Excerpt, # 41 Exhibit 23 - Nowrasteh Article, # 42 Exhibit 24 - Zakrewski article, # 43 Exhibit 25 - Chamber - America Works Initiative, # 44 Exhibit 26 - USCIS Registrations, # 45 Exhibit 27 - Dimmock Article, # 46 Exhibit 28 - Santamaria CRS Report, # 47 Text of Proposed Order)(Hughes, Paul) (Entered: 10/24/2025) |
| 10/24/2025 | 19 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ASSOCIATION OF AMERICAN UNIVERSITIES (Harrison, Lindsay) (Entered: 10/24/2025) |

| 10/24/2025 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF STATE served on 10/23/2025 (Attachments: # 1 Exhibit Certified Mail Receipt, # 2 Exhibit USPS Tracking and Proof of Delivery)(Hughes, Paul) (Entered: 10/24/2025) |
|---|---|---|
| 10/27/2025 | 21 | NOTICE of Appearance by Alexandra McTague on behalf of All Defendants (McTague, Alexandra) (Entered: 10/27/2025) |
| 10/27/2025 | 22 | MOTION to Stay re 18 MOTION for Preliminary Injunction *or, in the alternative* MOTION for Summary Judgment by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Proposed Order)(McTague, Alexandra) (Entered: 10/27/2025) |
| 10/28/2025 | 23 | Memorandum in opposition to re 22 MOTION to Stay re 18 MOTION for Preliminary Injunction *or, in the alternative* MOTION for Summary Judgment filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Hughes, Paul) (Entered: 10/28/2025) |
| 10/28/2025 | 24 | Cross MOTION for Briefing Schedule by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Hughes, Paul) (Entered: 10/28/2025) |
| 10/29/2025 | 25 | REPLY to opposition to motion re 22 Motion to Stay, filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (McTague, Alexandra) (Entered: 10/29/2025) |
| 10/29/2025 | 26 | Memorandum in opposition to re 24 Cross MOTION for Briefing Schedule filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (McTague, Alexandra) (Entered: 10/29/2025) |
| 10/29/2025 | 27 | REPLY to opposition to motion re 24 Motion for Briefing Schedule filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Hughes, Paul) (Entered: 10/29/2025) |
| 10/29/2025 | | MINUTE ORDER (paperless), upon consideration of defendants' 22 Motion to Stay ("Defs.' Stay Mot."), plaintiffs' 23 Memorandum in Opposition to the Motion to Stay ("Pls.' Opp'n to Stay") and 24 Cross Motion for Briefing Schedule ("Pls.' Cross Mot. for Briefing Schedule"), defendants' 25 Reply in Support of Motion for Stay ("Defs.' Stay Reply") and 26 Memorandum in Opposition to Cross Motion for Briefing Schedule, and plaintiffs' 27 Reply in Support of Cross Motion to Set Briefing Schedule, DENYING defendants' 22 Motion to Stay and GRANTING IN PART and DENYING IN PART plaintiffs' 23 Cross-Motion for Briefing Schedule, both of which motions became ripe today, for the following reasons.<br><br>Defendants raise three principal reasons for why a stay of any briefing schedule is required, but none is persuasive. First, defendants argue that attorneys at the Department of Justice "are prohibited from working, even on a voluntary basis, except in very limited circumstances, including 'emergencies involving the safety of human life or the protection of property.'" Defs.' Stay Mot. ¶ 6 (quoting 31 U.S.C. § 1342). To the contrary, the Department of Justice's own Contingency Plan obliges employees to work "[i]f a court denies [a stay] request and orders a case to continue" because such order "would constitute express legal authorization for the activity to continue." FY 2026 Contingency Plan at 3 (Sept. 29, 2025), https://www.justice.gov/jmd/media/1377216/dl. Moreover, defendants |

contend that "the stay proceedings ordered by Chief Judge Boasberg[] applies to this case and is still in effect." Defs.' Stay Mot. ¶ 5 (citing D.D.C. Standing Order, No. 25-55 (Oct. 1, 2025) (Boasberg, C.J.)). Such reliance is misplaced. D.D.C. Standing Order, No. 25-55, imposes, by default, a stay of deadlines imposed upon the United States in a summary judgment action, and permits such deadlines to apply in individual cases by "further order of the Court," D.D.C. Standing Order No. 25-55, in the discretion of the presiding Judge.

Second, defendants contend that federal government attorneys will have difficulty communicating with other federal government employees of defendants, many of whom may be furloughed. Consequently, "because of the lapse in appropriations, the [defendants'] attorney has not been able to work with the appropriate agency counsel to determine whether and to what extent there may be an administrative record necessary for the Court to review and resolve this case." Defs.' Stay Reply ¶ 4. While appreciating that the federal government attorneys are furloughed and face challenges in responding to the pending substantive motion in this case given the lapse in federal appropriations and the furloughs of employees of the executive branch and its agencies, "good cause" for denial of stay may be found for reasons broader than an emergency posing imminent and irreparable harm, as defendants seem to urge. Defs.' Stay Reply ¶ 1 ("There is no emergency and this alone is good cause to stay the briefing at this time."). Even if the alleged direct harm from the presidential proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, Proclamation 10973, 90 Fed. Reg. 46207 (Sept. 19, 2025), does not manifest for some members within an association "until March 2026," Defs.' Stay Reply ¶ 1, other members of the Chambers of Commerce not subject to the H-1B visa cap and all of the Association of American Universities' members, do allege present harm and are entitled to prompt adjudication of their claims. Pls.' Opp'n to Stay 5-6. For instance, the Vice Chancellor for Clinical Affairs and CEO for Wash U Medicine at Washington University in St. Louis represented that the Department of Anesthesiology had planned to file an application for an H1-B visa to fill a vacancy during the week of September 21st and two more soon thereafter but for the proclamation. *See* Pls.' Opp'n to Stay 6 (citing ECF 18-15 ¶ 10 (Scheel Decl.)). In short, the executive branch cannot rely on the lapse of appropriations to insulate itself from meaningful judicial review sought by those who allege that the executive branch's continuing actions exceed constitutional limitations and frustrate their ability, as private entities, to make plans for talent recruitment and resource allocation.

Third, defendants contend that plaintiffs sought a preliminary injunction as "an effort to side step" D.D.C. Standing Order, No. 25-55, Defs.' Stay Mot. ¶ 5, and "to sandbag the government and force Defendants into a quick response using skeletal staff," Defs.' Stay Reply ¶ 1, by having to respond to both a preliminary injunction and a summary judgment motion during a lapse in appropriations. Defendants posit that "[i]t is not clear how the government should proceed in addressing Plaintiffs' combined motion . . . . Plaintiffs simply assume both should be addressed." Defs.' Stay Reply ¶ 3. To further their point, defendants claim that the harms alleged by plaintiffs "amount to either a U.S. employer's decision not to participate in a regulatory program or [to] pay a program fee--neither of which is irreparable." Defs.' Stay Reply ¶ 1. To ameliorate defendants' concerns about the complexities of responding to two motions filed during a lapse in appropriations, and given the lack of any objection from the parties, the motion for a preliminary injunction will be converted to a motion for summary judgment on an expedited schedule.

Plaintiffs proposed a briefing schedule that would require defendants to file an opposition on November 10, 2025. Pls.' Cross Mot. for Briefing Schedule 11. Defendants request that, should the Court deny its motion for a stay, the deadline to submit an opposition shall be thirty days from the time of the order--or November 28. Defs.' Stay Reply ¶ 5. The following SCHEDULING ORDER shall control further proceedings:

| | | |
|---|---|---|
| | | (1) By November 28, 2025, defendants shall file any opposition to plaintiffs' 18 Motion for a Preliminary Injunction or in the Alternative, Summary Judgment; and |
| | | (2) By December 8, 2025, plaintiffs shall file any reply; |
| | | (3) As necessary, any hearing will be set following completion of briefing on the pending summary judgment motion. |
| | | Signed by Judge Beryl A. Howell on October 29, 2025. (lcbah4) (Entered: 10/29/2025) |
| 10/30/2025 | | Set/Reset Deadlines: Defendant Opposition To Plaintiffs' 18 Motion for a Preliminary Injunction or in the Alternative, Summary Judgment Responses due by 11/28/2025. Plaintiffs Reply due by 12/8/2025. (mac) (Entered: 10/30/2025) |
| 11/13/2025 | 28 | MOTION to Intervene by TAMARA SANDERFIELD. (Attachments: # 1 Text of Proposed Order)(mg) (Entered: 11/17/2025) |
| 11/18/2025 | | MINUTE ORDER (paperless) DENYING 28 Motion to Intervene as Plaintiff of Tamara Sanderfield, which *pro se* motion was docketed on November 17, 2025, at 10:31 P.M., for failure to comply with Federal Rule of Civil Procedure 24(c) and D.D.C. Local Rule of Civil Procedure 7(j). |
| | | Federal Rule of Civil Procedure 24(c) requires that all motions for intervention "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Likewise, Local Rule of Civil Procedure 7(j) obliges "[a] motion to intervene as a party" to be "accompanied by an original of the pleading setting forth the claim or defense for which intervention is sought." Here, "[m]ovant has not filed such a pleading, and the Court could deny the motion based on that failure to comply with the federal rules alone." *Friends of the Earth v. U.S. Env't Prot. Agency*, No. 12-cv-363 (ABJ), 2012 WL 13054264, *2 (D.D.C. Apr. 11, 2012). Although "[d]ocuments filed by *pro se* litigants... are 'to be liberally construed,'" "even *pro se* litigants must comply with the Federal Rules of Civil Procedure." *Id.* at n.4 (first quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); and then quoting *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987)); *see also Hedrick v. Fed. Bureau of Investigation*, 216 F. Supp. 3d 84, 93 (D.D.C. 2016) ("[E]ven a pro se plaintiff must comply with the Federal Rules of Civil Procedure and this Court's local rules[.]"). For failure to comply with the federal rules and local rules, the 28 Motion to Intervene is denied. |
| | | Signed by Judge Beryl A. Howell on November 18, 2025. (lcbah4) Modified on 11/19/2025. (zalh) (Entered: 11/18/2025) |
| 11/24/2025 | 29 | MOTION for Extension of Time to File Response/Reply *to Motion for Summary Judgment (opposed)* by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 11/24/2025) |
| 11/25/2025 | 30 | Memorandum in opposition to re 29 MOTION for Extension of Time to File Response/Reply *to Motion for Summary Judgment (opposed)* filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Hughes, Paul) (Entered: 11/25/2025) |
| 11/25/2025 | | MINUTE ORDER (paperless), upon consideration of defendants' 29 Motion for Extension of Time and plaintiffs' 30 Opposition to Defendants' Motion for Extension of Time, GRANTING IN PART and DENYING IN PART defendants' 29 motion; and ORDERING defendants to file any opposition to plaintiffs' 18 Motion for a Preliminary injunction or in the Alternative, Summary Judgment by December 1, 2025; and plaintiffs to file any reply |

| | | |
|---|---|---|
| | | by December 10, 2025. Signed by Judge Beryl A. Howell on November 25, 2025. (lcbah4) (Entered: 11/25/2025) |
| 11/26/2025 | | Set/Reset Deadlines: Defendants Opposition To Plaintiffs' 18 Motion for a Preliminary injunction or in the Alternative, Summary Judgment due by 12/01/2025. Plaintiffs Reply due by 12/10/2025. (mac) (Entered: 11/26/2025) |
| 11/26/2025 | 31 | NOTICE of Appearance by Tiberius T Davis on behalf of All Defendants (Davis, Tiberius) (Entered: 11/26/2025) |
| 12/01/2025 | 32 | NOTICE of Appearance by Glenn M. Girdharry on behalf of All Defendants (Girdharry, Glenn) (Entered: 12/01/2025) |
| 12/01/2025 | 33 | NOTICE of Appearance by Mary Schnoor on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Schnoor, Mary) (Entered: 12/01/2025) |
| 12/01/2025 | 34 | NOTICE of Appearance by Emmett Witkovsky-Eldred on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Witkovsky-Eldred, Emmett) (Entered: 12/01/2025) |
| 12/01/2025 | 35 | NOTICE of Appearance by Alex Christopher Boota on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Boota, Alex) (Entered: 12/01/2025) |
| 12/01/2025 | 36 | Memorandum in opposition to re 18 MOTION for Preliminary Injunction *or, in the alternative* MOTION for Summary Judgment filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Statement of Facts, # 2 Declaration Jackson, # 3 Declaration McTague, # 4 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/01/2025) |
| 12/01/2025 | 37 | Cross MOTION for Summary Judgment by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Statement of Facts, # 2 Declaration Jackson, # 3 Declaration McTague, # 4 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/01/2025) |
| 12/01/2025 | 38 | MOTION Relief from LR 7(n) by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/01/2025) |
| 12/02/2025 | 39 | RESPONSE re 38 MOTION Relief from LR 7(n) filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Hughes, Paul) (Entered: 12/02/2025) |
| 12/02/2025 | 40 | Cross MOTION to Hold in Abeyance re 37 Cross MOTION for Summary Judgment , 38 MOTION Relief from LR 7(n) by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Hughes, Paul) (Entered: 12/02/2025) |

| | | |
|---|---|---|
| 12/03/2025 | | MINUTE ORDER (paperless) DIRECTING, upon consideration of defendants' 38 Motion for Relief from Local Rule 7(n) and plaintiffs' 39 Opposition to Defendants' Motion for Relief from Local Rule 7(n) and Cross-Motion to Hold Defendants' Motion for Summary Judgment in Abeyance, defendants to file by December 4, 2025, at 2 P.M., any reply in support of its 38 motion for relief from Local Rule 7(n) and any opposition to plaintiffs' 39 cross-motion to hold defendants' motion for summary judgment in abeyance. Signed by Judge Beryl A. Howell on December 3, 2025. (lcbah4) (Entered: 12/03/2025) |
| 12/04/2025 | | Set/Reset Deadlines: Defendants Reply In Support Of Its 38 Motion For Relief From Local Rule 7(n) And Any Opposition To Plaintiffs' 39 Cross-Motion To Hold Defendants' Motion For Summary Judgment In Abeyance due by 12/4/2025. (mac) (Entered: 12/04/2025) |
| 12/04/2025 | 41 | Memorandum in opposition to re 40 Cross MOTION to Hold in Abeyance re 37 Cross MOTION for Summary Judgment , 38 MOTION Relief from LR 7(n) filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/04/2025) |
| 12/04/2025 | 42 | REPLY to opposition to motion re 38 Motion for Miscellaneous Relief *from LCvR 7(n)* filed by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/04/2025) |
| 12/04/2025 | | MINUTE ORDER (paperless) DENYING, upon consideration of defendants' 38 Motion for Relief from Local Rule 7(n) ("Defs.' Mot."), their 42 Reply to Opp'n to Mot. re Mot. for Misc. Relief ("Defs.' Reply"), and plaintiffs' 39 Opposition to Defendants' Motion for Relief from Local Rule 7(n) and Cross-Motion to Hold Defendants' Motion for Summary Judgment in Abeyance, defendants' 38 motion for relief from Local Rule 7(n); ORDERING defendants to file the administrative record by December 5, 2025; and DENYING, as moot and for failure to comply with Local Rule 7(m), plaintiffs' 39 cross-motion to hold defendants' motion for summary judgment in abeyance.

Local Rule 7(n) states that "[i]n cases involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record... *simultaneously* with the filing of a dispositive motion." D.D.C. Local Rule 7(n)(1) (emphasis added). Though filing a dispositive motion, *see* Defs.' 37 Cross Mot. for Summ. J., defendants declined to file a certified list of the contents of the administrative record, explaining that "[t]he administrative record is not required to resolve the pending motions" and that "there is no legitimate reason to burden the Defendants with production of an index of the administrative record at this time." Defs.' Mot. at 3, 5. The time for defendants to request such relief was before filing their dispositive motion. Further, production of the administrative record would not create a "burden" for defendants, given their representation that "because there is no final agency action, there is no record to produce." Defs.' Mot. at 5; *see also* Defs.' Reply at 6 ("These are not final agency actions requiring a record. Indeed, without a final agency action, there *is no record*." (emphasis original)). If no administrative record exists, defendants may easily say so.

Defendants' requests so far in this case have been amply accommodated. Plaintiffs' first dispositive motion was originally styled as a preliminary injunction, which would have provided defendants with just seven days to respond. *See* 18 Mot. for Prelim. Inj. or, in the Alternative, Mot. for Summ. J.; D.D.C. Local Rule 65.1(c). Defendants moved for the Court to stay, or, in the alternative, give them thirty days from the time of the Court's order to file their opposition, which motion was granted over plaintiffs' objection that defendants' time for response be limited to November 10, seventeen days after receiving the |

preliminary injunction. With the parties' consent, the Court converted the preliminary injunction into a motion for summary judgment and gave defendants the thirty days for which they had asked. *See* Minute Order (Oct. 29, 2025) ("To ameliorate defendants' concerns about the complexities of responding to two motions filed during a lapse in appropriations, and given the lack of any objection from the parties, the motion for a preliminary injunction will be converted to a motion for summary judgment on an expedited schedule."). Defendants subsequently requested an extension of their proposed and adopted deadline, and again over plaintiffs' objection, defendants were granted an additional three days to file opposition. *See* Minute Order (Nov. 25, 2025). During none of this prior briefing did defendants indicate that they did not intend to follow Local Rule 7(n), and they did not do so until they had already broken Local Rule 7(n) by filing a dispositive motion in this matter, without the required administrative record. Defendants are ORDERED to comply with Local Rule 7(n) by December 5, 2025.

Signed by Judge Beryl A. Howell on December 4, 2025. (lcbah4) (Entered: 12/04/2025)

| 12/05/2025 | | Set/Reset Deadlines: Defendants Administrative Record due by 12/5/2025. (mac) (Entered: 12/05/2025) |
|---|---|---|
| 12/05/2025 | 43 | NOTICE of Appearance by Matt A. Crapo on behalf of FEDERATION FOR AMERICAN IMMIGRATION REFORM (Crapo, Matt) (Entered: 12/05/2025) |
| 12/05/2025 | 44 | Unopposed MOTION for Leave to File Amicus Brief by FEDERATION FOR AMERICAN IMMIGRATION REFORM. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit [Proposed] Order Granting Motion For Leave)(Crapo, Matt) (Entered: 12/05/2025) |
| 12/05/2025 | | MINUTE ORDER (paperless) GRANTING the Federation for American Immigration Reform's 44 Unopposed Motion for Leave to File Amicus Brief to which all parties consent. Signed by Judge Beryl A. Howell on December 5, 2025. (lcbah4) (Entered: 12/05/2025) |
| 12/05/2025 | 45 | NOTICE *of Compliance with LCvR 7(n) and Court Order* by KRISTI NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE (Attachments: # 1 Exhibit State, # 2 Exhibit CBP, # 3 Exhibit USCIS)(McTague, Alexandra) (Entered: 12/05/2025) |
| 12/05/2025 | 46 | AMICUS BRIEF by FEDERATION FOR AMERICAN IMMIGRATION REFORM. (mg) (Entered: 12/08/2025) |
| 12/05/2025 | 49 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: NICHOLAS HAYS, NON-PARTY'S Letter. Reason(s): Other- NON-PARTY. (mg) (Entered: 12/11/2025) |
| 12/10/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' request for a hearing, *see* Pls.' 18 Mot. for Preliminary Injunction *or, in the alternative*, MOTION for Summary Judgment at 2, and the fact that briefing on plaintiffs' pending motion and defendants' pending 37 Cross-Motion for Summary Judgment, will only be completed on December 17, 2025, due to extensions granted at defendants' request, *see* Minute Order (Oct. 29, 2025) (giving defendants thirty days to oppose plaintiffs' motion instead of the default of seven days provided by the local rules); Minute Order (Nov. 25, 2025) (granting defendants additional three days to file an opposition), the parties are DIRECTED to appear in Courtroom 26A for a hearing on the pending motions on December 19, 2025, at 10 A.M. Signed by Judge Beryl A. Howell on December 10, 2025. (lcbah4) (Entered: 12/10/2025) |
| 12/10/2025 | 47 | Memorandum in opposition to re 37 Cross MOTION for Summary Judgment filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF |

| | | |
|---|---|---|
| | | THE UNITED STATES OF AMERICA. (Attachments: # 1 Supplemental Declaration of Condrad Daniels, # 2 Response to Defendants' Statement of Material Facts, # 3 Text of Proposed Order)(Hughes, Paul) (Entered: 12/10/2025) |
| 12/10/2025 | 48 | REPLY to opposition to motion re 18 Motion for Preliminary Injunction,,,,,,,, Motion for Summary Judgment,,,,,,, filed by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (Attachments: # 1 Supplemental Declaration of Condrad Daniels, # 2 Response to Defendants' Statement of Material Facts, # 3 Text of Proposed Order)(Hughes, Paul) (Entered: 12/10/2025) |
| 12/11/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for December 19, 2025 at 10:00AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833-990-9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB). **Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 12/11/2025)** |
| 12/15/2025 | 50 | MOTION to Dismiss *Amended Complaint* by KRISTI L. NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (Attachments: # 1 Text of Proposed Order)(McTague, Alexandra) (Entered: 12/15/2025) |
| 12/16/2025 | | Set/Reset Hearings: Motion Hearing set for 12/19/2025 at 10:00 AM in Courtroom 26A- In Person before Judge Beryl A. Howell. (mac) (Entered: 12/16/2025) |
| 12/17/2025 | 51 | REPLY to opposition to motion re 37 Motion for Summary Judgment, filed by KRISTI L. NOEM, MARCO A. RUBIO, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE. (McTague, Alexandra) (Entered: 12/17/2025) |
| 12/19/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 12/19/2025 re 18 Motion for Preliminary Injunction. The Court Heard Oral Arguments From The Parties. The Court Reserves Judgment. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 12/19/2025) |
| 12/23/2025 | 52 | TRANSCRIPT OF PROCEEDINGS before Judge Beryl A. Howell, held on 12-19-2025; Page Numbers: 1 - 112. Date of Issuance: 12-23-2025. Court Reporter: Elizabeth Davila, Telephone number: 202-354-3242, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/13/2026. Redacted Transcript Deadline set for 1/23/2026. Release of Transcript Restriction set for 3/23/2026.(Davila, Elizabeth) (Entered: |

| | | |
|---|---|---|
| | | 12/23/2025) |
| 12/23/2025 | 53 | ORDER DENYING plaintiffs' 18 Motion for Preliminary Injunction or, in the Alternative, Motion for Summary Judgment; GRANTING defendants' 37 Cross Motion for Summary Judgment; and DENYING as moot defendants' 50 Motion to Dismiss Amended Complaint. See Memorandum Opinion for further details. The Clerk of the Court is directed to close this case. Signed by Judge Beryl A. Howell on December 23, 2025. (lcbah4) (Entered: 12/23/2025) |
| 12/23/2025 | 54 | MEMORANDUM OPINION regarding plaintiffs' 18 Motion for Preliminary Injunction or, in the Alternative, Motion for Summary Judgment; defendants' 37 Cross Motion for Summary Judgment; and defendants' 50 Motion to Dismiss Amended Complaint. Signed by Judge Beryl A. Howell on December 23, 2025. (lcbah4) (Entered: 12/23/2025) |
| 12/29/2025 | 55 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 54 Memorandum & Opinion, 53 Order on Motion for Summary Judgment,, Order on Motion to Dismiss,, Order on Motion for Preliminary Injunction,,, by ASSOCIATION OF AMERICAN UNIVERSITIES, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. Filing fee $ 605, receipt number ADCDC-12156980. Fee Status: Fee Paid. Parties have been notified. (Hughes, Paul) (Entered: 12/29/2025) |
| 12/30/2025 | 56 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 55 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 12/30/2025) |
| 12/31/2025 | | USCA Case Number 25-5473 for 55 Notice of Appeal to DC Circuit Court, filed by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ASSOCIATION OF AMERICAN UNIVERSITIES. (znmw) (Entered: 12/31/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/09/2026 11:35:44 | | |
| **PACER Login:** | mw000036 | **Client Code:** | 013510-0071-00000 |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-03675-BAH |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br>1615 H Street, NW<br>Washington, D.C. 20062-2000;<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES<br>1200 New York Ave NW, Suite 500<br>Washington, DC 20005,<br><br>                 Plaintiffs,<br><br>v.<br><br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br>2707 Martin Luther King Jr. Avenue, SE<br>Washington, D.C. 20528;<br><br>UNITED STATES DEPARTMENT OF STATE<br>2201 C Street, NW<br>Washington, D.C. 20520;<br><br>KRISTI L. NOEM, in her official capacity as Secretary of Homeland Security<br>2707 Martin Luther King Jr. Avenue, SE<br>Washington, D.C. 20528;<br><br>MARCO A. RUBIO, in his official capacity as Secretary of State<br>2201 C Street, NW<br>Washington, D.C. 20520,<br><br>                 Defendants. | Case No. 1:25-cv-3675-BAH |

### AMENDED COMPLAINT

Plaintiffs the Chamber of Commerce of the United States of America and the Association of American Universities bring this action for declaratory and injunctive relief and alleges as follows:

## INTRODUCTION

1.    The United States is unique in its ability to attract the brightest talent from across the globe. For more than 70 years, what is now known as the H-1B visa program has enabled the United States to harness this magnetic draw. Tens of thousands of highly skilled people in specialized fields boost the American economy each year after obtaining H-1B status. These workers allow businesses of all sizes, in industries across the economy, to innovate and grow. They contribute to ground-breaking research and educate American students at America's leading universities. The resulting innovations lead to more American jobs, higher wages, and new products and services that improve the quality of life for all Americans.

2.    The H-1B program is a creature of statute, which Congress has meticulously maintained and modified over decades. The goal, from the start, has been to maximize the benefits of the program for the American people while also ensuring that American workers do not face a competitive disadvantage in the national workforce. That is, Congress has focused on making this program available to employers seeking workers with specialized skills not available in the United States while preventing H-1B abuse and the displacement of American workers. To that end, it has struck an intricate, thoughtful balance by specifying how fees for the program should be calculated, how many visas may be issued annually, and what requirements the executive branch should enforce to ensure that H-1B workers do not displace American workers or undercut wages.

3.    The presidential proclamation at issue in this action, Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 19, 2025) (the Proclamation), upends that carefully crafted congressional balance. The centerpiece of the Proclamation is the imposition of a $100,000 fee on all new petitions filed by United States employers

intending to hire foreign workers through the H-1B program. By comparison, prior to the Proclamation, most H-1B petitions cost less than $3,600.

4.    If implemented, that fee would inflict significant harm on American businesses and institutions of higher education, which would be forced to either dramatically increase their labor costs or hire fewer highly skilled employees for whom domestic replacements are not readily available. While Congress made the program generally available for domestic employers, this new fee would make it no longer economically viable for many, including smaller businesses, universities, and nonprofits. Indeed, a fee of $100,000 would significantly reduce participation in the program, resulting in fewer employers being able to access the highly skilled workers they need to continue to innovate and create American jobs.

5.    These harms to American businesses and higher education will also be a boon to America's economic rivals, who will surely welcome the talent no longer able to accept work in the United States. That is a competitive edge that foreign employers might never cede back.

6.    The Proclamation is not only misguided policy; it is plainly unlawful. The President has significant authority over the entry of noncitizens into the United States, but that authority is bounded by statute and cannot directly contradict laws passed by Congress.

7.    The Proclamation does precisely that: It blatantly contravenes the fees Congress has set for the H-1B program and countermands Congress's judgment that the program should provide a pathway for up to 85,000 people annually to contribute their talents to the United States for the betterment of American society. As fully set forth herein, other problems abound.

8.    Because the Proclamation exceeds the President's lawful authority, it must be enjoined as to Plaintiffs and their members, and any implementing agency action must be held unlawful and set aside.

**PARTIES**

9.    Plaintiff the Chamber of Commerce of the United States of America (the U.S. Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the U.S. Chamber is to represent the interests of its members before Congress, the executive branch, and the courts. To that end, the U.S. Chamber regularly litigates on behalf of its members in federal court. The U.S. Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

10.    Plaintiff the Association of American Universities ("AAU") is an association of 71 leading research universities, 69 of which are based in the United States, with the goal of transforming lives through education, research, and innovation. AAU's member organizations are public and private research universities that are world-renowned centers of innovation and scholarship contributing to scientific progress, economic development, security, and well-being. AAU is a 501(c)(3) nonprofit organization headquartered in Washington, D.C.

11.    Defendant the United States Department of Homeland Security is the federal department with substantial responsibility for immigration policy and enforcement. The Proclamation charges the Department of Homeland Security with certain aspects of its implementation. The Department of Homeland Security is integral to execution of the Proclamation's imposition of a $100,000 fee on new H-1B visas. The Department of Homeland Security is headquartered in Washington, D.C.

12.    Defendant the United States Department of State is the federal department charged with conducting foreign relations, including by issuing visas to noncitizens. The Proclamation charges the Department of State with certain aspects of its implementation. The Department of

State is integral to execution of the Proclamation's imposition of a $100,000 fee on new H-1B visas. The Department of State is headquartered in Washington, D.C.

13.     Defendant Kristi L. Noem is the Secretary of Homeland Security. She is sued in her official capacity.

14.     Defendant Marco A. Rubio is the Secretary of State. He is sued in his official capacity.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this suit under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq., the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq., and this Court's inherent equitable power.

16.     It is within this Court's inherent equitable power to enjoin actions by federal officers in excess of their lawful authority, including when acting pursuant to a presidential directive. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("We think it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'") (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part)); *id.* ("[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands.") (quotation marks omitted); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

17.     This Court has jurisdiction under 28 U.S.C. § 1331, as this case arises under the laws of the United States.

18.     Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(e)(1)(A)-(C) because this action seeks relief against federal agencies and officials acting in their official capacities, at least one defendant is located in this district, a substantial part of the events giving rise to the claim occurred in this district, and plaintiffs reside in this district and no real property is involved.

19.    The U.S. Chamber has standing to bring this action under the doctrine of associational standing. *See, e.g., Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 333 (1977). Many of the U.S. Chamber's members of all sizes, and across a wide spectrum of economic sectors, use the H-1B program. They count H-1B visa holders among their valued employees and plan to continue sponsoring future hires for visas through the H-1B process, including in the next annual H-1B visa lottery, which will occur in March 2026 and therefore is encompassed within the Proclamation's effective period. U.S. Chamber members use the H-1B program to access employees with specialized, often technical skills that are in high demand—and therefore in short supply—domestically.

20.    The imposition of a new $100,000 fee to continue using that program is thus a concrete harm suffered by the numerous U.S. Chamber members who participate in the program. Some members are unable to pay that fee and therefore must either reduce or entirely forgo their planned entries into the March 2026 lottery—thereby giving up the benefits of the program in terms of access to specialized talent and likely leaving difficult-to-fill positions empty. That creates ripple effects across the business, including forgone opportunities and loss of competitiveness. Other members who find a way to pay a $100,000 per-employee fee will be harmed too, incurring the "classic pocketbook injury" (*Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023)) of paying money to the government. And paying the fee will require members to divert resources and decrease investments in other areas.

21.    Either way, the U.S. Chamber's members who intend to sponsor H-1B employees this year are the object of the Proclamation's $100,000 fee requirement—as they are the parties now required to pay the fee—and therefore would have standing to sue in their own right. *See, e.g.*, *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. ___, 145 S. Ct. 2121, 2134 (2025) ("[I]f a plaintiff is 'an object of the action (or forgone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment

preventing or requiring the action will redress it.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-562 (1992))).

22.     This action is also germane to the U.S. Chamber's purpose of representing the interests of American business in court. *Hunt*, 432 U.S. at 333; *see also, e.g.*, *Healthy Gulf v. U.S. Dep't of Interior*, __ F.4th ___, 2025 WL 2486119, at *5 (D.C. Cir. Aug. 29, 2025) ("Germaneness requires 'pertinence between litigation subject and organizational purpose.'") (indirectly quoting *Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)); *Hodel*, 840 F.2d at 58 (germaneness requirement is "undemanding").

23.     The U.S. Chamber frequently represents members in both advocating business-friendly policies and challenging executive actions that will negatively affect business, including agency action that imposes unreasonable costs on doing business or that impedes a company's ability to hire well-qualified employees, innovate, and create jobs. The U.S. Chamber, through its Litigation Center, "fights for business at every level of the U.S. judicial system, on virtually every issue affecting business." *Chamber Litigation Center*, U.S. Chamber of Commerce (2025), https://perma.cc/WH3T-JXRP. And the supply of highly qualified labor is one of the fundamental inputs to any business; ensuring that supply is therefore well within the U.S. Chamber's advocacy mission. *See generally* U.S. Chamber of Commerce, *Topics: Immigration* (describing the U.S. Chamber's efforts in advocating for immigration policies that allow businesses to flourish), https://perma.cc/S4TA-3ZJD; U.S. Chamber of Commerce, *Major Initiatives: America Works Initiative* (describing the Chamber's major initiative to address the "worker shortage crisis" by "helping employers across the country develop and discover talent," including through the "related topic[]" of "immigration"), https://perma.cc/EG35-52F9.

24.     Thus, for example, the U.S. Chamber has brought several successful lawsuits (along with other business associations) on behalf of its members, challenging executive action that threatened to undermine the H-1B program. *See generally Chamber of Com. of the U.S. v. U.S.*

*Dep't of Homeland Sec.,* No. 4:20-cv-7331 (N.D. Cal. 2020); *Nat'l Assoc. of Mfrs. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-4887 (N.D. Cal. 2020). And the U.S. Chamber regularly participates in the notice-and-comment process when DHS or other agencies conduct rulemaking relating to business-relevant immigration policies in general, and to the H-1B program in particular. *See, e.g.*, U.S. Chamber of Commerce, Comment on *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting other Nonimmigrant Workers* (Dec. 22, 2023), https://perma.cc/FK9V-9RT2; U.S. Chamber of Commerce, Comment on *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media* (Sept. 26, 2025), https://perma.cc/B2RV-EUA2.

25.      Finally, the participation of the U.S. Chamber's individual members is unnecessary, as this action seeks only declaratory, injunctive, and vacatur relief. *See, e.g., United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,* 517 U.S. 544, 546 (1996) ("[I]ndividual participation is not normally necessary when an association seeks prospective or injunctive relief for its members" as opposed to "an action for damages to an association's members.") (quoting *Hunt* 432 U.S. at 343); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157 (D.C. Cir. 2025) ("[T]he purely injunctive and declaratory relief sought by the Center does not require the participation of individual members either to litigate or to remediate the claim.") (citation omitted).

26.      AAU likewise has standing to bring this action under the doctrine of associational standing. *See Hunt*, 432 U.S. at 333. AAU's 69 U.S.-based members use—and plan to continue using—the H-1B program to hire employees with highly specialized skills that are in short domestic supply, including for scientific research, teaching, and medical positions. Because AAU members are not subject to the statutory cap on H-1B visas, discussed below, and thus do not participate

in the H-1B lottery, also discussed below, they can and do file H-1B petitions on a rolling basis throughout the year.

27.    The Proclamation's imposition of a $100,000 fee for each H-1B petition concretely harms AAU members. Members that are unable to pay the fee must forgo or significantly reduce their planned H-1B petitions—and thus lose access to specialized talent, which will have cascading effects across member institutions, including on cutting-edge research and course offerings. As noted above, any members that do pay the fee incur a "classic pocketbook injury." *Tyler*, 598 U.S. at 636. Either way, AAU's members are suffering concrete injuries sufficient to support their standing to sue in their own right. *See, e.g.*, *Diamond Alternative Energy*, 145 S. Ct. at 2134.

28.    Because H-1B visa holders are critical to the research enterprise at AAU member institutions, this suit is also germane to AAU's purpose of ensuring that universities can continue to transform lives through education, research, and innovation. *Hunt*, 432 U.S. at 333; *see also, e.g.*, *Healthy Gulf*, 2025 WL 2486119, at *5; *Hodel*, 840 F.2d at 58.

29.    Finally, members' participation is not required for the claims asserted or the relief requested by AAU because the specific relief sought here depends on no individualized assessment of the Proclamation's effects.

## FACTUAL ALLEGATIONS

### A.    Legal background.

#### 1.    The H-1B Program.

30.    The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 et seq. Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184. Nonimmigrant visas are distinct from immigrant visas, which are issued to those intending to become permanent residents of the United States.

31.     First enacted in 1952, what is today known as the H-1B visa program makes available a nonimmigrant visa for a noncitizen "who is coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b). A "specialty occupation" is one that requires "theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)." *Id.* § 1184(i)(1); *see also* 8 C.F.R. § 214.2(h)(4)(ii).

32.     The process of applying for an H-1B visa is governed by 8 U.S.C. § 1184 and related regulations.

33.     The INA provides that the "importing employer" must submit a petition for a nonimmigrant visa "in such form and contain[ing] such information as the [Secretary of Homeland Security] shall prescribe." 8 U.S.C. § 1184(c)(1).

34.     An employer must also complete the labor condition application process. The employer must certify to the Department of Labor that (among other things) the company will pay its H-1B employee, at a minimum, the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question" or "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i); *see generally* 20 C.F.R. part 655 (DOL regulations governing labor condition application process).

35.     The "prevailing wage" is calculated by assessing the "skill level" of the proposed H-1B worker and corresponding wages for workers in the occupation and location in which the employer is seeking to employ the H-1B worker, based on statistics compiled by the Bureau of Labor Statistics. *See Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872, 63,875-63,876 (Oct. 8, 2020); *see* also 8 U.S.C. § 1182(p)(4).

36. Since 1990, Congress has maintained a cap on the total number of available H-1B visas that may be issued each year. Presently (with some exemptions discussed in greater detail below), the statutory cap allows 65,000 noncitizens to obtain H-1B nonimmigrant status per year, with an additional 20,000 visas per year available to individuals with an advanced degree from a U.S. higher education institution. *See* 8 U.S.C. § 1184(g).

37. Because demand for H-1B visas far outstrips the number of visas available—for fiscal year 2026, more than 336,150 people registered against a cap of 85,000—the United States Citizenship and Immigration Services (USCIS) traditionally has implemented a lottery system to determine which petitions would be processed. If the number of H-1B petitions filed exceeded the numerical quota for that year in the first five business days of the designated petition submission window, USCIS would select randomly among all petitions filed on those first five days. *See* 8 C.F.R. § 214.2(h)(8)(ii)(B) (prior to Apr. 1, 2019).

38. In 2019, USCIS implemented a "registration" system that requires a U.S. employer to register electronically for each person for whom they intend to file an H-1B petition. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). If USCIS receives more registrations than the number of available visas, the agency runs a lottery among the registrations to determine who can file an H-1B petition. After USCIS notifies an employer that its registration has been selected, the employer has 90 days to file its H-1B petition.

39. The lottery occurs every March. The next lottery to follow the implementation of the Proclamation will occur in March 2026.

40. Some employers are exempt from the cap: It does not apply to institutions of higher education or related or affiliated nonprofit entities, including university health systems, or to non-profit or government research organizations. *See* 8 U.S.C. § 1184(g)(5)(A), (B).

41. Universities, including AAU's U.S.-based members, therefore may submit H-1B petitions at any time, outside of the lottery process, and such petitions are processed on a rolling

basis. *See, e.g.*, U.S. Citizenship and Immigration Services, *USCIS Reaches Fiscal Year 2026 H-1B Cap* (stating that "U.S. Citizenship and Immigration Services has received enough petitions to reach the congressionally mandated" caps but noting that it will "continue to accept and process petitions that are otherwise exempt from the cap"), https://perma.cc/YJQ7-8D6A.

42.     Cap-exempt employers apply for H-1B visas by filing with USCIS the same I-129 form as employers subject to the cap, and must, like cap-subject employers, complete the labor condition application process. *See* 8 C.F.R. § 214.2(h)(2), (4); 8 U.S.C. § 1182(n)(1)(A)(i); Dep't of Homeland Sec., *Form I-129: Petition for a Nonimmigrant Worker*. But unlike employers subject to the cap, cap-exempt employers need not register for or participate in the lottery. *See* 8 U.S.C. § 1184(g)(5)(A), (B); 8 C.F.R. § 214.2(h)(8)(iii). And they have greater flexibility to set employees' start dates untethered from the lottery timeline. *See Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting Other Nonimmigrant Workers*, 89 Fed. Reg. 103183 (Dec. 18, 2024) (explaining that petitioners that qualify under cap exemptions "benefit from not having to wait for H-1B cap season to commence employment").

43.     The fees associated with H-1B petitions are set by USCIS through notice-and-comment rulemaking and are governed by statutory provisions. Relevant statutory provisions include 8 U.S.C. § 1356(m), which says that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." Presently, fees that USCIS has assessed under its Section 1356(m) authority include a registration fee to enter the H-1B lottery (8 C.F.R. § 106.2(c)(11)), a filing fee for the form (I-129) used to submit an H-1B petition (*id.* § 106.2(a)(3)), and an asylum program fee (*id.* § 106.2(c)(13)). Depending on the size of the employer, these fees can add up to as much as $1,595.

44.     In addition to the fees set by USCIS through notice-and-comment rulemaking pursuant to 8 U.S.C. § 1356(m), Congress has also set multiple specific fees for H-1B petitions by statute, including a $1,500 fee for most employers to file the petition (8 U.S.C. § 1184(c)(9)(A)-(C)) and an additional $500 fee to fund fraud prevention measures (*id.* § 1184(c)(12)(A)-(C)).

45.     Additionally, in 2010, Congress imposed by statute an additional fee of $2,000 on certain H-1B petitions. Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010). The fee was increased to $4,000 in 2015. Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015) (codified at 49 U.S.C. § 40101 note, Airline Transportation Safety and System Stabilization Act, Sec. 411).[1] Employers covered by this fee are those that employ more than 50 workers in the United States, and more than half of whose U.S. workforce is composed of H-1B or L-1 employees (a visa category used for intracompany transferees). *Id.*

46.     Congress also has provided for "premium processing" fees for immigration services—currently $2,805 for H-1B petitions—under which sponsoring employers can have petitions processed within a shorter timeframe. 8 U.S. § 1356(u)(3); *See USCIS Fee Schedule* (Aug. 29, 2025) at 32, https://perma.cc/U7D4-5VS9.

47.     Prior to the Proclamation, the total fees associated with filing an H-1B petition, including both USCIS-set fees and statutory fees, generally amounted to approximately $3,600 (excluding the optional premium processing fee and the additional $4,000 fee for H-1B-reliant employers). *See USCIS Fee Schedule*, *supra*, at 6, 39-40.

48.     After USCIS approves an H-1B petition, if an applicant is outside the United States, he or she must apply for an H-1B visa at a U.S. embassy or consulate abroad before traveling to

---

[1]    This $4,000 additional fee was initially set to sunset in 2025, but Congress later extended the sunset date until September 30, 2027. *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 30203(b), 132 Stat. 64, 126.

the United States. If granted, an H-1B visa is good for three years and is eligible for one extension of the same duration. *See* U.S.C. § 1184(g)(4); 8 C.F.R. § 214.2(h)(13)(iii)(A).

49.     Congress has carefully calibrated the H-1B visa system to the needs of the domestic economy. For example, as noted, the law contains labor protections designed to ensure that H-1B visas do not become a vehicle for displacing well-qualified Americans.

50.     Before hiring a noncitizen through the H-1B program, an employer must make various certifications to the Department of Labor regarding prevailing labor conditions. *See* 8 U.S.C. § 1182(n)(1)(A)-(D). An employer must attest, among other things, that the position pays prevailing wages, that the position will not adversely affect other workers, and that the employer has provided to existing employees certain forms of notice regarding the petition, including by physical posting. These certification requirements are backed up by monetary fines and bans on further visa applications. 8 U.S.C. § 1182(n)(2)(C).

51.     Employers with a history of willful certification violations or a large percentage of workers already on H-1B visas must additionally certify that they have tried and failed to fill the position with a domestic worker, and that they have not and will not displace a U.S. worker within the 180-day period surrounding the date of the application. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A); *see also* 20 C.F.R. § 655.736.

52.     For example, an employer with 51 or more U.S. employees must make these additional certifications—that U.S. workers were not available to fill the position and that it has not and will not displace U.S. workers in a 6-month period—if 15 percent or more of its employees are in H-1B status. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A)(iii).

53.     Since 1990, the law also has imposed an annual cap on the total number of new H-1B visas that can be issued each year, to prevent the American workforce from being overwhelmed with highly competitive noncitizen workers. *See* 8 U.S.C. § 1184(g).

54.    At the same time, Congress has been attuned to "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found and the need for other workers to meet specific labor shortages." H.R. Rep. 101-723, pt. 1, at 41 (Sept. 19, 1990). It enacted the modern H-1B statute based on the conviction "that immigration can and should be incorporated into an overall strategy that promotes the creation of the type of workforce needed in an increasingly competitive global economy without adversely impacting on the wages and working conditions of American workers." *Id.*

55.    In other words, the relevant statutory provisions struck an intentional balance between the hiring needs of employers and protections for American workers. Indeed, the government itself has recognized that "the broad intent of the Act is clear. . . . [It] seeks to make the immigration system more efficient and responsive to the needs of employers experiencing labor shortages, while at the same time providing greater safeguards and protections for both U.S. and alien workers." *Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705, 11,706- 11,707 (Mar. 20, 1991).

56.    Congress's repeated statutory amendments adjusting the H-1B program—without changing its essential nature—reaffirm this fundamental principle.

57.    In making one such statutory adjustment—instituting a temporary increase in the cap on H-1B visas—the Senate Report accompanying the American Competitiveness in the Twenty-First Century Act expressly noted that H-1B visas are essential to growing the number of American jobs:

> Critics of H-1B visas claim that they result in taking away jobs from Americans and giving them to foreigners. In fact, however, failure to raise the H-1B ceiling is what will deprive Americans of jobs. This is because artificially limiting companies' ability to hire skilled foreign professionals will stymie our country's economic growth and thereby partially atrophy its creation of new jobs. . . . Many of the concerns about H-1B visas revolve around the fear that individuals entering on H-1B visas will ''take'' a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed[.]

S. Rep. 106-260, at 11-12 (Apr. 11, 2000).

58.   In 2004, Congress specifically addressed appropriate limitations on the H-1B visa category via the H-1B Visa Reform Act of 2004. 118 Stat. 2809, 3353-61 §§ 421-430. This Act, among other things, revised prevailing wage requirements, adjusted the number of visas available by adding a set-aside for individuals completing U.S. graduate degrees, and otherwise calibrated the program to meet the needs of the domestic economy.

59.   Most recently, as noted, Congress in 2010 and again in 2015 responded to the potential for H-1B visa abuse by imposing a temporary surcharge fee of $4,000 on certain employers with a high proportion of H-1B visa holders as employees. Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010); Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015).

60.   These recent and ongoing congressionally enacted adjustments to the program reflect Congress's active and engaged decisionmaking about how the program is designed and ought to operate, as well as Congress's reaffirmation of the program's fundamental goals and purpose.

*2. The President's authority under the INA.*

61.   Congress, in the INA, provided the President certain authority. Under Section 212(f) of the INA:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

62.   And Section 215(a) of the INA provides that it is unlawful "for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). Any policy-making authority stemming from this provision "substantially overlap[s]" with the President's authority under Section 212(f). *Trump v. Hawaii*, 85 U.S. 667, 693 n.1 (2018).

B.    **Factual Background.**

1.    *Importance of H-1B workers.*

63.    H-1B visas are critical to the employers that use them: H-1B workers are integral to the success and growth of American businesses, and to the educational mission and ground-breaking innovations supported by American universities.

64.    It is estimated that as many as 730,000 H-1B visa holders currently work in specialized fields across the American economy. These workers contribute enormously to American productivity, prosperity, and innovation.

65.    Meanwhile, the United States suffers from a well-documented labor shortage. As recent research by the U.S. Chamber has shown, "[n]early every state is facing an unprecedented challenge finding workers to fill open jobs." *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce (Dec. 13, 2024), https://perma.cc/ZMJ6-BNF5. In the most-affected states, for example, the number of job openings is more than double the number of unemployed workers. *Id.*; *see also, e.g.,* Arturo Castellanos Canales, *America's Labor Shortage: How Low Immigration Levels Accentuated the Problem and How Immigration Can Fix It*, National Immigration Forum (February 28, 2022), https://perma.cc/B9UA-KA3M.

66.    The skilled labor shortage is even more acute in certain industries. For example, the United States faces a serious shortage of doctors: One report estimated that the United States will face a shortage of between 54,100 and 139,000 physicians by 2033. *See* Association of American Medical Colleges, *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033* (June 2020), https://perma.cc/36P9-PS2R). The H-1B program helps fill that gap. *See, e.g.,* Peter A. Kahn & Tova M. Gardin*, Distribution of Physicians With H-1B Visas By State and Sponsoring Employer,* JAMA: The Journal of the American Medical Association (June 6, 2017) (noting that there are roughly 10,000 H-1B approvals annually for physicians), https://perma.cc/3FN5-FLE9.

67.     Individuals entering the United States via H-1B visas also are integral to the landscape of higher education. In 2020, more than 28,000 H-1B-related labor condition applications were filed for higher education, confirming the central importance of these programs. Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020) (summarizing and linking to several leading studies), https://perma.cc/SMW4-UUJT; *see* ¶¶ 34-35, *supra* (describing labor condition application process). An analysis of federal data showed that as of June 30, 2025, "at least 930 colleges and universities had at least one employee with an H-1B visa." Katherine Knott, *Higher Ed's H-1B Visas in 4 Charts*, Inside Higher Ed (Sept. 29, 2025). That includes all of AAU's U.S.-based member schools.

68.     American firms, particularly in manufacturing and certain STEM (science, technology, engineering, and mathematics) fields, also face a shortage of domestic workers qualified and available to fill the roles needed for the companies to perform. For example, in 2016, "13 STEM jobs were posted online for each unemployed worker that year—or roughly 3 million more jobs than the number of available, trained professionals who could potentially fill them." New American Economy Research Fund, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017), https://perma.cc/4BZR-ED9S.[2]

69.     And "having the workers to fill such jobs" through nonimmigrant visa programs like H-1B "allows American employers to continue basing individual operations or offices in the United States, a move that creates jobs at all levels—from the engineers and computer programmers based in American offices to the secretaries, HR staff, and mailroom employees that support

---

[2]     *See also, e.g.*, Deloitte & The Manufacturing Institute, *The jobs are here, but where are the people?: Key findings from the 2018 Deloitte and The Manufacturing Institute skills gap and future of work study* 2 (2018) ("[R]esearch reveals an unprecedented majority (89 percent) of executives agree there is a talent shortage in the US manufacturing sector."), https://perma.cc/W2ND-RRLB; *id.* at 3 fig. 2 ("[The p]ersistent skills shortage could risk US$2.5 trillion [in] economic output over the next decade.").

them." Partnership for a New American Economy, *The H-1B Employment Effect: H-1Bs awarded between 2010-2013 will create more than 700,000 jobs for U.S.-born workers by 2020* 1-2 (2015), https://perma.cc/C6T2-6TKZ. One comprehensive study evaluating the productivity impacts from H-1B visas in 219 American cities showed that an increased number of H-1B visa holders in a city resulted in productivity gains. Specifically, "foreign STEM growth explained between one-third and one-half of the average [Total Factor Productivity] growth during the period" between 1990 to 2010. Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Citie*s, Journal of Labor Economics (July 2015), https://perma.cc/N4GV-YJJ6.

70.     Those productivity gains translate into jobs created. A recent study demonstrated that, at the individual firm level, each H-1B lottery win resulted not just in increased noncitizen employment, but a corresponding increase in native-born employment at the lottery-winning firm as well. Parag Mahajan et al., *The Impact of Immigration on Firms and Workers: Insights from the H-1B Lottery* 25 (May 2025) ("H-1B hires seem to crowd-in other workers, such as non-college workers of all nativities, as lottery-winning firms *expand* their usage of workers outside of the immigrant college group."), https://perma.cc/F9AE-BEJC.

71.     H-1B workers in higher education additionally support job growth for U.S. citizens by educating and training American students to fill highly skilled positions in the future. Congress recognized as much in exempting universities from the statutory cap for H-1B visas: It emphasized the important contributions of such H-1B workers in "educating Americans," and concluded that "[t]he more highly qualified educators in specialty occupation fields we have in this country, the more Americans we will have ready to take positions in these fields upon completing of their education." S. Rep. 106-260, at 21-22 (Apr. 11, 2000).

72.     H-1B visa petitions are associated with higher rates of new product innovation. Gaurav Khanna & Munseob Lee, *High-Skill Immigration, Innovation, and Creative Destruction*, Nat'l Bureau of Economic Research (2018), perma.cc/QE87-KDAC. Across the country, H-1B

workers "directly increase the production of knowledge through patents, innovation, and entrepreneurship." Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020), https://perma.cc/SMW4-UUJT.

73.    That innovation is a boon to the American economy and, ultimately, American workers. One 2019 study found that between 2000 and 2015, the foreign-born share of STEM professionals in the United States—many of them attributable to the H-1B program—created an estimated benefit of $103 billion for American workers, largely due to the development of new technologies that increase the productivity and wages of U.S.-born workers. Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, 61 Labour Economics (2019), https://perma.cc/U39W-P2SZ.

74.    As a result, the H-1B program has empowered tremendous growth and value creation in American firms. Indeed, a 2025 analysis of H-1B data from 2008 to 2020 showed that "H-1B workers contribute to firm value creation" through forces including "innovation" and "enhancing operational efficiency." Jiang, et al., *Skilled Foreign Labor, Urban Agglomeration, and Value Creation*, working paper at 22 (February, 19, 2025), https://perma.cc/9VWK-592B. Accordingly, after 12 years, "the nominal value of a dollar invested in [firms with high H-1B applications]" had grown by 1000%, three times the value created by firms with no H-1B applications. *Id.*

75.    Similarly, "the workers hired by universities and research institutes often play an outsized role in advancing innovation and academic research"—underscoring both the importance of the H-1B visa system and that curtailing universities' ability to hire H-1B visa holders "could … have ripple effects well beyond the nonprofit sector." Nicolas Morales, *Understanding the Potential Impact of H-1B Visa Program Changes*, Federal Reserve Bank of Richmond (Oct. 2025), https://perma.cc/PWE5-25CU.

76.    The H-1B program also is vital to the success of American manufacturing—the largest workforce sector in the United States. A 2021 analysis focusing on the manufacturing

industry concluded that the H-1B program, by promoting a "qualified educated labor force," is critical for the manufacturing sector to "be competitive on the global stage." Eron Gjoci, *Empirical evidence against U.S. H1-B visa restrictions, the case of employment in the manufacturing industry*, working paper at 21 (Nov. 16, 2021), https://perma.cc/7356-6W44.

77.     Relatedly, research shows that "participation of foreign-born workers in the American labor market has a positive effect on American trade with foreign nations." Nadia Almasalkhi, *High-Skilled Immigration Workers Benefit American Industry, But U.S. Policies Threaten Them*, Berkely Interdisciplinary Migration Initiative 1 (September 11, 2023) https://perma.cc/RUY2-GER6. That is attributable to, among other factors, the "language skills, cultural competency, and transnational personal networks of foreign-born high skilled workers," which are a "boon for businesses operating in fast-moving and competitive industries like technology," as well as the ability of high-skilled foreign-born workers to "facilitate the international flow of knowledge." *Id.*

78.     Research shows that at least three factors explain the link between robust high-skilled immigration and economic growth—*first*, individuals likely to be hired under an H-1B visa have an overabundance of entrepreneurship and innovative talent; *second*, high-skilled temporary workers tend to focus in "quantitative skills and STEM fields," which are specialties that fuel growth; and *third*, high-skilled temporary workers are often instrumental in the creation of new technologies. Giovanni Peri & Chad Sparber, *Presidential Executive Actions Halting High Skilled Immigration Hurt the US Economy*, U.C. Davis Global Migration Center Policy Brief 2 (July 2020), https://perma.cc/3B6B-25YU.

79.     For precisely these reasons, many of the U.S. Chamber's and AAU's members rely on the H-1B program and have benefited enormously from the program in ways that have allowed them to create better well-paying jobs for American workers.

2.  *The Proclamation.*

80.   The President issued the Proclamation, *Restriction on Entry of Certain Nonimmi-grant Workers*, on September 19, 2025.

81.   The preamble of the Proclamation cites an alleged "large-scale replacement of American workers through systemic abuse of the [H-1B] program." It alleges that certain employ-ers "have abused the H-1B statute and its regulations to artificially suppress wages resulting in a disadvantageous labor market for American citizens, while at the same time making it more diffi-cult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields."

82.   The Proclamation points to a doubling of "foreign STEM workers," the "key facil-itator" of which, it claims, has been "abuse of the H-1B visa." In particular, the Proclamation accuses "Information Technology (IT) firms" of "manipulat[ing] the H-1B system, significantly harming American workers in computer-related fields."

83.   Citing rising unemployment rates of IT workers overall, the Proclamation asserts that H-1B visas "are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States." Instead, the Proclamation charges H-1B employers with "undercut[ting] the integrity of the program" to the "detriment[] [of] American workers' wages and labor opportunities," "prevent[ing] American employers in other industries from utilizing the H-1B program in the manner in which it was intended," and creating "a national security threat" by encouraging fraud and discouraging Americans from pursuing STEM careers.

84.   The preamble concludes that it is "therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers."

85.   Section 1(a) of the Proclamation, citing Sections 212(f) and 215(a) of the INA, states that "the entry into the United States of aliens as nonimmigrants to perform services in a

specialty occupation under [the H-1B program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000," subject to certain exceptions.

86.    Section 1(b) states that "[t]he Secretary of Homeland Security shall restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers," and further directs the Secretary to "issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026."

87.    Section 1(c) states that the $100,000 fee requirement "shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States."

88.    Section 2(b) of the Proclamation requires the Secretary of State to "verify receipt" of the $100,000 fee and "approve only those visa petitions for which the filing employer has made the payment."

89.    Section 2(c) states that "[t]he Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation."

90.    The effective date of the Proclamation was September 21, 2025, and it expires 12 months thereafter. Within 30 days of the upcoming March 2026 H-1B lottery, however, Section 3(b) of the Proclamation directs the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security to jointly submit to the President a recommendation on whether to extend the $100,000 fee.

3. *The Proclamation's devastating effect on employers using the H-1B program.*

91.    Moments after the announcement of the Proclamation, panic rippled through the United States economy. With the Proclamation set to take effect days later, H-1B visa-holders traveling abroad scrambled to make emergency trips back to the United States for fear of losing their legal status. Companies and universities employing H-1B workers sought to understand the far-ranging implications for their present and future workforces.

92.    Though the White House eventually clarified that the Proclamation's imposition of a $100,000 fee applies only to future petitions for *new* H-1B visas, and thus does not affect current visa-holders or petitions for H-1B renewal, the thunderbolt of the Proclamation had already had its effect: The American business community and American institutions of higher education were on notice that soon one of the best tools at its disposal for recruiting high-skilled workers when American workers are not readily available would be prohibitively expensive.

93.    For many members of the U.S. Chamber and AAU, the Proclamation will have far-reaching effects.

94.    American businesses and institutions of higher education use programs like the H-1B program because the domestic supply of highly skilled workers is not large enough to keep apace with the demands of innovation. Certainly, the United States is home to many high-skilled workers. But it is also home to much of the world's innovation and knowledge generation. And as a result, the domestic supply of high-skilled workers is frequently insufficient to meet employers' needs. *See, e.g.*, ¶ 68 & n.2, *supra*.

95.    U.S.-based employers turn to the H-1B visa to make up the difference.

96.    With prohibitive limitations on such workers, employers in STEM-focused industries, including universities spearheading STEM-focused research, will be hit especially hard. Many of the largest tech companies in the United States currently have thousands of H-1B employees and hire new employees through the program each year. Meanwhile, highly innovative

start-ups and small businesses, as well as research universities, are particularly reliant on the program and will be especially hard-pressed to afford a $100,000 fee.

97.    In an interview after the Proclamation's announcement, one Silicon Valley-based tech startup founder offered this somber assessment:

> It diminishes our innovative capacity in the United States. It tells other brilliant people around the world that we are not open for innovation.
>
> I can say that as long as this is in place, we're not going to be able to afford to do it anymore. It's a catastrophe. This additional fee is a non-starter for start-ups and small- and medium-sized businesses.

*Bay Area Tech Leaders Warn New $100,000 H-1B Visa Fee Could Impact Innovation,* KPIX (Sept. 21, 2025) https://perma.cc/2SMX-RF3S.

98.    A prominent venture capitalist investing in start-ups offered a similar assessment: "There is not a single company that I have invested in the last 10 years that could afford to pay this." Madeline Ngo et al., *Trump's $100,000 Visa Fee Spurs Confusion and Chaos*, New York Times (Sept. 20, 2025), https://perma.cc/6F9G-NUS4.

99.    That sentiment is widespread. Indeed, many members of the U.S. Chamber are bracing for the need to scale back or entirely walk away from the H-1B program, to the detriment of their investors, customers, and their own existing employees.

100.    That is to say nothing of the many universities, including AAU's members, health systems, and other non-profit research-driven institutions that also rely on H-1B visas and certainly cannot afford a new $100,000 fee per H-1B employee.

101.    Employers that do continue to use the program will do so at a steep cost that sharply increases the price of labor and correspondingly reduces their ability to invest resources elsewhere, including in new innovations.

102.    Ultimately, Americans would pay the heaviest price. Shuttered or scaled-back domestic innovation means far fewer U.S.-based jobs, less demand for American workers, and, as a

result, lower wages. It also means fewer ground-breaking innovations available to improve the lives of U.S. consumers.

## DISCUSSION

### A.    The Proclamation exceeds the President's authority.

103.    The Proclamation intends to radically alter the H-1B program. Though purporting to impose a mere "payment," the new $100,000 fee for employers will dramatically reduce the number of H-1B petitions being filed: It drastically increases prospective labor costs, and basic economics dictates that employers will therefore hire fewer H-1B workers. Indeed, that is the stated intent of the Proclamation, which is aimed at reducing the pool of H-1B applicants to "the best of the best," as measured by the imperfect analogue of their employers' ability and willingness to pay the government a six-figure sum.

104.    That result—and the means taken to implement it—is flatly contrary to Congress's directives, as stated throughout the INA. Congress has created, long maintained, and periodically modified the H-1B program based on its judgment that bringing highly skilled noncitizen workers to the United States benefits the Nation by driving innovation and creating jobs. That has proven undoubtedly true. *See* ¶¶ 63-79, *supra*.

105.    Congress has meticulously defined how the H-1B program is to be implemented. For instance, it has detailed the principles USCIS should use to set fees associated with H-1B petitions, and just recently amended the law to impose a fee on the *heaviest* users of the H-1B program that is *twenty-five times* smaller than the blanket fee the President now aims to impose.

106.    Congress also has defined by statute how many people should be able to enter the United States under the program via cap-subject visas: in total, 85,000 annually—a carefully cali-brated statutory cap calculated to maximize the program's benefits for the American people while ensuring that highly skilled U.S.-based workers remain competitive in the workforce. *See* 8 U.S.C. § 1184(g). Congress arrived at this figure through titration over multiple pieces of legislation,

against the background knowledge that demand for visas vastly exceeds that amount. Most recently, Congress temporarily increased the cap to 195,000 annually for fiscal years 2001-2003 via the American Competitiveness in the Twenty-First Century Act. Pub. L. 106-313, § 102(a), 114 Stat. 1251 (2000); *see* 8 U.S.C. § 1184(g)(1)(A).[3] And Congress did so knowing that demand for H-1B visas exceeds supply. *See* S. Rep. 106-260, at 2 ("Despite the increase in the H-1B ceiling in 1998, a tight labor market, increasing globalization and a burgeoning economy have combined to increase demand for skilled workers even beyond what was forecast at that time. As a result, the 1998 bill has proven to be insufficient to meet the current demand for skilled professionals."). *Cf., e.g.*, *United States v. Wilson*, 290 F.3d 347, 354 (D.C. Cir. 2002) (considering "the contextual background against which Congress was legislating" as an interpretive aide).

107.    Relatedly, Congress established elaborate standards to protect American workers, such as the statutory cap and the labor condition application process, designed to ensure that H-1B visas do not become a means to undercut wages or put Americans at a competitive disadvantage. *See* ¶¶ 34-36, 49-53, *supra*.

108.    The Proclamation upends that careful balancing. It fundamentally alters the H-1B program by tacking on a plainly disproportional fee that expressly contradicts the more modest fees Congress has sought to impose, which are aimed explicitly at recovery of costs. And it replaces Congress's determination of the optimal annual number of new noncitizen workers (85,000, plus additional cap-exempt workers) with an onerous fee that will cause a significant reduction in participation in the program and may leave many H-1B spots unclaimed.

109.    Although the President has authority under the INA, that authority does not, and cannot, empower him to override existing statutory provisions and programs. Nor does it authorize

---

[3]    This law also established that universities and their nonprofit affiliates are exempt from the cap. Pub. L. 106-313, § 103, 114 Stat. at 1252.

the President to create new visa conditions in general—nor new fees in particular—under the guise of a restriction on "entry" under Section 212(f).

1. *The Proclamation expressly overrides provisions of the INA that govern the H-1B program.*

110.    The President's authority under Section 212 of the INA to restrict noncitizens from entering the United States, while broad, is not unlimited. Specifically, the Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Trump v. Hawaii,* 585 U.S. 667, 689 (2018). And other courts have extended that assumption into an express holding: A Section 212(f) proclamation cannot "effectively rewrit[e] provisions of the INA" or "eviscerate[] the statutory scheme." *Doe #1 v. Trump*, 957 F.3d 1050, 1064, 1067 (9th Cir. 2020).

111.    In other words, Section 212(f) "cannot plausibly be read to authorize the President … to supplant" the express provisions of the INA. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431, at *20 (D.D.C. 2025). The President lacks "authority to alter the rules" created by Congress or render other INA provisions "dead letters." *Id.* at 32, 35. Indeed, even Congress cannot provide the President authority to override prior statutory enactments. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 447 (1998) (Line Item Veto Act was unconstitutional because it "g[ave] the President the unilateral power to change the text of duly enacted statutes."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 525 (1838) ("[V]esting in the President a dispensing power"—that is, "clothing the President with a power to control the legislation of congress"—"has no countenance for its support in any part of the constitution.").

112.    At bottom, the President may not use his control over entry into the United States to supplant or nullify Congress's statutorily enacted immigration policy. Doing so is an *ultra vires* act, and one over which courts have inherent authority to order injunctive relief. *See, e.g., Trudeau*

*v. Fed. Trade Comm'n,* 456 F.3d 178, 189-190 (D.C. Cir. 2006); *Fleming v. Moberly Milk Prods. Co.*, 160 F.2d 259, 264 (D.C. Cir. 1947); *Youngstown*, 343 U.S. at 585.

113.    The H-1B program is the product of careful congressional balancing, reflecting several core policy determinations by Congress. Most obviously, Congress itself has set what it felt were the appropriate fees for the H-1B program and has delegated authority to the executive branch to impose additional fees only under certain conditions, including a cost-recovery principle and a requirement of notice-and-comment rulemaking. Plainly, the Proclamation's new $100,000 per-petition fee meets neither condition.

114.    Second, and perhaps more fundamentally, Congress has concluded that the program should exist, and in the robust form it prescribed. Congress statutorily created the H-1B program *in order* to allow employers to bring a certain number of highly skilled, specialized noncitizen workers to the country. That is good for American business and higher education, and it is good for American workers, who benefit from the well-paying jobs that result from economic growth and productivity. And the program's maximum benefit is realized when enough specialized workers can enter the United States to deliver those economic benefits but sufficient protections exist to ensure that Americans are not disadvantaged by the hiring of those workers.

115.    The Proclamation overrides that balance. It replaces Congress's design—expressed in duly enacted statutory text—with an altogether different approach that undercuts the very existence of the program.

116.    These clashes between the statutory design of the H-1B program and the Proclamation are reflected in the Proclamation's direct contradiction of the fees authorized by Congress, as well as its conflict with other aspects of the program.

### a. Explicit fee provisions.

117.    To begin, the Proclamation directly contradicts express provisions of the INA—most obviously, the specific fees that Congress deemed to be appropriate and therefore set for the H-1B program.

118.    Congress has set a clear baseline rule governing fees for immigration programs: The executive may charge fees for visas and related services sufficient to fund its activities related to those services, but no more than that. *See* 8 U.S.C. § 1356(m) (also known as INA § 286(m)).

119.    Prior to 1988, the immigration functions of the Department of Justice, carried out by the former Immigration and Naturalization Service, were funded from appropriations. *See generally U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 58,962, 58,966 (Sept. 24, 2010). That year, Congress enacted Section 1356(m) "to provide an alternative to appropriations." *Id.*; *see* Pub L. No. 101-459 § 209(a), 102 Stat. 2186 (1988).

120.    The statute therefore empowers the agency to impose "adjudication fees" by "regulation[.]" 8 U.S.C. § 1356(m). And as Congress shortly thereafter clarified in a 1990 amendment, those "fees for providing adjudication and naturalization services ***may be set at a level that will ensure recovery of the full costs of providing all such services***, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* (emphasis added); *see* Pub. L. No. 101-515 § 210(d), 104 Stat. 2101 (1990) (adding this provision).

121.    In other words, the fee for filing an H-1B petition or other request for an immigration benefit "may" be set at an amount that allows USCIS to recover its costs for processing H-1B petitions and similar services related to programs that cannot generate user fees in their own right. By clear implication, the fee may *not* be set at a level that bears no relationship whatsoever to those costs and indeed would dwarf them. *See, e.g.*, *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) ("When draftsmen mention one thing, like a grant of authority[,] it necessarily, or at least reasonably, implies the preclusion of alternatives.")

(quotation marks omitted; alterations incorporated); *cf. Bowles v. Russell*, 551 U.S. 205, 208-209 (2007) (statute and federal rule providing that a district court "may" reopen the time for filing a notice of appeal "for a period of 14 days" created a jurisdictional bar on reopenings lasting longer than 14 days).

122.     The legislative history is in accord. As the conference report on the bill that first established Section 1356 provided, "[t]he conferees expect that funds generated by this Account shall not be used for any purpose other than enhancing naturalization and adjudication programs." H.R. Rep. No. 100-979, at 38 (1988); *see also Depts. of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act for 1991, Hearings Before the Subcommittee of the Committee on Appropriations*, 101st Cong., at 74 (1990) ("The resources to be made available will be used to adjudicate applications and petitions for benefits under the Immigration and Nationality Act and to provide necessary support to adjudications and naturalization programs."). And the conference report accompanying the 1990 amendment makes plain that the bolded language above (*see* ¶ 121, *supra*) clarified that the fees are to be set at a level that allows USCIS to recoup all of its costs (as opposed to being strictly tied to the benefit provided to each individual petitioner)— *not* that the "may" in the clause makes the connection between fee levels and USCIS's actual costs somehow optional. *See* H.R. Rep. No. 101-909 (1990) (the provision "allows the Department to establish adjudications and naturalization fees at a level that will ensure recovery of the full costs of the program.").

123.     The government has agreed. Even while resisting the notion that USCIS's fee receipts for a given year must precisely match its costs for that year, the government recently affirmatively argued that Section 1356(m) "afforded USCIS flexibility to set fees at a level that bears 'some relationship' to its costs such that USCIS can carry out its statutory mandate to recover its full costs. That this flexibility encompasses the possibility that USCIS's fees collected might, from time to time, exceed its costs spent, makes sense where USCIS must set fees prospectively to

*guarantee* future recovery of its yet-to-be-determined full costs." Reply Mem. of Law in Supp. of Mot. to Dismiss at 10, *Tang v. United States*, No. 23-cv-9885 (S.D.N.Y. Oct 3, 2024), Dkt. 65. In other words, the government took the position that, although Section 1356(m) permits current fee receipts to exceed current costs "from time to time" in order to make the program administrable, the statute requires fees to at least "bear[] a "'relationship' to [USCIS's] costs" in carrying out its statutory functions.

124.    Elsewhere, the government has interpreted its authority even less flexibly: DHS recognized in a recent fee rulemaking that "INA section 286(m), 8 U.S.C. § 1356(m) *requires USCIS fees to be based on total costs* for USCIS to carry out adjudication and naturalization services." *USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194, 6,288 (Jan. 31, 2024); *see also id.* at 6,287 (stating that a particular fee collected under separate statutory authority "will . . . effectively supersede section 286(m)" by "go[ing] beyond normal cost recovery").

125.    In sum, Section 1356(m) provides that fees for benefit applications like H-1B petitions may be set only at the level necessary for USCIS to adjudicate those applications and perform its other functions.

126.    Pursuant to that congressional command, until now, H-1B fees have been set by USCIS through notice-and-comment rulemaking, with close attention paid to justifying the fee based on administrative expenses. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 88 Fed. Reg. 402, 501 (Jan. 4, 2023) (recognizing that an "increase from $10 to $215" in the lottery registration fee "may appear to be exorbitant" but arguing that it is necessary to "cover the expenses of the H-1B registration program").

127.    The Proclamation offers no such justification. It baldly conditions H-1B petitions on a $100,000 payment.

128.    Where the most recent H-1B petition fee of $780 was tied to administrative costs (*see USCIS Fee Schedule*, *supra*, at 39), the new $100,000 figure cannot bear any such relationship to costs. Rather, it is a punitively high exaction meant to deter use of the H-1B program.

129.    Moreover, Congress explicitly determined that notice-and-comment rulemaking—with the attendant protection for the public via arbitrary-and-capricious review—is requisite to set the appropriate fee. 8 U.S.C. § 1356(m). The President cannot disregard these requirements and change the mechanism by which fees are set, drastically reducing protections for the regulated public.

130.    In addition to the baseline requirement under Section 1356(m) that visa fee levels must be tied to the cost of administering visa and related programs, Congress itself has explicitly set additional fees for the H-1B program. The imposition of these fees demonstrates that Congress knows how to depart from the cost-recovery principle of Section 1356(m) when it wishes to do so.

131.    First, Congress has specified that the fee for the H-1B "petition" (either an initial petition, a renewal, or a request for an H-1B visa-holder to change employers) "shall be $1,500 for each such petition." 8 U.S.C. §§ 1184(c)(9)(A)-(C); *see also id.* § 1184(c)(9)(B) (fee is halved for smaller employers).

132.    Second, Congress has required payment of a $500 "fraud prevention and detection fee" from all employers filing an initial H-1B petition or seeking authorization for an H-1B visa-holder to change employers. 8 U.S.C. §§ 1184(c)(12)(A), (C); *see* Pub. L. No. 104-447 § 426, 188 Stat. 2809, 3357 (2004) (enacting this requirement).

133.    Third, Congress has imposed an additional $4,000 fee on certain employers. *See* Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015) (codified at 49 U.S.C. § 10101 note, Airline Transportation Safety and System Stabilization Act, Sec. 411). This additional fee applies to employers with more than 50 employees, over half of whom are foreign, nonimmigrant workers.

*Id.*; *see also* Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010) (earlier imposing a smaller $2,000 fee on these same employers).

134.    And fourth, Congress provided for "premium processing" fees for immigration benefits—currently $2,805 for H-1B applicants—under which sponsoring employers can have petitions processed within a shorter timeframe.  8 U.S.C. § 1356(u)(3). The statute specifically limits the circumstances in which premium processing can be suspended. *Id.* § 1356(u)(5). Congress thus determined that, if employers are willing to pay extra, they should receive an expedited decision, contrary to the Proclamation's determination that employers cannot submit a petition *at all* unless they pay a vastly greater fee.

135.    In sum, Congress itself has set—and repeatedly adjusted—the appropriate fees for H-1B petitions, and the fees set by Congress reflect its policy judgment concerning the design of the H-1B program. Congress structured the fees for visa programs generally to be tied to administrative costs (and to be determined by notice-and-comment rulemaking), with additional flat fees ($1,500 and $500) imposed on H-1B petitioners in particular to fund specific initiatives, and another flat fee ($4,000) on those employers who are most reliant on nonimmigrant workers.

136.    The $100,000 fee, imposed with no procedure whatsoever, dramatically upends Congress's deliberate decisions about how much a visa (and in particular, an H-1B visa) should cost and flouts the cost-recovery principle of Section 1356(m). It also distorts which employers can afford to participate in the program. Whereas Congress set fees that are attainable by employers large and small, the imposition of a $100,000 fee is likely prohibitive to many, particularly small businesses, universities, and nonprofits across the country that hire H-1B workers.

137.    Put differently, the INA permits the executive branch to charge immigration fees in two circumstances: (a) where the fee is adopted via notice-and-comment rulemaking and set at a level necessary to recoup USCIS's costs (8 U.S.C. § 1356(m)), or (b) where Congress itself has

expressly authorized the fee through statute. The Proclamation's exorbitant $100,000 application fee falls into neither category.

138.    Because the Proclamation "expressly override[s] particular provisions of the INA" (*Hawaii*, 585 U.S. at 689), it is not a lawful exercise of Section 212(f) power.

### b. Other INA provisions.

139.    The Proclamation also sits uneasily with other specific congressional determinations regarding the H-1B program.

140.    For one, the imposition of a $100,000 fee—which is intended to, and surely will, reduce the number of petitions received—will result in significantly fewer H-1B visas. This dramatic change cannot be squared with Congress's expectation that the high demand for H-1B visas would warrant imposing a statutory cap on the number of new H-1B visas.

141.    Congress decided that, with specified exceptions, employers should be able to sponsor up to 85,000 people—65,000 plus up to 20,000 more who must have advanced degrees from American universities—on H-1B visas. 8 U.S.C. § 1184(g). Although Congress's goal in imposing a cap was, in part, to assure that *no more* than this number of noncitizens could obtain visas under this pathway, its imposition of a cap also reflects Congress's considered policy view of roughly the right number of people to be able to obtain visas through the H-1B program each year.

142.    That is, Congress legislated the 85,000-person annual cap against the background knowledge that demand for visas under the program vastly exceeded that amount. It was well aware that by imposing an 85,000-person annual cap, it also was deciding that approximately 85,000 people would obtain non-cap-exempt H-1B visas annually.

143.    Congress arrived at this number by weighing the clear benefits and possible drawbacks of the program. It wanted to ensure that employers were able to bring enough workers into the United States for the Nation to reap the benefits of innovation and economic growth stimulated

by the H-1B program, while ensuring that the workforce was not overwhelmed by new, highly skilled foreign workers. For Congress, 85,000 new visas each year reflected the proper balance.

144.    For reasons explained above, the Proclamation upsets that balance by surely causing the number of new H-1B visas to plummet and making the program accessible only to a subset of employers. Most employers that rely on H-1B visas will reduce the number of petitions they submit. Employers who submit few petitions to begin with, or entities like small businesses and nonprofits, including universities, that cannot possibly afford a $100,000 fee, will be unable to participate at all.

145.    Moreover, insofar as the Proclamation suggests that the purpose of imposing a $100,000 fee is to protect American workers, the use of such a blunt tool to achieve those ends contravenes the intricate labor protections that Congress established and instructed the executive to use instead to achieve that goal.

146.    Congress has established a carefully reticulated regime to ensure that American workers are not harmed by the H-1B program. The centerpiece of this scheme is the Labor Condition Application, which requires any company seeking to hire an H-1B worker to make various certifications to the Department of Labor regarding prevailing labor conditions. *See* 8 U.S.C. §§ 1182(n)(1)(A)-(D).

147.    Among other requirements, employers must certify that the position pays prevailing wages (or higher), that the position will not adversely impact other workers, and that the employer has provided certain forms of notice to existing employees in the same occupational classification regarding the position. These provisions are designed to ensure that (a) H-1B workers are not hired at a rate that undercuts the wages American workers are willing to accept; (b) the creation of an H-1B position does not directly result in the elimination of a job held by an American worker; and (c) American jobseekers have the ability to compete for and obtain positions that might ultimately be filled by H-1B workers.

148.    The executive is not toothless in enforcing these requirements. Employers who violate them are subject to monetary fines and bans on filing future H-1B petitions. 8 U.S.C. § 1182(n)(2)(C). And certain employers—including those who have violated the certification requirement in the past or have a high percentage of H-1B workers already—must specifically certify that they tried and failed to fill the position with an American worker and that the employer has not and will not displace any American worker within 180 days before or after the date of the application. *See* 8 U.S.C. §§ 1182(n)(1)(E), (n)(1)(G), (n)(3)(A).

149.    The predominant concern expressed in the Proclamation is that certain employers are abusing the H-1B system to undercut American workers. That is, no doubt, a serious issue, which is why Congress carefully considered that problem and equipped the executive with various measures both to prevent such abuse from occurring—such as the labor condition application process—and to penalize employers who do abuse the system.

150.    In other words, when Congress created the H-1B program—and in its continued maintenance of and modifications to that program—it was aware of the potential for abuse and authorized the executive to take certain measures to prevent and remediate abuse. What Congress did not authorize is disincentivizing the use of the program by imposing a fee many times the amount of fees set by Congress.

### c. Practical availability of the H-1B program.

151.    At bottom, the Proclamation and its practical impact are difficult to square with Congress's basic determination that domestic employers *should* be able to access a program for admitting highly skilled nonimmigrant workers from specialized fields.

152.    Indeed, calling what the Proclamation institutes a "payment" is something of a misnomer. Contrary to the Proclamation's preamble, instituting a new $100,000 price tag on H-1B petitions does not merely impose "higher costs on companies seeking to use the H-1B program while still permitting companies to hire the best of the best temporary foreign workers." Rather,

the fee renders the H-1B program practically unavailable for many companies, particularly small businesses, as well as for nonprofits and institutions of higher education, depriving them of a talent pipeline that is critical to innovation and productivity.

153.    Although the Proclamation suggests that employers still may hire "the best of the best," it fails to appreciate the economic reality that many employers, particularly small businesses and nonprofits, simply cannot pay the $100,000 fee, regardless of how talented a prospective employee may be. For example, innovative startups typically compensate even their highest performing employees largely with equity compensation rather than cash precisely because cash is scarce, making a $100,000 per-hire outlay impracticable. The filter imposed by the new fee is therefore less about the quality and promise of the prospective employee, and more about the financial circumstances of the employer.

154.    Moreover, even to the extent the Proclamation could be successful in admitting only "the best of the best," it distorts Congress's design for the H-1B program. There are already separate provisions in the INA enabling companies to sponsor visas for prospective employees with "exceptional ability," "extraordinary ability," or other comparable qualities, and those noncitizens are eligible for *immigrant* visas. 8 U.S.C. §§ 1153(b)(1)(A), (b)(2)(A). The H-1B program is different. By congressional design, employers need not show that their prospective workers are the best of the best, but merely highly skilled. The statutory tradeoff is that workers on H-1B status are only eligible for a temporary stay in this country.

155.    Thus, even assuming that employers willing and able to pay a $100,000 fee correlated precisely with the "best of the best" talent, the imposition of such a "best of the best" requirement on the H-1B program would trample Congress's duly enacted policy choices.

156.    Although the President has broad authority to ensure that those entering the United States under the H-1B program align with the national interest, the President cannot nullify the

program altogether by making it infeasible for a subset of employers to use, nor fundamentally amend the program Congress crafted. So long as the Proclamation is in effect, that is the result.

2. *The Proclamation exceeds the President's authority by misapplying or failing to fulfill statutory requirements.*

157. The Proclamation also exceeds the scope of the President's statutory authority in several other respects.

### a. The $100,000 payment is not an entry restriction.

158. First, the Proclamation relies on a statute that permits the President to "suspend" or "restrict[]" "entry" (8 U.S.C. § 1182(f)), but the Proclamation relates to entry only tangentially. *Cf. Hawaii*, 585 U.S. at 694-695 & n.4 (discussing "the basic distinction" between "the concepts of entry and admission," on the one hand, and "issuance of a visa," on the other). A true entry suspension, such as the proclamation at issue in *Hawaii*, flatly bars the entry of all nationals from certain countries or restricts the entry of other countries' citizens to certain statuses or certain classes. *See id.* at 679-680. Here, by contrast, the Proclamation seeks to change the terms of an existing visa program under the INA while continuing to admit the very same noncitizens, so long as they comply with the new terms.

159. That is a "restriction" on "entry" (8 U.S.C. § 1182(f)) only in the most superficial sense. Taken to its extreme, the same logic would permit the President to promulgate an entirely new shadow-INA—that is, an entirely new extra-statutory system setting the terms and conditions of immigration to the United States—giving the President blanket authority to create completely different classifications, rules, and procedures, and deny "entry" to any noncitizen who did not comply with them. Section 212(f)'s delegation of entry-suspension power to the President should not be read so broadly, for a whole host of reasons: It would find the proverbial elephant in a textual mousehole, given the lack of any text naturally read as empowering the President to create new immigration programs (*see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)); it

runs afoul of the major questions doctrine for similar reasons (*see W. Va. v. EPA*, 597 U.S. 697, 723 (2022) (Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme") (quotation marks omitted)); and it raises serious constitutional questions about Congress's ability to empower the President to disregard or override "duly enacted statutes" (*Clinton*, 524 U.S. at 447; *see, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems.") (citation omitted)).

160.    Instead, the text is best read as permitting the President to either "suspend the entry" of a "class of aliens" or to "impose on the entry of aliens" a "*restriction[]*" (8 U.S.C. § 1182(f) (emphasis added)) in the natural, negative sense of that word. *See, e.g.*, Restrict, *Webster's New International Dictionary* 2125 (2d ed. 1947) ("To restrain within bounds; to limit; to confine."); Restrict, *Oxford English Dictionary* (Rev. 2010) ("To limit (a person or thing); to confine to or within certain limits. . . . To prohibit or prevent from."). It does not empower the executive to *condition* a noncitizen's entry on the noncitizen's compliance with affirmative, non-statutory mandates. By doing so, the Proclamation exceeds the power conferred by Section 212(f).

161.    Elsewhere in the statute, by contrast, Congress expressly used the language of "conditions," not restrictions, when that is what it meant to authorize. *See, e.g.*, 8 U.S.C. § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and *under such conditions* as the Attorney General may by regulations prescribe, including when he deems necessary *the giving of a bond*.") (emphases added); Pub. L. 82-414, § 214, 66 Stat. 163, 189 (enacting this language, like Section 212(f), in the original 1952 INA); *see* Condition, *Webster's New International Dictionary* 557 (2d ed. 1947) ("Something established or agreed upon as a requisite to the doing or taking effect of something else."). "That Congress used different language in these two provisions strongly suggests that it meant for them to work differently." *Stanley*

*v. City of Sanford*, 145 S. Ct. 2058, 2064 (2025). If "Congress had wanted" to authorize the President to impose conditions, rather than restrictions, "it knew exactly how to do so—it could have simply borrowed from the statute next door." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).

162.    Additionally, whatever authority Section 212(f) may confer, it certainly does not authorize the President to institute new *payments* as conditions of entry. After all, because raising revenue is a core power reserved for Congress (*see, e.g.*, U.S. Const. art. I § 7, cl. 1; *id.* § 8, cl. 1), "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to" impose "'fees' or 'taxes'" (*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989)); *see also Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1091 (D.C. Cir. 2012) (same, quoting *Skinner*); *Youngstown*, 343 U.S. at 643 (Jackson, J., concurring) ("Congress alone controls the raising of revenues.").

163.    Section 212(f) contains no such "clear[]" "indicat[ion]." *Skinner*, 490 U.S. at 224. Yet, as discussed, elsewhere in the INA, Congress *has* been clear in enumerating certain specific H-1B fees, and it has provided a limited, well-defined "delegat[ion]" (*id.*) of fee-setting power under Section 1356(m) for USCIS to recover its costs. Courts have not hesitated to block executive action that strains the text of Section 212(f) in similar ways. *See, e.g.*, *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *4 (rejecting the use of Section 212(f) to create a non-statutory repatriation system), *stay denied in part and granted in part by* No. 25-5243 (D.C. Cir. Aug. 1, 2025); *President and Fellows of Harvard College v. U.S. Dep't of Homeland Sec.*, 2025 WL 1737493, at *1, *9-10 (D. Mass. June 23, 2025) (rejecting use of Section 212(f) to bar noncitizens from entering the country to study at a particular institution).

164.    Moreover, certain of the Proclamation's provisions go beyond any possible conception of an entry restriction. Section 1(b) of the Proclamation orders the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment." Though in some sense related, the concept of "entry" is separate from the H-1B petitioning and "visa

issuance" process. *Hawaii*, 585 U.S. at 694-695 & n.3. Section 212(f) does not provide authority to categorically deem certain *petitions* acceptable or unacceptable. *Cf. Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32, 33 ("[T]he authority to 'impose on the *entry* of aliens any restrictions he may deem to be appropriate' does not mean that the President has the authority to alter the rules that apply to those who have already entered,," and "statutory grants of authority to the executive branch do not carry with them a sweeping, implied authority analogous to Congress's power under the Necessary and Proper Clause.") (citation omitted) (quoting 8 U.S.C. § 1182(f)).

165.    Likewise, Section 2(b) of the Proclamation orders the Secretary of State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment." Again, the President has broad authority concerning *entry* into the United States but does not have authority to singlehandedly direct the issuance or non-issuance of visas created by statute. *Hawaii*, 585 U.S. at 694-695 & n.3; *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32. Indeed, as courts in this district have held, the State Department has a nondiscretionary duty to process visa applications presented to it, even if the visa applicant is currently barred from *entry* by a Section 212(f) proclamation. *See Filazapovich v. Department of State*, 560 F. Supp. 3d 203, 235 (D.D.C. 2021) (rejecting the "argument[] that a Proclamation banning an immigrant from entry renders her ineligible for a visa,") *rev'd on other grounds sub nom. Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024).

166.    Sections 1(b) and 2(b), in directing federal agencies to take actions that lie outside the President's purview under Section 212(f), are therefore plainly beyond the power conferred by the statute.

> **b.  The Proclamation lacks the statutorily required finding necessary to proclaim a restriction on entry.**

167.    As a prerequisite to instituting any restriction on entry, the INA requires that the President "find[] that the entry of any aliens or of any class of aliens into the United States would

be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). But, while the Proclamation purports to follow this "find[ing]" requirement, the findings within the Proclamation are seriously deficient.

168.    For one thing, much of the data underlying the preamble's conclusions is misleading. For instance, the preamble cites a supposed "36 percent discount for H-1B 'entry-level' positions as compared to full-time, traditional workers." But that figure pits the prevailing wage of *entry-level* H-1B workers—that is, workers with specialized skills primarily due to their academic training, yet with few years of professional experience—against the median wage for *all* workers in the pertinent industry and region. It is entirely unsurprising that entry-level workers—who by definition lack experience and skills gained on the job—would command a lower wage than the median of all employees in the relevant industry, quite apart from their immigration status.

169.    Likewise, the Proclamation references an unnamed "2017 study" showing that "wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001." The Proclamation notably does not cite the actual study. It is clear why: notwithstanding that specific finding, the study broadly concludes that "immigration increased the overall welfare of US natives." *See* Bound et al., *Understanding the Economic Impact of the H-1B Program on the U.S.*, National Bureau of Economic Research Working Paper 23153, https://perma.cc/N9KF-XH3Y.

170.    Additionally, the Proclamation makes no finding about the putative "class of aliens" (8 U.S.C. § 1182(f)) that is ultimately the subject of the restriction implemented. *See Hawaii*, 585 U.S. at 687-688 (acknowledging that "properly identify[ing] a 'class of aliens'" is a "textual limit[]" imposed by Section 212(f)).

171.    The class of noncitizens identified in the Proclamation whose entry would be detrimental to the United States is noncitizens "whose petitions are [not] accompanied or

supplemented by a payment of $100,000." For one thing, this curious grouping strains the statutory term "class" beyond recognition. *See, e.g.*, Class, *Black's Law Dictionary* (12th ed. 2024) ("A group of people . . . that have common characteristics or attributes."); *cf. Hawaii*, 585 U.S. at 688 (holding that "the word 'class' comfortably encompasses a group of people linked by nationality").

172.    Indeed, historically speaking, this grouping includes *all* H-1B applicants. Going forward, their petitions will either include a $100,000 fee or exclude it, but the presence or absence of that fee will have nothing to do with the noncitizens themselves. It will not, for example, bear any relationship to their respective qualifications for employment in the United States, the economic value they might generate by working in the United States, the implications on national security or foreign policy of their entry into the United States, the industry in which they work, and so on.

173.    In fact, the presence or absence of the $100,000 payment will have nothing to do with the noncitizen at all, since it will be the employer filing the petition who either agrees or refuses to include a $100,000 payment.

174.    In any event, the Proclamation makes no findings about any noncitizens, let alone the specific class of noncitizens whose petitions are not accompanied or supplemented by a payment of $100,000. The preamble is directed entirely at *employers* who purportedly abuse the H-1B system, particularly in the IT field, and the concomitant impact on workers in that industry from that alleged abuse. It says nothing at all about the *noncitizens* actually targeted by the restriction or why noncitizens whose H-1B petitions include a $100,000 payment are any less detrimental to workers than noncitizens whose petitions do not.

175.    There is, by the same token, no connection between the findings made in the Proclamation, the class of noncitizens identified for exclusion, and the specific restriction adopted. For instance, the Proclamation draws no connections between the broad trends it identifies—a rising proportion of foreign-born workers in the IT industry and rising unemployment for Americans

graduating with degrees in that field—and the existence of a class of noncitizens whose H-1B visas lack a $100,000 fee.

176.    The Proclamation does not include any findings that noncitizens within the class are less likely to be hired by companies in the IT industry or by employers who abuse the H-1B system. There is also no connection drawn between the imposition of a $100,000 fee and the curtailing of H-1B abuse. Nor is there any mention of why the existing statutory tools for preventing and penalizing abuse are inadequate to accomplish that goal.

177.    In all, the Proclamation exceeds the President's statutory authority. It directly conflicts with the INA multiple times over, it extends to areas beyond the scope of the President's authority to restrict entry, and it fails to make the threshold findings required by law.

178.    As an act exceeding the President's lawful authority, the Proclamation must be declared unlawful and its enforcement must be enjoined as to the U.S. Chamber, AAU, and their members. *See Reich*, 74 F.3d at 1328 ("[R]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.") (quotation marks omitted).

**B.    Agency action implementing the Proclamation must be declared unlawful and set aside under the APA.**

179.    For many of the reasons described above, implementation of the Proclamation by any agency of the United States will also violate the Administrative Procedure Act (APA).

180.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

181.    Agency action taken to implement a presidential proclamation or executive order is subject to review under the APA. *See Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir.

1996) (agency action based on an executive order is not "insulate[d]" from "judicial review under the APA, even if the validity of the [executive order] [is] thereby drawn into question").

182.    Many aspects of the Proclamation are not self-executing but, rather, require implementation by executive branch agencies. For example, Section 1(b) of the Proclamation expressly directs the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment," but Section 1(c) authorizes the Secretary to waive that requirement, for a single noncitizen or a class, on grounds of "the national interest." Likewise, Section 2(b) directs the Secretary of State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment."

183.    In accordance with these commands, immediately after the Proclamation, USCIS issued a memorandum, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, which states that, effective September 21, 2025, "[t]he entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation" under the H-1B program "is restricted, except for those aliens whose petitions *are accompanied or supplemented* by a payment of $100,000." The memorandum further provides that it "applies to H-1B employment-based petitions filed after" the effective date. The document also directs "[a]ll officers of United States Citizenship and Immigration Services" to "ensure that their decisions are consistent with this guidance." *Id*. U.S. Customs and Border Protection has issued a memorandum to similar effect. And the Department of State "has posted guidance to all consulate offices, consistent with" the other agencies' memoranda.[4]

---

[4]    The informality of these documents does not detract from their finality. *See, e.g.*, *Nat'l Ev'tl Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006-1007 (D.C. Cir. 2014) (document was final agency action where it "provides firm guidance to enforcement officials about how to handle permitting decisions"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (same, where purported guidance document "reads like a ukase. It commands, it requires, it orders, it dictates.").

184.     As fully described above, agency actions taken to implement the Proclamation are substantively invalid and must be set aside under the APA, for numerous reasons.

185.     *First,* the $100,000 payment called for in the Proclamation was not set by notice-and-comment rulemaking, but by presidential fiat—violating both Section 1356(m)'s express requirement of such rulemaking and the fundamental rule that existing notice-and-comment regulations (such as DHS's existing fee schedule, *see* 8 C.F.R. §§ 106.1(a), 106.2) may be amended or rescinded only through additional notice-and-comment rulemaking. *See, e.g.*, *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) ("It is, of course, black-letter administrative law that ordinarily an agency that promulgates a rule [using notice and comment] must use the same procedure to revoke that rule."). Indeed, the government previously has taken the position that "[a]fter the fee schedule is effective, fees cannot be adjusted until the next fee schedule notice-and-comment rulemaking." *USCIS Fee Schedule*, 88 Fed. Reg. at 447.  Notice-and-comment rulemaking both "helps to prevent mistakes" and "also helps ensure that regulated parties receive fair treatment, a value basic to American administrative law." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 87-88 (D.C. Cir. 2014). The failure to follow that process here was both unlawful and arbitrary and capricious.

186.     *Second,* agency action implementing the Proclamation will not be done pursuant to a valid exercise of the President's authority to exclude noncitizens from the United States under Section 212(f). Specifically, Section 212(f) is limited to restrictions on entry and does not authorize the President, the Secretary of Homeland Security, or the Secretary of State to direct approvals or disapprovals of H-1B petitions or H-1B visas.  Despite instructions in the Proclamation to restrict decisions on petitions and the issuance of visas to applicants who have paid the $100,000 fee, the President has no statutory authority under Section 212(f) to direct USCIS's action on any H-1B petition or the State Department's issuance of visas. These subjects are not committed to the President's discretion by law. Rather, the President's authority under Section 212 is limited to *entry*

into the United States by a noncitizen or class of noncitizens. *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32-33. And in any event, the President's restriction-of-entry authority depends on the President making findings that he has not made.

187.    *Third*, such actions directly conflict with other elements of the INA, supplanting carefully considered congressional judgments regarding the H-1B program. Specifically, imposing a $100,000 fee on H-1B petitions will conflict with other provisions in the law relating to the appropriate fees for the H-1B program; Congress's decision to make the program available to a wide cross-section of employers; and the law's carefully reticulated scheme of labor protections.

188.    *Finally*, such actions are, and will be, arbitrary and capricious. The imposition of a $100,000 fee on H-1B petitions has nothing to do with the stated goals of that action, as expressed in the Proclamation, and the Proclamation rests on arguments and data referred to in the preamble that are conclusory, directly contradicted by the underlying sources quoted, and fail to consider all aspects of the problem, among other fundamental procedural defects.

189.    Because agency action implementing the Proclamation will be done in violation of the APA, the court must set aside any such action and declare it unlawful.

**CLAIMS FOR RELIEF**

**COUNT I**
**THE PROCLAMATION AND ANY IMPLEMENTING ACTION UNDER IT ARE IN EXCESS OF EXECUTIVE BRANCH AUTHORITY UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES**

190.    The U.S. Chamber and AAU incorporate and reallege the foregoing paragraphs as though fully set forth herein.

191.    Federal courts possess inherent authority to enjoin executive action that is in excess of lawful authority.

192.    For the reasons set forth in the foregoing paragraphs, the Proclamation is in excess of the President's authority under Sections 212(f) and 215(a) of the INA, and any executive action

implementing it is therefore in excess of executive branch authority under the Constitution and laws of the United States.

193.    Specifically, among other things, the imposition of a $100,000 fee for H-1B petitions directly contravenes Congress's statutory enactments related to the H-1B visa programs. These enactments include the much lower fees that Congress deemed appropriate—largely related to the direct costs USCIS incurs in reviewing H-1B petitions and providing similar services. The enactments also include the statutory cap on the number of visas that may be issued under the H-1B program each year and the labor protections incorporated into the law.

194.    Moreover, the imposition of a $100,000 fee for H-1B petitions will fundamentally alter the program, diminishing a program that Congress has said *should* exist, and *should* provide a pathway for employers to bring highly skilled noncitizens to work in the United States.

195.    The Proclamation also exceeds the President's authority under Section 212(f) by directing agency action that is beyond the scope of the President's authority to restrict entry into the United States; is not rationally related to a "class" of noncitizens targeted for restriction on entry; and does not contain "find[ings]" pertaining to that class of noncitizens required by law.

196.    Accordingly, the Proclamation and any implementing actions under it (including any not subject to review under the Administrative Procedure Act) are *ultra vires* executive action, for which there is no adequate remedy other than an injunction pursuant to this Court's inherent equitable power. The implementation of the Proclamation must be enjoined.

## COUNT II
## THE PROCLAMATION'S IMPLEMENTATION VIOLATES
## THE ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. § 706(2)

197.    The U.S. Chamber and AAU incorporate and reallege the foregoing paragraphs as though full set forth herein.

198.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

199.    Final agency action implementing the Proclamation is subject to review under the APA. *See Chamber of Commerce*, 74 F.3d at 1327.

200.    The Proclamation is not entirely self-executing but, rather, requires independent implementation by agencies and authorizes agencies to make independent judgments. Indeed, it expressly directs agency action.

201.    As fully described in the foregoing paragraphs, agency action implementing the Proclamation is, and will be, contrary to law and arbitrary and capricious.

202.    Specifically, among other things, agency action implementing the Proclamation would impose an unlawful $100,000 fee for H-1B petitions, in direct contravention of Congress's statutory enactments related to the H-1B visa program, including the fees set by law, the statutory cap on H-1B visas, and the labor protections existing in the law, all of which reflect careful congressional balancing aimed to implement a robust and active H-1B program while protecting American workers.

203.    Agency action taken to implement the Proclamation also would be unlawful because it would be taken pursuant to directions from the President made in excess of his lawful authority under Section 212(f).

204.    Action implementing the Proclamation also would be procedurally arbitrary and capricious, as the imposition of a fee on H-1B petitions by the executive branch must be done via notice-and-comment rulemaking.

205.    Additionally, such action would be unlawful and arbitrary and capricious because there are no "find[ings]" related to the targeted class of noncitizens, as required under Section

212(f), and the Proclamation rests on arguments and data citations that are conclusory, manifestly inaccurate, and fail to consider important aspects of the problem.

206.    Because agency action implementing the Proclamation violates the APA, it must be vacated and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in its favor and that the Court:

1.    Declare that the Proclamation and any implementing agency action exceed the executive branch's lawful authority;

2.    Enjoin defendants from implementing, enforcing, or otherwise carrying out the provisions of the Proclamation as to Plaintiffs and each of their members;

3.    Vacate and set aside, under the APA, any agency actions taken to implement the Proclamation;

4.    Award Plaintiff reasonable attorney's fees and costs; and

5.    Award Plaintiff such other and further relief as the Court may deem just and proper.

Dated: October 24, 2025

Respectfully submitted,

/s/ *Lindsay C. Harrison*

Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of American Universities*

/s/ *Paul W. Hughes*

Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)*
Alex C. Boota (Bar No. 90001014)*
Grace Wallack (Bar No. 1719385)
Emmett Witkovsky-Eldred (Bar No. 90012725)*
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

* *pro hac vice to be filed*

**PROOF OF SERVICE**

I hereby certify that I served the foregoing amended complaint on all defendants by causing copies to be sent by first-class mail to the following addresses:

United States Department of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, D.C. 20528

United States Department of State
Executive Office of the Legal Adviser and Bureau of Legislative Affairs
Suite 5.600
600 19th Street NW
Washington, DC 20522

Kristi L. Noem, in her official capacity as Secretary of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, D.C. 20528

Marco A. Rubio, in his official capacity as Secretary of State
Executive Office of the Legal Adviser and Bureau of Legislative Affairs
Suite 5.600
600 19th Street NW
Washington, DC 20522

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530

United States Attorney's Office for the District of Columbia
601 D Street NW
Washington, DC 20004

I further certify that, in accordance with Standing Order 25-55, I caused a copy of the foregoing amended complaint to be delivered by electronic mail to USADC.service-civil@usdoj.gov and to Brian Hudak at brian.hudak@usdoj.gov.

Dated:  October 24, 2025                    /s/ Paul W. Hughes
                                             Paul W. Hughes

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>       Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>       Defendants. | Case No. 1:25-cv-3675-BAH |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to LCvR 7(h)(1) and Rule 56 of the Federal Rules of Civil Procedure, and in support of Plaintiffs' Motion for a Preliminary Injunction, or in the Alternative, Summary Judgment, Plaintiffs the Chamber of Commerce of the United States of America (the U.S. Chamber) and the Association of American Universities (AAU) provide this "statement of material facts" as to which Plaintiffs contend there is "no genuine issue." LCvR 7(h)(1). All references to the record are made from the declarations and exhibits accompanying Plaintiffs' motion.

1.  On September 19, 2025, the President issued the proclamation *Restriction on Entry of Certain Nonimmigrant Workers* (The Proclamation). The Proclamation conditions the entry into the United States of certain noncitizens on a $100,000 payment accompanying their petitions for H-1B status, effective September 21, 2025, for one year. Hughes Decl. Ex. 1. The true and correct content of the Proclamation is reflected in Exhibit 1.

2.     On September 20, 2025, U.S. Citizenship and Immigration Services (USCIS) released a memorandum entitled *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*. Hughes Decl. Ex. 2. The true and correct content of that document is reflected in Exhibit 2.

3.     On September 20, 2025, U.S. Customs and Border Protection released a memorandum entitled *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*. Hughes Decl. Ex. 3. The true and correct content of that document is reflected in Exhibit 3.

4.     On September 21, 2025, the United States Department of State published on its website a webpage entitled *H-1B FAQ*. Hughes Decl. Ex. 4. The true and correct content of that document is reflected in Exhibit 4.

5.     USCIS has, on its website, a webpage entitled *H-1B Specialty Occupations*, which includes a section titled "Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers." Hughes Decl. Ex. 5. The true and correct content of that document is reflected in Exhibit 5.

6.     USCIS maintains a schedule of fees that apply to the various USCIS forms. Hughes Decl. Ex. 6. The true and correct content of that document is reflected in Exhibit 6.

7.     On September 19, 2025, the Washington Post quoted the President as saying, in reference to the $100,000 payment described in the Proclamation, "We're going to take that money and we're going to be reducing taxes and we're going to be reducing debt." Hughes Decl. Ex. 24. The President did, in fact, make this statement.

8.     The U.S. Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, DC. The U.S. Chamber is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. Shen Decl. ¶ 1.

9.      The U.S. Chamber advocates for pro-business policies including by advocating on the topic of immigration. Shen Decl. ¶ 3; Hughes Decl. Exs. 18, 25.

10.     The U.S. Chamber litigates in federal court on behalf of its members, including in cases related to immigration and the H-1B program specifically. It also participates in notice-and-comment rulemaking proceedings related to these issues. Shen Decl. ¶ 4; Hughes Decl. Exs. 17, 19, 20.

11.     Hundreds of U.S. Chamber members currently employ, in the aggregate, tens or hundreds of thousands of H-1B workers. These members hire thousands of new H-1B workers every year, and planned to do so again in the one-year period following September 21, 2025. Shen Decl. ¶ 23.

12.     The U.S. Chamber's membership includes both "cap-exempt" employers who may hire additional H-1B workers at any time, and cap-subject employers whose hiring of H-1B workers requires participation in the annual H-1B visa lottery. Shen Decl. ¶¶ 7-9.

13.     One U.S. Chamber member, HJI Supply Chain Solutions, intended to recruit H-1B candidates for an open position in the coming year but would be unable to do so if it must pay $100,000 to sponsor an H-1B petition. *See generally* Daniels Decl.; *see also* Shen Decl. ¶ 18.

14.     At least dozens of other U.S. Chamber members similarly intended to sponsor prospective employees for H-1B visas in the coming year but must either eliminate or reduce their H-1B recruitment efforts if they would be subject to a $100,000 fee for new H-1B petitions. Shen Decl. ¶¶ 13-22.

15.     Another member of the U.S. Chamber, GoRural, provides recruiting and staffing services to rural hospitals and other rural healthcare facilities and often recruits H-1B candidates. GoRural generates approximately 50% of its revenue from placing workers requiring H-1B visas, which will decrease as GoRural's clients are unable to pay a $100,000 fee. Poser Decl. ¶¶ 1, 6-11.

16.     AAU is a 501(c)(3) nonprofit organization headquartered in Washington, DC. It is an association of leading research universities, 69 of which are based in the United States. Snyder Decl. ¶ 3. AAU's purpose is to promote vital programs of academic research and scholarship and undergraduate, graduate, and professional education. *Id.* ¶ 4. Its mission is centrally focused on ensuring that its members can conduct pathbreaking research that contributes to public health and American economic growth. *Id.*

17.     AAU's U.S.-based members use—and plan to continue using—the H-1B program to hire employees. Snyder Decl. ¶ 5; *see also* ASU Decl. ¶¶ 5, 7; CMU Decl. ¶¶ 5, 8; UIUC Decl. ¶¶ 9, 13; JHU Decl. ¶¶ 5, 8; Michigan Decl. ¶¶ 9, 11; Minnesota Decl. ¶¶ 5, 10; Pitt Decl. ¶¶ 5, 7; Utah Decl. ¶¶ 5-6; WashU Decl. ¶¶ 5, 8; Wisconsin Decl. ¶¶ 5, 7. AAU's members are not subject to the statutory cap on H-1B visas and thus can and do file H-1B petitions on a rolling basis throughout the year. Snyder Decl. ¶ 6; *see also, e.g.*, Michigan Decl. ¶ 12; UW-Madison Decl. ¶ 8.

18.     AAU members have submitted thousands of H-1B visa petitions in 2025. Snyder Decl. ¶ 6.

19.     Before the Proclamation was issued, AAU members planned to submit H-1B visa petitions this fall on behalf of new H-1B workers, but have now had to put on hold petitions subject to the Proclamation's $100,000 fee. CMU Decl. ¶ 9; Minnesota Decl. ¶ 11; Utah Decl. ¶ 9; WashU Decl. ¶¶ 9-10.

20.     AAU members have had to put other recruiting and hiring efforts on hold as a result of the Proclamation. JHU Decl. ¶ 9; Utah Decl. ¶¶ 7–8, 10.

21.     The Proclamation does not itself exempt any specific noncitizen, category of noncitizen, company, or industry from the requirements specified in the Proclamation. Hughes Decl. Ex. 1.

22. The Proclamation does not require that the Secretary of Homeland Security grant any waivers or exceptions pursuant to Section 1(c) of the Proclamation. Hughes Decl. Ex. 1

23. As of October 23, 2025, the Secretary of Homeland Security has not yet granted any waiver or exception pursuant to Section 1(c) of the Proclamation.

24. The Secretary of Homeland Security will grant an exception to the Proclamation's requirements only in extraordinarily rare circumstances. Hughes Decl. Ex. 5.

25. To the extent that the Secretary of Homeland Security elects to grant an exception to the Proclamation's requirements pursuant to Section 1(c) of the Proclamation, she will do so only on an individual-by-individual basis. Hughes Decl. Ex. 5. The Secretary of Homeland Security will not grant any company-wide or industry-wide waivers or exceptions pursuant to Section 1(c) of the Proclamation. *Id.*

26. The federal government has not committed in any of the agency guidance issued pursuant to the Proclamation that it will recognize any fees paid in compliance with the Proclamation as "allowable cost[s]" related to "[s]hort term visas" under 2 C.F.R. § 200.463(d).

Dated: October 24, 2025

Respectfully submitted,

/s/ *Lindsay C. Harrison*

Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of
American Universities*

/s/ *Paul W. Hughes*

Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)*
Alex C. Boota (Bar No. 90001014)*
Grace Wallack (Bar No. 1719385)
Emmett Witkovsky-Eldred (Bar No. 90012725)*
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Counsel for Plaintiff Chamber of Commerce of
the United States of America*

* *pro hac vice to be filed*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

and

ASSOCIATION OF AMERICAN
UNIVERSITIES,

                    Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY et al.,

                    Defendants.

Case No. 1:25-cv-3675-BAH

## INDEX OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| Shen Decl. | Declaration of Patrick Shen |
| Daniels Decl. | Declaration of Condrad Daniels |
| Poser Decl. | Declaration of Torie Poser |
| Snyder Decl. | Declaration of Barbara Snyder, Association of American Universities |
| CMU Decl. | Declaration of James H. Garrett, Carnegie Mellon University |
| UIUC Decl. | Declaration of Charles L. Isbell, Jr., University of Illinois Urbana-Champaign |
| JHU Decl. | Declaration of Stephen J. Gange, Johns Hopkins University |
| Michigan Decl. | Declaration of Arthur Lupia and Judith Pennywell, University of Michigan |
| Minnesota Decl. | Declaration of Gretchen Ritter, University of Minnesota |
| Pitt. Decl. | Declaration of Anantha Shekhar, University of Pittsburgh |
| Utah Decl. | Declaration of Phyllis Vetter, University of Utah |

| WashU Decl. | Declaration of Paul J. Scheel, Washington University in St. Louis |
| UW-Madison Decl. | Declaration of Frances Vavrus, University of Wisconsin-Madison |
| Gonzales Decl. | Declaration of Nancy A. Gonzales |
| Hughes Decl. | Declaration of Paul W. Hughes |
| Exhibit 1 | Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 19, 2025) |
| Exhibit 2 | U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B* (Sept. 20, 2025) |
| Exhibit 3 | U.S. Customs and Border Protection, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]* (Sept. 20, 2025) |
| Exhibit 4 | U.S. Department of State, *H-1B FAQ* (Sept. 21, 2025) |
| Exhibit 5 | U.S. Citizenship and Immigration Services, *H-1B Specialty Occupations* |
| Exhibit 6 | U.S. Citizenship and Immigration Services, *USCIS Fee Schedule* (Aug. 29, 2025) |
| Exhibit 7 | *The H-1B Visa Program*, FWD.us (Jan. 27, 2025) |
| Exhibit 8 | *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce |
| Exhibit 9 | *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033,* Association of American Medical Colleges (June 2020) |
| Exhibit 10 | Peter A. Kahn & Tova M. Gardin, *Distribution of Physicians With H-1B Visas By State and Sponsoring Employer,* JAMA: The Journal of the American Medical Association (June 6, 2017) |
| Exhibit 11 | *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis,* American Immigration Council (Mar. 29, 2017) |
| Exhibit 12 | Giovanni Peri, Kevin Shih, Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Cities*, Journal of Labor Economics (July 2015) |
| Exhibit 13 | Parag Mahajan et al., *The Impact of Immigration on Firms and Workers: Insights from the H-1B Lottery* (May 2025) |
| Exhibit 14 | Hao Jiang, et al., *Skilled Foreign Labor, Urban Agglomeration, and Value Creation* (February 19, 2025) |
| Exhibit 15 | Nicolas Morales, *Understanding the Potential Impact of H-1B Visa Program Changes*, Federal Reserve Bank of Richmond (Oct. 2025) |

| Exhibit 16 | Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, Labour Economics (2019) |
|---|---|
| Exhibit 17 | *Chamber Litigation Center*, U.S. Chamber of Commerce |
| Exhibit 18 | *Topics: Immigration*, U.S. Chamber of Commerce |
| Exhibit 19 | Comment, *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting other Nonimmigrant Workers*, U.S. Chamber of Commerce (Dec. 22, 2023) |
| Exhibit 20 | Comment, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media*, U.S. Chamber of Commerce (Sept. 26, 2025) |
| Exhibit 21 | Nadia Almasalkhi, *High-Skilled Immigration Workers Benefit American Industry, But U.S. Policies Threaten Them*, Berkely Interdisciplinary Migration Initiative (September 11, 2023) |
| Exhibit 22 | National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration*, The National Academies Press (2017) |
| Exhibit 23 | Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation, Cato at Liberty* (May 14, 2020) |
| Exhibit 24 | Cat Zakrzewski et al., *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025) |
| Exhibit 25 | *Major Initiatives: America Works Initiative*, U.S. Chamber of Commerce |
| Exhibit 26 | U.S. Citizenship and Immigration Services, *H-1B Electronic Registration Process* |
| Exhibit 27 | Stephen Dimmock et al., *Give Me Your Tired, Your Poor, Your High-Skilled Labor: H-1B Lottery Outcomes and Entrepreneurial Success* 68 Management Science 6950 (2021) |
| Exhibit 28 | Kelsy Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (2024) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>               Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>               Defendants. | Case No. 1:25-cv-3675-BAH |

**DECLARATION OF PATRICK SHEN**

I, Patrick Shen, declare as follows:

1.      I am Vice President for Immigration Policy at Plaintiff Chamber of Commerce of the United States of America (the U.S. Chamber). I make this declaration based on my own personal knowledge and business records reasonably available to me in my role as Vice President for Immigration Policy. If called to testify in this matter, I could and would competently testify to the matters set forth herein.

2.      The U.S. Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, DC. The U.S. Chamber is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.

3.     For more than 100 years, the U.S. Chamber has advocated for pro-business policies that help businesses create jobs and grow our economy. The U.S. Chamber fulfills this purpose in part by leading pro-business initiatives on legislation and regulation. Ensuring that businesses have access to employees with the correct skills is fundamental to their success. Central to the U.S. Chamber's advocacy mission is addressing the "worker shortage crisis" by "helping employers across the country develop and discover talent." U.S. Chamber of Commerce, *Major Initiatives: America Works Initiative*, https://perma.cc/EG35-52F9. That includes within the "related topic[]" of immigration. *Id.*; *see also* U.S. Chamber of Commerce, *Topics: Immigration*, https://perma.cc/S4TA-3ZJD; U.S. Chamber of Commerce, *Major Initiatives: America Works Initiative* (describing the Chamber's major initiative to address the "worker shortage crisis" by "helping employers across the country develop and discover talent," including through the "related topic[]" of "immigration"), https://perma.cc/EG35-52F9.

4.     The U.S. Chamber regularly brings litigation against federal, state, and local governments to challenge governmental action that causes its members undue harms. This includes the U.S. Chamber's current challenge against the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the Proclamation). In addition to this current challenge, the U.S. Chamber (along with other business associations) has brought on behalf of its members several successful lawsuits challenging executive action that threatened to undermine the H-1B program. *See generally Chamber of Com. of the U.S. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-7331 (N.D. Cal. 2020); *Nat'l Assoc. of Mfrs. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-4887 (N.D. Cal. 2020). And the U.S. Chamber regularly participates in the notice-and-comment process when DHS or other agencies conduct rulemaking relating to business-relevant immigration policies in general, and to the H-1B program in particular. *See, e.g.*, U.S. Chamber of Commerce, Comment on *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting other Nonimmigrant Workers* (Dec. 22, 2023),

https://perma.cc/FK9V-9RT2; U.S. Chamber of Commerce, Comment on *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media* (Sept. 26, 2025), https://perma.cc/B2RV-EUA2.

5.      Part of the U.S. Chamber's mission is advocating for its members' abilities to hire and retain the world's best and brightest to foster innovation and facilitate economic growth and job creation in the United States. Many members of the U.S. Chamber face acute skill shortages as to certain specialty occupation workers. This difficulty corresponds to a well-documented, nationwide labor shortage. These struggles are especially pronounced in the science, technology, engineering, and mathematics (STEM) industries, where the gap is as much about the lack of necessary skills as it is suitable workers.  That is because, in many STEM fields, jobs require acute specialization acquired through advanced education and training. Workers with these skills take significant time and investment to develop, meaning a lack of sufficient skill in the domestic labor pool is not something that can be remedied overnight without seeking to hire non-U.S.-based workers.

6.      When they cannot find a sufficient number of talented individuals for the positions they need to fill domestically, employers may need to use the H-1B visa program to recruit qualified candidates. That may mean recruiting foreign-born students studying at American universities who may remain in the United States and work with the benefit of H-1B status, or it may mean recruiting workers who currently live overseas but can come to the United States via an H-1B visa. H-1B workers are a key driver of innovation and productivity gains for many U.S. Chamber member companies.

7.      The U.S. Chamber has members who are subject to the annual "cap" on visas, and it also has members who are "cap-exempt."  Our member companies that are subject to the cap—and therefore must participate in the annual registration and lottery to secure H-1B visas—must

begin their workforce planning, preparation, and recruiting process in the preceding autumn in order to make sure they are ready for the annual March lottery.

8.    The registration process is not as simple as a company "flipping a switch" and informing the government that it would like to petition for a particular number of H-1B visas in a given year, to be used at the company's discretion after they are granted.  Rather, a registration for the lottery requires a company to identify a specific individual whom it would like to sponsor for an H-1B visa.  That requirement, in turn, requires the company to recruit, screen, interview, and select a particular individual for the role the company is attempting to fill.  That process can—and regularly does—take months to complete.

9.    The U.S. Chamber's cap-exempt members, which include universities, are not subject to the annual lottery, meaning they can petition for H-1B visas at any time during the year.

10.    Oftentimes, H-1B workers contribute to the innovation and productivity of the U.S. Chamber's members by helping their research and development teams develop new patents. Such research efforts span across various industries, in businesses large and small, and they are critical to the strength of America's energy producers, pharmaceutical companies, cybersecurity firms, information technology companies, heavy equipment manufacturers, automobile companies, healthcare facilities, and many others.

11.    For members of the U.S. Chamber that are unable to afford the $100,000 fee—or may need to reduce the number of H-1B workers they attempt to hire—the Proclamation and its implementation will hamper their efforts to engage in critical research initiatives. It also will threaten their ability to successfully recruit qualified candidates whom, but for the $100,00 fee, they otherwise would attempt to hire.  That is because the member company would be forced to tell the candidates—many of whom are in demand in the pool for highly skilled labor—that even if the company "wins" the lottery and has the right to petition for an H-1B visa, it will not be able to pay the fee necessary to actually secure the visa.

12.    Relatedly, the H-1B workers employed by our members help support the jobs of their companies' American workers; in many cases, the contributions of the H-1B workers help create new job opportunities for U.S. workers. H-1B workers have this effect because recruiting talent with the specialized skills necessary to support innovation is essential for enhancing a company's productivity, which enables the company to grow, expand its operations, and thereby create new jobs. Enjoining the Proclamation and its implementation will allow American companies to meet their critical need for specialized, highly skilled labor so they can continue to compete in the global marketplace and perform the critical research initiatives that will move our nation and our economy forward.

13.    As Vice President for Immigration Policy for the U.S. Chamber, I know the reactions to the Proclamation of many U.S. Chamber members, including the ways in which the Proclamation will result in irreparable changes to the American market for highly skilled labor and inflict substantial harm upon many of the U.S. Chamber's members of all sizes and across several economic sectors.

14.    Dozens of specific U.S. Chamber members who were planning to hire H-1B workers through the upcoming H-1B visa lottery now anticipate, after the announcement of the Proclamation, hiring fewer or no H-1B workers. Without the ability to hire H-1B workers, these members will be left with unanticipated vacancies in critical roles, many of which our members anticipate will go unfilled.

15.    Numerous members, faced with an inability to fill U.S.-based positions with H-1B workers due to the Proclamation, have determined that they will have to move certain projects or positions outside of the United States. Many others would have to leave positions unfilled, resulting in lower productivity and, in some cases, requiring planned projects to be cancelled or downsized. These consequences will mean delays in product development and innovation.

16.      These impacts are also immediate. In anticipation of the March 2026 H-1B lottery, dozens of U.S. Chamber members have already begun their recruitment and hiring process for H-1B workers or were planning to do so before the end of 2025 because—as noted above—that process often takes months to complete.

17.      Numerous member companies that routinely hire multiple H-1B workers every year, and had begun preparations to do so again this year, have determined they will be unable to seek *any* H-1B visas due to the $100,000 fee. One such company uses the H-1B program because it has not been able to find enough U.S.-based graduates of top universities with the skills the company needs. Without the ability to hire H-1B workers, the company believes that it will be unable to fill those roles with U.S.-based workers, and thus anticipates needing to offshore certain roles, leave positions unfilled, and even cancel or downsized planned projects, significantly slowing investments in building innovative new technologies. Another member believes that without H-1B employees, it will need to eliminate certain roles in-house and outsource those positions, causing increased expenses, along with substantial and irreparable disruption in management structure and workforce planning. For another member, the company will either need to move those positions overseas or leave many of them unfilled, resulting in reduced productivity.

18.      I have read the declaration submitted in this action by Condrad Daniels, President of HJI Supply Chain Solutions, whose experience provides an example of the harms suffered by Chamber members who will be unable to use the H-1B program as they otherwise would. *See generally* Daniels Decl. As that declaration illustrates, the $100,000 fee makes it cost-prohibitive for many businesses to hire an H-1B employee, which can force a business to leave a vacant position unfilled, or to fill it with a candidate who is not as qualified.  *See id.* ¶¶ 6–13.

19.      Numerous members still plan to hire some H-1B employees but plan to reduce hiring or otherwise change their practices to accommodate the $100,000 fee. For example, one member that typically hires dozens of H-1B employees annually anticipates that it will hire fewer H-1B

employees than usual because of the fee and anticipates needing to relocate other positions over-seas or settling for unfilled positions, which might require downscaling planned products. Another member that ordinarily hires scores of H-1B employees expects to hire only a handful because of the fee and anticipates needing to offshore certain roles or downscale planned activities because it cannot recruit talent globally. Another member does not anticipate reducing its use of the H-1B program but must compete with companies outside of the United States that will not have to pay an added premium to access candidates with certain qualifications in quantitative and technical capacities, which will give foreign companies a competitive edge in hiring; this member antici-pates needing to increase hiring outside of the United States if the fee remains in effect, potentially building out operations overseas rather than domestically.

20.    These members are already incurring costs from the new fee. One member that anticipates seeking far fewer H-1B visas than usual is reevaluating its entire staffing model by evaluating which key roles still require H-1B sponsorship, which will need to be staffed in other countries, and which will have to be eliminated.  Another member that attempts to hire over 100 H-1B employees per year is already implementing—and will continue to implement—a substantial workforce planning response to the Proclamation.  That workforce planning response includes eliminating plans to hire H-1B employees for all but very senior roles—depriving the member of specialized international talent even in important mid-level roles—and assessing which of its in-ternational offices can best absorb recruitment, employment, and project execution for roles that ordinarily would be located in the United States. As a result, it will lead to a decline in U.S.-based research and development and innovation activity. Another member had already begun the recruit-ment and hiring process for H-1B employees for the upcoming lottery cycle prior to the issuance of the Proclamation—the member ordinarily hires over a hundred in a given year—but has had to pause extending offers to foreign-national hires requiring an H-1B visa, putting this company at a competitive disadvantage in attempting to recruit global talent.

21.    Another U.S. Chamber member—a public research university that is cap-exempt and therefore can petition for an H-1B visa at any time—similarly will be irreparably harmed by the Proclamation. I have read the declaration submitted in this action by Nancy A. Gonzales, Executive Vice President and University Provost at Arizona State University (ASU).  *See generally* Gonzales Decl.  As that declaration illustrates, prior to the Proclamation, ASU submitted H-1B visa petitions in order to fill critically important faculty positions and had planned to continue using the program at a similar rate.  *Id.* ¶¶ 6–7.  Indeed, but for the Proclamation (and its $100,000 fee), ASU intended to submit roughly a dozen new H-1B petitions over the next 12 months.  *See id.* ¶¶ 7–8.

22.    In addition, the harm caused by the Proclamation is not limited to U.S. Chamber members who hire H-1B workers as their own employees. I have read the declaration submitted in this action by Torie Poser, Owner of Poser Consulting, LLC (d/b/a GoRural), whose experience provides another example of the harms suffered by Chamber members as a result of the Proclamation's $100,000 fee on new H-1B petitions. *See generally* Poser Decl. As that declaration illustrates, some companies' revenue streams are dependent on the ability to recruit and place H-1B workers with other employers. *See id.* ¶ 9. Accordingly, those companies will lose money as long as the Proclamation is in effect. *Id.* ¶ 10. Not only that, but they potentially will have to cut jobs, not to mention the downstream consequences of their being unable to place H-1B workers with their clients.  *See id.* ¶¶ 11–15.

23.    These are just a few limited examples of harms experienced by hundreds of U.S. Chamber members. Members of the U.S. Chamber currently employ, in the aggregate, tens or hundreds of thousands of H-1B visa holders. And each year, hundreds of members of the U.S. Chamber recruit thousands of additional potential H-1B workers and register to file petitions on their behalf. Imposing a $100,000 fee for each new H-1B petition will drastically alter U.S. Chamber members' use of the H-1B program. Many members of the U.S. Chamber who wish to file

future H-1B petitions—particularly small businesses and startups whose relatively smaller operating budgets cannot absorb an unanticipated additional $100,000-per-worker recruitment expense—no longer will be able to afford to do so, and certainly not in the numbers that would be best for their business.

24.    Because employers often seek to participate in the H-1B program when the anticipated role is one they cannot fill with a domestic worker, in most cases, if a business cannot hire an H-1B worker, that position will go unfilled. These unfilled positions will result in lower productivity, efficiency, and innovation at the companies, making it harder for them to compete in the global marketplace. Likewise, these unfilled positions will reduce the availability of direct services provided to Americans, perhaps most significantly healthcare services. Alternatively, members might see no alternative option other than to relocate the position outside the United States. Consequently, American jobs supported by these projects will disappear, due to the job-creating gains in innovation supported by H-1B workers, as will the downstream economic benefits of those jobs.

25.    Even for member companies that can afford to pay the $100,000 fee and decide to do so, adding a $100,000 startup cost for hiring each H-1B employee will mean that member companies will need to either curtail their use of the H-1B program or cut spending elsewhere. The result will be either fewer temporary specialized workers than anticipated, or less budget to spend on research and development, program investment, or to create more American jobs. These companies, too, will experience reductions in productivity, efficiency, and innovation and likewise lose a competitive edge in the global marketplace.

26.    In the aggregate, members of the U.S. Chamber employ millions of U.S. workers. Because the effect of the rule will be to make it much more expensive—if not outright impossible—to hire new H-1B workers, the Proclamation will have a direct and immediate impact on the many business members of the U.S. Chamber that routinely seek to employ talented individuals from around the world who enter the U.S. on H-1B visas.

27.     The harms to businesses from the Proclamation will be irreparable, in part because, by imposing a $100,000 fee on H-1B petitions, the Proclamation severs anticipated new H-1B employees from the company and will result in positions being left unfilled. Companies subject to the annual H-1B cap get one chance each year to hire H-1B employees through the registration and lottery process. At a minimum, the Proclamation will be in effect for the next H-1B lottery, in March of 2026, and it might remain in effect in future years. Employers will forever lose the value gained from hiring workers through the H-1B program in 2026 and beyond. H-1B workers make valuable contributions to employers that will go unrealized. The loss of this talent pool, particularly when companies had anticipated to benefit from it in the coming year and into the future, is likely to be very disruptive for many U.S. Chamber members.

28.     Enjoining implementation of the Proclamation would immediately remedy these future harms that, absent an injunction, the Proclamation inevitably would cause.

29.     For many of the same reasons, enjoining implementation of the Proclamation not only would remedy substantial harm to the members of the U.S. Chamber, but also would benefit the public as a whole. The Nation benefits from the H-1B program through the job growth and economic productivity that results when businesses are able to hire H-1B workers—a process which allows companies to meet acute labor needs and invest in innovation, while being able to locate their operations within the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:   10/24/2025
        Washington, DC                                    Patrick Shen

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

and

ASSOCIATION OF AMERICAN
UNIVERSITIES,

            Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, et al.,

            Defendants.

Case No. 1:25-cv-3675-BAH

### DECLARATION OF CONDRAD DANIELS

I, Condrad Daniels, declare as follows:

1.      I am the President of HJI Supply Chain Solutions (HJI). I have worked at HJI since 2001. HJI is a member of Plaintiff organization the Chamber of Commerce of the United States of America (U.S. Chamber). I make this declaration based on my own personal knowledge. If called as a witness, I could and would testify competently to the matters set forth herein.

2.      HJI is based in Louisville, Kentucky and has provided supply chain logistics services to leading corporations since 1994. HJI regularly employs between 300 and 400 workers and is recognized as one of the largest woman/minority-owned third-party logistics companies in Kentucky. Nonetheless, HJI remains smaller than some other competitors, requiring it to stay nimble and perform certain engineering tasks in-house to compete. HJI provides services as a Tier 1 and Tier 2 supplier (meaning that it supplies end-user companies both directly and indirectly), supply chain warehousing, and logistics expertise to clients in a variety of industries, including

**JA88**

automative, food & beverage, consumer goods, and healthcare, all while integrating seamlessly across diverse supply chains. Our company prizes and depends on innovation to remain competitive in a global marketplace.

3.      Some of HJI's core service areas include ecommerce order fulfillment, subassembly, and manufacturing services, which our corporate clients use HJI as the third-party service provider to complete. This work depends on technical expertise, particularly in the fields of engineering and automation. Our large and diverse workforce includes many key roles whose responsibilities require advanced scientific and technical knowledge.

4.      During my tenure at HJI, the company has previously hired at least one H-1B employee in our corporate office, and we have sponsored the H-1B application of another. In my experience, the H-1B program has been helpful for allowing HJI to identify and recruit qualified candidates who allow the company to perform its work and serve its clients. We have been willing to pay existing H-1B visa fees, and undergo the H-1B lottery and petition process, because the benefits we receive from the program in terms of being able to hire a qualified labor force have been worth the time and expense.

5.      I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the Proclamation). I understand that the Proclamation would restrict from entry into the United States in H-1B status any noncitizen whose initial H-1B petition, filed after the effective date of the Proclamation, is not accompanied by a payment of $100,000. In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

6.      HJI has an open Integrations Engineer position that we have advertised for several months and have tried to fill with U.S.-based workers, without success. This position is located in Louisville, Kentucky and falls within our growing information technology (IT) team. Core responsibilities for the role include, among many others, developing integrations between our internal and third-party systems, working across departments to implement new systems and enhancements

that improve our productivity and service, and serving as a liaison between internal users and external vendors to ensure smooth data flow and system performance. Required qualifications for this role include a bachelor's degree in computer science, information systems, or a related technical field, 1-3 years of experience in a similar role, and familiarity with the various system communication protocols, database and scripting/query tools, and business applications that the IT team regularly uses. Filling this position with an experienced, well-qualified individual is very important to our company's success and ability to remain competitive within the industry.

7.     After months of searching through the typical channels, we have been unable to locate a qualified candidate for the Integrations Engineer position. Most applicants lack the right skill, experience, talent, and education to be successful in this role.

8.     Prior to the issuance of the Proclamation, we could have more specifically tailored our search and advertised explicitly our willingness to sponsor H-1B candidates for the role, which we understand would have exposed the role to additional H-1B candidates. Given the unique training, skills, and experience necessary to perform the job, H-1B workers are an important extension of the labor pool for this engineering role.

9.     Despite our interest in considering H-1B workers for the Integrations Engineer role, that will not be possible if there is a $100,000 fee for completing an H-1B petition. If there were a financial investment of a few thousand dollars in H-1B filing fees, we would pursue an H-1B worker. But it would be impossible for a company of our size and resources to invest $100,000 in a single engineer position.

10.     The imposition of a $100,000 fee puts HJI in a very difficult position. If we could use the H-1B program, then we would immediately begin recruiting from that pool of prospective candidates. But it is no longer possible to consider H-1B candidates if we must pay $100,000 to access a single engineer. As long as the $100,000 fee remains in place, we are deprived of the opportunity to recruit from this pool of candidates and will miss out on top talent. Moreover, even

if we were to make an offer conditional on the invalidation of the $100,000 fee, many employees would be unwilling to accept a job offer on these terms, given the risk that the $100,000 fee will remain in effect and we will be unable to sponsor their visa

11.    As our experience has shown, however, we are unable to fill this position with a well-qualified U.S.-based worker. If the $100,000 fee remains in effect, it is likely this role will simply go unfilled or, at best, we will have to hire a less experienced, less specialized candidate who is not optimally suited for the role.

12.    Either result will be damaging to HJI. Leaving the position unfilled will mean suffering a serious talent gap that will disrupt our operational approach. That disruption will mean direct losses in productivity, delays in program implementation, and drags on other portions of our workforce and operations as we expend additional time, effort, and company resources to reorganize in light of having to forgo an anticipated position. This vacancy exists for a reason: The company has an identified staffing need, and filling that role with a qualified candidate is important to executing on our operational vision.

13.    Without the H-1B program, the only alternative to leaving the role unfilled—and encountering the harms described above—is to fill the position with a candidate who is less experienced or less specialized. We are seeking to use the H-1B program because, despite attempting to hire for this role domestically, we have been unable to identify a qualified candidate. Having to settle for a candidate who is not well-suited for this role directly dilutes the quality of our labor force. It will mean encountering much greater ramp-up burdens and, accordingly, a longer time to achieve the productivity we anticipate gaining from filling this role. It will, likewise, result in an unanticipated diversion of additional staff resources to train this new employee, and, accordingly, a delay in overall effectiveness and slower timelines all around. Even then, bringing in a less qualified candidate increases the risk that the candidate will be unable to perform to expectations, such that we would need to begin the job search from scratch.

14.     As a small-to-midsize company, we depend on speed to compete in our industry. The direct productivity losses suffered by either leaving the position unfilled or filling it with a candidate lacking the proper skills and expertise will mean losing ground to our competitors. These harms are a direct, foreseeable consequence of the $100,000 fee imposed by the Proclamation. We want to use the H-1B program, but because of the fee that is not a viable option, and we will forgo use of the program for that reason alone. If the $100,000 fee is eliminated, HJI will pursue hiring an H-1B employee to fill the Integrations Engineer role. As things currently stand, however, HJI is unable to participate in the program.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: _____          _____
10/22/2025 | 11:55:38 PM CDT

        Louisville, Kentucky                                    Condrad Daniels

Signed by:
Condrad Daniels
BE33AE38FE9D424...

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>          Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>          Defendants. | Case No. 1:25-cv-3675-BAH |

### DECLARATION OF TORIE POSER

I, Torie Poser, declare as follows:

1.      I am the Founder and Owner of Poser Consulting, LLC (d/b/a GoRural), which provides, among other things, recruiting and staffing services to rural hospitals and other rural healthcare facilities in Montana, Wyoming, and Idaho. I started GoRural in 2023 after more than 17 years working in-house at a critical access hospital, where I helped recruit for and staff the hospital's job vacancies. As GoRural's owner, I am responsible for all of its operations. GoRural is a member of Plaintiff organization the United States Chamber of Commerce. I make this declaration based on my own personal knowledge. If called as a witness, I could and would testify competently to the matters set forth herein.

2.      Excluding me, GoRural has three employees: One is full time; one is three-quarters time, and one is half time. GoRural is headquartered in Lewistown, Montana.

3.      I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the Proclamation). I understand that the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000. In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

4.      GoRural's clients cover a broad range of industries, including engineering, accounting, ranching, construction, and behavioral health. The majority of our clients, however, are approximately 50 rural healthcare facilities in Montana, Wyoming, and Idaho. These healthcare facilities include both government-owned and private facilities. They are nonprofits and, accordingly, exempt from the annual H-1B visa "cap." They are small—most have 25 beds or fewer. The communities they serve are small, too—many range from populations of approximately 400 to approximately 8,000. And they are all desperate to fill job vacancies.

5.      Many of our clients—especially our rural healthcare clients—are critically understaffed. They need physicians, radiologists, nurses, medical technologists, radiologic technologists, and physical therapists. Some have entire departments operating at just 40% of a full staff. Their current staffing situations are not sustainable.

6.      At GoRural, we work to fill our clients' vacancies in any way we can. My role is to find candidates who want to live and work in a rural area, screen them, and connect them with one or more rural healthcare facilities that might want to hire them. We always prioritize U.S. candidates, but there simply are not enough qualified U.S. candidates available and willing to live and work in a rural area. Accordingly, we often turn to qualified international candidates, including those who require an H-1B visa.

7.      Once a facility decides it wants to hire the candidate, we handle many of the logistics on the facility's behalf. For international candidates, that includes taking the laboring oar on

both the immigration paperwork and, for candidates who work in highly technical or regulated fields, ensuring they have or obtain the appropriate state licensure.

8.      GoRural is a full-service firm, and our relationship with the workers we place does not end once we have placed them. I or someone from my team will pick them up from the air-port—which can be hundreds of miles from the healthcare facility that has hired them—and take them to their new employer's facility. And I am still in close contact with many workers who GoRural placed years ago.

9.      I would describe placing candidates requiring an H-1B to be the "bread and butter" of my business. Since I started GoRural in 2023, we have placed approximately 100 international candidates—almost all of whom require an H-1B visa—with our clients. Those placements con-stitute approximately 50% of GoRural's revenue.

10.      None of GoRural's clients can afford to pay the $100,000 fee for new H-1B peti-tions and, accordingly, now are unable to hire H-1B workers. As a result, since the Proclamation went into effect, we have been unable to recruit and place with any of our clients any international candidates who require H-1B sponsorship. Every week that the Proclamation is in effect, GoRu-ral's revenue is decreasing.

11.      In addition to my company being less profitable, if the Proclamation remains in effect, I will have to make difficult decisions about whether and to what extent to cut my employ-ees' hours or benefits or, potentially, terminate their employment entirely.

12.      Perhaps more importantly, the Proclamation threatens the very existence of the ru-ral hospitals and healthcare facilities that GoRural serves. The current staffing needs are critical *even with* H-1B workers, and those needs will only worsen as a result of the Proclamation. For example, as facilities experience natural attrition, they will be unable to turn to H-1B workers to fill open positions, meaning both that it will be even more difficult to fill open positions than it

already is *and* that there will be more open positions than there already are. And if our clients have too many open positions for too long, they simply will not be able to continue to operate.

13.    Many of GoRural's clients are the only healthcare facility for hundreds of miles. If they are forced to close their doors, the people in the communities they serve will be left without practical options to receive treatment, including in life-threatening situations.

14.    These effects are not just hypothetical. One of our clients—a hospital that is a 3.5-hour drive from the nearest large healthcare facility—is on the verge of having to close its laboratory because it is unable to fill a required role. It currently is operating the lab with just one medical technologist, even though it needs three. If the hospital has to close its lab, it no longer will be able to provide emergency services and, instead, will be reduced to a triage center—what I think of as a "band-aid station."

15.    That would be devastating for the local community. Our client would have to tell a rancher who comes in complaining of chest pain that they cannot evaluate whether he is having a heart attack and that, instead, he has three options: (1) drive himself or have a loved one drive him the 3.5 hours to the nearest facility capable of treating him—and risk harming himself and other drivers on the road in the event he has a heart attack while driving or, even if someone else is driving, risk not having medical care during the drive; (2) ride in an ambulance for the 3.5-hour drive—to the extent he can find an ambulance with a crew (many of which are staffed entirely by volunteers with other jobs) that is ready and available to transport him; or (3) take an emergency helicopter and be left saddled with a bill for at least tens of thousands of dollars, if not six figures— an amount that would financially cripple most families in the community.

16.    The bottom line is that an accessible H-1B program allows our clients—including rural hospitals and other rural healthcare facilities—to keep their doors open and continue to offer critical, lifesaving services. If the Proclamation and the $100,000 fee stay in effect, GoRural will

continue to lose revenue due to an inability to recruit and place H-1B workers, more roles will go

unfilled, and our clients will have to cut services or departments—if not close their doors entirely.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: _____

10/22/2025 | 7:06:29 PM PDT

Fargo, North Dakota

DocuSigned by:

*Torie Poser*

10CC0700DFBB419...

_____

Torie Poser

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

and

ASSOCIATION OF AMERICAN
UNIVERSITIES,

                    Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY et al.,

                    Defendants.

Case No. 1:25-cv-3675-BAH

## <u>DECLARATION OF AAU PRESIDENT BARBARA R. SNYDER</u>

I, Barbara R. Snyder, declare as follows:

1.      I am the President of the Association of American Universities ("AAU"). I have held that position since October 1, 2020.

2.      I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by AAU personnel and personnel from our member universities and could testify thereto.

3.      Founded in 1900, AAU is composed of America's leading research universities. AAU's 69 U.S.-based members are constantly working on new treatments and cures for diseases such as cancer and Alzheimer's, as well as life-changing innovations that grow our economy and make our nation more secure. Their work transforms lives through education, research, and innovation. AAU member universities collectively help shape policy for higher education, science, and

innovation; promote best practices in undergraduate and graduate education; and strengthen the contributions of leading research universities to American society.

4.      AAU's primary goal is to provide a forum for the development and implementation of institutional and national policies promoting strong programs of academic research and scholarship and undergraduate, graduate, and professional education. A central part of AAU's mission is to ensure that its members are able to conduct research that improves public health, addresses national challenges, and contributes significantly to America's economic strength.

5.      AAU's U.S.-based members rely on the H-1B visa program to fill critical positions in research labs, on faculties, and in university-affiliated medical centers. These roles require highly specialized, often technical, skills and knowledge, including in fields such as agriculture, computer science, engineering, and specialized areas of medicine, including the development of HIV/AIDS drugs, cancer cell-based immunotherapies, and prosthetics to treat and cure blindness. Participation in the H-1B visa program allows AAU members to recruit qualified candidates from outside the United States.

6.      In 2025 alone, AAU members submitted thousands of H-1B visa petitions. For example, one AAU member employs hundreds of H-1B visa holders, including dozens at its cutting-edge research facility, with dozens more joining every year. AAU members intend to continue sponsoring future hires for visas through the H-1B process on a rolling basis, unless cost is prohibitive.

7.      AAU member universities include, among others, Arizona State University, Carnegie Mellon University, the University of Illinois Urbana-Champaign, Johns Hopkins University, the University of Michigan, the University of Minnesota, the University of Pittsburgh, the University of Utah, the University of Wisconsin–Madison, and Washington University in St. Louis. I understand that these institutions are submitting declarations in this litigation, which provide institution-specific details on the matters described here.

8.      On September 19, 2025, President Trump issued a presidential proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation"). I understand the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a $100,000 payment. In effect, the Proclamation would impose a $100,000 fee on future H-1B petitions.

9.      The Proclamation will force AAU members to make an impossible decision between curtailing their employment of H-1B visa holders, on the one hand, and making cuts to their teaching, staff, patient care capacity in their affiliated medical centers, and other programs to offset the increased cost of H-1B applications, on the other.

10.      Curtailing employment of individuals through the H-1B visa program would have immediate negative consequences for AAU members. Colleges and universities rely on H-1B workers to teach students, drive cutting-edge research, and offer top-notch medical care. Without these workers, courses will be cut, research studies on a range of topics will be delayed, patients will wait longer for care, and fewer procedures (including surgeries) will be available at their medical centers—harm that will be felt not just by people within AAU member institutions but also in their surrounding communities and by the American public. That harm will also affect American workers, as university H-1B employees help spur innovation that generates job opportunities for U.S. workers and offer invaluable training to the next generation of scientists, researchers, and other professionals in the United States.

11.      Those harms are being felt already. As institutions of higher education, AAU members are exempt from the statutory cap on H-1B visas and are therefore not subject to the H-1B lottery. That means AAU members may—and do—submit H-1B visa petitions throughout the year. Before the Proclamation was issued, many AAU members planned to submit petitions in the coming weeks and months, including for positions in the upcoming 2026 spring semester. Now that the Proclamation imposes a $100,000 fee on each of those petitions, AAU members have had

to put those plans on hold, perhaps indefinitely. And the inability to use the H-1B process means that some of these slots will remain unfilled, with negative consequences for teaching, research, medical treatment, and numerous university facilities and programs that offer jobs to U.S. workers as well.

12.    AAU members that pay the $100,000 fee will be forced to divert that money from other important programs to offset the cost. As non-profit institutions, AAU members reinvest nearly all their revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps without revamping existing budgets or reducing spending on other institutional priorities like teaching and research.

13.    I understand several AAU members will explain at greater length in their own declarations the impact the Proclamation will have on their ability to conduct cutting-edge research, pursue advances in education and innovation, and offer critical medical treatments.

14.    Those effects will compound over time. The next generation of scientists, doctors, engineers, and other skilled professionals develop vital expertise learning from H-1B visa holders serving as faculty and staff and contributing groundbreaking research. The Proclamation would dramatically reduce those opportunities. Likewise, the Proclamation will undermine AAU members' ability to attract international students who enrich their communities and contribute to the American economy following their education here.

15.    Enjoining implementation of the Proclamation would immediately remedy those harms, as AAU members would no longer have to choose between forgoing access to talented and highly specialized workers and diverting resources from other areas.

16.    Enjoining implementation of the Proclamation would not only remedy substantial harm to AAU members, it would also benefit the public as a whole. The research that the H-1B program enables at leading universities has tremendous positive spillover effects for society, including through the discovery of new medical treatments; advances in cutting-edge technologies

4

**JA102**

such as artificial intelligence, quantum computing, and clean energy; and innovations that unlock

significant increases in productivity and economic growth.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 24, 2025.

_____
BARBARA R. SNYDER

## DECLARATION OF JAMES H. GARRETT

I, James H. Garrett, declare as follows:

1.      I am Provost and Chief Academic Officer at Carnegie Mellon University ("CMU") in Pittsburgh, Pennsylvania.  I have held that position since January 1, 2019.

2.      I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by CMU personnel, and could testify thereto.

3.      I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation").  I understand that the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000.  In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

4.      CMU is an R1 research university that contributes to critical research and innovation in numerous fields, including engineering, computer science and neuroscience. Such work has led to advancements in artificial intelligence, robotics, brain and cognitive sciences, public policy and the digital arts. CMU's research addresses real-world challenges, from developing autonomous vehicles and smart city infrastructure to advancing healthcare technologies and exploring the ethical implications of AI.

5.      CMU participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce.

6.      H-1B visa holders play a critical role in research, teaching and administration at CMU that also often has benefits for American business in the development of new products,

technologies, systems processes, solutions, job creation and new talent. Millions of Americans benefit from and depend on this research and work. For example: (a) a professor in social and decision sciences who is a founder of a research laboratory engaged in the development of computational models to emulate human decision-making across multiple contexts, including cybersecurity, dynamic resource allocation, dynamic control systems, search and rescue scenarios, exploration and exploitation problems. This professor also is the co-founder of an AI institute for societal decision-making that studies the development of AI to augment human decision-making in societal domains such as public health and disaster management that require complex, often life-saving, decisions to be made under uncertain, dynamic and resource-constrained circumstances, while also accounting for people's perceptions of risk and trust; (b) a faculty member who is one of the world's foremost researchers in computer vision, involving the development of methods for acquiring, processing, analyzing and understanding digital images and the extraction of high-dimensional data from the real world in order to produce numerical or symbolic information in the form of decisions; (c) a professor of economics whose work focuses on the design of tax policy and on the labor implication of technological change; (d) a researcher in the field of psychology whose research program is focused on the cognitive and neural mechanism underlying the awareness of perception and comprises diverse methodological approaches including investigation of cognitive impairments in neurological patients (i.e. patients with Spatial Neglect), and fMRI and EEG imaging studies; and (e) a professor in electrical and computer engineering and neuroscience who conducts interdisciplinary research directed towards developing a science of information for making decentralized sensing, communication and computing systems (including biomedical systems) energy-efficient and stable.

7.      CMU currently employs 192 H-1B visa holders. In the 2024-2025 academic year (July 2024 to June 2025), CMU submitted approximately 109 H-1B visa petitions, including seven petitions that I understand would have been subject to the $100,000 fee. In the last three years, CMU has submitted an estimated average of 120 H-1B petitions per year, and the estimated average number of fee-requiring petitions over this time is six per year.

8.      As it has in the past, CMU intends to submit H-1B petitions in the next year and in future years to come. But for the Proclamation, CMU reasonably expects that it would submit H-1B petitions at roughly the same rate in the coming years as it has in recent years.

9.      Before the Proclamation was issued, CMU planned to employ at least one new employee in a Senior Scientist position to begin in January 2026, who is currently outside the U.S. (*i.e.*, not change of status, amendments, or extensions). There is the potential of sponsoring additional noncitizens through the H-1B visa program by the start of the Fall 2026 academic year. However, petitions for the Senior Scientist and other prospective employees are now subject to the $100,000 per petition fee. The Senior Scientist and others CMU would hire through the H-1B program over the next year would fill critical roles and/or contribute to critical functions at CMU.

10.     By imposing a $100,000 fee on future H-1B petitions, the Proclamation has immediately complicated CMU's plans to employ the Senior Scientist and, pending a decision or solution on how to proceed, the important work for which the position was created will not move forward as intended.

11.     If the Proclamation remains in place, CMU will have to choose between paying a $100,000 fee for the Senior Scientist (and each of the other prospective H-1B visa holders) or leaving their positions unfilled. As described below, because CMU is a non-profit, that will

necessarily require taking funds away from the institution's educational and research mission—whichever part of the budget it might come out of.

12.     Going forward, if CMU cannot employ H-1B visa holders in positions at the same rate it has without paying a $100,000 fee, CMU's research – and America's research – and other work will be negatively affected.

13.     It is also not feasible or sustainable for CMU to use other revenue sources to fund petition fees at the anticipated rate without negatively affecting programs and services central to the institution's educational and research mission.  As a non-profit institution, CMU reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.  In other words, CMU does not generate significant surpluses that could be redirected without impacting core academic priorities such as insert examples, *e.g.*, educational programs and financial aid support for students.  Paying these fees, assuming it were possible, would require reductions in programs and services supporting CMU's faculty, students, staff, research, and teaching infrastructure.  At a time when CMU (like most universities) is aggressively looking for budget savings to avoid tuition increases, such an added cost would be particularly felt.

14.     There would also be additional longer-term cumulative and cascading effects, even if the Proclamation only remains in effect for one year. For example, the Proclamation would weaken CMU's ability to recruit international candidates who have niche expertise in areas not available in the U.S., are leaders in their research fields, and who bring cutting-edge research and innovation. Likewise, the Proclamation would negatively impact CMU's ability to maintain or improve its standing in global academic rankings, due to the inability to recruit top talent from an international pool of highly qualified candidates. The cascading effect is that student recruitment

and talent recruitment for other positions supporting these candidates would be diminished. Relatedly, international applications for admission may be depressed, further affecting CMU's budgets and causing a negative impact on the local and Pennsylvania economies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025.

JIM GARRETT

_James H. Garrett_

## <u>DECLARATION OF DR. CHARLES L. ISBELL, JR.</u>

I, Dr. Charles L. Isbell, Jr., pursuant to 28 U.S.C. § 1746 declare that the following is true and

correct:

1.     I am a resident of the State of Illinois. I am over the age of 18.

2.     I am the Chancellor of the University of Illinois Urbana-Champaign ("University

of Illinois") and vice president, University of Illinois System ("System"). I have held that position

since August 1, 2025. I served as Chancellor designate from July 26, 2025, through July 31, 2025.

Before joining the University of Illinois, I served as Provost and Vice Chancellor for Academic

Affairs at the University of Wisconsin-Madison for approximately two years.

3.     In my role as Chancellor, I have personal knowledge of the contents of this

declaration or have knowledge of the matters based on my review of information and records

gathered by University of Illinois personnel and could testify thereto.

4.     The University of Illinois is a university within the System, which is governed by

the Board of Trustees of the University of Illinois, a body corporate and politic established by the

Illinois General Assembly (110 ILCS 305). The System is composed principally of its three best-

in-class universities located in Urbana-Champaign, Chicago ("UIC"), and Springfield ("UIS").

5.     I am familiar with the presidential proclamation of September 19, 2025,

*Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation"). I understand that

the Proclamation requires a $100,000 payment to accompany certain new H-1B petitions filed on

or after 12:01 a.m. EDT on September 21, 2025. Specifically, the fee applies to petitions for

beneficiaries who are outside the United States and do not already hold a valid H-1B visa. In

effect, the Proclamation imposes a substantial new cost on many future H-1B petitions, which

may limit the ability of such individuals to enter the United States unless the fee is paid.

6.      The University of Illinois is among the preeminent public land grant universities in the nation. It boasts leading graduate and doctoral research centers, a medical school, a law school, world-class engineering and business colleges, a top liberal arts college, and educational programs available to residents of all 102 counties in the State of Illinois.

7.      The University of Illinois contributes to critical research and innovation in numerous fields, including engineering, agriculture, medicine, veterinary medicine, and public policy. Such work has led to advancements like developing the first graphical internet browser, revolutionizing molecular biology by discovering that life came in three forms rather than two, developing breakthrough medical imaging technologies, and numerous agricultural advancements to boost the American economy and help the world thrive.

8.      An extensive economic impact study shows that the University of Illinois contributes $12.2 billion annually to Illinois' economy. The university's impact supports over 109,200 jobs — which means one out of every 76 jobs in Illinois is supported by the activities of the University of Illinois and its students.

9.      The University of Illinois participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skills that are not readily available in the United States' labor market. These employees fill unique knowledge gaps and often emerge as top candidates from highly competitive searches where domestic applicant pools are limited. Through the H-1B visa program, the University of Illinois can attract exceptional talent from around the world to participate in research and development that benefits both Illinois and the nation.

10.     H-1B visa holders play a critical role in research, teaching, and service at the University of Illinois. For example, faculty members and postdoctoral research fellows on H-1B

visas within the Prairie Research Institute contribute engineering and technical expertise critical for executing complex projects with regional and national implications. Their work includes specialized scientific and analytical functions in artificial intelligence for remote sensing, hydrologic and hydraulic modeling, flood risk and hazard assessment, and surface-water planning; and conservation and compliance expertise.

11.    The University of Illinois currently employs approximately 393 H-1B visa holders. In 2025, thus far, the University of Illinois has submitted 128 H-1B visa petitions, including 19 petitions that I understand would have been subject to the $100,000 fee had the Proclamation been in effect at the time. This represents approximately 15% of the total H-1B petitions submitted. Based on internal analysis, the University of Illinois estimates that this proportion is consistent with prior years. From 2022 to 2024, the University of Illinois submitted an average of 185 H-1B petitions per year, with an estimated 28 petitions per year that would have been subject to the fee, based on a 15% rate of total petitions.

12.    Our sister institutions within the System, UIC and UIS, also employ H-1B visa holders. UIC currently employs approximately 298 H-1B visa holders and UIS currently employs 18 H-1B visa holders. Eight additional petitioners across both UIC and UIS would have been impacted by the $100,000 fee had the Proclamation been in effect at the time.

13.    The University of Illinois intends to submit H-1B petitions in the next year and in future years to come. But for the Proclamation, the University of Illinois reasonably anticipates that it would submit H-1B petitions at a similar rate in the coming years as it has in recent years. However, the Proclamation introduces significant uncertainty and potential financial burden into the hiring process, particularly as academic units begin recruitment for the next academic year.

14.     The timeline for recruiting faculty members normally begins in the Fall for the subsequent Fall academic term. Because of the Proclamation, hiring units must consider potentially significant and unexpected budgetary impacts as they strive to recruit the most qualified candidates – regardless of their location.

15.     Before the Proclamation was issued, based on past hiring trends, the University of Illinois anticipated employing similar proportions of new employees requiring H-1B status following global searches for the most qualified candidates, but petitions for certain prospective employees who need an H-1B visa are now subject to a $100,000 fee per petition. These positions would contribute to critical functions including researching and teaching in highly specialized subject matters that are integral to the university's mission to be a leader in learning, discovery, engagement, and economic development.

16.     By imposing a $100,000 fee on certain H-1B petitions, the Proclamation has complicated University of Illinois' ability to recruit outstanding international talent and its plans to employ those critical workers without adversely impacting other university programs.

17.      If the Proclamation remains in effect, the University of Illinois will have to choose between paying a $100,000 fee for certain prospective H-1B visa holders, hiring a less-qualified candidate, or leaving the position unfilled. Each of these outcomes would negatively affect the university's mission and operations. Paying the fee will necessarily require using funds that would have otherwise been used to support the university's educational or research mission. Hiring a less-qualified candidate would impact the university's ability to hire based on merit alone and would compromise academic excellence. Leaving the positions unfilled, which is a particular concern in certain disciplines that have a persistent shortage of domestic applicants, would compromise the university's ability to continue its work as a pre-eminent public research university.

18.    If the Proclamation remains in effect, the University of Illinois' ability to attract the most qualified employees from around the world and conduct high-impact research will be compromised. Institutional risks include a decline in research capacity, fewer successful applications for funding, slower innovation, and weakened relationships with funding partners. Economic and social risks involve fewer high-skill professionals available for critical roles, which would ultimately limit Illinois' and the nation's ability to respond to pressing challenges.

19.    Although the System maintains an endowment on behalf of the University of Illinois, it is not practical for any of the System campuses to rely on endowment funds to cover the $100,000 fee:

    a.    Much of the University of Illinois' endowment is restricted to specific donor-designated purposes, such as scholarship, faculty chairs, and academic programs. The University of Illinois is not legally permitted to use those funds to cover visa fees or any costs beyond what the gift agreement permits.

    b.    The portion of the endowment that is unrestricted is subject to a carefully managed annual payout to ensure long-term financial stability for the institution.

20.    The System reinvests nearly all of its other revenue into mission-critical activities. It does not operate with large surpluses or discretionary funds that could absorb significant unexpected visa fees without affecting other critical functions.

21.    Even if the University of Illinois paid the fees, doing so would require reductions in programs and services supporting University of Illinois' faculty, students, staff, research, and teaching infrastructure.

22.    In addition to disrupting the programs from which the University of Illinois would divert funds to cover the Proclamation's fees, the task of revamping the university's budget to

account for these unanticipated fees will require significant effort that is already underway, particularly as many hiring units have begun their annual hiring cycle.

23. There would also be additional cumulative and cascading effects, even if the Proclamation only remains in effect for one year. For example, delays or cancellations of research projects due to hiring constraints may result in higher restart costs, if the projects resume at all. Inability to hire H-1B talent could also cause setbacks in fulfilling contractual obligations, leading to diminished service delivery for Illinois communities. Prolonged uncertainty may also disrupt long-term workforce planning, particularly in areas that depend on rare technical expertise.

24. The requirement to pay $100,000 to hire certain H-1B employees compromises the University of Illinois' ability to hire top talent not otherwise available in the United States. This in turn could make it easier for competitor nations to recruit the most highly qualified individuals away from Illinois and the United States. The University of Illinois has already anecdotally observed a general increase in reluctance from international students and scholars to apply to positions at the university and elsewhere within the System.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025, at Urbana, Illinois.


Dr. Charles L. Isbell, Jr.

## DECLARATION OF STEPHEN J. GANGE

I, Stephen J. Gange, PhD, declare as follows:

1.     I am Executive Vice Provost at the Johns Hopkins University ("Johns Hopkins" or "JHU") and a professor of epidemiology at the Johns Hopkins Bloomberg School of Public Health in Baltimore, Maryland.  In my professorial role, I currently serve as the principal investigator of a large NIH-sponsored data center that supports the effort of over 35 employees. I have held the position of Executive Vice Provost since 2015 and previously served as my school's senior associate vice dean and deputy chair of my academic department.  I also served as interim provost from May 2023 to October 2023.  In my current provostial role, I oversee the Office of International Services ("OIS"), which provides immigration, visa, and travel guidance to the JHU international community, and serves over 15,000 international students, recent alumni, faculty, researchers, scholars, staff, and their dependents annually.

2.     I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by Johns Hopkins personnel and could testify thereto.

3.     I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation").  I understand that the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000.  In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

4.     Johns Hopkins is a nonprofit institution that enrolls more than 29,000 full-time and part-time students in ten academic divisions on four campuses in Baltimore, Maryland; one in Washington, D.C.; and facilities throughout the Baltimore-Washington region, as well as in

China and Italy.  Founded in 1876 as the nation's first research university, Johns Hopkins has been advancing knowledge and bringing discoveries to the world for nearly 150 years.  Johns Hopkins contributes to critical research and innovation in numerous fields, including medicine, engineering, biotechnology, and applied physics.  For example, researchers at the Johns Hopkins School of Medicine are leveraging the power of immunotherapy to develop promising treatments for pancreatic cancer and other malignant cancer tumors.  Researchers across Johns Hopkins are developing new ways to use artificial intelligence to speed up diagnoses and improve care across a range of ailments and diseases, including cancer, cardiovascular disease, sepsis, and cognitive impairment.

5.     Johns Hopkins participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge and training.

6.     H-1B visa holders play a critical role in key areas of medical, engineering, scientific and public health research, as well as in physician positions, as medical staff and as professors and instructors at Johns Hopkins.  The research, teaching and medical care provided by JHU H-1B visa holders is in the national interest of the United States, for example because of the myriad contributions made to U.S. health security and public health initiatives involving H-1B visa holders in JHU's Bloomberg School of Public Health.  One example is a Johns Hopkins H-1B visa holder from Brazil, who is a physician scientist with a focus on human immunology. He studies the pathogenesis of infectious diseases of great relevance to public health, including tuberculosis, HIV, viral hepatitis, arboviruses, malaria, leishmaniasis and bacterial pneumonia.  He is a productive scholar with over 480 publications with specialized knowledge and unique connections to populations and AI tools to help research groups and government health departments in the US and around the world to digest and visualize complex data At JHU, he holds a joint appointment

in both the School of Public Health and School of Medicine and is building a multidisciplinary team at JHU to grow and expand his research.  By bringing this H-1B visa holder to the United States and the resources and network available at JHU, we increase the scope and reach of his critical work and directly benefit the U.S. public health system.

7.      During Fiscal Year (FY), ending June 30, 2025, Johns Hopkins employed 610 H-1B visa workers.  Johns Hopkins submitted approximately 300 H-1B visa petitions of all types in calendar year 2024, including approximately 25 petitions that I understand would be subject to the $100,000 fee based on my current understanding of the scope of the Proclamation and accompanying guidance issued by U.S. Customs and Immigration Services ("USCIS").  Since 2022, Johns Hopkins has submitted an average of 300 H-1B petitions per year, and the average number of what would now be considered fee-requiring petitions over this time is 30.

8.      As it has in the past, Johns Hopkins intends to submit H-1B petitions in the next year and in future years to come.  But for the Proclamation, Johns Hopkins reasonably expects that it would submit H-1B petitions at roughly the same rate in the coming years as it has in recent years.

9.      Unlike nonimmigrant visas for students, such as F-1 visas, that generally follow the academic calendar, Johns Hopkins does not have a standard timeline for recruiting and hiring international workers that would qualify as H-1B visa holders.  Instead, given the nature of the H-1B visa, namely that it requires the worker to be highly specialized and have a bachelor's degree or higher, JHU is continually networking and looking for opportunities to recruit and hire subject matter experts for its medical, research and teaching roles.  Since the issuance of the Proclamation on September 19, 2025, considering the significant budgetary impact of a fee of $100,000 per application on a nonprofit institution, Johns Hopkins has been in a holding pattern awaiting further

details and guidance regarding the scope and application of the Proclamation before embarking on new recruiting and hiring efforts. A $100,000 fee is especially prohibitive where the position for which Johns Hopkins would be recruiting the H-1B visa holder pays less than $100,000 or is for a position, such as a postdoctoral researcher, who would be with JHU for a limited term of 2-3 years.

10.    Before the Proclamation was issued, Johns Hopkins planned to employ two additional noncitizens through the H-1B visa program as soon as January 2026 in the JHU School of Medicine, but petitions for those prospective employees are now subject to a $100,000 per petition fee. The first prospective H-1B visa worker would be a research specialist in the Department of Medicine, Division of Endocrinology, and the second prospective H-1B visa worker would be a postdoctoral research fellow in the Department of Ophthalmology. Both candidates had highly specialized research knowledge and professional experience that was sought after by the departments. These individuals—and others that Johns Hopkins would hire through the H-1B program over the next year—would have filled critical roles and/or contributed to critical functions at Johns Hopkins, including physicians, faculty and staff in the School of Medicine, Public Health and Engineering.

11.    By imposing a $100,000 fee on future H-1B petitions, the Proclamation has immediately complicated Johns Hopkins' plans to employ those critical workers. As part of its mission to "foster independent and original research, and to bring the benefits of discovery to the world," Johns Hopkins has always committed to bringing the best and brightest minds in science and academia together to create "knowledge for the world." H-1B visa holders serve as critical parties in this mission by teaching, engaging in and supporting highly specialized research and bringing expertise from industry and field experience around the world to augment and expand the resources at Johns Hopkins and in the United States. The Proclamation has disrupted the way

in which Johns Hopkins has been able to plan for hiring a portion of these positions, particularly positions with set appointment periods, such as faculty with fixed term contracts or timelines associated with research budgets, where the $100,000 fee would require changes to already-approved departmental budgets.

12.    If the Proclamation remains in place, Johns Hopkins will have to choose between paying a $100,000 fee for many of its prospective H-1B visa holders or leaving their positions unfilled.  As described below, because Johns Hopkins is a non-profit, paying the fee will necessarily require redirecting funds away from the institution's educational and research mission—whichever part of the budget it might come out of.  Leaving the positions unfilled would have negative consequences as well.  When a H-1B visa holder, who is a globally recognized expert in a given field, decides to come to Johns Hopkins to pursue their research, this often creates jobs and opportunities for people in the State of Maryland, most of whom are U.S. citizens, and attracts top graduate students from across the country to JHU.  For example, when an expert comes to work at Johns Hopkins, their work often involves recruiting new research teams.  This recently occurred when a new H-1B visa holder joined JHU with a joint appointment in both our School of Public Health and School of Medicine.  Foregoing the H-1B visa holder means foregoing the jobs and opportunities the H1-B visa holder would have created.

13.    It is also not feasible or sustainable for Johns Hopkins to use other revenue sources to fund petition fees at the anticipated rate without negatively affecting programs and services central to the institution's educational and research mission.  Moreover, as a non-profit institution, Johns Hopkins reinvests nearly all of its revenue into mission-critical activities such as educational programs, financial aid support for students, and non-sponsored research (including essential facilities), leaving little margin to absorb unexpected funding gaps.  Paying these fees would thus

require redirection of funds that would be otherwise used in programs and services supporting Johns Hopkins' faculty, students, staff, research, and teaching infrastructure.

14.     In addition to disrupting the programs from which Johns Hopkins would divert funds to cover the Proclamation's fees, the task of revamping Johns Hopkins' budget to account for these unanticipated fees will require significant effort.  Currently, under the pre-Proclamation structure, individual Johns Hopkins departments and research teams would identify and seek to hire a final candidate, who may require H-1B visa sponsorship in a specialty position at the university and, as such, the processing and filing fees, which typically did not exceed $5,000 were borne by the departments and added to departmental budgets where needed.  Based on years of relative consistency in filing requirements for H-1B visa holders by non-profit institutions of higher education, these fees were expected and manageable.  In major contrast to the $3,000 to $5,000 filing fees previously required, individual departments and research teams cannot afford to divert $100,000 to cover visa fees under this Proclamation.  Financial analysis on how to support departments and research groups and their educational and research efforts at JHU is ongoing.

15.     There would also be longer-term cumulative and cascading effects, even if the Proclamation only remains in effect for one year.  As a non-profit institution, Johns Hopkins does not have customers onto which higher pricing may be passed to cover the significantly increased overhead costs the $100,000 fee per H-1B visa application would create.  Thus, Johns Hopkins would be forced to utilize central and departmental funds to pay the $100,000 fee, which funds are currently allocated to academic programming, essential facilities and research.  At the current rate that Johns Hopkins seeks to recruit and hire highly skilled individuals that may require H-1B visa sponsorship, the amount of money diverted to the $100,000 fee would quickly total in the millions. This would impact local Baltimore/Washington and national programs in concrete ways and may

likely force Johns Hopkins departments to choose between life-saving research programming, academic initiatives and local initiatives that employ U.S. citizens in Baltimore, MD and Washington, DC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025.

_____
Stephen J. Gange

<u>**DECLARATION OF DR. ARTHUR LUPIA, VICE PRESIDENT FOR RESEARCH AND INNOVATION, OFFICE OF THE VICE PRESIDENT FOR RESEARCH, UNIVERSITY OF MICHIGAN AND DR. JUDITH PENNYWELL, DIRECTOR OF THE INTERNATIONAL CENTER, UNIVERSITY OF MICHIGAN**</u>

We, Arthur Lupia and Judith Pennywell, declare as follows:

1.      I, Arthur Lupia, am the Vice President for Research and Innovation at the University of Michigan (the University or U-M) in Ann Arbor, Michigan.  I have held these responsibilities since April 2024. One of the responsibilities of my office is to oversee all matters related to who can participate in research activities and on coordinating with researchers and unit leaders on regulations that apply to that work. Prior to my current leadership position at the University of Michigan, I served as an Assistant Director of the National Science Foundation from 2018-2022 and as co-chair of the White House Office of Science and Technology Policy's Subcommittee on Open Science from 2019-2021.

2.      I, Judith Pennywell, am the Director of the International Center (IC) at the University of Michigan. In addition, I serve as an Adjunct Lecturer in U-M's Marsal School of Education. I have held the position of International Center Director since 1/11/2016. The International Center at U-M's Ann Arbor campus is responsible for the employment-based immigration functions, including the filing of H-1B petitions with USCIS, for the University. Additionally, I served in leadership roles in international education at various institutions of higher education since May 2003.

3.      As Vice President for Research and Innovation and as Director of the IC, respectively, we have personal knowledge of the contents of this declaration, and/or have knowledge of the matters based on our review of information and records gathered by University of Michigan personnel, and could testify thereto.

4.      We are familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation").  We understand that The Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000.  In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

5.      The University of Michigan is an institution of higher education. The University of Michigan consists of three campuses in Ann Arbor, Dearborn and Flint as well as Michigan Medicine, a premier medical center, consisting of the Michigan Medical School, the UM Health System, Michigan Health Corporation, and one of the nation's largest biomedical research communities. According to QS World University Rankings, the University's main campus in Ann Arbor is ranked the #1 U.S. Public University (2019-2023). U-M is ranked #2 in research volume among U.S. public research universities (National Science Foundation, 2023), with $2.04B in total research expenditures, 1,931 research awards, 615 new inventions and 28 new startups during fiscal year 2024.  U.S. News and World Report ranked Michigan Medicine as the #1 hospital in the State of Michigan (2024). Michigan Medicine accommodated 2.6 million patient visits and is ranked nationally in 11 adult and 10 pediatric specialties (2021). The University of Michigan contributes to critical research, innovation and teaching in a wide variety of professional disciplines, including biomedical sciences, engineering and artificial intelligence. In addition, U-M faculty and staff work in a broad range of clinical positions.

6.      The University of Michigan, like other American research universities, achieves these objectives by convening subject matter experts from a wide range of scientific, technical, and medical fields. It incentivizes these experts to teach students from America and other countries, to engage with American communities, to work with American companies, and collaborate on new innovations that have created millions of American jobs. Collectively, this work has established American leadership in many critical areas of study, has strengthened national security, and has stimulated substantial economic growth for decades.

7.      America did not always lead the world in most key areas of science. In the 19th and early 20th century, Germany was the leader in a wide range of high-value scientific areas. In the mid- and late-20[th] century, our country engaged in forward-looking policies that incentivized the best minds in the world to generate their innovations in our country. We welcomed students, scholars and scientists that Germany and other countries would not. Our decision to combine American ingenuity, American resilience, and American entrepreneurialism with universities that could draw the best young minds from all over the

world, were essential to America's becoming the world leader in most high-value areas of science and technology.

8.     The University of Michigan's participation in the H1-B program is a vital component of our ability to serve our state and our nation as effectively as possible. It provides a means for our students, our companies, and our communities to get accelerated and privileged access to the flow of innovations that come from world-class research collaborations. This ability allows us to bring discovery to hospitals and marketplaces faster, and enhance American leadership in vital areas of science and medicine where we cannot afford to fall behind.

9.     The University participates in the H-1B program by submitting H-1B petitions for individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce. For example, U-M recently pursued H-1B sponsorship for a:

- Clinical faculty member performing adult cardiac surgery procedures; rounding on patients in the intensive care unit; mentoring junior faculty and medical residents and fellows; developing and conducting clinical and basic research in cardiac surgery.

- Research fellow conducting research in chemical engineering with a focus on deciphering how chronic disease affects skeletal metabolism with the goal of improving bone health in chronic disease patients.

- Nuclear Engineer/Radiological Scientist conducting research activities in self-organization phenomena and advanced laser systems to investigate the origins and mechanisms of self-organizing behaviors in plasma environments.

- Faculty member teaching and conducting research in Robotics; publishing scholarly findings in peer-reviewed journals, presenting work at academic conferences, and seeking external funding to support research activities.

10.    U-M currently employs more than 850 individuals in H-1B status.[1] In FY 2024, USCIS approved[2] 491 H-1B petitions on behalf of U-M. In the last five years, USCIS approved an average of 449 U-M-filed H-1B petitions per year. On an annual basis, approximately twenty (20) percent of petitions filed by the University are for new employees who are abroad and, based on the 10/20/2025 USCIS guidance on the Proclamation,[3] are subject to the $100,000 payment.

11.    As it has in the past, the University intends to submit H-1B petitions in the next year and in future years to come in support of its research, teaching and patient case mission. *But for the Proclamation*, U-M expects that it would submit H-1B petitions at approximately the same rate in the coming years as it has in recent years.

12.    As an institution of higher education, the University is not subject to the H-1B numerical cap. As a result, U-M files its H-1B petitions throughout the year, rather than during a prescribed petition window in the spring and summer of 2026. While many beneficiaries of our H-1B petitions are already in the U.S., e.g. as international students in F-1 status in their period of Optional Practical Training (OPT), not all are. Individuals in F-1 OPT status who are the beneficiary of a cap-subject H-1B petition (which must start on or after the start of the new federal fiscal year) are eligible for so-called cap-gap relief, granting them an automatic extension of their OPT on the basis of their H-1B petition; beneficiaries of H-1B petitions filed by cap-exempt employers do not receive this benefit. Therefore, to avoid a gap in employment eligibility, any new H-1B petition for a beneficiary employed at a cap-exempt employer, such as U-M, must be approved by the actual end date of their current nonimmigrant status and employment authorization.

13.    The University's recruitment and petition cycles are not based on the annual H-1B lottery. The University operates on a semester basis, with a substantial number of new faculty and staff joining at the start of any new semester, with the Winter Term starting on 1/7/2026. For example, Michigan Medicine offered a research position to a scholar coming from abroad to conduct research

---

[1] This includes individuals currently employed pursuant to a pending H-1B extension/amendment petition, as permitted by regulation.
[2] < https://www.uscis.gov/tools/reports-and-studies/h-1b-employer-data-hub>  (accessed 10/20/2025)
[3] < https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations> (accessed 10/20/2025)

focusing on tumor evolution, lineage plasticity, and therapy resistance in prostate cancer using molecular, cellular, and computational approaches to advance biomarker discovery and therapeutic strategies. His start date was scheduled for 1/5/2026, but this may not be possible – if he can join at all – due to the Presidential Proclamation.  Similarly, the department of Biological Chemistry offered a research position to a scholar coming from abroad to conduct research using single-particle cryo-electron microscopy in combination with biochemical approaches to study how messenger RNA translation is regulated in human health and disease. His anticipated employment, with start date of 2/1/2026, cannot realistically be achieved due to the Proclamation, if he can join at all.  To ensure sufficient time to adjudicate H-1B petitions for beneficiaries joining U-M in January or February 2026, especially if they are currently abroad and require an H-1B visa stamp from the U.S. consulate or embassy in their home country, H-1B petitions for these individuals need to be filed as soon as possible.

14.    Waiting to file H-1B petitions for these individuals will necessarily result in delays in their ability to join U-M in a timely fashion, causing harm to the University's teaching, research and patient care mission. If U-M cannot employ H-1B visa holders at the same rate it has and in the positions that H-1B visa holders typically occupy, federally funded and other critical research projects, such as those listed above, would be significantly hampered and slowed down due to the lack of critical expertise and experience. The inability to hire new H-1B visa holders would also have a significant and negative impact on the University's patient care mission, endangering the clinical care of many patients around the State of Michigan, and indeed around the country.

15.    Based on the University's average submission of 449 petitions per year, even if the $100,000 fee is only required for new petitions for prospective employees who are currently abroad, the new fee requirement would result in the need for the University to pay approximately $100,000 for twenty (20) percent of its petitions, resulting in $9,000,000 in additional fees on an annual basis.

16.    The Proclamation thus places the University of Michigan in the position of paying what is effectively a new tax on bringing some of the best minds to America at the expense of a decrease in our

capacity to deliver research, educational, and service activities that save lives, stimulate economic growth, and improve quality of life for families and communities across our state and nation, including those who live in medically underserved areas. As a non-profit institution, the University reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.  In other words, U-M does not generate significant surpluses that could be redirected without impacting core priorities such as educational programs and financial aid support for students or patient care for the people of Michigan.

17.     There would also be additional longer-term cumulative and cascading effects, even if the Proclamation only remains in effect for one year. While it may be possible to postpone an individual course taught within a program, research programs and projects cannot just be paused and resumed.  Instead, key research projects will need to stop and cannot easily be restarted once the Proclamation ends.  Similarly, life-saving clinical care cannot be postponed without endangering the lives of our patients.

18.     Finally, slowdowns or halts in research by the University of Michigan and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our national security and the Nation's economic dominance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 10/23/2025, at Ann Arbor, MI.

___/s Dr. Arthur Lupia_____

**Dr. Arthur Lupia**

___/s Dr. Judith Pennywell_____

**Dr. Judith Pennywell**

## DECLARATION OF GRETCHEN RITTER

I, Gretchen Ritter, declare as follows:

1.      I am Executive Vice President and Provost at the University of Minnesota  (the "University") in Minneapolis, Minnesota.  I have held that position since July 31, 2025.

2.      I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by the University personnel, and could testify thereto.

3.      I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation"). I understand that The Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of The Proclamation, was not accompanied by a payment of $100,000. In effect, The Proclamation aims to impose a $100,000 fee on future H-1B petitions.

4.      The University is a public, land-grant research institution that contributes knowledge and solutions to help address the world's greatest challenges. It is a research powerhouse and a key driver of economic growth in the state of Minnesota. In FY24, research expenditures were $1.32 billion for the Twin Cities campus.  This  ranks 12th among U.S. public research universities (NSF HERD Survey) and 47th worldwide (ARWU/Shanghai).

The University has a legacy of high-impact research spanning critical fields from health to agriculture. Just a few examples include the first successful open-heart surgery, and pancreas and bone marrow transplants in the U.S.; discovery of Ziagen, one of the most effective HIV/AIDS drugs; and the development of cold-hardy apple varieties, such as Honeycrisp.

In FY24, the University spun out 25 start-ups for the development of new products and services that benefit the public good and foster economic growth. One such start-up, Niron Magnetics, is developing new battery technologies that eliminate the need for the use of geopolitically sensitive rare-earth materials.  Its Clean Earth Magnet was named a TIME magazine best invention of 2023.

1

**JA128**

5.      The University participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce.

6.      The University currently employs approximately 430 H-1B visa holders, holding positions in the following job categories:

| | |
|---|---|
| Faculty (Research & Teaching) | 25% |
| Faculty (Clinical) | 10% |
| Researchers | 25% |
| Postdoctoral Associates | 21% |
| Residents/Fellows (Medical & Veterinary) | 5% |
| All Other | 14% |

7.      H1-B is the most preferred and appropriate visa in a number of different circumstances. For all tenure-track or tenured faculty, H-1B is the preferred and most appropriate visa type because it allows for dual intent (i.e. ability to pursue permanent residency while also maintaining non-immigrant status). This is also true for Researchers and Postdoctoral Associates if they have begun the permanent residency process.  For Medical Residents and Fellows, H-1B status is utilized under approved circumstances when use of the J-1 visa could create a hardship for the resident/fellow or employer.  For Veterinary Residents and Interns, because of limitations on patient contact under J-1 regulations, H-1B is the most appropriate visa type and is sometimes the only available visa type.

8.      H-1B visa holders contribute across the University, with the following breakdown by college:

| | |
|---|---|
| Medical School | 26% |
| Science & Engineering | 12% |

2

**JA129**

| Food, Agriculture, Natural Resources Sciences | 10% |
|---|---|
| Research and Innovation Office | 9% |
| Veterinary Medicine | 5% |
| Liberal Arts | 4% |
| Biological Sciences | 4% |
| All Others (less than 4% each) | 30% |

9.      In Fiscal Year 2025 (July 1, 2024 - June 30, 2025), the University submitted approximately 235 H-1B visa petitions (80% of which are filed by the University's International Student and Scholar Services), at least 24 of which were for Consular Processing (filings for individuals living outside the United States). In the last five years, the University has submitted an average of 220 H-1B petitions per year.

10.      As it has in the past, the University intends to submit H-1B petitions in this and in future years to come.  But for the Proclamation, the University reasonably expects that it would submit H-1B petitions at roughly the same rate in the coming years as it has in recent years.

11.      Since the proclamation was issued on September 19, the filing of the majority of our H-1B cases have been paused or postponed. The University's International Student and Scholar Services currently has 37 requests for H-1B status that have not yet been filed with USCIS. Of these requests, 16 are for H-1B extensions, 17 are for changes of status to H-1B, and 4 are for Consular Processing. Based on guidance received September 21 and then on October 20, the University has resumed filing for H-1B extensions and for change of status, but, with one exception, consular filings remain on hold.

12.      In addition to other disruptions, the Proclamation is inhibiting the University's recruitment efforts.  The faculty hiring and recruiting season begins in mid-fall for most departments.  But, due to the Proclamation, departments are determining whether they need to change their job postings and make clear

**JA130**

they are unable to provide visa sponsorship that requires consular processing. Doing so would limit the applicant pool and likely cause the University to lose top-qualified applicants to other employment opportunities.

13.    H1-B visa holders play a critical role in advancing the University of Minnesota's research and innovation enterprise. Their contributions are deeply integrated across the University's mission, fueling scientific discovery, strengthening partnerships with American businesses, and driving economic growth and workforce development in Minnesota and across the nation.

Over the past five years (FY21 to FY25), university employees who currently hold or previously held H1-B status have been instrumental to the University's success in securing and conducting thousands of research projects supported by federal, state, business & industry, foundations and associations sponsors. Collectively, their work has contributed to more than $900 million in research funding across a wide range of disciplines, including medicine, public health, engineering, agriculture, biological sciences, education, and other fields critical to national competitiveness and public well-being.

Examples include research to

- Accelerate crop improvement programs, contributing to stronger yields and resilience; ensure food security, protect public well-being, and maintain economic stability across the United States
- Develop treatment solutions for water contaminated with per- and polyfluoroalkyl substances (PFAS)
- Use data mining to improve educational outcomes
- Provide direct care for patients seen at veterinary clinic as well as clinical teaching for students in the College of Veterinary Medicine
- Develop new drug candidates and strengthen the U.S. biomedical and pharmaceutical landscape
- Remove nitrate from agricultural drainage, greatly contributing to lowering nitrate concentrations in rivers, lakes, and oceans
- Advance understanding of complex diseases through new statistical methods
- Improve health outcomes for all populations
- Develop novel sampling systems to prevent infection spread
- Research, teaching, and service to help people lead healthy, well-rounded lives
- Inform updates to the United States cancer screening guidelines

14.    If the University cannot continue to employ H-1B visa holders in the same manner as it has in recent years, the University's work will be hampered. Several areas have relied on H-1B visas to ensure

**JA131**

that innovative research, teaching, and clinical work continue at the highest level. For example, due to the high number of excellent jobs available for US bachelor degrees in engineering, there is a shortage of US citizens and US resident researchers in several critical engineering areas including materials science, computer science, biomedical, civil, electrical and aerospace. There are numerous cases in which H-1B visas have addressed this shortage. As an example, one faculty member from outside of the US recently accepted a job offer to conduct research and teach in a specialized area that would not have been possible without an H-1B visa.

15.    The College of Science and Engineering has 53 H-1B holders, of whom 31 are faculty members (early in their appointments; such faculty generally have sought and received permanent residency and eventually citizenship), 9 are postdocs (conducting mentored research), 11 are advanced research scientists and engineers, and two are in other roles.  Without this source of talent, there are certain subject areas where the number of available PhD-level scientists and engineers is inadequate to provide a source of researchers and teachers.  In particular, there is an acute shortage in certain nationally-critical areas including computer science (including AI and cybersecurity), high-energy physics, aerospace engineering, material science, and biomedical engineering.  Without these H-1B visa holders, the University would not have enough faculty to teach advanced computing, physics, and engineering.  We would also be unable to complete nationally-important research studies addressing materials for aerospace systems, machine learning and robotics, and the design of new life-saving medical devices and interventions.

16.    Another example of an area that would be significantly harmed is veterinary medicine. Specifically, the recent changes to H-1B visas could disrupt clinical and diagnostic services, as H-1B employees include faculty clinicians, house officers, and diagnostic specialists who contribute to patient care, client communication, and student clinical training. Research productivity would similarly decline, as applicant pools for many technical and faculty research roles rely on highly qualified international scholars. The recent changes in H-1B visa costs threaten to undermine Minnesota Statute 156.0721, which was recently established Institutional Licensure to address the veterinary workforce shortage by enabling the University to hire international professionals for teaching, training, and clinical roles. This bipartisan

5

measure was designed to strengthen veterinary service capacity across the state. Unfortunately, imposing a new budgetary burden may limit our ability to recruit internationally.

17.     While forgoing employment of individuals through the H-1B visa program would harm the University's ability to conduct important mission activities, including research and teaching, the same is true for continuing to submit H-1B petitions under the terms of the Proclamation. Based on the University's average submission of 26 consular petitions per year, the Proclamation would require the University to pay approximately $2.6 million per year in additional fees.

18.     The Proclamation thus places the University in an impossible position of choosing between alternatives that are each harmful to the University's ability to conduct the work that is key to its mission. The University cannot simultaneously pay the fees for the petitions it reasonably anticipates it would submit but for the Proclamation *and* also maintain all of its current research portfolio and other programs.

19.     While the University maintains an endowment, it is neither feasible nor sustainable for the University to use endowment funds or other revenue sources for this purpose because:

    a.     The majority of the University's endowment is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs.  For these restricted accounts, the University is not legally permitted to use those funds to cover research infrastructure costs.

    b.     Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout, typically around 4.5%, to ensure long-term financial stability for the institution.

20.     It is also not feasible or sustainable for the University to use other revenue sources to fund petition fees at the anticipated rate.  As a non-profit institution, the University reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.  In other words, the University does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.  Paying these fees would require reductions in key investments supporting the University's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain the University's

academic excellence.    So even if the University could "cover" these new fees, it could do so only by negatively affecting other critical goals central to the institution's mission.

21.    Disruptions to the University's research will also have negative effects in the Minneapolis-St. Paul area, the state of Minnesota, and the broader region, as certain research and other programs would face reductions.

22.    Finally, slowdowns or halts in research by the University and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025.

＿＿／s/ Gretchen Ritter＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Gretchen Ritter

## DECLARATION OF DR. ANANTHA SHEKHAR

I, Dr. Anantha Shekhar declare as follows:

1.      I am senior vice chancellor for the health sciences and John and Gertrude Petersen Dean of the School of Medicine at the University of Pittsburgh ("Pitt") in Pittsburgh, Pennsylvania.  I have held that position since June of 2020.  Prior to joining Pitt, I was at Indiana University (IU), the nation's largest medical school, where I held a number of leadership roles. While serving as director of IU's Precision Health Initiative, I founded the Indiana Clinical and Translational Sciences Institute, a statewide entity that involved a partnership between IU's medical school, Notre Dame and Purdue universities. During my time at Pitt, the six schools of the Health Sciences have seen a 47% increase in externally funded research and development expenditures, this year surpassing $1 billion for the first time.

2.      I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by Pitt personnel and could testify thereto.

3.      I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation"). I understand that the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000. In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

4.      Pitt is a top-rated state-related institution.  Pitt contributes to critical research and innovation in numerous fields, including innovations that have transformed mobility and rehabilitation for veterans and people with disabilities.  Such work has led to advancements in assistive technology, such as smart wheelchairs with robotic arms, environmental sensors, and

autonomous navigation features to enhance independence as well as integrating virtual reality into rehabilitation protocols to improve engagement and outcomes for veterans recovering from injury. Pitt is also leading the charge to turn data into knowledge for precision medicine by building a data coordinating center for a large national program sequencing metastatic breast cancer so that researchers can use machine learning and artificial intelligence tools to create personalized precision treatments for patients.

5.      Pitt participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce.

6.      Pitt currently employs 542 H-1B visa holders. In FY2025, Pitt submitted 29 H-1B consular processing visa petitions. In 2024, Pitt submitted 37 H-1B consular processing Petitions. In the last 4 years, Pitt has submitted an average of 30 H-1B consular processing petitions per year.

7.      As it has in the past, Pitt intends to submit H-1B petitions in the next year and in future years to come. But for the Proclamation, Pitt reasonably expects that it would submit H-1B petitions at roughly the same rate in the coming years as it has in recent years.

8.      H-1B visa holders play an essential role in research at Pitt.  Millions of Americans benefit from and depend on the outcomes of Pitt's research. Pitt is uniquely positioned in that it has six schools of the health sciences—dental medicine, health and rehabilitation sciences, medicine, nursing, pharmacy, and public health—working together to radically transform health care. Those who hold H-1B visas in these schools at the University help to make this transformation possible. Below are just a few examples of research areas that benefit from the critical support of H-1B visa holders.

a.   **Mobility:** The Human Engineering Research Laboratories (HERL) at Pitt is a

pioneering research center dedicated to advancing mobility and functional independence for people with disabilities, especially veterans. Founded in collaboration with the U.S. Department of Veterans Affairs, HERL serves as the VA Center for Wheelchairs and Rehabilitation Engineering and operates as a national hub for assistive robotics and rehabilitation technology.

b. **Artificial Intelligence-Related Research:** Pitt research involving artificial intelligence (AI) continues to grow and has applications in numerous fields ranging from pathology to radiology, critical care, pediatrics, and immunology, to name only a handful. Pitt's breast cancer research teams are investigating how AI models can integrate data like clinical variables, medical images and genomic assays from patient experiences to use patients' individual data to guide more personalized treatments of breast cancer. In addition, Pitt scientists employ machine-learning models to predict drug response in cancer patients. Others put AI to the task of identifying false positive HIV test results and enhancing diagnostic accuracy in tests for urinary tract infections in children.

c. **Vision:** Pitt's School of Medicine - Department of Ophthalmology recently ranked eighth in the country for National Institutes of Health funding for departments of ophthalmology has one of the top basic and clinical research programs in the country. Their research focuses on ocular immunology, infectious disease, molecular genetics, molecular biology of retinal disease and glaucoma, and advanced diagnostic imaging technology development.  Current research includes building and testing prosthetics to treat and cure blindness and working toward making whole-eye transplants possible through a series of studies.

In addition to Pitt's broad research in the health sciences, there are also critical projects in STEM. For example, in Pitt's Swanson School of Engineering, researchers are developing magnetic materials for electric power conversion systems and optical and electromagnetic materials for infrastructure sensing. These novel technologies can be used for a variety of applications, including enhancing energy resilience and transportation in the Appalachian region. Researchers are also using artificial intelligence to enhance critical infrastructure monitoring, which will have impacts on the U.S. electric power grid, natural gas and nuclear energy plants, carbon transport and storage, and applications for the U.S. military.

9.      If the University of Pittsburgh cannot employ H-1B visa holders at the same rate it has, Pitt's research discussed above will be hampered. For example, without the ability to employ workers through the H-1B visa program, the innovative biomedical research being done at Pitt would need to be curtailed. As we are an institution with global influence, we hire through competitive employment processes and attract the most talented people from around the world. Pitt is fortunate to recruit people with specialized knowledge from throughout the United States. Pitt simply needs more people, more researchers and more clinicians to deliver biomedical breakthroughs to patients. When Pitt employs people holding H-1B visas, it is building a cadre of talent tackling the most difficult health problems the United States faces today.

10.     In addition, the $100K payment by employers for H-1B petitions will affect training programs. Principal investigators rely on postdoctoral researchers (postdocs) for studies to advance. Postdocs often hold H-1B visas. By making the hiring of international postdocs that require consular processing economically infeasible, our faculty will not be able to bring trainees with leading edge research skills to their labs. Many postdocs who have H-1B visas go on to obtain a green card and eventually work in the United States, meeting a critical need for scientists working

in areas like cancer research, chronic disease, infectious disease, etc. Moreover, the number of faculty who enter the United States via H-1B visas will likely be reduced if the $100K payment by employers remains a requirement. This will limit the number of faculty who can teach and train students pursuing careers in medicine or biomedical research. Not only will this further limit the United States' supply of physicians and scientists, but it will also reduce the depth and breadth of research portfolios of U.S. institutions. Faculty and researchers entering the United States on H-1B visas often bring specialized expertise difficult, if not impossible to find here. In other instances, they bring similar expertise but help to increase the numbers needed to advance science and ensure that it ultimately improves or saves the lives of patients.

11.     Forgoing the employment of individuals through the H-1B visa program would hinder Pitt's ability to fulfill its mission and translate cutting-edge medical innovations into clinical practice, where they improve care and save lives. The same is true for continuing to submit H-1B petitions under the terms of the Proclamation. Based on Pitt's average submission of 233 petitions per year, even if the $100,000 fee is "only" required for new petitions for prospective employees who are currently abroad, the Proclamation would require Pitt to pay approximately at least $3 million dollars per year in additional fees.

12.     As a non-profit institution, Pitt reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, Pitt does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students. Paying these fees, would require reductions in other key investments supporting Pitt's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain Pitt's academic excellence. So even if Pitt could "cover" these new fees, it could do so only by

negatively affecting other critical goals central to the institution's mission. In addition to disrupting the programs from which Pitt would divert funds to cover the Proclamation's fees, the task of revamping Pitt's budget to account for these unanticipated fees will require significant effort.

13.     Pitt currently has 1 H-1B consular processing petition ready for submission that is awaiting Department of Labor certification. Additionally, Pitt has 6 H-1B cases currently pending with USCIS, including one consular processing case filed after September 21st. Employees associated with these petitions have start dates within the next three months, making timely processing and submission critical. These petitions represent essential faculty and staff roles that have already been approved through our competitive institutional recruiting and hiring processes. Delays in filing will result in significant disruptions to research projects, teaching obligations, and critical university operations, as these individuals have been recruited specifically to fill time-sensitive roles. The inability to submit these petitions during the next 6-8 weeks will force the university to either postpone start dates—potentially losing candidates to other opportunities—or proceed without these essential personnel, compromising our academic and research missions.

14.     There would also be additional, longer-term cumulative and cascading effects, even if the Proclamation only remains in effect for one year.  Research at Pitt is deeply integrated with multi-year grants, clinical trials, regulatory approvals, and long-term faculty and student commitments. Interrupting this work, even temporarily, has cascading consequences that cannot be reversed by simply removing a financial barrier like a $100,000 visa petition fee. If Pitt is unable to hire new international researchers due to visa constraints, critical roles remain vacant, delaying recruitment, onboarding, and project progress. These delays can jeopardize federally funded research, compromise clinical trial integrity, and stall the development of treatments in areas like

cancer, neuroscience, and regenerative medicine. The result isn't just lost time—it's delayed access to life-saving therapies for patients in Pennsylvania and around the world.

15.    Disruptions to Pitt research would have significant financial consequences for Pennsylvania. Pitt generates over $6.6 billion in annual economic impact statewide, supporting thousands of jobs and driving growth through research spending, commercialization, and partnerships. In fiscal year 2024 alone, Pitt's research expenditure directly benefited businesses in more than 80% of Pennsylvania counties, with Allegheny County receiving the largest share. The university also launched 13 startups in 2023, many of which contribute to local job creation, innovation, and investment attraction. Disruptions to research hiring, especially of international talent, would slow this momentum, reduce vendor spending, and weaken Pennsylvania's competitiveness in life sciences and advanced technology.

16.    Finally, slowdowns or halts in research by Pitt and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance. I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025.


*/s/ Anantha Shekhar*
Anantha Shekhar

## <u>DECLARATION OF PHYLLIS J. VETTER</u>

I, Phyllis J. Vetter, declare as follows:

1.      I am General Counsel and Vice President at the University of Utah (the "University") in Salt Lake City, Utah.  I have held that position since December 1, 2018.  Prior to that I served as Deputy General Counsel and Associate General Counsel since 1998.

2.      I have knowledge of the matters based on my review of information and records gathered by University of Utah personnel, and could testify thereto.

3.      I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation").  I understand that the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000.  In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

4.      The University of Utah is its state's flagship institution and a Tier 1 research university. The University participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce.

5.      The University of Utah relies on H-1B workers to perform critical roles teaching, researching, and providing patient care, both on campus and throughout University of Utah Health, the only academic medical center in the state of Utah, which provides care for the people of Utah, Idaho, Wyoming, Montana, western Colorado, and much of Nevada. The University of Utah serves as the training ground for scientists and the majority of Utah's physicians, nurses, pharmacists, therapists, and other health care professionals.

6.      The University of Utah currently employs approximately 400 H-1B visa holders. The University's H-1B employees play a key role in teaching our students, providing health care to patients, and developing major scientific research innovations. These activities serve the people of Utah and the nation. They support achievements and technologies that benefit American business interests and advance the local and national economy.  Millions of Americans benefit from and depend on the University's teaching, patient care and research advances.  As it has in the past, the University of Utah intends to submit H-1B petitions in the next year and in future years to come. But for the Proclamation, the University of Utah would continue to hire high-skilled international professionals located outside the U.S. through the H-1B program.

7.      This year, due to the Proclamation, the University has put on hold four petitions for H-1B workers it intended to fill with individuals abroad.

8.      The University was counting on those workers to perform the following roles: (1) a faculty member and medical physicist in the Department of Radiology providing critical teaching, research, and support of patient care related to  medical imaging and dosimetry; (2) a biological researcher in the Department of Human Genetics conducting research to address the genetics and cell biology of the visual system; (3) a global program manager in the Office of Global Engagement responsible for leading and executing global programming initiatives and managing a portfolio of international programs and events; and (4) a computer scientist in the Kahlert School of Computing researching high-performance game engines for interactive gaming, including real-time and offline game physics systems.

9.      The University was finalizing each of these applications when the Proclamation was issued. As a result, each of these roles remains unfilled impacting teaching, patient care, coordination of student programming and various research projects.

10.     In addition to these specific petitions that cannot be filed with U.S. Citizenship and Immigration Services, recruitment and hiring efforts across the University have been thrown into disarray as departments, centers, and programs attempt to pivot from their planned reliance on the H-1B program. Ongoing recruitment has been impacted for faculty in various disciplines, for physicians across multiple specialties as well as other professional roles.

11.     As a result, the University's leadership is fielding inquiries about how to handle outstanding offers of employment, current applicant pools, and initiation of new recruitment processes. The University is unable to move forward in any direction with several individuals with outstanding offers of employment while waiting for more clarity on the application of the Proclamation to cap exempt entities, the availability of exemptions for higher education, health care, and the availability of exemptions for highly qualified individuals filling critical roles.

12.     Leadership anticipates having to make staffing and budget adjustments to account for hiring gaps and barriers to recruitment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025.

_____
Phyllis J. Vetter

<u>**DECLARATION OF WASHINGTON UNIVERSITY IN ST. LOUIS**</u>

I, Paul J. Scheel, declare as follows:

1.       I am Vice Chancellor for Clinical Affairs and CEO for WashU Medicine at Washington University in St. Louis ("WashU").  I have held that position since 2017.

2.       I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by WashU personnel, and could testify thereto.

3.       I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation").  I understand that the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000.  In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

4.       Founded in 1853, Washington University in St. Louis is a private, nonprofit research university. WashU promotes higher education by fostering excellence and creativity in our teaching, conducts rigorous research and scholarship, and treats patients from Missouri, Illinois and beyond, at our nationally ranked affiliated hospitals.  WashU has six (6) campuses in and around the St. Louis area and maintains nine (9) schools.  Washington University in St. Louis contributes to critical research and innovation in numerous fields, including Medicine and Engineering.  For example, WashU Medicine is a research pioneer in the microbiome, the Human Genome Project, genetic testing, cancer cell-based immunotherapies, and DNA vaccines.  Such work has led to advancements in a blood test for Alzheimer's, the development of an intranasal COVID-19 vaccine, developed an FDA-approved drug for a genetic form of amyotrophic lateral sclerosis, and created two tests for genetic mutations in blood and solid tumors to enable precision

medicine, as well as many other significant contributions to medicine. Additionally, labs in WashU's McKelvey School of Engineering are undertaking cutting edge research to determine how artificial intelligence can be used in a variety of fields and applications such as AI-driven design of architecturally diverse and deconstructable polymers and the use of large language models to predict postoperative complications by analyzing preoperative assessments and clinical notes. Our 16,000 employees, including our 700+ employees holding H-1B visas, make vital contributions to WashU's teaching and scholarship and our ability to conduct cutting-edge research, make scientific discoveries, and care for patients.

5.     Washington University in St. Louis participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce.

6.     H-1B visa holders play a critical role in research, patient care and teaching at WashU. Our students and patients rely on H-1B visa holders for education and medical care and millions of Americans benefit from and depend on the work of such individuals who produce new and innovative technologies and lifesaving research. For example, our H-1B researchers have made groundbreaking scientific advances in many fields, including:

      a.  Conducting research that has contributed to the creation of advanced mass spectrometry techniques that can detect and measure disease-related proteins which have significantly improved the medical community's understanding of Alzheimer's disease development and progression. These discoveries have advanced the ability of physicians and researchers to detect Alzheimer's disease earlier and more accurately, allowing for more timely intervention and supporting the development of more effective treatments.

b.  Creating an innovative computer-based method to solve the pathway enrichment problem, a popular method for interpreting genomic data that helps scientists piece together the complex puzzle of how diseases develop and progress, leading to more targeted and effective approaches to healthcare.  The new method resulted in more accurate and precise interpretation of data, led to significant improvements in computational performance and has become part of a standard toolbox for researchers working with genomic data.

c.  Significantly advancing personalized medicine by creating novel statistical and machine learning prediction models using complex algorithms that have drastically enhanced the ability to predict an individual patient's risk of developing various diseases and conditions, such as cancer (breast cancer particularly) and Alzheimer's disease.  Use of these models will transform an individual's biographical statistics and declared symptoms into reliable predictions of the precise medical care, including prevention strategies, that will produce optimal health outcomes.

d.  Providing critical research contributions that have resulted in advancements in the development of new cancer treatment technologies such as the highly personalized delivery of radiation to cancerous tumors while sparing healthy tissue.  This research offers critical insights into the reduction of negative side effects and enhancement of treatment efficacy for a wide range of radiotherapy devices leading to radiation therapy that is highly automated, accurate, cost-effective, patient specific and minimally harmful to surrounding healthy tissues.

e.  Conducting innovative research that has directly impacted how physicians identify and treat patients suffering from a wide variety of infectious diseases, including

SARS-CoV-2 ("COVID-19"), viral hepatitis, bacterial infections, and Human Immunodeficiency Virus ("HIV"). Additionally, the creation of novel therapies that target the immune system during infections has served as a revolutionary approach for these serious diseases, and has had important implications for future research, patient care, and public health.

7.    Washington University in St. Louis currently employs 712 H-1B visa holders. In 2024, WashU submitted 330 H-1B visa petitions and of those petitions, forty (40) were new H-1B visa petitions that I understand would now be subject to the $100,000 fee. In the last three (3) years, WashU has submitted an average of two hundred and ninety-seven (297) H-1B petitions per year. Across those three years, an average of thirty-six (36) H-1B petitions each year have been new H-1B petitions that would require the $100,000 fee.

8.    As it has in the past, WashU intends to submit H-1B petitions in the next year and in future years to come. But for the Proclamation, WashU reasonably expects that it would submit H-1B petitions at roughly the same rate over the next several years as it has in recent years.

9.    Before the Proclamation was issued, WashU planned to employ approximately seven (7) additional noncitizens through the H-1B visa program by the end of 2026, but petitions for those prospective employees are now subject to a $100,000 per petition fee so those plans have been placed on hold. These employees would have filled critical teaching and patient care roles in the Department of Anesthesiology.

10.    As a result of the Proclamation, WashU temporarily halted all H-1B petitions until we received clarifying guidance regarding several matters addressed in the Proclamation, including information on how to apply for the exceptions provided for in Section 1(c) of the Proclamation. Additionally, WashU Medicine halted its recruitment of highly experienced

International Medical Graduates ("IMG") to fill teaching and clinical patient care positions in various understaffed departments including the Division of Infectious Diseases and the Department of Anesthesiology. For example, we are currently holding on three (3) petitions for H-1B *Physicians of National or International Renown* who reside outside the U.S. and who had been recruited over the course of two years by our Department of Anesthesiology. One (1) of those petitions would have been filed the week of September 21st, but for the Proclamation, with the other two (2) to follow shortly thereafter. The Department of Anesthesiology has resorted to recruiting outstanding clinical anesthesiologists outside the U.S. due to a severe shortage of anesthesiologists educated at U.S. medical schools. For FY 2026, the department projects a shortage of fifteen (15) anesthesiologists. The three (3) international physicians whose H-1B petitions are on hold would make up 20% of the anticipated shortfall so the delay in filing and potential loss of these candidates is significant; it will result in greater workloads for our existing anesthesiologists and longer patient wait times for procedures requiring anesthesia.

Moreover, due to the success that the Department of Anesthesiology has had in recruiting International Medical Graduates to perform teaching and patient care activities, other departments at WashU's School of Medicine have begun recruiting from abroad with the hope that such efforts will eliminate their recurring physician staffing shortages. Indeed, WashU's Division of Infectious Diseases received approval of an H-1B visa for its second IMG recruit just three (3) days after the Proclamation became effective. Unfortunately, the division's future international recruitment efforts are now on hold due to the Proclamation.

11.    By imposing a $100,000 fee on future H-1B petitions, the Proclamation has immediately complicated WashU's plans to employ those critical workers. As a non-profit institution, WashU will not be able to pay the $100,000 fee for each prospective H-1B visa holder

(up to an average of four million dollars ($4,000,000) annually) since the cost of just one such petition would exceed the entire budget that departments allocate for immigration and visa related expenses for an entire year.  Ultimately, this will adversely impact our patient care abilities due to staff shortages.  This will result in longer patient wait times for appointments and treatment across specialties.  Further, WashU Medicine will have to drastically cut back on the surgeries we perform as well as other procedures that require anesthesia due to lack of anesthesiologists.

12.     While WashU maintains an endowment, it is neither feasible nor sustainable for WashU to use endowment funds or other revenue sources for this purpose because:

a.  The majority of WashU's endowment is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs. WashU is not legally permitted to use those funds to cover research infrastructure costs.

b.  Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout, to ensure long-term financial stability for WashU.

13.     It is also not feasible or sustainable for WashU to use other revenue sources to fund petition fees at the anticipated rate without negatively affecting programs and services central to WashU's educational and research mission.  As a non-profit institution, WashU reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.  In other words, WashU does not generate significant surpluses that could be redirected without impacting core academic and research priorities.  Paying these fees, assuming it were possible, would require reductions in programs and services supporting WashU's faculty, students, staff, research, and teaching infrastructure.

14.     There would also be additional longer-term cumulative and cascading effects, even if the Proclamation only remains in effect for one year.  The Proclamation will have a long term

and detrimental impact on WashU's ability to recruit highly experienced and talented international physicians, researchers and academic faculty to come to WashU. Recruiting international physician candidates can take several years from the initial contact through receipt of a visa and commencement of employment. While the Proclamation is in place WashU will drastically scale back its recruiting efforts directed at international physicians. Even if the Proclamation ends after one year and we re-start recruitment efforts, we will not be able to quickly onboard international physicians due to the time it takes to vet each candidate. H-1B visa holders bring extraordinary talent, knowledge and expertise to WashU which benefits the patients and citizens we serve. However, the Proclamation will have a profound, negative impact on WashU's ability to educate students, perform innovative research, and provide world-class patient care.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025.

_____
Paul J Scheel, Jr., M.D.
Associate Vice Chancellor for Clinical Affairs &
CEO, WashU Medicine

## DECLARATION OF FRANCES VAVRUS

I, Frances Vavrus, declare as follows:

1.      I am Vice Provost and Dean at the University of Wisconsin-Madison (UW-Madison) in Madison, Wisconsin.  I have held that position since July 31, 2023.  Prior to this position, I served as Professor and Chair in the Department of Organizational Leadership, Policy, and Development at the University of Minnesota-Twin Cities, and, in the latter role, worked on the recruitment of international employees.

2.      I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by UW-Madison personnel, and could testify thereto.

3.      I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation"). I understand that The Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of The Proclamation, was not accompanied by a payment of $100,000. In effect, The Proclamation aims to impose a $100,000 fee on future H-1B petitions as specified in the updated USCIS guidance on October 20, 2025.

4.      UW-Madison, the flagship institution of the University of Wisconsin System, is a public land-grant university, enrolling over 52,000 students.  UW-Madison contributes to critical research and innovation in numerous fields, including all areas of medicine and the health sciences, biology, business and marketing, engineering, public health, and other fields.  Such work has led to advancements like the following:

a. Developing technologies for sustainable energy through the integration of mechanical and chemical engineering, advancing renewable energy innovation, and building connections between academia and industry.

b. Researching economic theory and computer science with a focus on AI and data-driven systems in insurance and business fields.

c. Conducting research to develop and apply machine learning and AI methods for consumer insights and valuation.

5. UW-Madison participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce.

6. UW-Madison currently employs 373 employees in H-1B status with 137 of them holding teaching titles (*i.e.*, professor, clinical professor, lecturer). In the 2025 calendar year, 35 UW-Madison-sponsored H-1B petitions with notification to a U.S. consulate or inspection facility were initiated; for the calendar years 2021-2025, UW-Madison began, on average, 43 H-1B petitions with notification to a U.S. consulate or inspection facility.

7. As it has in the past, UW-Madison intends to submit H-1B petitions in the next year and in future years to come. But for the Proclamation, UW-Madison reasonably expects that it would submit H-1B petitions at roughly the same rate in the coming years as it has in recent years.

8. In the next 6-8 weeks, UW-Madison plans to prepare and file at least 7 H-1B petitions with notification to a U.S. consulate or inspection facility. UW-Madison intends to file them as soon as possible to avoid having to pay for the premium processing fee (an additional $2,805 per petition). New employees currently working on their F-1 OPT often travel internationally during the summer before starting their second year of work. If they do travel

internationally, they must obtain a new H-1B visa stamp before re-entering the U.S. The sooner their H-1Bs are filed and approved, the sooner they can schedule visa appointments/interviews to ensure they are back in the U.S. before the start of the Fall 2026 semester, knowing that wait times for visa stamps tend to increase once summer begins.

9.     Employees in H-1B status play a critical role in research and teaching at UW-Madison. The loss of these highly educated and talented individuals would have a particularly detrimental impact on research and clinical care. Millions of Americans benefit from and depend on research in the health sciences, including work done at UW-Madison.  For example:

a.  Employees in H-1B status are vital to medical research initiatives and patient care in the UW-Madison School of Medicine and Public Health (SMPH). These employees hold faculty, scientist, and researcher appointments that bring specialized expertise that enhances SMPH's ability to innovate and develop new therapies and treatments. Some employees in H-1B status at SMPH are faculty physicians, who are crucial to delivering patient care and teaching the next generation of physicians. They offer diverse perspectives and expertise that enrich our healthcare services, particularly in subspecialties where there is a shortage of qualified American practitioners. Some of them are doing award-winning longitudinal research on neurocognitive aging that integrates the study of hearing, vision, motor skills, and other functions in people from age 50 onward.

b.  In the UW-Madison School of Pharmacy, employees in H-1B status are doing groundbreaking interdisciplinary research that benefits rural and urban residents. One example is the design and implementation of equitable,

digitally-enabled health interventions using insights from behavioral science,

implementation science, and design science with the goal of ensuring that

digital health innovations are effective and accessible for all

10.    If UW-Madison cannot provide H-1B sponsorship for employees in positions for

which qualified American workers are not available, UW-Madison's research and patient care will

be severely hampered. For example, if SMPH cannot employ faculty physicians in H-1B status

due to the cost-prohibition brought on by the Proclamation, the quality of patient care could be

impacted. The absence of these international physicians could strain our ability to maintain service

levels in certain departments. For instance, our division of hospital medicine relies heavily on

international hospitalists to address physician shortages. The inability to access this population of

talent could lead to longer waiting times for patients and limit our capacity to provide timely

interventions, ultimately affecting overall patient care. While forgoing employment of individuals

through the H-1B visa program would be devastating to UW-Madison's ability to further its

research, teaching, and patient care missions, the same is true for continuing to submit H-1B

petitions under the terms of the Proclamation. Based on UW-Madison's average number of 43 H-

1B petitions with notification to a U.S. consulate or inspection facility beginning each year, the

Proclamation would require UW-Madison to pay approximately $4,300,000 per year in additional

fees.

11.    The Proclamation thus places UW-Madison in a very difficult position of choosing

between alternatives that are each harmful to the university's ability to conduct the work that is

key to its mission. UW-Madison cannot simultaneously pay the fees for the petitions it reasonably

anticipates it would submit but for the Proclamation *and* maintain its current research initiatives

and other priorities. For example, UW-Madison's new research initiative known as RISE—

Research Innovation and Scholarly Excellence—would be significantly compromised because a key part of the initiative is the hiring of the best researchers in the world in the areas of AI, sustainability, virology, and the health span. The inability to hire the very top scholars and scientists regardless of their country of origin will harm our efforts at producing research for the public good and preparing the next generation of scientists.

12.    It is also not feasible or sustainable for UW-Madison to use other revenue sources to fund petition fees at the anticipated level of $4,300,000.  As a non-profit institution, UW-Madison reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.  In other words, UW-Madison does not generate the level of surplus necessary to cover these fees without impacting core academic priorities such as educational programs and financial aid support for students.

13.    Paying these fees, even if it were possible, would require reductions in key investments supporting UW-Madison's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain UW-Madison's academic excellence.  So even if UW-Madison could "cover" these new fees, it could do so only by negatively affecting other critical goals central to the institution's mission.

14.    In addition to disrupting the programs from which UW-Madison would divert funds to cover the Proclamation's fees, the task of revamping UW-Madison's budget to account for these unanticipated fees would require significant effort due to the recent launch of a new budget model. With implementation set for FY 27, the necessity of finding more than $4 million to cover the anticipated H-1B fees would set back this important budget transformation process.

15.    There would also be additional, longer-term cumulative and cascading effects, even if the Proclamation only remains in effect for one year. One of these effects is that these highly-

skilled doctors, scientists, and scholars will go to other countries, and we will lose the opportunity to benefit from their human capital in making medical breakthroughs, research innovations, and academic advancements. Moreover, it can take more than one year to get a research laboratory ready for a new faculty member, and we must be able to plan several years in advance for new hires to get the space and equipment necessary for their work. Even a one-year fee imposition would significantly set back the research enterprise at UW-Madison.

16.     Disruptions to UW-Madison's research will also have negative effects in the Madison area, the state of Wisconsin, and the broader region. Some employees in H-1B status conduct research that directly contributes to the Wisconsin Idea, namely, that research conducted on our campus ought to benefit the lives of the state's residents. Those whose research increases dairy production, improves medical care, advances entrepreneurship in the state's corporate sector, and enriches K-12 education help to stimulate the Wisconsin economy and improve the health and wellbeing of the population. The opportunity cost from ceasing H-1B sponsorship for potential employees  is great, and our state and nation will be paying the price for years to come should UW-Madison have to make the difficult choice of not submitting H-1B petitions owing to the prohibitive cost for our public institution.

17.     Finally, the slowdown or cessation of research by UW-Madison and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our nation's national security and its economic dominance. A recent report by the Center for Strategic and International Studies on China's research enterprise convincingly argues that that while the U.S. "remains the global leader in absolute R&D spending, China is rapidly narrowing the gap. Without decisive action, the erosion of U.S. leadership in research and technological development will carry lasting economic

and strategic costs" (https://www.csis.org/analysis/competing-chinas-public-rd-model-lessons-and-risks-us-innovation-strategy; September 17, 2025). This conclusion was reached before the September 19th Proclamation was issued, and it will only compound this national security crisis should universities like ours have to make the difficult decision to forgo the hiring of the most qualified researchers in the world because we do not have the requisite $4.3 million or more that would be required each year to pay their H-1B fees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025, at the University of Wisconsin-Madison.

*Francis Vanz*

_____

## <u>DECLARATION OF NANCY A. GONZALES</u>

I, Nancy A. Gonzales, declare as follows:

1.    I am Executive Vice President and University Provost at Arizona State University ("ASU") in Tempe, Arizona.  I have held that position since July 1, 2021.

2.    I either have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by ASU personnel and could testify thereto.

3.    I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the "Proclamation"). I understand that The Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of The Proclamation on behalf of a beneficiary who is outside the U.S. or otherwise requires the issuance of an H-1B visa in order to begin H-1b employment, was not accompanied by a payment of $100,000. In effect, The Proclamation aims to impose a $100,000 fee on future H-1B petitions of this type.

4.    ASU is a comprehensive public research university. ASU is a member of the Chamber of Commerce of the United States of America and of the Association of American Universities.

5.    ASU participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce, including international faculty.

6.    Since 2022, ASU has submitted forty-one H-1B visa petitions on behalf of international faculty that would have been subject to the $100,000 fee. These international faculty have filled critically important positions across our academic enterprise.

7.     As it has in the past, ASU intends to submit H-1B petitions in the next year and in future years to come in order to attract international talent to ASU's faculty. But for the Proclamation, ASU reasonably expects that it would submit H-1B petitions at roughly the same rate going forward.

8.     More specifically, based on prior years' experience and ASU's continued growth in its educational and research enterprises, ASU reasonably expects that, but for the Proclamation, it would submit approximately a dozen new H-1b petitions over the next 12 months in order to employ new teaching faculty who are presently outside the U.S.  Each of these new so-called "Consular Processing" H-1b petitions would be subject to the $100,000 fee.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025, at Tempe, Arizona

Nancy A. Gonzales

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>               Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et. al.,<br><br>               Defendants. | Case No. 1:25-cv-03675-BAH |

## DECLARATION OF PAUL W. HUGHES

I, Paul W. Hughes, declare as follows:

1.      I am a partner at McDermott Will & Schulte LLP and counsel for Plaintiff Chamber of Commerce of the United States of America (U.S. Chamber) in this action. I make this declaration based on my own personal knowledge and business records reasonably available to me in my role as counsel for the U.S. Chamber. If called as a witness, I could and would testify competently to the matters stated herein.

2.      Attached hereto as Exhibit 1 is a true and accurate copy of Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers,* 90 Fed. Reg. 46,027 (Sept. 19, 2025), also available at https://perma.cc/9MRK-QSZL.

3.      Attached hereto as Exhibit 2 is a true and accurate copy of a memorandum by U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B,* issued Sept. 20, 2025.

**JA161**

4.      Attached hereto as Exhibit 3 is a true and accurate copy of a memorandum by U.S. Customs and Border Protection, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*, issued Sept. 20, 2025.

5.      Attached hereto as Exhibit 4 is a true and accurate copy of a webpage on the United States Department of State website, *H-1B FAQ*, published September 21, 2025, downloaded from, https://perma.cc/KZ4E-4SHY.

6.      Attached hereto as Exhibit 5 is a true and accurate copy of a webpage on the U.S. Citizenship and Immigration Services website, *H-1B Specialty Occupations*, accessed on October 21, 2025, downloaded from https://perma.cc/39JB-994C.

7.      Attached hereto as Exhibit 6 is a true and accurate copy of *USCIS Fee Schedule* (Aug. 29, 2025), downloaded from https://perma.cc/U39L-CRRA.

8.      Attached hereto as Exhibit 7 is a true and accurate copy of *The H-1B Visa Program*, FWD.us (Jan. 27, 2025), downloaded from https://perma.cc/KN4A-9Y39.

9.      Attached hereto as Exhibit 8 is a true and accurate copy of *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce (Dec. 13, 2024), downloaded from https://perma.cc/ZMJ6-BNF5.

10.     Attached hereto as Exhibit 9 is a true and accurate copy of Association of American Medical Colleges, *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033* (June 2020), downloaded from perma.cc/36P9-PS2R.

11.     Attached hereto as Exhibit 10 is a true and accurate copy of Peter A. Kahn & Tova M. Gardin*, Distribution of Physicians With H-1B Visas By State and Sponsoring Employer*, JAMA: The Journal of the American Medical Association (June 6, 2017), downloaded from perma.cc/3FN5-FLE9.

12.     Attached hereto as Exhibit 11 is a true and accurate copy of American Immigration Council, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017), downloaded from https://perma.cc/SQG7-3Q4K.

13.     Attached hereto as Exhibit 12 is a true and accurate copy of Giovanni Peri, Kevin Shih, Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Citie*s, Journal of Labor Economics (July 2015), downloaded from https://perma.cc/N4GV-YJJ6.

14.     Attached hereto as Exhibit 13 is a true and accurate copy of Parag Mahajan et al., *The Impact of Immigration on Firms and Workers: Insights from the H-1B Lottery* (May 2025), downloaded from https://perma.cc/B7KN-288T.

15.     Attached hereto as Exhibit 14 is a true and accurate copy of Hao Jiang, et al., *Skilled Foreign Labor, Urban Agglomeration, and Value Creation* (February 19, 2025), downloaded from https://perma.cc/9VWK-592B.

16.     Attached hereto as Exhibit 15 is a true and accurate copy of Nicolas Morales, *Understanding the Potential Impact of H-1B Visa Program Changes*, Federal Reserve Bank of Richmond (Oct. 2025), downloaded from https://perma.cc/PWE5-25CU.

17.     Attached hereto as Exhibit 16 is a true and accurate copy of Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, Labour Economics (2019), downloaded from perma.cc/U39W-P2SZ.

18.     Attached hereto as Exhibit 17 is a true and accurate copy of *Chamber Litigation Center*, U.S. Chamber of Commerce (2025), downloaded from https://perma.cc/WH3T-JXRP.

19.     Attached hereto as Exhibit 18 is a true and accurate copy of *Topics: Immigration*, U.S. Chamber of Commerce, downloaded from https://perma.cc/S4TA-3ZJD.

20.     Attached hereto as Exhibit 19 is a true and accurate copy of U.S. Chamber of Commerce, Comment on *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program,*

*and Program Improvements Affecting other Nonimmigrant Workers* (Dec. 22, 2023), downloaded from https://perma.cc/NE9R-BRR4.

21.     Attached hereto as Exhibit 20 is a true and accurate copy of U.S. Chamber of Commerce, Comment on *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media* (Sept. 26, 2025), downloaded from https://perma.cc/5MJ6-Q973.

22.     Attached hereto as Exhibit 21 is a true and accurate copy of Nadia Almasalkhi, *High-Skilled Immigration Workers Benefit American Industry, But U.S. Policies Threaten Them*, Berkely Interdisciplinary Migration Initiative (September 11, 2023), downloaded from https://perma.cc/RUY2-GER6.

23.     Attached hereto as Exhibit 22 is a true and accurate copy of excerpted portions of National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration*, The National Academies Press (2017), downloaded from perma.cc/JU7U-LVJ2.

24.     Attached hereto as Exhibit 23 is a true and accurate copy of Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation, Cato at Liberty* (May 14, 2020), downloaded from perma.cc/SMW4-UUJT.

25.     Attached hereto as Exhibit 24 is a true and accurate copy of Cat Zakrzewski et al., *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025), downloaded from https://perma.cc/6QHY-CGA5.

26.     Attached hereto as Exhibit 25 is a true and accurate copy of *Major Initiatives: America Works Initiative*, U.S. Chamber of Commerce, downloaded from https://perma.cc/EG35-52F9.

27.     Attached hereto as Exhibit 26 is a true and accurate copy of U.S. Citizenship and Immigration Services, *H-1B Electronic Registration Process*, downloaded from https://perma.cc/P449-JGSY.

28.     Attached hereto as Exhibit 27 is a true and accurate copy of Stephen Dimmock et al., *Give Me Your Tired, Your Poor, Your High-Skilled Labor: H-1B Lottery Outcomes and Entrepreneurial Success* 68 Management Science 6950 (2021), downloaded from https://perma.cc/X5D9-JYF8.

29.     Attached hereto as Exhibit 28 is a true and accurate copy of Kelsy Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (2024), downloaded from https://perma.cc/6MEA-U2NF.

30.     I understand that the headquarters of Defendant the United States Department of Homeland Security, where Defendant the Secretary of Homeland of Security maintains her principal office, is in Washington, D.C. *See* United States Department of Homeland Security, *DHS Mailing Address*, available at https://perma.cc/Y65V-N3N7.

31.     I understand that the headquarters of Defendant the United States Department of State, where Defendant the Secretary of State maintains his principal office, is in Washington, D.C. *See, e.g.,* United States Department of States, *Contact Us – Office of the Legal Adviser*, available at https://perma.cc/L3RV-BBDS.

I declare under penalty of perjury that the foregoing is true and correct to best of my knowledge.


Dated: __October 24, 2025_____          _____
               Washington, DC                                      Paul W. Hughes

# EXHIBIT 1

# Presidential Documents

Proclamation 10973 of September 19, 2025

## Restriction on Entry of Certain Nonimmigrant Workers

By the President of the United States of America

A Proclamation

The H–1B nonimmigrant visa program was created to bring temporary workers into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor. The large-scale replacement of American workers through systemic abuse of the program has undermined both our economic and national security. Some employers, using practices now widely adopted by entire sectors, have abused the H–1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.

The number of foreign STEM workers in the United States has more than doubled between 2000 and 2019, increasing from 1.2 million to almost 2.5 million, while overall STEM employment has only increased 44.5 percent during that time. Among computer and math occupations, the foreign share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019. And the key facilitator for this influx of foreign STEM labor has been the abuse of the H–1B visa.

Information technology (IT) firms in particular have prominently manipulated the H–1B system, significantly harming American workers in computer-related fields. The share of IT workers in the H–1B program grew from 32 percent in Fiscal Year (FY) 2003 to an average of over 65 percent in the last 5 fiscal years. In addition, some of the most prolific H–1B employers are now consistently IT outsourcing companies. Using these H–1B-reliant IT outsourcing companies provides significant savings for employers: one study of tech workers showed a 36 percent discount for H–1B "entry-level" positions as compared to full-time, traditional workers. To take advantage of artificially low labor costs incentivized by the program, companies close their IT divisions, fire their American staff, and outsource IT jobs to lower-paid foreign workers.

Further, the abuse of the H–1B visa program has made it even more challenging for college graduates trying to find IT jobs, allowing employers to hire foreign workers at a significant discount to American workers. These effects of abuse of H–1B visas have coincided with increasing challenges in the labor market in which H–1B workers serve. According to a study from the Federal Reserve Bank of New York, among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively—more than double the unemployment rates of recent biology and art history graduates. Recent data reveals that unemployment rates among workers in computer occupations jumped from an average of 1.98 percent in 2019 to 3.02 percent in 2025.

Reports also indicate that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H–1B workers. One software company was approved

for over 5,000 H–1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees. Another IT firm was approved for nearly 1,700 H–1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July. A third company has reduced its workforce by approximately 27,000 American workers since 2022, while being approved for over 25,000 H–1B workers since FY 2022. A fourth company reportedly eliminated 1,000 jobs in February; it was approved for over 1,100 H–1B workers for FY 2025.

American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance. This suggests H–1B visas are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States.

The high numbers of relatively low-wage workers in the H–1B program undercut the integrity of the program and are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H–1B workers are concentrated. These abuses also prevent American employers in other industries from utilizing the H–1B program in the manner in which it was intended: to fill jobs for which highly skilled and educated American workers are unavailable.

The abuse of the H–1B program is also a national security threat. Domestic law enforcement agencies have identified and investigated H–1B-reliant outsourcing companies for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities to encourage foreign workers to come to the United States.

Further, abuses of the H–1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields. A 2017 study showed that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field.

It is therefore necessary to impose higher costs on companies seeking to use the H–1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers.

The severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response. I therefore find that the unrestricted entry into the United States of certain foreign workers who are described in section 1 of this proclamation would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Restriction on Entry*. (a) Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000—subject to the exceptions set forth in subsection (c) of this section. This restriction shall expire, absent extension, 12 months after the effective date of this proclamation, which shall be 12:01 a.m. eastern daylight time on September 21, 2025.

(b) The Secretary of Homeland Security shall restrict decisions on petitions not accompanied by a $100,000 payment for H–1B specialty occupation workers under section 101(a)(15)(H)(i)(b) of the INA, who are currently outside the United States, for 12 months following the effective date of this

proclamation as set forth in subsection (a) of this section. The Secretary of State shall also issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H–1B petitions that have an employment start date beginning prior to October 1, 2026.

(c) The restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H–1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States.

**Sec. 2.** *Compliance.* (a) Employers shall, prior to filing an H–1B petition on behalf of an alien outside the United States, obtain and retain documentation showing that the payment described in section 1 of this proclamation has been made.

(b) The Secretary of State shall verify receipt of payment of the amount described in section 1 of this proclamation during the H–1B visa petition process and shall approve only those visa petitions for which the filing employer has made the payment described in section 1 of this proclamation.

(c) The Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H–1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation.

**Sec. 3.** *Scope and Implementation of Restriction on Entry.* (a) The restriction on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation as set forth in section 1(a) of this proclamation.

(b) No later than 30 days following the completion of the H–1B lottery that immediately follows this proclamation, the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President and Homeland Security Advisor, a recommendation on whether an extension or renewal of the restriction on entry pursuant to section 1 of this proclamation is in the interests of the United States.

**Sec. 4.** *Amending the Prevailing Wage Levels.* (a) The Secretary of Labor shall initiate a rulemaking to revise the prevailing wage levels to levels consistent with the policy goals of this proclamation consistent with section 212(n) of the INA, 8 U.S.C. 1182(n).

(b) The Secretary of Homeland Security shall initiate a rulemaking to prioritize the admission as nonimmigrants of high-skilled and high-paid aliens, consistent with sections 101, 212, and 214 of the INA, 8 U.S.C. 1101, 1182, and 1184.

**Sec. 5.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this nineteenth day of September, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

[FR Doc. 2025–18601
Filed 9–23–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT 2



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

September 20, 2025

# Memorandum

TO:        Associate Directors,
             Deputy Associate Directors,
             Program Office Chiefs

FROM:   Joseph B. Edlow          JOSEPH B     Digitally signed by
                                             JOSEPH B EDLOW
             Director, United States Citizenship and Immigration Services    EDLOW    Date: 2025.09.20
                                                                                              17:26:38 -04'00'

SUBJECT:   Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, to address systemic abuse of H-1B nonimmigrant visas. Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions *are accompanied or supplemented* by a payment of $100,000. This guidance applies to H-1B employment-based petitions filed after 12:01 AM ET on September 21, 2025.

**This proclamation only applies prospectively to petitions that have not yet been filed.** The proclamation does not apply to aliens who: are the beneficiaries of petitions that were filed prior to the effective date of the proclamation, are the beneficiaries of currently approved petitions, or are in possession of validly issued H-1B non-immigrant visas. All officers of United States Citizenship and Immigration Services shall ensure that their decisions are consistent with this guidance. The proclamation does not impact the ability of any current visa holder to travel to or from the United States.

cc: David V. Roy, Chief Counsel (A)

# EXHIBIT 3



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and Border Protection**

September 20, 2025

MEMORANDUM FOR:    Executive Directors
                   Directors, Field Operations
                   Office of Field Operations

FROM:              Matthew S. Davies (b)(6);(b)(7)(c)
                   Executive Director, Admissibility and Passenger Programs
                   Office of Field Operations

SUBJECT:           Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* [H-1B]

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, to address systemic abuse of H1-B nonimmigrant visas. Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose *petitions are" accompanied or supplemented"* by a payment of $100,000. This guidance applies to H-1B employment-based petitions filed after 12:01 AM ET on September 21, 2025.

**This Proclamation only applies prospectively to petitions that have not yet been filed.** It does not impact aliens who are the beneficiaries of currently approved petitions, any petitions filed prior to 12:01 AM ET on September 21, 2025, or aliens in possession of validly issued H-1B non-immigrant visas. United States Citizenship and Immigration Services and the Department of State have been instructed to begin implementing the new monetary requirements for employers submitting petitions on behalf of aliens outside the United States for new H-1B petitions only. The Proclamation does not impact the ability of any current visa holder to travel to or from the United States. CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures. Aliens found inadmissible should be processed in alignment with existing guidance for the appropriate Title 8 disposition.

Please ensure this memorandum is distributed to port personnel. Should you require additional information, please contact (b)(6);(b)(7)(c) Director, Enforcement Programs Division.

For Official Use Only
Law Enforcement Sensitive

# EXHIBIT 4

# H-1B FAQ - United States Department of State

www.state.gov/h-1b-faq



[Skip to content](#)
An official website of the United States Government Here's how you know
**Official websites use .gov**

A **.gov** website belongs to an official government organization in the United States.
**Secure .gov websites use HTTPS**

A **lock ( )** or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.
Federal Government Shutdown

Due to the Democrat-led shutdown, website updates will be limited until full operations resume.

[Home](#)H-1B FAQ
hide

## H-1B FAQ

September 21, 2025

**JA177**

On Friday, September 19, 2025, President Donald J. Trump signed a Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," that took an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers.

This Proclamation:

- Requires a $100,000 payment to accompany any new H-1B visa petitions submitted after 12:01 a.m. eastern daylight time on September 21, 2025. This includes the 2026 lottery, and any other H-1B petitions submitted after 12:01 a.m. eastern daylight time on September 21, 2025.
- Authorizes the Department of Homeland Security and the Department of State to coordinate to take all necessary and appropriate action to implement this Proclamation.
  - U.S. Citizenship and Immigration Services has so far taken such action by issuing guidance regarding the Proclamation, available here .
  - U.S. Customs and Border Protection has also issued guidance, available here.
  - The Department of State has posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance.

This Proclamation does not:

- Apply to any previously issued H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on September 21, 2025.
- Does not change any payments or fees required to be submitted in connection with any H-1B renewals. The fee is a one-time fee on submission of a new H-1B petition.
- Does not prevent any holder of a current H-1B visa from traveling in and out of the United States.

Further steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include:

- A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers.
- A rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels.

Additional reforms are also under consideration and will be announced in the coming months.

**JA178**

# EXHIBIT 5

# H-1B Specialty Occupations

 **www.uscis.gov**/working-in-the-united-states/h-1b-specialty-occupations

October 20, 2025



Alert Type info

**ALERT:** On Sept. 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, an important initial step to reform the H-1B nonimmigrant visa program. Under the Proclamation, new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025 must be accompanied by an additional $100,000 payment as a condition of eligibility. Additional information is available in the "Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers" section below.

Alert Type info

**ALERT:** USCIS will process H-1B, H-2A, and H-2B related [Form I-129](#) petitions and CW-1 related [Form I-129CW](#) petitions during the government shutdown. We recognize, however, that the shutdown may affect a petitioner's ability to get required documentation (such as a labor condition application or a temporary labor certification from the U.S. Department of Labor), which may delay their ability to file Form I-129 or Form I-129CW.

If an H-1B, H-2A, H-2B, or CW-1 petitioner meets all other applicable requirements and submits evidence establishing that the primary reason they did not timely file an extension of stay or change of status request was due to the government shutdown, we will consider the government shutdown an extraordinary circumstance beyond the petitioner's control when we determine whether to excuse their failure to timely file the extension of stay or change of

**JA180**

status request. We will monitor the situation closely and publish additional guidance if needed. Find additional information in Vol. 2, Part A, Chapter 4 of the USCIS Policy Manual.

Alert Type info

**Alert:** We have received enough petitions to reach the congressionally mandated 65,000 H-1B visa regular cap and the 20,000 H-1B visa U.S. advanced degree exemption, known as the master's cap, for fiscal year 2026.

This nonimmigrant classification applies to people who wish to perform services in a specialty occupation, services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project, or services as a fashion model of distinguished merit or ability.

## Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, an important initial step to reform the H-1B nonimmigrant visa program. Under the Proclamation, certain H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025 must be accompanied by an additional $100,000 payment as a condition of eligibility.

### Who is subject to the $100,000 payment:

The Proclamation applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa. The Proclamation also applies if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests consular notification, port of entry notification, or pre-flight inspection for an alien in the United States.

In addition, if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests a change of status or amendment or extension of stay and USCIS determines that the alien is ineligible for a change of status or an amendment or extension of stay (e.g., is not in a valid nonimmigrant visa status or if the alien departs the United States prior to adjudication of a change of status request), the Proclamation will apply and the payment must be paid according to the instructions provided by USCIS.

The Proclamation does not apply to any previously issued and currently valid H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on September 21, 2025. In addition, the Proclamation does not prevent any holder of a current H-1B visa, or any alien beneficiary following petition approval, from traveling in and out of the United States.

The Proclamation also does not apply to a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, that is requesting an amendment, change of status, or extension of stay for an alien inside the United States where the alien is granted such

**JA181**

amendment, change, or extension. Further, an alien beneficiary of such petition will not be considered to be subject to the payment if he or she subsequently departs the United States and applies for a visa based on the approved petition and/or seeks to reenter the United States on a current H-1B visa.

**How to pay the $100,000 payment:**

Petitioners should submit the required $100,000 payment using pay.gov, following the instructions on pay.gov at the following link: https://www.pay.gov/public/form/start/1772005176.

**When to pay the $100,000 payment:**

Payment must be made prior to filing a petition with USCIS, as petitioners must submit proof that the payment has been scheduled from pay.gov or evidence of an exception from the $100,000 payment from the Secretary of Homeland Security at the time of filing the H-1B petition. Petitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied.

**Exceptions granted by the Secretary of Homeland Security:**

Exceptions to the $100,000 payment are granted by the Secretary of Homeland Security in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States. Petitioning employers who believe their alien worker satisfies this high threshold may seek an exception by sending their request and all supporting evidence to H1BExceptions@hq.dhs.gov.

**JA182**

## Eligibility Criteria

| Classification | General Requirements (among others) | Labor Condition Application Required? |
|---|---|---|
| H-1B Specialty Occupations | The occupation requires:<br><br>• Theoretical and practical application of a body of highly specialized knowledge; and<br>• Attainment of a bachelor's or higher degree in a directly related* specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.<br><br>The position must also meet one of the following criteria to qualify as a specialty occupation:<br><br>• A U.S. bachelor's or higher degree in a directly related specific specialty, or its equivalent, is normally the minimum entry requirement for the particular occupation;<br>• A U.S. bachelor's or higher degree in a directly related specific specialty, or its equivalent, is normally required to perform job duties in parallel positions among similar organizations in the employer's industry in the United States;<br>• The employer, or third party if the beneficiary will be staffed to that third party, normally requires a U.S. bachelor's or higher degree in a directly related specific specialty, or its equivalent, to perform the job duties of the position; or | Yes. The prospective petitioner must include evidence that a Form ETA-9035/9035E, Labor Condition Application (LCA) has been certified by the Department of Labor (DOL), with Form I-129, Petition for a Nonimmigrant Worker. See the DOL's Office of Foreign Labor Certification.<br><br>For more information see the Information for Employers and Employees page. |

**JA183**

| Classification | General Requirements (among others) | Labor Condition Application Required? |
|---|---|---|
| | • The specific duties of the offered position are so specialized, complex, or unique that the knowledge required to perform them is normally associated with the attainment of a U.S. bachelor's or higher degree in a directly related specific specialty, or its equivalent.*<br><br>For you to qualify to perform services in a specialty occupation you must meet one of the following criteria:<br><br>• Hold a U.S. bachelor's or higher degree required by the specialty occupation from an accredited college or university;<br>• Hold a foreign degree that is the equivalent to a U.S. bachelor's or higher degree required by the specialty occupation from an accredited college or university; or<br>• Hold an unrestricted state license, registration, or certification that authorizes you to fully practice the specialty occupation and be immediately engaged in that specialty in the state of intended employment.<br><br>Have education, specialized training, and/or progressively responsible experience that is equivalent to the completion of a U.S. bachelor's or higher degree in the specialty occupation, and have recognition of expertise in the specialty through progressively responsible positions directly related to the specialty.** | |

**JA184**

| Classification | General Requirements (among others) | Labor Condition Application Required? |
|---|---|---|
| H-1B2<br><br>DOD Researcher and Development Project Worker | The job must require a bachelor's or higher degree, or its equivalent, to perform the duties. The petition must be accompanied by:<br><br>1. A verification letter from the DOD project manager for the particular project stating that the beneficiary will be working on a cooperative research and development project or a coproduction project under a reciprocal government-to-government agreement administered by DOD. Details about the specific project are not required.<br>2. A general description of the beneficiary's duties on the particular project and the actual dates of the beneficiary's employment on the project.<br>3. A statement indicating the names of aliens currently employed on the project in the United States and their dates of employment and the names of aliens whose employment on the project ended within the past year.<br><br>To be eligible for this classification you must have a bachelor's or higher degree or its equivalent in the occupational field in which you will be performing services. This requirement can be met based on one of the following criteria:<br><br>• Hold a U.S. bachelor's or higher degree required by the duties from an accredited college or university | No. |

**JA185**

| Classification | General Requirements (among others) | Labor Condition Application Required? |
|---|---|---|
| | <ul><li>Hold a foreign degree that is the equivalent to a U.S. bachelor's or higher degree from an accredited college or university; or</li><li>Hold an unrestricted state license, registration, or certification that authorizes you to fully practice the duties of the job and be immediately engaged in that specialty in the state of intended employment</li><li>Have education, specialized training, or progressively responsible experience in the specialty that is equivalent to the completion a U.S. bachelor's or higher degree, and have recognition of expertise in the specialty through progressively responsible positions directly related to the specialty.**</li></ul> | |
| H-1B3<br><br>Fashion Model | The position/services must require a fashion model of prominence.<br><br>To be eligible for this visa category you must be a fashion model of distinguished merit and ability. | Yes. The prospective petitioner must include evidence that a Form ETA-9035/9035E, Labor Condition Application (LCA) has been certified by the Department of Labor (DOL), with the Form I-129. See the links to the Department of Labor's Office of Foreign Labor Certification. |

*For more information, see 8 CFR §214.2(h)(4)(iii)(A). For purposes of the specialty occupation criteria at paragraphs (h)(4)(iii)(A)(1) through (4), "normally" means conforming to a type, standard, or regular pattern, and is characterized by what is considered usual, typical, common, or routine. Normally does not mean always.

For purposes of the specialty occupation definition and criteria, "directly related" means that there is a logical connection between the required degree, or its equivalent, and the duties of the position. See 8 CFR § 214.2(h)(4)(ii).

**For more information see 8 CFR §214.2(h)(4)(iii)(C).

**JA186**

## H-1B Licensing

Some professions require an H-1B beneficiary to hold a state or local license authorizing the beneficiary to fully practice the specialty occupation.

If an occupation in the state of intended employment requires such a license, an H-1B beneficiary seeking classification in that occupation generally must have that license before the petition is approved, rather than at the time of filing the petition. See 8 CFR 214.2(h)(4) (v)(A)–(B). When a license is required, but there is no evidence of the beneficiary holding one, USCIS will generally issue a request for evidence of the required license.

## H-1B Electronic Registration Process

In 2020, we implemented an electronic registration process for the H-1B cap. We will not consider a cap-subject H-1B petition to be properly filed unless it is based on a valid, selected registration for the same beneficiary and the appropriate fiscal year, unless the registration requirement is suspended. For more information about the H-1B registration process, visit our H-1B Electronic Registration Process webpage.

## Petition Filing Process

**Step 1:** (only required for specialty occupation and fashion model petitions): Employer/Agent Submits LCA to DOL for Certification.
The employer/agent must apply for and receive DOL certification of an LCA. For further information regarding LCA requirements and DOL's process, see the Department of Labor's Foreign Labor Certification page.

**Step 2:** Employer/Agent Submits Completed Form I-129 to USCIS.
The employer/agent should file Form I-129, Petition for a Nonimmigrant Worker, at the correct location or online. Please see our I-129 Direct Filing Chart page. If subject to the Presidential Proclamation discussed above, the Form I-129 must be accompanied by either proof from pay.gov that the $100,000 payment has been scheduled for the specific beneficiary or by evidence of an exception from the $100,000 payment from the Secretary of Homeland Security. The DOL-certified LCA should also be submitted with the Form I-129 (only for specialty occupation and fashion models). See the instructions to the Form I-129 for additional filing requirements.

**Step 3:** Prospective Workers Outside the United States Apply for Visa and/or Admission.
If the Form I-129 petition is approved, the prospective H-1B worker who is outside the United States may apply with the U.S. Department of State (DOS) at a U.S. Embassy or Consulate abroad for an H-1B visa (if a visa is required). Regardless of whether a visa is required, the prospective H-1B worker must then apply to U.S. Customs and Border Protection (CBP) for admission to the United States in H-1B classification.

**JA187**

## Labor Condition Application (LCA)

Prospective specialty occupation and distinguished fashion model employers/agents must obtain a certification of an LCA from the DOL. This application includes certain attestations, a violation of which can result in fines, bars on sponsoring nonimmigrant or immigrant petitions, and other sanctions to the employer/agent. The application requires the employer/agent to attest that it will comply with the following labor requirements:

- The employer/agent will pay the H-1B worker a wage that is no less than the wage paid to similarly qualified workers or, if greater, the prevailing wage for the position in the geographic area in which the H-1B worker will be working.
- The employer/agent will provide working conditions that will not adversely affect other similarly employed workers.
- At the time of the labor condition application there is no strike or lockout at the place of employment.
- Notice of the filing of the labor condition application with the DOL has been given to the union bargaining representative or has been posted at the place of employment.

## Period of Stay

As an H-1B specialty occupation worker, you may generally be admitted for a period of up to 3 years. This initial period of admission may generally be extended for an additional period of up to 3 years, for a total period of admission of 6 years. If you possess a controlling interest in the petitioning organization or entity, meaning you own more than 50% of the petitioner or have majority voting rights in the petitioner, the approval of your initial petition and your first extension petition will each be limited to a validity period of up to 18 months.

However, you may be eligible for an H-1B extension beyond the sixth year under 8 CFR 214.2(h)(13)(iii)(E) if you are the beneficiary of an approved immigrant visa petition under the EB-1, EB-2, or EB-3 classifications, and are eligible to be granted that immigrant status but for application of the per country or worldwide limitations on immigrant visas. Petitioners must demonstrate the visa is not available as of the date they file an H-1B petition with USCIS. We may grant extensions on this basis in up to 3-year increments until we make a final decision to revoke the approval of the immigrant visa petition or to approve or deny your application for an immigrant visa or application to adjust status to lawful permanent residence.

Alternatively, under 8 CFR 214.2(h)(13)(iii)(D), you may be eligible for an H-1B extension beyond the sixth year if at least 365 days have passed since a labor certification was filed with the Department of Labor on your behalf (if such certification is required) or an immigrant visa petition was filed with USCIS on your behalf.

**JA188**

You are ineligible for this extension beyond the sixth year if you fail to file an adjustment of status application or apply for an immigrant visa within 1 year of an immigrant visa being available. If the accrual of such 1-year period is interrupted by the unavailability of an immigrant visa, you will have a new 1-year period after an immigrant visa again becomes immediately available, during which you generally must file an adjustment of status application or apply for an immigrant visa. We may, in our discretion, excuse a failure to file an adjustment of status application or apply for an immigrant visa within 1 year of an immigrant visa being available if your employer establishes that the failure to apply was due to circumstances beyond your control. When considering whether to excuse a failure to timely file within 1 year, we will look at the totality of the circumstances, which may include:

- whether there was a change of employment;
- whether the change of employment was voluntary;
- when and why the employment with the original employer ended; and
- what steps you and your new employer took after the change of employment to file an adjustment of status application or apply for an immigrant visa.

We may excuse a failure to timely file in cases of both voluntary and involuntary change of employment when considering the totality of the circumstances. We may grant extensions under this provision in up to 1-year increments until the approved permanent labor certification expires or a final decision has been made to:

- deny the application for permanent labor certification, or, if approved, to revoke or invalidate the approval;
- deny the immigrant visa petition, or, if approved, revoke the approval;
- deny or approve your application for an immigrant visa or application to adjust status to lawful permanent residence; or
- administratively or otherwise close the application for permanent labor certification, immigrant visa petition, or application to adjust status.

Your employer will be liable for the reasonable costs of your return transportation if they terminate your employment before the end of your period of authorized stay. Your employer is not responsible for the costs of your return transportation if you voluntarily resign from your position. For more information, please see Options for Nonimmigrant Workers Following Termination of Employment.

## H-1B Cap

The H-1B classification has an annual numerical limit (cap) of 65,000 new statuses/visas each fiscal year (with certain deductions and additions based on H-1B1 set asides and usage). An additional 20,000 petitions filed on behalf of beneficiaries who have earned a master's degree or higher from a U.S. institution of higher education are exempt from the

**JA189**

cap. Additionally, H-1B workers who are petitioned for or employed at an institution of higher education or its affiliated or related nonprofit entities, a nonprofit research organization, or a government research organization, are not subject to this numerical cap.

For further information about the numerical cap, see our H-1B Cap Season page.

## Changing Employers or Employment Terms with the Same Employer (Portability)

### Changing Employers

**When can I begin working for a new H-1B employer if I change employers?**

- If you are changing H-1B employers, you may begin working for the new employer as soon as they properly file a non-frivolous Form I-129 petition on your behalf, or as of the requested start date on that petition, whichever is later.
- To be eligible for portability, you must not have been employed without authorization from the time of your last admission into the United States, and your new employer must properly file a new, non-frivolous petition before your H-1B period of authorized stay expires.

**Will I still have employment authorization if I change employers?**

- If you are eligible for H-1B portability, your employment is authorized until USCIS has made a decision on the Form I-129.
- If the new I-129 petition is approved, you may continue working for the new employer for the period of time indicated on the new petition approval.
- If the new petition is denied, you may continue working for your previous employer if your prior period of authorized employment is still valid, but your authorization to work based on portability ceases upon denial of the petition.
- If you are laid off, fired, quit, or otherwise cease employment with your previous employer, you may have up to 60 consecutive days or until the end of your authorized validity period, whichever is shorter, to find new employment, change status, or depart the country.

**Can I move from cap-exempt to cap-subject employment?**

- If you are moving from cap-exempt to cap-subject employment, your new employer's H-1B petition will be subject to the H-1B cap. If subject to the cap, your new employer must first submit an electronic registration when registration period opens. This is typically in March.

**JA190**

- If more unique beneficiaries are registered than projected as needed to meet the cap for a given fiscal year, unique beneficiaries of properly submitted registrations will be randomly selected. All registrants of selected beneficiaries will be notified of selection and selection notices will be uploaded to their account informing them that they may file a petition for the beneficiary named in the selection notice during the applicable filing period.  H-1B cap petitions must have a start date of Oct. 1 (or later) of the applicable fiscal year and may not be filed more than 6 months before the requested start date on the petition.
- If you are currently employed in a cap-exempt position, you may engage in concurrent employment in a cap-subject position as long as you will continue to be employed in the cap-exempt position. You may begin working concurrently for the cap-subject employer as soon as they properly file a non-frivolous Form I-129 petition on your behalf, or as of the requested start date on that petition, whichever is later. As long as you continue your cap-exempt employment, were previously counted toward the cap, or otherwise remain cap exempt, you will not become subject to the H-1B cap again during the same H-1B validity period.

## Changing Employment Terms with the Same Employer

**What if I want to start new employment or change employment terms with my current employer?**

- Form I-129 is also used to request new employment or a change of employment with the same employer.
- If your current H-1B employer properly files a non-frivolous Form I-129 requesting new employment or a change of employment on your behalf, you are authorized to work according to the terms of the new or changed employment once that petition is filed, or as of the requested start date on that petition, whichever is later.

### Family of H-1B Nonimmigrants

Your spouse and unmarried children under 21 years of age may seek admission in the H-4 nonimmigrant classification. Certain H-4 dependent spouses of H-1B nonimmigrants can file Form I-765, Application for Employment Authorization, as long as the H-1B nonimmigrant has already started the process of seeking employment-based lawful permanent resident status. Please visit our [Employment Authorization for Certain H-4 Dependent Spouses](#) page to learn more.

### More Information

**JA191**

# EXHIBIT 6



**Fee Schedule**

**Department of Homeland Security**          **USCIS**
U.S. Citizenship and Immigration Services          **Form G-1055**

### U.S. Citizenship and Immigration Services
### Fee Schedule

The table below presents the fees, currently in effect, for all U.S. Citizenship and Immigration Services (USCIS) forms. Each application, petition, or re uest must be accompanied by the correct fee(s) unless you are exempt from paying the fee(s) or are eligible for a fee waiver. If the fee is incorrect, the application, petition, or re uest will be re ected.

**Filing Online**

 ou may file certain forms online as indicated in the table below. If you file your form online (see uscis.gov file-online), the system will guide you through the process of paying your fees with a credit, debit, or pre-paid card. Bank account withdrawals are also available when paying online. There is often a $50 discount when filing a form online.

**Filing by Mail**

If you are filing your application, petition, or re uest by mail, please visit our website for filing guidance, at uscis.gov forms filing-guidance tips-for-filing-forms-by-mail. Fees for applications or petitions can be paid by check, money order, ACH debit, or credit card:

**1) Payments by Checks or Money Orders.** ou may pay fees with bank drafts, cashier s checks, certified checks, personal checks, and money orders that are drawn on U.S. financial institutions and payable in U.S. funds. Make the check or money order payable to U.S. Department of Homeland Security, do not use the initials USDHS or DHS. enerally, you must mail your check or money order together with your application or petition. Use a separate check or money order for each application or petition you submit. Do not combine the filing fees for multiple applications or petitions into one check or money order. If paying by check or money order for a single form that re uires multiple fees, pay each fee with a separate check or money order, unless noted otherwise below or in the form instructions.

**NOTE:** If you send USCIS a check, we will convert it into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check. The debit from your account will usually take 2 hours and your bank will show it on your regular account statement. ou will not receive your original check back. We will destroy your original check but will keep a copy of it. If USCIS cannot process the EFT for technical reasons, you authorize us to process the copy in place of your original check. If your check is returned as unpayable, we may re ect your application, petition, or re uest.

**2) Payments by Credit Card.** ou may pay your fee(s), using a credit card. Please see **Form G-1450** (uscis.gov g-1 50), Authorization for Credit Card Transactions, for more information.

**3) Payments by Automated Clearing House (ACH).** ou may pay your fee(s) by electronic funds transfer (EFT). Please see **Form G-1650 (uscis.gov/g-1650)**, Authorization for ACH Transactions, for more information.

**Filing at a USCIS Office**

If you are filing your application or petition at a USCIS office cash, a cashier s check or money order cannot be used to pay for the filing and or biometric services fee. The only payment options accepted at an USCIS office are payment through pay.gov via a credit card, debit card or with a personal check.

**Fees required under Public Law 119-21 (Pub. L. 119-21)**

Certain forms have an additional fee re uired along with any filing fee and are listed in the tables below. These fees are not waivable and must be paid by separate payment concurrent with any filing fee. If there is no filing fee for the form or you have applied for a fee waiver (see below) for the form s filing fee, you must still pay the additional fee mandated by Pub. . 119-21.

**NOTE:** Pub. . 119-21 fees ad ust each year as re uired by law.

**Fee Waivers**

Certain filers may  ualify for a fee waiver for certain forms. See Form I-912, Re uest for Fee Waiver, at uscis.gov i-912 to determine if you are eligible for a fee waiver. If you are not eligible for a fee waiver, you must submit the correct fee(s). For most applications, you cannot re uest a fee waiver when filing online.  ou must file paper versions of Form I-912, or your written re uest for a fee waiver, and the form for which you are re uesting a fee waiver.  ou may **not** re uest a fee waiver of the immigration fees re uired by **Pub. L. 119-21**. However, you may re uest a waiver of the filing fee set by USCIS, if otherwise eligible, while submitting the fee re uired by Pub. . 119-21.

**Fee Exemptions**

Fee-exempt forms and filing categories list $0 as the Filing Fee.  ou do not need file Form I-912 or make a formal re uest to  ualify for a fee exemption. However, the fee exemptions in this schedule only indicate that the form is free to file. They do not indicate eligibility to file those benefit re uests in all circumstances. Eligibility to file a particular benefit re uest is set forth in the applicable regulations and form instructions.

**How to Use the Table Below:**

 ou may search for a specific form by entering a form number, a form name, or a fee in the search box. The forms listed below are generally ordered alphabetically, in ascending order. Forms with various filing fees will be listed more than once to display the different fees for each filing purpose.

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **USCIS Immigrant Fee** (uscis.gov forms filing-fees uscis-immigrant-fee) | If you are immigrating to the United States as a lawful permanent resident. | $2 5 |
| | Children who enter the United States under the orphan or Hague adoption programs. | $0 |
| | Ira i and Afghan special immigrants | $0 |
| | Returning lawful permanent residents (SB-1s) | $0 |
| | nonimmigrants | $0 |
| **Claimant under INA 289, American Indian Born in Canada** | **General filing** | $0 |
| **AR-11 Alien's Change of Address Card** (uscis.gov ar-11) | **General filing** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **EB-5 Integrity Fund Fee** (uscis.gov integrityfund) | Annual Integrity Fund Fee for regional centers with over 20 total investors in the preceding fiscal year. | $20,000 |
| | Annual Integrity Fund Fee for regional centers with 20 or fewer total investors in the preceding fiscal year. | $10,000 |
| **EOIR-29** **Notice of Appeal to the Board of Immigration Appeals from a Decision of a DHS Officer** (uscis.gov eoir-29) | **General filing** | $1,010 |
| **EOIR-40** **Application for Suspension of Deportation** ( ustice.gov eoir eoir-forms) | **General filing** <br><br> **Additional Fee:** Biometric Services Fee | $ 00 plus additional fee <br><br> $ 0 per person |
| **EOIR-42A** **Application for Cancellation of Removal for Certain Permanent Residents** ( ustice.gov eoir eoir-forms) | **General filing** <br><br> **Additional Fee:** Biometric Services Fee | $ 00 plus additional fee <br><br> $ 0 per person |
| **EOIR-42B** **Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents** ( ustice.gov eoir eoir-forms) | **General filing** <br><br> **Additional Fee:** Biometric Services Fee | $1, 00 plus additional fee <br><br> $ 0 per person |
| **G-28** **Notice of Entry of Appearance as Attorney or Accredited Representative** (uscis.gov g-28) | **General filing** | $0 |
| **G-28I** **Notice of Entry of Appearance as Attorney in Matters Outside the Geographical Confies of the United States** (uscis.gov g-28i) | **General filing** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **G-325A**<br>**Biographical Information**<br>**(for Deferred Action)**<br>(uscis.gov g-25a) | **Initial and Subsequent Request** | Paper Filing: $0 |
| | If you are selecting    es  in **Part 3.**, **Item Number 1.** to re uest an EAD upon approval of Deferred Action and you are applying under:<br>    abor Investigation-Based ( IB DA)<br>    Spouse, Widower(er), Parent, Son, or Daughter of Active Duty Service member of the U.S. armed forces or Individual in the Selected Reserve of the Ready Reserve (MI DA)<br>    Spouse, Widower(er), Parent, Son, or Daughter of Individual (Whether  iving or Deceased) who Previously Served on Active Duty Service or in the Selected Reserve of the Ready Reserve (MI DA)<br>    Medical or Humanitarian<br>    Statelessness<br>      overnment Referral (Other than  abor Agency)<br>    Other<br><br>**Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** (uscis.gov i-912) | Paper Filing: $520 |
| | If you are selecting **Part 3.**, **Item Number 1.** to re uest an EAD upon approval of Deferred Action and you are applying under:<br>    Special Immigrant Juvenile (SIJ DA) | Paper Filing: $0 |
| **G-325R**<br>**Biographic Information**<br>**(Registration)**<br>(uscis.gov forms all-forms g-25r) | **General filing** | Online Filing: $0 |
| **G-639**<br>**Freedom of Information/**<br>**Privacy Act Request**<br>(uscis.gov about-us freedom-information-and-privacy-act-foia) | **General filing** | USCIS will notify you if a fee must be submitted after we review your re uest |
| **G-845**<br>**Verification Request**<br>(uscis.gov g-8 5) | **General filing** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **Form G-845 Supplement, Verification Request** (uscis.gov g-8_5-supplement) | **General filing** | $0 |
| **G-884 Request for the Return of Original Dcouments** (uscis.gov g-88_ ) | **General filing** | $0 |
| **G-1041 Genealogy Index Search Request** (uscis.gov g-10_1) | **General filing** | Paper Filing: $80 Online Filing: $ 0 |
| **G-1041A Genealogy Records Request** (uscis.gov g-10_1a) | **General filing** | Paper Filing: $80 Online Filing: $ 0 |
| **G-1145 e-Notification of Application/Petition Acceptance** (uscis.gov g-11_5) | **General filing** | $0 |
| **G-1450 Authorization for Credit Card Transactions** (uscis.gov g-1_50) | **General filing** | $0 |
| **G-1566 Request for a Certificate of Non-Existence** (uscis.gov g-15_ ) | **General filing** | Paper Filing: $ 0 Online Filing: $280 |
| **G-1650 Authorization for ACH Transactions** (uscis.gov g-1_50) | **General filing** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **H-1B Registration Tool** ([uscis.gov working-in-the-united-states temporary-workers h-1b-specialty-occupations-and-fashion-models h-1b-electronic-registration-process](#)) | **General filing** | $215 **(per beneficiary)** |
| **I-9 Employment Eligibility Verification** ([uscis.gov i-9](#)) | **General filing** | $0 |
| **I-90 Application to Replace Permanent Resident Card** ([uscis.gov i-90](#)) | **General filing, unless noted below.** | Paper Filing: $   5 Online Filing: $  15 |
| | If you have reached your 1 th birthday and your existing card will expire **before** your 1 th birthday. | Paper Filing: $   5 Online Filing: $  15 |
| | If you have reached your 1 th birthday, and your existing card will expire **after** your 1 th birthday. | $0 |
| | If you are filing because we issued your previous card, but you never received it, and it was returned as undeliverable to USCIS. | $0 |
| | If you are filing because we issued the card with incorrect information because of a Department of Homeland Security (DHS) error. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** ([uscis.gov i-912](#)) | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-102**<br>**Application for**<br>**Replacement/Initial**<br>**Nonimmigrant Arrival-**<br>**Departure Document**<br>(uscis.gov i-102) | **General filing, unless noted below.** | $5 0 |
| | If you are filing because you were not issued Form I-9  when you were admitted by U.S. Customs and Border Protection (CBP) at a port-of-entry in the United States (whether at a land border, airport, or seaport). Select **Part 2., Item Number 1.e.** | $5 0 |
| | If you are filing to correct your Form I-9 , I-9 W, or Form I-95 through no fault of your own and you were admitted to the United States by CBP at an airport or seaport after April  0, 201  and were issued an electronic Form I-9  by CBP, or you re uire a replacement paper Form I-9  issued by CBP, and you cannot obtain your Form I-9  from the CBP website. Select **Part 2., Item Number 1.f.** | $0 |
| | If you are filing as a nonimmigrant member of the U.S. armed forces. Select **Part 2., Item Number 1.g.** | Initial Re uest $0<br>Subse uent Re uest $5 0 |
| | If you are filing as a participant in a North Atlantic Treaty Organization (NATO) armed forces or civil component. | Initial Re uest $0<br>Subse uent Re uest $5 0 |
| | If you are filing as a nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement (SOFA). | Initial Re uest $0<br>Subse uent Re uest $5 0 |
| | If you are filing for a replacement for DHS error. Select **Part 2., Item Number 1.f.** | $0 |
| **I-129**<br>**Petition for a**<br>**Nonimmigrant Worker**<br>(uscis.gov i-129) | **Varies** | See Appendix A: I-129 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-129CW** **Petition for a CNMI-Only Nonimmigrant Transitional Worker** (uscis.gov i-129cw) | **General filing, unless noted below.** | $1,015 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $510 plus additional fees |
| | **Additional Fees:** 1.  Asylum Program Fee a. If you are filing as a Regular Petitioner b. If you are filing as a Nonprofit c. If you are filing as a Small Employer If paying by check or money order, submit the fee separately. 2.  Pub.  . 110-229 re uires you to pay a supplemental educational funding fee per beneficiary, per year. This fee cannot be waived.  If paying by check or money order, submit the fee separately. .  Pub.  . 110-229, as revised by the Northern Mariana Islands U.S. Workforce Act of 2018, re uires you to pay the Fraud Prevention and Detection Fee for each petition.  This fee cannot be waived.  If paying by check or money order, submit the fee separately. | a. $ 00 b. $0 c. $ 00 2. $210 per beneficiary, per year .  $50 |
| | **Certain petitioners may be eligible for a Fee Waiver of the General filing fee.** **See Form I-912 Instructions** (uscis.gov i-912) | $0 plus additional fees |
| **I-129CWR** **Semiannual Report for CW-1 Employers** (uscis.gov i-129cwr) | **General filing** | $0 |
| **I-129F** **Petition for Alien Fiancé(e)** (uscis.gov i-129f) | **General filing, unless noted below.** | $  5 |
| | For  -  status based on the Form I-1 0, Petition for Alien Relative (uscis.gov i-1  0), you filed. | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-129S**<br>**Nonimmigrant Petition Based on Blanket L Petition**<br>(uscis.gov i-129s) | **General filing** | $0<br>plus additional fees, if applicable |
| | **Additional Fees:**<br><br>1. **Fraud Prevention and Detection Fee**<br>  The  -1 Visa Reform Act of 200  re uires some petitioners to submit a **$500** Fraud Prevention and Detection Fee.<br><br>  **a. Visa Applications filed with the U.S. Department of State.** The Secretary of State will collect the **$500** fee from the petitioner through a beneficiary:<br><br>    i. Who applies at a U.S. Embassy or U.S. Consulate for an   -1 visa  and<br><br>    ii. On whose behalf the petitioner is seeking  -1 approval based on an approved blanket petition.<br><br>  *Submit the fee in a separate check or money order to the Department of State.*<br><br>  **b. Visa-Exempt Petitions filed with DHS (USCIS or U.S. Customs and Border Protection).** The Secretary of Homeland Security will collect the **$500** fee from a petitioner who seeks:<br>    i. Initial approval of   -1 classification for a beneficiary  or<br>    ii. Approval of an    nonimmigrant to continue employment with an entity different from the previous petitioner.<br><br>  *Submit the fee in a separate check or money order to the Department of Homeland Security.*<br><br>  The **Fraud Prevention and Detection Fee**, when applicable, may not be waived and is not refundable, regardless of any action taken on the petition. | 1. $500 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | **2. Public Law 114-113 Fee**<br>Public Law (Pub. L.) 11 -11 re uires some petitioners filing an -1 petition to pay a **$4,500** fee. Petitioners must pay this fee if:<br><br>**a.** They are re uired to pay the $500 Fraud Prevention and Detection fee<br>**b.** They employ 50 or more individuals in the United States<br>**c.** More than 50 percent of those employees are in H-1B, -1A, or -1B nonimmigrant status **and**<br>**d.** The petition is filed before October 1, 202 .<br><br>The **Pub. L. 114-113 Fee**, when applicable, may not be waived and is not refundable, regardless of any action taken on the petition.<br><br>*Submit the fee in a separate check or money order to the Department of Homeland Security.* | 2. $ ,500 |
| **I-130**<br>**Petition for Alien Relative**<br>(uscis.gov i-1 0) | **General filing, unless otherwise noted below.** | Paper Filing: $ 5<br>Online Filing: $ 25 |
| **I-131**<br>**Application for Travel Documents, Parole Documents, and Arrival/ Departure Records**<br>(uscis.gov i-1 1) | **Varies** | See Appendix B: I-1 1 |
| **I-131A**<br>**Application for Carrier Documentation**<br>(uscis.gov i-1 1a) | **General filing, unless noted below.**<br>ou must pay the fee online (my.uscis.gov accounts travel-document start overview) | $5 5 |
| | If you are a refugee, a person paroled as a refugee, or a lawful permanent resident who obtained such status as a refugee in the United States. | $0 |
| **I-134**<br>**Declaration of Financial Support**<br>(uscis.gov i-1 ) | **General filing** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-140**<br>**Immigrant Petition for Alien Workers**<br>(uscis.gov i-1_0) | **General filing** | $ 15<br>plus additional fees, if applicable |
| | **Additional Fees:**<br>　1.  Asylum Program Fee<br>　　　a. If you are filing as a Regular Petitioner<br>　　　b. If filing as a Nonprofit<br>　　　c. If filing as a Small Employer or self-petitioner<br><br>If paying by check or money order, submit the fee separately. | a. $  00<br>b. $0<br>c. $  00 |
| **I-191**<br>**Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)**<br>(uscis.gov i-191) | **General filing** | $9  0 |
| | Certain applicants may be eligible for a Fee Waiver.<br>See **Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **I-192**<br>**Application for Advance Permission to Enter as a Nonimmigrant**<br>(uscis.gov i-192) | **General filing, unless noted below.** | $1,100 |
| | If you are filing as a petitioner for U nonimmigrant status (including derivatives). | $0 |
| | If you are filing as an applicant for T nonimmigrant status (including derivatives). | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
|  | If filing with U.S. Customs and Border Protection (CBP). **If you are applying to CBP, use the following guidelines for the Form I-192 filing fee:**<br><br>**1.** We recommend that you contact the CBP Port of Entry where you intend to be processed for payment instructions. Please visit the CBP website at **cbp.gov** (go to the search box and type  Form I-192,   I-192,   192,  or  waiver ).<br><br>**2. Special Instructions for Citizens of Palau, the Federated States of Micronesia, or the Marshall Islands**.   ou may contact the nearest U.S. Embassy or U.S. Consulate to receive payment instructions.   ou may also receive instructions by emailing the CBP Admissibility Review Office (ARO) at: **aroinquirywaiver@cbp.dhs.gov**. | $1,100 |
|  | **Certain applicants may be eligible for a Fee Waiver.** See Form I-912 Instructions (uscis.gov i-912) | $0 |
| **I-193**<br>**Application for Waiver of Passport and/or Visa**<br>(uscis.gov i-19 ) | **General filing, unless noted below.** | $ 95 |
|  | If you are filing as a petitioner for U nonimmigrant status (including derivatives). | $0 |
|  | If you are filing as an applicant for T nonimmigrant status (including derivatives). | $0 |
|  | Certain applicants may be eligible for a Fee Waiver. See **Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **I-212**<br>**Application for Permission to Reapply for Admission Into the United States After Deportation or Removal**<br>(uscis.gov i-212) | **General filing, unless noted below.** | $1,1 5 |
|  | If you are applying for a nonimmigrant visa, you may contact the U.S. Consulate with  urisdiction over your nonimmigrant visa to receive payment instructions. | $1,1 5 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are applying with the Department of Justice, Executive Office for Immigration Review (EOIR) during removal proceedings, you must submit the payment as instructed by the immigration court with  urisdiction over your case.  For information about EOIR, visit EOIR s website at usdo .gov eoir. | $1,1 5 |
| | If you are applying with U.S. Customs and Border Protection (CBP) at a Port of Entry, use the following guidelines for the Form I-212 filing fee:<br><br>**1.** We recommend that you contact the CBP Port of Entry where you intend to be processed for payment instructions. Please visit the CBP website at cbp.gov (go to the search box and type  Form I-212,  I-212,  212,  or  waiver ).<br><br>**2.**  If you are a citizen of Palau, the Federal States of Micronesia, or the Marshall Islands, you may contact CBP at  uam Port of Entry or the nearest U.S. Embassy or U.S. Consulate to receive payment instructions. To locate the U.S. Embassy or U.S. Consulate, visit the Department of State s website at **state.gov**. | $1,1 5 |
| | If you are filing with USCIS as a person seeking or granted special immigrant visa or status as:<br>　An Afghan or Ira  i translator or interpreter<br>　An Ira  i national employed by or on behalf of the U.S.<br>　  overnment<br>　An Afghan national employed by or on behalf of the<br>　U.S.   overnment or employed by the International<br>　Security Assistance Force (ISAF)  or<br>　A derivative beneficiary of one of the above. | $0 |
| | If you are filing with USCIS as a person seeking or granted ad ustment of status as an abused spouse or child under the Cuban Ad ustment Act (CAA) or the Haitian Refugee Immigration Fairness Act (HRIFA). | $0 |
| | If you are filing with USCIS as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions (uscis.gov i-912)** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-290B**<br>**Notice of Appeal or Motion**<br>(uscis.gov i-290b) | **General filing, unless noted below.** | $800 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification (only if filed for any benefit re uest filed before ad usting status or a motion filed for Form I- 85 and an associated ancillary form). | $0 |
| | If you are filing as a person seeking or granted T nonimmigrant status (including derivatives) (only if filed for any benefit re uest filed before ad usting status or for Form I- 85 and an associated ancillary form). | $0 |
| | If you are filing as a petitioner for U nonimmigrant status (including derivatives) (only if filed for any benefit re uest filed before ad usting status or for Form I- 85 and an associated ancillary form). | $0 |
| | If you are filing as a person seeking or granted special immigrant visa or status as:<br>    An Afghan or Ira i translator or interpreter<br>    An Ira i national employed by or on behalf of the U.S.     overnment<br>    An Afghan national employed by or on behalf of the U.S.    overnment or employed by the International Security Assistance Force (ISAF)  or<br>    A derivative beneficiary of one of the above.<br><br>If Form I-290B is filed for any benefit re uest filed before ad usting status or a motion filed for a Form I- 85. | $0 |
| | If this is the first I-290B filing for a parole re uest (Form I-1 1) filed on behalf of a national of Afghanistan outside the U.S., and that parole re uest was denied between August 1, 2021, and September  0, 202 . | $0 |
| | If you are filing as a person seeking or granted ad ustment of status as an abused spouse or child under the Cuban Ad ustment Act (CAA) - if Form I-290B is filed for any benefit re uest filed before ad ustment of status or a motion filed on an Application to Register Permanent Residence or Ad ust Status (Form I- 85). | $0 |
| | If you are filing as a person seeking or granted ad ustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA) - if Form I-290B is filed for any benefit re uest filed before ad ustment of status or a motion filed on an Application to Register Permanent Residence or Ad ust Status (Form I- 85). | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are filing as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives):<br>    For any benefit re uest filed before ad ustment of status, a motion on an Application to Register Permanent Residence or Ad ust Status (Form I- 85), or an associated ancillary form. | $0 |
| | If you are a conditional permanent resident filing a waiver of the oint filing re uirement (Form I- 51) based on battery or extreme cruelty. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions (**uscis.gov i-912**)** | $0 |
| **I-356**<br>**Request for Cancellation of Public Charge Bond**<br>(uscis.gov i- 5 ) | **General filing** | $0 |
| **I-360**<br>**Petition for Amerasian, Widow(er), or Special Immigrant**<br>(uscis.gov i-  0) | **General filing, unless noted below.** | $515 |
| | If you are filing for or as an Amerasian special immigrant. | $0 |
| | If you are self-petitioning under Violence Against Women Act (VAWA) as an abused spouse or child of a U.S. citizen or lawful permanent resident, or an abused parent of a U.S. citizen son or daughter. | $0 |
| | If you are filing as a Special Immigrant Juvenile.<br><br>**Additional Fee:** Pub. . 119-21 Fee | $0 plus additional fee<br><br>$250 |
| | If you are filing as an:<br>    Afghan or Ira i national who worked with the U.S. armed forces as a translator or interpreter, or the surviving spouse and children of a deceased principal<br>    Ira i national who worked for or on behalf of the U.S. overnment in Ira , or the surviving spouse and children of a deceased principal or<br>    Afghan national who worked for or on behalf of the U.S. overnment or the International Security Assistance Force (ISAF) in Afghanistan, or the surviving spouse and children of a deceased principal. | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are a filing as a person who served honorably on active duty in the U.S. armed forces filing under the Immigration and Nationality Act (INA) section 101(a)(2 )( ). | $0 |
| **I-361**<br>**Affidavit of Financial Support and Intent to Petition for Legal Custody of Public Law 97-359 Amerasian**<br>([uscis.gov i- 1](uscis.gov)) | **General filing** | $0 |
| **I-363**<br>**Request to Enforce Affidavit of Financial Support and Intent to Petition for Custody for Public Law 97-359 Amerasian**<br>([uscis.gov i-](uscis.gov)) | **General filing** | $0 |
| **I-407**<br>**Record of Abandonment of Lawful Permanent Resident Status**<br>([uscis.gov i- 0](uscis.gov)) | **General filing** | $0 |
| **I-485**<br>**Application to Register Permanent Residence or Adjust Status for applicant over the age of 14** ([uscis.gov i- 85](uscis.gov)) | **General filing, unless noted below.**<br><br>**Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub. . 119-21) | $1, 0<br><br>$1,500 |
| | If under 1 years of age and submitting Form I- 85 concurrently with the Form I- 85 of one parent.<br><br>**Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub. . 119-21) | $950<br><br>$1,500 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are filing as an applicant who served honorably on active duty in the U.S. armed forces and who is filing under INA section 101(a)(2 )( ). Select **Part 2.**, **Item Number 3.c.**: Certain U.S. Armed Forces Members (also known as the Six and Six program) (does not include non-military derivative spouses or children). | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub.   . 119-21) | $1,500 |
| | If you are a refugee or you were paroled as a refugee. Select **Part 2.**, **Item Number 3.d.**: Refugee Status (INA section 20  ) or indicate refugee status or paroled as refugee in **Part 1**. | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub.   . 119-21) | $1,500 |
| | If you are in deportation, exclusion, or removal proceedings before an immigration  udge, and the court waives your application fee. | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub.   . 119-21) | $1,500 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification. Select **Part 2.**, **Item Number 3.c.**: Special Immigrant Juvenile. | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub.   . 119-21) | $1,500 |
| | If you are filing as a U nonimmigrant seeking ad ustment of status under INA section 2  5(m). Select **Part 2.**, **Item Number 3.e.**: Victim of   ualifying Criminal Activity (U Nonimmigrant). | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub.   . 119-21) | $1,500 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are filing as a T nonimmigrant seeking ad ustment of status under INA section 2 5(l). Select **Part 2., Item Number 3.e.**: Human Trafficking Victim (T Nonimmigrant). | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub. . 119-21) | $1,500 |
| | If you are filing as a person seeking or granted special immigrant visa or status as:<br>　　An Afghan or Ira i translator or interpreter<br>　　An Ira i national employed by or on behalf of the U.S. overnment<br>　　An Afghan national employed by or on behalf of the U.S. overnment or employed by the International Security Assistance Force (ISAF) or<br>　　A derivative beneficiary of one of the above.<br><br>Select **Part 2., Item Number 3.c.**: Certain Afghan or Ira i National. | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub. . 119-21) | $1,500 |
| | If you are filing under Section 1 of Pub. . 85- 1 as an Afghan Diplomat or immediate family member who held valid A or status on July 1 , 2021. Select **Part 2., Item Number 3.f.**: Diplomats or High-Ranking Officials Unable to Return Home. | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub. . 119-21) | $1,500 |
| | If you are filing as a person seeking ad ustment of status as an abused spouse or child under the Cuban Ad ustment Act (CAA). Select **Part 2., Item Number 3.f.**: A Victim of Battery or Extreme Cruelty as a Spouse or Child Under the Cuban Ad ustment Act. | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub. . 119-21) | $1,500 |

**JA210**

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are filing as a person seeking ad ustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA). Select **Part 2.**, **Item Number 3.f.**: A Victim of Battery or Extreme Cruelty as a Spouse or Child Applying Based on Dependent Status Under the Haitian Refugee Immigrant Fairness Act. | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub.  . 119-21) | $1,500 |
| | If you are filing as a person seeking immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). Select **Part 2.**, **Item Number 3.a.**: VAWA self-petitioning spouse, child, or parent. | $0 |
| | **Additional Fee:** If you file with, or your Form I- 85 is ad udicated by, the Immigration Court (Pub.  . 119-21) | $1,500 |
| | **Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** ([uscis.gov i-912](uscis.gov i-912)). | $0 |
| **I-485A Supplement A to Form I-485, Adjustment of Status Under Section 245(i)** ([uscis.gov i- 85supa](uscis.gov i- 85supa)) | **General filing, unless noted below.** | $1,000 |
| | If you are an unmarried child under 1  years of age. | $0 |
| | If you are the spouse or unmarried child under 21 years of age of a legalized alien and have attached a copy of a USCIS receipt or approval notice for a properly filed Form I-81 , Application for Family Unity Benefits. ([uscis.gov i-81](uscis.gov i-81  )) | $0 |
| **I-485J Confirmation of Valid Job Offer or Request for Job Portability Under INA Section 204(j)** ([uscis.gov i- 85sup](uscis.gov i- 85sup )) | **General filing** | $0 |

**JA211**

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-508**<br>**Waiver of Certain Rights, Privileges, Exemptions, and Immunities**<br>(uscis.gov i-508) | **General filing** | $0 |
| **I-526**<br>**Immigrant Petition by Standalone Investor**<br>(uscis.gov i-52_) | **General filing** | $11,1_0 |
| **I-526E**<br>**Immigrant Petition by Regional Center Investor**<br>(uscis.gov i-52_e) | **General filing** | $11,1_0 |
| | If you file an initial Form I-52_E on or after October 1, 2022, you must include a separate fee of $1,000 as re_uired by the EB-5 Reform and Integrity Act of 2022. This additional amount does not apply to an amendment re_uest.<br><br>If paying by check or money order, submit the fee separately. | $1,000 |
| **I-539**<br>**Application to Extend/ Change Nonimmigrant Status**<br>(uscis.gov i-5_9) | **General filing, unless noted below.** | Paper Filing: $_0<br>Online Filing: $_20 |
| | If filing into or out of A, _, or NATO nonimmigrant status. | $0 |
| | Victims of severe form of trafficking (T nonimmigrants). | $0 |
| | Victims of _ualifying criminal activity (U nonimmigrants). | $0 |
| | If seeking to extend status as or change status to that of a B-1 nonimmigrant United Nations (UN) Mission Observer (or B-2 dependent of a UN Mission Observer). | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions** (uscis.gov i-912) | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-566**<br>**Interagency Record of Request - A, G, or NATO Dependent Employment Authorization or Change/ Adjustment To/From A, G, or NATO Status**<br>([uscis.gov i-5__](#)) | **General filing** | $0 |
| **I-589**<br>**Application for Asylum and for Withholding of Removal**<br>([uscis.gov i-589](#)) | **General filing**<br><br>**Additional Fees Under Pub. L. 119-21:**<br><br>Due at Filing<br><br>Annual Asylum Fee<br>(USCIS will notify you when this fee is due)<br><br>These fees may not be waived. | $0 plus additional fee<br><br><br><br>$100<br><br>Online: $100,<br>(due upon receipt of Notice) |
| **I-590**<br>**Registration for Classification as a Refugee** | **General filing** | $0 |
| **I-600**<br>**Petition to Classify Orphan as an Immediate Relative**<br>([uscis.gov i-_00](#)) | **General filing, unless noted below.** | $920 |
| | If you are filing your first Form I-_00 petition during your Form I-_00A approval period. | $0 |
| | If you file more than one Form I-_00 during your Form I-_00A approval period for children who are not birth siblings before the proposed adoption. | $920<br>for the second and any subse_uent non-birth siblings |
| | If you are filing more than one Form I-_00 during your Form I-_00A approval period for children who are birth siblings before the proposed adoption. | $0 |
| | New Combination filing: If you previously filed a Form I-_00 combination filing and your marital status changed after the suitability approval. | $920 |
| | New Combination filing: If your marital status changes while your previous Form I-_00 combination filing petition is pending, you must submit a new Form I-_00 combination filing. | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-600A**<br>**Application for Advance Processing of an Orphan Petition**<br>(uscis.gov i- 00a) | **General filing, unless noted below.** | $920 |
| | Filed due to change in marital status after prior Form I- 00A is approved. | $920 |
| | Filed due to change in marital status while prior Form I- 00A is pending. | $0 |
| **I-600A/I-600**<br>**Supplement 1 Listing of Adult Member of the Household**<br>(uscis.gov i- 00a) and (uscis.gov i- 00) | **General filing** | $0 |
| **I-600A/I-600**<br>**Supplement 2 Consent to Disclose Information**<br>(uscis.gov i- 00a) and (uscis.gov i- 00) | **General filing** | $0 |
| **I-600A/I-600**<br>**Supplement 3 Request for Action on Approved Form I-600A/I-600**<br>(uscis.gov i- 00a) **and** (uscis.gov i- 00) | **General filing, unless noted below.** | $ 55 |
| | Filed for a **FIRST** or **SECOND** extension of your Form I- 00A. | $0 |
| | Filed for a **THIRD** or **SUBSEQUENT** extension of your Form I- 00A. | $ 55 |
| | Filed for a new approval notice based on a significant change and updated home study after we approved your Form I- 00A or Form I- 00 and there is no re uest for a first or second extension of your Form I- 00A approval or a first or second change of non-Hague Adoption Convention country on the same Supplement . | $ 55 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | Filed for a **FIRST** or **SECOND** change to a new non-Hague Adoption Convention country for which you were not previously approved in your suitability determination. | $0 |
| | Filed for a **THIRD** or **SUBSEQUENT** change to a new non-Hague Adoption Convention country for which you were not previously approved in your suitability determination. | $ 55 |
| | Filed for a duplicate approval notice. | $0 |
| **I-601**<br>**Application for Waiver of Grounds of Inadmissibility**<br>(uscis.gov i- 01) | **General filing, unless noted below.**<br><br>**Additional fee:** If you apply with, or your Form I- 01 is ad udicated by, the Immigration Court (Pub. . 119-21) | $1,050<br><br>$1,050 |
| | If you are filing as a person seeking or granted:<br><br>Special Immigrant Juvenile classification<br>T nonimmigrant status<br>U nonimmigrant status<br>Ad ustment of Status as an abused spouse or child under the Cuban Ad ustment Act (CAA)<br>Ad ustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA)<br>Benefits under the Nicaraguan Ad ustment and Central American Relief Act (NACARA) or<br>Immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives).<br><br>**Additional fee:** If you apply with, or your Form I- 01 is ad udicated by, the Immigration Court (Pub. . 119-21) | $0<br><br><br><br><br><br><br><br><br><br><br><br><br><br>$1,050 |
| | If you are filing as a person seeking or granted special immigrant visa or ad ustment of status as:<br>An Afghan or Ira i translator or interpreter<br>An Ira i national employed by or on behalf of the U.S. overnment<br>An Afghan national employed by or on behalf of the U.S. overnment or employed by the International Security Assistance Force (ISAF) or<br>A derivative beneficiary of one of the above.<br><br>**Additional fee:** If you apply with, or your Form I- 01 is ad udicated by, the Immigration Court (Pub. . 119-21) | $0<br><br><br><br><br><br><br><br><br>$1,050 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are filing this form in connection with a Form I- 85 under Section 1  of Pub.  . 85- 1  as an Afghan Diplomat or immediate family member who held valid A or    status on July 1 , 2021. | $0 |
| | **Additional fee:** If you apply with, or your Form I- 01 is ad udicated by, the Immigration Court (Pub.  . 119-21) | $1,050 |
| | For applicants for ad ustment of status of Indochina refugees under Pub.  . 95-1 5. | $0 |
| | **Additional fee:** If you apply with, or your Form I- 01 is ad udicated by, the Immigration Court (Pub.  . 119-21) | $1,050 |
| | **Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions (**uscis.gov i-912**).** | $0 |
| **I-601A Application for Provisional Unlawful Presence Waiver** (uscis.gov i- 01a) | **General filing** | $ 95 |
| | If you are filing as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification. | $0 |
| **I-602 Application by Refugee for Waiver of Inadmissibility Grounds** (uscis.gov i- 02) | **General filing** | $0 |
| **I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended)** (uscis.gov i- 12) | **General filing** | $1,100 |

**JA216**

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-687**<br>**Application for Status as a Temporary Resident Under Section 245A of the INA**<br>(uscis.gov i- 8 ) | **General filing** | $1,2 0 |
| **I-690**<br>**Application for Waiver of Grounds of Inadmissibility Under Sections 245A or 210 of the Immigration and Nationality Act**<br>(uscis.gov i- 90) | **General filing** | $905 |
| **I-693**<br>**Report of Immigration Medical Examination and Vaccination Record**<br>(uscis.gov i- 9 ) | **General filing** | $0 |
| **I-694**<br>**Notice of Appeal of Decision Under Section 210 or 245A of the Immigration and Nationality Act**<br>(uscis.gov i- 9 ) | **General filing, unless noted below.** | $1,125 |
| | **Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **I-698**<br>**Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA)**<br>(uscis.gov i- 98) | **General filing** | $1, 0 |
| **I-730**<br>**Refugee/Asylee Relative Petition**<br>(uscis.gov i- 0) | **General filing** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-751**<br>**Petition to Remove**<br>**Conditions on Residence**<br>(uscis.gov i- 51) | **General filing** | $ 50 |
| | Conditional permanent residents, spouse, or child who filed a waiver of the oint filing re uirement based on battery or extreme cruelty. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **I-765**<br>**Application for**<br>**Employment**<br>**Authorization**<br>(uscis.gov i- 5) | **Varies** | See Appendix C: I- 5 |
| **I-765V**<br>**Application for**<br>**Employment**<br>**Authorization for Abused**<br>**Nonimmigrant Spouse**<br>(uscis.gov i- 5v) | **General filing** | $0 |
| **I-800**<br>**Petition to Classify**<br>**Convention Adoptee as an**<br>**Immediate Relative**<br>(uscis.gov i-800) | **General filing, unless noted below.** | $920 |
| | If you file more than one Form I-800 during your Form I-800A approval period, for children who are not birth siblings before the proposed adoption. | $920<br>for each non-birth sibling |
| | If you are filing your first Form I-800 during your Form I-800A approval period. | $0 |
| | If you are filing more than one Form I-800 during your Form I-800A approval period for children who are birth siblings before the proposed adoption. | $0 |
| **I-800**<br>**Supplement 1 Consent to**<br>**Disclose Information**<br>(uscis.gov i-800) | **General filing** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-800A Application for Determination of Suitability to Adopt a Child from a Convention Country** (uscis.gov i-800a) | **General filing, unless noted below.** | $920 |
| | If filed due to a change in marital status after approval of a prior Form I-800A. | $920 |
| | If filed due to a change in marital status while a prior Form I-800A is pending. | $0 |
| **I-800A Supplement 1 Listing of Adult Member of the Household** (uscis.gov i-800a) | **General filing** | $0 |
| **I-800A Supplement 2 Consent to Disclose Information** (uscis.gov i-800a) | **General filing** | $0 |
| **I-800A Supplement 3 Request for Action on Approved Form I-800A** (uscis.gov i-800a) | **General filing, unless noted below.** | $ 55 |
| | Filed for a **FIRST** or **SECOND** extension of your Form I-800A. | $0 |
| | Filed for a **THIRD** or **SUBSEQUENT** extension of your Form I-800A. | $ 55 |
| | Filed for a new approval notice based on a significant change and updated home study after we approved your Form I-800A, and there is no re uest for a first or second extension of your Form I-800A approval or a first or second change of Hague Adoption Convention country on the same Supplement  . | $ 55 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | Filed for a **FIRST** or **SECOND** change in Convention country after the approval of Form I-800A. | $0 |
| | Filed for a **THIRD** or **SUBSEQUENT** change in Convention country after we approved your Form I-800A. | $ 55 |
| | Filed for a duplicate approval notice. | $0 |
| **I-817**<br>**Application for Family Unity Benefits**<br>(uscis.gov i-81  ) | **General filing, unless noted below.** | $   0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **I-821**<br>**Application for Temporary Protected Status**<br>(uscis.gov i-821) | If you are filing for **initial** registration. | $500<br>plus additional fee |
| | If you are filing for **re-registration**. | $0 plus additional fee |
| | **Additional Fee:** Biometric Services Fee<br><br>  ou must submit the biometric services fee separately from the filing fee. | $ 0 |
| | **Certain applicants may be eligible for a Fee Waiver of the biometric services fee only.**<br>**See Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **I-821D**<br>**Consideration of Deferred Action for Childhood Arrivals**<br>(uscis.gov i-821d) | **General filing** | $85 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-824**<br>**Application for Action on an Approved Application or Petition**<br>(uscis.gov i-82 ) | **General filing, unless noted below.** | $590 |
| | If you are filing as a person seeking or granted special immigrant visa or status as:<br>    An Afghan or Ira i translator or interpreter<br>    An Ira i national employed by or on behalf of the U.S. overnment<br>    An Afghan national employed by or on behalf of the U.S. overnment or employed by the International Security Assistance Force (ISAF) or<br>    A derivative beneficiary of one of the above. | $0 |
| | If you are filing as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification. | $0 |
| | If you are filing as a person seeking or granted T nonimmigrant status. | $0 |
| | If you are filing as a person seeking or granted ad ustment of status as an abused spouse or child under the Cuban Ad ustment Act (CAA). | $0 |
| | If you are filing as a person seeking or granted ad ustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA). | $0 |
| | If you are filing as a person seeking or granted U nonimmigrant status. | $0 |
| | If you are an abused spouse or child applying for benefits under the Nicaraguan Ad ustment and Central American Relief Act (NACARA). | $0 |
| | If you are a battered spouse or child of a lawful permanent resident or U.S. citizen applying for cancellation of removal or ad ustment of status under INA section 2 0A(b)(2). | $0 |
| **I-829**<br>**Petition by Investor to Remove Conditions on Permanent Resident Status**<br>(uscis.gov i-829) | **General filing** | $9,525 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-854**<br>**Inter-Agency Alien Witness and Informant Record**<br>(uscis.gov i-85 ) | **General filing** | $0 |
| **I-864**<br>**Affidavit of Support Under Section 213A of the INA**<br>(uscis.gov i-8 ) | **General filing** | $0 |
| **I-864A**<br>**Contract Between Sponsor and Household Member**<br>(uscis.gov i-8 a) | **General filing** | $0 |
| **I-864EZ**<br>**Affidavit of Support Under Section 213A of the INA**<br>(uscis.gov i-8 ez) | **General filing** | $0 |
| **I-865**<br>**Sponsor's Notice of Change of Address**<br>(uscis.gov i-8 5) | **General filing** | $0 |
| **I-881**<br>**Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA)**<br>(uscis.gov i-881) | **General filing, unless noted below.** | $ 0 |
| | If you are filing as an abused spouse or child applying for benefits under the Nicaraguan Ad ustment and Central American Relief Act (NACARA). | $0 |
| | If you are filing with the Immigration Court (Executive Office of Immigration Review). The court will charge a single fee separate from the USCIS filing fee for applications filed by one or more applicants in the same proceeding. | $1 5<br>Immigration Court fee |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
|  | If we refer the application to the Immigration Court, the court will not charge a fee separate from the USCIS filing fee (if any). | $0<br>Immigration Court fee |
|  | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions (**uscis.gov i-912**)** | $0 |
| **I-905**<br>**Application for Authorization to Issue Certification for Health Care Workers**<br>(uscis.gov i-905) | **General filing** | $2 0 |
| **I-907**<br>**Request for Premium Processing Service**<br>(uscis.gov i-90  ) | To determine if Premium Processing is available for your benefit re  uest, please visit our website at uscis.gov I-90   or call the USCIS Contact Center at **800-375-5283** (TT **800-767-1833**).<br><br> The Premium Processing fee is in addition to all other applicable filing fees.    ou must submit the Premium Processing fee separately from other filing fees.  Form I-90 may not be filed by a beneficiary or co-applicant of the primary form for which premium processing is being re  uested.<br><br>The following benefit re  uests are designated under the regulations for Premium Processing Service.  Please be aware that you may only re  uest premium processing for a benefit if USCIS has announced on its website that premium processing is available for that benefit. | Varies |

| Form Number and Title | Filing Category | | Fee(s) |
|---|---|---|---|
| **I-907**<br>**Request for Premium Processing Service**<br>(continued) | Form I-129<br>Petition for Nonimmigrant Worker | H-1B nonimmigrant classification | Paper Filing: $2,805<br>Online Filing: $2,805 |
| | | E-1, E-2, E- , H- , 1 (including Blanket -1), O, P, , or TN nonimmigrant classfication | Paper Filing: $2,805 |
| | | H-2B or R nonimmigrant classification | Paper Filing: $1, 85 |
| | Form I-1 0, Immigrant Petition for Alien Workers | EB-1 (E11, E12, E1 ), EB-2 (E21 NIW, E21 non-NIW), or EB- (E 1, E 2, EW ) immigrant classification | Paper Filing: $2,805 |
| | Form I-5 9, Application to Extend Change Nonimmigrant Status | F-1, F-2, J-1, J-2, M-1, or M-2 nonimmigrant classification | Paper Filing: $1,9 5<br>Online Filing: $1,9 5 |
| | Form I- 5, Application for Employment Authorization | I- 5 categories | Paper Filing: $1, 85<br>Online Filing: $1, 85 |
| **I-910**<br>**Application for Civil Surgeon Designation**<br>(uscis.gov i-910) | **General filing** | | $990 |
| **I-912**<br>**Request for Fee Waiver**<br>(uscis.gov i-912) | **General filing** | | $0 |
| **I-914**<br>**Application for T Nonimmigrant Status**<br>(uscis.gov i-91 ) | **General filing** | | $0 |
| **I-914 Supplement A**<br>**Application for Family Member of a T-1 Recipient**<br>(uscis.gov i-91 ) | **General filing** | | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-914 Supplement B Declaration of Law Enforcement Officer for Victim of Trafficking in Persons** (uscis.gov i-91_) | **General filing** | $0 |
| **I-918 Petition for U Nonimmigrant Status** (uscis.gov I-918) | **General filing** | $0 |
| **I-918 Supplement A Petition for Qualifying Family Member of U-1 Recipient** (uscis.gov I-918) | **General filing** | $0 |
| **I-918 Supplement B U Nonimmigrant Status Certification** (uscis.gov I-918) | **General filing** | $0 |
| **I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant** (uscis.gov i-929) | **General filing** | $0 |
| **I-941 Application for Entrepreneur Parole** (uscis.gov i-9_1) | **General filing** **Additional Fee if Approved:** Pub. . 119-21 Immigration Parole Fee | $1,200 Online: $1,000, if USCIS notifies you of conditional approval |
| **I-945 Public Charge Bond** (uscis.gov i-9_5) | **General filing** | $0 |
| **I-956 Application for Regional Center Designation** (uscis.gov i-95_) | **General filing** | $ , 95 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-956F**<br>**Application for Approval of an Investment in a Commercial Enterprise**<br>(uscis.gov i-95 f) | **General filing** | $ , 95 |
| **I-956G**<br>**Regional Center Annual Statement**<br>(uscis.gov i-95 g) | **General filing** | $ , 0 |
| **I-956H**<br>**Bona Fides of Persons Involved with Regional Center Program**<br>(uscis.gov i-95 h) | **General filing** | $0 |
| **I-956K**<br>**Registration for Direct and Third-Party Promoters**<br>(uscis.gov i-95 k) | **General filing** | $0 |
| **N-300**<br>**Application to File Declaration of Intention**<br>(uscis.gov n- 00) | **General filing, unless noted below.** | $ 20 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **N-336**<br>**Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336**<br>(uscis.gov n- ) | **General filing, unless noted below.**<br>Fee determined based on how form is submitted. | Paper Filing: $8 0<br>Online Filing $ 80 |
| | If you filed Form N- 00 under INA sections 28 or 29 with respect to military service and your application has been denied. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions** (uscis.gov i-912) | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **N-400**<br>**Application for Naturalization**<br>(uscis.gov n- 00) | **General filing, unless noted below.**<br>Fee determined based on how form is submitted.<br><br>*You cannot file online if you are requesting a fee waiver or a reduced fee; you must file a paper Form N-400.* | Paper Filing: $  0<br>Online Filing: $ 10 |
| | If your documented annual household income is not more than  00 percent of the Federal Poverty  uidelines and you submit supporting documentation with your application. | Paper Filing: $ 80 |
| | If you meet the re uirements of INA sections  28 or  29 with respect to your military service. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions (uscis.gov i-912)** | $0 |
| **N-426**<br>**Request for Certification of Military or Naval Service**<br>(uscis.gov n- 2 ) | **General filing** | $0 |
| **N-470**<br>**Application to Preserve Residence for Naturalization Purposes**<br>(uscis.gov n-  0) | **General filing, unless noted below.** | $  20 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions (uscis.gov i-912)** | $0 |
| **N-565**<br>**Application for Replacement Naturalization/ Citizenship Document**<br>(uscis.gov n-5 5) | **General filing, unless noted below.**<br>Fee determined based on how form is submitted. | Paper Filing: $555<br>Online Filing: $505 |
| | If you are filing because your certificate contains incorrect information due to USCIS error. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions (uscis.gov i-912)** | $0 |
| **N-600**<br>**Application for Certificate of Citizenship**<br>(uscis.gov n- 00) | **General filing, unless noted below.**<br>Fees determined based on how form is submitted. | Paper Filing: $1, 85<br>Online Filing: $1,  5 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you, as a current or former member of any branch of the U.S. armed forces, are re uesting a Certificate of Citizenship for yourself.<br><br>**NOTE:** Children of service members do not ualify for this fee exemption. | $0 |
| | If you are filing on behalf of an individual who is the sub ect of a final adoption for immigration purposes and meets (or met before 18 years of age) the definition of child under INA sections 101(b)(1)(E), (F), or ( ). | $0 |
| | **Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **N-600K**<br>**Application for Citizenship and Issuance of Certificate Under Section 322**<br>(uscis.gov n- 00k) | **General filing, unless noted below.**<br>Fees determined based on how form is submitted. | Paper Filing: $1, 85<br>Online Filing: $1, 5 |
| | If you are filing on behalf of a child who is the sub ect of a final adoption for immigration purposes and meets the definition of child under section INA sections 101(b)(1)(E), (F), or ( ). | $0 |
| | **Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **N-644**<br>**Application for Posthumous Citizenship**<br>(uscis.gov n- ) | **General filing** | $0 |
| **N-648**<br>**Medical Certification for Disability Exceptions**<br>(uscis.gov n- 8) | **General filing** | $0 |

**Appendix A: I-129, Petition for a Nonimmigrant Worker**

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-129**<br>**Petition for a Nonimmigrant Worker**<br>([uscis.gov i-129](uscis.gov i-129)) | **Petition for a Nonimmigrant Worker** | Varies |
| | If you are filing an E-1, E-2, E-2C, E- , or TN petition.<br><br>If you are filing as a Small Employer or Nonprofit. | $1,015 plus additional fees<br>$510 plus additional fees, if applicable |
| | If you are filing an H- petition.<br>*(limited to 25 beneficiaries per petition)*<br><br>If you are filing as a Small Employer or Nonprofit. | $1,015 plus additional fees<br><br>$510 plus additional fees, if applicable |
| | If you are filing an O petition.<br>*(limited to one beneficiary per petition for O-1; limited to 25 beneficiaries per petition for O-2)*<br><br>If you are filing as a Small Employer or Nonprofit. | $1,055 plus additional fees<br><br>$5 0 plus additional fees, if applicable |
| | If you are filing a P petition.<br>*(limited to 25 beneficiaries per petition)*<br><br>If you are filing as a Small Employer or Nonprofit. | $1,015 plus additional fees<br><br>$510 plus additional fees, if applicable |
| | If you are filing a   petition.<br>*(limited to 25 beneficiaries per petition)*<br><br>If you are filing as a Small Employer or Nonprofit. | $1,015 plus additional fees<br><br>$510 plus additional fees, if applicable |
| | If you are filing an R petition. | $510 plus additional fees, if applicable |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | **Additional Fees:**<br>　1. Asylum Program Fee<br>　　a.　If you are filing as a Regular Petitioner<br>　　b.　If you are filing as a Nonprofit<br>　　c.　If you are filing as a Small Employer<br><br>If paying by check or money order, submit the fee separately. | a. $ 00<br>b. $0<br>c. $ 00 |
| | **An applicant for E-2 CNMI investor nonimmigrant status under 8 CFR 214.2(e)(23) may be eligible for a Fee Waiver. See Form I-912 Instructions (**uscis.gov i-912**)** | $0 |
| **I-129 - H-2A petitions** | If you are filing an H-2A petition with named workers. *(limited to 25 beneficiaries per petition)* | Paper Filing:<br>$1,090<br>plus additional fees<br><br>Online Filing: $1,0 0 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | Paper Filing:<br>$5 5<br>plus additional fees,<br>if applicable<br><br>Online Filing:<br>$5 5 plus additional fees,<br>if applicable |
| | If you are filing an H-2A petition with unnamed workers. *(no limit to number of beneficiaries per petition)* | Paper Filing:<br>$5 0<br>plus additional fees<br><br>Online Filing: $ 80 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | Paper Filing:<br>$ 0<br>plus additional fees,<br>if applicable<br><br>Online Filing: $ 0 plus additional fees,<br>if applicable |
| | **Additional Fees:**<br>　1. Asylum Program Fee<br>　　a.　If you are filing as a Regular Petitioner<br>　　b.　If you are filing as a Nonprofit<br>　　c.　If you are filing as a Small Employer<br><br>If paying by check or money order, submit the fee separately. | a. $ 00<br>b. $0<br>c. $ 00 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-129 - H-2B petitions** | If you are filing an H-2B petition with named workers. *(limited to 25 beneficiaries per petition)*<br><br>If you are filing as a Small Employer or Nonprofit. | $1,080 plus additional fees<br><br>$5 0 plus additional fees |
| | If you are filing H-2B petition with unnamed workers. *(no limit to number of beneficiaries per petition)*<br><br>If you are filing as a Small Employer or Nonprofit. | $580 plus additional fees<br><br>$ 0 plus additional fees |
| | **Additional Fees:**<br>1. H-2B petitioners must submit an additional Fraud Prevention and Detection fee. If paying by check or money order, submit the fee separately.<br><br>2. Asylum Program Fee<br>  a. If you are filing as a Regular Petitioner<br>  b. If you are filing as a Nonprofit<br>  c. If you are filing as a Small Employer<br><br>If paying by check or money order, submit the fee separately. | 1. $150<br><br><br><br>2. Varies<br>  a. $ 00<br>  b. $0<br>  c. $ 00 |
| **I-129 - H-1B and H-1B1 petitions** | If you are filing H-1B or H-1B1 petitions. | Paper Filing: $ 80 plus additional fees<br>Online Filing: $ 0 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | Paper Filing: $ 0 plus additional fees, if applicable<br><br>Online Filing: $ 0 plus additional fees, if applicable |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | **Additional Fees:** | |
| | 1. Asylum Program Fee | 1. Varies |
| |    a.  If you are filing as a Regular Petitioner |   a. $ 00 |
| |    b.  If you are filing as a Non-profit |   b. $0 |
| |    c.  If you are filing as a Small Employer |   c. $ 00 |
| | If paying by check or money order, submit the fee separately. | |
| | 2. H-1B petitioners must submit a Fraud Prevention and Detection fee if they are: | 2. $500 |
| |    a.  Seeking initial approval of H-1B nonimmigrant status for a beneficiary  or | |
| |    b.  Seeking approval to employ an H-1B nonimmigrant currently working for another petitioner. | |
| | Petitioners for Chile or Singapore H-1B1 Free Trade Nonimmigrants do not have to pay the Fraud Prevention and Detection fee. Fraud Prevention and Detection fee, when applicable, may not be waived. If paying by check or money order, submit the fee separately. | |

**JA232**

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-129 - H-1B and H-1B1 petitions** | . H-1B petitioners are re uired to submit an additional fee mandated by Public aw 11 -11 , if:<br>  a.  They are re uired to submit the Fraud Prevention and Detection fee<br>  b.  They employ 50 or more individuals in the United States and<br>  c.  More than 50 percent of those employees are in H-1B, -1A, or -1B nonimmigrant status.<br><br>If paying by check or money order, submit the fee separately. | . $ ,000 |
| | . American Competitiveness and Workforce Improvement Act (ACWIA). Petitioners filing for:<br>  a.  An H-1B nonimmigrant or<br>  b.  A Chile or Singapore H-1B1 Free Trade Nonimmigrant must submit an additional ACWIA fee, unless they are exempt under Section 2 of the H-1B Data Collection and Filing Fee Exemption Supplement.<br><br>To determine which ACWIA fee to pay, complete Section 2 of the H-1B Data Collection and Filing Fee Exemption Supplement.<br><br>Payment for this fee may be made in the form of a single check or money order for the total amount due (filing fee ACWIA fee), or as two separate checks or money orders (one for the ACWIA fee and one for the filing fee). | . $1,500 or $ 50, depending on number of workers the petitioner employs |
| **I-129-L petitions** | If you are filing petitions. | $1, 85 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $ 95 plus additional fees, if applicable |
| | **Additional Fees:**<br>  1. Asylum Program Fee<br>    a.  If you are filing as a Regular Petitioner<br>    b.  If you are filing as a Nonprofit<br>    c.  If you are filing as a Small Employer<br><br>If paying by check or money order, submit the fee separately. | 1. Varies<br>  a. $ 00<br>  b. $0<br>  c. $ 00 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | 2.   petitioners must submit a Fraud Prevention and Detection fee if they are:<br>  a.  Seeking initial approval of   nonimmigrant status for a beneficiary<br>  b.  Seeking approval to employ an   nonimmigrant currently working for another petitioner  or<br>  c.  For blanket petitions, seeking approval for an nonimmigrant to continue employment with an entity different from the previous petitioner.<br><br>If paying by check or money order, submit the fee separately.<br><br>  .  -1 petitioners are re  uired to submit an additional fee mandated by Public  aw 11 -11 , if:<br>  a.  They are re  uired to submit the Fraud Prevention and Detection fee<br>  b.  They employ 50 or more individuals in the United States  and<br>  c.  More than 50 percent of those employees are in H-1B,   -1A, or   -1B nonimmigrant status.<br><br>If paying by check or money order, submit the fee separately. | 2. $500<br><br><br><br><br><br><br><br><br><br><br><br>.  $  ,500 |

**Appendix B: I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records**

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/ Departure Records** (uscis.gov i-1_1)<br>**Reentry Permit** | If filing for a **Reentry Permit**<br><br>Select **Part 1., Item Number 1.**<br><br>**Not Eligible for Fee Waiver request.** | Paper Filing: $   0 |
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/ Departure Records** (uscis.gov i-1_1)<br>**Refugee Travel Document** | If you now hold **refugee** status in the United States (Select **Part 1., Item Number 2.** and **Item Number 13.**) or are a lawful permanent resident as a direct result of refugee status (select **Part 1., Item Number 3.** and **Item Number 13.**) | $0 |
|  | If you now hold **asylee** status in the United States (Select **Part 1., Item Number 2.**), or are a lawful permanent resident as a direct result of asylee status (select **Part 1., Item Number 3.**), and you are: |  |
|  |    1. Under 1  years of age. | $1 5 |
|  |    2. 1  years of age or older. | $1 5 |
|  | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions** (uscis.gov i-912) | $0 |
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/ Departure Records** (uscis.gov i-1_1)<br>**Travel Authorization Document (for Temporary Protected Status (TPS) beneficiaries who are inside the United States)** | If you are a TPS beneficiary in the United States, and you are applying for a TPS Travel Authorization Document under INA 2  (f)( ) to allow you to seek admission under TPS upon your return from abroad. **Select Part 1., Item Number 4.** | Paper Filing: $   0<br>Online Filing: $580 |
|  | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions** (uscis.gov i-912) | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/ Departure Records** (uscis.gov i-1 1)<br>**Advance Parole Document (for individuals who are inside the United States)** | If you have a pending Form I- 85, Application to Register Permanent Residence or Ad ust Status. Select **Part 1., Item Number 5.A.** | Paper Filing: $ 0<br>Online Filing: $580 |
| | If you have a pending Form I-589, Application for Asylum and for Withholding of Removal. Select **Part 1., Item Number 5.B.**<br><br>**Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** (uscis.gov i-912). | Paper Filing: $ 0 |
| | If you have a pending initial Form I-821, Application for Temporary Protected Status. Select **Part 1., Item Number 5.C.**<br><br>**Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** (uscis.gov/i-912). | Paper Filing: $ 0<br>Online Filing: $580 |
| | If you have been granted Deferred Enforced Departure. Select **Part 1., Item Number 5.D.** | Paper Filing: $ 0<br>Online Filing: $580 |
| | If you have an approved Form I-821D, Consideration of Deferred Action for Childhood Arrivals. Select **Part 1., Item Number 5.E.** | Paper Filing: $ 0<br>Online Filing: $580 |
| | If you have an approved Form I-91 , Application for T Nonimmigrant Status, or Form I-91 , Supplement A, Application for Family Member of T-1 Recipient. Select **Part 1., Item Number 5.F.** | $0 |
| | If you have an approved Form I-918, Petition for U Nonimmigrant Status, or Form I-918, Supplement A, Petition for   ualifying Family Member of U-1 Recipient. Select **Part 1., Item Number 5.G.** | $0 |
| | If you are a current parolee under INA 212(d)(5). Select **Part 1., Item Number 5.H.** | Paper Filing: $ 0 |
| | If you have an approved Form I-81 , Application for Family Unity Benefits. Select **Part 1., Item Number 5.I.** | Paper Filing: $ 0 |
| | If you have a pending Form I- 8 , Application for Status as a Temporary Resident Under Section 2 5A of the Immigration and Nationality Act. Select **Part 1., Item Number 5.J.** | Paper Filing: $ 0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
|  | If you hold V Nonimmigrant Status. Select **Part 1., Item Number 5.K.** | Paper Filing: $   0 |
|  | Other re uest for Advance Parole. Select **Part 1., Item Number 5.M.** | Paper Filing: $   0 |
|  | **Additional Fee if Approved:** Pub.  . 119-21 Immigration Parole Fee<br><br>Each time you seek parole at a port of entry (POE), U.S. Customs and Border Patrol (CBP) will re uire you to pay an additional fee at the POE, unless they determine that you  ualify for an exception. | $1,000 |
|  | **Unless otherwise noted, not eligible for Fee Waiver request.** | N A |
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/ Departure Records** (uscis.gov i-1  1)<br>**Advance Permission to Travel for Commonwealth of Northern Mariana Islands (CNMI) Long-Term Residents** | If you are applying for advance permission to travel as a CNMI long-term resident. Select **Part 1., Item Number 5.L.**<br><br>**Not Eligible for Fee Waiver request.** | Paper Filing: $   0 |
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/ Departure Records** (uscis.gov i-1  1)<br>**Initial Parole Document (for individuals who are currently outside the United States)** | If you are applying under the Filipino World War II Veterans Parole (FWVP) Program. Select **Part 1., Item Number 6.A.** | Paper Filing: $   0 |
| If you are filing Form I-1  1 on behalf of another person, a fee exemption ($0) applies only if the person on whose behalf you are filing meets the eligibility re uirements for a fee exemption. | If you are applying under the Immigrant Military Members and Veterans Initiative (IMMVI) as a current or former service member. Select **Part 1., Item Number 6.B.(1).** | $0 |

**JA237**

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-131**<br>**Initial Parole Document (for individuals who are currently outside the United States)** (continued) | If you are applying under the Immigrant Military Members and Veterans Initiative (IMMVI) as a:<br><br>Current spouse, child, or unmarried son or daughter (or their child under 21 years of age) of a current or former service member  (Select **Part 1., Item Number 6.B.(2)**) or<br><br>Current legal guardian or surrogate of a current or former service member. (Select **Part 1., Item Number 6.B.(3)**) | Paper Filing: $   0<br>Online Filing: $580 |
| | Family Reunification Task Force (FRTF) Process: If you are re uesting parole as a child or family member affected by family separations at the United States-Mexico border by DHS between the dates of January 20, 201 , and January 20, 2021 (Ms.  . v. ICE, 18-cv-00 28 (S.D. Cal.)). Select **Part 1., Item Number 6.D.** | $0<br>(through Dec. 11, 2029) |
| | If you are filing under another specific parole program or process. Select **Part 1., Item Number 6.E.** | Paper Filing: $   0 |
| | If filing under Cuban Family Reunification Parole (CFRP) process as an add-on derivative beneficiary where Form I-1 1 CFRP re uest is pending for a principal beneficiary. Select **Part 1., Item Number 6.E.** Other and Write  CFRP Add-On . | $0 |
| | If you are applying for an initial parole document under INA 212(d)(5)(A) for yourself or on behalf of someone else outside the United States, but not under a specific parole process. Select **Part 1., Item Number 7.** | Paper Filing: $   0<br>Online Filing: $580 |
| | **Additional Fee if Approved:** Pub.  . 119-21 Immigration Parole Fee<br><br>Each time you seek parole at a port of entry (POE), U.S. Customs and Border Patrol (CBP) will re uire you to pay an additional fee at the POE, unless they determine that you  ualify for an exemption. | $1,000 |
| | **Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions ([uscis.gov/i-912](uscis.gov/i-912))** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/Departure Records** ([uscis.gov i-1  1](uscis.gov))<br>**Initial Request for Arrival/Departure Record for Parole In Place (for individuals who are inside the United States)** | If you are applying for Military Parole in Place (PIP), only on your behalf, as a:<br><br>Current or former service member. Select **Part 1., Item Number 8.A.(1).**<br>Spouse, parent, son, or daughter of a current or former service member. Select **Part 1., Item Number 8.A.(2).** | $0 |
| If you are filing Form I-1  1 on behalf of another person, a fee exemption ($0) applies only if the person on whose behalf you are filing meets the eligibility re  uirements for a fee exemption. | Family Reunification Task Force (FRTF): If you are re  uesting parole in place for purposes of Family Reunification for children or family members affected by family separations at the United States-Mexico border by DHS between the dates of January 20, 201  , and January 20, 2021 (Ms.   . v. ICE, 18-cv-00  28 (S.D. Cal.)). Select **Part 1., Item Number 8.B.** | $0<br>(through Dec. 11, 2029) |
| | If you are filing under another specific parole program or process. Select **Part 1., Item Number 8.C.** | Paper Filing: $  0 |
| | If you are applying for an initial period of parole in place under INA 212(d)(5)(A) for yourself or someone else inside the United States, but not under a specific parole process.  Select **Part 1., Item Number 9.** | Paper Filing: $  0 |
| | **Additional Fee if Approved:** Pub.   . 119-21 Immigration Parole Fee | [See below](#) |
| | **Not Eligible for FeeWaiver Request.** | $0 |
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/Departure Records** ([uscis.gov i-1  1](uscis.gov))<br>**Arrival/Departure Records for Re-parole for Individuals Who Are Requesting a New Period of Parole (from inside the United States)** | If you are applying under a Family Reunification Parole Process. Select **Part 1., Item Number 10.A.** | Paper Filing: $  0<br>Online Filing: $580 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| If you are filing Form I-1 1 on behalf of another person, a fee exemption ($0) applies only if the person on whose behalf you are filing meets the eligibility re uirements for a fee exemption. | If you are applying under the process for Certain Afghans Paroled into the United States After July  1, 2021 through September  0, 202 . Select **Part 1.**, **Item Number 10.B.** | Paper Filing: $  0<br>Online Filing: $580 |
| | If you are applying under the re-parole process for Certain Ukrainians and their Immediate Family Members Paroled into the United States on or After February 11, 2022. Select **Part 1.**, **Item Number 10.C.** | Paper Filing: $  0<br>Online Filing: $580 |
| | If you are applying under the Filipino World War II Veterans Parole (FWVP) Program. Select **Part 1.**, **Item Number 10.D.** | Paper Filing: $  0<br>Online Filing: $580 |
| | If you are applying under the Immigrant Military Members and Veterans Initiative (IMMVI) as a current or former service member. Select **Part 1.**, **Item Number 10.E.(1).** | $0 |
| | If you are applying under the Immigrant Military Members and Veterans Initiative (IMMVI) as a:<br>  Current spouse, child, or unmarried son or daughter (or their child under 21 years of age) of a current or former service member. Select **Part 1.**, **Item Number 10.E.(2).**<br>  Current legal guardian or surrogate of a current or former service member. Select **Part 1.**, **Item Number 10.E.(3).** | Paper Filing: $  0<br>Online Filing: $580 |
| | If you are applying under the Central American Minors (CAM) Program. Select **Part 1.**, **Item Number 10.F.** | Paper Filing: $  0<br>Online Filing: $580 |
| | Family Reunification Task Force: If you are applying as a child or family member affected by family separations at the United States-Mexico border by DHS between the dates of January 20, 201 , and January 20, 2021 (Ms.   . v. ICE, 18-cv-00 28 (S.D. Cal.)). Select **Part 1.**, **Item Number 10.G.** | $0<br>(through Dec. 11, 2029) |
| | If you are applying for Military Parole in Place (Military PIP) as a:<br>  Current or former service member. Select **Part 1.**, **Item Number 10.H.(1).**<br>  Spouse, parent, son, or daughter of a current or former service member. Select **Part 1.**, **Item Number 10.H.(2).** | Paper Filing: $0 |
| | If you are applying under another program or process. Select **Part 1.**, **Item Number 10.I.** | Paper Filing: $  0<br>Online Filing: $580 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-131**<br>**Arrival/Departure**<br>**Records for Re-parole for**<br>**Individuals Who Are**<br>**Requesting a New Period**<br>**of Parole (from inside the**<br>**United States)**<br>(continued) | If you or someone else was initially paroled into the U.S. or granted parole in place under INA 212(d)((5)(A), and you are re uesting a new period of parole for yourself or someone else, but not under a specific program or process. Select **Part 1., Item Number 11.** | Paper Filing: $  0<br>Online Filing: $580 |
| | If you are selecting **Part 9., Item Number 1.** to re uest an Employment Authorization Document (EAD) upon approval of your new period of parole (re-parole).<br><br>Fee listed is for both Form I-1 1 and EAD fee.<br><br>**Additional EAD Fee Due at Filing:** Pub. . 119-21 Fee  ou must submit this fee separately from the filing fee. This fee may not be waived. | Paper Filing: $1,150 plus additional fee(s)<br>Online Filing: $1,050 plus additional fee(s)<br><br><br><br>$2 5 |
| | If you are selecting **Part 9., Item Number 1.** to re uest an EAD upon approval of re-parole and you are applying under:<br><br>    IMMVI as a current or former service member (**Part 1., Item Number 10.E.(1)**)<br>    Family Reunification Task Force (**Part 1., Item Number 10.G.)**  or<br>    Military Parole in Place for a current or former service member (**Part 1., Item Number 10.H.(1)**).<br><br>**Additional EAD Fee Due at Filing:** Pub. . 119-21 Fee  ou must submit this fee separately from the filing fee. This fee may not be waived. | $0 plus additional fee(s)<br><br><br><br><br><br><br><br><br><br>$2 5 |
| | If you are selecting **Part 9., Item Number 1.** to re uest an EAD upon approval of re-parole and you are applying for Military Parole in Place for the spouse, parent, son, or daughter of a current or former service member (**Part 1., Item Number 10.H.(2)**).<br><br>**Additional EAD Fee Due at Filing:** Pub. . 119-21 Fee  ou must submit this fee separately from the filing fee. This fee may not be waived. | Paper Filing: $520 plus additional fee<br><br><br><br><br>$2 5 |
| | **Certain applicants may be eligible for a Fee Waiver if they were initially granted parole from outside the United States.  This does not apply to applicants requesting Parole in Place.  You cannot request a fee waiver for any fees required by Pub. L. 119-21.**<br><br>**See Form I-912 Instructions (**uscis.gov i-912**)** | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | **Additional Fee if Approved:** Pub. . 119-21 Immigration Parole Fee | See below |
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/ Departure Records**<br>(uscis.gov i-1 1)<br><br>**Advance Parole Document (for individuals who are inside the United States) (fee collected by CBP),**<br><br>**Initial Parole Document (for individuals who are currently outside the United States) (fee collected by CBP),**<br><br>**Initial Request for Arrival/Departure Record for Parole In Place (for individuals who are inside the United States) (fee collected by USCIS),**<br><br>and<br><br>**Arrival/Departure Records for Re-parole for Individuals Who Are Requesting a New Period of Parole (from inside the United States) (fee collected by USCIS).** | **Additional I-131 Fee if Approved:** Pub. . 119-21 Immigration Parole Fee<br><br>If USCIS recommends approval, you must pay this additional fee to be granted parole, unless DHS determines that you ualify for one of the exceptions provided in Pub. . 119-21.<br><br>ou cannot re uest a fee waiver for any fees re uired by Pub. . 119-21.<br><br>USCIS may determine an alien ualifies for an exception to the HR-1 parole fee if the alien is being paroled because:<br><br>**(1)** (A) the alien has a medical emergency  and (B)(i) the alien cannot obtain necessary treatment in the foreign state in which the alien is residing  or (ii) the medical emergency is life-threatening and there is insufficient time for the alien to be admitted to the United States through the normal visa process<br><br>**(2)** (A) the alien is the parent or legal guardian of an alien described in paragraph **(1)** above  and (B) the alien described in paragraph **(1)** is a minor<br><br>**(3)** (A) the alien is needed in the United States to donate an organ or other tissue for transplant  and (B) there is insufficient time for the alien to be admitted to the United States through the normal visa process<br><br>**(4)** (A) the alien has a close family member in the United States whose death is imminent  and (B) the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted to the United States through the normal visa process<br><br>**(5)** (A) the alien is seeking to attend the funeral of a close family member  and (B) the alien could not arrive in the United States in time to attend such funeral if the alien were to be admitted to the United States through the normal visa process<br><br>**(6)** the alien is an adopted child -- (A) who has an urgent medical condition  (B) who is in the legal custody of the petitioner for a final adoption-related visa  and (C) whose medical treatment is re uired before the expected award of a final adoption-related visa | Online: $1,000, if USCIS notifies you of conditional approval. |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | **(7)** the alien -- (A) is a lawful applicant for adjustment of status under INA 2 5  and (B) is returning to the United States after temporary travel abroad<br><br>**(8)** the alien -- (A) has been returned to a contiguous country pursuant to INA 2 5(b)(2)(C)  and (B) is being paroled into the United States to allow the alien to attend the alien s immigration hearing<br><br>**(9)** the alien has been granted the status of Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980 (Pub.  . 9 - 22  8 U.S.C. 1522 note) or<br><br>**(10)** DHS determines that a significant public benefit has resulted or will result from the parole of an alien -- (A) who has assisted or will assist the U.S.   overnment in a law enforcement matter  (B) whose presence is re uired by the U.S.   overnment in furtherance of such law enforcement matter  and (C)(i) who is inadmissible or does not satisfy the eligibility re uirements for admission as a nonimmigrant  or (ii) for which there is insufficient time for the alien to be admitted to the United States through the normal visa process. | . |
| **I-131**<br>**Application for Travel Document, Parole Documents, and Arrival/ Departure Records (**[uscis.gov/i-131](uscis.gov/i-131)**)**<br><br>**General Fee Exemptions**<br><br>  If you seek parole at a port of entry, U.S. Customs and Border Patrol (CBP) will re uire you to pay a fee as re uired by Pub.  . 119-21, unless they determine you  ualify for an exception. This fee is applicable each time you seek parole at the POE. | If you filed Form I- 85 on or after July  0, 200 , and before April 1, 202 , you paid the re uired Form I- 85 filing fee, and your Form I- 85 is still pending.<br><br>      Refugee Travel Document,<br>      TPS Travel Authorization Document,<br>      Advance Parole Document, or<br>      Arrival Departure Records for Re-parole for Aliens. | $0, plus Immigration Parole Fee for certain approvals (Pub.  . 119-21) |
| | If you are filing for a **replacement** document because the document we issued to you contains incorrect information due to our error.<br><br>      All Reentry Permits, Travel Documents, Parole Documents, and Arrival Departure Records. | |
| | If you are filing for a **replacement** document because the document we issued, but you did not receive it due to USCIS or USPS error.<br><br>      All Reentry Permits, Travel Documents, Parole Documents, and Arrival Departure Records. | |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are a current or former U.S. armed forces service member (does not apply to family members unless the family member is also a current or former U.S. armed forces service member).<br><br>    All Reentry Permits, Travel Documents, Parole<br>    Documents, and Arrival Departure Records. | |
| | If you are a person seeking or granted Special Immigrant Juvenile classification or ad ustment of status under INA 2 5(h).<br><br>    All Reentry Permits, Travel Documents, Parole<br>    Documents, and Arrival Departure Records. | |
| | If you are a person seeking or granted T nonimmigrant status or ad ustment of status under INA 2 5(l).<br><br>    All Reentry Permits, Travel Documents, Parole<br>    Documents, and Arrival Departure Records. | |
| | If you are a person seeking or granted a special immigrant visa or status as an Afghan or Ira i translator or interpreter, Ira i national employed by or on behalf of the U.S. overnment, or Afghan national employed by or on behalf of the U.S. overnment or employed by the ISAF, or their derivative beneficiary or seeking ad ustment of status under such classification.<br><br>    All Reentry Permits, Travel Documents, Parole<br>    Documents, and Arrival Departure Records. | |
| | If you are a person seeking or granted ad ustment of status as an abused spouse or child under the Cuban Ad ustment Act (CAA).<br>    Reentry Permit,<br>    Advance Parole Document, or<br>    Arrival Departure Records for Re-parole for Aliens. | |
| | If you are a person seeking or granted ad ustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA).<br>    Reentry Permit,<br>    Advance Parole Document, or<br>    Arrival Departure Records for Re-parole for Aliens. | |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| | If you are a person seeking or granted U nonimmigrant status or ad ustment of status under INA 2 5(m). | |
| | All Reentry Permits, Travel Documents, Parole Documents, and Arrival Departure Records. | |
| | If you are a person seeking or granted immigrant classification as a VAWA self-petitioner or derivative. | |
| | All Reentry Permits, Travel Documents, Parole Documents, and Arrival Departure Records. | |
| | If you are a refugee, a person paroled as a refugee, or a lawful permanent resident who obtained such status as a refugee in the United States. Reentry Permit, Refugee Travel Document, Advance Parole Document, Arrival Departure Records for Re-parole for Aliens. | |

**Appendix C: I-765, Application for Employment Authorization**

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-765 Application for Employment Authorization** ([uscis.gov i- 5](uscis.gov)) | **General filing for initial, replacement, or renewal Employment Authorization Document (EAD), unless noted below.**<br><br>Fee determined based on how form is submitted.<br><br>Review all options below to confirm if you are eligible for a reduced fee or fee exemption. | Paper Filing: $520<br>Online Filing: $ 0 |
| | If you filed Form I- 85 with a fee on or after April 1, 202  and your Form I- 85 is still pending. | Paper Filing: $2 0<br>Online Filing: $2 0 |
| | If you are filing for an **initial, replacement, or renewal** Employment Authorization Document (EAD) and you have a pending Form I- 85, Application to Register Permanent Residence or Ad ust Status that you filed on or after July  0, 200  , and before April 1, 202  , and you paid the Form I- 85 filing fee. | $0 |
| | If you are filing for **replacement** EAD because the card we issued to you contains incorrect information due to our error, or we issued your previous card but you never received it due to United States Postal Service (USPS) error or our error. | $0 |
| | If you are filing under category **(c)(33)**, consideration of Deferred Action for Childhood Arrivals. | Paper Filing: $520<br>Online Filing: $ 0 |
| | If you are re uesting an **initial** EAD under the following categories:<br><br>**(a)(12)** Temporary Protected Status (TPS)<br>**(c)(8)** Asylum applicant under the **special ABC procedures**<br>**(c)(19)** TPS applicant  or<br>**(c)(11)** Parolee (most categories).<br><br>**Additional Fee:** Pub.  . 119-21 Fee<br> ou must submit this fee separately from the filing fee. | Paper Filing: $520 plus additional fee<br>Online Filing: $ 0 plus additional fee<br><br><br><br><br><br>$550 |
| | If you are filing for an **initial** EAD under **(c)(34)** for the paroled spouse of a (b)( ) entrepreneur.<br><br>**Additional Fee:** Pub.  . 119-21 Fee<br> ou must submit this fee separately from the filing fee.<br>This fee may not be waived. | Paper filing: $520 plus additional fee<br><br>$550 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-765** (continued) | If you are filing for an **initial** EAD under the following categories:<br><br>**(a)(4)** Paroled as refugee  or<br>**(c)(8)** Asylum applicant with a pending Form I-589, Application for Asylum and for Withholding of Removal, including derivatives, and you are **NOT** filing under the special ABC procedures<br>**(c)(11)** Special Parole processes for Immigrant Military Members and Veterans Initiative (IMMVI) and you are a current or former U.S. armed forces service member or<br>**(c)(11)** Special Parole processes for Ukrainian nationals paroled into the United States:<br>  o  Between February 2 , 2022, and September  0, 202<br>  o  After September  0, 202 , and are spouses or children of Ukrainian nationals paroled between February 2 , 2022, and September  0, 202<br>  o  After September  0, 202  and are parents, legal guardians, or primary caregivers of Ukrainian unaccompanied children paroled between February 2 , 2022, and September  0, 202 . | $0, plus additional fee |
|  | **Additional Fee:** Pub.  . 119-21 Fee<br> ou must submit this fee separately from the filing fee. This fee may not be waived. | $550 |
|  | If you are filing for a **renewal** EAD under the following categories:<br>**(a)(12)** Temporary Protected Status (TPS)  or<br>**(c)(8)** asylum applicant  or<br>**(c)(11)** parolee  or<br>**(c)(19)** as a TPS applicant. | Paper Filing: $520 plus additional fee<br>Online Filing: $  0 plus additional fee |
|  | **Additional Fee:** Pub.  . 119-21 Fee<br> ou must submit this fee separately from the filing fee. This fee may not be waived. | $2 5 |
|  | If you are filing for an **renewal** EAD under **(c)(34)** for the paroled spouse of a (b)( ) entrepreneur.<br><br>**Additional Fee:** Pub.  . 119-21 Fee<br> ou must submit this fee separately from the filing fee. This fee may not be waived. | Paper Filing: $520 plus additional fee<br><br>$2 5 |

**JA247**

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-765** (continued) | If you are filing for a **renewal** EAD under the following categories:<br><br>    **(a)(4)** Paroled as a refugee  or<br>    **(c)(11)** Special Parole processes for Immigrant Military Members and Veterans Initiative (IMMVI) and you are a current or former U.S. armed forces service member. | $0, plus additional fee |
| | **Additional Fee:** Pub. . 119-21 Fee<br> ou must submit this fee separately from the filing fee. This fee may not be waived. | $2 5 |
| | Family Reunification Task Force (FRTF). If you are filing for an **initial** EAD based on an initial period of parole or a period of re-parole as a child or family member affected by family separations at the United States-Mexico border by DHS between the dates of January 20, 201 , and January 20, 2021 (*Ms. L. v. ICE*, 18-cv-00 28 (S.D. Cal.)). | $0<br>(through Dec. 11, 2029), plus additional fee |
| | **Additional Fee:** Pub. . 119-21 Fee | $550 |
| | Family Reunification Task Force (FRTF). If you are filing for a **renewal** EAD based on a period re-parole as a child or family member affected by family separations at the United States-Mexico border by DHS between the dates of January 20, 201 , and January 20, 2021 (*Ms. L. v. ICE*, 18-cv-00 28 (S.D. Cal.)). | $0<br>(through Dec. 11, 2029), plus additional fee |
| | **Additional Fee:** Pub. . 119-21 Fee | $2 5 |
| | If you are filing for an **initial** Employment Authorization Document (EAD) under one of the following categories:<br><br>    (a)( ) Refugee<br><br>    (a)(5) Asylee<br><br>    (a)( ) N-8 (Parent of alien classed as S    ) or N-9 nonimmigrant (Child of N-8) nonimmigrants<br><br>    (a)(8) Citizen of Micronesia, Marshall Islands, or Palau<br><br>    (a)(10)  ranted Withholding of Deportation or Removal<br><br>    (a)(1 ) Victim of severe form of trafficking (T-1)<br><br>    (a)(19) U-1 nonimmigrant<br><br>    (a)(20) U-2, U- , U- , U-5 nonimmigrant | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-765** (continued) | (c)(1), (c)( ), or (c)( ) Dependent of certain foreign government, international organization, or NATO personnel | $0 |
| | (c)(2) Taiwanese dependents of Taipei Economic and Cultural Representative Office (TECRO) E-1 employees | |
| | (c)(9) Special Immigrant Juvenile seeking to ad ust status | |
| | (c)(9) T nonimmigrant seeking to ad ust status under INA section 2 5(l) | |
| | (c)(9) Persons seeking ad ustment of status as a Special Immigrant Ira i or Afghan national | |
| | (c)(9) Persons seeking ad ustment of status as an abused spouse or child under the Cuban Ad ustment Act (CAA) | |
| | (c)(9) Persons seeking ad ustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA) | |
| | (c)(9) U nonimmigrant seeking to ad ust status under INA section 2 5(m) | |
| | (c)(9) Persons seeking ad ustment of status as a Violence Against Women Act (VAWA) self-petitioner (including derivatives) | |
| | (c)(10) Abused spouses and children applying for benefits under the Nicaraguan Ad ustment and Central American Relief Act (NACARA) | |
| | (c)(10) Abused spouses and children of lawful permanent residents or abused spouses and children of U.S. citizens applying for cancellation of removal and ad ustment of status under INA section 2 0A(b)(2) | |
| | (c)(1 ) Deferred action if filed by a petitioner seeking U-1, U-2, U- , U- , or U-5 nonimmigrant status | |
| | (c)(1 ) Deferred action if filed by a Special Immigrant Juvenile | |
| | (c)(1 ) Deferred action if filed by a Violence Against Women Act (VAWA) self-petitioner (including derivatives) | |
| | (c)(25) T-2, T- , T- , T-5, or T-  nonimmigrant | |
| | (c)( 1) Principal beneficiaries or derivative children of an approved Violence Against Women Act (VAWA) self-petition | |

**JA249**

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-765** (continued) | (c)( 0) Applicant for T Nonimmigrant Status or Applicant for Derivative T Nonimmigrant Status With Bona Fide Application<br><br>Current or former U.S. armed forces service members (does not apply to family members unless the family member is also a current or former U.S. armed forces service member). | $0 |
| | If you are filing for a **renewal** EAD under one of the following categories:<br><br>(a)(  ) Refugee<br><br>(a)(8) Citizen of Micronesia, Marshall Islands, or Palau<br><br>(a)(10)   ranted Withholding of Deportation or Removal<br><br>(a)(1  ) Victim of severe form of trafficking (T-1 nonimmigrant)<br><br>(a)(19) U-1 nonimmigrant<br><br>(a)(20) U-2, U-  , U-  , U-5 nonimmigrant<br><br>(c)(1), (c)(  ), or (c)(  ) Dependent of certain foreign government, international organization, or NATO personnel<br><br>(c)(9) Special Immigrant Juvenile seeking to ad ust status<br><br>(c)(9) T nonimmigrant seeking to ad ust status under INA section 2  5(l)<br><br>(c)(9) U nonimmigrant seeking to ad ust status under INA section 2  5(m)<br><br>(c)(9) Persons seeking ad ustment of status as a Special Immigrant Ira  i or Afghan national<br><br>(c)(9) Persons seeking ad ustment of status as an abused spouse or child under the Cuban Ad ustment Act (CAA)<br><br>(c)(9) Persons seeking ad ustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA)<br><br>(c)(9) Persons seeking ad ustment of status as a Violence Against Women Act (VAWA) Form I-  0 self-petitioner (including derivatives)<br><br>(c)(10) Abused spouses and children applying for benefits under the Nicaraguan Ad ustment and Central American Relief Act (NACARA) | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-765** (continued) | (c)(10) Abused spouses and children of lawful permanent residents or abused spouses and children of U.S. citizens applying for cancellation of removal and ad ust ment of status under INA section 2 0A(b)(2).<br><br>(c)(1 ) Deferred action if filed by a petitioner for U-1, U-2, U- , U- , or U-5 nonimmigrant status<br><br>(c)(1 ) Deferred action if filed by a Special Immigrant Juvenile<br><br>(c)(1 ) Deferred action if filed by a Violence Against Women Act (VAWA) Form I- 0 self-petitioner (including derivatives)<br><br>(c)(25) T-2, T- , T- , T-5, or T- nonimmigrant<br><br>(c)( 1) Principal beneficiaries or derivative children of an approved Violence Against Women Act (VAWA) self-petition or<br><br>Current or former U.S. armed forces service members (does not apply to family members unless the family member is also a current or former U.S. armed forces service member). | $0 |
| | If you are filing for a **replacement** EAD because your previously issued card was **lost**, **stolen**, or **damaged**, but has not expired, and you are filing under one of the following categories:<br><br>(a)( ) Refugee<br><br>(a)( ) Paroled as refugee<br><br>(a)(8) Citizen of Micronesia, Marshall Islands, or Palau<br><br>(a)(10) ranted Withholding of Deportation or Removal<br><br>(a)(1 ) Victim of severe form of trafficking (T-1 nonimmigrant)<br><br>(a)(19) U-1 nonimmigrant<br><br>(a)(20) U-2, U- , U- , U-5 nonimmigrant<br><br>(c)(1), (c)( ), or (c)( ) Dependent of certain foreign government, international organization, or NATO personnel<br><br>(c)(9) Special Immigrant Juvenile seeking to ad ust status<br><br>(c)(9) T nonimmigrant seeking to ad ust status under INA section 2 5(l)<br><br>(c)(9) Persons seeking ad ustment of status as a Special Immigrant Ira i or Afghan national | $0 |

| Form Number and Title | Filing Category | Fee(s) |
|---|---|---|
| **I-765** (continued) | (c)(9) Persons seeking ad ustment of status as an abused spouse or child under the Cuban Ad ustment Act (CAA) | |
| | (c)(9) Persons seeking ad ustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA) | |
| | (c)(9) U nonimmigrant seeking to ad ust status under INA section 2 5(m) | |
| | (c)(9) Persons seeking ad ustment of status as a Violence Against Women Act (VAWA) Form I- 0 self-petitioner (including derivatives) | |
| | (c)(10) Abused spouses and children applying for benefits under the Nicaraguan Ad ustment and Central American Relief Act (NACARA) | |
| | (c)(10) Abused spouses and children of lawful permanent residents or abused spouses and children of U.S. citizens applying for cancellation of removal and ad ustment of status under INA section 2 0A(b)(2) | |
| | (c)(11) Special Parole processes for Immigrant Military Members and Veterans Initiative (IMMVI) and you are a current or former U.S. armed forces service member | $0 |
| | (c)(1 ) Deferred action if filed by a petitioner for U-1, U-2, U- , U- , or U-5 nonimmigrant status | |
| | (c)(1 ) Deferred action if filed by a Special Immigrant Juvenile | |
| | (c)(1 ) Deferred action if filed by a Violence Against Women Act (VAWA) Form I- 0 self-petitioner (including derivatives) | |
| | (c)(25) T-2, T- , T- , T-5, or T- nonimmigrant | |
| | (c)( 1) Principal beneficiaries or derivative children of an approved Violence Against Women Act (VAWA) self-petition or | |
| | Current or former U.S. armed forces service members (does not apply to family members unless the family member is also a current or former U.S. armed forces service member). | |
| | **Certain applicants may be eligible for a Fee Waiver.** **See Form I-912 Instructions** (uscis.gov i-912) | $0 |

# EXHIBIT 17

 U.S. Chamber of Commerce

# Chamber Litigation Center



**Fighting for business in the courts**

Founded in 1977, the U.S. Chamber Litigation Center fights for business at every level of the U.S. judicial system, on virtually every issue affecting business, including class actions and arbitration, labor and employment, energy and environment, securities and corporate governance, financial regulation, free speech, preemption, government contracts, and criminal law.

**Explore the case database**

Use advanced search features to view recent activity on the regulatory litigation and amicus briefs the Litigation Center has filed on behalf of the business community.

Search now

"The chamber has created the equivalent of a boutique law firm at its headquarters, one whose roster of talent now rivals some of Washington's most elite practices."

– Reuters, "Chamber of Commerce forms its own elite law team"

JA254



**Featured Story**

# Why the U.S. Chamber Is Fighting to Protect Amicus Filers

Proposed changes to the federal rules could harm important First Amendment rights and impose unnecessary burdens on amicus filers and federal courts.

Read More

## Request access to the Litigation Center's newsletter

Request access to exclusive updates about the U.S. Chamber Litigation Center's lawsuits and amicus briefs protecting the American business community.

Request access

## Leadership



### Daryl Joseffer

Executive Vice President and Chief Counsel, U.S. Chamber Litigation Center



### Tara Morrissey

Senior Vice President and Deputy Chief Counsel, U.S. Chamber Litigation Center

# EXHIBIT 18

 U.S. Chamber of Commerce

# Immigration



Workforce availability is a major challenge for businesses. When we hear from businesses across America about expanding and investing in their communities, workforce is one of the biggest impediments they raise. Businesses simply can't grow without the talent needed to do it. The president was right to focus on border security, which was a crucial first step, and we commend his leadership on this issue. Having made significant progress, now is the time to review our legal immigration system.

America's success has always relied on welcoming the most talented, hardworking people from around the world. This has been a significant driver in our nation's growth and prosperity.

Unfortunately, the current immigration system doesn't meet the needs of our economy, businesses, or workers. That's why we're advocating for reforms to legal immigration that will boost economic growth, create jobs, and foster innovation for all Americans. We urge Congress and the administration to implement commonsense reforms to help businesses meet their workforce needs.

**Become a part of the world's largest business organization and network**

U.S. Chamber members range from small businesses and chambers of commerce across the country to startups in fast-growing sectors, leading industry associations, and global corporations.

Discover the ROI Chamber membership can deliver for you.

Get started

**Our Work**

To allow businesses to meet their workforce needs, the U.S. Chamber is pushing Congress and the administration to implement commonsense reforms to our legal immigration system. When businesses are empowered to welcome international talent to the workforce, we renew our nation's legacy as an open and welcoming country where anyone who works hard can attain his or her goals.

Latest        **Major Initiatives**        Programs



America Works Initiative

**Events**

**International**

## AACCLA's 58th Annual Meeting and Forecast on Latin America and the Caribbean Conference

Live Now
U.S. Chamber of Commerce, 1615 H St NW, Washington, DC 20062

Learn More ↗

**Environment and Sustainability**

## Chemistry Solutions Forum 2025

Wednesday, October 22
09:00 AM EDT - 12:00 PM EDT

U.S. Chamber of Commerce 1615 H St NW, Washington, DC 20062

Learn More ↗

**Corporate Social Responsibility**

## 2025 Business Solves Annual Conference

Tuesday, October 28 - Wednesday, October 29
08:00 AM EDT - 03:00 PM EDT
U.S. Chamber of Commerce Foundation 1615 H St NW, Washington, D.C. 20062

Learn More ↗

**Latest Content**

# EXHIBIT 28





# Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)

## Updated February 21, 2024

The President has the authority "to suspend the entry of all aliens or any class of aliens" whenever the President "finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." Presidential Administrations have invoked this authority, found in 8 U.S.C. § 1182(f), in diverse contexts, including to suspend the entry of some individuals connected with "Russian efforts to undermine the sovereignty and territorial integrity of Ukraine," certain students and researchers arriving from China, and some foreign nationals arriving to the United States by air from specific countries during the COVID-19 pandemic. This statutory authority to restrict the entry of certain aliens has garnered recent attention by lawmakers. This Legal Sidebar discusses the presidential authority found in Section 1182(f) and provides a table documenting entry restrictions expressly invoking this authority that have been issued from December 31, 1980, through February 15, 2024.

## Background

Prior to the enactment of Section 1182(f), predecessor statutes passed in response to World War I and World War II authorized the President to restrict the entry and departure of persons. In 1918, Congress passed the Act of May 22, 1918, which authorized the President, "when the United States is at war," to place restrictions and prohibitions on "the departure of persons from and their entry into the United States … if the President shall find that the public safety requires" these restrictions. Invoking this authority, President Woodrow Wilson then issued Presidential Proclamation No. 1,473, providing that "[n]o alien shall receive permission to depart from or enter the United States unless it shall affirmatively appear that there is reasonable necessity for such departure or entry and that such departure or entry is not prejudicial to the interests of the United States."

The 1918 Act was effective only during wartime, but it was amended just before the United States entered World War II to apply to the national emergency declared in response to the widening conflict. The Alien Visa Act of 1941 amended the 1918 Act to authorize the President, "[w]hen the United States is at war or during the existence of the national emergency proclaimed by the President on May 27, 1941," to limit the departure of persons from and their entry into the United States when "the President shall find that the interests of the United States require." During consideration of the Alien Visa Act of 1941 and proposed amendments, legislators debated the appropriate scope of the presidential authority, including whether to

"

https://crsreports.congress.gov

LSB10458

restrict the authority to wartime and whether to ground such authority in the protection of "public safety" or the "public interest." One Senator argued that "we are constantly drifting away from constitutional methods of procedure in government and proceeding to government by Executive decree." In response, another Senator explained that, according to the Department of State, the authority permitting the President to place limitations in support of the "interests of the United States" would be used only to "suppress subversive activities." President Franklin Roosevelt invoked this authority through Presidential Proclamation 2,523, which provided that, among other restrictions on travel, "[n]o alien shall be permitted to enter the United States if it appears to the satisfaction of the Secretary of State that such entry would be prejudicial to the interests of the United States.... "

The current version of Section 1182(f) authorizing the President to suspend the entry of aliens or classes of aliens if such entry would be detrimental to the interests of the United States derives from the initial passage of the Immigration and Nationality Act (INA) in 1952. An amendment that would have limited the provision to a national emergency or state of war was debated during this time, with some arguing that the broad language with no limitations was "absolutely essential." For instance, one Representative pointed to a potential "outbreak of an epidemic in some country," claiming it would be "impossible" for Congress "to act." Others expressed concern in giving the President such broad authority independent of a requirement of war or national emergency, asserting that it would give the President "the right to say that hereafter there shall be no more immigration into the United States."

The Supreme Court has understood Section 1182(f) to convey broad authority to the President to limit the entry of aliens into the United States. In the 1993 decision *Sale v. Haitian Centers Council, Inc.*, the Court upheld the validity of an interdiction program established by President George H. W. Bush through Executive Order No. 12,807, which was based on the authority under Section 1182(f). According to the *Sale* Court, "[i]t is perfectly clear that 8 U.S.C. § 1182(f) grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores."

In the 2018 decision *Trump v. Hawaii*, the Supreme Court interpreted Section 1182(f) as granting broad presidential authority to suspend the entry of aliens. In this case, the Court considered whether President Donald Trump had authority under Section 1182(f) to issue Proclamation No. 9,645, which "place[d] entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate," and whether it violated the Establishment Clause of the First Amendment. The Court rejected the legal challenges by a 5-4 vote, holding that the breadth of the restrictions on nationals of the countries identified by the proclamation did not exceed the President's authority under Section 1182(f). The majority stated that, "[b]y its terms," Section 1182(f) "exudes deference to the President" and grants the President broad authority to impose entry restrictions. The Court reasoned that Section 1182(f) is a "comprehensive delegation" that gives the President discretion over every detail of the entry restrictions he sets under it, including "when to suspend entry," "whose entry to suspend," "for how long," and "on what conditions."

Following *Trump v. Hawaii*, lowers courts have continued to address the scope of the President's authority to exclude aliens under Section 1182(f). In particular, courts have considered whether the level of deference owed to the President's exercise of that authority should depend on whether the proclamation is premised on national security interests or purely domestic affairs. Some courts have held that the President is entitled to less deference when a proclamation is based on domestic interests. For example, in one case, a federal district court held that a 2020 proclamation issued by President Trump suspending entry of certain nonimmigrant workers based on economic concerns during the COVID-19 pandemic exceeded the President's authority under Section 1182(f) because the statute "does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners." (President Joe Biden revoked the challenged proclamation during the pendency of the government's appeal, and the U.S. Court of Appeals decided this action rendered the case moot without reaching the merits of the lower court decision.) In a separate case concerning the legality of that proclamation,

another district court, citing Supreme Court precedent, rejected the distinction between domestic and foreign affairs for purposes of determining the appropriate level of deference.

Lower courts have also explained that, while Section 1182(f) gives the President authority to suspend the entry of certain aliens, immigration officials may not rely upon that authority to suspend visa adjudications. More generally, courts have explained that the President's authority under Section 1182(f) is not unbounded and may not be used to supersede or conflict with other provisions of the INA. In one recent case, however, a federal district court suggested in a footnote that, at least in some circumstances, Section 1182(f) "would certainly seem to authorize the President to close the border to arriving aliens once it became apparent that … [immigration detention] facilities were not going to be able to handle the 'surge' of aliens coming to the border."

In sum, while courts uniformly recognize that Section 1182(f) conveys broad authority to the President to restrict the entry of aliens into the United States, the judicial branch continues to grapple with questions over Section 1182(f)'s application and the degree that domestic interests may inform the President's decision to invoke that authority.

# Presidential Actions Suspending Entry of Aliens

As shown in **Table 1**, various presidential Administrations have relied on Section 1182(f) in many contexts. It appears that Presidents did not employ Section 1182(f) to impose entry restrictions until the Reagan Administration. On at least two earlier occasions—1953 and 1979—Presidents invoked a separate INA provision, 8 U.S.C. § 1185, to authorize Department of State regulations restricting alien entry. Since 1981, every President has invoked Section 1182(f) at least once, as shown in **Table 1** below. Invocations have become more frequent in recent presidential Administrations, as shown below.

**Table 1** below lists information regarding presidential proclamations and executive orders (hereinafter "presidential documents") issued after December 31, 1980, through February 15, 2024, that have expressly invoked 8 U.S.C. § 1182(f) to impose entry restrictions.

- **Column 1—Date of Invocation** lists the date an entry restriction was issued. The entry restrictions are arranged in reverse-chronological order.

- **Column 2—Title of Order or Proclamation** lists the title of the presidential document published in the *Federal Register*.

- **Column 3—Citation** includes an executive order or proclamation number as well as *Federal Register* citation. Any identified amendments or partial revocations to the entry restrictions are noted in parentheticals.

- **Column 4—Nature of Exclusion** briefly summarizes the nature of the listed entry exclusion but does not identify waivers, exemptions, or limitations.

- **Column 5—Status** includes information about the status of the entry restrictions listed in **Columns 1-3**, including any presidential document that entirely revoked or superseded a listed entry restriction. "No presidential revocation identified" indicates that no rescission by way of presidential document was found. When a complete revocation was not identified for a listed restriction, **Column 5** includes the most recent reference to the listed restriction in a presidential document if such a reference exists.

CRS compiled **Table 1** using the parameters and limitations outlined in the "Table Methodology" section below. Different research methodologies may yield different results.

**Table 1. Entry Restrictions Expressly Invoking 8 U.S.C. § 1182(f) Issued After December 31, 1980, and Through February 15, 2024**

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Invocations by President Joe Biden |||||
| Feb. 1, 2024 | Imposing Certain Sanctions on Persons Undermining Peace, Security, and Stability in the West Bank | Exec. Order No. 14,115, 89 Fed. Reg. 7,605 (Feb. 5, 2024). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to the West Bank (e.g., persons involved with "actions … that threaten the peace, security, or stability of the West Bank"). | No presidential revocation identified. |
| Dec. 11, 2023 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Enabling Corruption | Pres. Proc. No. 10,685, 88 Fed. Reg. 86,541 (Dec. 14, 2023). | Suspending the entry as immigrants or nonimmigrants of certain persons connected with "significant corruption" (e.g., "laundering of its proceeds or obstruction of judicial or investigative processes"). | No presidential revocation identified. |
| May 4, 2023 | Imposing Sanctions on Certain Persons Destabilizing Sudan and Undermining the Goal of a Democratic Transition | Exec. Order No. 14,098, 88 Fed. Reg. 29,529 (May 5, 2023). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to Sudan (e.g., persons involved with "actions or policies that threaten the peace, security, or stability of Sudan"). | No presidential revocation identified. Referenced in Notice of Oct. 31, 2023, 88 Fed. Reg. 75,227 (Oct. 31, 2023). |
| July 19, 2022 | Bolstering Efforts to Bring Hostages and Wrongfully Detained United States Nationals Home | Exec. Order No. 14,078, 87 Fed. Reg. 43,389 (July 21, 2022). | Suspending the entry as immigrants or nonimmigrants of certain persons connected with "the hostage-taking of a United States national or the wrongful detention of a U.S. national abroad." | No presidential revocation identified. Referenced in Notice of July 12, 2023, 88 Fed. Reg. 45,327 (July 15, 2023). |
| Feb. 21, 2022 | Blocking Property of Certain Persons and Prohibiting Certain Transactions with Respect to Continued Russian Efforts to Undermine the Sovereignty and Territorial Integrity of Ukraine | Exec. Order No. 14,065, 87 Fed. Reg. 10,293 (Feb. 23, 2022). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to Russia's "purported recognition of the so-called Donetsk People's Republic (DNR) or Luhansk People's Republic (LNR) regions of Ukraine." | No presidential revocation identified. |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Dec. 15, 2021 | Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade | Exec. Order No. 14,059, 86 Fed. Reg. 71,549 (Dec. 17, 2021). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to "global illicit drug trade" (e.g., persons involved with "activities or transactions that have materially contributed to ... the international proliferation of illicit drugs or their means of production"). | No presidential revocation identified.<br><br>Referenced in Notice of Dec. 13, 2023, 88 Fed. Reg. 86,809 (Dec. 13, 2023). |
| Nov. 26, 2021 | Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease 2019 | Pres. Proc. No. 10,315, 86 Fed. Reg. 68,385 (Dec. 1, 2021). | In response to COVID-19, suspending the entry as immigrants and nonimmigrants of certain persons who were physically present within Botswana, Eswatini, Lesotho, Malawi, Mozambique, Namibia, South Africa, and Zimbabwe during the 14-day period before their entry or attempted entry. | Revoked by Pres. Proc. No. 10,329, 87 Fed. Reg. 149 (Jan. 3, 2022). |
| Nov. 16, 2021 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies or Actions That Threaten Democracy in Nicaragua | Pres. Proc. No. 10,309, 86 Fed. Reg. 64,797 (Nov. 19, 2021). | Suspending the entry as immigrants or nonimmigrants of specified categories of persons responsible for policies or actions that threaten Nicaragua's democratic institutions (e.g., government officials with the rank of vice minister or above; military officers). | No presidential revocation identified. |
| Oct. 25, 2021 | Advancing the Safe Resumption of Global Travel During the COVID-19 Pandemic | Pres. Proc. No. 10,294, 86 Fed. Reg. 59,603 (Oct. 25, 2021). | Suspending the entry as nonimmigrants of persons not fully vaccinated against COVID-19, with exceptions. | Revoked in part by Pres. Proc. No. 10,575, 88 Fed. Reg. 30,889 (May 9, 2023). |
| Sept. 17, 2021 | Imposing Sanctions on Certain Persons with Respect to the Humanitarian and Human Rights Crisis in Ethiopia | Exec. Order No. 14,046, 86 Fed. Reg. 52,389 (Sept. 21, 2021). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to Ethiopia (e.g., persons involved with "corruption or serious human rights abuse in or with respect to northern Ethiopia"). | No presidential revocation identified.<br><br>Referenced in Notice of Sept. 7, 2023, 88 Fed. Reg. 62,435 (Sept. 11, 2023). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Aug. 9, 2021 | Blocking Property of Additional Persons Contributing to the Situation in Belarus | Exec. Order No. 14,038, 86 Fed. Reg. 43,905 (Aug. 11, 2021). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to Belarus (e.g., persons found "to operate … in the defense and related materiel sector"). | No presidential revocation identified. Referenced in Notice of June 12, 2023, 88 Fed. Reg. 39,109 (June 14, 2023). |
| June 8, 2021 | Blocking Property and Suspending Entry into the United States of Certain Persons Contributing to the Destabilizing Situation in the Western Balkans | Exec. Order No. 14,033, 86 Fed. Reg. 31,079 (June 10, 2021). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to the Western Balkans (e.g., persons found to be involved with serious human rights abuses and corruption in the Western Balkans). | No presidential revocation identified. Referenced in Notice of June 20, 2023, 88 Fed. Reg. 40,683 (June 22, 2023). |
| Apr. 30, 2021 | Suspension of Entry as Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease 2019 | Pres. Proc. No. 10,199, 86 Fed. Reg. 10,199 (May 6, 2021). | In response to COVID-19, suspending the entry as nonimmigrants of persons who were physically present in India during the 14-day period before their entry or attempted entry. | Revoked by Pres. Proc. No. 10,294, 86 Fed. Reg. 59,603 (Oct. 25, 2021). |
| Apr. 15, 2021 | Blocking Property with Respect to Specified Harmful Foreign Activities of the Government of the Russian Federation | Exec. Order No. 14,024, 86 Fed. Reg. 20,249 (Apr. 19, 2021) (amended by Exec. Order No. 14,066, 87 Fed. Reg. 13,625 (Mar. 10, 2022), and Exec. Order No. 14,114, 88 Fed. Reg. 246 (Dec. 26, 2023)). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to Russia (e.g., persons found to operate in the technology or the defense and related materiel sector of the Russian economy and those who have engaged in malicious cyber-enabled activities). | No presidential revocation identified. Referenced in Notice of Apr. 7, 2023, 88 Fed. Reg. 21,457 (Apr. 10, 2023). |
| Feb. 10, 2021 | Blocking Property with Respect to the Situation in Burma | Exec. Order No. 14,014, 86 Fed. Reg. 9,429 (Feb. 12, 2021). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to Burma (e.g., persons found "to operate in the defense sector" of the Burmese economy and those who engage in actions that "undermine the democratic processes or institutions in Burma"). | No presidential revocation identified. Referenced in Notice of Feb. 7, 2024, 89 Fed. Reg. 8,989 (Feb. 9, 2024). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Jan. 25, 2021 | Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease 2019 | Pres. Proc. No. 10,143, 86 Fed. Reg. 7,467 (Jan. 28, 2021). | In response to COVID-19, suspending the entry as immigrants and nonimmigrants of certain persons who were physically present within the Schengen Area, the United Kingdom, Ireland, Brazil, and South Africa during the 14-day period before their entry or attempted entry. | Revoked by Pres. Proc. No. 10,294, 86 Fed. Reg. 59,603 (Oct. 25, 2021). |
| Invocations by President Donald Trump |||||
| Sept. 21, 2020 | Blocking Property of Certain Persons with Respect to the Conventional Arms Activities of Iran | Exec. Order No. 13,949, 85 Fed. Reg. 60,043 (Sept. 23, 2020). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to Iran (e.g., persons who engage in "any activity that materially contributes to the supply, sale, or transfer ... to or from Iran, or for the use in or benefit of Iran, of arms and related materiel, including spare parts"). | No presidential revocation identified. Referenced in Notice of Mar. 10, 2023, 88 Fed. Reg. 15,595 (Mar. 13, 2023). |
| July 14, 2020 | The President's Executive Order on Hong Kong Normalization | Exec. Order No. 13,936, 85 Fed. Reg. 43,413 (July 14, 2020). | Suspending the entry as immigrants or nonimmigrants of persons related to certain activities in Hong Kong (e.g., persons found to have been involved "in the coercing, arresting, detaining, or imprisoning of individuals under the authority of ... the Law of the People's Republic of China"). | No presidential revocation identified. Referenced in Notice of July 11, 2023, 88 Fed. Reg. 44,669 (July 12, 2023). |
| June 11, 2020 | Blocking Property of Certain Persons Associated with the International Criminal Court | Exec. Order No. 13,928, 85 Fed. Reg. 36,139 (June 15, 2020). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to the International Criminal Court. | Revoked by Exec. Order No. 14,022, 86 Fed. Reg. 17,895 (Apr. 7, 2021). |
| May 29, 2020 | Suspension of Entry as Nonimmigrants of Certain Students and Researchers from the People's Republic of China | Pres. Proc. No. 10,043, 85 Fed. Reg. 34,353 (June 4, 2020). | Suspending the entry as nonimmigrants of any national of China seeking to enter the United States pursuant to an F or J visa to study or conduct research in the United States, with exceptions. | No presidential revocation identified. |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| May 24, 2020 | Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus | Pres. Proc. No. 10,041, 85 Fed. Reg. 31933 (May 28, 2020) (amended by Pres. Proc. No. 10,042, 85 Fed. Reg. 32,291 (May 28, 2020)). | In response to COVID-19, suspending the entry as immigrants and nonimmigrants of persons who were physically present in Brazil during the 14-day period before their entry or attempted entry. | Revoked by Pres. Proc. No. 10,138, 86 Fed. Reg. 6,799 (Jan. 22, 2021). |
| Apr. 22, 2020 | Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak | Pres. Proc. No. 10,014, 85 Fed. Reg. 23,441 (Apr. 27, 2020) (amended by Pres. Proc. No. 10,052, 85 Fed. Reg. 38,263 (June 25, 2020), Pres. Proc. June 29, 2020, Pres. Proc. Dec. 31, 2020, and Pres. Proc. No. 10,131, 86 Fed. Reg. 417 (Jan. 6, 2021). | In response to COVID-19, suspending the entry as immigrants and nonimmigrants of persons. | Restrictions revoked in part by Pres. Proc. No. 10,014, 85 Fed. Reg. 23,441 (Feb. 24, 2021), and in part expired on Mar. 31, 2021. Pres. Proc. No. 10,131, 86 Fed. Reg. 417 (Jan. 6, 2021). |
| Mar. 14, 2020 | Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus | Pres. Proc. No. 9,996, 85 Fed. Reg. 15,341 (Mar. 18, 2020). | In response to COVID-19, suspending the entry as immigrants and nonimmigrants of persons who were physically present in the United Kingdom or Ireland during the 14-day period before their entry or attempted entry. | Revoked by Pres. Proc. No. 10,138, 86 Fed. Reg. 6,799 (Jan. 22, 2021). |
| Mar. 11, 2020 | Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus | Pres. Proc. No. 9,993, 85 Fed. Reg. 15,045 (Mar. 16, 2020). | In response to COVID-19, suspending the entry as immigrants or nonimmigrants of persons who were physically present in the Schengen Area during the 14-day period before their entry or attempted entry. | Revoked by Pres. Proc. No. 10,138, 86 Fed. Reg. 6,799 (Jan. 22, 2021). |
| Feb. 29, 2020 | Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus | Pres. Proc. No. 9,992, 85 Fed. Reg. 12,855 (Mar. 4, 2020). | In response to COVID-19, suspending the entry as immigrants or nonimmigrants of persons who were physically present in Iran during the 14-day period before their entry or attempted entry. | Revoked by Pres. Proc. No. 10,294, 86 Fed. Reg. 59,603 (Oct. 25, 2021). |
| Jan. 31, 2020 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus and Other Appropriate Measures to Address This Risk | Pres. Proc. No. 9,984, 85 Fed. Reg. 6,709 (Feb. 5, 2020). | In response to COVID-19, suspending the entry as immigrants or nonimmigrants of persons who were physically present in mainland China during the 14-day period before their entry or attempted entry. | Revoked by Pres. Proc. No. 10,294, 86 Fed. Reg. 59,603 (Oct. 25, 2021). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Jan. 31, 2020 | Improving Enhanced Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats | Pres. Proc. No. 9,983, 85 Fed. Reg. 6,699 (Feb. 5, 2020). | Suspending the entry as immigrants of nationals of Myanmar, Eritrea, Kyrgyzstan, and Nigeria and suspending the issuance of diversity visas to nationals of Sudan and Tanzania. | Revoked by Pres. Proc. No. 10, 141, 87 Fed. Reg. 7,005 (Jan. 25, 2021). |
| Jan. 10, 2020 | Imposing Sanctions with Respect to Additional Sectors of Iran | Exec. Order No. 13,902, 85 Fed. Reg. 2,003 (Jan. 14, 2020). | Suspending the entry as immigrants or nonimmigrants of persons operating or conducting significant transactions within certain sectors of the economy of Iran. | No presidential revocation identified. |
| Oct. 14, 2019 | Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Syria | Exec. Order No. 13,894, 84 Fed. Reg. 55,851 (Oct. 17, 2019). | Suspending the entry as immigrants or nonimmigrants of certain persons contributing to the situation in Syria. | No presidential revocation identified.<br><br>Referenced in Notice of Oct. 12, 2023, 88 Fed. Reg. 71,271 (Oct. 12, 2023). |
| Oct. 4, 2019 | Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans | Pres. Proc. No. 9,945, 84 Fed. Reg. 53,991 (Oct. 9, 2019). | Suspending the entry as immigrants of persons who do not have approved health insurance and do not have the financial resources to pay foreseeable medical costs. | Revoked by Pres. Proc. No. 10,209, 86 Fed. Reg. 27,015 (May 19, 2021). |
| Sept. 25, 2019 | Suspension of Entry as Immigrants and Nonimmigrants of Senior Officials of the Government of Iran | Pres. Proc. No. 9,932, 84 Fed. Reg. 51,935 (Sept. 30, 2019). | Suspending the entry as immigrants or nonimmigrants of senior officials of the government of Iran and their immediate family members. | No presidential revocation identified. |
| Sept. 25, 2019 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies or Actions That Threaten Venezuela's Democratic Institutions | Pres. Proc. No. 9,931, 84 Fed. Reg. 51,931 (Sept. 30, 2019). | Suspending the entry as immigrants or nonimmigrants of specified categories of persons "responsible for policies or actions that threaten Venezuela's democratic institutions" (e.g., government officials with the rank of vice minister or above; military officers). | No presidential revocation identified. |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Aug. 5, 2019 | Blocking Property of the Government of Venezuela | Exec. Order No. 13,884, 84 Fed. Reg. 38,843 (Aug. 7, 2019). | Suspending the entry as immigrants or nonimmigrants of certain persons who have provided material assistance or support to persons subject to property restrictions due to their links to the government of Venezuela. | No presidential revocation identified.<br><br>Referenced in Notice of Mar. 1, 2023, 88 Fed. Reg. 13,287 (Mar. 2, 2023). |
| July 26, 2019 | Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Mali | Exec. Order No. 13,882, 84 Fed. Reg. 37,055 (July 30, 2019). | Suspending the entry as immigrants or nonimmigrants of specified categories of persons who have contributed to the situation in Mali in specified ways (e.g., by engaging in "actions or policies that threaten the peace, security, or stability of Mali"). | No presidential revocation identified.<br><br>Referenced in Notice of July 21, 2023, 88 Fed. Reg. 48,027 (July 25, 2023). |
| June 24, 2019 | Imposing Sanctions with Respect to Iran | Exec. Order No. 13,876, 84 Fed. Reg. 30,573 (June 26, 2019). | Suspending the entry as immigrants or nonimmigrants of certain government officials and corporate executives in Iran (e.g., any person "appointed by the Supreme Leader of Iran or the [Supreme Leader's Office] to a position as a state official of Iran") and others who materially assist or support them. | No presidential revocation identified.<br><br>Referenced in Notice of Mar. 10, 2023, 88 Fed. Reg. 15,595 (Mar. 13, 2023). |
| May 8, 2019 | Imposing Sanctions with Respect to the Iron, Steel, Aluminum, and Copper Sectors of Iran | Exec. Order No. 13,871, 84 Fed. Reg. 20,761 (May 10, 2019). | Suspending the entry as immigrants or nonimmigrants of certain persons operating or conducting business in the iron, steel, aluminum, or copper sectors of Iran. | No presidential revocation identified.<br><br>Referenced in Notice of Mar. 10, 2023, 88 Fed. Reg. 15,595 (Mar. 13, 2023). |
| Nov. 27, 2018 | Blocking Property of Certain Persons Contributing to the Situation in Nicaragua | Exec. Order No. 13,851, 83 Fed. Reg. 61,505 (Nov. 29, 2018). | Suspending the entry as immigrants or nonimmigrants of persons who have contributed to the situation in Nicaragua in specified ways (e.g., by engaging in "serious human rights abuse in Nicaragua"). | No presidential revocation identified.<br><br>Referenced in Notice of Nov. 16, 2023, 88 Fed. Reg. 80,549 (Nov. 17, 2023). |
| Nov. 9, 2018 | Addressing Mass Migration Through the Southern Border of the United States | Pres. Proc. No. 9,822, 83 Fed. Reg. 57,661 (Nov. 15, 2018) (amended by Pres. Proc. No. 9,842, 84 Fed. Reg. 3,665 (Feb. 12, 2019) and Pres. Proc. No. 9,880, 84 Fed. Reg. 21,229 (May 13, 2019)). | Suspending the entry of aliens between ports of entry across the southern border, in conjunction with an interim final rule rendering aliens ineligible for asylum if they violate the suspension on entry. | Revoked by Exec. Order No. 14,010, 86 Fed. Reg. 8,267 (Feb. 5, 2021). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Sept. 20, 2018 | Authorizing the Implementation of Certain Sanctions Set Forth in the Countering America's Adversaries Through Sanctions Act | Exec. Order No. 13,849, 83 Fed. Reg. 48,195 (Sept. 21, 2018). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to property sanctions related to the Countering America's Adversaries Through Sanctions Act. | No presidential revocation identified. |
| Sept. 12, 2018 | Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election | Exec. Order No. 13,848, 83 Fed. Reg. 46,843 (Sept. 14, 2018). | Suspending the entry as immigrants or nonimmigrants of certain persons determined to have been complicit in foreign interference in a United States election. | No presidential revocation identified. Referenced in Notice of Sept. 7, 2023, 88 Fed. Reg. 62,437 (Sept. 11, 2023). |
| Aug. 6, 2018 | Reimposing Certain Sanctions with Respect to Iran | Exec. Order No. 13,846, 83 Fed. Reg. 38,939 (Aug. 7, 2018). | Suspending the entry as immigrants or nonimmigrants of certain persons subject to sanctions related to Iran (e.g., persons who have materially assisted "the purchase or acquisition of U.S. bank notes or precious metals by the Government of Iran"). | No presidential revocation identified. Referenced in Notice of Mar. 10, 2023, 88 Fed. Reg. 15,595 (Mar. 13, 2023). |
| Dec. 20, 2017 | Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption | Exec. Order No. 13,818, 82 Fed. Reg. 60,839 (Dec. 26, 2017). | Suspending the entry as immigrants or nonimmigrants of 13 named persons and other persons determined to be complicit in serious human rights abuses or corruption. | No presidential revocation identified. Referenced in Notice of Dec. 18, 2023, 88 Fed. Reg. 87,891 (Dec. 19, 2023). |
| Oct. 24, 2017 | Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities | Pres. Proc. No. 13,815, 82 Fed. Reg. 50,055 (Oct. 27, 2017). | Providing for the resumption of the United States Refugee Admissions Program upon the expiration of Executive Order 13,780, subject to limitations established by the Secretaries of State and Homeland Security. | Revoked by Exec. Order No. 14013, 86 Fed. Reg. 8,839 (Feb. 9, 2021). |
| Sept. 24, 2017 | Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats | Pres. Proc. No. 9,645, 82 Fed. Reg. 45,161 (Sept. 27, 2017) (amended by Pres. Proc. No. 9,723, 83 Fed. Reg. 15,937 (Apr. 13, 2018)). | Suspending the entry as immigrants, nonimmigrants, or both of specified categories of nationals of Chad, Iran, Libya, North Korea, Syria, Venezuela, Yemen, and Somalia. | Revoked by Pres. Proc. No. 10,141, 86 Fed. Reg. 7,005 (Jan. 25, 2021). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Sept. 20, 2017 | Imposing Additional Sanctions with Respect to North Korea | Exec. Order No. 13,810, 82 Fed. Reg. 44,705 (Sept. 25, 2017). | Suspending the entry as immigrants or nonimmigrants of specified categories of persons subject to property sanctions for operating in certain sectors of the North Korean economy or engaging in commercial activity in North Korea. | No presidential revocation identified. Referenced in Notice of June 20, 2023, 88 Fed. Reg. 40,681 (June 22, 2023). |
| Mar. 6, 2017 | Protecting the Nation from Foreign Terrorist Entry into the United States | Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017). | Suspending for 90 days the entry of aliens from Iran, Libya, Somalia, Sudan, Syria, and Yemen and suspending the entry of all refugees for 120 days. | Revoked by Pres. Proc. No. 10,141, 87 Fed. Reg. 7,005 (Jan. 25, 2021). |
| Jan. 27, 2017 | Protecting the Nation from Foreign Terrorist Entry into the United States | Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Feb. 1, 2017). | Suspending for 90 days the entry as immigrants or nonimmigrants of persons from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen; suspending the entry of all refugees for 120 days; and suspending the entry of refugees from Syria indefinitely. | Revoked by Pres. Proc. No. 10,141, 87 Fed. Reg. 7,005 (Jan. 25, 2021). |
| **Invocations by President Barack Obama** | | | | |
| Apr. 19, 2016 | Blocking Property and Suspending Entry into the United States of Persons Contributing to the Situation in Libya | Exec. Order No. 13,726, 81 Fed. Reg. 23,559 (Apr. 21, 2016). | Suspending the entry as immigrants or nonimmigrants of persons determined to have "contributed to the situation in Libya" in specified ways (e.g., engaging in "actions or policies that threaten the peace, security, or stability" of that country or may lead to or result in the misappropriation of Libyan state assets). | No presidential revocation identified. Referenced in Notice of Feb. 7, 2023, 88 Fed. Reg. 10,823 (Feb. 21, 2023). |
| Mar. 15, 2016 | Blocking Property of the Government of North Korea and the Workers' Party of Korea, and Prohibiting Certain Transactions with Respect to North Korea | Exec. Order No. 13,722, 81 Fed. Reg. 14,943 (Mar. 18, 2016). | Suspending the entry as immigrants or nonimmigrants of persons determined to have engaged in certain transactions involving North Korea (e.g., selling or purchasing metal, graphite, coal, or software directly or indirectly to or from North Korea or to persons acting for or on behalf of the North Korean government or the Workers' Party of Korea). | No presidential revocation identified. Referenced in Notice of June 20, 2023, 88 Fed. Reg. 40,681 (June 22, 2023). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Nov. 22, 2015 | Blocking Property of Certain Persons Contributing to the Situation in Burundi | Exec. Order No. 13,712, 80 Fed. Reg. 73,633 (Nov. 25, 2015). | Suspending the entry as immigrants or nonimmigrants of persons determined to have "contributed to the situation in Burundi" in specified ways (e.g., engaging in "actions or policies that threaten the peace, security, or stability of Burundi" or "undermine democratic processes or institutions" in that country). | No presidential revocation identified.

Revoked by Exec. Order 14,054, 86 Fed. Reg. 66,149 (Nov. 19, 2021). |
| Apr. 1, 2015 | Blocking the Property of Certain Persons Engaging in Significant Malicious Cyber-Enabled Activities | Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 2, 2015) (expanded by Exec. Order No. 13,757, 82 Fed. Reg. 1 (Jan. 3, 2017)). | Suspending the entry as immigrants or nonimmigrants of persons determined to have engaged in "significant malicious cyber-enabled activities" (e.g., harming or significantly compromising the provision of services by a computer or computer network that supports an entity in a critical infrastructure sector). | No presidential revocation identified.

Referenced in Notice of Mar. 29 2023, 88 Fed. Reg. 19,209 (Mar. 30, 2023). |
| Mar. 8, 2015 | Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Venezuela | Exec. Order No. 13,692, 80 Fed. Reg. 12,747 (Mar. 11, 2015) (expanded by Exec. Order No. 13,850, 83 Fed. Reg. 55,243 (Nov. 2, 2018)). | Suspending the entry as immigrants or nonimmigrants of persons determined to have "contributed to the situation in Venezuela" in specified ways (e.g., engaging in actions or policies that undermine democratic processes or institutions, significant acts of violence, or conduct that constitutes a serious abuse or violation of human rights). | No presidential revocation identified.

Referenced in Notice of Mar. 1, 2023, 88 Fed. Reg. 13,287 (Mar. 2, 2023). |
| Jan. 2, 2015 | Imposing Additional Sanctions with Respect to North Korea | Exec. Order No. 13,687, 80 Fed. Reg. 819 (Jan. 6, 2015). | Suspending the entry as immigrants or nonimmigrants of persons with specified connections to North Korea (e.g., officials of the North Korean government or the Workers' Party of Korea). | No presidential revocation identified.

Referenced in Notice of June 20, 2023, 88 Fed. Reg. 40,681 (June 22, 2023). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Dec. 19, 2014 | Blocking Property of Certain Persons and Prohibiting Certain Transactions with Respect to the Crimea Region of Ukraine | Exec. Order No. 13,685, 79 Fed. Reg. 77,357 (Dec. 24, 2014). | Suspending the entry as immigrants or nonimmigrants of persons determined to have engaged in certain transactions involving the Crimea region of Ukraine (e.g., materially assisting, sponsoring, or providing financial, material, or technological support for, or goods or services to or in support of, persons whose property or interests are blocked under the order). | No presidential revocation identified.<br><br>Referenced in Notice of Mar. 1, 2023, 88 Fed. Reg. 13,285 (Mar. 2, 2023. |
| May 12, 2014 | Blocking Property of Certain Persons Contributing to the Conflict in the Central African Republic | Exec. Order No. 13,667, 79 Fed. Reg. 28,387 (May 15, 2014). | Suspending the entry as immigrants or nonimmigrants of persons determined to have contributed to the conflict in the Central African Republic in specified ways (e.g., engaging in actions or policies that threaten the peace, security, or stability of that country or that threaten transitional agreements or the political transition process). | No presidential revocation identified.<br><br>Referenced in Notice of May 10, 2023, 88 Fed. Reg. 30,637 (May 11, 2023). |
| Apr. 3, 2014 | Blocking Property of Certain Persons with Respect to South Sudan | Exec. Order No. 13,664, 79 Fed. Reg. 19,283 (Apr. 7, 2014). | Suspending the entry as immigrants or nonimmigrants of persons determined to have engaged in certain conduct as to South Sudan (e.g., actions or policies that "have the purpose or effect of expanding or extending the conflict" in that country or obstructing reconciliation or peace talks or processes). | No presidential revocation identified.<br><br>Referenced in Notice of Mar. 29, 2023, 88 Fed. Reg. 19,211 (Mar. 30, 2023). |
| Mar. 20, 2014 | Blocking Property of Additional Persons Contributing to the Situation in Ukraine | Exec. No. Order 13,662, 79 Fed. Reg. 16,169 (Mar. 24, 2014). | Suspending the entry as immigrants or nonimmigrants of persons determined to have contributed to the situation in Ukraine in specified ways (e.g., operating in the financial services, energy, metals and mining, engineering, or defense and related materiel sectors of the Russian Federation economy). | No presidential revocation identified.<br><br>Referenced in Notice of Mar. 1 2023, 88 Fed. Reg. 13,285 (Mar. 2, 2023). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Mar. 16, 2014 | Blocking Property of Additional Persons Contributing to the Situation in Ukraine | Exec. No. Order 13,661, 79 Fed. Reg. 15,535 (Mar. 19, 2014). | Suspending the entry as immigrants or nonimmigrants of persons determined to have contributed to the situation in Ukraine in specified ways (e.g., officials of the government of the Russian Federation or persons who operate in the arms or related materiel sector). | No presidential revocation identified. Referenced in Notice of Mar. 1 2023, 88 Fed. Reg. 13,285 (Mar. 2, 2023). |
| Mar. 6, 2014 | Blocking Property of Certain Persons Contributing to the Situation in Ukraine | Exec. No. Order 13,660, 79 Fed. Reg. 13,493 (Mar. 10, 2014). | Suspending the entry as immigrants or nonimmigrants of persons determined to have contributed to the situation in Ukraine in specified ways (e.g., engagement in or responsibility for misappropriation of state assets of Ukraine or of economically significant entities in that country). | No presidential revocation identified. Referenced in Notice of Mar. 1 2023, 88 Fed. Reg. 13,285 (Mar. 2, 2023). |
| June 3, 2013 | Authorizing the Implementation of Certain Sanctions Set Forth in the Iran Freedom and Counter-Proliferation Act of 2012 and Additional Sanctions with Respect to Iran | Exec. Order No. 13,645, 78 Fed. Reg. 33,945 (June 5, 2013). | Suspending the entry as immigrants or nonimmigrants of persons who have engaged in certain conduct related to Iran (e.g., materially assisting, sponsoring, or providing support for, or goods or services to or in support of, any Iranian person included on the list of Specially Designated Nationals and Blocked Persons). | Revoked by Exec. Order No. 13,716, 81 Fed. Reg. 3,693 (Jan. 21, 2016) and superseded by Exec. Order No. 13,846, 83 Fed. Reg. 38,939 (Aug. 7, 2018). |
| Oct. 9, 2012 | Authorizing the Implementation of Certain Sanctions Set Forth in the Iran Threat Reduction and Syria Human Rights Act of 2012 and Additional Sanctions with Respect to Iran | Exec. Order No. 13,628, 77 Fed. Reg. 62,139 (Oct. 12, 2012) (amended by Exec. Order No. 13,716, 81 Fed. Reg. 3,693 (Jan. 21, 2018)). | Suspending the entry as immigrants or nonimmigrants of persons determined to have engaged in certain actions involving Iran (e.g., knowingly transferring or facilitating the transfer of goods or technologies to Iran, to entities organized under Iranian law or subject to Iranian jurisdiction, or to Iranian nationals that are likely to be used by the Iranian government to commit serious human rights abuses against the Iranian people). | Revoked and superseded by Exec. Order No. 13,846, 83 Fed. Reg. 38,939 (Aug. 7, 2018). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| July 11, 2012 | Blocking Property of Persons Threatening the Peace, Security, or Stability of Burma | Exec. Order No. 13,619, 77 Fed. Reg. 41,243 (July 13, 2012). | Suspending the entry as immigrants or nonimmigrants of persons determined to threaten the peace, security, or stability of Burma in specified ways (e.g., participation in the commission of human rights abuses or importing or exporting arms or related materiel to or from North Korea). | Revoked by Exec. Order 13,742, 81 Fed. Reg. 70,593 (Oct. 12, 2016). |
| May 1, 2012 | Prohibiting Certain Transactions with and Suspending Entry into the United States of Foreign Sanctions Evaders with Respect to Iran and Syria | Exec. Order No. 13,608, 77 Fed. Reg. 26,409 (May 3, 2012). | Suspending the entry as immigrants or nonimmigrants of persons determined to have engaged in certain conduct as to Iran and Syria (e.g., facilitating deceptive transactions for or on behalf of any person subject to U.S. sanctions concerning Iran and Syria). | No presidential revocation identified.<br><br>Referenced in Notice of Mar. 10, 2023, 88 Fed. Reg. 15,595 (Mar. 13, 2023). |
| Apr. 22, 2012 | Blocking the Property and Suspending Entry into the United States of Certain Persons with Respect to Grave Human Rights Abuses by the Governments of Iran and Syria via Information Technology | Exec. Order No. 13,606, 77 Fed. Reg. 24,571 (Apr. 24, 2012). | Suspending the entry as immigrants or nonimmigrants of persons determined to have engaged in specified conduct involving "grave human rights abuses by the governments of Iran and Syria via information technology" (e.g., operating or directing the operation of communications technology that facilitates computer or network disruption, monitoring, or tracking that could assist or enable serious human rights abuses by or on behalf of these governments). | No presidential revocation identified.<br><br>Referenced in Notice of Mar. 10, 2023, 88 Fed. Reg. 15,595 (Mar. 13, 2023). |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Aug. 4, 2011 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and Other Abuses | Pres. Proc. No. 8,697, 76 Fed. Reg. 49,277 (Aug. 9, 2011). | Suspending the entry as immigrants or nonimmigrants of persons who participate in serious human rights and humanitarian law violations and other abuses (e.g., planning, ordering, assisting, aiding and abetting, committing, or otherwise participating in "widespread or systemic violence against any civilian population" based, in whole or in part, on race, color, descent, sex, disability, language, religion, ethnicity, birth, political opinion, national origin, membership in a particular social group, membership in an indigenous group, or sexual orientation or gender identity). | No presidential revocation identified. |
| July 24, 2011 | Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions | Pres. Proc. No. 8,693, 76 Fed. Reg. 44,751 (July 27, 2011). | Suspending the entry as immigrants or nonimmigrants of persons subject to U.N. Security Council travel bans and International Emergency Economic Powers Act sanctions. | No presidential revocation identified.<br><br>Referenced in Exec. Order No. 14,115, 89 Fed. Reg. 7,605 (Feb. 5, 2024). |
| **Invocations by President George W. Bush** | | | | |
| Jan. 16, 2009 | To Suspend Entry as Immigrants and Nonimmigrants of Foreign Government Officials Responsible for Failing to Combat Trafficking In Persons | Pres. Proc. No. 8,342, 74 Fed. Reg. 4,093 (Jan. 22, 2009). | Suspending the entry as immigrants or nonimmigrants of foreign government officials responsible for failing to combat trafficking in persons. | No presidential revocation identified. |
| June 28, 2007 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies and Actions That Threaten Lebanon's Sovereignty and Democracy | Pres. Proc. No. 8,158, 72 Fed. Reg. 36,587 (July 3, 2007). | Suspending the entry as immigrants or nonimmigrants of persons responsible for policies or actions that threaten Lebanon's sovereignty and democracy (e.g., current or former Lebanese government officials and private persons who "deliberately undermine or harm Lebanon's sovereignty"). | No presidential revocation identified. |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| May 12, 2006 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies or Actions That Threaten the Transition to Democracy in Belarus | Pres. Proc. No. 8,015, 71 Fed. Reg. 28,541 (May 16, 2006). | Suspending the entry as immigrants or nonimmigrants of persons responsible for policies or actions that threaten the transition to democracy in Belarus (e.g., Members of the government of Alyaksandr Lukashenka and other persons involved in policies or actions that "undermine or injure democratic institutions or impede the transition to democracy in Belarus"). | No presidential revocation identified. |
| Jan. 12, 2004 | To Suspend Entry as Immigrants or Nonimmigrants of Persons Engaged in or Benefiting from Corruption | Pres. Proc. No. 7,750, 69 Fed. Reg. 2,287 (Jan. 14, 2004). | Suspending the entry as immigrants or nonimmigrants of persons who have engaged in or benefited from corruption in specified ways (e.g., current or former public officials whose solicitation or acceptance of articles of monetary value or other benefits has or had "serious adverse effects on the national interests of the United States"). | No presidential revocation identified. |
| Feb. 22, 2002 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Actions That Threaten Zimbabwe's Democratic Institutions and Transition to a Multi-Party Democracy | Pres. Proc. No. 7,524, 67 Fed. Reg. 8,857 (Feb. 26, 2002). | Suspending the entry as immigrants or nonimmigrants of persons responsible for actions that threaten Zimbabwe's democratic institutions and transition to a multiparty democracy (e.g., Senior members of the government of Robert Mugabe, persons who through their business dealings with Zimbabwean government officials derive significant financial benefit from policies that undermine or injure Zimbabwe's democratic institutions). | No presidential revocation identified. |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| June 26, 2001 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Actions That Threaten International Stabilization Efforts in the Western Balkans, and Persons Responsible for Wartime Atrocities in That Region | Pres. Proc. No. 7,452, 66 Fed. Reg. 34,775 (June 29, 2001). | Suspending the entry as immigrants or nonimmigrants of persons responsible for actions that threaten international stabilization efforts in the Western Balkans or are responsible for wartime atrocities in that region. | No presidential revocation identified. |
| **Invocations by President William Clinton** | | | | |
| Oct. 10, 2000 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Impeding the Peace Process in Sierra Leone | Pres. Proc. No. 7,359, 65 Fed. Reg. 60,831 (Oct. 13, 2000). | Suspending the entry as immigrants or nonimmigrants of persons who plan, engage in, or benefit from activities that support the Revolutionary United Front or otherwise impede the peace process in Sierra Leone. | No presidential revocation identified. |
| Nov. 12, 1999 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Repression of the Civilian Population in Kosovo or for Policies That Obstruct Democracy in the Federal Republic of Yugoslavia (Serbia and Montenegro) ("FRY") or Otherwise Lend Support to the Current Governments of the FRY and of the Republic of Serbia | Pres. Proc. No. 7,249, 64 Fed. Reg. 62,561 (Nov. 17, 1999). | Suspending the entry as immigrants or nonimmigrants of persons responsible for repression of the civilian population in Kosovo or policies that obstruct democracy in the FRY or otherwise lend support to the government of the FRY and the Republic of Serbia. | No presidential revocation identified. |
| Jan. 14, 1998 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Are Members of the Military Junta in Sierra Leone and Members of Their Families | Pres. Proc. No. 7,062, 63 Fed. Reg. 2,871 (Jan. 16, 1998). | Suspending the entry as immigrants or nonimmigrants of members of the military junta in Sierra Leone and their families. | No presidential revocation identified. |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Dec. 12, 1997 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Are Senior Officials of the National Union for the Total Independence of Angola ("UNITA") and Adult Members of Their Immediate Families | Pres. Proc. No. 7,060, 62 Fed. Reg. 65,987 (Dec. 16, 1997). | Suspending the entry as immigrants or nonimmigrants of senior officials of UNITA and adult members of their immediate families. | No presidential revocation identified. |
| Nov. 22, 1996 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Are Members or Officials of the Sudanese Government or Armed Forces | Pres. Proc. No. 6,958, 61 Fed. Reg. 60,007 (Nov. 26, 1996). | Suspending the entry as immigrants or nonimmigrants of members of the government of Sudan, officials of that country, and members of the Sudanese armed forces. | No presidential revocation identified. |
| Oct. 3, 1996 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Formulate or Implement Policies That Are Impeding the Transition to Democracy in Burma or Who Benefit from Such Policies | Pres. Proc. No. 6,925, 61 Fed. Reg. 52,233 (Oct. 7, 1996). | Suspending the entry as immigrants or nonimmigrants of persons who "formulate, implement, or benefit from policies that impede Burma's transition to democracy" and their immediate family members. | No presidential revocation identified. |
| Oct. 25, 1994 | Blocking Property and Additional Measures with Respect to the Bosnian Serb-Controlled Areas of the Republic of Bosnia and Herzegovina | Pres. Proc. No. 6,749, 59 Fed. Reg. 54,117 (Oct. 27, 1994). | Suspending the entry as immigrants or nonimmigrants of certain persons described in U.N. Security Council Resolution 942 (e.g., officers of the Bosnian Serb military and paramilitary forces and those acting on their behalf or persons found to have provided financial, material, logistical, military, or other tangible support to Bosnian Serb forces in violation of relevant U.S. Security Council resolutions). | Revoked by Exec. Order No. 13,304, 68 Fed. Reg. 32,315 (May 29, 2003). |
| Sept. 30, 1994 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Formulate or Implement Policies That Are Impeding the Transition to Democracy in Liberia or Who Benefit from Such Policies | Pres. Proc. No. 6,730, 59 Fed. Reg. 50,683 (Oct. 5, 1994). | Suspending the entry as immigrants or nonimmigrants of persons who formulate, implement, or benefit from policies that impede Liberia's transition to democracy and those aliens' immediate families. | No presidential revocation identified. |

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| May 7, 1994 | Suspension of Entry of Aliens Whose Entry Is Barred Under United Nations Security Council Resolution 917 or Who Formulate, Implement, or Benefit from Policies That Are Impeding the Negotiations Seeking the Return to Constitutional Rule in Haiti | Pres. Proc. No. 6,685, 59 Fed. Reg. 24,337 (May 10, 1994). | Suspending the entry as immigrants or nonimmigrants of persons described in U.N. Security Council Resolution 917 (e.g., officers of the Haitian military, including the police, and their immediate families and major participants in the 1991 Haitian coup d'etat). | No presidential revocation identified. |
| Dec. 10, 1993 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Formulate, Implement, or Benefit from Policies That Are Impeding the Transition to Democracy in Nigeria | Pres. Proc. No. 6,636, 58 Fed. Reg. 65,525 (Dec. 14, 1993). | Suspending the entry as immigrants or nonimmigrants of persons who formulate, implement, or benefit from policies that impede Nigeria's transition to democracy and their immediate families. | No presidential revocation identified. |
| June 21, 1993 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Formulate, Implement, or Benefit from Policies That Are Impeding the Transition to Democracy in Zaire | Pres. Proc. No. 6,574, 58 Fed. Reg. 34,209 (June 23, 1993). | Suspending the entry as immigrants or nonimmigrants of persons who formulate or benefit from policies that impede Zaire's transition to democracy and their immediate family. | No presidential revocation identified. |
| June 3, 1993 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Formulate or Implement Policies That Are Impeding the Negotiations Seeking the Return to Constitutional Rule in Haiti | Pres. Proc. No. 6,569, 58 Fed. Reg. 31,897 (June 7, 1993). | Suspending the entry as immigrants or nonimmigrants of persons who formulate, implement, or benefit from policies that impede the progress of negotiations to restore a constitutional government to Haiti and their immediate families. | Revoked by Pres. Proc. No. 6,685, 59 Fed. Reg. 24,337 (May 10, 1994). |
| **Invocation by President George H. W. Bush** | | | | |
| May 24, 1992 | Interdiction of Illegal Aliens | Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (June 1, 1992). | Making provisions to enforce the suspension of the entry of inadmissible aliens by sea and the interdiction of any covered vessel carrying such aliens. | No presidential revocation identified.<br><br>Referenced in Pres. Proc. No. 9,699, 83 Fed. Reg. 8,161 (Feb. 23, 2018). |
| **Invocations by President Ronald Reagan** | | | | |

**JA280**

| Date of Invocation | Title of Order or Proclamation | Citation | Nature of Exclusion | Status |
|---|---|---|---|---|
| Oct. 22, 1988 | Suspension of Entry as Nonimmigrants of Officers and Employees of the Nicaraguan Government | Pres. Proc. No. 5,887, 53 Fed. Reg. 43,185 (Oct. 26, 1988). | Suspending the entry of specified Nicaraguan nationals into the United States as nonimmigrants (e.g., officers of the Nicaraguan government or the Sandinista National Liberation Front holding diplomatic or official passports). | Revoked by Pres. Proc. No. 6,167, 55 Fed. Reg. 33,093 (Aug. 13, 1990). |
| June 10, 1988 | Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Formulate or Implement the Policies of the Noriega/Solis Palma Regime | Pres. Proc. No. 5,829, 53 Fed. Reg. 22,289 (June 14, 1988). | Suspending the entry as immigrants or nonimmigrants of certain Panamanian nationals who formulate or implement the policies of Manuel Antonio Noriega and Manuel Solis Palma and their immediate families. | No presidential revocation identified. |
| Aug. 22, 1986 | Suspension of Cuban Immigration | Pres. Proc. No. 5,517, 51 Fed. Reg. 30,470 (Aug. 26, 1986). | Suspending the entry of Cuban nationals as immigrants with certain specified exceptions (e.g., Cuban nationals applying for admission as immediate relatives under INA § 201(b)). | No presidential revocation identified. |
| Oct. 4, 1985 | Suspension of Entry as Nonimmigrants by Officers or Employees of the Government of Cuba or the Communist Party of Cuba | Pres. Proc. No. 5,377, 50 Fed. Reg. 41,329 (Oct. 10, 1985). | Suspending the entry of specified classes of Cuban nationals as nonimmigrants (e.g., officers or employees of the Cuban government or the Communist Party of Cuba holding diplomatic or official passports). | No presidential revocation identified. |
| Sept. 29, 1981 | High Seas Interdiction of Illegal Aliens | Pres. Proc. No. 4,865, 46 Fed. Reg. 48,107 (Oct. 1, 1981) (expanded by Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (June 1, 1992)). | Suspending the entry of inadmissible aliens from the high seas and directing the interdiction of certain vessels carrying such aliens. | No presidential revocation identified. Referenced in Pres. Proc. No. 9,822, 83 Fed. Reg. 57,661 (Nov. 15, 2018). |

**Source:** Westlaw's *Presidential Documents* database and the White House's Presidential Action web page.

**Note:** A number of the proclamations and orders listed above make the entry restrictions they impose subject to waivers, exceptions, and limitations. *See, e.g.*, Pres. Proc. No. 9,645, 82 Fed. Reg. 45,161, at § 3 (Sept. 27, 2017).

## Table Methodology

The entry restrictions above were compiled through searches of Westlaw's *Presidential Documents* database for variations and combinations of the terms *Immigration and Nationality Act, INA, § 212(f), 8 U.S.C. § 1182(f), vetting capabilities, alien, person, immigrant, nonimmigrant, suspend, entry, entering,* and *block* as of February 15, 2024. CRS supplemented this methodology by reviewing the White House's Presidential Action web page for entry restrictions issued after the publication of the February 15, 2024,

issue of the *Federal Register*. **Table 1** identifies only those presidential documents that expressly impose entry restrictions under 8 U.S.C. § 1182(f).

To determine whether a listed entry restriction has been expressly amended or revoked by a later presidential document, CRS completed a manual review of results from searches of Westlaw's *Presidential Documents* database for *(order OR proclamation OR EO OR E.O.) PRE /5* [presidential document number(s) listed in **Column 3**]) as of February 15, 2024. Identified amendments and partial revocations are listed as parentheticals in **Column 3**, and complete revocations are listed in **Column 5**. When this methodology yielded no results expressly revoking the listed entry restriction, the column notes that "no presidential revocation was identified." In such instances, the column cell also includes the most recent (if any) reference to the corresponding entry restriction in Westlaw's *Presidential Documents* database as of February 15, 2024.

*Acknowledgment:* ***Table 1*** *updates an earlier table prepared and updated by Kate M. Manuel, Ben Harrington, and Theresa Reiss.*

## Author Information

Kelsey Y. Santamaria                              Calvin Gibson
Legislative Attorney                              Law Librarian


Hillel R. Smith
Legislative Attorney

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

        *Defendants*.

Case No. 1:25-cv-3675

## DEFENDANTS' RESPONSE AND CROSS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

I.      The Executive's Broad Authority .................................................................... 3

II.     H-1B Nonimmigrant Classification ................................................................. 4

III.    Presidential Proclamation 10973 .................................................................... 7

IV.     Agency Guidance and Memoranda .................................................................. 9

V.      Procedural History ....................................................................................... 10

STANDARD OF REVIEW ............................................................................................. 11

ARGUMENT .................................................................................................................. 11

I.      Plaintiffs' Challenges to the Proclamation are not Justiciable. ....................... 11

II.     Plaintiffs Lack a Cause of Action ................................................................. 14

        A.      Plaintiffs cannot challenge the Proclamation or its implementation under the
                APA ................................................................................................. 15

                1.      Merely implementing a Presidential Proclamation is not reviewable ...... 15

                2.      There is no final agency action otherwise ................................................ 17

                3.      Any agency action would be committed to agency discretion. .............. 18

        B.      The Plaintiff Cannot Assert an Ultra Vires Claim to Challenge the Proclamation
                ......................................................................................................... 19

III.    The Proclamation satisfies the statutory prerequisites of 8 U.S.C. §§ 1182(f) and
        1185(a)(1) and does not conflict with the INA ............................................. 24

        A.      The Proclamation satisfies the statutory prerequisites of 8 U.S.C. § 1182(f) and
                1185(a)(1). ....................................................................................... 25

                1.      The Proclamation satisfies the "sole prerequisite." ............................... 26

                2.      The Proclamation clearly applies to a class of aliens............................. 29

i

        3.     The Proclamation does suspend or restrict entry.................................. 31

   B.    The Proclamation Does Not Conflict with the INA............................................ 35

IV.   Relief and Stay.............................................................................................................. 42

CONCLUSION.......................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASE LAW

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986)..................................................................13, 31

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978)...........................................................................44

*Al Makaaseb Gen. Trading Co. v. Christopher*,
    1995 WL 110117 (S.D.N.Y. Mar. 13, 1995) .....................................................14

*Allen v. Milas*,
    896 F.3d 1094 (9th Cir. 2018) ..........................................................................18

*Am. Butterfly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020).........................................................................20

*Am. Foreign Serv. Ass'n v. Trump*,
    2025 WL 1742853 (D.C. Cir. June 20, 2025)..................................19, 20, 24, 42

*Ancient Coin Collectors Guild v. CBP*,
    801 F. Supp. 2d 383 (D. Md. 2011) ..................................................................16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................11

*Armstrong v. Bush*,
    924 F.2d 282 (D.C. Cir. 1991)..........................................................................15

*Bailey v. Drexel Furniture Co.*,
    259 U.S. 20 (1922)............................................................................................32

*Barahona v. Napolitano*,
    2011 U.S. Dist. LEXIS 117536 (S.D.N.Y. Oct. 11, 2011).............................37, 38

*Bautista-Rosario v. Mnuchin*,
    568 F. Supp. 3d 1 (D.D.C. 2021).......................................................................13

*Bennett v. Spear*,
    520 U.S. 177 (1997)..........................................................................................17

*Caremax Inc. v. Holder*,
    40 F. Supp. 3d 1182 (N.D. Cal. 2014)................................................................4

iii

*Castaneira v. Noem*,
    138 F.4th 540 (D.C. Cir. 2025) ................................................................... 34

*Cboe Futures Exch., LLC v. SEC*,
    77 F.4th 971 (D.C. Cir. 2023) ..................................................................... 45

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ..................................................................... 23

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) ..................................................................................... 17

*Coney Island Prep v. HHS*,
    506 F. Supp. 3d 203 (S.D.N.Y. 2020) ........................................................ 43

*Dakota Central Telephone Co.* v. *South Dakota ex rel. Payne*,
    250 U.S. 163 (1919) ............................................................................... 21, 22

*\*Dalton v. Specter*,
    511 U.S. 462 (1994) ......................................................... 15, 19, 20, 21

*Department of State v. Muñoz*,
    144 S. Ct. 1812 (2024) ........................................................................... 11, 12

*\*Detroit Int'l Bridge Co. v. Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016) ........................................................ 17, 19

*Doan v. INS*,
    160 F.3d 508 (8th Cir. 1998) ................................................................. 13, 34

*Doe #1 v. Biden*,
    2 F.4th 1284 (9th Cir. 2021) .................................................................. 28, 35

*Doe #1 v. Trump*,
    984 F.3d 848 (9th Cir. 2020) ................................................................. 28, 35

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ..................................................................... 35

*Doe Co. v. Cordray*,
    849 F. 3d 1129 (D.C. Cir. 2017) ................................................................. 43

*Doshi v. Blinken*,
    No. 23-cv-3613, 2024 WL 3509486 (D.D.C. July 22, 2024) ..................... 14

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ................................................................................. 15

*Enters., Inc. v. Dep't of Homeland Sec.*,
    467 F. Supp. 2d 728 (E.D. Mich. 2006) ................................................................... 5

*Feds for Med. Freedom v. Biden*,
    2022 WL 188329 & n.6 (S.D. Tex. Jan. 21, 2022) ................................................. 39

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ........................................................................................... 12, 21

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................................................... 15

*Glob. Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ................................................................................. 22

*Goodluck v. Biden*,
    104 F.4th 920 (2024) ............................................................................................. 42

*Haig v. Agee*,
    453 U.S. 280 (1981) ............................................................................................... 22

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ............................................................................................... 22

*Holder v. Humanitarian Law Project*,
    561 U. S. 1 (2010) ................................................................................................. 28

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
    140 S. Ct. 768 (2020) ............................................................................................ 40

*Kerry v. Din*,
    576 U.S. 86 (2015) ................................................................................................. 34

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ......................................................................................... 13, 25

*Loper Bright v. Raimondo*,
    603 U.S. 369 (2024) ............................................................................................... 38

*Malyutin v. Rice*,
    677 F. Supp. 2d 43 (D.D.C. 2009), *aff'd*, 2010 WL 2710451 (D.C. Cir. July 6, 2010) ........... 14

**JA288**

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892)..........................................................................33

*Maryland v. King*,
    567 U.S. 1301 (2012)........................................................................44

*Mass. Coal. for Immigr. Ref. v. DHS*,
    698 F. Supp. 3d 10 (D.D.C. 2023).....................................................11

*Matushkina v. Nielsen*,
    877 F.3d 289 (7th Cir. 2017)........................................................13, 14

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014).........................................................40

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..........................................................................42

*Nken v. Holder*,
    556 U.S. 418 (2009)....................................................................44, 45

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)............................................................................18

*\*Nuclear Regul. Comm'n (NRC) v. Texas*,
    145 S. Ct. 1762 (2025).........................................................20, 22, 24

*Nyunt v. Chairman, Broad. Bd. of Govs.*,
    589 F.3d 445 (D.C. Cir. 2009)...........................................................20

*Pacito v. Trump*,
    152 F.4th 1082 (9th Cir. 2025)....................................................32, 42

*Patel v. Garland*,
    596 U.S. 328 (2022)..........................................................................30

*President and Fellow of Harvard College v. DHS*,
    788 F. Supp. 3d 182 (D. Mass. 2025).................................................33

*Rahmani v. Yellen*,
    2024 WL 2024 WL 1701681 (D.D.C. Apr. 19, 2024).........................13

*Refugee and Immigrant Center for Education and Legal Services v. Noem*,
    793 F. Supp. 3d 19 (D.D.C. 2025).....................................................33

*Royal Siam Corp. v. Chertoff,*
 484 F.3d 139 (1st Cir. 2007)..............................................................................4

*Saavedra Bruno v. Albright,*
 197 F.3d 1153 (D.C. Cir. 1999)........................................................................18

*Sale v. Haitian Centers Council, Inc.,*
 509 U.S. 155 (1993)...................................................................................29, 32

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
 591 U.S. 197 (2020)..........................................................................................15

*Shaughnessy v. United States ex rel. Mezei,*
 345 U.S. 206 (1953)..........................................................................................21

*Sierra Club v. Env't Prot. Agency,*
 955 F.3d 56 (D.C. Cir. 2020)............................................................................18

*Tao Han v. Tarango,*
 2024 WL 3186556 (N.D. Cal. June 25, 2024) ..................................................14

*Texas v. Biden,*
 597 U.S. 785 (2022)....................................................................................17, 36

*Thatikonda v. DHS,*
 2022 WL 425013 (D.D.C. Feb. 11, 2022) .........................................................14

*Trump v. CASA, Inc.,*
 606 U.S. 831, 145 S. Ct. 2540 (2025) ...............................................................44

*\*Trump v. Hawaii,*
 585 U.S. 667 (2018).................................................................................. *passim*

*\*Tulare County v. Bush,*
 185 F. Supp. 2d 18 (D.D.C. 2001) ..............................................................16, 39

*United States ex rel. Knauff v. Shaughnessy,*
 338 U.S. 537 (1950)....................................................................................12, 23

*United States v. George S. Bush & Co., Inc.,*
 310 U.S. 371 (1940)..........................................................................................29

*United States v. Ju Toy,*
 198 U.S. 253 (1905)....................................................................................13, 34

*United States v. Texas*,
   599 U.S. 670 (2023) .................................................................................... 44, 45

*W. Virginia ex rel. Morrisey v. United States Dep't of Health & Hum. Servs.*,
   2014 WL 12803229 (D.D.C. Nov. 3, 2014) ...................................................... 18

*\*Webster v. Doe*,
   486 U.S. 592 (1988) ............................................................................................ 21

*Wisconsin Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ........................................................................... 43

*Yafai v. Pompeo*,
   912 F.3d 1018 (7th Cir. 2019) ........................................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ........................................................................................... 13

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ............................................................................................... 33

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ........................................................................................... 22

## STATUTES

5 U.S.C. § 701(a)(2) ................................................................................................ 18

5 U.S.C. § 702(1) .................................................................................................... 18

5 U.S.C. § 704 .................................................................................................. 15, 17

8 U.S.C. § 1101 ........................................................................................................ 3,

8 U.S.C. § 1101(a)(4) ............................................................................................... 3

8 U.S.C. § 1101(a)(15)(F) ...................................................................................... 30

8 U.S.C. § 1101(a)(15)(H) ...................................................................................... 30

8 U.S.C. § 1101(a)(15)(H)(i)(b) ...................................................................... 1, 4, 6

8 U.S.C. § 1101(a)(15)(L) ...................................................................................... 30

8 U.S.C. § 1103(a)(1) ............................................................................................... 4

**JA291**

8 U.S.C. § 1181 ...................................................................................................... 3

8 U.S.C. § 1181(a)(7)(A)(i) .................................................................................. 3

8 U.S.C. § 1181(B)(i)(II) ...................................................................................... 3

8 U.S.C. § 1182(a) ................................................................................................ 3

8 U.S.C. § 1182(f) ........................................................................................ *passim*

8 U.S.C. § 1184(a)(1) ...................................................................................... 4, 32

8 U.S.C. § 1184(c) ............................................................................................... 38

8 U.S.C. § 1184(c)(1) ................................................................................... 4, 7, 34

8 U.S.C. § 1184(c)(9) ..................................................................................... 38, 39

8 U.S.C. § 1184(c)(12) ................................................................................... 37, 39

8 U.S.C. § 1184(g)(1)(A) ...................................................................................... 5

8 U.S.C. § 1184(g)(5)(A) .................................................................................. 5, 6

8 U.S.C. § 1184(g)(5)(C) ...................................................................................... 5

8 U.S.C. § 1184(g)(7) ............................................................................................ 5

8 U.S.C. § 1184(i)(1) ............................................................................................. 5

8 U.S.C. § 1185(a) ....................................................................................... *passim*

8 U.S.C. § 1185(a)(1) ...................................................................................... 1, 20

8 U.S.C. § 1185(d) ................................................................................................ 3

8 U.S.C. § 1201(g) ................................................................................................ 3

8 U.S.C. § 1201(h) ................................................................................................ 3

8 U.S.C. § 1203 .................................................................................................... 3

8 U.S.C. § 1225(a) ................................................................................................ 3

8 U.S.C. § 1356 .................................................................................................. 40

8 U.S.C. § 1356(e)(3) ................................................................................................. 37

8 U.S.C. § 1356(j) .................................................................................................. 40, 41

8 U.S.C. § 1356(m) ........................................................................................ 32, 36, 39, 41

8 U.S.C. § 1356(u)(1) ............................................................................................... 37

8 U.S.C. § 1356(u)(3) ............................................................................................... 38

8 U.S.C. § 1356(u)(3)(B) ........................................................................................... 40

8 U.S.C. § 1361 ....................................................................................................... 34

40 U.S.C. § 486(a) .................................................................................................... 23

49 U.S.C. § 10101 .................................................................................................... 38

## FEDERAL REGULATIONS

8 C.F.R. § 214.2(h)(2)(i)(A) ......................................................................................... 34

8 C.F.R. § 214.2(h)(4)(iii)(B)(1) .................................................................................... 6

8 C.F.R. § 214.2(h)(4)(C)(iii) ....................................................................................... 34

8 C.F.R. § 214.2(h)(8)(iii)(A)(1) ..................................................................................... 6

8 C.F.R. § 214.2(h)(8)(iii)(A)(5)-(6) ................................................................................. 6

8 C.F.R. § 214.2(h)(8)(iii)(A)(5)(ii) ................................................................................. 6

8 C.F.R. § 214.2(h)(8)(iii)(A)(6)(ii) ................................................................................. 6

8 C.F.R. § 214.2(h)(8)(iii)(C) ........................................................................................ 6

8 C.F.R. § 214.2(h)(8)(iii)(D) ........................................................................................ 6

8 C.F.R. § 214.2(h)(9)(i) ............................................................................................. 6

8 C.F.R. § 214.2(h)(10)(ii) ........................................................................................... 6

8 C.F.R. § 214.2(h)(11) .............................................................................................. 6

8 C.F.R. § 214.2(h)(13)(iii)(D) ...................................................................................... 5

x

8 C.F.R. § 214.2(h)(13)(iii)(E) ................................................................................................5

8 C.F.R. § 248.3(f) ....................................................................................................................7

## FEDERAL REGISTER

85 Fed. Reg. 34,353.........................................................................................................30, 32

85 Fed. Reg. 36,139............................................................................................................30

90 Fed. Reg. 46,027..................................................................................................1, 26, 41

90 Fed. Reg. 46,028........................................................................................................1, 26

90 Fed. Reg. 46,028-29..........................................................................................................24

90 Fed. Reg. 46,029..............................................................................................................17

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(a)..............................................................................................................11

## PUBLIC LAW

Pub. L. 104–208....................................................................................................................32

## MISCELLANEOUS

U.S. Citizenship and Immigration Services, *H-1B Electronic Registration Process*, Available at https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations/h-1b-electronic-registration-process (Last visited Dec. 1, 2025) .......................42

U.S. Citizenship and Immigration Services, *H-1B Specialty Occupations*, Available at www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (Last visited Dec. 1, 2025) .........................................................................................................................9

U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, Available at https://www.uscis.gov/sites/default/files/document/memos/H1B_Proc_Memo_FINAL.pdf (Last visited Dec. 1, 2025) .......................................................................................................9

xi

**JA294**

U.S. Customs and Border Protection, *Proclamation, Restrictions on Entry of Certain Nonimmigrant Workers [H-1B]*, Available at www.cbp.gov/sites/default/files/2025-09/2025_09_20_-_memo_-_h1b_restriction_on_entry_1_redacted.pdf (Last visited Dec. 1, 2025) ........................................................................................................................9

U.S. Dept. of Labor, Available at *H-1B Program*, www.dol.gov/agencies/whd/immigration/h1bl (Last visited Dec. 1, 2025)........................................................................................................4

U.S. Dept. of State, *H-1B FAQ*, Available at www. https://www.state.gov/h-1b-faq/ (Last visited Dec. 1, 2025) ...............................................................................................................10

## INTRODUCTION

For decades companies have exploited the H-1B nonimmigrant worker visa program by importing lower-paid, lower-skilled alien workers—thereby artificially depressing wages and employment opportunities for skilled U.S. citizens. Responding to this pervasive abuse of the H-1B system, President Trump issued Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (the "Proclamation"). In the Proclamation, the President determined that "[t]he large-scale replacement of American workers through systemic abuse of the [H-1B] program has undermined both [the United States'] economic and national security." *Id*. The President explained that "[t]he high numbers of relatively low-wage workers in the H-1B program" undercuts the program's integrity and "are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated." *Id*. at 46,028. And "abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields." *Id*. As a result, the President found that "the unrestricted entry" into the country of certain H-1B temporary workers "would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages[.]" *Id*.

Based on these finding, the President invoked his authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to adopt temporarily "reasonable rules, regulations, and orders" and/or to restrict temporarily "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation" under 8 U.S.C. § 1101(a)(15)(H)(i)(b) "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000—subject to the exceptions set forth" in the Proclamation. 90 Fed. Reg. at 46,028.

1

Section 1182(f) vests the President with extraordinarily broad discretion to suspend the entry of aliens whenever he finds their admission "detrimental to the interests of the United States." Section 1185(a)(1) permits the President to adopt "reasonable rules, regulations, and orders… as the President may prescribe" with no prerequisites. The Supreme Court has repeatedly confirmed that this authority is "sweeping," subject only to the requirement that the President identify a class of aliens and articulate a facially legitimate reason for their exclusion. *Trump v. Hawaii*, 585 U.S. 667, 684–88 (2018). The Proclamation here readily satisfies that standard.

The H-1B system was ruthlessly and shamelessly exploited by bad actors. The flip side of the economic losers was that some companies and aliens were winners who enjoyed the lucrative spoils of the system. Hence this suit. Here, Plaintiffs Chamber of Commerce and the American Association of Universities, both associations that do not directly petition U.S. Citizenship and Immigration Services ("USCIS") for H-1B temporary workers, have moved for summary judgment and ask this Court to disregard the President's inherent authority to restrict the entry of aliens into the country and override his judgment. The Court should deny Plaintiffs' motion and instead enter judgment for Defendants.

First, Plaintiffs' claims are foreclosed by the longstanding doctrine of nonreviewability, which bars judicial review of the Executive's discretionary determination under the Immigration and Nationality Act ("INA") to restrict the entry of aliens into the United States. Second, Plaintiffs have no cause of action under the Administrative Procedure Act ("APA"), and their *ultra vires* claim fails as a matter of law. This is because it is well-settled that (1) the President is not subject to suit under the APA and (2) his statutory authority to regulate or restrict the entry of aliens into the United States derives explicitly from 8 U.S.C. §§ 1182(f) and 1185(a). Moreover, that authority is entirely discretionary, and judicial review to challenge such discretionary actions is unavailable

via an *ultra vires* claim or the APA. Third, the Proclamation readily satisfies the statutory prerequisites of 8 U.S.C. §§ 1182(f) and 1185(a)(1) and does not conflict with any provision of the INA. The Proclamation simply adds an additional restriction on the entry of a class of aliens to further a key national interest: protecting American workers and national security. Finally, any claim by Plaintiffs that implementation of the Proclamation is procedurally deficient because it did not go through APA notice-and-comment rulemaking fails because Defendants have merely implemented what the Proclamation requires.

The Proclamation is a lawful exercise of the President's authority to restrict the admission of aliens into the United States. The Court should therefore deny Plaintiffs' summary judgment motion in its entirety and enter summary judgment for Defendants.

## BACKGROUND

### I. The Executive's Broad Authority

Under INA, ch. 477, 66 Stat. 163 (8 U.S.C. § 1101 et seq.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. A visa is typically necessary, but not sufficient, for admission; the alien still must be found admissible upon inspection at a port of entry. 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see* 8 U.S.C. § 1101(a)(4).

The INA establishes myriad bases of inadmissibility and visa ineligibility. *See, e.g.*, 8 U.S.C. §§ 1182(a), 1201(g). Congress has also accorded the President broad discretionary authority to suspend or impose restrictions on the entry of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause."

*Hawaii*, 585 U.S. at 684. The Supreme Court has thus "observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a). Presidents have invoked that authority to advance national-security and foreign-policy objectives over 90 times since its passage.

## II.    H-1B Nonimmigrant Classification

The INA provides for the classification of qualified temporary foreign workers who are coming to the United States to perform services in a "specialty occupation" based "upon petition of the importing employer." 8 U.S.C. §§ 1101(a)(15)(H)(i)(b); 1184(c)(1) (the "H-1B program"); *see also Royal Siam Corp. v. Chertoff,* 484 F.3d 139, 144 (1st Cir. 2007) (discussing the eligibility requirements). The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General (and, since the Homeland Security Act of 2002, the Secretary of Homeland Security) may by regulations prescribe. 8 U.S.C. §§ 1184(a)(1), 1103(a)(1). "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." www.dol.gov/agencies/whd/immigration/h1b; *see also Caremax Inc. v. Holder*, 40 F. Supp. 3d 1182, 1187 (N.D. Cal. 2014) ("Fundamentally, an H–1B visa allows an employer … to fill a temporary position because of a special need, presumably one that cannot be easily fulfilled within the U.S.").

Consistent with that intent, with certain exceptions for models and Department of Defense, most H-1B jobs and applicants must meet the "specialty occupation" requirement as a minimum

qualification for eligibility.  A specialty occupation is defined as an occupation that requires (A) "theoretical and practical application of a body of highly specialized knowledge" and (B) "the attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum qualification for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); *see, e.g.*, *EG Enters., Inc. v. Dep't of Homeland Sec.*, 467 F. Supp. 2d 728, 735 (E.D. Mich. 2006) (explaining that issue is not simply whether a particular beneficiary qualifies as a member of a specialty occupation, but whether the proffered position constitutes a specialty occupation).

By statute, H-1B petitions fall into two broad categories: cap-subject petitions and cap-exempt petitions. Cap-subject petitions are counted against the strict numerical limitations created by Congress, which for any fiscal year after 2003 is 65,000 ("Regular Cap"), with an additional 20,000 for individuals who have earned a master's or higher degree from a United States institution of higher education ("Master's Cap"), for a total annual allocation of 85,000 initial H-1B visas or initial grants of H-1B status. *See* 8 U.S.C. § 1184(g)(1)(A) (Regular Cap); § 1184(g)(5)(C) (Master's Cap). Once a beneficiary has been counted towards the numerical allocations, the beneficiary may be cap-exempt for a 6-year period of H-1B admission, with the potential for exemption from the 6-year limitation if pursuing lawful permanent resident status. *See* 8 U.S.C. § 1184(g)(7); 8 CFR § 214.2(h)(13)(iii)(D) and (E). Other H-1B petitions are cap-exempt based on the nature of the petitioning employer or work location. *See* 8 U.S.C. § 1184(g)(5)(A) and (B). The demand for initial H-1B status invariably exceeds the Congressionally imposed numerical limitations, and as such, DHS regulations provide rules for the administration of an H-1B cap selection process, commonly referred to as a "lottery." *See* 8 C.F.R. § 214.2(h)(8)(iii).

Before a petitioning employer is eligible to submit a Form I-129, Petition for a Nonimmigrant Worker, requesting H-1B classification on behalf of a beneficiary who is subject

to the H-1B cap ("an H-1B cap-subject petition"), the petitioner must register for the H-1B cap lottery through the USCIS website. *See* 8 C.F.R. § 214.2(h)(8)(iii)(A)(1) (discussing the registration requirement). Once the registration period closes, USCIS then determines whether it has received registrations for a sufficient number of unique beneficiaries projected as needed to meet the Regular and Master's caps. *See* 8 C.F.R. §§ 214.2(h)(8)(iii)(A)(5)-(6). When USCIS determines that it has received sufficient registrations, it closes the registration period and randomly selects, through a computer-generated program, the number of unique beneficiaries deemed necessary to meet the cap among the registrations properly submitted. *See id.* at §§ 214.2(h)(8)(iii)(A)(5)(ii); 214.2(h)(8)(iii)(A)(6)(ii). If a beneficiary is selected, USCIS sends a notification to the online account of each prospective petitioner who submitted a registration for the selected beneficiary along with petition filing instructions. 8 C.F.R § 214.2(h)(8)(iii)(C); *see also id.* § 214.2(h)(8)(iii)(D).

The employer must then file a Form I-129 to request the classification of the alien as an H-1B nonimmigrant worker (known as an "H-1B petition") and obtain authorization to employ the beneficiary. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(4)(iii)(B)(1). Under the applicable regulations, USCIS shall notify the petitioner of the approval, denial, intent to revoke, and revocation of any H-1B petitions. 8 C.F.R. § 214.2(h)(9)(i), (h)(10)(ii), (h)(11). If the petition is approved and the alien beneficiary is outside the United States, is inside the United States and requested consulate notification, or inside the United States and the alien's associated status request was denied, the alien beneficiary of the approved H-1B petition, unless visa exempt, must apply for a visa at a U.S. consulate abroad before applying for admission as an H-1B nonimmigrant. See 8 U.S.C. § 1184(c)(1) (providing that an H-1B petition "shall be made and approved before the visa is granted."). If the alien is in the United States, and for which a

requested change of status was granted, the change to H-1B status is generally effective upon the petition validity start date. 8 C.F.R. § 248.3(f).

### III.    Presidential Proclamation 10973

President Donald J. Trump issued the Proclamation on September 19, 2025. The Proclamation explained that abuse of the H-1B nonimmigrant worker program has led to "[t]he large-scale replacement of American workers," "suppress[ed] wages," and "a disadvantageous labor market for American citizens," which "has undermined both our economic and national security." *Id.* at 46,027. H-1B workers account for an outsized share of the labor market in Science, Technology, Engineering, and Mathematics (STEM) fields, and that the information technology (IT) sector, and particularly outsourcing firms, have abused the H-1B system, providing H-1B workers for entry-level positions at a 36% discount over American workers. *Id.*

As the number of H-1B workers in STEM fields has increased, the unemployment rate for recent college graduates in those fields has also increased, and companies have at times laid off thousands of American workers while simultaneously hiring thousands of H-1B workers. *Id.* at 46,027-28. In some cases, American workers were forced to train their H-1B replacements. *Id.* at 46,028. Employing H-1B workers in entry-level positions at discounted rates undercuts American worker wages and opportunities, and is antithetical to the purpose of the H-1B program, which is "to fill jobs for which highly skilled and educated American workers are unavailable." *Id.*

Not only are H-1B program abuses detrimental to American workers, the Proclamation also explains that such abuses are a national security threat because they reduce American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an

immediate response" and that "unrestricted entry into the United States of certain foreign workers … would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." *Id.* The President accordingly determined that it was "therefore necessary to impose higher costs on companies seeking to use the H–1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.*

To that end, the Proclamation imposed entry restrictions on H-1B workers pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a). In particular, it restricted entry to only petitions accompanied by or supplemented by a payment of $100,000. *Id.* It created an exception for individuals, companies, or industries that the Secretary of Homeland Security determines, in her discretion, are "in the national interest and do not pose a threat to the security or welfare of the United States." *Id.* at 46,029.

The Proclamation instructed the Secretary of Homeland Security to restrict decisions on H-1B petitions not accompanied by the $100,000 payment, and it instructed the Secretary of State to confirm payment of the $100,000 before addressing any visa application. *Id.* at 46,028-29. It also instructed the Department of State and the Department of Homeland Security to take all necessary steps to implement the Proclamation and deny entry to the United States of any H-1B nonimmigrant whose employer has not made the payment. *Id.* at 46,029. The Proclamation also instructed the Department of Labor and the Department of Homeland Security to engage in rulemaking on issues relating to the prevailing wage and the H-1B lottery. *Id.* Such rulemaking is not complete and is not challenged in this litigation.

The restrictions are set to expire after 12 months, absent an extension. *Id.* at 46,028.

IV.    **Agency Guidance and Memoranda**

The day after the Proclamation, USCIS issued a two-paragraph Memorandum explaining the contours of the Proclamation. *See* Plaintiffs' Exhibit 2.[1] USCIS explained that the Proclamation applied prospectively, to those petitions not yet filed and did not impact the ability of any current visa holder to travel to or from the United States. *Id.* USCIS also updated its website to explain that the Proclamation "applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa." Plaintiffs' Exhibit 5.[2] It explained that the $100,000 payment can be submitted through pay.gov, that "[p]ayment must be made prior to filing a petition with USCIS", that "petitioners must submit proof that the payment has been scheduled" or evidence that they received a waiver, and that [p]etitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied." *Id.* It further provided information on where to submit a request for an exception. *Id.*

U.S. Customs and Border Protection ("CBP") also issued brief guidance on September 20, 2025, stating that the Proclamation applies only to new H-1B petitions and does not impact aliens who are the beneficiary of approved petitions or who hold a valid H-1B visa. *See* Plaintiffs' Exhibit 3.[3] It explained that "[t]he Proclamation does not impact the ability of any current visa holder to travel to or from the United States" and that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." *Id.*

The State Department issued two paragraphs of guidance on its website explaining that the

---

[1] Available at https://www.uscis.gov/sites/default/files/document/memos/H1B_Proc_Memo_FINAL.pdf
[2] Available at /www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations
[3] Available at www.cbp.gov/sites/default/files/2025-09/2025_09_20_-_memo_-_h1b_restriction_on_entry_1_redacted.pdf

Proclamation "restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation" and "restricts the issuance of H-1B visas, except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000." McTague Exhibit 1.[4] The State Department unequivocally stated that "No visas have been revoked pursuant to the Proclamation." *Id.* In FAQs, the State Department referenced the USCIS and CBP guidance and stated that it had "posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance." Plaintiffs' Ex. 4.[5]

## V.    Procedural History

Nearly a month after the Proclamation issued, the Chamber of Commerce filed this action challenging that Proclamation and the payment it requires. ECF 1 (Oct. 16, 2025). On October 24, 2025, Chamber of Commerce, with new plaintiff Association of American Universities, filed an Amended Complaint, which was served on Defendants on Saturday October 25, 2025. Plaintiffs assert that they have associational standing. Am. Compl. ¶¶ 19, 26. The Amended Complaint asserts two causes of action. Count I alleges a non-statutory claim in equity that the Proclamation is *ultra vires*. *Id.* ¶ 196. It seeks to enjoin implementation of the Proclamation and enforcement of the Proclamation against the Plaintiffs and their members by the agencies. Am. Compl. ¶ 196; *see also id.* Prayer ¶ 2. Count II alleges that any agency action implementing the Proclamation would be contrary to law and arbitrary and capricious, in violation of the APA. *Id.* ¶¶ 201-206. It seeks to have any such actions vacated and set aside. *Id.; see also id.* Prayer ¶ 3.

---

[4] Available at travel.state.gov/content/travel/en/News/visas-news/restriction-on-entry-of-certain-nonimmigrant-workers.html
[5] Available at www.state.gov/h-1b-faq/

Plaintiffs also served Defendants with a motion for a preliminary injunction on Saturday, October 25, 2025, which sought summary judgment in the alternative. ECF 18 ("Br."). After expedited briefing in which the government sought a stay during the lapse in appropriations in part because the Plaintiffs could not establish irreparable harm (ECF 22-27), the court on October 29, 2025, converted Plaintiffs' motion to summary judgment and ordered the Defendants to provide their opposition by the Friday after Thanksgiving, November 28, 2025 (Minute Order), which was then extended to Monday, December 1, 2025 (Minute Order).

## STANDARD OF REVIEW

The Court must grant summary judgment to a party when "there is no genuine dispute as to any material fact" and that party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether there is a "genuine dispute as to any material fact," the Court must ask itself whether any reasonable jury could find for the nonmoving party at trial. *Id.; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This serves the core function of summary judgment: to "avoid the expense of trial where a trial would be a useless formality because no factfinder could find for the nonmoving party." *Mass. Coal. for Immigr. Ref. v. DHS*, 698 F. Supp. 3d 10, 21 (D.D.C. 2023) (cleaned up).

## ARGUMENT

## I.    Plaintiffs' Challenges to the Proclamation are not Justiciable.

The Proclamation is not reviewable under principles of consular nonreviewability. The Supreme Court has long held that "[t]he admission and exclusion of foreign nationals is a fundamental sovereign attribute" that is "largely immune from judicial control." *Department of State v. Muñoz*, 144 S. Ct. 1812, 1820 (2024) (quotations omitted). In particular, the Supreme Court has held that "[t]he conditions of entry for every alien, the particular classes of aliens that

shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (citation omitted). Indeed, the authority to regulate the entry of aliens is "inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see also Hawaii*, 585 U.S. at 702 (quoting *Fiallo*, 430 U.S. at 792 for same reasoning). Review of entry decisions is "not within the province of any court, unless expressly authorized by Congress." *Id.* On the flip side, "Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference" and "[w]hen it does so, the action of an executive officer to admit or to exclude an alien is final and conclusive." *Muñoz*, 144 S. Ct. at 1820 (quotations omitted).

Plaintiffs' claims challenging the President's Proclamation are non-justiciable on both fronts. Congress has clearly not authorized the review of entry decisions. *Ex rel. Knauff v. Shaughnessy*, 338 U.S. at 543. Since "[t]he Immigration and Nationality Act (INA) does not authorize judicial review of a consular officer's denial of a visa; thus, as a rule, the federal courts cannot review those decisions" under the "doctrine of consular nonreviewability." *Muñoz*, 144 S. Ct. at 1820 (quotations omitted). Instead, Congress has delegated sweeping "discretionary authority" over whether to admit aliens. *Id.* Congress made a policy choice in 8 U.S.C. §§ 1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the

decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions. *Hawaii*, 585 U.S. at 682, 684 (declining to resolve "difficult question" of reviewability). So, whereas here, "the President acts pursuant to an express or implied authorization of Congress"—e.g., 8 U.S.C. §§ 1182(f) and 1185(a)(1)—the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

Nor does it matter which agency is enforcing the President's Proclamation in the first instance. Over a century of caselaw shows that principles of nonreviewability apply regardless of who decides to deny entry to a foreign national. *See Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come into this country, and to have its declared policy in that regard *enforced exclusively through executive officers, without judicial intervention*, is settled by our previous adjudications." (emphasis added) (quotations omitted)). By way of historical review, the doctrine has been applied to executive officers like the President, *Hawaii*, 585 U.S. at 703–04, the Attorney General, *Mandel,* 408 U.S. at 766, the Secretary of the Treasury, *Rahmani v. Yellen*, 2024 WL 2024 WL 1701681, at *14–15 (D.D.C. Apr. 19, 2024); *Bautista-Rosario v. Mnuchin*, 568 F. Supp. 3d 1, 6–7 (D.D.C. 2021), the "Secretary of Commerce and Labor," *United States v. Ju Toy*, 198 U.S. 253, 261 (1905) (decision is "conclusive"), CBP determinations, *Matushkina v. Nielsen*, 877 F.3d 289, 295-96 (7th Cir. 2017), and legacy INS determinations, *Doan v. INS*, 160 F.3d 508, 509 (8th Cir. 1998).

*All* of these cases involved non-"consular" officers and discussed the deference owed to the Executive Branch's visa determinations more generally. *See Tao Han v. Tarango*, 2024 WL

3186556, at *2 (N.D. Cal. June 25, 2024) ("The doctrine of consular nonreviewability applies whether Mr. Han is challenging the consular office's visa denial, the USCIS fraud finding underpinning the visa denial, or the USCIS refusal to waive Mr. Han's inadmissibility."); *Thatikonda v. DHS*, 2022 WL 425013, at *6 (D.D.C. Feb. 11, 2022) ("[The plaintiff]'s suit is barred by the doctrine of consular nonreviewability. Just as it made no difference that Matushkina challenged the CBP finding of inadmissibility, it makes no difference here that [the plaintiff] purports to attack a USCIS finding.").[6] The bottom line is that while courts have often characterized the doctrine in the context of consular officials' decisions, the same separation-of-powers principles apply to determinations by other executive officials. *See also Doshi v. Blinken*, No. 23-cv-3613, 2024 WL 3509486, at *5 (D.D.C. July 22, 2024) (holding that Plaintiffs' challenge to their Section 7031(c) designation is not reviewable under the APA); *Yafai v. Pompeo*, 912 F.3d 1018, 1020–21 (7th Cir. 2019) (applying principles of nonreviewability) (quoting *Matushkina v. Nielsen*, 877 F.3d 289, 294 (7th Cir. 2017)). Since Plaintiffs are challenging the Executive's admission decisions, such claims are nonreviewable.

## II.    Plaintiffs Lack a Cause of Action.

Plaintiffs raise their only claims under the APA or as equitable *ultra vires* claims. Neither works. Thus, Plaintiffs lack a cause of action and summary judgment must be granted for the

---

[6] *See also Al Makaaseb Gen. Trading Co. v. Christopher*, 1995 WL 110117, at *2–3 (S.D.N.Y. Mar. 13, 1995) ("Plaintiffs attempt to circumvent the doctrine of nonreviewability by alleging in their opposition to the motion to dismiss that the State Department, not the consulate, denied the visa applications by virtue of its inclusion of Al Makaaseb on the so-called Automated Visa Lookout System. Even assuming those facts to be true, plaintiffs' claim is still barred from judicial review."); *Malyutin v. Rice*, 677 F. Supp. 2d 43, 46 (D.D.C. 2009) (noting how "the doctrine also applies where a plaintiff attempts to circumvent the doctrine by claiming [that] he is not seeking a review of the consular officer's decision, but is challenging some other, related aspect of the decision"), *aff'd*, 2010 WL 2710451 (D.C. Cir. July 6, 2010).

Defendants.

**A.    Plaintiffs cannot challenge the Proclamation or its implementation under the APA.**

**1.    Merely implementing a Presidential Proclamation is not reviewable.**

The APA does not provide a cause of action for judicial review of the President's Proclamation. The President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994). As the Ninth Circuit has explained, "[t]he scope of our review [under the APA] ... is limited to 'agency action,' and the President is not an 'agency.'" *Id.* at 770; *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (refusing to hold that the President is an "agency" within the meaning of the APA). Plaintiffs' request to enjoin the Proclamation thus cannot be based in the APA or its standards. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018).

Plaintiffs also cannot pursue an APA claim against DHS or any of the other agency Defendants, Br. 34-36, because they have not identified any final agency action distinct from the Proclamation. *See* 5 U.S.C. § 704. Indeed, Plaintiffs have not identified an "agency action" at all, much less a final one. To start, it is true that agencies must implement the Proclamation. But that is always true, as the President cannot deny each entry on his own. *Cf. Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020) ("[N]o single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance."). If the fact that an agency is simply enacting the President's Proclamation allowed for an APA challenge, this would effectively nullify the President's exemption from the APA.

Realizing this, courts have found no APA review is available where the agency's action (if any) is an "extension of the President's action" and "merely carrying out directives of the President." *Tulare County v. Bush*, 185 F. Supp. 2d 18, 21 (D.D.C. 2001), *aff'd on other grounds*,

306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Forest Service is merely carrying out directives of the President, and the APA does not apply to presidential action"); *see also Ancient Coin Collectors Guild v. CBP,* 801 F. Supp. 2d 383, 403 (D. Md. 2011) (no APA review was available where agency was "acting on behalf of the President."). Here, Plaintiffs only challenge short explanatory memoranda as the necessary final agency actions. Any argument that the agency memoranda "is agency action would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Tulare County,* 185 F. Supp. 2d at 21. This is not to say any implementation of a presidential directive is unreviewable; rather, there is no reviewable action when the agency is merely carrying out the President's proclamation and has no independent decision-making as here. *Id.* That is doubly true here given the broad discretionary nature of the statute and the intersection of foreign affairs, national security, and immigrations issues.

Plaintiffs mainly focus on a two-paragraph Memorandum issued by USCIS that simply explains the Proclamation and clarifies that it only applies prospectively. Br. 35-36; Plaintiffs' Exhibit 2. USCIS's website was also updated to explain how the $100,000 could be paid and that "petitioners must submit proof that the payment has been scheduled" or evidence that they received a waiver. Plaintiffs' Exhibit 5. Similarly, CBP issued a two-paragraph memorandum explaining the Proclamation, clarifying that it was prospective, and stating that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." Plaintiffs' Exhibit 3. Finally, the State Department posted two paragraphs on its website explaining the Proclamation, that its prospective, and that USCIS and CBP had issued similar guidance. McTague Ex. 1.

None of these explanations reflect an agency decision or rulemaking. The Supreme Court

has held that courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability ... designed to implement' that decision." *Texas v. Biden*, 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)). At most the memoranda are implementing the President's Proclamation and thus do not constitute final agency action on their own. *See Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016). Nor are Plaintiffs injured by these memoranda, as they only explain the existing Proclamation, which is what restricts entry subject to the $100,000 payment. Indeed, the Proclamation itself dictates how employers must comply. 90 Fed. Reg. 46029 § 2. Absent the memoranda, Plaintiffs would face the same harms but clearly have nothing to challenge other than the Proclamation itself. At most, the memoranda clarify that the Proclamation is only prospective, which does not harm Plaintiffs.

### 2.  There is no final agency action otherwise.

For similar reasons, even if implementing a Presidential Proclamation did not preclude APA review by itself, the agency memoranda cannot constitute "final agency action." Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. To be final (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,'" or from which "'legal consequences will flow[.]'" *Bennett*, 520 U.S. at 177–78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

Plaintiffs' claims fail both prongs. None of the memoranda reflect any decision-making by the agencies. The agencies simply explained the Proclamation and have otherwise been implementing it. No decision apart from the President's Proclamation was made. Similarly, no rights or consequences flow from the memoranda themselves. *See Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 62-65 (D.C. Cir. 2020). Any impact on rights stems instead from the Proclamation itself, which restricts entry subject to a $100,000 payment. The memoranda merely

explain this and clarify that the restriction is prospective, which cannot harm Plaintiffs. Even if the memoranda were vacated, the Proclamation would still exist and have the exact same impact on Plaintiffs.[7]

### 3. Any agency action would be committed to agency discretion.

Even if APA review were generally available for Presidential actions, it would still be unavailable here. The APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. § 702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens, *see supra* § I; *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999). The APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

There is no statute or other law to gauge the agency action against, only the President's Proclamation under Sections 1182(f) and 1185(a)(1), which "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Section 1182(f) allows the President to suspend entry of a class of aliens "[w]henever the President finds that the entry… would be detrimental to the interests of the United States." And in doing so the President can impose "any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Section 1185(a)(1) authorizes the President to set "reasonable rules, regulations, and orders" for entry or departure as "the President may prescribe." These sections grant the President sweeping discretion to determine when to issue a Proclamation and what restrictions to impose. The Supreme Court has thus "observed that § 1182(f) vests the

---

[7] Because of Defendants' position that there is no final agency action, there is no administrative record to produce. Plaintiffs, however, have insisted that Defendants produce an administrative record under Local Rule 7(n). If Plaintiffs believe an administrative record is necessary, then their motion for summary judgment was premature and may be denied on that ground. *See W. Virginia ex rel. Morrisey v. United States Dep't of Health & Hum. Servs.*, 2014 WL 12803229, at *2 (D.D.C. Nov. 3, 2014) (staying briefing as premature).

President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. Thus, the President's determination of whether and how to suspend or regulate entry is inherently committed to his discretion and is therefore unreviewable under the APA. By transitive property, that discretion is carried over to the agencies that implement the Proclamation. The agencies' implementation of the proclamation is thus also committed to agency discretion as well. *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 105-06 (President had discretion and his order delegated discretion to Secretary, so no APA review of Secretary's decision since that was also committed to agency discretion).

Thus, the Proclamation is the relevant source of law for the agencies, foreclosing judicial review. Proclamations under Sections 1182(f) and 1885(a)(1) are simply not reviewable under the APA. Any contrary conclusion would eviscerate the "longstanding" rule that "[h]ow the President chooses to exercise the discretion Congress has granted him"—here in 8 U.S.C. §§ 1182(f) and 1185(a)(1)—"is not a matter for [ judicial] review." *Dalton*, 511 U.S. 462, at 476.

## B.    The Plaintiff Cannot Assert an *Ultra* Vires Claim to Challenge the Proclamation.

Otherwise lacking a cause of action, Plaintiffs seek to challenge the Proclamation and its implementation as *ultra vires*. Am. Compl. ¶ 192. To start, it is doubtful that *ultra vires* review is available to challenge presidential actions at all. *See Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam). Regardless, "longstanding authority holds" that *ultra vires* review of executive action is "not available" when, as here, "the statute in question commits the decision to the discretion of the President." *Dalton*, 511 U.S. at 474; *see also Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *2 (per curiam). And even if such review is available generally, the Supreme Court has made clear that an *ultra vires* challenge based on a statute "applies only when an agency has taken action entirely in excess of its delegated powers," and

"contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n (NRC) v. Texas*, 145 S. Ct. 1762, 1776 (2025) (internal quotation marks omitted). At most, even a broader view of *ultra vires* claims requires the statutory violation to be "obviously beyond the terms of the statute" or "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). As a result, *ultra vires* claims "rarely succeed." *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). Plaintiffs' claims certainly do not here.

Section 1182(f) is the quintessential statute that "commits the decision to the discretion of the President" and thus precludes an *ultra vires* cause of action. *Dalton*, 511 U.S. at 474. Section 1182(f) provides a grant of broad, unreviewable discretion to the President to exercise powers to suspend or restrict the entry into the United States of any aliens or class of aliens "[w]henever the *President finds*" that entry of such aliens or class of aliens "would be *detrimental to the interests of the United States.*" 8 U.S.C. § 1182(f) (emphasis added). As the Supreme Court has held, "[b]y its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii,* 585 U.S. at 684. The discretion in section 1185(a)(1) is even clearer, as it allows the President to set "reasonable rules, regulations, and orders, and subject to such limitations and exceptions as *the President may* prescribe." 8 U.S.C. § 1185(a)(1) (emphasis added). The Supreme Court previously addressed parallel language in § 102(c) of the Foreign Services Act which allowed termination of a CIA employee whenever the Director "shall *deem* such termination necessary or *advisable in the interests of the United States*" finding that language, too, "fairly exudes deference" to the President. *Webster v. Doe,* 486 U.S. 592, 600 (1988) (emphasis added). As a result, the Court found that the provision in *Webster* "appears … to foreclose the application of any meaningful judicial standard of review." *Id.* It also foreclosed a discharged employee from "complain[ing] that

his termination was not 'necessary or advisable in the interests of the United States,' since that assessment is the Director's alone." *Id.* at 603.

Sections 1182(f) and 1185(a)(1) likewise provides no meaningful standard of review and foreclose any inquiry into the President's reasoning because the provisions do not require evidence that such entry *is* detrimental to the interests of the United States, only that the President finds that it would be. *Id.* at 600. "How the President chooses to exercise the discretion Congress has granted him" in Sections 1182(f) and 1185(a)(1) of the INA is thus "not a matter for [a court's] review." *Dalton*, 511 U.S. at 476. That prohibition on review extends to any claim that "concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power" because "the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion." *Id.* at 474 (quoting *Dakota Central Telephone Co.* v. *South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)). Thus, the Proclamation, which was made pursuant to a broad grant of discretionary authority in sections 1182(f) and 1185(a)(1), is not subject to review via an *ultra vires* claim.

Judicial review of the President's discretionary determination in this area is particularly inappropriate because that determination includes both immigration and national security issues. The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). It is "wholly outside the power of this Court to control" the power to expel or exclude aliens, including "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based"

are "wholly outside the power of this Court to control." *Id*. at 796 (citation omitted). Likewise, "[n]ational-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Dakota Central Telephone Co.*, 250 U.S. at 184 (refusing to consider claim that President abused discretion based upon statutory provision giving President power to control telephone lines if he "deem[ed] it necessary for the national security or defense"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). Courts are therefore "'reluctant to intrude upon'" an exercise of that national-security authority "unless 'Congress specifically has provided otherwise,'" *Ziglar*, 582 U.S. at 143, and an *ultra vires* claim like Plaintiffs assert here necessarily lacks congressional authorization.

This leads to the next point. Even if there could be *ultra vires* review, there is certainly no "specific prohibition in a statute" that would render the Proclamation "entirely in excess of [the President's] delegated powers." *NRC*, 145 S. Ct. at 1776. Plaintiffs can "point to no specific prohibition the defendants have violated to an extreme and nearly jurisdictional degree." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). Rather, the statute "exudes deference" and this Proclamation falls well within its scope. *Hawaii*, 585 U.S. at 684. Plaintiffs' claims are thus doomed.

Plaintiffs' reliance on *Chamber of Commerce v. Reich* is also misplaced. There, the

President had relied on a provision in the Procurement Act to issue a proclamation regarding hiring of permanent workers during a strike. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996). While the court acknowledged that the provision gave discretion to the President, it also noted that the discretion was circumscribed, including by "wage and price standards and likely savings to the government." *Id.* at 1330-31 (citation omitted). Indeed, § 486(a) stated that "[t]he President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder." 40 U.S.C. § 486(a) (1986).

That statute was by no means as broad a grant of discretion as Sections 1182(f) and 1185(a)(1), which grants the President authority to restrict entry if he "finds that the entry … would be detrimental to the interests of the United States" and set "reasonable rules, regulations, and orders… as the President may prescribe." Further, the court in *Reich* distinguished *Dalton* because the proclamation at issue took away an express right granted by statute to employers during a strike. *Id.* at 1332. Here, there is no allegation that an express right has been rescinded via the Proclamation; nor could there be. Aliens outside of the United States do not have any right to enter the United States, let alone an express right. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[A]n alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted to an alien only upon such terms as the United States shall prescribe."). Indeed, for that reason, consular nonreviewability also bars Plaintiff's claims. *See id.*; *see also Hawaii*, 585 U.S. at 682 (noting that consular non-reviewability is a difficult question in the context of § 1182(f), but because it did not go to the court's jurisdiction, it did not

need to consider it). Moreover, Plaintiffs certainly do not have a right to H-1B visas, which are capped and heavily regulated. And the Proclamation does not eliminate the ability to obtain an H-1B, but rather merely adds a restriction in the form of a payment.

Similarly, the agency memoranda and guidance discussing the Proclamation are likewise unreviewable through an *ultra vires* claim. Those documents do little more than quote and explain the Proclamation. 90 Fed. Reg. 46028-29. To allow review of such documents via an *ultra vires* claim, when the Proclamation itself is unreviewable, would result in the absurd notion that any agency statement or action about, or in accordance with, a Presidential Proclamation somehow renders the Proclamation itself subject to an *ultra vires* challenge. And, once again, there is no "specific prohibition" on the agency actions. *NRC*, 145 S. Ct. at 1776. Absent this "hail Mary" *ultra vires* claim, Plaintiffs lack a cause if action to challenge the Proclamation. *Id.*

## III.  The Proclamation satisfies the statutory prerequisites of 8 U.S.C. §§ 1182(f) and 1185(a)(1) and does not conflict with the INA.

Even if Plaintiffs' claims are justiciable, this court's review of the Proclamation "must be exceedingly deferential" because the delegation of Sections 1182(f) and 1185(a)(1) "invokes the President's discretion in exercising core Article II responsibilities" addressing immigration, foreign affairs, and national security. *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *3. "Because decisions in these matters may implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive." *Hawaii*, 585 U.S. at 702 (quotations omitted). And when the Executive Branch provides "a facially legitimate and bona fide reason" for denying a visa, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification." *Mandel*, 408 U.S. at 770. The Proclamation

readily passes muster under the deferential review afforded to the President or under any other standard.

### A.    The Proclamation satisfies the statutory prerequisites of 8 U.S.C. § 1182(f) and 1185(a)(1).

Section 1182(f) provides that whenever the President finds that the entry of "any class of aliens into the United States would be detrimental to the interests of the United States," he may suspend their entry or impose on their entry "any restrictions he may deem to be appropriate." Section 1185(a)(1) authorizes the President to establish "reasonable rules, regulations, and orders" for entry and departure "as the President may prescribe." Sections 1182(f) and 1185(a)(1) "exude[] deference to the President in every clause," as it "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," and "on what conditions." *Hawaii*, 585 U.S. at 684. The "*sole prerequisite*" to the President's exercise of authority under this "comprehensive delegation" is the determination that entry of the covered aliens into the United States "would be detrimental to the interests of the United States." *Id.* at 685 (emphasis added).

Notably, Section 1185(a)(1) requires no finding of detriment, does not have to apply to a class of aliens, and can simply be a regulation on entry rather than a suspension. That authority alone validates the Proclamation. Yet Plaintiffs do not address it other than to say the section "does not convey any authority that Section 212(f) does not," Br. 23 n.6, because the Supreme Court said they "substantially overlap[]," *Hawaii*, 585 U.S. at 683 n.1. But the Court simply noted that given the overlap "we need not resolve ... the precise relationship between the two statutes" based on the Government's argument that any distinction was irrelevant for that proclamation. *Id.* Here, the $100,000 payment can easily be supported as a reasonable regulation on entry under Section 1185(a)(1) alone. Regardless, the Proclamation also satisfies Section 1182(f)'s prerequisites and can be upheld on that basis.

1.  **The Proclamation satisfies the "sole prerequisite."**

The President more than satisfied this "sole prerequisite" of Section 1182(f) with a detailed Proclamation. The President expressly found "that the unrestricted entry into the United States of certain foreign workers" described in the Proclamation "would be detrimental to the interests of the United States[.]" 90 Fed. Reg. at 46,028. That alone would suffice, as the Supreme Court has upheld a Proclamation saying only that. *See Hawaii*, 585 U.S. at 686 (upholding single sentence proclamation).

The President, however, explained his decision in detail. The President found that "[t]he H-1B nonimmigrant visa program was created to bring temporary workers into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor." 90 Fed. Reg. at 46,027. The President made clear that the "systematic abuse of the program" has led to "[t]he large-scale replacement of American workers", "suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." *Id.* The President provided specific facts about the increase in foreign tech workers, reduction in American tech workers, Americans workers training their foreign replacements, entry-level jobs being taken by foreigners rather than American college graduates, and major companies laying off American workers just to replace them with H-1B workers. *Id.* at 46,027-28. In addition, the President found that these abuses threaten national security because it "discourage[es] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response" and it is "therefore necessary to impose higher costs on companies seeking to use the H–1B program in

order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.* The President determined that a $100,000 payment was required to make sponsors choose between paying American workers more or paying for H-1B workers they truly need to address these serious economic and national security concerns. *Id.*

These findings easily satisfy the deferential standard laid out in *Hawaii*, because they set forth the basis for the President's conclusion that entry of the enumerated workers "would be detrimental to the national interest." *Hawaii*, 585 U.S. at 685. And those findings are far more detailed than many prior Proclamations. *Id*. at 686 (noting that President Clinton gave a one-sentence explanation for a Proclamation under § 1182(f) in 1996, and President Reagan gave a five-sentence explanation for a proclamation under § 1182(f) in 1981). In addition, the Proclamation is limited in time and allows for individual exemptions, features that reinforced the legality and carefully considered nature of the Proclamation in *Hawaii*, 585 U.S. at 707-09.

Despite the President's detailed findings, Plaintiffs argue that the required finding was improperly premised on abuses by employers, not the aliens. Br. 29-30. This is misguided. To start, Section 1182(f) does not require the aliens to be inherently detrimental; rather, it is the "entry of any aliens" that "would be detrimental to the interests of the United States." The fact that employers are engaged in the abuse is of no moment. The Proclamation is also not limited to employers who previously engaged in fraud. Instead, the Proclamation is attempting to fix the problem of aliens *entering* and taking opportunities from American workers, especially in national security sensitive industries. *Id.* Abuse is a core part of the Proclamation, but it is not the only thing being addressed. "[W]hen the President adopts 'a preventive measure . . . in the context of international affairs and national security,' he is 'not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions.'" *Hawaii*, 585 U.S. at

686-87 (quoting *Holder v. Humanitarian Law Project*, 561 U. S. 1, 35 (2010)). Even so, when companies abuse the H-1B program they are making the *entry* of H-1B aliens detrimental to America's interest because their entry is reducing wages and employment opportunities for Americans and threatening national security in key sectors. And the aliens are not wholly separate from the abuse at issue. Their participation allows for the abuse. It is their entry that is ultimately detrimental.

Plaintiffs also claim the Proclamation impermissibly regulates and targets domestic companies. Br. 30. Not so. The Proclamation bans the entry of aliens absent a payment, regardless of who the sponsor is. And for H-1B visas, where the employer is a necessary sponsor, regulation of the alien is inherently bound up in the employer. That does not categorically exempt H-1B visas from the scope of Section 1182(f)—nor does it transform the Proclamation into a purely domestic regulation. Moreover, it is inaccurate to claim that the purpose of the statute (and thus its scope) is limited to foreign concerns. The text has no such limit. Instead, it permits the President to determine when entry would be detrimental to the interests of the United States for any reason. Indeed, the proclamation upheld in *Hawaii* stemmed from concerns about unvetted migrants raising "national security" and "public-safety threats" within the United States. 585 U.S. at 677-80. The Ninth Circuit made this clear, holding that "it makes no difference whether the additional entry restrictions are imposed under § 212(f) based on assertedly domestic policy concerns… [as] all such restrictions may be characterized as reflecting "domestic" policy concerns to a greater or lesser degree." *Doe #1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020), *vacated on denial of reh'g en banc sub nom. Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021) (collecting examples). So the domestic impact or even intent of the Proclamation is irrelevant.

In any event, Section 1182(f) does not permit litigants to "challenge" a Presidential entry-

suspension order "based on their perception of its effectiveness and wisdom," because Congress did not permit courts to substitute their own assessments "for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Hawaii*, 585 U.S. at 708 (citations and quotations omitted). Whether the President's chosen method of addressing a perceived risk to the national interest "is justified from a policy perspective" is irrelevant, because he need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Id*. at 686-87 (citations omitted). Yet that is all Plaintiffs' argument amounts to; a challenge to the President's reasoning and chosen remedy. Such judicial second guessing "would amount to a clear invasion of the legislative and executive domains." *United States v. George S. Bush & Co., Inc.*, 310 U.S. 371, 380 (1940); *see Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 165 (1993) ("[t]he wisdom of the policy choices" reflected in Presidential Proclamations are not "matter[s] for our consideration").

### 2.  The Proclamation clearly applies to a class of aliens

Section 1182(f) does not define a "class of aliens." Classes are inherently abstract concepts that are subject to countless permutations. Clearly aliens seeking H-1B visas for the purpose of entering the United States to perform a "specialty occupation" constitute a class. Yet Plaintiffs argue that a "class" requires some common link, namely nationality. Br. 28-29.

But there is no basis in the statute's text or otherwise to limit the President's broad discretion to determine the relevant class of aliens under the statute. The Supreme Court rejected a similar argument that a class of aliens could not be "overbroad" because it "simply amounts to an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only 'any class of aliens' but 'all aliens.'" *Hawaii*, 585 U.S. at 688. The Supreme Court thus rebuffed a claim that the class "must refer to a well-defined group of individuals who share a

common 'characteristic' apart from nationality" as atextual. *Id*. The Supreme Court did not hold, however, that the only possible class must be defined by nationality. *Id*. Indeed, the Supreme Court held that Section 1182(f) "entrusts to the president" the question of "whose entry to suspend." *Id*. at 683. That breadth and deference is supported by the use of the term "any," which is expansive. *See Patel v. Garland*, 596 U.S. 328, 338 (2022).

In any event, the Proclamation does define the relevant "class of aliens" based on a "common link:" the purpose of the alien's entry. That is a proper class. Indeed, the proclamation in *Hawaii* was also based on the purpose of entry, as the same immigrant barred for business or tourism could enter as a permanent resident or an asylee. 585 U.S. at 680, 685. Visas are inherently based on the purpose of entry, such as to pursue a full-time course of study for F-1 students, to temporarily transfer to another branch of a company as a manager or executive for L-1 employees or, as here to temporarily perform services in a specialty occupation as H-1B nonimmigrants. *See* 8 U.S.C. § 1101(a)(15)(F), (H), (L). The aliens seeking H-1B visas are connected by the common purpose of that visa. That is more than sufficient. Other Proclamations have been based on visas. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for Chinese students, but they could enter other ways). And many Proclamations have been based on things other than nationality. *See* 85 Fed. Reg. 36,139 (June 15, 2020) (suspending entry for connection with ICC). The fact that some aliens can enter if the petition filed on their behalf includes evidence that the $100,000 payment has been made does not alter the class. That is a "restriction[]" on entry, which is explicitly permitted by Sections 1182(f) and certainly 1185(a)(1). The class the restriction on entry applies to is still those seeking H-1B visas. Such a class of aliens is no different from the class in *Hawaii*, which "restrict[ed] entry of aliens who could not be vetted with adequate information" because such information was not supplied by their countries of origin. 585 U.S. at

685. In both instances, the grouping is based upon the national security concern and is derived

from information related to an entity other than the alien. And in both instances, exemptions could

be made and the aliens could enter for other purposes. *Id*. The class here is clearly permissible.

    3.  **The Proclamation does suspend or restrict entry.**

    Under the Proclamation aliens seeking to enter with new H-1B visas cannot *enter* the

country for that purpose unless evidence is provided showing that the additional $100,000 payment

has been made, when applicable. 90 Fed. Reg. at 46028. So the Proclamation literally "suspend[s]

... entry" or imposes "restrictions ... on the entry of aliens." 8 U.S.C. § 1182(f). This is underscored

by the fact that aliens already *within* the United States may be able to seek an H-1B visa without

the $100,000 payment. The restriction is solely upon *entrance—i.e.*, precisely what § 1182(f)

permits. And, once again, this is obviously a "regulation" on entry under § 1185(a)(1).

    1.  Plaintiffs nonetheless argue that a required payment is not an "entry restriction" but

instead is an attempt to "fundamentally transform" the H-1B program. Br. 23. This is wrong. The

Supreme Court has held that § 1182(f)'s use of the language "any restrictions he may deem to be

appropriate" "vests the President with 'ample power' to impose entry restrictions in addition to

those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. Thus § 1182(f) delegates

authority to the President to "supplement the other grounds of inadmissibility in the INA." *Id*. That

holding is consistent with the longstanding D.C. Circuit precedent that the "sweeping proclamation

power" in § 1182(f) permits the President to supplement the grounds of inadmissibility in the INA.

*Abourezk*, 785 F. 2d at 1049 n.2. The $100,000 payment is simply another restriction on entrance

that the President deemed appropriate to address the serious national interest concerns.

    Furthermore, such entry restrictions may take whatever form the President chooses, and

may take place before an alien reaches the border or a port of entry. *See Sale*, 509 U.S. at 187

(finding it "perfectly clear" that the President could "establish a naval blockade" to prevent illegal

migrants from entering the United States). Plaintiffs' citations to the 1952 definition of "entry" to limit any restrictions to the border is thus unpersuasive. That definition was deleted in 1996. Pub. L. 104–208, §301(a). And even in 1993, while that definition was still in the INA, the Supreme Court found that a naval blockade on the high seas was permissible. *See Sale*, 509 U.S. at 158. In any event, the payment is a negative or prohibitory limit: an alien cannot enter unless that restriction is satisfied. Who chooses to satisfy that restriction with a payment is irrelevant.[8]

**2.**      Nothing in Section 1182(f) suggests that a restriction on entry cannot be monetary in nature, nor do Plaintiffs cite anything in support. Instead, Plaintiffs rely on Congress' taxing power to argue a restriction cannot effectively be a tax. Br. 25 (citing U.S. Const. Art. I, sec. 8, cl. 1). First, not every payment requirement is akin to a tax, as the payment here operates as a "regulation" rather than "revenue production." *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922). The point of the payment is to increase employment and wages of Americans, especially in national security related industries. While it may raise revenue, that is not the purpose and the effect might not raise revenue. Second, Plaintiffs acknowledge that Defendants have the ability to adjust fees for visas, including for H-1B. 8 U.S.C. §§ 1356(m), 1184(a)(1). If that is not an intrusion on Congress' taxing power, then neither is imposing a limited payment as a restriction on aliens entering the country.

Plaintiffs argue (at 34) that the delegation in those provisions is express while here it is not. But to the extent this is a delegation, it occurs at the intersection of foreign affairs and immigration

---

[8] Plaintiffs also briefly argue the Proclamation is not a suspension on entry because the same aliens can enter other ways. That is irrelevant, as the Proclamation restricts entry for a particular purpose. As noted, the Proclamation in *Hawaii* allowed the same aliens to enter for other purposes. 585 U.S. at 685, 680. This is often true for proclamations; the same aliens can have entry restricted for one visa but not others. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for Chinese students, but they could enter other ways); *Pacito v. Trump*, 152 F.4th 1082, 1087 (9th Cir. 2025) (proclamation suspending refugees likely to succeed even though aliens could enter other ways).

where the President wields significant "authority," so Congress "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Accordingly, Congress may "invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892). The same is true here, where Congress delegated sweeping discretion to impose "*any restrictions he may deem to be appropriate*" in the realm of "immigration" and "foreign affairs." *Hawaii*, 585 U.S. at 684, 708 (quoting § 1182(f)) (emphasis added). Given this foreign affairs and immigration context—and that Proclamations are limited in time, to entry, and classes of aliens—this power does not raise a major question either. Indeed, Congress expressly delegated this "sweeping authority," and the Proclamation falls well within that broad delegation. *Hawaii*, 585 U.S. at 639.[9]

**3.** Plaintiffs also claim that the Proclamation is *ultra vires* because the Executive does not have the power to "stop deciding visa petitions." Br. 28. But the entire point of a visa is to provide a mechanism to enter the country. So if a petitioner has not paid $100,000 and thus the alien beneficiary cannot enter, there is no purpose in processing those petitions. And, as noted before, consular non-reviewability can apply to decisions other than the State Department's ultimate award or denial of a visa. *See Ju Toy*, 198 U.S. at 261 (Labor and Commerce); *Doan*, 160 F.3d at 509 (INS).

Plaintiffs' attempt to disentangle the petition from entry is also disingenuous because

---

[9] Plaintiffs cite *Refugee and Immigrant Center for Education and Legal Services v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025) for the proposition that courts enjoin proclamations that exceed the authority of § 1182(f). But the D.C. Circuit stayed that opinion regarding the Proclamation's impact on the entry of those seeking asylum and only denied the stay for removals, which is irrelevant here. *RAICES v. Noem*, 25-5243, (D.C. Cir. Aug. 1, 2025). Plaintiffs also (incorrectly) cite *President and Fellow of Harvard College v. DHS*, but the court did not decide the statutory issue. 788 F. Supp. 3d 182, 197 (D. Mass. 2025). In any event, neither case is binding nor correct.

although the visa is the entry document presented at the port, the INA specifically requires that other documents are required for entry. The INA requires that "[w]henever any person makes application for a visa *or any other document required for entry*, or makes application for admission, *or otherwise attempts to enter the United States*, the burden of proof shall be upon such person to establish that he is eligible to receive such visa *or such document,* or is not inadmissible under any provision of this chapter, *and*, if an alien, *that he is entitled to the nonimmigrant*, immigrant, special immigrant, immediate relative, or refugee *status claimed*, as the case may be." 8 U.S.C. § 1361 (emphasis added); s*ee also Castaneira v. Noem*, 138 F.4th 540, 543 (D.C. Cir. 2025) (applying § 1361 to petitions before USCIS). The H-1B petition is a statutorily required step in the process to enter the United States as an H-1B beneficiary: "Such petition [to import[] any alien as a nonimmigrant under subparagraph (H) shall be made and approved before the visa is granted." 8 U.S.C. § 1184(c)(1); *see also* 8 C.F.R. § 214.2(h)(2)(i)(A) (requiring a petition in the form required by USCIS); *id.* § 214.2(h)(4)(C)(iii) (beneficiary qualifications). Moreover, the INA contemplates that to receive such entry documents the alien must be both admissible and eligible for the status claimed. *Id.* § 1361. The alien cannot be inadmissible under "any provision of the INA." *Kerry v. Din*, 576 U.S. 86, 89 (2015) (citing 8 U.S.C. § 1361). That includes § 1182(f), which "enabl[es] the President to supplement the other grounds of inadmissibility in the INA." *Hawaii*, 585 US. at 684. And, the petition must be submitted in the form required by USCIS, 8 C.F.R. § 214.2(h)(2)(i)(A), which here includes proof of payment. Plaintiff Ex. 5 (ECF 18-23). Thus, there can be no legitimate argument that the Proclamation payment is not a restriction on entry.

But even if Plaintiffs were correct, that would not justify enjoining or vacating the entire implementation of the Proclamation. It would merely require the processing of visas, which would

not redress Plaintiffs' injuries since their H-1B sponsored workers could still not enter the country. Indeed, proceeding in such a manner could harm petitioners willing to pay the fee who may not be selected in the lottery despite their willingness to pay.

### B.    The Proclamation Does Not Conflict with the INA.

Provisions in the INA do not override the President's Sections 1182(f) and 1185(a)(1) authority. Congress layered the President's Sections 1182(f) and 1185(a)(1) authority on top of his authority under the INA to prescribe restrictions on alien admissions. Indeed, *Hawaii* explained that "§ 1182(f) vests the President with 'ample power' to impose entry restrictions *in addition* to those elsewhere enumerated in the INA." 585 U.S. at 684 (emphasis added). The Supreme Court rebuked the plaintiffs there for adopting a "cramped" reading of the President's authority, one that regarded the sections as conferring on the President "only a residual authority to address emergency situations." *Id.* at 691 (emphasis added). An unduly "cramped" reading is precisely what Plaintiffs offer with their primary argument that the Proclamation unlawfully conflicts with the INA and H-1B program. Br. 15-22. The Proclamation does not conflict with any statutory provision, at most the payment "impose[s] [an] entry restriction[] in addition to those elsewhere" in the H-1B program. *Hawaii*, 585 U.S. at 684.[10]

1.    Plaintiffs characterize the payment required as a restriction on entry as an H-1B program "fee" and argue that fees are statutorily limited to USCIS's adjudication costs under 8 U.S.C. § 1356(m). Br. 16-18. This argument fails.

As an initial matter, the Proclamation's payment restriction is not a "fee" that would fall

---

[10] Plaintiffs rely on *Doe #1 v. Trump* to argue that the Proclamation cannot conflict with the INA. Br. 15 (citing 957 F.3d 1050 (9th Cir. 2020)). But that was a stay decision. And the merits panel disagreed, holding that there was no conflict and the Proclamation satisfied section 1182(f) despite domestic impacts. *Doe #1*, 984 F.3d at 868, 870. That opinion was vacated in the denial of en banc because administrations changed, mooting the case. *Biden*, 2 F.4th 1284 (9th Cir. 2021).

within the ambit of § 1356(m). It is not designated by the Attorney General in any regulation, nor is it paid into the specified Treasury account. *See* § 1356(m); *see also* Declaration of Jerome Jackson, ¶¶ 4-7. The payment is not to cover costs, it performs a completely different function that is not expressly prohibited or otherwise governed by the INA. Rather, the Proclamation payment was set by the President as a restriction on entry that he found "would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages" and it is paid into a general account for miscellaneous payments. 90 Fed. Reg. at 46027; Jackson Decl. ¶¶ 4-7. Plaintiffs' unilateral decision to characterize the Proclamation payment as "adjudication fee" is simply not supported by § 1356(m).

But even if one could characterize it as a fee under that section, Plaintiffs' arguments still fail. Plaintiffs say the section only allows fees to recover costs "but no more than that." Br. 16. The statutory provision has no such limit. Instead, the statutory text *empowers* the Attorney General to set fees and is entirely permissive: "fees for providing adjudication and naturalization services *may be set* at a level that will ensure recovery of the full costs of providing all such services," and "*may also be set* at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m) (emphasis added). The Supreme Court "has repeatedly observed that the word 'may' clearly connotes discretion." *Biden v. Texas*, 597 U.S. 785, 802 (2022) (quotations omitted). Furthermore, subsection (m) is a general provision, not a fee schedule specific to H-1B petitions. It would be a significant limit to suggest this foreclosed any payment restriction under 1182(f) or 1185(a)(1) absent an express prohibition. Yet nothing in that section limits the possibility of any other payments.

Indeed, Plaintiffs acknowledge that other fees can be charged for H-1B petitions for other purposes and thus payments are not limited to section 1356(m) fees to cover costs. Br. 5, 18-19.

For example, section 1356(u) "authorize[s]" the Secretary to "establish and collect a premium fee," including for H-1B petitions. That section acknowledges payments "in addition to any other fees authorized by law." 8 U.S.C. § 1356(u)(1). Another provision Plaintiffs point to, 8 U.S.C. § 1184(c)(12), likewise says a fee "shall" be imposed for fraud prevention, but acknowledges this is "[i]n addition to any other fees authorized by law." So the fees that can be charged for H-1B are not limited to subsection (m). Sections 1182(f) and 1885(a)(1) allow for such payments "in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. There is no clear conflict other than those manufactured by Plaintiffs.

By contrast, Congress knows how to create a specific prohibition when it wants to. Section 1356(e)(3), for example, says that a specific fee "shall not apply" to certain immigrants arriving by ferry. 8 U.S.C. § 1356(e)(3). When Congress intends a specific prohibition to apply to immigration fees, it makes it express. There is no such prohibition in § 1356(m).

Plaintiffs rely on the legislative history to suggest that fees under § 1356(m) are limited. Br. 17. Even if such legislative history is relevant, the 1990 amendment to that section *expanded* the scope of fees to say they may be set at a level to *ensure* the *full cost* of all such services are recovered. *See Barahona v. Napolitano*, 2011 U.S. Dist. LEXIS 117536 at *6-9 (S.D.N.Y. Oct. 11, 2011) (explaining legislative history and amendment). While that may set a minimum for the fees, it does not set a maximum. In any event, none of the legislative history suggests that this is the only payment that can be levied. There is nothing in the history about the President's ability to set other payments under other authorities.

**2.** As a final attempt to suggest § 1356(m) contains a specific prohibition, Plaintiffs cite two sentences in a Federal Register notice about fees from USCIS and a statement from a government reply brief in a different litigation. Br. at 17. *Chevron* was overruled; the agency's

statutory construction from last year is not entitled to deference. *Loper Bright v. Raimondo*, 603 U.S. 369, 412-13 (2024). That statement also speaks only to § 1356(m), and obviously does not foreclose all other payments. And the government brief, which is not binding on the agency and relates to a different issue entirely, argues that § 1356(m) does not set a ceiling on the fees. Indeed, the agency has argued in the past that § 1356(m) provides it leeway to assess fees beyond the cost of adjudication, to, for example, enhance its technology and services. *Barahona*, 2011 U.S. Dist. LEXIS 117536 at *11-12. At bottom, the fact remains that the plain language of the statute is permissive and does not contain a specific prohibition that would limit payments imposed under other authorities.

In fact, the agency's implementation of the Proclamation payment, requiring proof of submission of the payment with the petition, is required by section 1(b) of the Proclamation and is consistent with the INA. 8 U.S.C. § 1184(c) states that a nonimmigrant petition including an H-1B petition "shall be in such form and contain such information as the [Secretary of Homeland Security] shall prescribe." 8 U.S.C. § 1184(c). Here, consistent with the statute, USCIS made clear that the petition shall include proof of payment as directed by the Proclamation. *See* Pl. Ex. 5 (USCIS Guidance), ECF 18-23. If anything, the Proclamation aligns with the rest of the INA. At the very least, it does not conflict with other provisions.

**3.** Plaintiffs' claim that other H-1B fee provisions contain a prohibition on additional fees likewise fails. Plaintiffs cite to 8 U.S.C. § 1184(c)(9), (c)(12), 49 U.S.C. § 10101 (note), and 8 U.S.C. § 1356(u)(3) as the universe of fees that may be assessed for an H-1B petition, which they call a "carefully calibrated scheme." Br. 18-19. But nowhere in their brief do they cite any language in those statutory provisions containing a specific prohibition on levying additional fees or payments for the H-1B program. For example, 8 U.S.C. § 1184(c)(9) says a fee "shall" be

imposed but in no way limits other fees. And 8 U.S.C. § 1184(c)(12) says a fee "shall" be imposed for fraud prevention, but acknowledges this is "[i]n addition to any other fees authorized by law." Nothing in these statutes limit additional restrictions or payments.

Nor is it relevant that the Proclamation payment is more than the fees combined. All of those fees serve a different purpose than the payment required by the Proclamation: a restriction on entry to improve employment, wages, and national security while ensuring that the visas go to petitions that are absolutely necessary. This argument thus fails for the same reason Plaintiffs' 8 U.S.C. § 1356(m) argument fails: absent an express prohibition, the President can "impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. He did so here.

**4.** Similarly, the claim that the agency memoranda—which reiterate the Proclamation—should have gone through notice and comment rulemaking to ensure the payment is subject to arbitrary and capricious review is unavailing. Br. 19-20. Again, simply implementing a Proclamation is not reviewable under the APA, so its procedural and substantive limits on agency rulemaking are simply inapplicable. *See Tulare County,* 185 F. Supp. 2d at 21. A contrary rule would anomalously require agencies to disregard the President's directives if a court concluded that the President's policy choice was arbitrary and capricious—even though the court has no authority to make such a determination by directly reviewing the President's policy determination under the APA. *See Feds for Med. Freedom v. Biden*, 2022 WL 188329, at *7 & n.6 (S.D. Tex. Jan. 21, 2022) *vacated and remanded on other grounds by Fed. For Medical Freedom v.* Biden, 30 F.4th 503 (5th Cir. 2022) (concluding that APA review is unavailable for a rule implementing vaccination requirement for federal government contractors because Plaintiffs challenged only the agency's implementation of an executive order). At base, Plaintiffs are really challenging the

Proclamation. But under the APA, such a claim is unavailable.

Even so, section 1356(j) states that "[t]he Attorney General may prescribe such rules and regulations as may be necessary to *carry out the provisions of this section*." 8 U.S.C. § 1356(j) (emphasis added). As explained, the payment does not fall under subsection (m) or any other "provisions of this section." The payment is "in addition" to those sections and thus not subject to their rulemaking requirements. *Hawaii*, 585 U.S. at 684.

Moreover, section 1356(j) is permissive, as it says "[t]he Attorney General *may prescribe* such rules and regulations as *may be necessary* to carry out the provisions of this section." 8 U.S.C. § 1356(j) (emphasis added). By contrast, Congress used mandatory language in § 1356 when it wanted to impose specific regulatory requirements. In § 1356(u)(3)(B) for example (a subsection not mentioned by Plaintiffs), Congress required that for certain petitions, any premium processing fee "*shall be established by regulation*, which shall include methodology supporting the proposed premium amount." 8 U.S.C. § 1356(u)(3)(B) (emphasis added). Plaintiffs' reliance on *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014) is similarly inapposite, because in that case, the statute said the Secretary of Labor "shall issue regulations." Br. 19.

Thus, the permissive statutory language in sections 1356(m) and 1356(j) is plain and unambiguous. *See Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020). The Proclamation neither "rewrites" the INA nor "overrid[es] the congressionally mandated fee-setting mechanism" as Plaintiffs claim, because § 1356(j) *permits* the Secretary to "prescribe such rules and regulations as may be necessary" but does not require it and § 1356(m) likewise says the Secretary "may" issue regulations. 8 U.S.C. § 1356(j), (m). Accordingly, even if the Proclamation Payment were found to fall within the ambit of § 1356(m), there is no requirement that the payment

must have been promulgated via regulation.[11]

5.      Plaintiffs also claim that the Proclamation payment is designed to turn the H-1B program into a program for "the best of the best" and is thus contrary to the INA, which has different sections for those of extraordinary ability. Br. 18, 21. But the H-1B program was never intended to be used to fill entry-level jobs that could be filled by Americans. Rather, the program was designed by Congress to fill openings in "specialty occupations" which by statute require "theoretical and practical application of a body of highly specialized knowledge, and attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1). Yet, the President found that hiring aliens as H-1B nonimmigrants for entry-level jobs has become rampant, while Americans go unhired. 90 Fed. Reg. 46,027. As a result, the President imposed an entry restriction that supplements the restrictions of the INA, in accordance with his authority under § 1182(f), to address this detriment to the national interest. Nothing about that entry restriction contradicts the requirements for an H-1B versus other employment visas as Plaintiffs allege. If anything, the restriction better aligns current practice with the purpose of H-1B to ensure only highly specialized aliens with "theoretical and practical application of a body of highly specialized knowledge" that cannot otherwise be found in America are permitted entry. 8 U.S.C. § 1184(i)(1). Plaintiffs' policy disagreement is not a basis to enjoin or vacate the Proclamation. *See Hawaii*, 585 U.S. at 686-87, 708.

Plaintiffs also allege the Proclamation payment will cause fewer people to apply for H-1B visas than the statutory caps allow. Br. 22. As an initial matter, H-1B registrations for the lottery

---

[11] Plaintiffs do not actually argue that any agency action is itself arbitrary and capricious, so such a claim would be waived.

far exceed the statutory caps every single year. For the most recent FY 2026 lottery, USCIS received registrations for 336,153 separate individuals and selected 124,415 registrations in the lottery.    https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations/h-1b-electronic-registration-process. Even if Plaintiffs' speculation that fewer people would apply is correct, the number would have to drop by about two thirds before USCIS would not meet the statutory caps. *See id.* Moreover, those statutory numbers are just that—ceilings, not floors. There is no requirement that USCIS must approve enough H-1B petitions every year to satisfy the visa caps. *See Goodluck v. Biden*, 104 F.4th 920, 928 (2024) (explaining worldwide levels of visas are ceilings, not floors); *Pacito*, 152 F.4th at 1087 (rejecting a similar cap argument against a proclamation). Therefore nothing Plaintiffs point to shows a conflict between the Proclamation and the INA.

**IV.    Relief and Stay.**

Plaintiffs must also establish the traditional factors for equitable injunctive relief in support of their *ultra vires* claim. *Am. Foreign Serv. Ass'n,* 2025 WL 1742853, at *2 (an *ultra vires* claim is a claim in equity). A plaintiff seeking a permanent injunction must demonstrate that (1) he has suffered an irreparable injury; (2) remedies available at law, like monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the parties warrants equitable relief; and (4) the injunction is not against the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

Plaintiffs cannot show irreparable injury. This case is about whether Plaintiffs should have to pay $100,000 to participate in the optional H-1B program within the next year (the current timeframe of the Proclamation), whether through a cap-exempt petition or through the lottery in March 2026. Plaintiffs allege that the "imposition of a new $100,000 fee to continue using that

program is thus a concrete harm suffered by the numerous members who participate in the program" because "[s]ome members are unable to pay that fee and therefore must either reduce or entirely forgo their planned entries into the March 2026 lottery." Br. 19. "[I]t is 'well settled that economic loss does not, in and of itself, constitute irreparable harm,'" *Doe Co. v. Cordray*, 849 F. 3d 1129, 1134 (D.C. Cir. 2017) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). At most, the Chamber speculates that some members may not be able to afford the fee and this will disrupt projects. Br. 37. The AAU has even less and cannot plausibly claim that universities with billions in endowments cannot pay $100,000 to petition for H-1B visas, especially when the money could be reimbursed. Br. 37-38. Simply having to adjust budgets or divert resources is hardly irreparable, as that is true of most cases involving money. Br. 37-38, 41-44; *see Coney Island Prep v. HHS*, 506 F. Supp. 3d 203, 215 (S.D.N.Y. 2020) (diversion of resources often is not an injury much less an irreparable one). And since there is a cap on H-1B visas, it is speculative that they would receive all of the workers they need in any event. Moreover, it is not apparent that Plaintiffs cannot simply hire Americans to fulfil their labor needs. There is no concrete, non-economic, non-self-inflicted, *irreparable* harm in their motion. Thus, Plaintiffs cannot show irreparable harm during the timeframe of the Proclamation.

A claim for injunctive relief also requires showing that remedies at law are inadequate. Plaintiffs do not even attempt such a showing. Indeed, the funds are set up to allow reimbursements if a payment is made for a petition but the visa is ultimately not awarded. As a result, refunds can be made and Plaintiffs could theoretically have a remedy at law if they paid the $100,000 payment. The fact that Plaintiffs chose to bring causes of action that cannot award damages was their choice and does not entitle them to an injunction.

Finally, the balance of hardships and public interest weigh in favor of the Government.

Where the Government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). By challenging the Proclamation, Plaintiffs seek to block an exercise of the President's broad authority to suspend or regulate the entry of aliens whose entry he determined would be detrimental to the nation's interests. Here, the Proclamation is directed at resolving "[t]he large-scale replacement of American workers", "suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." *Id.* at 46027. The abuse of the H-1B program is a national security threat because it reduces American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* Those are quintessential national interests, and an injunction severely impedes the Executive's ability to safeguard them. As the D.C. Circuit has explained, such relief "deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). And while Plaintiffs have failed to show irreparable harm, the government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does. *Trump v. CASA, Inc.*, 606 U.S. 831, 145 S. Ct. 2540, 2562 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Every day an injunction is in place, the President loses valuable time to implement his policies. So the balance of equities and public interest weigh decidedly in Defendants' favor.

If the Court decides relief is warranted, however, it must limit any relief to the actual members of each Plaintiff. *See CASA, Inc.*, 145 S. Ct. at 2562–63. The same is true for vacatur under the APA. *See United States v. Texas*, 599 U.S. 670, 695–99 (2023) (Gorsuch, J., concurring). Section 706(2) says nothing about vacatur and is located under "Scope of Review," the rest of which clearly relates to review. By contrast, section 703 says parties can bring "any applicable

form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus," never mentioning vacatur. Instead, remedies under the APA should reflect historical equitable remedies with the same limits. *See Texas*, 599 U.S. at 695–99 (Gorsuch, J., concurring). Even so, vacatur is not mandatory. *See Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023). For the same equitable reasons explained, the Court should not totally vacate the implementation of the Proclamation beyond the parties here.

Regardless, for all of the reasons explained the Court should stay any injunction or vacatur pending appeal. *See Nken*, 556 U.S. at 435. Preventing the President from implementing a core policy touching on national security would irreparably harm Defendants. And the balance of equities favor Defendants for all the reasons explained. So the Court should not grant injunctive relief or vacate any policy. If the Court does, however, it should stay the relief pending appeal.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and enter summary judgment for Defendants.

Respectfully submitted,

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration

**Tiberius Davis**
Counsel to the Assistant Attorney General

**Glenn Girdharry**
Acting Deputy Director

By: */s/ Alexandra McTague*
**Alexandra McTague**
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 718-0483
Alexandra.mctague2@usdoj.gov
*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE ) UNITED STATES OF AMERICA, *et al.* )<br><br>  Plaintiffs, )<br><br>  v. )<br><br>U.S. DEPARTMENT OF HOMELAND )<br>SECURITY, *et al.*, )<br><br>  Defendants. )<br>_____ ) | No. 1:25-cv-3675-BAH |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND**
**RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h)(1), Defendants hereby submit their statement of

undisputed facts in support of their cross-motion for summary judgment, and respond to

Plaintiffs' statement of undisputed facts (ECF 18-2).

**I.    Defendants' Statement of Undisputed Material Facts**

1.    Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90

Fed. Reg 46027 (Sept. 24, 2025) (hereinafter the "Proclamation") was made pursuant to the

authority granted to the President by Congress in 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a). *See*

Plaintiffs' Exhibit 1 (ECF 18-19).

2.    The Proclamation contains the President's findings as to why unrestricted entry into

the United States of certain foreign workers would be detrimental to the interests of the United

States.

3.    The President's findings in the Proclamation include that abuse of the H-1B

nonimmigrant worker program has led to "[t]he large-scale replacement of American workers",

1

**JA341**

"suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." 90 Fed. Reg. at 46027.

4.      The President's findings include that employing H-1B workers in entry-level positions at discounted rates undercuts American worker wages and opportunities, and is antithetical to the purpose of the H-1B program, which is "to fill jobs for which highly skilled and educated American workers are unavailable." 90 Fed. Reg. at 46027.

5.      The President's findings include that H-1B program abuses are a national security threat because they reduce American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." 90 Fed. Reg. at 46027.

6.      The President's findings include that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response" and that "unrestricted entry into the United States of certain foreign workers … would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." 90 Fed. Reg. at 46027.

7.      The President's findings include that it is "therefore necessary to impose higher costs on companies seeking to use the H–1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." 90 Fed. Reg. at 46027.

8.      The Proclamation placed entry restrictions on foreign nationals outside of the United States seeking H-1B visas by way of new petitions filed after the effective date of the Proclamation.  Plaintiffs' Ex. 1; *see also* Plaintiffs' Ex. 2.

2

**JA342**

9.      The entry restriction requires a $100,000 payment.  Plaintiffs' Ex. 1; *see also* Plaintiffs' Ex. 2.

10.     U.S. Citizenship and Immigration Services (USCIS) has stated that proof payment of the $100,000 payment required by the Proclamation must be submitted with any new H-1B petition filed after the effective date of the Proclamation.  Plaintiffs' Ex. 5.

11.     No H-1B visas have been revoked as a result of the Proclamation.  McTague Decl. Ex. 1.

12.     The Proclamation does not apply to aliens holding H-1B visas prior to the date of the proclamation.  Plaintiffs' Exs. 1, 2, 3.

13.     The Proclamation does not apply to aliens holding visas other than H-1B visas. Plaintiffs' Ex. 1.

14.     The Proclamation does not apply to aliens within the United States. Plaintiffs' Exs. 1, 2, 3

15.     The Proclamation has a term of one year. Plaintiffs' Ex. 1.

16.     The USCIS Memorandum (Plaintiffs' Ex. 2) merely paraphrases and carries out the directives of the President as set forth in the Proclamation.  *See* Plaintiffs' Ex. 1, 2.

17.     The U.S. Customs and Border Protection Memorandum (Plaintiffs' Ex. 3) merely paraphrases and carries out the directives of the President as set forth in the Proclamation. *See* Plaintiffs' Ex. 1, 3.

18.     The State Department website guidance  found in McTague Decl. Ex. 1 merely paraphrases and carries out the directives of the President as set forth in the Proclamation. *See* McTague Decl. Ex 1, Plaintiffs' Ex. 1.

3

**JA343**

19.    The State Department FAQs merely paraphrase and carry out the directives of the President as set forth in the Proclamation.  *See* Plaintiffs' Ex. 1, 4.

20.    The USCIS website section entitled "H-1B Specialty Occupations" (Plaintiffs' Ex 5) merely paraphrases and carries out the directives of the President as set forth in the Proclamation.  *See* Plaintiffs' Ex. 1, 5.

21.    In the Immigration and Nationality Act (INA), Congress identified different classes of nonimmigrants, each of which is entitled to a different visa.  8 U.S.C. § 1101(a)(15).

22.    In the INA, Congress identified the class of nonimmigrants commonly referred to as H-1B.  8 U.S.C. § 1101(a)(15)(H)(i)(b).

23.    The Proclamation payment applies to the class of H-1B nonimmigrants whose petitions were filed after the effective date of the Proclamation.  *See* Plaintiffs' Ex. 1, Ex. 2, Ex. 5.

24.    HJI Supply Chain Solutions, the company identified in Plaintiffs' ECF filing 18-5, did not, as of December 1, 2025, have a job opening for an Integrations Engineer.  McTague Decl. Exs. 2, 3.

25.    The $100,000 payment required by the Proclamation is not on the USCIS fee schedule for H-1B petition fees.  *See* Plaintiffs' Ex. 6.

26.    The $100,000 payment required by the Proclamation is paid into a Treasury General Fund Receipt Account (GFRA) for the Department of Homeland Security. Monies deposited into the GFRA remain in the GFRA until the end of each fiscal year and then are swept into the General Fund of the Treasury.  *See* Jackson Declaration ¶¶ 4-7.

## II.    Response to Plaintiffs' Statement of Undisputed Material Facts

**Plaintiffs' Fact # 1:** September 19, 2025, the President issued the proclamation Restriction on Entry of Certain Nonimmigrant Workers (The Proclamation). The Proclamation conditions the entry into the United States of certain noncitizens on a $100,000 payment accompanying their petitions for H-1B status, effective September 21, 2025, for one year. Hughes Decl. Ex. 1. The true and correct content of the Proclamation is reflected in Exhibit 1.

    **Defendants' Response:** The first sentence is undisputed. Defendants do not dispute that a true and correct copy of the Proclamation, as printed in the Federal Register, is contained in Plaintiffs' Exhibit 1.

    With respect to the second sentence, Defendants do not dispute that the Proclamation pertains to certain aliens, that it restricts (as opposed to conditions) entry into the United States of certain aliens absent an exemption, that it relates to certain aliens seeking to enter in H-1B status, that it is effective September 21, 2025, and that it lasts for one year unless extended.

    The document speaks for itself, and Defendants dispute Plaintiffs' characterization to the extent it conflicts with the document. By way of example, USCIS has stated that *proof* of payment must accompany the petition, not that the payment must accompany the petition. *See* Plaintiffs' Exhibit 5 at 4 ("When to pay the $100,000 payment"). Furthermore, the Proclamation requires the $100,000 payment in addition to the other requirements of the INA and is not, in and of itself, sufficient for approval of the petition or entry into the United States.

**Plaintiffs' Fact #2:** On September 20, 2025, U.S. Citizenship and Immigration Services (USCIS) released a memorandum entitled *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B.* Hughes Decl. Ex. 2. The true and correct content of that document is reflected in Exhibit 2.

    **Defendants' Response:** Defendants generally do not dispute Fact #2 except that the subject line of the memorandum was *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B.* The Memorandum did not contain a separate title.

**JA345**

**Plaintiffs' Fact #3:** On September 20, 2025, U.S. Customs and Border Protection released a memorandum entitled *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*. Hughes Decl. Ex. 3. The true and correct content of that document is reflected in Exhibit 3.

   **Defendants' Response:** Defendants generally do not dispute Fact #3 except that the

subject line of the memorandum was Proclamation*, Restriction on Entry of Certain*

*Nonimmigrant Workers* [H-1B]. The Memorandum did not contain a separate title.

**Plaintiffs' Fact #4:** On September 21, 2025, the United States Department of State published on its website a webpage entitled *H-1B FAQ*. Hughes Decl. Ex. 4. The true and correct content of that document is reflected in Exhibit 4.

   **Defendants' Response:** Undisputed**.**

**Plaintiffs' Fact #5:** USCIS has, on its website, a webpage entitled *H-1B Specialty Occupations*, which includes a section titled "Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers." Hughes Decl. Ex. 5. The true and correct content of that document is reflected in Exhibit 5.

   **Defendants' Response:** The first sentence of Fact #5 is undisputed. With respect to

whether Plaintiffs' Exhibit 5 is a true and correct copy of the cited webpage, Defendants note

that the "More Information" section lacks any text, which is not consistent with the webpage.

The remainder of the document appears consistent with the website.

**Plaintiffs' Fact #6:** USCIS maintains a schedule of fees that apply to the various USCIS forms. Hughes Decl. Ex. 6. The true and correct content of that document is reflected in Exhibit 6.

   **Defendants' Response:** Undisputed. For clarification purposes, Defendants note that the

document in Exhibit 6 is the October 16, 2025, edition. Defendants also note that even though the

document in Exhibit 6 was issued *after* the Proclamation, it does not contain a reference to the

$100,000 payment as relating to any particular USCIS form, and that is because the payment is

not a filing fee associated with a particular USCIS form.

**Plaintiffs' Fact # 7:** On September 19, 2025, the Washington Post quoted the President as saying, in reference to the $100,000 payment described in the Proclamation, "We're going to

take that money and we're going to be reducing taxes and we're going to be reducing debt." Hughes Decl. Ex. 24. The President did, in fact, make this statement.

**Defendants' Response:** The Washington Post has credited the President, on September 19, 2025, as making the statement quoted in Exhibit 24. However, Defendants dispute that the statement was made in reference to the $100,000 payment in the Proclamation, and dispute that the Washington Post tied it to the $100,000 payment. The video signing ceremony shows that the statement was actually made in reference to the Gold Card, which was announced on the same day. *See* https://www.whitehouse.gov/presidential-actions/2025/09/the-gold-card/ . The video is available here: https://www.youtube.com/watch?v=d9rENKjxMiw&t=269s. The context for the quote at issue begins around minute 4:26 and continues to 4:47.

**Plaintiffs Facts #8-10:**

The U.S. Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, DC. The U.S. Chamber is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. Shen Decl. ¶ 1.

The U.S. Chamber advocates for pro-business policies including by advocating on the topic of immigration. Shen Decl. ¶ 3; Hughes Decl. Exs. 18, 25.

The U.S. Chamber litigates in federal court on behalf of its members, including in cases related to immigration and the H-1B program specifically. It also participates in notice-and-comment rulemaking proceedings related to these issues. Shen Decl. ¶ 4; Hughes Decl. Exs. 17, 19, 20.

**Defendants' Response:** The facts in these paragraphs relate to the business of the Chamber of Commerce, based upon the Shen Declaration submitted with Plaintiffs' motion. Defendants have no independent knowledge of any of these facts but have no basis at this time to dispute them other than the general deficiencies in the Shen declaration, noted in response to Fact 11, below. Defendants do not believe such facts are material to the issues presented in summary judgment.

**Plaintiffs Fact # 11:** Hundreds of U.S. Chamber members currently employ, in the aggregate, tens or hundreds of thousands of H-1B workers. These members hire thousands of new H-1B

workers every year, and planned to do so again in the one-year period following September 21, 2025. Shen Decl. ¶ 23.

**Defendants' Response:** Defendants dispute this fact as lacking specificity and reliability and as clearly not based upon Mr. Shen's personal knowledge, and thus for failing to comply with Fed. R. Civ. P. 56(c)(4) and 56(e). *See Cobell v. Norton*, 391 F.3d 251, 260-61 (D.C. Cir. 2004) (noting that summary judgment affidavits must comply with personal knowledge requirement of rule). "Hundreds" of members could be anywhere from 200 to over 999, which is a vast differential. To claim those hundreds then employ anywhere between tens of thousands (20,001-99,999) or hundreds of thousands (200,000 – 999,999) H-1B workers lacks any sort of meaningful data or specificity. Furthermore, although Mr. Shen states that information in the declaration is supported by "business records reasonably available to me in my role as Vice President for Immigration Policy" (Shen Decl. ¶ 1), he does not reference any such records or otherwise suggest what information supports these vague numbers. Witness testimony is not admissible if it lacks a sufficient foundation. Fed. R. Evid. 602. Finally, Mr. Shen's declaration states "I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge." Shen Decl. p. 11. While that may suffice for a preliminary injunction, summary judgment carries a higher burden. *See Cobell*, 391 F.3d at 260-61 (D.C. Cir. 2004) (distinguishing requirements for a preliminary injunction under § 1746 and for summary judgment under Rule 56, noting summary judgment is a higher standard). If Mr. Shen must qualify his statement as to whether the facts in his declaration are true and correct, those facts are clearly not based upon his personal knowledge and are not admissible. *See id.*; *see also* Fed. R. Civ. P. 56(c)(4); (e).

**Plaintiffs' Fact # 12:** The U.S. Chamber's membership includes both "cap-exempt" employers who may hire additional H-1B workers at any time, and cap-subject employers whose hiring of H-1B workers requires participation in the annual H-1B visa lottery. Shen Decl. ¶¶ 7-9.

**Defendants' Response:** Disputed. The statements in paragraphs 7-9 are a combination of factual information and legal conclusions. Mr. Shen provides no foundation for the legal conclusions that a member is cap-exempt. Moreover, Mr. Shen provides no examples of a member who is cap exempt in the cited paragraphs nor does he provide any foundation for his alleged personal knowledge that the membership includes cap-exempt employers. Thus, the statements lack support and are inadmissible. Fed. R. Evid. 602; Fed. R. Civ. P. 56(c)(4); (e). At best they may be inadmissible hearsay with no identified exception. Fed. R. Evid. 801.

**Plaintiffs' Fact #13:** One U.S. Chamber member, HJI Supply Chain Solutions, intended to recruit H-1B candidates for an open position in the coming year but would be unable to do so if it must pay $100,000 to sponsor an H-1B petition. *See generally* Daniels Decl.; *see also* Shen Decl. ¶ 18.

**Defendants' Response:** Disputed. Paragraph 18 of the Shen Declaration is inadmissible hearsay because it explicitly relies on the Daniels declaration. *See* Fed. R. Evid. 801. The Daniels declaration (ECF 18-5) states that they have hired one H-1B worker, sponsored another, and would like to hire an H-1B worker for a current job posting for an Integrations Engineer. ECF 18-5, ¶¶ 4-8. However, according to HJI's website, there is no open position for an Integrations Engineer. *See* McTague Decl. Exs. 2, 3 (attaching screenshot of HJI website as of December 1, 2025). Thus, the Daniels declaration is facially unreliable and should be excluded.

The Daniels declaration does not state the salary for the (apparently non-existent) position. It does state, however, that the $100,000 payment for a single engineer is simply too much. It does not, however, provide context for what "too much" means, such as whether the company will go out of business if it must pay $100,000, or simply have lower profits, or makes little business sense in view of the offered salary. Furthermore, it states that the requirements for the job are "a bachelor's degree in computer science, information systems, or a related technical field, 1-3 years of experience in a similar role, and familiarity with the various system communication protocols,

9

**JA349**

database and scripting/query tools, and business applications that the IT team regularly uses." ECF 18-5, ¶ 6. Thus, this is exactly the type of role the President found to be problematic—an IT job with minimal experience required. *See* Proclamation, 90 Fed. Reg. 46027, 46027-28 (Sept. 24, 2025). If HJI cannot fill the (apparently non-existent) job with an American, perhaps the unstated salary offered is too low.

**Plaintiffs' Fact #14:** At least dozens of other U.S. Chamber members similarly intended to sponsor prospective employees for H-1B visas in the coming year but must either eliminate or reduce their H-1B recruitment efforts if they would be subject to a $100,000 fee for new H-1B petitions. Shen Decl. ¶¶ 13-22

    **Defendants' Response:** Disputed. The statements in Paragraphs 13-22 of the Shen Declaration are hearsay. Fed. R. Evid. 801. Paragraphs 18, 21, and 22, explicitly state that they are based upon reading the declarations of other people. Paragraphs 13-17 and 19-20 make general references to unidentified members. No exception to the rule against hearsay is identified. Thus, Paragraphs 13-22 are not based upon Shen's personal knowledge, are inadmissible, and cannot be relied upon to support Plaintiffs' motion for summary judgment. *See* Fed. R. Evid. 602, 801; Fed. R. Civ. P. 56(c)(4); (e).

**Plaintiffs' Fact # 15:** Another member of the U.S. Chamber, GoRural, provides recruiting and staffing services to rural hospitals and other rural healthcare facilities and often recruits H-1B candidates. GoRural generates approximately 50% of its revenue from placing workers requiring H-1B visas, which will decrease as GoRural's clients are unable to pay a $100,000 fee. Poser Decl. ¶¶ 1, 6-11.

    **Defendants' Response:** Defendants have no independent knowledge of the first sentence of Fact #15. Defendants do not dispute GoRural's representation that it is a staffing company with three employees that fills 50% of vacancies at its end clients with foreign H-1B workers rather than Americans.

    Defendants dispute that GoRural's clients cannot pay the $100,000 payment. The statement in the Poser Declaration paragraph 10 is inadmissible. There is no foundation for the statement,

such as how Poser knows that the clients cannot pay. There is no identification of the clients. The

statement applies to all clients, without any information as to how Poser knows it applies to all

clients. In other words, the statement lacks foundation, it is about third parties, so Poser lacks

personal knowledge for it, and at best it is inadmissible hearsay if based upon statements of those

third parties. As a result, it is inadmissible. *See* Fed. R. Evid. 602, 801; Fed. R. Civ. P. 56(c)(4),

(e).

**Plaintiffs' Fact #16:** AAU is a 501(c)(3) nonprofit organization headquartered in Washington,
DC. It is an association of leading research universities, 69 of which are based in the United States.
Snyder Decl. ¶ 3. AAU's purpose is to promote vital programs of academic research and
scholarship and undergraduate, graduate, and professional education. *Id.* ¶ 4. Its mission is
centrally focused on ensuring that its members can conduct pathbreaking research that contributes
to public health and American economic growth. *Id.*

      **Defendants' Response:** The facts in these paragraphs relate to the business of AAU, based

upon the Snyder Declaration submitted with Plaintiffs' motion. Defendants have no independent

knowledge of any of these facts but have no basis at this time to dispute them. Defendants do not

believe such facts are material to the issues presented in summary judgment.

**Plaintiffs' Fact #17:** AAU's U.S.-based members use—and plan to continue using—the H-1B
program to hire employees. Snyder Decl. ¶ 5; *see also* ASU Decl. ¶¶ 5, 7; CMU Decl. ¶¶ 5, 8;
UIUC Decl. ¶¶ 9, 13; JHU Decl. ¶¶ 5, 8; Michigan Decl. ¶¶ 9, 11; Minnesota Decl. ¶¶ 5, 10; Pitt
Decl. ¶¶ 5, 7; Utah Decl. ¶¶ 5-6; WashU Decl. ¶¶ 5, 8; Wisconsin Decl. ¶¶ 5, 7. AAU's members
are not subject to the statutory cap on H-1B visas and thus can and do file H-1B petitions on a
rolling basis throughout the year. Snyder Decl. ¶ 6; *see also, e.g.*, Michigan Decl. ¶ 12; UW-
Madison Decl. ¶ 8.

      **Defendants' Response:** Defendants dispute that the evidence shows that every AAU

member uses and plans to continue using the H-1B program. Indeed, only 69 of its members are

based in the United States. *See* Plaintiffs' Fact #16. Members outside of the United States would

not use the H-1B program. Furthermore, Paragraph 5 of the Snyder declaration does not state that

every member uses the H-1B program and that every member plans to continue to do so, it lacks

any foundation to show that it is based on personal knowledge, and to the extent it is based on

discussion with members, it is inadmissible hearsay. *See* Fed. R. Evid. 602, 801; Fed. R. Civ. P. 56(c)(4), (e). To the extent Plaintiffs meant to rely on Paragraph 6, that paragraph also lacks any foundation to show that it is based on personal knowledge, and to the extent it is based on discussion with members, it is inadmissible hearsay. *See* Fed. R. Evid. 602, 801; Fed. R. Civ. P. 56(c)(4), (e).

Defendants do not dispute that the Universities with separate declarations identified in Fact #16 use and plan to continue using H-1B program, although it is unclear whether that means hiring H-1B holders already in the United States or filing new petitions. Indeed, the CMU declaration states that CMU is undecided on whether to file new petitions. ECF 18-8 ¶ 11. Defendants also do not dispute that Michigan and UW-Madison may qualify for cap-exempt H-1B petitions, depending on the scope of the position sought to be filled. Defendants dispute that Paragraph 6 of the Snyder Declaration states that all universities are cap-exempt. That paragraph contains no such information, and such a statement would, at any rate, be a legal conclusion without foundation, or otherwise lacking in foundation or inadmissible hearsay. Fed. R. Evid. 602, 801; Fed. R. Civ. P. 56(c)(4), (e).

**Plaintiffs' Fact # 18:** AAU members have submitted thousands of H-1B visa petitions in 2025. Snyder Decl. ¶ 6.

**Defendants' Response:** Disputed. The statement in the Synder declaration lacks any foundation or specificity to show that Snyder has personal knowledge of how many H-1B petitions were submitted by AAU members in 2025 and is thus inadmissible as lacking foundation or personal knowledge or as inadmissible hearsay. Fed. R. Evid. 602, 801; Fed. R. Civ. P. 56(c)(4), (e).

**Plaintiffs' Fact #19:** Before the Proclamation was issued, AAU members planned to submit H-1B visa petitions this fall on behalf of new H-1B workers, but have now had to put on hold petitions

subject to the Proclamation's $100,000 fee. CMU Decl. ¶ 9; Minnesota Decl. ¶ 11; Utah Decl. ¶ 9; WashU Decl. ¶¶ 9-10.

**Defendants' Response:** Undisputed that the specific AAU member declarations cited state that they have put some H-1B petitions on hold. Disputed to the extent Plaintiffs suggest all AAU members placed petitions on hold. Disputed to the extent that the fact suggests the members "had" to place the petitions on hold, as opposed to making a choice to place the petitions on hold because of the tradeoffs of hiring for the position versus making the $100,000 payment. Defendants do not believe, and Plaintiffs have not provided proof, that these universities with hundreds of millions, if not billions, of dollars in endowments cannot afford the payment if the workers are truly so important. Their choice not to pay reflects their determination that those workers are not worth the $100,000 payment.

**Plaintiffs' Fact #20:** AAU members have had to put other recruiting and hiring efforts on hold as a result of the Proclamation. JHU Decl. ¶ 9; Utah Decl. ¶¶ 7–8, 10.

**Defendants' Response:** Undisputed that the specific AAU member declarations cited state that they have put some recruiting and hiring efforts on hold. Disputed to the extent Plaintiffs suggest all AAU members placed such efforts on hold. Disputed to the extent that the fact suggests the members "had" to put recruiting and hiring efforts on hold, as opposed to making a choice to do so.

**Plaintiffs' Fact # 21:** The Proclamation does not itself exempt any specific noncitizen, category of noncitizen, company, or industry from the requirements specified in the Proclamation. Hughes Decl. Ex. 1.

**Defendants' Response:** Disputed. The Proclamation is narrow in scope, applying only to foreign nationals outside of the United States, lacking a valid H-1B visa, who seek to enter the United States on an H-1B visa granted on a petition filed after the effective date of the

13

**JA353**

Proclamation. *See, e.g.,* Plaintiffs' Exhibits 1 through 5. Thus, it necessarily exempts certain aliens, and categories of aliens who fall outside of its scope.

**Plaintiffs' Fact # 22:** The Proclamation does not require that the Secretary of Homeland Security grant any waivers or exceptions pursuant to Section 1(c) of the Proclamation. Hughes Decl. Ex. 1

 **Defendants' Response:** Undisputed.

**Plaintiffs' Fact #23:** As of October 23, 2025, the Secretary of Homeland Security has not yet granted any waiver or exception pursuant to Section 1(c) of the Proclamation.

 **Defendants' Response:** Undisputed.

**Plaintiffs' Fact #24:** The Secretary of Homeland Security will grant an exception to the Proclamation's requirements only in extraordinarily rare circumstances. Hughes Decl. Ex. 5.

 **Defendants' Response.** Disputed as a partial characterization of the exhibit which speaks for itself. The full quote from USCIS's website is: "Exceptions to the $100,000 payment are granted by the Secretary of Homeland Security in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States."

**Plaintiffs' Fact #25:** To the extent that the Secretary of Homeland Security elects to grant an exception to the Proclamation's requirements pursuant to Section 1(c) of the Proclamation, she will do so only on an individual-by-individual basis. Hughes Decl. Ex. 5. The Secretary of Homeland Security will not grant any company-wide or industry-wide waivers or exceptions pursuant to Section 1(c) of the Proclamation. *Id.*

 **Defendants' Response:** Disputed. The USCIS website does not make the statement in Fact #25. USCIS's website speaks for itself. The ultimate decision of whether to grant exceptions is in the discretion of the Secretary of Homeland Security, based upon her findings, as stated in the Proclamation.

**Plaintiffs' Fact #26:** The federal government has not committed in any of the agency guidance issued pursuant to the Proclamation that it will recognize any fees paid in compliance with the Proclamation as "allowable cost[s]" related to "[s]hort term visas" under 2 C.F.R. § 200.463(d).

**Defendants' Response:** As explained in Defendants' memorandum in support of its opposition to summary judgment, the payment is not a "fee." Defendants' do not dispute that there are no statements about whether the Proclamation Payment qualifies under 2 C.F.R. § 200.463(d).

Respectfully submitted,

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST FLENTJE
Special Counsel for Immigration

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

GLENN M. GIRDHARRY
Acting Deputy Director

By: */s/ Alexandra McTague*
Alexandra McTague
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 718-0483
Email:alexandra.mctague2@usdoj.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al*.

    Plaintiffs,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al*.,

    Defendants.

No. 1:25-cv-3675-BAH

## <u>DECLARATION OF JEROME JACKSON</u>

I, Jerome Jackson, declare as follows:

1. I currently serve as the Branch Manager of the Budget Reporting Branch (BRB) in the Central Accounting and Reporting Division at the Department of the Treasury's Bureau of the Fiscal Service (BFS). I have been employed in this role since May 13, 2015.

2. BFS is responsible for, among other things, collecting federal taxes, charges, and fees; disbursing U.S. Treasury payments; and providing financial management services and solutions to federal agencies. BRB is an office in BFS that is responsible for, among other things, providing guidance to Federal agencies regarding the accounting and reporting of their transactions and account balances, and establishing and maintaining an official record of Federal account symbols and titles for all government programs,

1

appropriations, funds, and receipt accounts. Treasury Account Symbols (TAS) are the cornerstones for reporting the government's financial transactions. Each TAS allows the Department of the Treasury and the Office of Management and Budget (OMB) to track funds collected or spent by Federal agencies, accurately perform accounting and reporting for those funds, and ensure that those funds are spent in accordance with law.

3. To establish a new account to appropriately account for the expenditure or collection of funds, a Federal program agency works OMB and BRB. BRB assigns a TAS after considering the Federal government's relationship to the accounts, such as the source of receipts and the availability of the funds. Each TAS is composed of numbers identifying the responsible agency, the period of availability (for accounts related to appropriations), and the type of account.

4. BRB will establish a General Fund Receipt Account (GFRA) for an agency for the purpose of receiving and accounting for collections not defined by law for a specific purpose.

5. Consistent with the Miscellaneous Receipts Act, 31 U.S.C. § 3302, all amounts held in a Federal agency's GFRA sweep into the General Fund of the U.S. Treasury at the end of the fiscal year.

6. On October 7, 2025, BRB received a request from the Department of Homeland Security (DHS) to establish an account for amounts collected pursuant to the September 19, 2025 Presidential Proclamation entitled "Restriction on Entry of Certain Nonimmigrant Workers" (Proclamation).

7. In response to DHS's request, BRB established a GFRA for amounts collected pursuant to the Proclamation, because such collections are not defined by law for a specific purpose. As with all GFRAs, the amounts in

2

**JA357**

this GFRA will sweep to the General Fund of the U.S. Treasury at the end of the fiscal year.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of December, 2025.

Jerome Jackson, Branch Manager
Bureau of the Fiscal Service
Department of the Treasury

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.* | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:25-cv-3675-BAH |
| v. | ) ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF ALEXANDRA MCTAGUE

I, Alexandra McTague, declare and state as follows:

1. I am an attorney with the United States Department of Justice.

2. I make this declaration in support of Defendants' opposition to Plaintiffs' motion for summary judgment and cross-motion for summary judgment in the above-captioned case.

3. Attached as Exhibit 1 is a true and correct printout of a screenshot of the webpage located at https://travel.state.gov/content/travel/en/News/visas-news/restriction-on-entry-of-certain-nonimmigrant-workers.html as of December 1, 2025.

4. Attached as Exhibit 2 is a true and correct copy of a screenshot of part of the webpage located at https://hjisolutions.com/careers/ as of December 1, 2025, which shows a button for "Job Openings."

5. Attached as Exhibit 3 is a true and correct printout of a screenshot, as of December 1, 2025, of the webpage that appears when the "Job Openings" button referenced in Paragraph 4 is clicked.  The URL for that webpage is https://www.paycomonline.net/v4/ats/web.php/jobs?clientkey=94F8734C 1F2113B1BB47F40560356D93.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 1st day of December, 2025.          /s/ Alexandra McTague
                                                  Alexandra McTague
                                                  Senior Litigation Counsel
                                                  U.S. Department of Justice
                                                  Civil Division

2

**JA360**



# MCTAGUE DECLARATION EXHIBIT 1



**MCTAGUE DECLARATION EXHIBIT 2**



**MCTAGUE DECLARATION EXHIBIT 3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

and

ASSOCIATION OF AMERICAN                    Case No. 1:25-cv-3675-BAH
UNIVERSITIES

                                Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY et al.,

                                Defendants.

**CERTIFICATION OF**
**ADMINISTRATIVE RECORD**

I, Larry W. Talbott, hereby declare under penalty of perjury:

1.  I am employed by the United States Department of State, Bureau of Consular Affairs,
    Visa Office, Office of Information Management and Liaison. The facts attested to herein
    are based upon my personal knowledge and upon information provided to me in my
    official capacity.

2.  I certify that the following documents annexed hereto constitutes the Department of
    State's Administrative Record in this matter:

    A.  Email guidance transmitted on September 19, 2025 from the Bureau of
        Consular Affairs to consular sections;

1

**JA364**

B.  ALDAC transmitted on September 20, 2025 from the Bureau of Consular

Affairs to consular sections;

C.  Announcement on the Department's website (travel.state.gov) regarding

implementation of the proclamation, posted September 21, 2025,

D.  FAQs on the Department's website (travel.state.gov) regarding the

proclamation, posted September 21, 2025; and.

E.  List of websites considered.


I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true

and correct to the best of my knowledge.


Executed on December 5, 2025

<div style="margin-left:40%">

Larry W Talbott   <span style="font-size:small">Digitally signed by Larry W Talbott<br>Date: 2025.12.05 20:35:04 -05'00'</span>

_____

Larry W. Talbott
Deputy Director
Office of Information Management and Liaison
Visa Office, Bureau of Consular Affairs
U.S. Department of State

</div>

2

SBU - LEGAL

Beaumont, Taylor W.

| | |
|---|---|
| **From:** | The-Visa-Office |
| **Sent:** | Friday, September 19, 2025 10:21 PM |
| **To:** | The-Visa-Office |
| **Subject:** | ACTION REQUEST: Operational Guidance – Restriction on Entry of Certain Nonimmigrant Workers |

Dear Colleagues,

Presidential Proclamation Restriction on Entry of Certain Nonimmigrant Workers, issued on September 19, 2025, restricts the entry of aliens in H-1B status and restricts issuance of H-1B visas, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000. This proclamation takes effect at 12:01 a.m. EDT on September 21, 2025.

Posts are instructed to immediately implement the following operational guidance in this email pending additional guidance via ALDAC:

- **Continue to adjudicate all H-1B applicants:** Posts should not cancel appointments of individuals affected by the suspension. Posts should continue to adjudicate applications as per regular procedures.
- Until additional press guidance is available on CA Web, refer external inquiries to the White House announcement at whitehouse.gov.

**VO will provide additional guidance – we ask that you please hold all questions until after the release of the ALDAC.**

Sincerely,
The Visa Office

*Sent to:* Consular Chiefs, RCOs, and MCCAs

*Sent by:* Catherine Miller-Tittle, CA/VO/F/IE, Division Chief

SENSITIVE BUT UNCLASSIFIED

1

**JA366**

UNCLASSIFIED

SBU



| | |
|---|---|
| **MRN:** | 25 STATE 92902 |
| **Date/DTG:** | Sep 20, 2025 / 202243Z SEP 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CMGT, CVIS |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 State 5914 |
| **Subject:** | Action Request:  Restriction on Entry to the United States of Certain Nonimmigrant Workers Pursuant to Section 212(f) of the INA (8 U.S.C. 1182(f)) |

1. (U) This is an action request. **See paragraphs 3-9.**

2. **(SBU) SUMMARY:** Presidential Proclamation (PP) "Restriction on Entry of Certain Nonimmigrant Workers," issued on September 19, 2025, restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation.  This PP restricts the issuance of H-1B visas, <u>except</u> for those aliens whose petitions are accompanied or supplemented by a payment of $100,000.  The PP's restrictions on visa issuance and entry apply ONLY to aliens seeking visa issuance or entry into the United States based on H-1B petitions filed after the PP's effective date of September 21, 2025 at 12:01 a.m. Eastern Daylight Time (EDT).  The PP does NOT direct the revocation of valid H-1B visas issued before the effective date.  **END SUMMARY.**

**ACTION REQUEST/IMPLEMENTATION GUIDANCE**

**Prior to September 21, 2025, at 12:01 a.m. EDT**

3. (SBU) From the release of this ALDAC until September 21, 2025, at 12:01 a.m. EDT, GSS vendors and posts should continue scheduling H-1B and H-4 applicants, and posts should continue visa processing in accordance with standard procedures, including approving eligible applicants, printing visas, and returning passports with issued visas.  Posts should not cancel appointments for individuals who might be affected by the PP.

**As of September 21, 2025, at 12:01 a.m. EDT**

4. (SBU) As of September 21, 2025, at 12:01 a.m. EDT, GSS vendors and posts should continue scheduling H-1B and H-4 applicants, and posts should continue adjudicating all applications, for petitions submitted prior to September 21, 2025, at 12:01 a.m. EDT.  The Department will send guidance SEPTEL on identifying and adjudicating any applications affected by the proclamation.  The Department will not provide refunds for MRV receipts, as these applicants are still permitted to proceed with their application, including an interview appointment.  Posts should continue to review and approve, as appropriate, expedite requests for H-1B and H-4 applicants in accordance with standard guidance on expediting appointments, even if the applicant is affected by the PP.  The restrictions of the PP apply to H-1B visa applicants with petitions filed after the effective date.

**Restriction on Issuance**

5. (SBU) The PP's restriction on issuance and entry under INA 212(f) applies to H-1B visa applicants with petitions filed AFTER 12:01 a.m. EDT on

**JA368**

September 21, 2025, <u>except</u> for those aliens whose petitions are accompanied or supplemented by a payment of $100,000, as verified by DHS.  Guidance on confirming payments and exceptions will come SEPTEL.

**B in Lieu of H**

6.  (SBU) The PP further instructs the Secretary of State to "prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026."  If you encounter a B visa applicant who you suspect is seeking a B visa to carry out activities in the United States that would otherwise more appropriately fall under an H-1B visa, including a B-1 visa in lieu of an H-1 visa, you must carefully consider the applicant's eligibility for the B visa and whether he or she overcomes INA 214(b).  **If the applicant is otherwise eligible, including based on careful review of 9 FAM 402.2-5(F), which outlines circumstances in which a B-1 visa may be issued in lieu of an H-1, you must consult with the Visa Office before proceeding with issuance by emailing your VO/F Visa Policy Analyst.**  CA is reviewing relevant guidance to make any necessary updates in accordance with the proclamation.

**H-1 Categories Not Subject to the PP**

7.  (SBU) The PP applies only to H-1B applicants seeking to perform services in the United States in a specialty occupation.  Visa applicants with an approved H-1B1, H-1B2, or H-1B3 petition from USCIS are not subject to the PP, as their basis for status and visa issuance falls outside the scope of the PP, and should continue to be admitted to the United States as normal per the terms of their visas.  Consular sections may proceed with adjudication and issuance for any qualified applicants in these categories.

**Petition Revocations**

8.  (SBU) Consular sections should not return H-1B petitions for revocation based solely on lack of payment as described in the PP.  However, consular sections should continue to return petitions in all other circumstances where a revocation recommendation is warranted.  See CAWeb for additional resources.

9.  (U) **Additional Guidance:**  CA will provide additional guidance SEPTEL and will schedule webinars in the coming days to provide information to the field and answer additional questions.

10.   (U) **Mission Website:**  CA will coordinate with GPA to publish a notice at the top of the visa page on mission websites.  CA/EX will work with GSS vendors to provide cleared language for their websites.  Posts should not ask their local GSS contacts to put alternative language on post-specific GSS websites.

11.   (U) **Inquiries:**  Posts must refer any U.S. media inquiries regarding E.O.s and PPs to ████████████████ and congressional inquiries regarding E.O.s and PPs to ███████████████████.  Posts should refer local media inquiries regarding payment to USCIS.  Posts should refer local media inquiries regarding entry to CBP.  Posts may continue to reply to routine case-specific constituent inquiries about cases subject to the PP.  Posts may respond to requests from international media regarding E.O.s and PPs using CA's cleared press guidance, on ███████ copying ████████████████

**Signature:**     RUBIO

**XMT:**     BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL;
KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST
PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL;
YEKATERINBURG, AMCONSUL

UNCLASSIFIED
SBU

An official website of the United States Government **Here's how you know**

Home > H-1B FAQ

# H-1B FAQ

SEPTEMBER 21, 2025

On Friday, September 19, 2025, President Donald J. Trump signed a Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," that took an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers.

This Proclamation:

Requires a $100,000 payment to accompany any new H-1B visa petitions submitted after 12:01 a.m. eastern daylight time on September 21, 2025. This includes the 2026 lottery, and any other H-1B petitions submitted after 12:01 a.m. eastern daylight time on September 21, 2025.

Authorizes the Department of Homeland Security and the Department of State to coordinate to take all necessary and appropriate action to implement this Proclamation.

U.S. Citizenship and Immigration Services has so far taken such action by issuing guidance regarding the Proclamation, available **here** .

U.S. Customs and Border Protection has also issued guidance, available **here** .

Cookie Settings

**JA372**

The Department of State has posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance.

This Proclamation does not:

Apply to any previously issued H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on September 21, 2025.

Does not change any payments or fees required to be submitted in connection with any H-1B renewals. The fee is a one-time fee on submission of a new H-1B petition.

Does not prevent any holder of a current H-1B visa from traveling in and out of the United States.

Further steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include:

A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers.

A rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels.

Additional reforms are also under consideration and will be announced in the coming months.

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

**JA373**

America 250



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

**JA374**

# Restriction on Entry of Certain Nonimmigrant Workers

Last Updated: September 21, 2025

Presidential Proclamation (PP) _Restriction on Entry of Certain Nonimmigrant Workers_⧉, issued on September 19, 2025, restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation.  This restricts the issuance of H-1B visas, <u>except</u> for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000. **The Proclamation's restrictions on visa issuance and entry apply only to aliens seeking visa issuance or entry into the United States based on H-1B petitions filed with USCIS <u>after</u> the Proclamation's effective date of September 21, 2025, at 12:01 a.m. Eastern Daylight Time (EDT).**

No visas have been revoked pursuant to the Proclamation. All exceptions to this Proclamation will be determined by the Department of Homeland Security as set forth in the Proclamation.

The full text of the proclamation is available here: https://www.whitehouse.gov/presidential-actions/2025/09/restriction-on-entry-of-certain-nonimmigrant-workers/⧉

**White House Fact Sheet:** https://www.whitehouse.gov/fact-sheets/2025/09/fact-sheet-president-donald-j-trump-suspends-the-entry-of-certain-alien-nonimmigrant-workers/⧉

**H-1B FAQs on state.gov:** https://www.state.gov/h-1b-faq/

· ·

**JA375**

## E  LIST OF   EBSITES CONSIDERED

1. https://www.whitehouse.gov/presidential-actions/2025/09/restriction-on-entry-of-certain-nonimmigrant-workers/

2. https://www.whitehouse.gov/fact-sheets/2025/09/fact-sheet-president-donald-j-trump-suspends-the-entry-of-certain-alien-nonimmigrant-workers/

3. https://www.uscis.gov/sites/default/files/document/memos/H1B  Proc  Memo  FINAL .pdf

4. https://x.com/CBP/status/1969512486627095007

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA**, *et al.* | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) ) | **No. 1:25-cv-3675-BAH** |
| **U.S. DEPARTMENT OF HOMELAND SECURITY**, *et al.*, | ) ) ) | |
| **Defendants.** | ) ) ) ) | |

## CERTIFICATION OF THE ADMINISTRATIVE RECORD

Dale Johnson, pursuant to 5 U.S.C. § 706, deposes and says as follows:

1.       I am the Branch Chief, Enforcement Programs Division (EPD), Admissibility and Passenger Programs (APP), Office of Field Operation (OFO), U.S. Customs and Border Protection, Department of Homeland Security, in Washington, D.C. APP was principally responsible for issuing guidance to OFO personnel at U.S. ports of entry implementing the President's September 19, 2025 Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* (the Proclamation), which is the subject of the above-captioned case. As a Branch Chief with EPD, I am a senior member of the law enforcement team at CBP Headquarters which oversees admissibility policy development in conjunction with oversight for the processing of travelers seeking entry to the United States at ports of entry. I have served in this role since February 12, 2025.

2.       To the best of my knowledge, information, and belief, the attached documents, also designated in the accompanying Index of Certified Administrative Record, constitute a true and complete copy of all non-privileged documents and materials considered by the agency in issuing

1

**JA377**

initial guidance to OFO personnel regarding the implementation of the Proclamation.

      3.      I certify under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of December, in Washington, DC.

**DALE P JOHNSON**
Digitally signed by DALE P JOHNSON
Date: 2025.12.05 16:40:00 -05'00'

Dale Johnson
Branch Chief, Enforcement Programs Division
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection

2

**JA378**

## INDEX

| DATE | DOCUMENT |
|---|---|
| September 19 2025 | Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*<br><br>https://www.whitehouse.gov/presidential-actions/2025/09/restriction-on-entry-of-certain-nonimmigrant-workers/ |
| September 20, 2025 | Memo from Matthew S. Davies to Executive Directors, Field Operations Directors, and Office of Field Operations, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B].*<br><br>https://www.cbp.gov/document/foia-record/restriction-entry-certain-non-immigrant-workers-h-1b-memo |

**JA379**

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

RESTRICTION ON ENTRY OF CERTAIN NONIMMIGRANT WORKERS

Proclamations

September 19, 2025

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

The H-1B nonimmigrant visa program was created to bring temporary workers into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor.  The large-scale replacement of American workers through systemic abuse of the program has undermined both our economic and national security.  Some employers, using practices now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.

The number of foreign STEM workers in the United States has more than doubled between 2000 and 2019, increasing from 1.2 million to almost 2.5 million, while overall STEM employment has only increased 44.5 percent during that time.  Among computer and math occupations, the foreign share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019.  And the key facilitator for this influx of foreign STEM labor has been the abuse of the H-1B visa.

Information technology (IT) firms in particular have prominently manipulated the H-1B system, significantly harming American workers in computer-related fields.  The share

JA380

of IT workers in the H-1B program grew from 32 percent in Fiscal Year (FY) 2003 to an average of over 65 percent in the last 5 fiscal years.  In addition, some of the most prolific H-1B employers are now consistently IT outsourcing companies.  Using these H 1B-reliant IT outsourcing companies provides significant savings for employers:  one study of tech workers showed a 36 percent discount for H-1B "entry-level" positions as compared to full-time, traditional workers.  To take advantage of artificially low labor costs incentivized by the program, companies close their IT divisions, fire their American staff, and outsource IT jobs to lower-paid foreign workers.

Further, the abuse of the H-1B visa program has made it even more challenging for college graduates trying to find IT jobs, allowing employers to hire foreign workers at a significant discount to American workers.  These effects of abuse of H-1B visas have coincided with increasing challenges in the labor market in which H-1B workers serve.  According to a study from the Federal Reserve Bank of New York, among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively — more than double the unemployment rates of recent biology and art history graduates.  Recent data reveals that unemployment rates among workers in computer occupations jumped from an average of 1.98 percent in 2019 to 3.02 percent in 2025.

Reports also indicate that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers.  One software company was approved for over 5,000 H-1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees.  Another IT firm was approved for nearly 1,700 H-1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July.  A third company has reduced its workforce by approximately 27,000 American workers since 2022, while being approved for over 25,000 H-1B workers since FY 2022.  A fourth company reportedly eliminated 1,000 jobs in February; it was approved for over 1,100 H-1B workers for FY 2025.

American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance.  This suggests H-1B visas are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States.

JA381

The high numbers of relatively low-wage workers in the H-1B program undercut the integrity of the program and are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated.  These abuses also prevent American employers in other industries from utilizing the H-1B program in the manner in which it was intended:  to fill jobs for which highly skilled and educated American workers are unavailable.

The abuse of the H-1B program is also a national security threat.  Domestic law enforcement agencies have identified and investigated H-1B-reliant outsourcing companies for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities to encourage foreign workers to come to the United States.

Further, abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields.  A 2017 study showed that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field.

It is therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers.

The severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response.  I therefore find that the unrestricted entry into the United States of certain foreign workers who are described in section 1 of this proclamation would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

<u>Section 1</u>.  <u>Restriction on Entry</u>.  (a)  Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment

**JA382**

of $100,000 — subject to the exceptions set forth in subsection (c) of this section.  This restriction shall expire, absent extension, 12 months after the effective date of this proclamation, which shall be 12:01 a.m. eastern daylight time on September 21, 2025.

(b)  The Secretary of Homeland Security shall restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers under section 101(a)(15)(H)(i)(b) of the INA, who are currently outside the United States, for 12 months following the effective date of this proclamation as set forth in subsection (a) of this section.  The Secretary of State shall also issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026.

(c)  The restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States.

Sec. 2.  Compliance.  (a)  Employers shall, prior to filing an H-1B petition on behalf of an alien outside the United States, obtain and retain documentation showing that the payment described in section 1 of this proclamation has been made.

(b)  The Secretary of State shall verify receipt of payment of the amount described in section 1 of this proclamation during the H-1B visa petition process and shall approve only those visa petitions for which the filing employer has made the payment described in section 1 of this proclamation.

(c)  The Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation.

Sec. 3.  Scope and Implementation of Restriction on Entry.  (a)  The restriction on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation as set forth in section 1(a) of this proclamation.

(b)  No later than 30 days following the completion of the H-1B lottery that immediately follows this proclamation, the Secretary of State, the Attorney General, the

**JA383**

12/5/25, 5:29 PM
Case 1:25-cv-03675-BAH Document 45-2 Filed 12/05/25 Page 8 of 11
Restriction on Entry of Certain Nonimmigrant Workers – The White House

Secretary of Labor, and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President and Homeland Security Advisor, a recommendation on whether an extension or renewal of the restriction on entry pursuant to section 1 of this proclamation is in the interests of the United States.

Sec. 4. Amending the Prevailing Wage Levels. (a) The Secretary of Labor shall initiate a rulemaking to revise the prevailing wage levels to levels consistent with the policy goals of this proclamation consistent with section 212(n) of the INA, 8 U.S.C. 1182(n).

(b) The Secretary of Homeland Security shall initiate a rulemaking to prioritize the admission as nonimmigrants of high-skilled and high-paid aliens, consistent with sections 101, 212, and 214 of the INA, 8 U.S.C. 1101, 1182, and 1184.

Sec. 5. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this nineteenth day of September, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

DONALD J. TRUMP

**JA384**

 

NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS



Subscribe to The White House newsletter

| Your email | SIGN UP |

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



**JA386**



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

September 20, 2025

MEMORANDUM FOR:    Executive Directors
                   Directors, Field Operations
                   Office of Field Operations

FROM:              Matthew S. Davies (b)(6);(b)(7)(c)
                   Executive Director, Admissibility and Passenger Programs
                   Office of Field Operations

SUBJECT:           Proclamation, *Restriction on Entry of Certain Nonimmigrant
                   Workers* [H-1B]

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain
Nonimmigrant Workers*, to address systemic abuse of H1-B nonimmigrant visas. Pursuant to
sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and
1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a
specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C.
1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose *petitions are" accompanied or
supplemented"* by a payment of $100,000. This guidance applies to H-1B employment-based
petitions filed after 12:01 AM ET on September 21, 2025.

**This Proclamation only applies prospectively to petitions that have not yet been filed.** It
does not impact aliens who are the beneficiaries of currently approved petitions, any petitions
filed prior to 12:01 AM ET on September 21, 2025, or aliens in possession of validly issued H-
1B non-immigrant visas. United States Citizenship and Immigration Services and the
Department of State have been instructed to begin implementing the new monetary requirements
for employers submitting petitions on behalf of aliens outside the United States for new H-1B
petitions only. The Proclamation does not impact the ability of any current visa holder to travel
to or from the United States. CBP will continue to process current H-1B visa holders in
accordance with all existing policies and procedures. Aliens found inadmissible should be
processed in alignment with existing guidance for the appropriate Title 8 disposition.

Please ensure this memorandum is distributed to port personnel. Should you require additional
information, please contact (b)(6);(b)(7)(c) Director, Enforcement Programs Division.

~~For Official Use Only~~
~~Law Enforcement Sensitive~~

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al.*
  Plaintiffs,

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,
  Defendants.

_____

No. 1:25-cv-3675-BAH

## CERTIFICATION OF INDEX TO ADMINISTRATIVE RECORD

    I, ANDREW JENSEN, BEST Portfolio Director (Acting) within the Service Center Operations of the United States Citizenship and Immigration Services, hereby certify that the USCIS documents indexed in the appended document constitute the administrative record of the implementation documents challenged in Plaintiffs' amended complaint.

Executed this 5th day of December, 2025, in Lincoln, NE.

ANDREW D
JENSEN

Digitally signed by ANDREW D
JENSEN
Date: 2025.12.05 19:20:38 -06'00'

_____

ANDREW JENSEN

Service Center Operations

US Citizenship and Immigration Services

INDEX

| DATE | DOCUMENT | BATES NUMBER |
|---|---|---|
| 09/20/2025 | USCIS H-1B Proclamation Memo | USCIS000001 |
| 09/21/2025 | USCIS H-1B FAQ | USCIS000002 |
| 10/15/2025 | USCIS Alert Banner and Information Regarding Proclamation on H-1B Specialty Occupations website | USCIS000004 |
| 10/20/2025 | USCIS G-1055, Fee Schedule (Updated for $100K Fee) | USCIS000007 |
| 10/20/2025 | USCIS Pay.gov H1B payment page | USCIS000012 |
| 9/19/2025 | Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* | USCIS000014 |



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

September 20, 2025

# Memorandum

TO:         Associate Directors,
                   Deputy Associate Directors,
                   Program Office Chiefs

FROM:     Joseph B. Edlow
                   Director, United States Citizenship and Immigration Services

SUBJECT:  Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, to address systemic abuse of H-1B nonimmigrant visas. Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions *are accompanied or supplemented* by a payment of $100,000. This guidance applies to H-1B employment-based petitions filed after 12:01 AM ET on September 21, 2025.

**This proclamation only applies prospectively to petitions that have not yet been filed.** The proclamation does not apply to aliens who: are the beneficiaries of petitions that were filed prior to the effective date of the proclamation, are the beneficiaries of currently approved petitions, or are in possession of validly issued H-1B non-immigrant visas. All officers of United States Citizenship and Immigration Services shall ensure that their decisions are consistent with this guidance. The proclamation does not impact the ability of any current visa holder to travel to or from the United States.

cc: David V. Roy, Chief Counsel (A)

USCIS000001

## U.S. Citizenship and Immigration Services

MENU

Home > Newsroom > All News > Alerts > H-1B FAQ

# H-1B FAQ

Release Date : 09/21/2025

On Friday, Sept. 19, 2025, President Donald J. Trump signed a Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," that took an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers.

This Proclamation:

- Requires a $100,000 payment to accompany any new H-1B visa petitions submitted after 12:01 a.m. eastern daylight time on Sept. 21, 2025. This includes the 2026 lottery, and any other H-1B petitions submitted after 12:01 a.m. eastern daylight time on Sept. 21, 2025.
- Authorizes the Department of Homeland Security and the Department of State to coordinate to take all necessary and appropriate action to implement this Proclamation.
  - U.S. Citizenship and Immigration Services has so far taken such action by issuing guidance regarding the Proclamation, available here (PDF, 177.48 KB).
  - U.S. Customs and Border Protection has also issued guidance, available here.
  - The Department of State has posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance.

This Proclamation does not:

- Apply to any previously issued H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on Sept. 21, 2025.
- Does not change any payments or fees required to be submitted in connection with any H-1B renewals. The fee is a one-time fee on submission of a new H-1B petition.
- Does not prevent any holder of a current H-1B visa from traveling in and out of the United States.

Further steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include:

- A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers.
- A rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels.

Additional reforms are also under consideration and will be announced in the coming months.



Need Help?
Chat with Emma™

For more information on USCIS and its programs, please visit <u>uscis.gov</u> or follow us on <u>X (formerly Twitter)</u>⧉
, <u>Instagram</u>⧉, <u>YouTube</u>⧉, <u>Facebook</u>⧉ and <u>LinkedIn</u>⧉.

Last Reviewed/Updated:  09/21/2025

**JA392**

USCIS000003



**U.S. Citizenship
and Immigration
Services**

MENU

Home > Working in the United States > Temporary Workers > H-1B Specialty Occupations

# H-1B Specialty Occupations

---

ⓘ **ALERT:** On Sept. 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, an important initial step to reform the H-1B nonimmigrant visa program. Under the Proclamation, new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025 must be accompanied by an additional $100,000 payment as a condition of eligibility. Additional information is available in the "Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers" section below.

---

ⓘ **ALERT:** USCIS will process H-1B, H-2A, and H-2B related Form I-129 petitions and CW-1 related Form I-129CW petitions during the government shutdown. We recognize, however, that the shutdown may affect a petitioner's ability to get required documentation (such as a labor condition application or a temporary labor certification from the U.S. Department of Labor), which may delay their ability to file Form I-129 or Form I-129CW.

If an H-1B, H-2A, H-2B, or CW-1 petitioner meets all other applicable requirements and submits evidence establishing that the primary reason they did not timely file an extension of stay or change of status request was due to the government shutdown, we will consider the government shutdown an extraordinary circumstance beyond the petitioner's control when we determine whether to excuse their failure to timely file the extension of stay or change of status request. We will monitor the situation closely and publish additional guidance if needed. Find additional information in Vol. 2, Part A, Chapter 4 of the USCIS Policy Manual.

---

ⓘ **Alert:** We have received enough petitions to reach the congressionally mandated 65,000 H-1B visa regular cap and the 20,000 H-1B visa U.S. advanced degree exemption, known as the master's cap, for fiscal year 2026.

---

This nonimmigrant classification applies to people who wish to perform services in a specialty occupation, services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project, or services as a fashion model of distinguished merit or ability.

↗ Close All     ↗ Open All



Need Help?
Chat with Emma™

USCIS000004

# Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers  ⌃

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, an important initial step to reform the H-1B nonimmigrant visa program. Under the Proclamation, certain H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025 must be accompanied by an additional $100,000 payment as a condition of eligibility.

**Who is subject to the $100,000 payment:**

The Proclamation applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa. The Proclamation also applies if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests consular notification, port of entry notification, or pre-flight inspection for an alien in the United States.

In addition, if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests a change of status or amendment or extension of stay and USCIS determines that the alien is ineligible for a change of status or an amendment or extension of stay (e.g., is not in a valid nonimmigrant visa status or if the alien departs the United States prior to adjudication of a change of status request), the Proclamation will apply and the payment must be paid according to the instructions provided by USCIS.

The Proclamation does not apply to any previously issued and currently valid H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on September 21, 2025. In addition, the Proclamation does not prevent any holder of a current H-1B visa, or any alien beneficiary following petition approval, from traveling in and out of the United States.

The Proclamation also does not apply to a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, that is requesting an amendment, change of status, or extension of stay for an alien inside the United States where the alien is granted such amendment, change, or extension. Further, an alien beneficiary of such petition will not be considered to be subject to the payment if he or she subsequently departs the United States and applies for a visa based on the approved petition and/or seeks to reenter the United States on a current H-1B visa.

**How to pay the $100,000 payment:**

Petitioners should submit the required $100,000 payment using pay.gov, following the instructions on pay.gov at the following link: https://www.pay.gov/public/form/start/1772005176.

**When to pay the $100,000 payment:**

Payment must be made prior to filing a petition with USCIS, as petitioners must submit proof that the payment has been scheduled from pay.gov or evidence of an exception from the $100,000 payment from the Secretary of Homeland Security at the time of filing the H-1B petition. Petitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied.

**Exceptions granted by the Secretary of Homeland Security:**

**JA394**

Exceptions to the $100,000 payment are granted by the Secretary of Homeland Security in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States. Petitioning employers who believe their alien worker satisfies this high threshold may seek an exception by sending their request and all supporting evidence to H1BExceptions@hq.dhs.gov.

---

Eligibility Criteria      ⌄

H-1B Licensing      ⌄

H-1B Electronic Registration Process      ⌄

Petition Filing Process      ⌄

Labor Condition Application (LCA)      ⌄

Period of Stay      ⌄

H-1B Cap      ⌄

Changing Employers or Employment Terms with the Same Employer (Portability)      ⌄

Family of H-1B Nonimmigrants      ⌄

More Information      ⌄

⤢ Close All      ⤢ Open All

Last Reviewed/Updated: 10/20/2025



U.S. Citizenship
and Immigration
Services

MENU

Home > Forms > Filing Fees > Fee Schedule

# G-1055, Fee Schedule

> ℹ **ALERT:** On Oct. 1, 2025, we began sending notices to all aliens with a pending Form I-589, Application for Asylum and for Withholding of Removal, who are required to pay the new Annual Asylum Fee (AAF) as provided in the July 22, 2025 Federal Register notice titled "USCIS Immigration Fees Required by HR-1 Reconciliation Bill." We also sent notices to any representatives of these aliens listed on Form G-28.
>
> On Oct. 30, 2025, the United States District Court for the District of Maryland in *Asylum Seeker Advocacy Project v. United States Citizenship and Immigration Services, et al.*, SAG-25-03299 (D. Md.), temporarily stayed the AAF implementation provisions by USCIS. USCIS strongly disagrees with the Court's order but will follow its terms pending possible further judicial review.
>
> In accordance with the Oct. 30 order, USCIS has paused the issuance of AAF notices pending further litigation developments. Any applicant who has received a notice from USCIS instructing him or her to pay the AAF may disregard that notice while the temporary stay is in place. USCIS will not refund previously paid annual asylum fees, and applicants who paid the fee should retain their receipts. USCIS will issue updated instructions on payment of the AAF pending further litigation developments.

> ℹ **ALERT**: On Nov. 14, 2025, we published a new edition of Form G-1055, Fee Schedule. The new edition changed the filing fees for EB-5 related petitions and applications to the pre April 1, 2024, Fee Rule filing fees for:
> - Form I-526, Immigrant Petition by Standalone Investor;
>
> - Form I-526E, Immigrant Petition by Regional Center Investor;
>
> - Form I-829, Petition by Investor to Remove Conditions on Permanent Resident Status;
>
> - Form I-956, Application for Regional Center Designation;
>
> - Form I-956F, Application for Approval of an Investment in a Commercial Enterprise; and
>
> - Form I-956G, Regional Center Annual Statement
>
> Read more here: Court Order on Partial Stay of DHS 2024 USCIS Fee Rule.

Use this form to verify fee information for immigration forms.



Need Help?
Chat with Emma™

USCIS000007

**JA396**

Each application, petition, or request must be accompanied by the correct fee(s) unless you are exempt from paying the fee(s) or are eligible for a fee waiver. If the fee is incorrect, your application, petition, or request will be rejected.

Fees for applications, petitions, or requests can be paid by ACH debit, or credit card.

### Filing at a USCIS Office

If you are filing your application or petition at a USCIS office, you must pay for the filing fee through pay.gov via a credit card or debit card, or electronic funds transfer (EFT) from a U.S. banking institution using Form G-1650, Authorization for ACH Transactions. Cash can never be used to pay a filing and/or biometric services fee, even when filing at a USCIS Office.

### Fees required under Public Law 119-21 (Pub. L. 119-21)

Certain forms require additional fees along with any filing fee. Additional fees are not eligible for fee waivers and must be paid by separate payment concurrent with any filing fee. If your form does not have a filing fee or you have applied for a fee waiver for the form's filing fee, you must still pay the new fee mandated by Pub. L. 119-21.

**NOTE:** Pub. L. 119-21 fees adjust each year as required by law. For specific information regarding the form you are filing, please see the Additional Fee for the form you are filing.

### Fee Waivers

Certain filers may qualify for a fee waiver for certain forms. To determine your eligibility for a fee waiver, please review Form I-912, Request for Fee Waiver. If you are not eligible for a fee waiver, you must submit the correct fee(s). For most forms, you cannot request a fee waiver when filing online. You must file a paper version of Form I-912, or a written request for a fee waiver, and the form for which you are requesting a fee waiver. You may not request a fee waiver of the additional fees required by Pub. L. 119-21. However, you may request a waiver of the filing fee set by USCIS, if otherwise eligible, while submitting the additional fee required by Pub. L. 119-21.

### Fee Exemptions

Fee-exempt forms and filing categories list $0 as the Filing Fee. You do not need to file Form I-912, Request for Fee Waiver, or make a formal request to qualify for a fee exemption. However, the fee exemptions in this schedule only indicate that the form is free to file. They do not indicate eligibility to file those benefit requests in all circumstances. Eligibility to file a particular benefit request is set forth in the applicable regulations and form instructions.



### Edition Date

11/14/25. You can find the edition date at the bottom of the page of Form G-1055, Fee Schedule.



### Downloads

USCIS Fee Schedule

**JA397**

USCIS000008

If you need help downloading and printing forms, read our instructions.

# Select a Form for Fee Information

| I-129, Petition for a Nonimmigrant Worker – H-1B and H-1B1 Petitions ▼ |
|---|

---

# I-129, Petition for a Nonimmigrant Worker – H-1B and H-1B1 Petitions

Visit the I-129 page for more information.

| Filing Category | Paper Filing Fee | Online Filing Fee |
|---|---|---|
| 1. If you are filing H-1B or H-1B1 petitions.<br>2. If you are filing as a Small Employer or Nonprofit. | 1. $780 plus additional fees<br>2. $460 plus additional fees, if applicable | 1. $730 plus additional fees<br>2. $460 plus additional fees, if applicable |
| Additional Fees:<br><br>Asylum Program Fee<br><br>a. If you are filing as a Regular Petitioner<br>b. If you are filing as a Non-profit<br>c. If you are filing as a Small Employer | Varies<br><br>a. $600<br>b. $0<br>c. $300 | Varies<br><br>a. $600<br>b. $0<br>c. $300 |

**JA398**

USCIS000009

| Filing Category | Paper Filing Fee | Online Filing Fee |
|---|---|---|
| Additional Fees:<br><br>H-1B petitioners must submit a Fraud Prevention and Detection fee if they are:<br><br>a. Seeking initial approval of H-1B nonimmigrant status for a beneficiary; or<br><br>b. Seeking approval to employ an H-1B nonimmigrant currently working for another petitioner.<br><br>Petitioners for Chile or Singapore H-1B1 Free Trade Nonimmigrants do not have to pay the Fraud Prevention and Detection fee.  Fraud Prevention and Detection fee, when applicable, may not be waived. | $500 | $500 |
| Additional Fees:<br><br>H-1B petitioners are required to submit an additional fee mandated by Public Law 114-113, if:<br><br>a. They are required to submit the Fraud Prevention and Detection fee; **and**<br><br>b. They employ 50 or more individuals in the United States; and<br><br>c. More than 50 percent of those employees are in H-1B, L-1A, or L-1B nonimmigrant status. | $4,000 | $4,000 |

USCIS000010

| Filing Category | Paper Filing Fee | Online Filing Fee |
|---|---|---|
| Additional Fees:<br><br>American Competitiveness and Workforce Improvement Act (ACWIA). Petitioners filing for:<br><br>a. An H-1B nonimmigrant; or<br>b. A Chile or Singapore H-1B1 Free Trade Nonimmigrant must submit an additional ACWIA fee unless they are exempt under Section 2 of the H-1B Data Collection and Filing Fee Exemption Supplement.<br><br>To determine which ACWIA fee to pay, complete Section 2 of the H-1B Data Collection and Filing Fee Exemption Supplement. | $1,500 or $750 (depending on number of workers the petitioner employs) | $1,500 or $750 (depending on number of workers the petitioner employs) |
| Additional Fees:<br><br>Presidential Proclamation on Restriction of Entry of Certain Nonimmigrant Workers.<br><br>Do not submit payment for this fee with your petition. You must use pay.gov to pay this fee prior to filing your petition. For additional information, see our H-1B Specialty Occupations page. | N/A | $100,000 (unless an exception has been granted by the Secretary of Homeland Security) |

**File Online**

Last Reviewed/Updated: 11/18/2025

USCIS000011



🇺🇸 An official website of the United States government    Here's how you know

MENU

# H-1B VISA PAYMENT TO REMOVE RESTRICTION

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| **Before You Begin** | Complete Agency Form | Enter Payment Info | Review & Submit | Confirmation |

**About this form**

Use this form to pay your H-1B VISA PAYMENT TO REMOVE RESTRICTION.

**Attention!** You must capture the Pay.gov and Agency Tracking ID information after completing your transaction. Keep this information for your records.

**Accepted Payment Methods:**

- Bank account (ACH)

**With an account you can:**

- See the payments you made since you created an account.
- Store payment information so you don't have to re-enter it.
- Copy a form you already submitted the next time you need to make a payment.

**To take advantage of these benefits, you can Sign In . If you don't have an existing account, you will have the option to create an account on the sign-in page. To continue as a guest user, click the 'Continue to the Form' button.**

| **Preview Form** | Cancel | | Continue to the Form |

This is a secure service provided by United States Department of the Treasury. The information you will enter will remain private. Please review our privacy policy for more information.

**We're here to help!**

Return to top

**Accessibility Policy**      **Privacy and Security Policy**      **Notices and Agreements**

**For Agencies**      *      **Feedback**



## Pay.gov

Pay.gov is a program of the U.S. Department of the Treasury, Bureau of the Fiscal Service

**Pay.gov Support**

WARNING WARNING WARNING

You have accessed a U.S. Government information system, which includes (1) this computer, (2) this network, (3) all computers connected to this network, and (4) all devices and storage media attached to this network or to a computer on this network. U.S. Government information systems are provided for the processing of official U.S. Government information only. Unauthorized or improper use of this information system is prohibited and may subject you to disciplinary action, as well as civil and criminal penalties. All data contained on U.S. Government information systems is owned by the U.S. Government and may, for the purpose of protecting the rights and property of the U.S. Government, be monitored, intercepted, recorded, read, searched, copied, or captured in any manner and disclosed or used for any lawful government purpose at any time. THERE IS NO RIGHT TO PRIVACY IN THIS SYSTEM. System personnel may give to law enforcement officials any potential evidence of crime found on U.S. Government information systems. USE OF THIS SYSTEM BY ANY USER, AUTHORIZED OR UNAUTHORIZED, CONSTITUTES YOUR UNDERSTANDING AND CONSENT TO THIS MONITORING, INTERCEPTION, RECORDING, READING, COPYING, OR CAPTURING AND DISCLOSURE.

Note: This system may contain Sensitive But Unclassified (SBU) data that requires specific data privacy handling.

**JA402**

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

RESTRICTION ON ENTRY OF CERTAIN NONIMMIGRANT WORKERS

Proclamations

September 19, 2025

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

The H-1B nonimmigrant visa program was created to bring temporary workers into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor.  The large-scale replacement of American workers through systemic abuse of the program has undermined both our economic and national security.  Some employers, using practices now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.

The number of foreign STEM workers in the United States has more than doubled between 2000 and 2019, increasing from 1.2 million to almost 2.5 million, while overall STEM employment has only increased 44.5 percent during that time.  Among computer and math occupations, the foreign share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019.  And the key facilitator for this influx of foreign STEM labor has been the abuse of the H-1B visa.

Information technology (IT) firms in particular have prominently manipulated the H-1B system, significantly harming American workers in computer-related fields.  The share

of IT workers in the H-1B program grew from 32 percent in Fiscal Year (FY) 2003 to an average of over 65 percent in the last 5 fiscal years.  In addition, some of the most prolific H-1B employers are now consistently IT outsourcing companies.  Using these H 1B-reliant IT outsourcing companies provides significant savings for employers:  one study of tech workers showed a 36 percent discount for H-1B "entry-level" positions as compared to full-time, traditional workers.  To take advantage of artificially low labor costs incentivized by the program, companies close their IT divisions, fire their American staff, and outsource IT jobs to lower-paid foreign workers.

Further, the abuse of the H-1B visa program has made it even more challenging for college graduates trying to find IT jobs, allowing employers to hire foreign workers at a significant discount to American workers.  These effects of abuse of H-1B visas have coincided with increasing challenges in the labor market in which H-1B workers serve. According to a study from the Federal Reserve Bank of New York, among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively — more than double the unemployment rates of recent biology and art history graduates.  Recent data reveals that unemployment rates among workers in computer occupations jumped from an average of 1.98 percent in 2019 to 3.02 percent in 2025.

Reports also indicate that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers.  One software company was approved for over 5,000 H-1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees.  Another IT firm was approved for nearly 1,700 H-1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July.  A third company has reduced its workforce by approximately 27,000 American workers since 2022, while being approved for over 25,000 H-1B workers since FY 2022.  A fourth company reportedly eliminated 1,000 jobs in February; it was approved for over 1,100 H-1B workers for FY 2025.

American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance.  This suggests H-1B visas are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States.

12/5/25, 7:45 PM
Case 1:25-cv-03675-BAH Document 45-3 Filed 12/05/25 Page 18 of 22
Restriction on Entry of Certain Nonimmigrant Workers – The White House

The high numbers of relatively low-wage workers in the H-1B program undercut the integrity of the program and are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated.  These abuses also prevent American employers in other industries from utilizing the H-1B program in the manner in which it was intended:  to fill jobs for which highly skilled and educated American workers are unavailable.

The abuse of the H-1B program is also a national security threat.  Domestic law enforcement agencies have identified and investigated H-1B-reliant outsourcing companies for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities to encourage foreign workers to come to the United States.

Further, abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields.  A 2017 study showed that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field.

It is therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers.

The severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response.  I therefore find that the unrestricted entry into the United States of certain foreign workers who are described in section 1 of this proclamation would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Restriction on Entry.  (a)  Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment

12/5/25, 7:45 PM
Case 1:25-cv-03675-BAH    Document 45-3    Filed 12/05/25    Page 19 of 22
Restricting the Entry of Certain Nonimmigrant Workers – The White House

of $100,000 — subject to the exceptions set forth in subsection (c) of this section. This restriction shall expire, absent extension, 12 months after the effective date of this proclamation, which shall be 12:01 a.m. eastern daylight time on September 21, 2025.

(b)  The Secretary of Homeland Security shall restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers under section 101(a)(15)(H)(i)(b) of the INA, who are currently outside the United States, for 12 months following the effective date of this proclamation as set forth in subsection (a) of this section. The Secretary of State shall also issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026.

(c)  The restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States.

Sec. 2.  Compliance.  (a)  Employers shall, prior to filing an H-1B petition on behalf of an alien outside the United States, obtain and retain documentation showing that the payment described in section 1 of this proclamation has been made.

(b)  The Secretary of State shall verify receipt of payment of the amount described in section 1 of this proclamation during the H-1B visa petition process and shall approve only those visa petitions for which the filing employer has made the payment described in section 1 of this proclamation.

(c)  The Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation.

Sec. 3.  Scope and Implementation of Restriction on Entry.  (a)  The restriction on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation as set forth in section 1(a) of this proclamation.

(b)  No later than 30 days following the completion of the H-1B lottery that immediately follows this proclamation, the Secretary of State, the Attorney General, the

USCIS000017

12/5/25, 7:45 PM
Case 1:25-cv-03675-BAH  Document 45-3  Filed 12/05/25  Page 20 of 22
Restriction on Entry of Certain Nonimmigrant Workers – The White House

Secretary of Labor, and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President and Homeland Security Advisor, a recommendation on whether an extension or renewal of the restriction on entry pursuant to section 1 of this proclamation is in the interests of the United States.

Sec. 4. Amending the Prevailing Wage Levels. (a) The Secretary of Labor shall initiate a rulemaking to revise the prevailing wage levels to levels consistent with the policy goals of this proclamation consistent with section 212(n) of the INA, 8 U.S.C. 1182(n).

(b) The Secretary of Homeland Security shall initiate a rulemaking to prioritize the admission as nonimmigrants of high-skilled and high-paid aliens, consistent with sections 101, 212, and 214 of the INA, 8 U.S.C. 1101, 1182, and 1184.

Sec. 5. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this nineteenth day of September, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

DONALD J. TRUMP




GET THE FACTS →

NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS



Subscribe to The White House newsletter

| Your email | SIGN UP |
| --- | --- |

USCIS000019

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



JA409

USCIS000020

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>                Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>                Defendants. | Case No. 1:25-cv-3675-BAH |

### REPLY DECLARATION OF CONRAD DANIELS

I, Conrad Daniels, declare as follows:

1.      I am the President of HJI Supply Chain Solutions (HJI). I have worked at HJI since 2001. HJI is a member of Plaintiff organization the Chamber of Commerce of the United States of America (U.S. Chamber). I make this declaration based on my own personal knowledge. If called as a witness, I could and would testify competently to the matters set forth herein.

2.      I am familiar with the Defendants' filings in response to Plaintiffs' Motion for a Preliminary Injunction or in the Alternative for Summary Judgment (Dkt. No. 18), including the Defendants' Statement of Undisputed Material Facts and Response to Plaintiffs' Statement of Undisputed Material Facts (Dkt. No. 36-1) and the exhibits attached to the Declaration of Alexandra McTague, which include screenshots from HJI's website (Dkt. No. 36-3).

3.      In the time since I made my initial declaration on October 22, 2025, HJI filled the Integrations Engineer position with a domestic, non-H1-B employee—but one who lacked some

of the qualifications in the job posting. Although HJI advertised for, and hoped to recruit, an experienced individual (*see* Daniels Decl. ¶ 11), HJI ultimately hired an entry-level employee with no relevant practical experience. As a result, HJI is currently diverting resources to on-the-job training for this individual, which would not have been necessary if HJI had been able to hire a candidate with the qualifications that HJI had desired.

4.      As I explained in my first declaration, due to the imposition of the $100,000 fee, HJI was unable to recruit prospective candidates from the pool of H1-B candidates. Daniels Decl. ¶ 10. As a result, it took HJI months to fill the Integrations Engineer position, and ultimately, HJI hired a "less experienced, less specialized candidate" for the job than we had originally wanted to hire. *Id.* ¶ 11.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: _____        _____
          12/10/2025 | 3:51:45 PM CST
            Louisville, Kentucky                              Condrad Daniels

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>　　　　　　　　Defendants. | Case No. 1:25-cv-03675-BAH |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF**
**UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h)(1), Plaintiffs hereby submit this response to Defendants' statement of material facts, ECF No. 36-1.

**GENERAL OBJECTIONS**

Plaintiffs object to Defendants' Statement of Undisputed Material Facts to the extent that it relies upon declarations of government officials or documents not included in the administrative record, for the reasons explained in Plaintiffs' Response to Defendants' Motion for Relief from Local Rule 7(n) (ECF No. 39 at 6-11), which this Court denied (Minute Order of Dec. 4, 2025).

Plaintiffs also object that legal conclusions or arguments and purported facts that are not material are not properly included in a statement of undisputed material facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) ("Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

## RESPONSES AND OBJECTIONS

### I.    Responses and Objections to Defendants' Statement of Undisputed Material Facts

1.    Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg 46027 (Sept. 24, 2025) (hereinafter the "Proclamation") was made pursuant to the authority granted to the President by Congress in 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a). *See* Plaintiffs' Exhibit 1 (ECF 18-19).

**Plaintiffs' Response**: Undisputed that Proclamation 10973 was announced on September 19, 2025, and entered into the Federal Register on September 24, 2025, and that it purported to rely on 8 U.S.C. §§ 1182(f) and 1185(a). Plaintiffs object that the remainder of this statement constitutes a legal conclusion about whether the Proclamation was made under authority conferred on the President by Congress, rather than an assertion of fact. As such, it is not properly included in the government's statement of undisputed material facts, and no response is required.

2.    The Proclamation contains the President's findings as to why unrestricted entry into the United States of certain foreign workers would be detrimental to the interests of the United States.

**Plaintiffs' Response**: Undisputed that the Proclamation purports to contain the findings made by the President in support of the Proclamation. As to the remainder of the statement, Defendants' summary and characterization of the Proclamation is not a material fact, and as such is not properly included in the government's statement of undisputed material facts, and no response is required. Plaintiffs refer the Court to the text of the Proclamation, which speaks for itself.

3.    The President's findings in the Proclamation include that abuse of the H-1B nonimmigrant worker program has led to "[t]he large-scale replacement of American workers",

"suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." 90 Fed. Reg. at 46027.

**Plaintiffs' Response**: Undisputed that the quotations from the Proclamation are accurate. Disputed as to the content of the President's purported findings, for which the Defendants cite no evidence in support.

4.     The President's findings include that employing H-1B workers in entry-level positions at discounted rates undercuts American worker wages and opportunities, and is antithetical to the purpose of the H-1B program, which is "to fill jobs for which highly skilled and educated American workers are unavailable." 90 Fed. Reg. at 46027.

**Plaintiffs' Response**: Undisputed that the quotation from the Proclamation is accurate. Disputed as to the content of the President's purported findings, for which the Defendants cite no evidence in support. In addition, the purpose of the H1-B program is a legal conclusion to which no response is required.  Plaintiffs refer the Court to the text of the Proclamation, which speaks for itself.

5.     The President's findings include that H-1B program abuses are a national security threat because they reduce American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." 90 Fed. Reg. at 46027.

**Plaintiffs' Response**: Undisputed that the quotation from the Proclamation is accurate. Disputed as to the content of the President's purported findings, for which the Defendants cite no evidence in support. Plaintiffs refer the Court to the text of the Proclamation, which speaks for itself.

6.     The President's findings include that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate

response" and that "unrestricted entry into the United States of certain foreign workers … would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." 90 Fed. Reg. at 46027.

**Plaintiffs' Response**: Undisputed that the quotation from the Proclamation is accurate. Disputed as to the content of the President's purported findings, for which the Defendants cite no evidence in support. Plaintiffs refer the Court to the text of the Proclamation, which speaks for itself.

7.      The President's findings include that it is "therefore necessary to impose higher costs on companies seeking to use the H–1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." 90 Fed. Reg. at 46027.

**Plaintiffs' Response**: Undisputed that the quotation from the Proclamation is accurate. Disputed as to the content of the President's purported findings, for which the Defendants cite no evidence in support. Plaintiffs refer the Court to the text of the Proclamation, which speaks for itself.

8.      The Proclamation placed entry restrictions on foreign nationals outside of the United States seeking H-1B visas by way of new petitions filed after the effective date of the Proclamation. Plaintiffs' Ex. 1; *see also* Plaintiffs' Ex. 2.

**Plaintiffs' Response**: Plaintiffs dispute that the Proclamation placed an "entry restriction[]" on foreign nationals seeking H-1B visas, which is a legal conclusion rather than an assertion of fact. As such, it is not properly included in the government's statement of undisputed material facts, and no response is required. Plaintiffs do not dispute that the Proclamation applies to new petitions filed after the Proclamation's effective date, with the caveat that petitions requesting a change of status or amendment or extension of stay are not considered "new petitions." *See* Dkt. No. 45-3 at 7. Plaintiffs refer the Court to the text of the Proclamation, which speaks for itself.

9.      The entry restriction requires a $100,000 payment. Plaintiffs' Ex. 1; *see also* Plaintiffs' Ex. 2.

**Plaintiffs' Response**: Plaintiffs dispute that the Proclamation placed an "entry restriction" on foreign nationals seeking H-1B visas, which is a legal conclusion rather than an assertion of undisputed material fact. As such, it is not properly included in the government's statement of undisputed material facts, and no response is required. Plaintiffs do not dispute that the Proclamation requires a $100,000 payment. Plaintiffs refer the Court to the text of the Proclamation, which speaks for itself.

10.      U.S. Citizenship and Immigration Services (USCIS) has stated that proof payment of the $100,000 payment required by the Proclamation must be submitted with any new H-1B petition filed after the effective date of the Proclamation. Plaintiffs' Ex. 5.

**Plaintiffs' Response:** Undisputed, with the caveat that a petition requesting a change of status or amendment or extension of stay is not a "new petition." *See* Dkt. No. 45-3 at 7.

11.      No H-1B visas have been revoked as a result of the Proclamation. McTague Decl. Ex. 1.

**Plaintiffs' Response**: Plaintiffs dispute that this fact is material. Plaintiffs do not dispute that Exhibit 1 to the McTague Declaration states that "[n]o visas have been revoked pursuant to the Proclamation." Plaintiffs additionally object to this statement's reliance on sources outside the administrative record. Subject to those qualifications, Plaintiffs have no independent knowledge of this fact but have no basis at this time to dispute it.

12.      The Proclamation does not apply to aliens holding H-1B visas prior to the date of the proclamation. Plaintiffs' Exs. 1, 2, 3.

**Plaintiffs' Response**: Plaintiffs object that this is a legal conclusion, not a statement of fact, and as such it is not properly included in the government's statement of undisputed material facts, and no response is required. To the extent it could be viewed as a statement of fact, it is

undisputed that the government has represented that the Proclamation does not apply to such persons.

13.    The Proclamation does not apply to aliens holding visas other than H-1B visas. Plaintiffs' Ex. 1.

**Plaintiffs' Response**: Plaintiffs object that this is a legal conclusion, not a statement of fact, and as such it is not properly included in this statement of undisputed material facts, and no response is required. To the extent it could be viewed as a statement of fact, it is undisputed.

14.    The Proclamation does not apply to aliens within the United States. Plaintiffs' Exs. 1, 2, 3.

**Plaintiffs' Response**: Plaintiffs object that this is a legal conclusion, not a statement of fact, and as such it is not properly included in the government's statement of undisputed material facts, and no response is required. To the extent it could be viewed as a statement of fact, it is disputed. The cited documents do not support this statement. Plaintiffs do not dispute that the Proclamation states that it "shall apply only to aliens who enter or attempt to enter the United States after the effective date" of the Proclamation.

In Plaintiffs' Ex. 5, USCIS states that

> The Proclamation applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa. The Proclamation also applies if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests consular notification, port of entry notification, or pre-flight inspection for an alien in the United States.

This statement suggests that the Proclamation does not apply only if (a) a noncitizen is inside the United States *and* (b) does not need to leave the United States in order to obtain the H-1B visa, such as through the consular notification process.

15.    The Proclamation has a term of one year. Plaintiffs' Ex. 1.

**Plaintiffs' Response**: Undisputed, with the caveat that the Proclamation provides that it may be extended. *See* Plaintiffs' Ex. 1 at 3.

16.    The USCIS Memorandum (Plaintiffs' Ex. 2) merely paraphrases and carries out the directives of the President as set forth in the Proclamation. *See* Plaintiffs' Ex. 1, 2.

**Plaintiffs' Response**: Defendants' characterization of the contents of the USCIS Memorandum is not a statement of fact. As such, it is not properly included in the government's statement of undisputed material facts, and no response is required. To the extent it could be viewed as a statement of fact, it is disputed.

17.    The U.S. Customs and Border Protection Memorandum (Plaintiffs' Ex. 3) merely paraphrases and carries out the directives of the President as set forth in the Proclamation. *See* Plaintiffs' Ex. 1, 3.

**Plaintiffs' Response**: Defendants' characterization of the contents of the USCBP Memorandum is not a statement of fact. As such, it is not properly included in the government's statement of undisputed material facts, and no response is required. To the extent it could be viewed as a statement of fact, it is disputed.

18.    The State Department website guidance found in McTague Decl. Ex. 1 merely paraphrases and carries out the directives of the President as set forth in the Proclamation. *See* McTague Decl. Ex 1, Plaintiffs' Ex. 1.

**Plaintiffs' Response**: Defendants' characterization of the contents of the State Department Guidance is not a statement of fact. As such, it is not properly included in the government's statement of undisputed material facts, and no response is required. To the extent it could be viewed as a statement of fact, it is disputed.

19.    The State Department FAQs merely paraphrase and carry out the directives of the President as set forth in the Proclamation. *See* Plaintiffs' Ex. 1, 4.

**Plaintiffs' Response**: Defendants' characterization of the contents of the State Department FAQs is not a statement of fact. As such, it is not properly included in the government's statement of undisputed material facts, and no response is required. To the extent it could be viewed as a statement of fact, it is disputed.

20.     The USCIS website section entitled "H-1B Specialty Occupations" (Plaintiffs' Ex 5) merely paraphrases and carries out the directives of the President as set forth in the Proclamation. *See* Plaintiffs' Ex. 1, 5.

**Plaintiffs' Response**: Defendants' characterization of the contents of the USCIS website is not a statement of fact. As such, it is not properly included in the government's statement of undisputed material facts, and no response is required. To the extent it could be viewed as a statement of fact, it is disputed.

21.     In the Immigration and Nationality Act (INA), Congress identified different classes of nonimmigrants, each of which is entitled to a different visa. 8 U.S.C. § 1101(a)(15).

**Plaintiffs' Response**: Undisputed that the INA identifies different nonimmigrant categories. To the extent Defendants suggest that each visa category is a "class" within the meaning of Section 212(f) (8 U.S.C. § 1182(f)), that is both a legal conclusion and disputed.

22.     In the INA, Congress identified the class of nonimmigrants commonly referred to as H-1B. 8 U.S.C. § 1101(a)(15)(H)(i)(b).

**Plaintiffs' Response**: Undisputed that the INA identifies the H-1B nonimmigrant category. To the extent Defendants suggest that the H-1B visa category is a "class" within the meaning of Section 212(f) (8 U.S.C. § 1182(f)), that is both a legal conclusion and disputed.

23.     The Proclamation payment applies to the class of H-1B nonimmigrants whose petitions were filed after the effective date of the Proclamation. *See* Plaintiffs' Ex. 1, Ex. 2, Ex. 5.

**Plaintiffs' Response**: Undisputed that the Proclamation applies to H-1B petitions and applies after its effective date. To the extent Defendants suggest that the Proclamation applies to a

"class" within the meaning of Section 212(f) (8 U.S.C. § 1182(f)), that is both a legal conclusion and, to the extent it could be viewed as a statement of fact, disputed.

24.    HJI Supply Chain Solutions, the company identified in Plaintiffs' ECF filing 18-5, did not, as of December 1, 2025, have a job opening for an Integrations Engineer. McTague Decl. Exs. 2, 3.

25.    **Plaintiffs' Response**: Plaintiffs do not dispute that Exhibits 2 and 3 of the McTague Declaration are accurate screenshots, and that as of today's date, HJI does not have a job opening for an Integrations Engineer. As described in Mr. Daniels's supplemental declaration, HJI ultimately hired an entry-level, domestic employee to fill the role, despite that person not meeting the stated qualifications for the position. Daniels Supp. Decl. ¶ 3. As a result, "HJI is currently diverting resources to on-the-job training for this individual, which would not have been necessary if HJI had been able to hire a candidate with the appropriate qualifications" through the H1-B program. *Id.*

26.    The $100,000 payment required by the Proclamation is not on the USCIS fee schedule for H-1B petition fees. *See* Plaintiffs' Ex. 6.

**Plaintiffs' Response**: Undisputed.

27.    The $100,000 payment required by the Proclamation is paid into a Treasury General Fund Receipt Account (GFRA) for the Department of Homeland Security. Monies deposited into the GFRA remain in the GFRA until the end of each fiscal year and then are swept into the General Fund of the Treasury. *See* Jackson Declaration ¶¶ 4-7.

**Plaintiffs' Response**: Plaintiffs object to this statement's reliance on sources outside the administrative record. Plaintiffs also dispute the statement to the extent it suggests that $100,000 payments have in fact been paid into a Treasury General Fund Receipt Account; the Jackson Declaration states only, as relevant, that the Budget Reporting Branch "established a GFRA for amounts collected pursuant to the Proclamation," and that "the amounts in this GFRA will sweep

to the General Fund of the U.S. Treasury at the end of the fiscal year." Subject to those objections,

Plaintiffs do not dispute that this statement otherwise accurately reflects the contents of the Jackson

Declaration, which Plaintiffs have no basis to dispute at this time.

Respectfully submitted,

/s/ *Lindsay C. Harrison*
Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of American Universities*

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Grace Wallack (Bar No. 1719385)
Alex Boota (Bar No. 90001014)
Emmett Witkovsky-Eldred (Bar No. 90012725)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | Civil Action No. 25-cv-3675 (BAH) <br><br> Judge Beryl A. Howell |

## <u>ORDER</u>

Upon consideration of plaintiffs the Chamber of Commerce of the United States and the Association of American Universities' Motion for a Preliminary Injunction or, in the Alternative, Summary Judgment, ECF No. 18; defendants the Department of Homeland Security, the Department of State, and their respective Secretaries in their official capacities' Cross-Motion for Summary Judgment, ECF No. 37; defendants' Motion to Dismiss the Complaint, ECF No. 50; the memoranda and exhibits submitted in support and opposition; and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that plaintiffs' Motion for a Preliminary Injunction or, in the Alternative, Summary Judgment, ECF No. 18, is **DENIED**; it is further

**ORDERED** that defendants' Cross-Motion for Summary Judgment, ECF No. 37, is **GRANTED**; it is further

**ORDERED** that defendants' Motion to Dismiss the Complaint, ECF No. 50, is **DENIED** as moot; it is further

**ORDERED** that judgment is entered in favor of defendants; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

*This is a final and appealable order.*

Date:   December 23, 2025

_____
**BERYL A. HOWELL**
United States District Judge

**JA422**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 25-cv-3675 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

On September 19, 2025, the President signed a Proclamation adding a $100,000 payment requirement before processing employers' petitions for new H-1B visas.  *See* Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sept. 19, 2025).  The H-1B program has, for over three decades, permitted employers to bring nonimmigrant foreign workers into the United States to perform services in "specialty occupation[s]" requiring "highly specialized knowledge" and advanced education.  *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(c)(1), (i)(1); *see also* Immigration Act of 1990, Pub. L. No. 101-649, § 205(c), 104 Stat. 4978, 5020 (1990) (creating the H-1B program).  In response to the Proclamation, plaintiffs the Chamber of Commerce of the United States (the "Chamber")—the world's largest business federation with approximately 300,000 direct members—and the Association of American Universities ("AAU")—an organization representing 69 U.S.-based research universities—filed this instant action.

Plaintiffs assert two claims against defendants, the Department of Homeland Security ("DHS"), the Department of State, and their respective Secretaries: first, that the Proclamation and its implementation are *ultra vires*, as beyond defendants' legal authority, Am. Compl. ¶¶ 190-196,

1

ECF No. 8; and second, that the Proclamation's *implementation* violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, *id.* ¶¶ 197-206.  As support for their claims, plaintiffs also expend considerable ink extolling the benefits to the country from H-1B workers, arguing that "[t]hese workers contribute enormously to American productivity, prosperity, and innovation." *Id.* ¶ 64; *see also id.* ¶¶ 63-79, 93-102.  The H-1B program, plaintiffs assert, helps hospitals, universities, and firms in manufacturing and science, technology, engineering and mathematics (STEM) fields overcome purported domestic labor shortages, *id.* ¶¶ 66-68; creates domestic jobs by "allow[ing] American employers to continue basing individual operations or offices in the United States," *id.* ¶ 69 (citation omitted); results in "higher rates of new product innovation," *id.* ¶ 72; enables the "manufacturing sector to be competitive on the global stage," *id.* ¶ 76 (internal quotation marks omitted); and "has a positive effect on American trade with foreign nations," *id.* ¶ 77 (citation omitted).

Now pending before the Court, on an expedited basis, are three motions: plaintiffs have moved for summary judgment, Pls.' Mot. for Prelim. Inj. or, in the Alternative, Mot. for Summ. J. ("Pls. Mot."), ECF No. 18, and defendants have both cross-moved for summary judgment, Defs.' Cross Mot. for Summ. J., ECF No. 37, and, most recently, to dismiss plaintiffs' complaint for failure to state a claim, Defs.' Mot. to Dismiss, ECF No. 50.

Defendants have the stronger position.  The lawfulness of the Proclamation and its implementation rests on a straightforward reading of congressional statutes giving the President broad authority to regulate entry into the United States for immigrants and nonimmigrants alike. As instructed by binding precedent, when the executive "exercises authority expressly delegated to it by Congress[,] it is at the zenith of its powers." *Am. Trucking Ass'ns, Inc. v. United States*, 627 F.2d 1313, 1320 (D.C. Cir. 1980); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343

2

**JA424**

U.S. 579, 635 (1952) (Jackson, J., concurring in the judgment and opinion of the Court) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."). Here, the Proclamation was issued pursuant to such an express statutory grant of authority to the President and, as such, is not *ultra vires*. The lawfully authorized nature of the Proclamation, which directed immediate implementation, carries over to the limited, ministerial actions taken to date by defendants to comply with its terms and, as such, those actions are not in violation of the APA.

To be clear, this decision in favor of defendants is not to dismiss or discount the past and ongoing contributions of H-1B workers to the American economy that plaintiffs highlight. Important as those contributions may be, the effects of the H-1B program on the American economy or national security, whether positive or negative, are simply not at issue in this case. The Supreme Court has long maintained that matters of economic and foreign policy are generally entrusted to the political branches of government and "rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981); *see also Green v. Frazier*, 253 U.S. 233, 240 (1920). Here, Congress has decided to delegate broad power to the President to restrict entry of noncitizens "[w]henever the President finds that" such entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f); *see also* 8 U.S.C. § 1185(a) (similarly conferring on the President broad authority to "order[]" restrictions and prohibitions on entry and to adopt "reasonable rules, regulations, and orders" governing entry or removal of noncitizens). The President, in turn, has exercised the discretion Congress gave him to find that the Proclamation is "necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of the program while still permitting companies to hire the best of the best

temporary foreign workers." Proclamation, 90 Fed. Reg. at 46028. Among other findings, the President explained that "[t]he high numbers of relatively low-wage workers in the H-1B program . . . are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated," and "present[s] a national security threat by discouraging Americans from pursuing careers in science and technology." *Id.* The parties' vigorous debate over the ultimate wisdom of this political judgment is not within the province of the courts—so long as the actions dictated by the policy decision and articulated in the Proclamation fit within the confines of the law, the Proclamation must be upheld.

Accordingly, for the reasons explained more fully below, plaintiffs' motion for summary judgment is denied, *see* ECF No. 18, defendants' cross-motion for summary judgment is granted, *see* ECF No. 37, and defendants' motion to dismiss is denied as moot, *see* ECF No. 50.

## I.    BACKGROUND

Set out below is an overview of the relevant statutory framework for resolving the parties' pending cross-motions for summary judgment and defendants' pending motion to dismiss, followed by the factual and procedural background for this case.

### A.    The Executive's Broad Authority Under the INA

Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, noncitizens wishing to enter the United States typically must have a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. In addition to presenting a valid visa, the noncitizen must separately also be found admissible upon inspection at a port of entry. *See* 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see* 8 U.S.C. § 1101(a)(4).

"The INA establishes numerous grounds on which an alien abroad may be inadmissible to the United States and ineligible for a visa." *Trump v. Hawaii*, 585 U.S. 667, 683 (2018); *see, e.g.*, 8 U.S.C. §§ 1182(a), 1201(g). Congress has also accorded the President "broad discretion to

suspend the entry of aliens into the United States." *Hawaii*, 585 U.S. at 683-84 (citing 8 U.S.C. § 1182(f)). Specifically, the INA's § 212(f), codified at 8 U.S.C. § 1182(f), states, in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). The Supreme Court has observed that, "[b]y its terms, § 1182(f) exudes deference to the President in every clause," *Hawaii*, 585 U.S. at 684, "entrust[ing] to the President the decisions whether and when to suspend entry ('[w]henever [he] finds that the entry' of aliens 'would be detrimental' to the national interest); whose entry to suspend ('all aliens or any class of aliens'); for how long ('for such period as he shall deem necessary'); and on what conditions ('any restrictions he may deem to be appropriate')," *id.* (quoting 8 U.S.C. § 1182(f)).

Section 1182(f) is not the only INA provision that expressly mentions the President and his authority in regulating entry into the United States. Section 1185(a) enumerates certain restrictions and prohibitions on travel of both citizens and aliens into the United States, "[u]nless otherwise ordered by the President," and then further grants the President the authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

These two provisions, 8 U.S.C. §§ 1182(f) and 1185(a)(1), granting the President broad authority, are both located in the INA's same subpart addressing "Admission Qualifications for Aliens; Travel Control of Citizens and Aliens." *See* 8 U.S.C. Chapter 12, Subchapter II ("Immigration"), Part II ("Admission Qualifications for Aliens; Travel Control of Citizens and Aliens," encompassing §§1181 to 1189). The statutory authorization for the H-1B visa program falls within this same subpart, as described below.

1.    ***The H-1B Program***

The INA authorizes U.S. employers to "petition" for non-immigrant foreign workers to perform services in "specialty occupation[s]" through the H-1B visa program. *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b) (defining "nonimmigrant alien"), 1184(c)(1). A specialty occupation is one that requires "(A) theoretical and practical application of a body of highly specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." *Id.* § 1184(i)(1). "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." *H-1B Program*, Dep't of Lab., https://www.dol.gov/agencies/whd/immigration/h1b [https://perma.cc/NR4Z-U4LA] (last visited Dec. 22, 2025).

The H-1B program makes some effort to ensure that the "working conditions for [an H-1B] nonimmigrant . . . will not adversely affect the working conditions of workers similarly employed" in the United States. *Id.* § 1182(n)(1)(A)(ii) (requiring employer to make such an attestation). To that end, the INA requires that employers who participate in the H-1B program "promise to pay the higher of either (I) the actual wage that it pays to similarly skilled employees or (II) the prevailing wage for such employees in the local area." *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1031 (D.C. Cir. 2023) (citing 8 U.S.C. § 1182(n)(1)(A)(i)). Employers with a history of willful certification violations or a large percentage of existing H-1B workers must additionally certify that the company has tried and failed to fill the position with an American worker and that it has not and will not displace an American worker within the 180-day period surrounding the date of the application. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A). Employment through the H-1B visa program is temporary: H-1B visas are valid for a period of up

6

to three years and eligible for one extension of the same duration.  *See id.* § 1184(g)(4); 8 C.F.R. § 214.2(h)(13)(iii)(A).

## 2. *H-1B Visa Caps*

The INA imposes a limit, or cap, on the number of H-1B visas for most U.S. employers, including private businesses and federal, state, and local governments, with some exceptions.  The limit on the number of H-1B visas to be issued for most employers is 65,000 per year, with an additional 20,000 H-1B visas available to aliens who have earned an advanced degree from a United States institution of higher education, for a total annual allocation of 85,000 H-1B visas.  8 U.S.C. §§ 1184(g)(1)(A)(vii), (g)(5)(C).  Since the demand for H-1B visas always exceeds the statutory cap, DHS regulations provide for a "lottery" process to determine which cap-subject H-1B employers registered to petition for entry of nonimmigrant beneficiaries on H-1B visas would be able to file such petitions.  *See* generally 8 C.F.R. § 214.2(h)(8)(iii).  Among the employers exempt from the numerical limit on H-1B visas are universities, nonprofit research organizations, and government research organizations.  *See* 8 U.S.C. § 1184(g)(5)(A)-(B).

Before a cap-subject employer may submit an H-1B petition on behalf of a prospective worker, who is a noncitizen, the employer must first "register" for the H-1B lottery through the U.S. Citizenship and Immigration Services ("USCIS") website.  8 C.F.R. § 214.2(h)(8)(iii)(A)(1).  An employer selected in the lottery can submit an H-1B petition (Form I-129), which USCIS may approve or deny.  *Id.*  If the employer's H1-B visa petition is approved, and the noncitizen beneficiary of the approved H-1B petition resides outside the United States, the beneficiary must typically then apply for a visa at a U.S. embassy or consulate abroad before traveling to the United States.  *See* 8 U.S.C. § 1184(c)(1); *id.* § 1201(a)(1).  If the noncitizen already resides in the United States and is granted a change of status to H-1B status, the change is generally effective upon grant of the H-1B petition "without the requirement of filing a separate application."  8 C.F.R. § 248.3(f).

Employers petitioning for an H-1B worker are required to pay certain fees.  Some fees are statutory, *see generally* 8 U.S.C. § 1356(m); *id.* § 1184(c)(9)-(13), and include a $1,500 filing fee, 8 U.S.C. § 1184(c)(9)(A)-(C), and a $500 fraud-prevention fee, *id.* § 1184(c)(12)(A)-(C).  Another set of fees are regulatory and set by USCIS, historically through notice-and-comment rulemaking, to ensure recovery of the full administrative costs to provide services.  *See* 8 U.S.C. § 1103(a)(3); *id.* § 1356(m) (authorizing DHS to assess "fees for providing adjudication and naturalization services," which "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants").  All in, prior to the challenged Proclamation, an employer petitioning for an H-1B visa could pay upwards of several thousands of dollars in statutory and regulatory fees.  *See* Pls.' Mot., Ex. 24, U.S. Citizenship & Immigr. Servs., Dep't of Homeland Sec., Fee Schedule 36-37, ECF No. 18-24.

### B.    Factual Background

As described in more detail below, Proclamation 10973 begins with a recitation of reports and labor and employment statistics detailing the effects of the H-1B program on the American workforce.  The Proclamation then makes findings that support both economic and national security rationales to curb overuse of the H-1B program before issuing directives and other guidance grouped into five sections.  This overview of the Proclamation is followed by a discussion of the actions taken by agencies to effectuate its directives.

### 1.    *Presidential Proclamation 10973*

Presidential Proclamation 10973, titled "*Restriction on Entry of Certain Nonimmigrant Workers*," became effective on September 21, 2025.  *See* Proclamation , 90 Fed. Reg.at 46028.  In a multi-paragraph prefatory section, the Proclamation sets out reasons for the actions directed, explaining that "[t]he H-1B nonimmigrant visa program was created to bring temporary workers

8

**JA430**

into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor." *Id.* at 46027. Elaborating on this critique of the H-1B program, the Proclamation states that, "[s]ome employers, using practices now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields." *Id.* This situation then leads to the over-arching finding that "[t]he large-scale replacement of American workers through systemic abuse of the program has undermined both our economic and national security." *Id.*

To bolster this finding, the Proclamation recites a series of reports and statistics, including: (1) that "[t]he number of foreign STEM workers in the United States has more than doubled between 2000 and 2019, increasing from 1.2 million to almost 2.5 million, while overall STEM employment has only increased 44.5 percent during that time," *id.*; (2) "[t]he share of IT workers in the H-1B program grew from 32 percent in Fiscal Year (FY) 2003 to an average of over 65 percent in the last 5 fiscal years," *id.*; (3) "among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively—more than double the unemployment rates of recent biology and art history graduates," *id.*; (4) "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers," *id.*, citing the examples of four unnamed companies that in recent years had, collectively, laid off approximately 45,400 thousands of employees, while simultaneously being approved for approximately 32,800 H-1B workers, *id.* at 46027-28; (5) "American IT workers have reported

they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance," *id.* at 46028; and (6) a 2017 study showing "that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field," *id.*

Based on these labor and employment reports and statistics, the Proclamation makes specific findings that: (1) "H-1B visas are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States," *id.*; (2) "high numbers of relatively low-wage workers in the H-1B program . . . are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated," *id.*; and (3) abuse of the program "prevent[s] American employers in other industries from utilizing the H-1B program in the manner in which it was intended: to fill jobs for which highly skilled and educated American workers are unavailable," *id.* These findings also provide the economic and national security rationales to curb "abuse of the H-1B program," which "harm[s] American workers, including by undercutting their wages," *id.*, and "present[s] a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields," *id.*

The Proclamation divides its orders and guidance into five sections. Invoking presidential authority under "the Constitution and the laws of the United States," and more specifically citing 8 U.S.C. §§ 1182(f) and 1185(a), the first section, titled *Restriction on Entry*, directs that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation . . . is restricted, except for those aliens whose petitions are accompanied or

supplemented by a payment of $100,000," unless certain exceptions set forth in Subsection 1(c) apply. *Id.*, Proclamation § 1(a). This supplemental payment obligation is sunset twelve months after the Proclamation's effective date of September 21, 2025. *Id.*

Next, the Secretary of Homeland Security is directed to "restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers . . . who are currently outside the United States." *Id.*, Proclamation § 1(b). In addition, "[t]he Secretary of State shall also issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H–1B petitions that have an employment start date beginning prior to October 1, 2026." *Id.* at 46029.

The Secretary of Homeland Security is further authorized to grant waivers of the $100,000 payment obligation, subject to the general parameters described as follows: the payment obligation imposed under the Proclamation "shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.*, Proclamation § 1(c).

Section 2, titled "*Compliance*," sets out mechanisms to ensure compliance with the Proclamation, with requirements imposed on employers, DHS and the Department of State. Employers are directed to "obtain and retain documentation showing that the [$100,000] payment . . . has been made" before "filing an H-1B petition on behalf of an alien outside the United States." *Id.*, Proclamation § 2(a). "The Secretary of State shall verify receipt of [the $100,000] payment . . . during the H-1B visa petition process and shall approve only those visa petitions for which the filing employer has made the payment[.]" *Id.*, Proclamation § 2(b).

11

**JA433**

Additionally, "[t]he Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment." *Id.*, Proclamation § 2(c).

Section 3, titled "*Scope and Implementation of Restrictions on Entry*," limits the scope of the supplemental payment obligation to "apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation," *id.*, Proclamation § 3(a), and directs submission, after the next H–1B lottery, by the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security of a joint recommendation "on whether an extension or renewal of the restriction on entry pursuant to section 1 of this proclamation is in the interests of the United States," *id.*, Proclamation § 3(b).

Section 4, titled "*Amending the Prevailing Wage Levels*," prescribes two rulemakings. First, the Secretary of Labor is directed to "initiate a rulemaking to revise the prevailing wage levels to levels consistent with the policy goals of this proclamation." *Id.*, Proclamation § 4(a). The prevailing wage level is set pursuant to 8 U.S.C. § 1182(n) and can serve as the floor above which prospective employers must pay newly admitted H-1B holders. Second, the Secretary of Homeland Security is directed to "initiate a rulemaking to prioritize the admission as nonimmigrants of high-skilled and high-paid aliens." *Id.*, Proclamation § 4(b).

The last section, Section 5, titled "*General Provisions*," contains provisions expressing the intent, *inter alia*, that the Proclamation "be construed" not "to impair or otherwise affect . . . the authority granted by law" to federal agencies or their heads and that the "proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.*, Proclamation § 5(a)-(c).

12

**JA434**

Subsequently, defendants and their components took various actions to implement the Proclamation, as briefly summarized next.

### 2. *Defendants' Actions Implementing the Proclamation*

As identified by plaintiffs, defendants have taken four meaningful steps to implement the Proclamation. *See* Pls.' Mem. Supp. Summ. J. ("Pls.' Mem.") at 35-36 & n.13, ECF 18-1. Each of these actions is included in the administrative record, totaling 46 pages, produced by defendants. *See* Defs.' Notice of Compliance with LCvR 7(n) & Court Order, ECF No. 45; Dep't of State Admin. Rec. ("AR"), ECF No. 45-1; U.S. Customs & Border Prot. ("CBP") AR, ECF No. 45-2; USCIS AR, ECF No. 45-3.

First, on September 20, 2025, the day after the Proclamation issued, the Director of USCIS issued a memorandum clarifying that the Proclamation "only applies prospectively to petitions that have not been filed," and stating that "[a]ll officers . . . shall ensure that their decisions are consistent with this guidance." USCIS AR at 3, Mem. from Joseph B. Edlow, Dir. USCIS, to Assoc. Dirs., Deputy Assoc. Dirs., & Program Off. Chiefs ("USCIS Sept. 2025 Memo") (Sept. 20, 2025); Pls.' Mem., Ex. 2, ECF 18-20 (same).

Second, also on September 20, 2025, the Executive Director for Admissibility and Passenger Programs of CBP issued a similar memorandum clarifying that the Proclamation "only applies prospectively to petitions that have not yet been filed," and notifying CBP personnel of the instruction to "begin implementing the new monetary requirements for employers submitting petitions on behalf of aliens outside the United States for new H-1B petitions only." CBP AR at 11, Mem. from Matthew S. Davies, Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, to Exec. Dirs., Dirs. of Field Operations, Off. of Field Operations ("CBP September 2025 Memo") (Sept. 20, 2025); Pls.' Mem., Ex. 3, ECF 18-21 (same).

Third, on September 21, 2025, the State Department updated its "Frequently Asked Questions" webpage to summarize the Proclamation, clarifying that the payment requirement only applies prospectively, and advising that "[f]urther steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include: A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers[;] [a] rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels."  Dep't of State AR at 9-11, *H-1B FAQ—United States Department of State*, U.S. Dep't of State (Sept. 21, 2025), http://www.state.gov/h-1b-faq [https://perma.cc/9SUH-WJBJ]; *see also* Pls.' Mem., Ex. 4,  ECF 18-22 (same).

Fourth, on October 20, 2025, USCIS revised its website about the H-1B program to include additional clarification as to "[w]ho is subject to the $100,000 payment," "[h]ow to pay" it, "[w]hen to pay" it, and the "[e]xceptions granted by the Secretary of Homeland Security."  USCIS AR at 6-8, *H-1B Specialty Occupations*, USCIS (Oct. 20, 2025), https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations  [https://perma.cc/XN3K-TDSL]  ("USCIS Guidance"); Pls.' Mem., Ex. 5, ECF 18-23 (same).

### C.    Procedural Background

The Chamber filed the instant suit on October 16, 2025, *see* Compl., ECF No. 1, and with the AAU joining as a plaintiff, filed the operative Amended Complaint, ECF No. 8, on October 24, 2025.  Based on allegations that the Proclamation "blatantly contravenes the fees Congress has set for the H-1B program and countermands Congress's judgment that the program should provide a pathway for up to 85,000 people annually to contribute their talents to the United States," Am. Compl. ¶ 7, plaintiffs bring two claims for relief: first, that "the Proclamation is in excess of the President's  authority  under  [8 U.S.C. §§ 1182(f) and 1185(a)], and any executive action

14

**JA436**

implementing it is therefore in excess of executive branch authority under the Constitution and laws of the United States," *id.* ¶ 192, and second, that "agency actions taken to implement the Proclamation are substantially invalid and must be set aside under the APA," *id.* ¶ 184. Plaintiffs seek a declaration "that the Proclamation and any implementing agency action exceed the executive branch's lawful authority," an injunction barring defendants "from implementing, enforcing, or otherwise carrying out the provisions of the Proclamation as to Plaintiffs and each of their members," vacatur under the APA of "any agency actions taken to implement the Proclamation," award of "attorneys' fees and costs," and "further relief as the Court may deem just and proper." *Id.* at 51.

Contemporaneously with filing the Amended Complaint, plaintiffs moved for either a preliminary injunction "blocking the enforcement of the [Proclamation] . . . and any agency action implementing the Proclamation against Plaintiffs' respective members" or summary judgment to the same effect. Pls.' Mot. at 1. Following briefing on defendants' motion to stay the litigation due to the lapse in federal appropriations between October 1 and November 12, 2025, plaintiffs' motion was converted, with the parties' consent, into a motion for summary judgment on an expedited schedule. Oct. 29, 2025 Minute Order ("To ameliorate defendants' concerns about the complexities of responding to two motions filed during a lapse in appropriations, and given the lack of any objection from the parties, the motion for a preliminary injunction will be converted to a motion for summary judgment on an expedited schedule.").

On December 1, 2025, defendants filed a cross-motion for summary judgment, along with a motion, opposed by plaintiffs, to be excused from filing an administrative record, as typically required, under local procedural rules, for cases "involving the judicial review of administrative agency actions." Defs.' Cross Mot. for Summary Judgment ("Defs.' Opp'n"), ECF No. 37; Defs.'

Mot. for Relief from Local Rule 7(n), ECF No. 38; *see also* D.D.C. Local Rule 7(n).  Following briefing, defendants were ordered to comply with the local rule by filing the administrative record.  *See* Minute Order (Dec. 4, 2025).  Defendants filed the administrative record, consisting of fewer than fifty pages, on December 5, 2025.  *See* Defs.' Notice of Compliance (noting that "compliance with the Court's order . . . does not constitute a waiver of any of Defendants' arguments including that there is no final agency action in this case nor that an administrative record is not require[d] to decide the issues presented").

On December 15, 2025, defendants filed a motion to dismiss the amended complaint for the same reasons provided in support of their cross-motion for summary judgment.  *See* Defs.' Mot. to Dismiss Am. Compl.  A hearing was held on the pending motions four days later, on December 19, 2025.  At the hearing, plaintiffs orally opposed defendants' motion to dismiss by incorporating the arguments presented in their briefing on the cross-motions for summary judgment.  Motions Hr'g  (Dec. 19, 2025) Tr. 8:4-8.  Thus, all three pending motions are now ripe for review.

## II.    LEGAL STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "'The mere existence of some alleged factual dispute between the parties' will not defeat summary judgment; 'the requirement is that there be no genuine issue of material fact.'"  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).  "Material" facts are those that "might affect the outcome of the suit under the governing law," and "genuine" issues are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*,

16

**JA438**

477 U.S. at 248.  Any "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

When assessing a motion for summary judgment with respect to an APA claim, "the district judge sits as an appellate tribunal," *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009), since the "'entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action,'" *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).  Under the APA, a court "shall" "hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).  This standard "'requires agencies to engage in reasoned decisionmaking,' and . . . reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach."  *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (citations omitted).  The scope of a court's review under the APA is "narrow."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A court may not "second guess an agency decision or question whether the decision made was the best one."  *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1565 (D.C. Cir. 1991).  Rather, the court's role is merely to determine whether an agency action is "rational and consistent with the authority delegated to it by Congress."  *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016).

17

**JA439**

## III.    DISCUSSION

Despite plaintiffs' vigorous efforts to overcome the hurdles presented by congressional statutes affording broad latitude to the President to control entry at the border, their challenge to the Proclamation as *ultra vires* fails.  Additionally, assuming in plaintiffs' favor that the challenged agency actions to carry out the President's directions set out in the Proclamation are subject to APA review, plaintiffs' statutory challenge nonetheless fails because defendants' mere implementation of a legally permissible Proclamation is not arbitrary or capricious or contrary to law, and defendants' lack of discretion to deviate from the President's directives renders any failure to engage in notice-and-comment rulemaking harmless error.  Consequently, plaintiffs' motion for summary judgment must be denied and defendants' cross-motion for summary judgment granted.

### A.    Standing

Though not contested by defendants, the Court is obliged to assure itself that plaintiffs have standing to exercise subject matter jurisdiction and review the claims presented.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To establish standing, plaintiffs "must show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Plaintiffs do not claim organizational standing to sue in their own right, but instead seek standing to sue on behalf of their members.  "An association has standing to sue on behalf of its members if: '(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.'" *Chamber of Com. of the U.S. v. Env't Prot. Agency*, 642 F.3d 192, 199 (D.C. Cir.

18

**JA440**

2011) (quoting *Sierra Club v. Env't Prot. Agency*, 292 F.3d 895, 898 (D.C. Cir. 2002)).  Moreover, as here, where an organization "claims associational standing, it is not enough to aver that unidentified members have been injured," *id.*, but instead the organization "must specifically 'identify members who have suffered the requisite harm,'" *id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).[1]

Arizona State University ("ASU") is an identified member of both plaintiffs and satisfies the first prong of demonstrating standing to sue in its own right.  Pls.' Mot., Decl. of ASU's Exec. Vice President & Univ. Provost, Nancy A. Gonzalez ("Gonzalez Decl.") ¶ 4, ECF No. 18-17 (stating ASU "is a member of the Chamber of Commerce of the United States of America and of the Association of American Universities," without indicating duration of ASU's membership in in the Chamber or AAU); *see* Motions Hr'g Tr. at 21:25-26:1 (Chamber's counsel indicating he was unaware of how long ASU had been member of Chamber).  As a public university, ASU is "not subject to the statutory cap on H-1B visas and thus can and do[es] file H-1B petitions on a

---

[1]     At the hearing, the Chamber's counsel urged that standing had been established for its cap-subject members based on a declaration submitted by the Chamber's Vice President for Immigration Policy, Patrick Shen.  Motions Hr'g Tr. at 19:15-22; *see* Pls.' Mot., Decl. of Vice President for Immigr. Pol'y for Chamber of Com. of the U.S., Patrick Shen ("Shen Decl."), ECF No. 18-4.  Mr. Shen attested that "numerous" cap-subject members would face multiple harms from the obligation to make the $100,000 payment required for new H-1B visas under the Proclamation, Shen Decl. ¶¶ 15-20.  Notably, however, nowhere were these many cap-subject members identified or named in any way, nor did they submit supporting declarations, other than a single member, HJI Supply Chain Solutions, based in Louisville, Kentucky, which expressed interest in recruiting a single H-1B worker for a single job opening for an "Integrations Engineer role," Pls.' Mot., Decl. of President of HJI, Condrad Daniels ¶¶ 6, 9, ECF No. 18-5, and ultimately hired a "domestic, non-H1-B [sic] employee" for the role, Pls.' Reply, Reply Decl. of Condrad Daniels ¶ 3, ECF No. 47-1, leading defendants, correctly, to credit the Proclamation as "already working" as intended, Defs.' Reply at 3-4.  In contrast, AAU produced ten declarations from AAU members, rather than relying on unnamed members.  Such anonymity among the Chamber's cap-subject members claiming harm from the Proclamation may "fall short of establishing certainly impending dangers for any particular member of the [Chamber's] association[]." *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 819 (D.C. Cir. 2006).  At the hearing, the Chamber's counsel explained, "I think in the current environment, there are significant pressures from entities to decide whether they provide their information to the Chamber, and the Chamber can represent them in associational standing capacity and present that information to the Court," Motions Hr'g Tr. at 20:2-6, and further acknowledged that "[t]he universities are very brave, Your Honor," *id.* at 20:17-18.  That Chamber members in the business community are reluctant to be identified by name in a court proceeding as challenging actions by the current administration is startling.  Fortunately for them, the Chamber's Article III standing is otherwise clearly established by a "brave" university member.  *See* Shen Decl. ¶ 21 (stating that Arizona State University, which is "cap-exempt," is a Chamber member).

rolling basis throughout the year."  Pls.' Mot., Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF") ¶ 17, ECF No. 18-2.  "Since 2022, ASU has submitted forty-one H-1B visa petitions on behalf of international faculty that would have been subject to the $100,000 fee," Gonzalez Decl. ¶ 6, and "reasonably expects that, but for the Proclamation, it would submit approximately a dozen new H-1b [sic] petitions over the next 12 months in order to employ new teaching faculty who are presently outside the U.S.," *id.* ¶ 8.

As for the remaining prongs for associational standing, the interests that the organizations seek to protect are germane to their purposes.  The Chamber "advocate[s] for pro-business policies," Shen Decl. ¶ 3, and its members "currently employ, in the aggregate, tens or hundreds of thousands of H-1B visa holders," *id.* ¶ 23.  The "central" mission of AAU is to "ensure that its members are able to conduct research that improves public health, addresses national challenges, and contributes significantly to America's economic strength," 4, Decl. of AAU President Barbara R. Snyder ¶ 4, ECF No. 18-7, and "[i]n 2025 alone, AAU members [have] submitted thousands of H-1B visa petitions," *id.* ¶ 6.  This lawsuit accords with both missions and neither the claims asserted nor the relief requested would require any member to sue individually.  Accordingly, plaintiffs have standing to bring the claims at issue here.

### B.    Plaintiffs' *Ultra Vires* Claim

In broad terms, plaintiffs' principal argument in support of their *ultra vires* claim is that "Congress did not delegate to the President authority to impose payment obligations on U.S. employers, particularly when those fees directly contradict the INA's comprehensive scheme for the H-1B program" and, consequently, the Proclamation is "*ultra vires* and cannot be lawfully enforced against" plaintiffs.  Pls.' Mem. at 15.  Survival of this *ultra vires* claim turns on three distinct legal inquiries: whether the Proclamation is susceptible to *ultra vires* review at all; whether the Proclamation falls outside the broad grants of authority Congress has delegated to the President

20

**JA442**

in 8 U.S.C. §§ 1182(f) and 1185(a)(1); and whether the Proclamation contravenes other statutory limitations imposed by the INA, including the statutorily authorized fees provided in 8 U.S.C. § 1356(m).

The first inquiry raises complex separation of powers concerns carrying implications for the permissible exercise of unilateral and unreviewable presidential power, with defendants arguing for *carte blanche* authority in the immigration context presented here, due to judicial nonreviewability of consular decisions, Defs.' Opp'n at 11-14, as well as presidential action being insulated from *ultra vires* challenges, *id.* at 19-24, while plaintiffs strongly contend that consular nonreviewability does not apply to prospective challenges, Pls.' Reply at 22-24, and that "a federal district court has the inherent authority to enjoin an *ultra vires* act of the executive," Pls.' Mem. at 34. Parties spar on the treatment of justiciability in three precedents: the Supreme Court's decision in *Trump v. Hawaii*, 585 U.S. 667 (2018), and two D.C. Circuit cases, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), and *American Foreign Service Association v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) (per curiam). In *Reich*, a case outside of the immigration context, the D.C. Circuit found *ultra vires* review available where "presidential action . . . independently violates" another statute. 74 F.3d at 1332. In the other two cases, the courts presumed justiciability to reach the merits of the plaintiffs' statutory claims, which were rejected. *Hawaii*, 585 U.S. at 683 ("[W]e may assume without deciding that plaintiffs' statutory claims are reviewable[.]"); *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *3 ("Even assuming this case is justiciable, our review must be exceedingly deferential."). As defendants accurately summarize, in *American Foreign Service Association*, the D.C. Circuit "found for the government in an alternate way, thus sidestepping the issue, just as the Supreme Court did in *Hawaii*." Defs.' Reply at 7.

Rather than dive unnecessarily into defendants' arguments regarding the applicability of the doctrine of consular nonreviewability and the extent to which the President is insulated from *ultra vires* challenges, this Court takes the same "side-step" employed by appellate courts and assumes that plaintiffs' claims challenging the Proclamation are justiciable. Notwithstanding the assumption of justiciability to reach the merits of plaintiffs' claims, the following analysis demonstrates that the Proclamation is consistent with congressional grants of authority to the President, without contravening limitations set out in other statutory provisions, and thus plaintiffs' *ultra vires* claim does not survive.[2]

### 1. *The Proclamation Falls Within Authority Granted by 8 U.S.C. §§ 1182(f) and 1185(a)(1)*

The President invokes authority for issuance of the Proclamation under both the Constitution and the INA provisions codified at 8 U.S.C. §§ 1182(f) and 1185(a)(1). 90 Fed. Reg. at 46027. While plaintiffs focus largely on § 1182(f), the interplay of this subsection with § 1185(a)(1) illuminates the full breadth of the authority handed to the President over time by Congress to regulate entry into the United States.

The older of these two sections, 8 U.S.C. § 1185(a)(1), was first enacted in 1918 and provided that, during wartime, "if the President shall find that the public safety requires that restrictions and prohibitions in addition to those provided otherwise," he may announce through proclamation "reasonable rules, regulations, and orders," for "any alien to depart from or enter"

---

[2] Defendants argue that the Proclamation was authorized under both statutory authority and the inherent constitutional powers of the President. *See* Defs.' Opp'n at 12. The INA grants the president sufficient authority to issue the Proclamation, rendering analysis of the President's inherent powers unnecessary. *See Blum v. Bacon*, 457 U.S. 132, 137 (1982) ("Where a party raises both statutory and constitutional arguments . . . ordinarily [courts] first address the statutory argument in order to avoid unnecessary resolution of the constitutional issue.").

the United States.  Act of May 22, 1918, ch. 81, §1 (a), 40 Stat. 559, 559.[3]  In 1941, the section was expanded to encompass not just times of war but also the then-contemporary national emergency announced by President Roosevelt in response to Germany's threats of world domination.  Act of June 21, 1941, ch. 210, § 1, 55 Stat. 252, 252-53.  In the next decade, when enacting the INA, Congress kept these historical conditions present in the grant of authority to the President and recodified this section to be effective "[w]hen the United States is at war or during the existence of any national emergency proclaimed by the President."  INA § 215(a)(1), Pub. L. No. 82-414, 66 Stat. 163, 190 (1952).  In 1978, however, Congress significantly amended the provision by striking the text limiting the President's authority to wartime or national emergencies, leaving the current language.  Foreign Relations Authorization Act, Fiscal Year 1979, § 707, Pub. L. No. 95-426, 92 Stat. 963, 992-93 (1978).  Today, 8 U.S.C. § 1185(a)(1), states, in pertinent part:

> "Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe[.]"

Over thirty years after enactment of the first iteration of § 1185(a)(1), Congress passed, in 1952, the INA, which included § 1182(f) with the same text as today, providing, in its first sentence, that:

> "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."

INA § 212(e), Pub. L. No. 82-414, 66 Stat. 163, 188 (1952).

---

[3]     The original Act provided, in relevant part: "That when the United States is at war, if the President shall find that the public safety requires that restrictions and prohibitions in addition to those provided otherwise than by this Act be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or Congress, be unlawful . . . [f]or any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe[.]"  *Id.*

As reflected in the text, § 1185(a)(1) provides a general delegation of authority to the President to prescribe "limitations and exceptions" on entry by aliens to the United States— without any predicated finding or duration consideration—whereas § 1182(f) constrains the President's authority to suspend or otherwise impose restrictions on entry by aliens by requiring a presidential finding that such entry "would be detrimental to the interests of the United States," and implicitly indicating the temporary duration of presidential action only "for such period as he shall deem necessary." Thus, § 1182(f) provides a narrower grant of authority to the President than does § 1185(a)(1), prompting the question of whether the limitations in the former INA provision must govern any exercise of authority under the latter INA provision. *See* Motions Hr'g Tr. at 76:24-77:3 (defendants' counsel acknowledging narrower grant of authority in §1182(f) than § 1185(a)(1)).

The Supreme Court has instructed that when federal courts "can easily read Congress's statutes to work in harmony, that is where our duty lies." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 525 (2018). A traditional rule of statutory construction dictates that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550-51 (1972); *see also Am. Fed'n of Gov't Emps., Local 3882 v. Fed. Lab. Rels. Auth.*, 944 F.2d 922, 932 (D.C. Cir. 1991) ("Moreover, it is a cardinal rule of statutory construction that, to the extent possible, a legislative enactment is to be so read as to give operation to all of its parts, and we are not prepared to disregard this salutary canon of interpretation." (footnote omitted)). For this reason, satisfaction of the statutory criteria laid out in 8 U.S.C. § 1182(f) is considered as having *a fortiori* satisfied the conditions of 8 U.S.C. § 1185(a)(1) as well. *Cf. Hawaii*, 585 U.S. at 683 n.1 ("Because [8 U.S.C. § 1185(a)(1)] 'substantially overlap[s]' with § 1182(f), we agree with the Government that

24

**JA446**

we 'need not resolve . . . the precise relationship between the two statutes' in evaluating the validity of the Proclamation." (citation omitted)).

Plaintiffs argue that the Proclamation is *ultra vires* and not authorized under § 1182(f) because two textual preconditions in that statutory provision remain unsatisfied.  Pls.' Mem. at 28-30; Pls.' Reply at 18-20.  A simple comparison of the Proclamation's textual findings and scope limitations with the requirements of § 1182(f) makes clear this presidential action meets the statutory requirements for the authority exercised in the directives.

First, plaintiffs contend that "the Proclamation does not make the findings that Section [1182](f) requires as a predicate—namely, 'that the entry of any [noncitizen] or class of [noncitizens]' as immigrants or nonimmigrants would be detrimental to the interests of the United States."  Pls.' Mem. at 29 (alterations in original) (quoting 8 U.S.C. § 1182(f)).  In plaintiffs' reading, the Proclamation falls short by making "findings about U.S. *employers*, describing alleged 'abuse of the H-1B visa program' by certain employers" instead of "findings about *any* noncitizens."  Pls.' Mem. at 29 (emphases in original); *see* Motions Hr'g Tr. at 53:2-5 (AAU's counsel stating, "[T]he proclamation is very express . . . that the [reason the] proclamation has issued is in order to shift the incentives of businesses and institutions in the United States[.]").  The purported defect plaintiffs identify in the Proclamation appears based on a strained segregation of cause and effect that glosses over the continuum in reasoning set out in the Proclamation to reach the requisite finding under § 1182(f): the Proclamation identifies domestic employers' perceived abuses of the H-1B program as facilitating the importation, or entry, of nonimmigrant workers with certain skill sets and the concomitant effect of displacing American workers, all of which activity results in the perceived detriment to the economic and national security interests of the United States.  *See, e.g.*, Proclamation, 90 Fed. Reg. at 46027 ("Some employers, using practices

now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.").

The Proclamation explicitly makes the requisite presidential findings under § 1182(f), stating that "I therefore find that the unrestricted entry into the United States of certain foreign workers who are described in section 1 of this proclamation would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." Proclamation, 90 Fed. Reg. 46028. Not only is the requisite finding under § 1182(f) clearly articulated, but the Proclamation provides support for this finding by recounting a series of reports and statistics, *see supra* I.B.1, including "that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers," *id.*, and examples of four companies that, collectively, announced layoffs of approximately 45,400 employees while simultaneously petitioning and receiving approval to employ approximately 32,800 H-1B employees, *id.*[4] Based on these and other reports and

---

[4]    While plaintiffs characterize these reports and statistics as "quite misleading" by failing to take account of "the broader picture [] and how the H-1B program provides economic benefits to the United States as a whole," Motions Hr'g Tr. at 26:6-8, plaintiffs' own declarations confirm a heavy reliance on H-1B employees. For instance, nine of AAU's members submitted declarations on behalf of their universities disclosing that they employed, in total, *approximately 4,500 H-1B employees*, including as faculty and in research positions, *see* ECF Nos. 18-8 to 18-16—raising puzzling questions about why these same academic institutions are not producing sufficient numbers of adequately skilled American faculty and researchers—or whether other factors are at play—but those questions range far beyond the purview of the current case to answer. These nine universities represent but a small fraction of AAU's 69 U.S.-based members and an even smaller fraction of the thousands of universities in the United States. Some declarations further reported that, every year, between 5% to 20% of the universities' H-1B petitions were filed for individuals who live outside the United States and thus would be subject to the $100,000 payment. *See* Decl. of James H. Garrett, ECF No. 18-8 (Carnegie Mellon, 5%); Decl. of Dr. Charles L. Isbell, Jr., ECF No. 18-9 (University of Illinois, 15%); Decl. of Stephen J. Gange, ECF No. 18-10 (Johns Hopkins University, 10%); Decl. of Arthur Lupia and Judith Pennywell, ECF No. 18-11 (University of Michigan, 20%); Decl. of Gretchen Ritter, ECF No. 18-12 (University of Minnesota, 10%); Decl. of Paul J. Scheel, ECF No. 18-15 (Washington University in St.

statistics, the Proclamation reached the conclusion that "[i]t is therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.*

The evidentiary support and justification offered in the Proclamation for the findings made and actions directed is more extensive than that offered in other presidential proclamations. As described by the Supreme Court, for instance, President Clinton "explain[ed] in one sentence why suspending entry of members of the Sudanese Government and armed forces 'is in the foreign policy interests of the United States'" and President Reagan "explain[ed] in five sentences why measures to curtail 'the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States' are 'necessary.'" *Hawaii*, 585 U.S. at 686; *see* Defs.' Opp'n at 27 (emphasizing this point); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 182 (D.D.C. 2020) (determining that the findings of a different proclamation, issued pursuant to § 1182(f), "are more than adequate" because "although the findings here may not be as robust as those in *Trump v. Hawaii* or supported by any evident 'worldwide, multi-agency review,' the Court surely did not mean for the findings and administrative efforts in that case to set a floor for future presidential actions under § 1182(f)").

Moreover, to the extent plaintiffs take issue with the reports and statistics described in the Proclamation and identify any mismatch between such evidence and the findings made, that is not

---

Louis, 12%). These universities assert that, but for the $100,000 payment requirement, they would expect to submit H-1B petitions at roughly the same rate as they had in the past recent years. *See, e.g.*, Garrett Decl. ¶ 8; Ritter Decl. ¶ 10; Shekhar Decl. ¶ 7; Scheel Decl. ¶ 8.

Similarly, Chamber member, GoRural, which is not an employer of H-1B workers itself but recruits such workers for domestic employers, attests that it has "placed approximately 100 international candidates—almost all of whom require an H-1B visa—with" rural hospitals. Poser Decl. ¶ 9. GoRural reports that many of its "rural healthcare clients . . . are critically understaffed" and "need physicians, radiologists, nurses, medical technologists, radiologic technologists, and physical therapists" with "entire departments operating at just 40% of a full staff. *Id.* ¶ 5. The record does not provide any answer as to why this country's education system is not producing enough skilled medical professionals to fill these roles with domestic labor, but the answer to that question is also beyond the purview of the current case to answer.

sufficient to overcome the "exceeding[] deferen[ce]" owed to the President in this realm.  *Am.*

*Foreign Serv. Ass'n*, 2025 WL 1742853, *3.  Indeed, the Supreme Court found "questionable"

"that § 1182(f) requires the President to *make* a finding that entry 'would be detrimental to the

interests of the United States,' but also to explain that finding with sufficient detail to enable

judicial review."  *Hawaii*, 585 U.S. at 686 (quoting 8 U.S.C. § 1182(f)) (emphasis in original).

The Supreme Court determined that "'[w]hether the President's chosen method' of addressing

perceived risks is justified from a policy perspective is 'irrelevant to the scope of his [§ 1182(f)]

authority,'" and so "when the President adopts 'a preventative measure . . . in the context of

international affairs and national security,' he is 'not required to conclusively link all of the pieces

in the puzzle before [courts] grant weight to [his] empirical conclusions'"  *Id.* at 686-87 (first

alteration added) (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187-88 (1993), and

*Holder v. Humanitarian L. Project*, 561 U.S. 1, 35 (2010)).

In short, contrary to plaintiffs' critique, the Proclamation provides ample support for the

clear findings articulated as the basis for the action taken to suspend or impose restrictions on new

H-1B visa holders, and this meets the prerequisite for invocation of § 1182(f) authority.

Second, plaintiffs raise a separate challenge to the invocation of authority under 8 U.S.C.

§ 1182(f), namely that "the Proclamation does not operate on a valid 'class of aliens.'"  Pls.' Mem.

at 28 (quoting 8 U.S.C. § 1182(f)).  As plaintiffs read § 1182(f), the "class of aliens" contemplated

by the statute "encompasses a group of people linked by nationality" or at the very least by

"common characteristics or attributes."  *Id.* at 29 (emphasis omitted) (quoting *Hawaii*, 585 U.S. at

688, and Class, *Black's Law Dictionary* (12th ed. 2024)).  Rather than such a class, the

Proclamation covers noncitizens "linked only by the circumstance that their U.S. employers are

either unwilling or unable to pay $100,000 to the government to sponsor their immigration status," and this does not conform to plaintiffs' definition of "class". *Id.*

This reading misapprehends the structure of § 1182(f), which permits the President to undertake three different actions: he may (1) "suspend the entry of all aliens . . . as immigrants or nonimmigrants," (2) "suspend the entry of . . . any class of aliens as immigrant or nonimmigrants" or (3) "impose on the entry of aliens any restrictions he may deem to be appropriate." The "class of aliens" language appears as part of the object of the preposition relating to the discussion of presidential power to suspend entry whereas no similar language mentioning "class" appears in the portion of the statute discussing presidential power to impose restrictions. In this case, the Proclamation imposes a restriction, a supplemental $100,000 payment obligation on domestic employers, on the entry of certain aliens. After all, the Proclamation literally titles its first section "*Restriction on Entry*," Proclamation §1, 90 Fed. Reg. at 46028 (emphasis in original), and goes on to say, "*entry into the United States of aliens . . . is restricted*, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000," *id.* (emphasis added).[5] Consequently, plaintiffs' urging that some form of "class of aliens" must be properly defined for the Proclamation to comply with § 1182(f) is untethered to the actual text of the statute. In short, the Proclamation need not define a "class of aliens" as the target of the restrictions set out in the directives to fall within this statutory grant of authority to the President.

Regardless, even if plaintiffs were correct about the necessity of a defined "class of aliens" under § 1182(f), their argument would still fail. The Supreme Court has previously rejected the

---

[5]    Defendants describe the Proclamation as imposing a suspension on entry because "aliens subject to the Proclamation are literally suspended from entering for a year or unless the employer pays $100,000." Defs.' Reply at 15. Alternatively, defendants posit that "[a]t a minimum, the $100,000 payment is a restriction on entry." *Id.* at 16; Motions Hr'g Tr. at 79:25-80:10 (defendants' counsel stating, "I think it can be both [a suspension or a restriction on entry]. . . . [E]ven if you want to see it as a restriction or a regulation, I think it's well-encompassed within the statute."). The latter view of the $100,000 payment is the more natural reading of the Proclamation, as discussed in the text. Under either construction, the textual prerequisites for invocation of § 1182(f) are satisfied.

challenge that a presidential proclamation improperly defined an "overbroad" class. *Hawaii*, 585 U.S. at 688. The Supreme Court reasoned that an overbreadth challenge on the class definition "simply amounts to an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only 'any class of aliens' but 'all aliens.'" *Id.*

Indeed, broadly and generally defined classes of aliens in past presidential proclamations have received repeated judicial approval. In 1992, for instance, President H.W. Bush signed Executive Order 12807, pursuant to 8 U.S.C. §§ 1182(f) and 1185(a)(1), obliging the Coast Guard to "enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens." Exec. Order No. 12807, 57 Fed. Reg. 23133, 23133 (May 24, 1992). The phrase "defined vessel" encompassed vessels "numbered pursuant to the laws of the United States," "[v]essels without nationality," and "[v]essels of foreign nations with whom we have arrangements authorizing the United States to stop and board such vessels." *Id.* The Supreme Court upheld this executive order in *Sale v. Haitian Centers. Council, Inc.*, 509 U.S. 155, 172 (1993), even though the "class of aliens" only shared the common characteristic of entering the country on certain vessels. More recently, in 2020, President Trump signed Presidential Proclamation 10014, again pursuant to 8 U.S.C. §§ 1182(f) and 1185(a)(1), declaring that "[t]he entry into the United States of aliens as immigrants is hereby suspended and limited subject to" certain limitations including that they were not then-present visa holders. Proclamation No. 10014, 85 Fed. Reg. 23441, 23442 (Apr. 22, 2020). This proclamation was upheld and an *ultra vires* challenge rejected, on the basis that all noncitizens constituted a class. *See Gomez*, 485 F. Supp. 3d at 178-83.

In sum, contrary to plaintiffs' arguments, the Proclamation adequately satisfies the preconditions for invocation of presidential authority under § 1182(f) by making an explicit finding

about the detriment to the interests of the United States and the resultant "necess[ity]" of and "demand[]" for imposition of the restriction on the entry of certain aliens, as directed in Section 1(a), *see* Proclamation, 90 Fed. Reg. at 46028, and, further, applying the restriction to all nonimmigrant beneficiaries of petitions for new H-1B visas, regardless of whether these aliens constitute a "class of aliens" on terms other than their status as nonimmigrant beneficiaries of new H-1B visas.

### 2. *Whether the Proclamation Exceeds the President's Delegation of Authority Under 8 U.S.C. § 1182(f)*

Having determined that the Proclamation satisfies the prerequisites for invocation of 8 U.S.C. § 1182(f), the analysis now turns to whether the directives required by the Proclamation exceeded the congressional delegation of authority. Given that "[b]y its plain language § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States" and "exudes deference to the President in every clause" by "vest[ing] the President with 'ample power' to impose entry restrictions in addition to those enumerated in the INA," *Hawaii*, 585 U.S. at 683-84 (quoting *Sale*, 509 U.S. at 187), this is a high hurdle for plaintiffs to overcome.

In support of their position that the Proclamation exceeds the authority granted to the President by § 1182(f), plaintiffs assert three arguments. First, plaintiffs argue that "[t]he Proclamation does not 'suspend . . . entry' or impose 'restrictions' 'on the entry of aliens.'" Pls.' Mem. at 23 (quoting 8 U.S.C. § 1182(f)). Instead, plaintiffs characterize the Proclamation's restriction on entry as merely a pretense to regulate domestic conduct, so the President's discretion should be limited accordingly. *See* Pls.' Mem. at 30 ("Section 212(f) does not empower the President to impose entry restrictions *as a penalty* for domestic employers' alleged misconduct; the detriment to the interests of the United States must instead arise from 'the entry' of a 'class of aliens' into the United States." (emphasis in original) (quoting 8 U.S.C. § 1182(f)). The

Proclamation does not "suspend" entry, according to plaintiffs, because "[a]ny noncitizen remains free to enter, consistent with other admission requirements, so long as he or she does not require an H-1B visa, or if a U.S. employer pays the $100,000 fee." *Id.* at 24.  Plaintiffs then string together a series of definitions to interpret the phrase "impose on the entry of aliens any restrictions" to mean that the provision "authorizes the President to impose *prohibitions* that operate *at the border* on *noncitizens*." *Id.* at 24-25 (emphases in original).  According to plaintiffs, "the Proclamation does not impose a negative or prohibitory limit at the border[; r]ather, it leverages [§ 1182(f)] to require U.S. employers to comply with affirmative, non-statutory mandates." *Id.* at 25.

Plaintiffs' argument suffers the same flaw, again, of straining to segregate the perceived cause from the effect and resultant remedy as directed in the Proclamation, but just because the President identifies domestic employers as the cause of the problem of American workers being displaced with H-1B workers does not put the remedy beyond his reach, when that remedy takes the form of entry restrictions designed and intended to make H-1B workers more costly.  The text of § 1182(f) makes this clear: Congress delegated to the President authority to "impose on the entry of aliens *any restrictions* he may deem to be appropriate."  8 U.S.C. § 1182(f) (emphasis added); *see also* 8 U.S.C. § 1185(a)(1) ("[I]t shall be unlawful . . . for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.").  Congress could have, but did not, impose the limit on presidential authority that plaintiffs' urge.  For example, Congress could have added text to § 1182(f) that the restrictions the President was authorized to impose could not take the form of a monetary payment or, even more specifically, a monetary payment on domestic employers.  Such text is simply not there nor even implied.

The D.C. Circuit has repeatedly emphasized the expansive scope of "any," reminding that "any . . . means any." *United States v. Haynes*, No. 23-3065, 2024 WL 1591589, *2 (D.C. Cir. 2024) (per curiam) (quoting *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010)); *see also Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999) ("[T]he adjective 'any' is not ambiguous . . . . [It] has an expansive meaning, that is, one or more indiscriminately of whatever kind . . . . [A]ny means all." (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997)); *United States v. Cullen*, 499 F.3d 157, 163 (2d Cir. 2007) ("The word 'any' means 'without restriction or limitation.'" (quoting *Tambe v. Bowen*, 839 F.2d 108, 110 (2d Cir. 1988))).  Just as "any restriction" has been upheld when that restriction took the form of "additional scrutiny" for Somalia nationals seeking nonimmigrant visas, *Hawaii*, 585 U.S. at 680, a restriction may also take the form of an additional monetary payment.  To be sure, as defendants' counsel confirmed, § 1182(f) has not been previously invoked to restrict entry into the United States using monetary mechanisms.  *See* Motions Hr'g Tr. at 74:19-23 (defendants' counsel stating, "I don't believe 1182(f) has [ever been invoked to impose a monetary form of restriction].").  Nonetheless, the Supreme Court has held that "§ 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA" and to "supplement the other grounds of inadmissibility in the INA."  *Hawaii*, 585 U.S. at 684; *see* Defs.' Opp'n at 31 (citing *Hawaii*).  The President, evoking authority pursuant to § 1182(f), has merely "supplement[ed] the other grounds of inadmissibility in the INA" by requiring a payment before an H-1B petition is processed.  *See Hawaii*, 585 U.S. at 684 (citing *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)).

As support for the proposition that imposing a payment obligation on domestic business as a means of restricting entry of H-1B visa workers is an impermissible re-writing of the INA, or, in

other words, outside the scope of § 1182(f), Pls.' Mem. at 15, plaintiffs rely on the same reasoning

as that of the Ninth Circuit in *Doe #1 v. Trump*, 957 F.3d 1050, 1056, 1067 (9th Cir. 2020).[6]  In

that case, the Ninth Circuit denied "the government's motion to stay the district court's preliminary

injunction enjoining a Presidential Proclamation restricting family-sponsored immigrants from

entering the United States without acquiring specific health insurance," thereby preventing

implementation of the Proclamation at issue, *id.* at 1056; in so holding, the court previewed

findings on the merits, reasoning that the authority granted to the President under § 1182(f) "is

more circumscribed when he addresses a purely domestic economic issue" since, in the domestic

context, "the national security and foreign affairs justifications for policy implementations

disappear, and the normal policy-making channels remain the default rules of the game," *id.* at

1067.  As another Judge on this Court persuasively observed regarding this reasoning, however,

the distinction between foreign and domestic policy "finds no support in the statutory text" which

"simply speaks in terms of restricting entry of aliens 'detrimental to the United States'" and

contains no limitation "to any particular sphere, foreign or domestic." *Gomez*, 485 F. Supp. 3d at

180 (quoting 8 U.S.C. § 1182(f)).  Nor does the Ninth Circuit's distinction conform to Supreme

Court case law which has recognized that "'[t]he exclusion of aliens is a fundamental act of

sovereignty' that 'is inherent in the executive power to control the foreign affairs of the nation,'"

---

[6]     This Ninth Circuit case relied on by plaintiffs has a circuitous history.  Following the decision cited by plaintiffs and referred in the text, a Ninth Circuit panel later reversed, on the merits, the district court's order and vacated the preliminary injunction, finding that "the Proclamation's restrictions rest on a valid exercise of the authority delegated in § 212(f)" and that "[t]he district court identified no coherent basis for insisting that, in delegating authority to impose additional restrictions on who may immigrate into this country from another nation, Congress must provide greater guidance when the asserted detrimental impact of such aliens is based on 'domestic' policy concerns."  *Doe #1 v. Trump*, 984 F.3d 848, 869-70 (9th Cir. 2020).  This merits panel decision thus seems to disavow the distinction regarding domestic matters.  In any event, on May 14, 2021, the new President revoked Proclamation 9945, *see* Proclamation No. 10209, 86 Fed. Reg. 27015 (May 14, 2021), and,  consequently, the en banc Ninth Circuit vacated the panel's merits opinion and remanded the matter to the district court with instructions to vacate the preliminary injunction of the now-revoked proclamation as moot, *Doe #1 v. Biden*, 2 F.4th 1284, 1285 (Mem.) (9th Cir. 2021) (en banc).

as well as that "*any policy* towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Id.* (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), and *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) (alteration and emphasis original)). Even if the purported distinction plaintiffs urge were "a practically feasible one, it does not follow that judicial deference is any less" because, as the Supreme Court has explained, entry restrictions may "implicate 'relations with foreign powers,' *or* involve 'classifications defined in the light of changing political and *economic circumstances*,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Id.* at 180-81 (quoting *Hawaii*, 585 U.S. 702) (emphases original).

Second, plaintiffs contend that, by taking the form of a "payment requirement," the restriction imposed by the Proclamation exceeds the statutory delegation since "[r]aising revenue is a core power reserved by the Constitution for Congress." Pls.' Mem. at 25. For this contention, plaintiffs rest heavily on *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212 (1989), where the Supreme Court upheld rulemaking by the Department of Transportation on setting "fees to cover the costs of administering certain federal pipeline safety programs" against a challenge that the act providing for such rulemaking represented "an unconstitutional delegation of the taxing power." *Skinner*, 490 U.S at 214. The Supreme Court observed that "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties." *Id.* at 224. According to plaintiffs here, Congress provided no such clear indication in § 1182(f), in contrast to "many other provisions of the INA that *do* expressly empower the executive to impose fees, collect bond payments from noncitizens, and the like." Pls.' Mem. at 25 (emphasis in original). To bolster this

35

**JA457**

argument, plaintiffs stress that, in seventy years of practice, no other president has used § 1182(f) to impose required payments. Pls.' Mem. at 26.[7] Permitting such a mechanism for restricting entry by aliens to the United States would, according to plaintiffs, amount to "find[ing] the proverbial elephant in a textual mousehole." Pls.' Mem. at 27 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).[8]

The Supreme Court recently explained, however, that *Skinner* was an instance where the Court declined the "request to create a special nondelegation rule for revenue-raising legislation." *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025). Likewise, here, the Taxing Clause does not impose on Congress a heightened requirement to make a valid delegation to the President, and Congress was clear in its delegation. Section 1182(f) uses exceeding broad language, including that the regulation might occur "for such period as he shall deem necessary" and may entail "any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). This language—"any regulation"—is sufficiently broad to encompass a regulation requiring an

---

[7]    At the hearing, plaintiffs also supported this argument by referring to the "*Passenger* Cases," though acknowledging these cases were not cited in briefing by either side. Motions Hr'g Tr. at 48:8-13 (AAU's counsel citing *Smith v. Turner*, 48 U.S. (7 How.) 283 (1849)). While this argument not raised in briefing may be deemed waived, regardless, the *Smith* plurality opinion stands for the proposition that "a State cannot do . . . indirectly which she is forbidden by the Constitution to do directly." *Smith*, 48 U.S. at 458. States may not "lay any Duty on Tonnage," U.S. Const. art. 1, § 10, cl. 3, so the Supreme Court held that States also may not charge a tax based on "the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers which [a vessel] carries," *Smith*, 48 U.S. at 458-59. In contrast, the instant case does not require a determination of whether a constitutional limitation has been violated, *see supra* n.2, and focuses instead on whether the presidential action exceeds the scope of delegated statutory authority. *Smith* is thus inapposite and does not aid in resolution of the instant case.

[8]    This argument seems to allude to the major questions doctrine. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring) ("That major questions canon reflects both background separation of powers understandings and the commonsense interpretive maxim that Congress does not usually 'hide elephants in mouseholes' when granting authority to the President." (quoting *Whitman*, 531 U. S. at 468)). Yet, plaintiffs devote only one sentence to the major questions doctrine in their opening brief, *see* Pls.' Mem. at 27, and four sentences in their reply brief, *see* Pls.' Reply at 15. During the hearing, which lasted over two hours, the major questions doctrine was not mentioned once. Any argument that a substantive version of the major questions doctrine is relevant to this issue has thereby been forfeited; however, consideration is given to the context in which the delegation was made and how that context informs the proper interpretation of the statute.

36

**JA458**

additional payment obligation for entry of a nonimmigrant H-1B visa worker when the additional

prerequisites in § 1182(f) are met.[9]

Third, plaintiffs claim that "certain of the Proclamation's provisions go beyond any

possible conception of an entry restriction," including the key directive in Section 1(b) that the

Secretary of Homeland Security should not approve petitions for H-1B visas unless they are

accompanied by the $100,000 payment.  Pls.' Mem. at 27-28; see Proclamation § 1(b), 90 Fed.

Reg. at 46028 (directing that DHS Secretary "shall restrict decisions on petitions not accompanied

by a $100,000 payment for H-1B specialty occupation workers . . . , who are currently outside the

United States, for 12 months following the effective date of this proclamation . . . . The Secretary

of State shall also issue guidance, as necessary . . . to prevent misuse of a B visas by alien

beneficiaries of approve H-1B petitions that have an employment start date beginning prior to

October 1, 2026.").  Defendants characterize this argument as "disingenuous because although the

visa is the entry document presented at the port, the INA specifically requires that other documents

are required for entry," Defs.' Opp'n at 33-34, and that the INA places the burden of proof of being

permitted to enter the country on the noncitizen, id. at 34 (citing 8 U.S.C. § 1361).

Plaintiffs' challenge to the Proclamation on this basis takes a myopic view of the process

for legally entering the United States, with a focus solely on the visa approval part of this process,

when more is necessary.  The process for legal entry into the United States is comprised of two

---

[9]    Defendants respond that "the payment here operates as a 'regulation' rather than 'revenue production,'" Defs.' Opp'n at 32 (quoting *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922)), but, as plaintiffs correctly point out, reliance on *Drexel Furniture* is misplaced here.  That case concerned the division of powers between two sovereigns, states and the federal government "whe[re] one sovereign can impose a tax only, and the power of regulation rests in another."  259 U.S. at 28.  The Supreme Court held that Congress could not use taxes for "the purpose to regulate matters of state concern."  *Id.* at 41.  Here, the question concerns whether the congressional authority to implement a monetary obligation requirement has been sufficiently delegated to the President, who may appropriately exercise such properly delegated power.  *See* Pls.' Reply at 16 ("Instead, *Drexel Furniture* held that Congress could *not* 'use its taxing power . . . to regulate behavior otherwise regarded at the time as beyond federal authority.'" (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 572 (2012)) (emphasis original)).

inter-related but distinct steps, requiring both visa approval and issuance and then a determination

of eligibility for admission.  The Supreme Court has confirmed "the basic distinction between

admissibility determinations and visa issuance that runs throughout the INA."  *Hawaii*, 585 U.S.

at 694.  While essential for admission to work in the United States, a work-related visa, alone, is

not sufficient to gain entry.  As another Judge on this Court succinctly explained, "[a] visa is a

travel document that allows its holder to travel to a port of entry and request permission to enter

the United States, but it does not guarantee the right to enter the country."  *Gomez*, 485 F. Supp.

3d at 158; *id.* at 191 (relying on distinction between visa issuance and admissibility determination

to find that INA's "Subsection 1201(g) precludes the issuance of visas only as to persons who are

'ineligible to receive a visa' under Section 1182, not to persons who are only ineligible to enter

under that provision" (emphasis omitted)); *see also Milligan v. Pompeo*¸ 502 F. Supp. 3d 302, 315

(D.D.C. 2020) (expressly following *Gomez*); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 145 (D.D.C.

2021) (BAH) ("Because § 1182(f) concerns itself only with entry, a person subject to a Presidential

Proclamation relying on § 1182(f) is only ineligible to enter, but not ineligible for a visa."); *Thein*

*v. Trump*, 25-cv-2369, 2025 WL 2418402, at *15 (D.D.C. Aug. 21, 2025) ("Several other courts

in this District have held that the Department of State cannot rely on proclamations issued pursuant

to 8 U.S.C. § 1182(f) to deny visa applications. . . .  Today, this Court joins that chorus.").  The

INA makes this distinction between visa approval and admissibility determinations plain.  *See,*

*e.g.*, 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom

a visa or other documentation has been issued, to be admitted the United States, if, upon arrival at

a port of entry in the United States, he is found to be inadmissible under this chapter, or any other

provision of law.  The substance of this subsection shall appear upon every visa application.").

This distinction between visa approval and admissibility determination carries over into the H-1B visa worker context, and both parts of this inter-related process are necessary for a nonimmigrant worker in a specialty occupation to enter the United States.  The process of applying for H-1B visas proceeds in several phases.  Employers who seek to file petitions for H-1B visa workers must file a Labor Condition Application ("LCA") with the Secretary of Labor stating, among other things, "the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed."  8 U.S.C. § 1182(n)(1)(D); *see also* 20 C.F.R. § 655.730.  Next, employers subject to the H-1B visa cap "must electronically submit a separate registration for each beneficiary it seeks to register" for the H-1B visa lottery.  8 C.F.R. § 214.2(h)(8)(iii)(A)(2).  For those employers whose beneficiaries are selected by the lottery or are cap-exempt, the next step is for the "importing employer" to complete an H-1B petition to receive authorization to employ the beneficiary.  8 U.S.C. § 1184(c); *see* § 214.2(h)(8)(iii)(A)(1).  USCIS reviews the petition to determine whether the beneficiary qualifies as a member of a specialty occupation and whether the profession involves a specialty occupation; the statute defines "specialty occupation" as a job that requires "theoretical and practical application of a body of highly specialized knowledge" and the "attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States."  8 U.S.C. § 1184(i)(1); *see also All Aboard Worldwide Couriers, Inc. v. Attorney General*, 8 F. Supp. 2d 379, 381 (S.D.N.Y. 1998) ("The statutory and regulatory framework of the H-1B visa obliges the INS to examine the interplay among the petitioner, the job, and the industry.").  If their petitions are approved, those beneficiaries who are outside of the United States typically must apply for a visa at a U.S. consulate before seeking admission.  *See* 8 U.S.C. §§ 1184(c)(1), 1201(a)(1).

As this description makes clear, the "importing employer" plays a critical role for entry of an H-1B worker, since the "petition of the importing employer . . . . shall be made and approved before the visa is granted."  8 U.S.C. § 1184(c)(1).  Yet, even then, "[t]he approval of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant."  *Id.*  Put another way, the fallacy in plaintiffs' argument that imposition of the $100,000 payment obligation on the "importing employer" is somehow not part of an entry restriction authorized under § 1182(f) blithely ignores the necessity of a compliant petition by an "importing employer" before an entry visa for the qualifying H-1B worker may be approved.

In a last gasp effort to support their *ultra vires* claim, plaintiffs assert that "the Proclamation's unprecedented invocation of [§ 1182(f)] knows no limiting principle."  Pls.' Mem. at 26.  They are certainly right that this congressional grant of authority to the President is so broad that outer limits on his authority to impose restrictions on entry into the United States are, in fact, quite limited.  One such limiting principle is that such proclamations must be temporary, though even this limit "does not mean that the President is required to prescribe in advance a fixed end date for the entry restrictions."  *Hawaii*, 585 U.S. at 687.  Additionally, presidential actions, as here, reflected in proclamations relying on the statutory authority in § 1182(f), may only apply to aliens who are outside of the United States upon their entry.  *See* 8 U.S.C. § 1182(f) (permitting the President to "suspend the entry of all aliens or any class of aliens . . . or impose on the entry of aliens any restrictions").  The Proclamation complies fully with both of those limits, since temporally the directives are in effect for "twelve months" and only apply to new petitions for H-1B workers "who are currently outside the United States."  Proclamation, § 1(b), 90 Fed. Reg. at 46028.  Finally, the Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA."  *Hawaii*, 585 U.S. at 689; *see* Motions

40

**JA462**

H'rg Tr. at 81:4-12 (defendants' counsel acknowledging these three limits on § 1182(f)'s grant of authority to President, stating: "1182(f), again, has to be temporary. . . .  I don't think—if there is a specific prohibition in the INA, it could necessarily overcome that specific prohibition.  It, obviously, can't apply to citizens; it's only aliens, and it's only on entry.").  This leads to the next inquiry to analyze whether the Proclamation "expressly override[s]" or otherwise contravenes INA provisions.

### 3.    *Whether the Proclamation Contravenes INA Provisions*

Plaintiffs claim that the Proclamation's imposition of the $100,000 payment obligation on U.S. employers filing petitions to import H-1B workers "clashes" with "the statutory design of the H-1B program," Am. Compl. ¶ 116, in two different ways.  First, in plaintiffs' view, the Proclamation imposes an obligation in "direct contradiction of the fees authorized by Congress," *id.*, thereby "dramatically upend[ing] Congress's deliberate decisions about how much a visa (and in particular, an H-1B visa) should cost and flout[ing] the cost-recovery principle of Section 1356(m)," *id.* ¶ 136.  Second, plaintiffs describe the Proclamation's practical impact as "sit[ting] uneasily with other specific congressional determinations," *id.* ¶ 139, regarding the number of H-1B petitions received, with the Proclamation having the effect of reducing that number, *id.* ¶ 140, since the cost of the H-1B program is "likely prohibitive to many, particularly small businesses, universities, and nonprofits across the country that hire H-1B workers," *id.* ¶ 136.  These bases for plaintiffs' challenge to the Proclamation as contravening the INA are addressed *seriatim*.

First, plaintiffs are correct that the INA provision codified at 8 U.S.C. § 1356(m), sets out a "statutory requirement" for the H-1B program, Pls., Mem. at 16, providing, *inter alia*, that (1) "all adjudication fees as are designated by the Attorney General in regulations shall be deposited as offsetting receipts into a separate account entitled 'Immigration Examinations Fee Account' in the

41

**JA463**

Treasury of the United States," *id.* § 1356(m); (2) "[t]hat fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," *id.*; and (3) that "[s]uch fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected," *id.*; *see* Pls.' Mem. at 16-18 (discussing these three provisions in § 1356(m)).[10]  According to plaintiffs, in this statutory scheme, Congress intentionally made "deliberate decisions about how much a visa (in particular, an H-1B visa) should cost overall," Pls.' Mem. at 18, by setting an initial $1,500 fee and a $500 "fraud prevention and detection fee" for filing an H-1B petition, *id.* (citing 8 U.S.C. §§ 1184(c)(9), (c)(12)).  In addition, Congress added a $4,000 fee if the company has more than fifty employees, over half of whom are nonimmigrant workers, and a "premium processing" fee for companies seeking to reduce the timeframe to have their H-1B petitions considered.  *Id.* at 18-19 (citing 49 U.S.C. § 10101 (note) and 8 U.S.C. § 1356(u)(3)).  Plaintiffs contend that this statutory language bars presidential action in the form of the supplemental $100,000 payment obligation because Congress has already set the allowable fees and "fees may *not* be set at a level that bears no relationship whatsoever to relevant costs."  Pls.' Mem. at 16 (emphasis original).

As a threshold matter, no matter the number of times plaintiffs call the Proclamation's new $100,000 payment obligation a "fee," this supplemental payment is not an adjudication or cost

---

[10]    The text of 8 U.S.C. § 1356(m) provides that adjudication fees will be set by the "Attorney General," but this reference is "a minor anachronism" because "[r]egulatory authority (for purposes of § 1356) transferred from the Attorney General to the Secretary [of the Department of Homeland Security] in 2003 with the formation of DHS (which subsumed the functions of the Immigration and Naturalization Service)."  *Paz v. Mayorkas*, 767 F. Supp. 3d 368, 375 n.9 (E.D. Tex. 2025) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002)); *see also Astakhov v. U.S. Citizenship & Immigr. Servs.*, 698 F. Supp. 3d 135, 142–43 (D.D.C. 2023) (JEB) ("Plaintiff here alleges that the agency (USCIS) unlawfully charged her a fee (to apply for employment authorization) and that she is now entitled to get her money back.  The relevant statutes and regulations, too, look exactly the same.  There is a statutory provision that empowers Defendants to charge 'fees for providing adjudication and naturalization services.'" (quoting 8 U.S.C. § 1356(m))).

recovery fee, as contemplated by 8 U.S.C. § 1356(m).  The fees set by § 1356(m) "are designated by the [DHS Secretary] in regulations" and "deposited as offsetting receipts into a separate account entitled 'Immigration Examinations Fee Account' in the Treasury," for the purpose of cost recovery.  In contrast to the statutory scheme, the $100,000 payment obligation set by the President to be paid by importing employers for H-1B visa workers is established in the Proclamation for a totally different purpose, namely: "to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers."  Proclamation, 90 Fed. Reg. at 46028.  Thus, payments under the Proclamation go not to the Immigration Examinations Fee Account, but to a General Fund Receipt Account created "for the purpose of receiving and accounting for collections not defined by law for a specific purpose," and then deposited "into the General Fund of the U.S. Treasury at the end of the fiscal year."  Defs.' Opp'n, Decl. of Branch Manager of the Budget Reporting Branch in the Cent. Acct. & Reporting Div. at the Bureau of the Fiscal Serv. at the U.S. Dep't of Treasury, Jerome Jackson ¶¶ 4-7, ECF No. 36-2.

Contrary to plaintiffs' argument, Congress in §1356(m) neither precludes the imposition of other payment obligations, nor cross-references or otherwise bars the President from acting to regulate entry, pursuant to §§ 1182(f) or 1185(a)(1).  To start, the statutory text in § 1356(m) uses the permissive modal verb "may," and the Supreme Court "has 'repeatedly observed' that 'the word 'may' *clearly* connoted discretion.'"  *Biden v. Texas*, 597 U.S. 785, 802 (2022) (quoting *Opati v. Republic of Sudan*, 590 U.S. 418, 428 (2018), and collecting cases); *see* Defs.' Opp'n at 36 (quoting *Biden*).  More to the point, nowhere in § 1356(m) is there a prohibition against any

executive branch agency creating or collecting other fees related to the H-1B visa program or for payment obligations to be imposed for purposes other than cost-recovery.[11]

Section 1356(m) also does not mention the President, let alone hint at constraining his power to impose entry regulations under other INA provisions by barring his use of monetary payments. Plaintiffs' contravention argument would have more force if, for example, the President in the Proclamation had waived statutorily mandated fees or directed accelerated processing without payment of the "premium processing" fee, since such waivers of statutorily mandated fees would have exceeded the authority granted under § 1182(f) by "expressly overrid[ing] particular provisions of the INA." *Hawaii*, 585 U.S. at 689. That has not occurred here: the statutorily imposed fees are still being collected. *See* Motions Hr'g Tr. at 72:23-73:2 (Defendants' counsel stating, "I think the most fundamental point here is that those fees are not being displaced, they still apply, we are not overriding them; and that they don't have anything that excludes the possibility of other payments or that limits the President's power."); Defs.' Opp'n at 36 ("It would be a significant limit to suggest this foreclosed any payment restriction under 1182(f) or 1185(a)(1) absent an express prohibition. Yet nothing in that section limits the possibility of any other payments.").

The legislative history for § 1356(m) bolsters reading this provision as neither designed nor intended as a limitation to the President's authority under §§ 1182(f) or 1185(a)(1). Before 1988, the costs of "administration of immigration and naturalization benefits was funded entirely by Congressional appropriations." *Barahona v. Napolitano*, No. 20-cv-1574, 2011 WL 4840716, at *2 (S.D.N.Y. Oct. 11, 2011). Then, in 1988, Congress enacted § 1356(m) and (n), providing

---

[11]    Since the $100,000 payment is not an adjudicatory fee, plaintiffs' corollary argument that any changes to the level of adjudication fees may only occur through notice-and-comment rulemaking, *see* Pls.' Mem. at 19-20; Pls.' Reply at 6-7, is not reached.

that "fees deposited in the [Immigration Examinations Fee Account] were to be used to fund the 'expenses in providing immigration adjudication and naturalization services.'" *Id.* Two years later, § 1356(m) was amended, and the "House Appropriations Committee recognized that the purpose of the 1990 amendment was to ensure that the IEFA funds would fund 'the entire cost of operating the Adjudications and Naturalization program.'" *Id.* at *3. In short, § 1356(m) is designed to ensure that immigration services may be operated without requiring funding from Congressional funds, for which purpose, the statute sets suggested fee levels to ensure that additional congressional funds are not needed. The argument that Congress intended simultaneously to impose a cap on the fees imposed or intended to limit the broad power delegated to the President in § 1182(f), as plaintiffs urge, would be passing strange.

Second, plaintiffs also point to the practical impact of the supplemental $100,000 payment obligation under the Proclamation to argue this "disrupts Congress's carefully calibrated scheme" thus overriding the "particular provisions of the INA." Pls' Mem. at 19 (quoting *Hawaii*, 585 U.S. at 689). Plaintiffs anticipate that "the Proclamation [will] fundamentally transform[] the visa category that Congress by statute created," Pls.' Reply at 1, by reducing "the number of petitions far below what Congress provided" with the cap on H-1B visas, Pls.' Mem. at 22, and limiting the availability of the H-1B visa program to those domestic employers able to afford the supplemental payment, and to certain types of H-1B workers, who are "the best of the best" when the INA "imposes no such requirement on the H-1B program," *id.* at 20.

While plaintiffs' predictions about the practical impact of the Proclamation may be accurate, including a reduction below the annual cap in the number of H-1B petitions and the number and types of employers able to afford the cost of importing H-1B workers, this does not contravene statutory terms in the INA nor even congressional policy. The Proclamation is intended

to provide a remedy for the perceived displacement of American workers by imported H-1B workers and the adverse effects this poses for the economic and national security interests of the United States. The same concern about protecting the American workers from displacement by imported labor animating the Proclamation is, in fact, a predominant theme in the INA and for the H-1B program specifically. Thus, Congress conditioned participation in the H-1B program by requiring importing employers, for example, to file an LCA identifying the specialty occupation position at issue and confirming that they will comply with the requirements of the program, by paying the prospective nonimmigrant worker the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i); 8 C.F.R. § 214.2(h)(4); *see supra* Part I.A.1. In addition, before filing an H-1B petition, certain importing employers must obtain certification from the Department of Labor that "there are not sufficient workers who are able, willing, qualified . . . and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor," and "the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1182(a)(5)(A)(i)(I) and (II).

Indeed, protecting American workers against displacement is an underlying congressional policy reason for a cap on the number of H-1B visas awarded annually. The H-1B visa cap sets a number above which "[t]he total number of aliens who may be issued visas . . . may not exceed," 8 U.S.C. §§ 1184(g)(1)(A)(vii), but the INA is devoid of a requirement or even a goal for a minimum number of such visas to issue. Thus, a reduction in numbers of H-1B visa petitions and

workers resulting due to operation of the Proclamation would not contravene any INA requirement or prohibition.

Furthermore, the Proclamation does nothing to upset the statutory requirement that individuals receiving H-1B visas need to be "engaged in a specialty occupation," meaning an occupation requiring "theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty." 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(i)(1).  Employers will still be able to seek H-1B visas on behalf of individuals who are not the "best of the best," but the cost for employers to do so will be higher.

In sum, plaintiffs have not persuasively identified a single manner in which the Proclamation expressly conflicts with or overrides another provision of the INA.  Having determined that the Proclamation satisfies the textual prerequisites of § 1182(f) and reflects the exercise of authority within the broad discretion afforded to the President under § 1182(f), plaintiffs' *ultra vires* challenge fails.[12]

### C.    Plaintiffs' Administrative Procedure Act Claim

Separately, plaintiffs seek review under the APA of "the agencies' implementing actions," Pls.' Mem. at 35; *see also supra* Part I.B.2, arguing that "[t]he agency implementation of the Proclamation fee . . . is arbitrary and capricious and 'without observance of procedure required by law,' given that the fee rests on no lawful basis and was not promulgated through notice-and-comment rulemaking," Pls.' Reply at 43 (quoting 5 U.S.C. § 706(2)).

Defendants raise a number of threshold reasons to bar judicial review of this APA claim, with the primary argument being that "Plaintiffs have not identified an 'agency action' at all, much

---

[12]    At the hearing, plaintiffs clarified that their *ultra vires* claim is also asserted against agency implementation of the Proclamation.  Motions Hr'g Tr. at 36:5-6 (Chamber's counsel stating, "[The ultra vires claim] is targeting the proclamation as well as the agency implementation of it.").  As the foregoing analysis makes clear, the Proclamation is not *ultra vires*, so the *ultra vires* challenge against agency implementation fails.

47

less a final one," because the challenge is effectively to the President's Proclamation and not to any agency decisionmaking. Defs.' Opp'n at 15-18; *see also id.* at 18-19 (also arguing, alternatively, that "[a]ny agency action would be committed to agency discretion"). Defendants begin with the undisputed proposition that "[t]he President is not an agency, and his actions are not subject to APA review." Defs.' Opp'n at 15 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), and *Dalton v. Specter*, 511 U.S. 462, 470 (1994)). Defendants next point out that, as a matter of practicality, "agencies must implement the Proclamation" because "the President cannot deny each entry on his own." *Id.* at 15. "If the fact that an agency is simply enacting the President's Proclamation allowed for an APA challenge," defendants argue, "this would effectively nullify the President's exemption from the APA." *Id.* Plaintiffs disagree, contending that if defendants' position were accurate, "presidents could 'insulate' from judicial review any future agency actions 'with the single stroke of an executive pen.'" Pls.' Reply at 31 (quoting *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024)). Both sides make valid points, with this debate raising the troubling specter of executive officers presenting proposed agency actions in a form that otherwise would be subject to notice-and-comment rulemaking to the President for signature and issuance in the form of an executive order or presidential proclamation to avoid APA review altogether.[13]

---

[13]    At the hearing, plaintiffs' counsel elaborated on the concerns about the potential scope of the President's authority, as compounded by its "feature," in Proclamation § 1(c), of "an open-ended discretionary exemption from" the $100,000 payment obligation, Motions Hr'g Tr. at 43:17-25, using as examples the possibility that H-1B visa petitions may only be approved if "the petitioning employer has to attach . . . an enforceable covenant" not "to engage in layoffs, off-shoring, or some other conduct that the administration identifies for five years" or the President "may just bar all immigration entirely unless noncitizens entering the country agree to follow a new migrant code promulgated by the President," *id.* at 44:14-20. Plaintiffs also expressed concerns about the exercise of discretion to grant waivers of the $100,000 payment obligation on a "quid pro quo" basis, *id.* at 33:17-22 (Chamber's counsel, confirming whether members have such concern, "Absolutely, Your Honor."), or on the basis of whether a company seeking such a waiver was located in a State or locality with elected political officials favored by the current Administration, *id.* at 34:16-35:16 (in response to Court's query, citing stipulation by federal agency defendants in another case that grant termination decisions have been "influenced by whether a grantee's address was located in a

Whether an agency's implementation of a presidential directive constitutes "final agency action" reviewable under the APA, *see* 5 U.S.C. § 704, remains an open question in the D.C. Circuit. *See Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 120 (D.D.C. 2020) (noting that "this circuit has not clearly determined whether action taken pursuant to [a] Proclamation is reviewable"); *Milligan*, 502 F. Supp. 3d at 313-14 (noting that "the Circuit has not been perfectly clear on where to draw the line as to which agency actions are reviewable" when it concerns the "implementation of . . . Proclamations"). The Circuit has, in *dicta* in a non-APA case, "expressed doubt that regulations promulgated by an executive agency to 'flesh out' an executive order would be unreviewable [under the APA] simply because they are based on an executive order." *Tate*, 513 F. Supp. 3d at 142-43 (BAH) (quoting *Reich*, 74 F.3d at 1327). When confronted with the question in a later APA case, however, the Circuit declined to reach the issue and ruled on other grounds instead. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 903 (D.C. Cir. 2018) (declining to decide whether "the issuance of a Presidential Permit by the Secretary of State is final agency action" under the APA, because "even if the Presidential Permit issuance were agency action, it is unreviewable under the APA because it is 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2)").

Other Judges on this Court have thoughtfully considered, and landed on either side of, the question, yielding no clear majority view on the answer. *See, e.g.*, *Detroit Int'l Bridge Co. v. Gov't*

---

State that tends to elect and/or has recently elected Democratic candidates in state and national elections (so-called 'Blue States')," Joint Supplemental Filing at 8-9, *City of St. Paul v. Wright*, No. 25-cv-3899 (APM), ECF No. 17, Chamber's counsel confirming, "I think that that is a distinct problem with, first, imposing an unlawful $100,000 fee and then having a discretionary way to get around an unlawful fee in the first place. . . . I think there are concerns, yes, Your Honor. There are concerns."); *id.* at 43:17-18 (AAU's counsel confirming, "So I agree entirely with what Mr. Hughes said. You know, yes, it's a concern."). That waivers of the $100,000 payment obligation might be influenced by whether employers are located in a "so-called 'Blue State[]'" or are engaged in activities deemed to be consistent with, or contrary to, the interests of the current Administration, may sound far-fetched, but no matter how concerning to plaintiffs, as expressed in response to queries at the motions hearing, plaintiffs have not presented that concern as part of their challenge here. *See infra* n.17.

*of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (RMC) (agreeing with "several cases['] . . . conclu[sion] that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA") (collecting cases); *Nat. Res. Def. Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (RJL) (holding that State Department's issuances of presidential permits for cross-border oil pipeline were not reviewable under the APA because the Department was "acting solely on behalf of the President"); *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001) (RMU) (extending the bar on APA review of presidential actions to agency actions where the agency is "merely carrying out directives of the President"), *aff'd on other grounds*, 306 F.3d 1138 (D.C. Cir. 2002). *But see, e.g.*, *Moghaddam*, 424 F. Supp. 3d at 120 (CKK) (finding "persuasive" the argument that "officer suits against executive branch officials charged with carrying out the instructions contained in [a] Proclamation" are APA-reviewable); *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 468 (D.D.C. 2020) (APM) (finding APA challenge to an agency's implementation of a visa-related waiver program governed by a Proclamation reviewable, because plaintiffs "do not challenge the President's actions[,] and instead challenge agency adherence to the Proclamation itself and agency guidance" (internal quotation marks omitted)); *O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) (RDM) ("The fact that the Rule defines those who are ineligible for asylum by reference to a presidential proclamation or other presidential order . . . does not insulate the Rule from APA review . . . ." (internal quotation marks omitted)).[14]

---

[14]        Courts in other circuits are similarly split. *See, e.g.*, *White Earth Nation v. Kerry*, No. 14-cv-4726, 2015 WL 8483278, at *6-7 (D. Minn. Dec. 9, 2015) (finding that State Department's letters interpreting the scope of a presidential permit were not "an agency action that is reviewable under the APA" because the Department "was carrying out the directives of the President as set forth in [Executive Order] 13337"); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) ("[T]he State Department and Assistant Secretary were acting on behalf of the President [via delegated authority], and therefore their actions are not reviewable under the APA."); *Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009) (finding that State Department's issuance of environmental impact statement was "presidential in nature" so no

The line-drawing on whether APA review is available, or not, may depend on whether an agency's actions involved "mere ministerial implementation of presidential action," which might be shielded from APA review, or independent decisionmaking that "flesh[ed] out" a presidential directive, which might not be. *See Tate*, 513 F. Supp. 3d at 142-43 (BAH) (internal quotation marks omitted) (first discussing *Detroit International Bridge* and then discussing *Reich*); *see also Gomez*, 485 F. Supp. 3d at 178 (similar conclusion); *Milligan*, 502 F. Supp. 3d at 314 (similar conclusion); Pls.' Opp'n at 29 (appearing to concede that "plaintiffs may not obtain APA arbitrary-and-capricious review of an agency's ministerial implementation of a Presidential action that is concededly within the President's authority"). Such line-drawing as to what qualifies as a "ministerial implementation" may not always be a simple exercise.[15]

Fortunately, the resolution of plaintiffs' APA claim does not require wading into this uncertain terrain because a more straightforward resolution exists: Even if defendants' implementation of the Proclamation constituted "final agency action" under 5 U.S.C. § 704, defendants' actions would not run afoul of the APA. *See Ancient Coin Collectors Guild v. U.S.*

---

viable APA claim). *But see, e.g.*, *Su*, 121 F.4th at 15 (holding agency actions are subject to APA review "even if implementing an executive order"); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1157 (D. Minn. 2010) (holding that State Department's issuance of a presidential permit for cross-border oil pipeline constitutes agency action reviewable under the APA).

[15]        Whether an agency's actions are "ministerial" can be an important consideration informing APA reviewability, but relying solely on that factor raises concern. For example, if the bar on APA review applied whenever a presidential directive required only "ministerial" agency action, could an agency circumvent APA review simply by bringing proposed regulations to the President to sign as an executive order? After all, in this hypothetical, any actions taken by the agency consistent with the executive order could arguably be considered "ministerial." Yet creating such a loophole to APA review would eviscerate the right to judicial review of agency action as established by Congress. *See* Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2350-51 (2001) ("It is true that the Supreme Court held in *Franklin v. Massachusetts* that the President is not an 'agency' as defined in the APA and his actions therefore are not subject to the judicial review provisions of that statute. . . . [However,] [w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern. . . . [S]o long as the courts remain open to legal challenges, the use of presidential directive authority cannot too greatly displace the clear preferences of . . . Congress with respect to agency action."). The lack of clarity in the case law, the concerns with line-drawing, and the availability of a more straightforward resolution on the merits all counsel against deciding the threshold APA issues raised by defendants in this case.

*Customs & Border Prot.*, 698 F.3d 171, 183-84 (4th Cir. 2012) (declining to decide whether agency's actions "at the behest of the President" were shielded from APA review, because, "[e]ven were we to assume that [the agency] was fully subject to the APA, none of its actions were remotely arbitrary or capricious").

Plaintiffs concede that if issuance of the Proclamation is not *ultra vires*, then their APA claim would similarly fail. *See* Motions Hr'g Tr. at 56:13-14 (AAU's counsel stating, "[The APA] claims would not work if you thought the proclamation was lawful."). As determined above, the dictates of the Proclamation fall within the President's discretionary authority, under 8 U.S.C. §§ 1182(f) and 1185(a)(1). *See supra* Part III.B. Plaintiffs' challenge to defendants' implementation of the Proclamation as "contrary to law and arbitrary and capricious" is thus unpersuasive. Pls.' Mot. at 2; *see also* Pls.' Mem. at 19-20. Since defendants' challenged implementing memoranda merely carry out the Proclamation, defendants plainly do not act "arbitrarily and capriciously" or "contrary to law" in implementing a legally permissible presidential directive. Indeed, defendants here had no other course of action: As the D.C. Circuit has held, an agency "may not simply disregard" a binding presidential directive. *See Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012) (finding agency did not act arbitrarily and capriciously by adhering to the directives of a legally valid Executive Order without considering alternative policy options, because the agency "may not simply disregard an Executive Order"). As "agenc[ies] under the direction of the executive branch, [defendants] must implement the President's policy directives to the extent permitted by law." *Id.* (citing *Bldg. & Const. Trades Dep't. v. Allbaugh*, 295 F.3d 28, 32-33 (D.C. Cir. 2002)); *see also Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 731 (10th Cir. 2024) (holding that an agency action cannot "be[ ] an arbitrary and capricious exercise of agency discretion [where] the agency ha[s] *no discretion* to act otherwise"

under a "2021 executive order" (emphasis original)).  Given that defendants' implementing memoranda summarizing and clarifying the Proclamation properly adhere to the President's directive—which directive is permitted by law—defendants' actions are not arbitrary or capricious or contrary to law.[16]

Likewise, plaintiffs' related contention that defendants' imposition of the $100,000 payment obligation is "procedurally unlawful" for failure to "set fees for visas pursuant to notice-and-comment rulemaking" is not persuasive for two inter-related reasons.  Pls. Mem. at 19.  First, any failure by defendants to engage in notice-and-comment rulemaking in implementing the Proclamation is harmless error.  In administrative law, "error can be harmless if notice-and-comment would not alter the legal conclusion of the rule."  *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023); *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471-72 (D.C. Cir. 2014) (rejecting notice-and-comment claim when "the statute itself" foreclosed the plaintiffs' position, and thus "all the procedure in the world" could not lead the agency to a different conclusion).  "As incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error."  *First Am. Disc. Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (citation omitted).  Here, plaintiffs have not met their burden to show that they could have "mount[ed] a

---

[16]    Some courts have expressed concern that, where the law provides the President discretion over a decision, exposing the President's policy choices to APA review via challenges against the implementing agency "would run afoul of the separation of powers."  *Nat. Res. Def. Council*, 658 F. Supp.2d at 111 (internal quotation marks omitted); *see also Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 403 (reasoning that when "agencies act on behalf of the President, the separation of powers concerns ordinarily apply with full force—especially in an area as sensitive and complex as foreign affairs" where the president has "inherent constitutional authority").  These separation of powers concerns about judicial review under the APA of such implementing agency actions may be overblown: a successful APA challenge would be difficult to mount against an agency's implementation of a presidential directive so long as the agency adheres closely to the directive and the President acted in a constitutional manner, pursuant to his inherent powers or under an enabling statute.  *See Sherley*, 689 F.3d at 784-85 (holding that, where "the President's policy directives . . . [are] permitted by law," an agency—"[b]ound as it is to carry out" the directives—does not act arbitrarily and capriciously in adhering to presidential orders).

credible challenge" to the defendants' memoranda with notice and an opportunity to comment. *See Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002).

This is related to the second reason: defendants lacked any discretion to deviate from the Proclamation's $100,000 payment requirement, and thus "no amount of procedure would have remedied [plaintiffs'] alleged harm" stemming from the Proclamation. *See Ctr. for Biological Diversity*, 77 F.4th at 685; *see also Bradford*, 101 F.4th at 731 ("[T]he 2021 executive order . . . left [the agency] no discretion . . . . Thus, it would have been futile for [the agency] to have considered comments advocating alternatives that it lacked discretion to adopt.").[17]

Plaintiffs' motion for summary judgment as to their APA claim is thus denied, and defendants' cross-motion is granted.

---

[17]     Plaintiffs do not challenge the Proclamation's conferral, in Subsection (1)(c), of discretion to the Secretary of Homeland Security to waive the $100,000 payment requirement upon her determination that the hiring of "any individual alien, all aliens working for a company, or all aliens working in an industry . . . is in the national interest and does not pose a threat to the security or welfare of the United States," Proclamation, § 1(c), 90 Fed. Reg. at 46029, nor the Secretary's current position that such waiver would only be granted in consideration of "a particular alien worker," and not on a company-wide or industry-wide basis, *see* USCIS Guidance; *see also* Motions Hr'g Tr. at 33:9-12 (responding to Court's query about lack of argument about implementation of waiver discretion provided to Secretary in § 1(c), Chamber's counsel explained: "Well, your Honor, I think that would be just a Band-Aid on an otherwise flatly unlawful policy. So we have focused on the fact that the proclamation as a whole is flatly unlawful . . . ."); *id.* at 83:4-10 (Defendants' counsel stating: "[I]t makes sense that plaintiffs didn't focus on the waiver piece . . . because it doesn't harm them that there is a possible waiver. And if that's really the way to . . . backdoor attack the entire proclamation, . . . the President could, frankly, just pass another proclamation and just get rid of the waiver all together."). Plaintiffs also offer no reason to consider whether any discretionary determination by the Secretary to deny a waiver may be subject to APA review. On this point, defendants' counsel suggested that APA review might be available for waiver decisions if some policy or rule, written or unwritten, guided the Secretary's decisions. Motions Hr'g Tr. at 84:20-85:1 ("I think, [as] plaintiff said, like, if these waiver decisions start coming and we think there is a policy or something[,] that that would be a separate claim they can bring, and that does seem like a possible separate claim. Again, like, if there is a policy written or unwritten [informing waiver grants], I think that that could be separately, possibly, challenged."); *id.* at 85:12-15 (defendants' counsel further stating: "[T]he proclamation does tell the agencies to engage in some rulemaking, those rulemaking haven't happened; but if they did, that would separately be challengeable."). While defendants' position is consistent with the reasoning in this case—that APA reviewability depends in part on how much independent decisionmaking an agency employs in carrying out a lawful presidential directive—an argument not pressed by plaintiffs need not be reached. *See Anglers Conserv. Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.10 (D.D.C. 2010) (noting that "an argument not raised in an opening brief is forfeited" (citing *Fox v. Gov't of D.C.*, 794 F.3d 25, 29 30 (D.C. Cir. 2015))).

## IV.    CONCLUSION

Plaintiffs' arguments have some force that the Proclamation's imposition of a $100,000 payment for processing new H-1B visas "would inflict significant harm on American businesses and institutions of higher education, which would be forced to either dramatically increase their labor costs or hire fewer highly skilled employees for whom domestic replacements are not readily available," and that the Proclamation has ignored that "[t]hese harms to American businesses and higher education will also be a boon to America's economic rivals, who will surely welcome the talent no longer able to accept work in the United States."  Compl. ¶¶ 4-5; *see also* Pls.' Mem. at 8-11 ("Years of research confirms that these workers make invaluable contributions to the Nation, boosting productivity, sparking advancements across the domestic economy, creating jobs, and helping to train the next generation of American scientists and innovators.").  Indeed, plaintiffs point out that during the pendency of this litigation, the President has apparently acknowledged a need for high-skilled foreign workers to train domestic workers, saying in an interview that the country does not "have certain talents and people have to learn.  You can't take people off an unemployment line and say, 'I'm going to put you into a factory where we're going to make missiles.'"  Pls.' Reply at 2, 40 n.19 (quoting Brett Samuels, *Trump on H1-B Visas: US Lacks Enough 'Talented People*,' The Hill (Nov. 12, 2025)).

Regardless of the force of plaintiffs' arguments and concerns, however, the relevant analysis focuses on constitutional and statutory *powers*, not economic *policy*.  After all, the "Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of *laissez faire*."  *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting).  Here, Congress has granted the President broad statutory authority, which he has used to issue the Proclamation addressing, in the manner he sees fit, a

problem he perceives to be a matter of economic and national security.  The Proclamation and its implementation are lawful and therefore withstand plaintiffs' challenges as *ultra vires* and violative of the APA.

For the foregoing reasons, plaintiffs' motion for summary judgment is denied,  defendants' cross-motion for summary judgment is granted, and defendants' motion to dismiss is denied as moot.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  December 23, 2025

_____

**BERYL A. HOWELL**
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br><div align="center">Plaintiffs,</div><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br><div align="center">Defendants.</div> | Case No. 1:25-cv-3675-BAH |

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs Chamber of Commerce of the United States of America and Association of American Universities appeal to the United States Court of Appeals for the District of Columbia Circuit from the December 23, 2025, final order denying Plaintiffs' Motion for a Preliminary Injunction or, in the Alternative, Summary Judgment and granting Defendants' Cross-Motion for Summary Judgment (Dkt. No. 53), along with all other orders and decisions that merge therein, including the Court's memorandum opinion (Dkt. No. 54).

Dated:  December 29, 2025

Respectfully submitted,

/s/ *Lindsay C. Harrison*

Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of American Universities*

/s/ *Paul W. Hughes*

Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Grace Wallack (Bar No. 1719385)
Alex Boota (Bar No. 90001014)
Emmett Witkovsky-Eldred (Bar No. 90012725)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*