# ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5473

**In the
United States Court of Appeals for the
District of Columbia Circuit**

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and

ASSOCIATION OF AMERICAN UNIVERSITIES,

Plaintiffs-Appellants,

- v. -

UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,

Defendants-Appellees.

**On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-3675, Hon. Beryl A. Howell**

**BRIEF AMICUS CURIAE OF
CONSUMER TECHNOLOGY ASSOCIATION**

Alan B. Morrison
George Washington University Law School
2000 H Street NW
Washington D. C. 20052
202 994 7120
abmorrison@law.gwu.edu
Counsel for the Amicus Curiae

January 16, 2026

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

**Parties and Amici.** All parties and amici known to amicus are set forth in the brief of the appellants.

**Rulings under Review.** All rulings under review are set forth in the brief of the appellants

**Related Cases.** All related cases are set forth in the brief of the appellants.

> */s/ Alan B. Morrison*
> Alan B. Morrison

# CERTIFICATE OF COUNSEL UNDER D.C. CIRCUIT RULE 32(d)

Counsel for the parties have consented to the filing of this brief. Counsel for the amicus certifies that the brief of the Plaintiffs-Appellants focused on the proper interpretation of the provisions of Title 8, United States Code, at issue on this appeal. This brief presents a different reason for the Court to conclude that Title 8 should not be interpreted to allow the Defendants-Appellees to impose a $100,000 tax on H1B applicants: doing so will enable the Court to avoid deciding the constitutional question of whether Title 8 unconstitutionally delegates to the President the legislative task of imposing a $100,000 tax on H1B visa applications, with no statutory limits and with no judicial review over the President's choice of the amount of the tax.

*/s/ Alan B. Morrison*
Alan B. Morrison

# DISCLOSURE STATEMENT UNDER CIRCUIT RULE 26.1

Amicus Consumer Technology Association (CTA) is a non-profit 501(c)(6) membership organization. It has no parent corporation, and no publicly-held company has a 10% or greater ownership interest in the CTA.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES…..……..i

CERTIFICATE OF COUNSEL UNDER D.C. CIRCUIT RULE 32(d)…..……..…ii

DISCLOSURE STATEMENT UNDER CIRCUIT RULE 26.1….…………..…iii
.
TABLE OF AUTHORITIES…………………………………………….v

IDENTITY AND INTEREST OF THE AMICUS CURIAE..................................1

INTRODUCTION AND SUMMARY OF ARGUMENT......................................1

ARGUMENT..................................................................................................4

    AS CONSTRUED BY THE DISTRICT COURT,
    THE APPLICABLE PROVISIONS OF TITLE 8
    WOULD CONSTITUTE AN UNCONSTITUTIONAL
    DELEGATION OF LEGISLATIVE POWER.

CONCLUSION...............................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*American Power & Light Co. v. SEC*,
   329 U.S. 90 (1946)................................................................................4

*Clinton v. City of New York,* 524 U.S. 417 (1998) ……………………………5

*Federal Communications Commission v. Consumers' Research*,
   145 S. Ct. 2482 (2025)   ………………………………………………….2, 4, 6-10

*Gundy v. United States*,
   588 U.S. 128 (2019)..........................................................................9,10

*INS v. Chadha*,
   462 U.S. 919 (1983)................................................................................7

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928)................................................................................2

*OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dept. of Labor*,
   312 U.S. 126 (1941)................................................................................6

*Robertson v. Seattle Audubon Society*,
   503 U.S. 429 (1992)................................................................................3

*Whitman v. American Trucking Ass'ns*,
   531 U.S. 457 (2001)................................................................................4

*Yakus v. United States,*
   312 U.S. 414 (1944) ..………………………………………………………….9

**Statutes**

8 U.S.C. § 1182(f)  ................................................................................2
8 U.S.C. § 1184(c) ................................................................................2
8 U.S.C. § 1185(a) ................................................................................2
47 U.S.C. § 402....................................................................................6

