# United States Court of Appeals for the District of Columbia Circuit

## No. 25-5473

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; ASSOCIATION OF AMERICAN UNIVERSITIES,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF STATE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; MARCO RUBIO, in his official capacity as Secretary of State,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:25-cv-03675-BAH, Honorable Beryl A. Howell, U.S. Senior District Judge.*

## BRIEF OF *AMICUS CURIAE* FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP IN SUPPORT OF PLAINTIFFS-APPELLANTS

*On the Brief:*
  CARL W. HAMPE
  DANIEL P. PIERCE
  NATALIE M. PATE

DANIEL P. PIERCE
FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP
1101 15th Street, N.W., Suite 700
Washington DC 20005
(202) 223-5515
dpierce@fragomen.com

*Counsel for Amicus Curiae*

January 16, 2026

CP COUNSEL PRESS    (800) 4-APPEAL • (389497)

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici**. Except *amicus curiae* Fragomen, Del Rey, Bernsen & Loewy, LLP, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

**Rulings Under Review**. References to the rulings at issue appear in the Brief for Appellants.

**Related Cases**. *Amici* is unaware of any related cases pending before this Court or any other court.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29, and D.C. Circuit Rule 26.1, Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen") submits its corporate disclosure statement:

Fragomen is a private law firm owned solely by individual partners and has no parent company. No publicly held corporation or entity owns any interest in Fragomen.

Fragomen provides legal immigration services including the provision of legal advice and the preparation and filing of petitions and applications with government authorities for corporate client employers on behalf of their job applicants, employees and dependent family members. Fragomen also provides immigration compliance support including analyzing existing work authorization policies and procedures, providing guidance regarding new or ongoing client compliance initiatives, providing briefings on regulatory immigration changes, and providing assistance with the establishment and administration of immigration-related training programs for client managers and employees.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ...................................................................................iv

GLOSSARY OF ABBREVIATIONS ......................................................................vi

STATEMENT OF INTEREST .................................................................................1

ARGUMENT .........................................................................................................1

    I.     THE H-1B VISA IS AMONG THE MOST HEAVILY
            REGULATED VISA TYPES .................................................................4

    II.    THE COMPLEX STATUTORY AND REGULATORY
            FRAMEWORK THAT UNDERPINS THE H-1B VISA
            MUST INFORM THE CONSTRUAL OF THE ENTRY
            BAN AUTHORITY .................................................................................9

    III.   THE PROCLAMATION REGULATES DOMESTIC
            CONDUCT—NOT "ENTRIES"—AND THUS FALLS
            OUTSIDE OF THE AMBIT OF THE PRESIDENT'S
            AUTHORITY .........................................................................................13

CONCLUSION .....................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989).........................................................................................13

*Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*,
140 S.Ct. 1891 (2020)......................................................................................13

*Encino Motorcars, LLC v. Navarro*,
136 S.Ct. 2117 (2016)......................................................................................13

*Gibbons v. Ogden*,
22 U.S. 1 (1824)..................................................................................................5

*Trump v. Hawaii*,
585 U.S. 667 (2018)............................................................................................2

*Watt v. Alaska*,
451 U.S. 259 (1981)........................................................................................13

**Statutes and Other Authorities:**

U.S. Const., art. I § 8, cl. 3 ...............................................................................5

8 U.S.C. § 1101 .................................................................................................2

8 U.S.C. § 1182..................................................................................2, 10, 14

8 U.S.C. § 1182(f)............................................................................2, 13, 15

8 U.S.C. § 1182(n)(1)........................................................................................6

8 U.S.C. § 1182(n)(1)(A)(i)...............................................................................7

8 U.S.C. § 1182(n)(1)(C)(i)...............................................................................7

8 U.S.C. § 1182(n)(2)......................................................................................10

8 U.S.C. § 1182(n)(2)(C)(vi)(II).........................................................................6

8 U.S.C. § 1184(c)(9)(B)....................................................................................6

8 U.S.C. § 1184(c)(12).......................................................................................6

8 U.S.C. § 1184(g)(1)(A)....................................................................................6

8 U.S.C. § 1184(g)(5)(A)....................................................................................6

8 U.S.C. § 1184(g)(5)(B) ........................................................................6

8 U.S.C. § 1356(m) ................................................................................6

8 C.F.R. § 214 .......................................................................................9

8 C.F.R. § 214.2(h)(2)(i)(E) ...................................................................7

20 C.F.R. § 655 Subpart H .....................................................................6

20 C.F.R. § 655.730(d)(1) .......................................................................7

20 C.F.R. § 655.734 ...............................................................................7

20 C.F.R. § 655.810(b) .........................................................................10

20 C.F.R. § 655.810(d) .........................................................................10

Fed. R. App. P. 29(a)(4)(E) ...................................................................1