# IDENTITY AND INTEREST OF THE AMICUS[1]

Amicus curiae Consumer Technology Association (CTA) is a non-profit 501(c)(6) membership organization that represents the U.S. consumer technology industry and produces CES, the world's most influential technology event. Its members include more than 1200 companies, from startups to global brands, supporting more than 18 million American jobs. A number of its members use the H1B program at issue in this case, and if the ruling below is affirmed, they would either have to pay the $100,000 per applicant or lose the advantage of having employees covered by the program. CTA recently filed comments with the defendant Department of Homeland Security on another aspect of the H1B program. https://www.cta.tech/media/qkpd1nxd/cta-comments-to-dhs-on-h-1b-weighted-selection-process.pdf.

# INTRODUCTION & SUMMARY OF ARGUMENT

Amicus agrees fully with plaintiffs that the administration's $100,000 H-1B petition fee is not authorized by Title 8. There is no statutory basis for the imposition

---

[1] This brief is filed with the consent of the parties. No person other than amicus or its counsel authored this brief in whole or in part or contributed money that was intended to support the preparation or submission of this brief.

of a $100,000 tax on employers who seek to bring into this country individuals who qualify for H1B immigrant status. There is not a word in the two statutes cited in the President's Proclamation − 8 U.S.C. § 1182(f) or 8 U.S.C. § 1185(a) − or anywhere else in Title 8, that suggests that Congress ever authorized the President to require any such revenue-generating payments. Indeed, Congress' inclusion of a detailed set of modest fee provisions in 8 U.S.C. §§ 1184(c)(9)-(13), amounting to no more than several thousand dollars, implies precisely the opposite. The requirement to pay $100,000 functions as an "innovation tax" that harms small and midsize firms, pushes advanced work offshore, and undermines U.S. competitiveness. The decision below nonetheless grants the President unchecked power to impose arbitrary taxes on H1B applicants.

There is another reason why this Court should agree with plaintiffs' reading of Title 8: if the Court were to agree with the District Court that Title 8 authorized the President (in his unfettered discretion) to require the payment of $100,000 in order to enter the H1B lottery, that would raise the most serious constitutional problems under the non-delegation doctrine, as most recently enunciated by the Supreme Court in *FCC v. Consumers' Research*, 145 S. Ct. 2482 (2025). In restating the "intelligible principle" test set forth in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928), the Court focused on three separate inquiries: (1) "the degree of agency discretion that is acceptable varies according to the scope of the power

2

congressionally conferred"; (2) whether there are "boundaries [on the] delegated authority"; and (3) whether "Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Consumers' Research* at 2497.

Because there are no boundaries in Title 8 on the imposition of H1B taxes and there are no standards that would enable a court to assure that the boundaries were maintained, the failure of Congress to include any limits would make the statute unconstitutional, even if in fact Congress had authorized the President to impose taxes under Title 8. At the very least, this Court should construe the provisions on which defendants rely not to authorize them to impose this tax in order avoid having to decide the constitutional question. "As between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [a court's] plain duty is to adopt that which will save the act." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992) (brackets and citation omitted).[2]

---

[2] Another example of this administration's attempt to allow wealthy foreigners to buy their way into this country is President Trump's Gold Card Executive Order 14351, 90 Fed, Reg 46031 (September 19, 2025). The Order would enable those who could pay $1 million or more to automatically qualify for immigration preferences under statutes that make no mention of payment, let alone limit any payments to amounts specified in the statute.

3

# ARGUMENT

## AS CONSTRUED BY THE DISTRICT COURT, THE APPLICABLE PROVISIONS OF TITLE 8 WOULD CONSTITUTE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER.

The applicable constitutional nondelegation test is whether the statute at issue contains an "intelligible principle" that guides and limits the President or agency in implementing the statute. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928). The Supreme Court's decision last term in *Consumers' Research* spelled out the three requirements for Congress to satisfy that test, and nothing in Title 8 comes close to satisfying them. Because there is no specific provision within Title 8 that confers on the President or any other officer of the United States the power to impose taxes on H1B visa petitioners, the relevant inquiry is whether Title 8 as a whole meets the intelligible principle test for this tax.

First, quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 475 (2001), the Supreme Court stated in *Consumers' Research* that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred,'" adding that the "'guidance' needed is greater . . . when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue (*e.g.*, the definition of 'country [grain] elevators')." 145 S.

Ct. at 2497. While the tax imposed here is far from universal, its impact on the national economy is far greater than the impact of the definition of a county grain elevator.

Second, "we have generally assessed whether Congress has made clear *both* 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Id.* (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)) (emphasis added). As for the general policy of imposing a tax on H1B applications, the statute fails even that quite open-ended requirement because it does not mention any such tax. More significantly, Title 8 fails the "boundaries" requirement because there are no limits of any kind on this tax. The President chose $100,000, but there is nothing that prevented him from charging $1 million or even $10 or $100 million.

Indeed, under section 1(c) of the President's Proclamation, "if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States," she may exempt "any individual alien, all aliens working for a company, or all aliens working in an industry" meeting those criteria. The "in the national interest" and "no threat to the security or welfare of the United States" language is reminiscent of similar open-ended phrases in the Line-Item Veto Act held unconstitutional as

conferring legislative power on the President in *Clinton v. City of New York,* 524 U.S. 417 (1998) (veto exercisable if the action of the President would "(i) reduce the Federal budget deficit; (ii) not impair any essential Government functions; and (iii) not harm the national interest"). Thus, under defendants' theory of what Title 8 permits, the President could set the tax on H1B applications at any amount he wants, he can exempt any employer he prefers, and presumably he could set the tax at $100,000 for most employers, but at $10,000 for some and $200,000 for others. Perhaps Congress could do that, but the President may not do so on his own.

Third, the *Consumers' Research* Court recognized the importance of judicial review: "we have asked if Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id.* at 2497 (quoting *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dept. of Labor*, 312 U.S. 126, 144 (1941)). All aspects of the FCC program at issue in *Consumers' Research* were fully reviewable under 47 U.S.C. § 402, but there is no provision for judicial review of the legality of any particular H1B tax. Perhaps more significantly, even if there were judicial review of the legality of this $100,000 tax, that task would be impossible for a court to perform because there is no "law," *i.e.*, boundaries or limits, in Title 8 that tell the President either what he must do or what he may not do.

Judicial review is not itself a constitutional requirement under the nondelegation doctrine, but rather a means of assuring that the statutory limits are followed. By conducting judicial review, the courts can satisfy themselves that Congress has adhered to the principle behind the nondelegation doctrine, which is that Article I vests the legislative power in Congress and "that assignment of power to Congress is a bar on its further delegation: Legislative power, we have held, belongs to the legislative branch, and to no other." *Consumers' Research*, 145 S. Ct. at 2496.

In his concurring opinion in *Consumers' Research*, Justice Kavanaugh made the same point about judicial review, quoting from *INS v. Chadha,* 462 U.S. 919, 953-54, n.16 (1983): "'Executive action under legislatively delegated authority . . . is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely.'" *Consumers' Research*, 145 S. Ct at 2513, n.3.

The importance of boundaries and judicial review in *Consumers' Research* was not resisted by the Government. To the contrary, the Government agreed that the intelligible principle doctrine places real limits on the authority that Congress may confer on the executive branch. "[D]istinguishing lawful conferrals of discretion from unlawful delegations requires more than just asking 'in the abstract

7

whether there is an 'intelligible principle.' Congress must delineate both the 'general policy' that the agency must pursue and the 'boundaries of th[e] delegated authority.'" Reply Brief of Federal Petitioners at 3, *FCC v. Consumers' Research*,