American Competitiveness and Workforce Improvement Act,
  Pub. L. No. 105-277, 112 Stat. 2681 (1998) ......................................7

American Competitiveness in the Twenty-First Century Act,
  Pub. L. No. 106-313, 114 Stat. 1251 (2000) ......................................8

Dep't of Labor, *US Department of Labor Launches Project Firewall to
  Protect America's Highly Skilled Workforce* (Sept. 19, 2025) .........10

H-1B Visa Reform Act, Pub. L. No. 108-447, 118 Stat. 3353 (2004) .....8

Imm. Act of 1990, Pub. L. No. 101-649, Title II, § 205, 104 Stat. 4978
  (1990) .................................................................................................1

Jason Ma, "White House scrambles to clear up H-1B visa confusion after
  panic throws corporate America into chaos overnight," FORTUNE (Sept.
  20, 2025), https://fortune.com/2025/09/20/h1b-visas-100000-fee-white-
  house-renew-existing-holder-reentry-foreign-travel/ ........................12

Maria Gracia Santillan Linaries, "New $100K Fee For H-1B Visas Causes
  Travel Chaos," FORBES (Sept. 25, 2025), https://www.forbes.com/sites/
  mariagraciasantillanalinares/2025/09/24/new-100k-fee-for-h-1b-visas-
  causes-travel-chaos/ .........................................................................12

Proclamation No. 10973, Restriction on Entry of Certain Nonimmigrant
  Workers, 90 Fed. Reg. 46,027 (Sept. 19, 2025). ...............................2

Registration Requirement for Petitioners Seeking To File H-1B Petitions
  on Behalf of Cap-Subject Aliens, 84 Fed. Reg. 888 (Jan. 31, 2019) ............... 8-9

U.S. Citizenship & Imm. Servs., *H-1B Specialty Occupations*,
   https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-
   occupations ........................................................................................................14

Weighted Selection Process for Registrants and Petitioners Seeking To
   File Cap-Subject H-1B Petitions, 90 Fed. Reg. 60864 (Feb. 27, 2026) ...............9

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **INA** | Immigration and Nationality Act |
| **LCA** | Labor Condition Application |
| **ACWIA** | American Competitiveness and Workforce Improvement Act |
| **AC-21** | American Competitiveness in the Twenty-First Century Act |

*Amici* Fragomen is the world's largest immigration law firm, with immigration professionals throughout the United States and the world. Fragomen helps the full range of U.S. employers navigate the H-1B system across the country, across industries, and across organizational types. Because of that work, Fragomen and its professionals are attuned to the complexities and challenges of the system for employers and foreign talent alike. All appearing parties have consented to the filing of this amicus brief.

## ARGUMENT

Congress created the "H-1B" visa category in 1990 to permit U.S. employers to sponsor foreign professional talent from abroad. *See* Imm. Act of 1990, Pub. L. No. 101-649, Title II, § 205, 104 Stat. 4978, 5019 (1990). Since its creation, the H-1B has undergone numerous legislative and regulatory changes designed explicitly to balance U.S. labor market concerns with the program. Congress and the executive agencies have developed a complex apparatus designed to ensure that U.S. workers are protected, that U.S. employers have access to critical foreign talent, and that the executive can combat misuse of the H-1B visa category.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Fragomen affirms that no counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing of submitting this brief, and no person other than Fragomen or its counsel contributed money that was intended to fund the preparation or submission of this brief.

The instant case concerns the President's recent Proclamation, in which he seeks to impose a new $100,000 fee in the context of certain new H-1B visa requests under his authority to suspend entries as outlined in 8 U.S.C. § 1182(f). *See* Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sept. 19, 2025). The authorities that the President is invoking in the Proclamation are indisputably broad—the Supreme Court found that Congress had "exude[d] deference" to the President with every phrase of that authority. *Trump v. Hawaii,* 585 U.S. 667, 684 (2018). And indeed, that broad authority has been used to protect critical foreign policy and national security concerns by presidents throughout the decades since its enactment.