The Government was even more specific on the need for statutory limits where the Government is requiring payments from others. In its reply brief in *Consumers' Research,* the Government answered the respondents' charge that the law created "'[u]nbounded' power to levy taxes, subject at most to 'precatory' standards and 'aspirational' principles": "If the Universal Service Fund really worked that way, the government would not defend its constitutionality. *Congress may not vest federal agencies with an unbounded taxing power*." Reply Br. at 1–2 (emphasis added). In response to the challengers' allegation that the FCC statute at issue there was "too 'hazy' or 'contentless,'" the Government replied: "Were these provisions contentless, the government would not defend their constitutionality." *Id.* at 11. This was followed by the Government's detailed refutation of the claim that the statute lacks boundaries, where it pointed to the many specific ways in which the agency's ability to levy assessments was constrained. *Id.* at 12–15.

At oral argument, Government counsel emphasized this point over and over, referring to various provisions in the FCC statute as "a real limit," Transcript of Oral Argument at 7, *FCC v. Consumers' Research*, 145 S. Ct. 2482 (2025) ("*Consumers' Research* Tr."), and asserting that "we are not arguing for a no limits at all approach

8

where you can just raise whatever revenue we feel like . . . there are qualitative limits that are baked into the statutory scheme, not raise whatever amount of money; you know, a trillion dollars." *Id*. at 8. The Acting Solicitor General did not argue that the nondelegation doctrine requires rigid lines because "obviously there is a judgment line on how much discretion is too much, but at a minimum Congress is obviously having to provide parameters that you can tell, yes or no, did the agency transgress the boundaries?" *Id.* at 61.

Perhaps most significant of all, the Government recognized the constitutional significance of judicial review in the nondelegation analysis. After reiterating the importance of statutory guidance to the agency, it stated that "the guidance must be 'sufficiently definite' to permit meaningful judicial review of agency action. *Gundy* [*v. United States*, 588 U.S. 128, 158 (2019)] (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944))." Reply Br. at 4. And in defending the delegation in the FCC statute, the Government emphasized that "Courts have invalidated FCC action that violates those requirements." *Id.* at 13. As Government counsel explained, "one of the most important" parameters to comply with the nondelegation doctrine asks: 'is there sufficiently definite and precise language in the statute to enable Congress, *the courts,* and the public to ascertain whether Congress's rules are followed?'" *Consumers' Research* Tr. at 22 (emphasis added).

The Government has a further hurdle to overcome from *Consumers' Research*: the dissenting opinion written by Justice Gorsuch and joined by Justices Thomas and Alito. *See* 145 S. Ct. at 2519-39. That dissent reprised and amplified Justice Gorsuch's dissent in *Gundy*, which Chief Justice Roberts joined. *Gundy, supra,* 588 U.S. at 149. Those Justices would draw an even firmer line under which a law imposing a tax would violate the nondelegation doctrine unless it "prescribed the tax rate" or "instead opted to cap the total sum the Executive may collect," 145 S. Ct. at 2526, and Title 8 does neither. *See also id.* at 2532 ("Though the Constitution does not require Congress to make every decision, there are some choices that belong to Congress alone—including setting a tax's rate or, at least, capping receipts."). Of course, because Title 8 never mentions taxes, there are no limiting principles whatsoever—let alone caps or even permissible rates—on the sort of tax imposed by the President here. That means Title 8, as (mis)-construed by the district court, poses a far greater nondelegation problem from the perspective of both the majority and dissent in *Consumers' Research*.

## CONCLUSION

For the foregoing reasons, and those set forth in the briefs of the plaintiffs, the judgment below should be reversed, and the District Court directed to enter judgment in favor the plaintiffs on the ground that defendants lack the legal authority to impose a tax of $100,000, or any other amount, as a requirement to petition for an H1B visa.

Respectfully Submitted,

Alan B. Morrison
George Washington University Law School
2000 H Street NW
Washington D.C. 20052
202 994 7120
abmorrison@law.gwu.edu

Counsel for the Amicus Curiae
Consumer Technology Association

January 16, 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2385 words, less than one half of the 13,000 words allowed by FRAP 32(a)(7)(B). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

/s/ Alan B. Morrison
Alan B. Morrison