But the broad entry ban authority that Congress granted the President comes with important limitations recognized in *Hawaii* itself—that the President should not be allowed to *contradict* other provisions that Congress has set forth. *Id.* at 689 ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA."). The Proclamation here runs afoul of this limitation, such that the Proclamation should be set aside as violating the text of § 1182 and the structure of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and independently of the more complex constitutional concerns raised by the parties. Congress did not and could not have intended for the entry

ban authority to upset the careful balancing that Congress and the agencies—acting under congressional authority—have done in this space.

H-1Bs are among the most highly regulated areas of immigration law and have been a subject of regulatory and statutory changes for decades, aimed at the important concerns that the President has identified—including the need to ensure that H-1B visas are used without sacrificing the interests of U.S. workers. Congress has capped the visas to control the flow of this labor, has set various fees that employers must absorb, has dictated methods to ensure employers are not undercutting domestic wages, and has otherwise provided a robust intra-agency regulatory framework for governing the use of these visas. Congress has also provided the President with a full set of tools to combat misuse of the H-1B category, including investigations of employers alleged to have violated the rules and significant sanctions against those determined to have done so. The Proclamation speaks to the same underlying issues but effectively overwrites Congress's careful scheme and the extensive regulatory framework for H-1Bs.

The President's preferred reading of the relevant authority here would allow him to upset a carefully balanced legislative and regulatory scheme. There is no evidence that Congress believed that the Executive could unilaterally overrule its decisionmaking in the domestic economic sphere under the entry ban authority. We explain herein the complex H-1B framework that Congress has promulgated

and why—as a matter of the INA's structure and notwithstanding constitutional or other considerations—the District Court erred below.

And while the Proclamation is framed as a restriction on "entry," the government's own implementing guidance confirms that it operates instead as a new fee imposed at the petition stage and borne by U.S. employers. Under that guidance, the $100,000 charge is assessed when an employer files an H-1B petition with the Department of Homeland Security, alongside the other congressionally authorized filing fees that apply to such petitions. It has no application at a port of entry, at a visa interview, or at the point Congress identified as most critical to protecting U.S. workers—the filing and certification of a Labor Condition Application. Thus, in operation, the Proclamation regulates domestic employer conduct within the United States, not the entry of noncitizens at the border.

The President's aims here, including protections for U.S. workers and insuring against H-1B misuse, are indisputably important. But equally important is cabining the broad authorities under the INA to their proper place, lest future presidents be allowed to restructure existing visa types notwithstanding Congress or the typical agency functions.

## I.   THE H-1B VISA IS AMONG THE MOST HEAVILY REGULATED VISA TYPES.

The lower court opinion failed to consider important aspects of the INA's structure. Since promulgation of the H-1B visa category decades ago, Congress

and the executive agencies have fashioned and refashioned a multi-agency, multi-step approach for employers who seek H-1B visas. While that process often *ends* with entry of a worker, the proclamation's $100,000 fee operates not at the entry step but instead upstream and as to employers who must bear the fees and who never make any "entry" that would trigger the President's authority. In short, the Proclamation seeks to regulate and restructure domestic economic conduct—a power our Constitution allocates to Congress. U.S. Const., art. I § 8, cl. 3; *Gibbons v. Ogden*, 22 U.S. 1 (1824) ("The power to regulate commerce is general, and has no limitations but such as are prescribed in the constitution itself.").

The process for obtaining H-1B visas runs through three different agencies—the Department of Labor, the Department of Homeland Security, and the State Department. Until the final stages of the process, the employer must make filings, pay fees, and otherwise deal with the government. In the following figure we have outlined the multi-step process:

## H-1B Process for Employers Subject to H-1B Cap



**1** Employer Files Electronic Registration for a Potential Employee to Enter Lottery Selection with

U.S. Citizenship and Immigration Services (USCIS)

Fee $215

**2** Employer Completes Labor Condition Application (LCA) Filing, prevailing wage attestation, and certification with the Department of Labor

**3** Employer Submits Petition and Applicable Fees to USCIS

Fees Range $2,580-6,880*

*Fee Breakdown:
- Filing Fee: $780 paper/$730 online
- Asylum Program Fee: $600
- ACWIA Fee: $1,500 or $750 (depending on number of employees)
- Fraud Prevention and Detection Fee: $500
- H-1B Dependent Employers Charge (more than 50 percent in H-1B, L-1A/B status): $4,000

**4** Prospective H-1B Beneficiary Completes Visa Application and Consular Interview with the Department of State

Machine Readable Visa (MRV) Fee $205

**5** Beneficiary Travels to the United States and Seeks Entry with

U.S. Customs and Border Protection

☑ H-1B status begins when the person enters the United States after being admitted by CBP at a port of entry.

At each step of that process, Congress and the agencies have put into place protections for U.S. workers and safeguards against abuse of the H-1B system. Congress has placed an annual cap that limits the volume of foreign workers that companies can sponsor.[2] 8 U.S.C. § 1184(g)(1)(A). Congress has dictated that employers pay all related H-1B fees. *Id.* § 1182(n)(2)(C)(vi)(II). Congress has imposed fees specifically aimed at safeguarding against fraud, *id.* § 1184(c)(12) (establishing the Fraud Prevention and Detection Fee), and training U.S. workers, *id.* § 1184(c)(9)(B) (establishing the American Competitiveness and Workforce Improvement Act Fee). Every fee has either been set by Congress itself, or a federal agency according to a specific legislative mandate that the fees be calibrated to the costs of administering the program. *See id.* § 1356(m).

Congress also dictated that H-1B wages and working conditions not undercut those of U.S. workers through the Department of Labor's Labor Condition Application, or "LCA," process. An employer intending to hire an H-1B worker must first file an LCA with the agency, in which the employer agrees to provide certain wages, as well as benefits and working conditions, such that the proposed employment will not adversely affect U.S. workers. *See generally* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655 Subpart H. Specifically, the employer

---

[2] Only certain employers are not subject to the annual H-1B visa cap: higher-educational institutions and related nonprofits and nonprofit or governmental research organizations. *See* 8 U.S.C. § 1184(g)(5)(A)–(B).

provides information about the occupation and lists the wage it will pay. This wage must be equal to or higher than the average wage for the occupation in that area based on Department of Labor data, called the "prevailing wage," and must also be equal to or higher than what the employer pays other workers in that occupation. *See* 8 U.S.C. § 1182(n)(1)(A)(i); 20 C.F.R. § 655.730(d)(1). The employer must also notify similarly situated workers of the potential H-1B employment and how to file complaints if they believe any program violations or misrepresentations occur. *See* 8 U.S.C. § 1182(n)(1)(C)(i); 20 C.F.R. § 655.734. If certified, the employer includes the LCA in the H-1B petition or visa application. The certified LCA then serves as a series of enforceable promises about the terms and conditions under which the employer will employ the H-1B worker. A change in the nature of the employment (*e.g.,* location, wage, employer, position) may require the employer to file a new LCA and petition. *See* 8 C.F.R. § 214.2(h)(2)(i)(E).

Congress has remained active in the H-1B space to ensure that it strikes the right balance between relevant interests. In the past few decades, Congress has made numerous major legislative changes, including:

- The American Competitiveness and Workforce Improvement Act ("ACWIA"), Pub. L. No. 105-277, 112 Stat. 2681 (1998), introduced new requirements regarding worker benefits and recruitment, strengthened wage protections and enforcement mechanisms, and

increased filing fees, including a new fee aimed at preparing more Americans for high-skill jobs, reducing the need to recruit professionals from abroad.

- The American Competitiveness in the Twenty-First Century Act ("AC-21"), Pub. L. No. 106-313, 114 Stat. 1251 (2000), was aimed at addressing issues with green card backlogs, including temporarily raising the annual cap to 195,000 visas and improving H-1B worker flexibility to change employers.

- The H-1B Visa Reform Act, Pub. L. No. 108-447, 118 Stat. 3353 (2004),[3] reinstated additional requirements for employers who rely on higher percentages of H-1B workers and "willful violators" of H-1B program rules, introduced a new anti-fraud fee, expanded the Department of Labor's investigative authority, and lowered the annual cap back to 65,000 while introducing a cap-exempt category for 20,000 individuals with U.S. master's degrees.

The executive agencies have also been active in the H-1B space. Most notably in the recent past, the agencies have deployed changes to the H-1B lottery to establish and makes changs to a preliminary "registration" system with attendant fees. *See, e.g., Registration Requirement for Petitioners Seeking To File H-1B*

---

[3] Part of the Consolidated Appropriations Act of 2005.

*Petitions on Behalf of Cap-Subject Aliens,* 84 Fed. Reg. 888 (Jan. 31, 2019) (codified at 8 C.F.R. § 214); *Weighted Selection Process for Registrants and Petitioners Seeking To File Cap-Subject H-1B Petitions*, 90 Fed. Reg. 60864 (Feb. 27, 2026) (to be codified at 8 C.F.R. § 214).

The Proclamation and the concerns expressed therein thus are set not against a blank canvas but in a policymaking area that has been active from both the legislative and executive sides. The problems identified in the Proclamation concerning U.S. workers and striking the right economic balance in this area have been under active consideration by policymakers using traditional legislative and regulatory tools. Congress has, in effect, regulated the H-1B labor market as it sees fit, and has empowered the executive agencies to promulgate their own regulations through traditional notice-and-comment rulemaking processes.

## II. THE COMPLEX STATUTORY AND REGULATORY FRAMEWORK THAT UNDERPINS THE H-1B VISA MUST INFORM THE CONSTRUAL OF THE ENTRY BAN AUTHORITY.

The District Court concluded that the Proclamation was a lawful exercise of the President's entry ban authority but failed to grapple with the structural issues caused by that reading of the INA. In the District Court's view, the $100,000 fee was appropriately supplemental of the existing framework. But in an area where Congress and the agencies have set total fees at approximately $4,000 on average,

a "supplemental" fee of more than 25 times that acts to rebalance the costs and benefits of the visa and alter the behavior of U.S. employers that use those visas.

The District Court made no mention *at all* of the various tools that Congress provided separate from § 1182 to address the concerns in the Proclamation. Under the rubric that Congress has developed, however, the President through his agencies already has ways of remedying violations. The Department of Labor has broad enforcement authority to investigate allegations that an employer violated the H-1B program rules, such as those regarding wages, working conditions, displacement, and recordkeeping. *See generally* 8 U.S.C. § 1182(n)(2). Violations come with significant civil monetary penalties, ranging from $2,364 to $67,367 for *each* violation, depending on the type of violation. *See* 20 C.F.R. § 655.810(b). The agency can also debar an employer entirely from using the immigration programs for a period of one to three years. *See id.* § 810(d). Indeed, the agency's recent Project Firewall initiative, which invokes previously unused authority to investigate H-1B employers even in the absence of a triggering complaint, aims to increase and enhance these investigations to further protect U.S. workers. *See* Dep't of Labor, *US Department of Labor Launches Project Firewall to Protect America's Highly Skilled Workforce* (Sept. 19, 2025).[4] Rather than imposing

---

[4] *Available at* https://www.dol.gov/newsroom/releases/osec/osec20250919.

prohibitive fees on all employers, Congress provided the executive branch power to levy substantial sanctions against those that violate the rules it set.

All of this is not to say that Congress and the agencies have weeded out all abuse or adverse effects to U.S. workers. Presumably, that conversation will continue, albeit through traditional policymaking that involves advance notice to the regulated public. But Congress has provided every tool to ensure that H-1B workers are paid the same or greater wage as any U.S. worker, and H-1B workers on average cost more in terms of employer resources than similarly situated U.S. workers given the complex web of government and legal fees that employers incur and the wage protections involved.

The District Court erred by refusing to take the broader context into account when determining what Congress meant in granting the President entry ban authority. Congress clearly did not "exude deference" to the President to upend the rules of the H-1B visa program that it carefully crafted. But in the District Court's view, a provision that does not even mention the H-1B visa can be used to overwrite all its provisions. The President need not investigate alleged misuse of the program under his investigatory authority—he can raise fees so high as to bypass the issue entirely. The President need not set fees that are aimed at processing costs or deterring fraud, as Congress has required—he can impose a one-time fee that dwarfs those considerations.

Congress has reset the cap on annual H-1B visa issuance across time. In AC-21, Congress temporarily lifted the cap to 195,000 H-1Bs per year—up from the 65,000 ceiling in place since 1990. After a few years, Congress set the number back to 65,000 but included another 20,000 H-1Bs available only to U.S. advanced-degree holders. Would Congress have thought that the President could set a cap that differed from that laid out in the statute—perhaps 25,000—under the auspices of his entry authority? Congress intended that the entry ban authority be used for purposes other than second-guessing legislative decisionmaking.

The President's entry ban authority can surely be used to protect the homeland against terrorists, war outbreaks, or other emergent needs that Congress could not easily foresee. But use of an authority that can be imposed on an immediate basis[5] and without any oversight from courts simply cannot be what Congress intended. However laudable the goal to protecting U.S. workers, the imposition of policy by executive fiat *in an area where Congress has spoken* does not respect Congress's wishes and does not give effect to the statute as a whole

---

[5] The Proclamation caused significant confusion and uncertainty for employers that use the H-1B program and for H-1B visaholders. Maria Gracia Santillan Linaries, "New $100K Fee For H-1B Visas Causes Travel Chaos," FORBES (Sept. 25, 2025), https://www.forbes.com/sites/mariagraciasantillanalinares/2025/09/24/new-100k-fee-for-h-1b-visas-causes-travel-chaos/; Jason Ma, "White House scrambles to clear up H-1B visa confusion after panic throws corporate America into chaos overnight," FORTUNE (Sept. 20, 2025), https://fortune.com/2025/09/20/h1b-visas-100000-fee-white-house-renew-existing-holder-reentry-foreign-travel/.

here.[6] *See Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose."); *Davis v. Mich. Dep't of Treasury,* 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

## III.  THE PROCLAMATION REGULATES DOMESTIC CONDUCT— NOT "ENTRIES"—AND THUS FALLS OUTSIDE OF THE AMBIT OF THE PRESIDENT'S AUTHORITY.

The District Court further erred by concluding that the Proclamation regulates "entry" of aliens when in fact it regulates domestic economic conduct and thus falls outside of § 1182(f). Again, this error stems from the District Court's failure to understand the complexity of the H-1B process.

As outlined above, the procedure for hiring an H-1B worker is a lengthy one, with registrations for the H-1B lottery beginning early in the year for visas that become available on October 1. Each part of that process—other than the final one—occurs within the United States and is driven by the employer, not the employee. Employers must register putative H-1Bs into the lottery; employers

---

[6] We also note the substantial reliance interests that many U.S. employers have developed through continued use of the H-1B program to recruit highly skilled foreign talent, and that this Proclamation failed to consider. *See Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S.Ct. 1891, 1913 (2020) ("When an agency changes course, as DHS did here, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" (quoting *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2126, (2016))).

must file the petition to secure the H-1B; and employers must work to determine wage levels and make attestations to the Department of Labor. Crucially, all of these steps—including payment of the new fee—occur separately from and well before any "entry" of the H-1B professional. Indeed, under the government's own guidance, the $100,000 fee, like all other H-1B fees, must be borne by the employer and is due at the time of filing. *See* U.S. Citizenship & Imm. Servs., *H-1B Specialty Occupations*, https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (last visited Jan. 15, 2026) ("[P]etitioners must submit proof that the payment has been scheduled from pay.gov or evidence of an exception from the $100,000 payment from the Secretary of Homeland Security *at the time of filing the H-1B petition.*") (emphasis added).

Any "entry" that can be made using an H-1B visa occurs not until the final step in the chain when the employer's petition has been approved and when the individual presents first to the State Department and then to border officials. The employer—who bears the burden of paying the fees here—never makes an "entry," which is reserved to individuals. *See generally* 8 U.S.C. § 1182 (referring to the entry of "aliens" or "classes of aliens" for purposes of determining admissibility).

## CONCLUSION

The President has expressed critiques of the current H-1B program and its alleged misuse. But the District Court's ruling would set a dangerous precedent and

allow the next president to override Congress's will with impunity so long as he ties his preferred policy back, however tenuously, to "entry" and cites § 1182(f). And the imposition of policy by executive fiat protects none of the important stability and predictability interests that the law provides.

The Court simply should not countenance this move as a pure structural matter, since Congress could not have intended for the President to *overrule* its policy decisions in a highly regulated area. No president for 75 years has believed that he could use the entry ban authority to impose fees or rewrite a visa category that Congress created. The Court need not resort to sweeping constitutional principles to reach that conclusion—it can do so from reading § 1182(f) in its broader context. The District Court's ruling should be overturned.

Respectfully submitted,

*/s/ Daniel P. Pierce*
Carl W. Hampe (DC Bar # 440475
Daniel P. Pierce (DC Bar #208991)
Natalie M. Pate (DC Bar # 1779549)
FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP
1101 15th St. NW, Suite 700
Washington, DC 20005
P: (202) 223-5515
F: (202) 371-2898
champe@fragomen.com
dpierce@fragomen.com
npate@fragomen.com

**CERTIFICATE OF COMPLIANCE**

This amicus curiae brief complies with the world limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,394 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typeface style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

## CERTIFICATE OF SERVICE

I hereby certify, pursuant Federal Rule of Appellate Procedure 25(c) and D.C. Circuit Rule 25(c), that on January 16, 2026, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated:  January 16, 2026

*/s/ Daniel P. Pierce*
Daniel P. Pierce