# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and
ASSOCIATION OF AMERICAN UNIVERSITIES,
*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Defendants-Appellees.*

On Appeal From the United States District Court for the District of Columbia,
No. 25-cv-3675 (District Judge Beryl A. Howell)

**BRIEF FOR AMERICAN ASSOCIATION OF INTERNATIONAL HEALTHCARE RECRUITMENT AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Andrew D. Prins
Jonathan L. Williams
Cherish A. Drain
Dorothy M. Canevari*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
andrew.prins@lw.com

*Admitted to practice in New York only. All work supervised by a member of the D.C. Bar.

*Counsel for* Amicus Curiae
*American Association of
International Healthcare
Recruitment*

January 16, 2026

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies the following:

## A.  Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in Plaintiffs-Appellants' Opening Brief:

- American Association of International Healthcare Recruitment.

## B.  Ruling Under Review

Reference to the ruling at issue appears in Plaintiffs-Appellants' Opening Brief.

## C.  Related Cases

As also stated in Plaintiffs-Appellants' Opening Brief, counsel is aware of no related cases pending in this Court.

*/s/ Andrew D. Prins*

Andrew D. Prins
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
andrew.prins@lw.com

**CORPORATE DISCLOSURE STATEMENT**

Under Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, *amicus curiae* American Association of International Healthcare Recruitment ("AAIHR") submits the following corporate disclosure statement:

AAIHR is a not-for-profit 501(c)(6) organization that represents the mutual interests of U.S.-based organizations that recruit international healthcare professionals to fill critical staffing needs, and to promote legal, ethical, socially responsible, and professional practices for international healthcare recruitment. AAIHR member organizations recruit, screen, train, test, credential, sponsor, relocate, resettle, and employ a variety of healthcare professionals including Registered Nurses, Physical Therapists, Occupational Therapists, Speech Language Pathologists, and Medical Technologists for U.S. employment. AAIHR's members rely on the H-1B visa program to attract highly qualified professionals in these fields to fill critical U.S. healthcare shortages and work in communities underserved by the U.S. healthcare workforce.

AAIHR is a non-profit "trade association" under D.C. Circuit Rule 26.1(b). AAIHR has no parent corporation, and no publicly traded company owns any interest in it.

*/s/ Andrew D. Prins*

Andrew D. Prins
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
andrew.prins@lw.com

**RULE 29 CERTIFICATE**

All parties have consented to the filing of this *amicus curiae* brief.

This brief was not authored in whole or in part by a party or its counsel. No party or party's counsel contributed money intended to fund the preparation or filing of this brief; and no person other than *amicus curiae* and its members contributed money intended to fund the preparation or submission of this brief.

Pursuant to Circuit Rule 29(d), *amicus* certifies that a separate brief is necessary to provide the perspective of AAIHR, whose members are directly impacted by the decision under review. As explained in the Interests of *Amicus Curiae* section, AAIHR has extensive and unique knowledge on the use of the H-1B visa program to fill critical needs in the healthcare industry, particularly the shortage of nurses that harms the availability of quality healthcare for Americans nationwide.

*/s/ Andrew D. Prins*
Andrew D. Prins
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
andrew.prins@lw.com

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ........................................................................................ i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

RULE 29 CERTIFICATE .................................................................... iv

TABLE OF AUTHORITIES .................................................................. vi

INTEREST OF *AMICUS CURIAE* ........................................................1

STATUTES AND REGULATIONS .........................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT .........................3

ARGUMENT ........................................................................................5

I.    The H-1B Visa Program Is An Important Tool To Meet
Americans' Unmet Healthcare Needs ............................................5

    A.    International Nurses Are A Key Part Of Addressing
America's Dire Nursing Shortage .........................................6

    B.    The Proclamation Will Effectively End H-1B Visas for
Nurses While Harming American Nurses ...........................14

II.    The Proclamation Improperly Rejects Congress's Choices About
How to Balance The Same Interests That Underlie The
Proclamation ................................................................................16

CONCLUSION .................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*City & County of San Francisco v. EPA*,
    604 U.S. 334 (2025).................................................................17

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)............................................................5, 17

*Nixon v. Missouri Mun. League*,
    541 U.S. 125 (2004).................................................................17

*Small v. United States*,
    544 U.S. 385 (2005).................................................................17

*Trump v. Hawaii*,
    585 U.S. 667 (2018).................................................................24

## STATUTES AND REGULATIONS

8 U.S.C. § 1101(a)(15)(H)(i)(b)..................................................18

8 U.S.C. § 1182(a)(5)(A)(i) ...................................................6, 18

8 U.S.C. § 1182(f)...............................................................4, 24

8 U.S.C. § 1182(n)(1)(A)(i)........................................................20

8 U.S.C. § 1182(n)(1)(E) ..........................................................19

8 U.S.C. § 1182(n)(1)(G)(i) .......................................................19

8 U.S.C. § 1182(n)(2)(G) ..........................................................23

8 U.S.C. § 1182(n)(2)(G)(i) .......................................................23

8 U.S.C. § 1182(n)(3)(A) ..........................................................19

8 U.S.C. § 1182(n)(3)(A)(iii).....................................................19

8 U.S.C. § 1182(p)(3)-(4)..........................................................22

8 U.S.C. § 1184....................................................................23

8 U.S.C. § 1184(c)(12).............................................................23

8 U.S.C. § 1184(i)(1) ....................................................................18

8 U.S.C. § 1381 ..........................................................................23

29 U.S.C. § 2916a .......................................................................23

29 U.S.C. § 3224a .......................................................................23

Pub. L. No. 108-447, 118 Stat. 2809 (Dec. 8, 2004). ...........21, 22, 23, 24

20 C.F.R. § 655.731(a)..................................................................20

20 C.F.R. § 656.5 ..................................................................7, 16, 18

20 C.F.R. § 656.40(b)(2)................................................................20

## OTHER AUTHORITIES

30 Fed. Reg. 14494 (Nov. 19, 1965) ...............................................7

90 Fed. Reg. 46027 (Sept. 19, 2025) ................................1, 18, 19, 21

Sety Abooali, Va. State Off. of Rural Health, *The Nursing Shortage and Its Consequences in Rural Virginia* (Nov.-Dec. 2022), https://www.vdh.virginia.gov/content/uploads/sites/76/2022/12/Policy-Brief-The-Nursing-Shortage-and-its-Consequences-in-Rural-Virginia-final.pdf ....................................................8

Am. Ass'n of Colls. of Nursing, *New Data Show Enrollment Declines in Schools of Nursing, Raising Concerns About the Nation's Nursing Workforce* (May 2, 2023), https://www.aacnnursing.org/news-data/all-news/new-data-show-enrollment-declines-in-schools-of-nursing-raising-concerns-about-the-nations-nursing-workforce.........................9

Am. Hosp. Ass'n, *2025 Health Care Workforce Scan* (2024), https://www.aha.org/system/files/media/file/2024/11/2025-Health-Care-Workforce-Scan.pdf....................................................13

Annette M. Bourgault, *The Preceptor Shortage: Seeking Solutions*, CriticalCareNurse (June 2025), https://aacnjournals.org/ccnonline/article/45/3/6/32741/The-Preceptor-Shortage-Seeking-Solutions ..........................................................9

Diana Bowser, et al., *Nurse workforce change and metropolitan medically underserved Areas in the United States*, 25 BMC Health Serv. Res. (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11734408/ ...................................................................................................9

Zoe Caplan, U.S. Census Bureau, *U.S. Older Population Grew from 2010 to 2020 at Fastest Rate Since 1880 to 1890* (May 25, 2023), https://www.census.gov/library/stories/2023/05/2020-census-united-states-older-population-grew.html ...........................................................7

Andrew Cass, *41 Hospitals Closing Departments or Ending Services*, Becker's Hospital Review (Dec. 31, 2025), https://www.beckershospitalreview.com/finance/10-hospitals-closing-departments-or-ending-services-8/ .......................................................10

Center for Healthcare Quality & Payment Reform, *Stopping the Loss of Rural Maternity Care* (Dec. 2025), https://ruralhospitals.chqpr.org/downloads/Rural_Maternity_Care_Crisis.pdf ...............................................................................................11

Consular Affs., U.S. Dep't of State, *Visa Bulletin for February 2026* (Feb. 202 6), https://travel.state.gov/content/dam/visas/Bulletins/visabulletin_February2026.pdf ..............................................................6

Examining the Importance of the H-1B Visa to the American Economy: Hearing before the S. Comm. on the Judiciary, 108th Cong. (Sept. 16, 2003) ..................................................................21, 22

Peter Griffiths et al., *Nursing Team Composition and Mortality Following Acute Hospital Admission*, JAMA Network Open (Aug. 19, 2024), https://doi.org/10.1001/jamanetworkopen.2024.28769 ...................12

Lisa M. Haddad et al., *Nursing Shortage*, StatPearls Publ'g (Feb. 13, 2023), https://www.ncbi.nlm.nih.gov/books/NBK493175...................................9

Amy Harding, *Building a Sustainable Rural Health Workforce for the 21st Century*, Advocs. for Human Potential, Inc., In Partnership with Nat'l Rural Health Res. Ctr. (May 2024), https://www.ruralcenter.org/sites/default/files/2024-09/Building%20a%20Sustainable%20Rural%20Health%20Workforce%20FINAL%20DRAFT.pdf...............................................................8

Health Res. & Servs. Admin., *2022 National Sample Survey of Registered Nurses Snapshot* (Mar. 2024), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/Nurse-Survey-Fact-Sheet-2024.pdf ..................................................10

Makinizi Hoover et al., *Data Deep Dive: A National Nursing Crisis*, U.S. Chamber of Com. (Jan. 29, 2024), https://www.uschamber.com/workforce/nursing-workforce-data-center-a-national-nursing-crisis ...........................................................................8

Alexander T. Janke et al., *Hospital 'Boarding' Of Patients In The Emergency Department Increasingly Common, 2017-24*, Health Affs. (June 2025), https://doi.org/10.1377/hlthaff.2024.01513........................12

Karen B. Lasater et al., *Is Hospital Nurse Staffing Legislation in the Public's Interest? An Observational Study in New York State*, 59 Med. Care 444, 444 (May 2021), https://doi.org/10.1097/MLR.0000000000001519..............................................................12, 13

Nat'l Ctr. for Health Workforce Analysis, Health Res. & Servs. Admin., *Nurse Workforce Projections, 2023-2038* (Dec. 2025), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/nursing-projections-factsheet.pdf ......................7, 8, 14

Elizabeth K. Ottman, *It's Time to Open up the L-1B: How the Emergence of Open Source Technology Will Impact the L-1B Visa Program*, 66 Cath. U. L. Rev. 907 (2017)........................................22

Anil Rupasingha & Julia Cho, *146 rural hospitals closed or stopped providing inpatient services from 2005 to 2023 in the United States*, Econ. Rsch. Serv., U.S. Dep't of Agric. (Feb. 18, 2025), https://ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=110927 .......................................................................10

Testimony of Stephen Yale-Loehr, Adjunct Professor of Law, Cornell Law School, Before the Subcomm. on Immigr. & Border Sec. of the S. Comm. on the Judiciary Regarding the L-1 Visa Program and American Interests in the 21st Century Global Economy (July 29, 2003), https://www.judiciary.senate.gov/imo/media/doc/yale-loehr_testimony_07_29_03.pdf................................................21

Testimony of Stephen Yale-Loher Adjunct Professor of Law, Cornell Law School, Before the S. Comm. of the Judiciary on Examining the Importance of the H-1B Visa to the American Economy (Sept. 16, 2003), https://www.judiciary.senate.gov/imo/media/doc/yale-loehr_testimony_09_16_03.pdf ..............................................................21

U.S. Bureau of Lab. Stats., Dep't of Lab., *Occupational Outlook Handbook: Registered Nurses* (Aug. 28, 2025), https://www.bls.gov/ooh/healthcare/registered-nurses.htm ..............................14

U.S. Bureau of Lab. Stats., U.S. Dep't of Lab., *Occupational Outlook Handbook: Registered Nurses* (Aug. 28, 2025), https://www.bls.gov/ooh/healthcare/registered-nurses.htm#tab-6 ......................7

U.S. Dep't of Lab., *Performance Data*, https://www.dol.gov/agencies/eta/foreign-labor/performance (last visited Jan. 15, 2026 ........................................................................6

U.S. Gov't Accountability Off., GAO-03-883, Report to the Ranking Minority Member, Subcomm. on Env't, Tech. & Sci., *H-1B Foreign Workers: Better Tracking Needed to Help Determine H-1B Program's Effects on U.S. Workforce* (Sept. 2003) ......................................22

U.S. Gov't Accountability Off., *Why are Urban Hospitals Closing and What Happens After They Do? WatchBlog: Following the Federal Dollar* (Sept. 24, 2025), https://www.gao.gov/blog/why-are-urban-hospitals-closing-and-what-happens-after-they-do ..........................10

Brian Weichelt et al., *Rural Workforce Recruitment and Retention Factors*, Nat'l Rural Health Ass'n (Mar. 2025), https://www.ruralhealth.us/nationalruralhealth/media/documents/advocacy/nrha-policy-brief-workforce-retention-factors-final-3-7-25.pdf ........................................................................................8

Arielle Zionts & Phillip Reese, *Rural Health Care Providers Could Be Collateral Damage From $100K Trump Visa Fee*, KFF Health News (Dec. 9, 2025), https://kffhealthnews.org/news/article/h1b-visa-fee-rural-hospitals-foreign-worker-shortages-north-dakota/. .....................14

Arielle Zionts, *Rural Patients Face Tough Choices When Their Hospitals Stop Delivering Babies*, KFF Health News (May 19, 2025), https://kffhealthnews.org/news/article/rural-patients-hospitals-maternity-maternal-birthing-childbirth-distance-access/......................11

# GLOSSARY

AAIHR                    American Association of International Healthcare
                         Recruitment

**INTEREST OF *AMICUS CURIAE***

*Amicus curiae* American Association of International Healthcare Recruitment ("AAIHR") is an association that represents the mutual interests of U.S.-based organizations that participate in the recruitment of international healthcare professionals to fill critical staffing needs, and to promote legal, ethical, socially responsible, and professional practices for international healthcare recruitment. AAIHR member organizations recruit, screen, train, test, credential, sponsor, relocate, resettle, and employ a variety of healthcare professionals including Registered Nurses, Physical Therapists, Occupational Therapists, Speech Language Pathologists, and Medical Technologists for U.S. employment. AAIHR's members rely on the H-1B program to attract highly qualified, international healthcare professionals in these fields to fill critical U.S. healthcare shortages and work in communities underserved by the U.S. healthcare workforce. The members of AAIHR are thus directly impacted by Proclamation 10973. *See* 90 Fed. Reg. 46027 (Sept. 24, 2025).

AAIHR's members share a commitment to alleviating the chronic and growing United States healthcare worker shortages, particularly in rural and other underserved communities. They believe that the H-1B program should operate within the framework set by Congress, without upheavals that undermine its legal foundation and effectiveness in addressing healthcare staffing needs.

**STATUTES AND REGULATIONS**

The relevant statutes and regulations are reproduced in Plaintiffs-Appellants'

Opening Brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

AAIHR and its members support responsible use of the H-1B visa program and agree that it is important that the program be designed to protect American interests and limit abuse of the system. But if allowed to stand, the Proclamation's $100,000 fee will cause significant adverse impacts to the U.S. healthcare system. Put simply, our healthcare system and the patients that depend on it rely on highly qualified international nurses and other healthcare professionals because there are not enough similarly qualified professionals currently available domestically to provide the care that we need.

AAIHR's members are healthcare staffing companies whose nurses and other healthcare professionals provide urgently needed staffing to healthcare providers throughout the United States. AAIHR's members exist because our Nation's longstanding and dire shortage of healthcare professionals prevents even the largest and most sophisticated healthcare providers from hiring the number of healthcare professionals needed to care for patients. Take registered nurses—a profession that has long experienced a severe shortage of qualified workers. There are hundreds of thousands more nursing positions in the United States than there are nurses to fill them. As a result, AAIHR's members, like healthcare providers generally, simply cannot hire enough U.S. nurses to meet patient needs. Because staffing companies and healthcare providers cannot afford the $100,000 fee for qualified H-1B nurses,

3

the fee will deprive patients of the care they need.  This will harm U.S. nurses, as well, for whom chronic staffing shortages have led to excessive overtime, burnout, and clinical errors, contributing to an exodus from the profession.

Not only does the $100,000 fee threaten to undermine U.S. healthcare, but it violates the Immigration and Nationality Act ("INA").  Through the INA, Congress has already decided how to balance the need for temporary international labor with the interests of U.S. workers and the potential for abuse of the system—the same policy concerns invoked to support the new $100,000 fee.  By allowing employment-based visas only when there is a shortage of qualified workers, Congress ensured that international labor would not replace U.S. workers.  By requiring employers to pay prevailing wages through a process administered by the Department of Labor, Congress acted to protect U.S. workers' wages.  And by providing a mandate to pursue employer violations of immigration laws and funds for investigations, Congress ensured that the Executive could combat immigration fraud and abuse where it exists through lawful, statutory means.

While the President's authority under 8 U.S.C. § 1182(f) is undoubtedly broad, there is no indication that Congress intended that authority to allow the President to bypass Congress simply because he disagrees about the wisdom of the H-1B program's design.  Construing Section 1182(f) to uphold the Proclamation

would disregard the broader context of the INA and cannot be the "best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373 (2024).

Solving the nation's long-term healthcare workforce shortage is an important issue that demands attention from governmental and private institutions alike. It will not be easy, nor will it be quick. In the meantime, temporary skilled healthcare professionals admitted under the H-1B program are an important part of the solution. The Proclamation deprives Americans of international healthcare professionals' care, harming patients and U.S. healthcare workers alike.

AAIHR respectfully requests that the Court reverse the decision below.

## ARGUMENT

## I. THE H-1B VISA PROGRAM IS AN IMPORTANT TOOL TO MEET AMERICANS' UNMET HEALTHCARE NEEDS

Through the INA, Congress has provided a system that protects American workers' interests while ensuring that Americans can benefit from international labor when there are not enough American workers to meet our economy's needs. Perhaps nowhere is the need for international labor more visible than in our chronically understaffed healthcare system. As companies whose very existence flows from healthcare providers' inability to hire enough qualified healthcare professionals to care for our Nation's aging population, AAIHR's members know the essential role of highly qualified international workers, including H-1B workers, in the U.S. healthcare system. H-1B visas provide an important flow of nurses into

the United States, with more than 1,600 nurses granted H-1B visas in 2025 alone.[1]

H-1B visas are an especially important pathway for international nurses today, because the wait for EB-3 visas that have been a primary pathway for international nurses has grown to nearly three years.[2]  Making it economically impossible to hire nurses on H-1B visas will exacerbate the nursing shortage that is harming American patients and continue to drive attrition in this demanding and essential profession.

A.     **International Nurses Are A Key Part Of Addressing America's Dire Nursing Shortage**

Under federal law, H-1B visas and other employment-based visas are available only when the federal government determines that there are not "sufficient workers who are able, willing, qualified, . . . and available" to fill a particular job.  8 U.S.C. § 1182(a)(5)(A)(i).  That is precisely the case for nurses.  Since 1965, the Department of Labor has certified that the country lacks "sufficient" nurses to provide the healthcare that our country requires.  Availability of and Adverse Effect

---

[1]    The U.S. Department of Labor makes available online for each quarter Labor Certification Applications, a filing associated with H-1B applications.  *See* U.S. Dep't of Lab., *Performance Data*, https://www.dol.gov/agencies/eta/foreign-labor/performance (last visited Jan. 15, 2026).  We report data for confirmed applications that were not withdrawn.

[2]    Under the latest State Department guidance, only EB-3 nurses with approved petitions filed on or before October 1, *2023* are eligible to receive visas.  Consular Affs., U.S. Dep't of State, *Visa Bulletin for February 2026*, at 5 (Feb. 2026), https://travel.state.gov/content/dam/visas/Bulletins/visabulletin_February2026.pdf.

on American Workers, 30 Fed. Reg. 14494, 14494 (Nov. 19, 1965). Today, nursing remains one of the very few professions so recognized. 20 C.F.R. § 656.5.

The need for nurses and other healthcare professionals continues as Americans live longer and our population ages.[3] By 2028, the U.S. Health Resources and Services Administration ("HRSA") projects that fully 8 percent of nursing jobs will remain open—a shortage of more than 250,000 nurses across the country.[4] This is not a single-year issue: HRSA predicts continued and significant nurse shortages until at least 2038, the latest year of its projections.[5] Bureau of Labor Statistics figures confirm this outlook: Each year over the next decade, the agency projects about 189,100 new openings for registered nurses.[6]

---

[3]   Zoe Caplan, U.S. Census Bureau, *U.S. Older Population Grew from 2010 to 2020 at Fastest Rate Since 1880 to 1890* (May 25, 2023), https://www.census.gov/library/stories/2023/05/2020-census-united-states-older-population-grew.html.

[4]   Nat'l Ctr. for Health Workforce Analysis, Health Res. & Servs. Admin., *Nurse Workforce Projections, 2023-2038* (Dec. 2025), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/nursing-projections-factsheet.pdf.

[5]   *Id.*

[6]   U.S. Bureau of Lab. Stats., U.S. Dep't of Lab., *Occupational Outlook Handbook: Registered Nurses* (Aug. 28, 2025), https://www.bls.gov/ooh/healthcare/registered-nurses.htm#tab-6.

Like many contemporary hardships, the nursing shortage hits particularly hard in rural areas, which face shortages twice as severe as urban areas.[7] In a 2021 survey of rural hospital leaders, nearly all reported struggling to fill nursing positions, with half turning patients away because they lacked enough nurses.[8] Two years later, another report found 293 rural hospitals at risk of immediate closure due to the shortage.[9] At the same time, the demographic trends driving demand for nurses are more pronounced in rural areas. Eighty-five percent of counties with the most elderly populations are in rural America.[10] As the Baby Boom generation continues

---

[7] *See* Brian Weichelt et al., *Rural Workforce Recruitment and Retention Factors*, Nat'l Rural Health Ass'n (Mar. 2025), https://www.ruralhealth.us/nationalruralhealth/media/documents/advocacy/nrha-policy-brief-workforce-retention-factors-final-3-7-25.pdf; *see also Nurse Workforce Projections, 2023-2038*, *supra* (projecting this disparity to continue through 2038).

[8] Sety Abooali, Va. State Off. of Rural Health, *The Nursing Shortage and Its Consequences in Rural Virginia* (Nov.–Dec. 2022), https://www.vdh.virginia.gov/content/uploads/sites/76/2022/12/Policy-Brief-The-Nursing-Shortage-and-its-Consequences-in-Rural-Virginia-final.pdf.

[9] Makinizi Hoover et al., *Data Deep Dive: A National Nursing Crisis*, U.S. Chamber of Com. (Jan. 29, 2024), https://www.uschamber.com/workforce/nursing-workforce-data-center-a-national-nursing-crisis.

[10] Amy Harding, *Building a Sustainable Rural Health Workforce for the 21st Century* 4, Advocs. for Human Potential, Inc., In Partnership with Nat'l Rural Health Res. Ctr. (May 2024), https://www.ruralcenter.org/sites/default/files/2024-09/Building%20a%20Sustainable%20Rural%20Health%20Workforce%20FINAL%20DRAFT.pdf.

to age and nursing positions are left unfilled, these vulnerable populations will face limited or even no access to critical care.[11]

The nursing shortage's causes are complex and will not be solved overnight. As Americans live longer and the populace has aged, the need for nurses has surged,[12] leaving U.S. nursing training programs unable to keep pace. In 2022 alone, U.S. nursing programs turned away almost 80,000 applications from qualified student applicants due to insufficient qualified faculty, clinical sites, and classroom space, along with budget constraints.[13] The existing shortage complicates efforts to fix the problem by leaving an ever-dwindling pool of experienced nurse preceptors to teach student nurses while balancing a high clinical patient load.[14] Just like

---

[11] Other underserved communities face similar shortages. Despite modest growth in the advanced practice nursing workforce in metropolitan areas, there has been no corresponding growth in nurse practitioners and registered nurses in high medical need areas within the broader metropolitan regions. Diana Bowser, et al., *Nurse workforce change and metropolitan medically underserved Areas in the United States*, 25 BMC Health Serv. Res. (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11734408/. As in rural areas, these shortages threaten the "quality and timeliness" of healthcare available to residents. *Id.*

[12] Lisa M. Haddad et al., *Nursing Shortage*, StatPearls Publ'g (Feb. 13, 2023), https://www.ncbi.nlm.nih.gov/books/NBK493175/.

[13] Am. Ass'n of Colls. of Nursing, *New Data Show Enrollment Declines in Schools of Nursing, Raising Concerns About the Nation's Nursing Workforce* (May 2, 2023), https://www.aacnnursing.org/news-data/all-news/new-data-show-enrollment-declines-in-schools-of-nursing-raising-concerns-about-the-nations-nursing-workforce.

[14] Annette M. Bourgault, *The Preceptor Shortage: Seeking Solutions* 6-7, CriticalCareNurse (June 2025), https://aacnjournals.org/ccnonline/article/45/3/6/32741/The-Preceptor-Shortage-Seeking-Solutions.

doctors in residency, nurses in training participate in months of clinical rotations to learn hands-on skills treating patients in teaching hospitals. But without enough nurses to treat patients, the resources to provide preceptors are stretched thin.

All of this magnifies the burnout that has driven experienced nurses from the profession.[15] The pandemic saw nearly 200,000 nurses exit the workforce, with one-fifth reporting inadequate staffing as a reason for leaving.[16] The nursing shortage thus has a self-perpetuating, snowball effect.

Predictably, the nursing shortage leads to worse healthcare outcomes for Americans. In many communities, shortages have prompted closures of hospital units and even entire hospitals. Even where facilities stay open, the shortages imperil patient care.

Stories of healthcare facilities forced to partially or completely shut down by staffing shortages abound.[17] These closures make it harder for patients to get the

---

[15]   Health Res. & Servs. Admin., *2022 National Sample Survey of Registered Nurses Snapshot* (Mar. 2024), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/Nurse-Survey-Fact-Sheet-2024.pdf.

[16]   *Id.*

[17]   *See generally* Andrew Cass, *41 Hospitals Closing Departments or Ending Services*, Becker's Hospital Review (Dec. 31, 2025), https://www.beckershospitalreview.com/finance/10-hospitals-closing-departments-or-ending-services-8/; *see also* U.S. Gov't Accountability Off., *Why are Urban Hospitals Closing and What Happens After They Do? WatchBlog: Following the Federal Dollar* (Sept. 24, 2025), https://www.gao.gov/blog/why-are-urban-hospitals-closing-and-what-happens-after-they-do; Anil Rupasingha & Julia Cho, *146 rural hospitals closed or stopped providing inpatient services from 2005 to 2023*

care they need, especially in rural areas where there may be no other providers nearby. Most rural hospitals, for example, no longer offer obstetric services.[18] Since the end of 2020, more than 100 rural hospitals stopped delivering babies, leaving fewer than 1,000 rural hospitals nationwide with labor and delivery services.[19] The closures continue: In February 2025, Winner Regional Hospital in South Dakota closed its labor and delivery unit due to a lack of nurses and other medical professionals, forcing expecting mothers to travel more than 90 miles—and in some cases 170 miles—to receive prenatal care and give birth.[20] This lack of local care increases the risk of complications and death, along with the likelihood of inadequate prenatal and postpartum care.[21]

Even where facilities remain open, these shortages harm patient care from admission through discharge. Unsurprisingly, as staffing shortages have worsened and facilities have closed, wait times at remaining facilities have grown longer. One

---

*in the United States*, Econ. Rsch. Serv., U.S. Dep't of Agric. (Feb. 18, 2025), https://ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=110927.

[18] Ctr. for Healthcare Quality & Payment Reform, *Stopping the Loss of Rural Maternity Care* (Dec. 2025), https://ruralhospitals.chqpr.org/downloads/Rural_Maternity_Care_Crisis.pdf.

[19] *Id.* at 2.

[20] Arielle Zionts, *Rural Patients Face Tough Choices When Their Hospitals Stop Delivering Babies*, KFF Health News (May 19, 2025), https://kffhealthnews.org/news/article/rural-patients-hospitals-maternity-maternal-birthing-childbirth-distance-access/.

[21] *See Stopping the Loss of Rural Maternity Care*, *supra*.

recent study analyzing 46 million emergency visits across all 50 States found patient wait times increased nationally to more than 4 hours, with 5 percent of patients waiting more than 24 hours for care.[22] Burdensome for any patient, this loss of time can be the difference between life and death in an emergency.

Once admitted, a patient's quality of care continues to be profoundly impacted by staffing shortages. A review of data from 626,313 patients found the risk of death increased when patients were exposed to low nurse staffing.[23] And while filling nursing vacancies with nursing assistants and other less-qualified healthcare workers can mitigate this effect to a degree, those substitutions were still associated with a 4 percent increase in death.[24] Another study found that increasing nurses' patient load increases the likelihood of death, length of hospital stays, and chances of being readmitted to the hospital within 30 days.[25] This makes sense. Overburdened nurses cannot deliver the same quality of care, so patients have worse outcomes.

---

[22] Alexander T. Janke et al., *Hospital 'Boarding' Of Patients In The Emergency Department Increasingly Common, 2017–24*, Health Affs. (June 2025), https://doi.org/10.1377/hlthaff.2024.01513.

[23] Peter Griffiths et al., *Nursing Team Composition and Mortality Following Acute Hospital Admission*, JAMA Network Open (Aug. 19, 2024), https://doi.org/10.1001/jamanetworkopen.2024.28769.

[24] *Id.*

[25] Karen B. Lasater et al., *Is Hospital Nurse Staffing Legislation in the Public's Interest? An Observational Study in New York State*, 59 Med. Care 444, 444 (May 2021), https://doi.org/10.1097/MLR.0000000000001519.

Nurses know the harm the shortage has caused. A 2025 American Hospital Association survey found that 88 percent of nurses express concern about the impact of staffing shortages on patient care, and 63 percent report having to manage too many patients.[26] That is nearly 9 out of every 10 nurses who say that they worry staffing shortages are harming patients, and more than 6 out of every 10 saying that they themselves have too many patients to care for.

This first-hand experience confirms what a recent study has concluded: improving hospital nurse staffing could save thousands of lives every year.[27] All of this data points to a single commonsense conclusion: Addressing the nursing shortage is critical to the national interest because it will save American lives.

In short, our Nation's prolonged nursing shortage is harming patients, driving nurses out of the profession, and frustrating efforts to train new nurses. International nurses—vetted by healthcare staffing companies, qualified by relevant U.S. credentialing agencies, and authorized by U.S. regulatory agencies—cannot solve this problem entirely. But they are a critical part of meeting American patient needs.

---

[26] *See* Am. Hosp. Ass'n, *2025 Health Care Workforce Scan* 19 (2024), https://www.aha.org/system/files/media/file/2024/11/2025-Health-Care-Workforce-Scan.pdf.

[27] *See Lasater*, *supra*, at 444.

**B.** **The Proclamation Will Effectively End H-1B Visas for Nurses While Harming American Nurses**

Although seemingly a well-intentioned effort to protect American workers, the Proclamation's new $100,000 fee will undermine efforts to address the nursing shortage.

Some industries may be able to absorb the $100,000 fee. Healthcare cannot. The $100,000 fee is more than the annual salary for the median registered nurse.[28] And again, the impact will be greatest on poorer healthcare facilities, particularly those in rural areas where every penny matters. Rural areas face a disproportionate shortage of nurses compared to wealthier urban areas, and the new fee has already led rural healthcare providers to abandon hiring H-1B nurses.[29] As one healthcare staffing agency serving rural hospitals attested below, none of its clients can afford the $100,000 fee, with some now at risk of closing essential services. JA95-97; *see also* JA149-50 (noting that the University of Washington "will have to drastically cut back on the surgeries [it] perform[s] as well as other procedures" and that

---

[28] *See* U.S. Bureau of Lab. Stats., Dep't of Lab., *Occupational Outlook Handbook: Registered Nurses* (Aug. 28, 2025), https://www.bls.gov/ooh/healthcare/registered-nurses.htm (reflecting the median annual wage for a registered nurse in 2024 as $93,600).

[29] *See Nurse Workforce Projections, 2023-2038, supra,* at 1; *see also* Arielle Zionts & Phillip Reese, *Rural Health Care Providers Could Be Collateral Damage From $100K Trump Visa Fee*, KFF Health News (Dec. 9, 2025), https://kffhealthnews.org/news/article/h1b-visa-fee-rural-hospitals-foreign-worker-shortages-north-dakota/.

"patient care abilities" will be adversely impacted due to "staff shortages"). AAIHR's members' experience is the same. Healthcare providers cannot afford H-1B staffing under the Proclamation, and they cannot hire American nurses that do not exist. If staffing shortages force more rural healthcare facilities to close, entire communities will lose local access to care—resulting in dangerous delays and burdensome travel for both urgent and routine medical needs.

The Proclamation's provision for exceptions cannot erase these harms. Although the text directs the Department of Homeland Security to exempt entire industries when appropriate, the agency has already informed stakeholders—including hospitals and health systems—that there will be no broad-based waiver available.[30] The alternative of individual waivers does not provide relief. Such waivers are costly to pursue, with no guarantee or track record of success, and with no timeline for decision. For healthcare staffing companies like AAIHR's members, this is particularly problematic because their healthcare provider clients cannot make plans based on such an opaque and potentially lengthy process. And for healthcare providers already operating on a shoestring budget, the uncertain and costly process of individual waivers is not a feasible option.

---

[30] Tr. of Mot. Hr'g at 29:7-30:12, *Chamber of Com. of the United States of America v. U.S. Dep't of Homeland Sec.*, No. 25-3675 (D.D.C. Dec. 19, 2025).

All of this might be sensible policy if there were enough nurses in the country to meet the growing demand. But the federal government has already determined that there are not enough American nurses available to counter the shortage. *See, e.g.*, 20 C.F.R. § 656.5. The Proclamation will cause patients to receive inadequate care, hinder nurse education, and increase strain on our already overtaxed nurses.

## II. THE PROCLAMATION IMPROPERLY REJECTS CONGRESS'S CHOICES ABOUT HOW TO BALANCE THE SAME INTERESTS THAT UNDERLIE THE PROCLAMATION

Not only will the $100,000 H-1B fee harm the U.S. healthcare system and the patients that depend on it, but it fundamentally alters Congress's design for the H-1B program. Congress was, of course, aware that an unrestrained visa system could potentially affect U.S. workers' interests if employers turned to it for staffing over U.S. workers or otherwise abused the system. To avoid that harm while still permitting the use of H-1B workers, Congress rejected an unrestrained system, instead including carefully considered limitations designed to protect American workers' interests and ferret out any potential abuse of the program. The President's authority to suspend or restrict entry under Section 1182(f) must be interpreted in the context of Congress's decision about how to address the same concerns underlying the Proclamation. Properly understood, the President's authority does not extend to fundamentally altering the terms of the H-1B program based on concerns Congress considered and determined how to address.

The President's authority to "suspend" or "restrict[]" alien entry into the United States if their entry "would be detrimental to the interests of the United States" is but one part of a comprehensive statutory scheme governing immigration. 8 U.S.C. § 1182(f). The "best reading of the statute," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373 (2024), requires interpreting this authority in light of the entirety of the INA. *City & County of San Francisco v. EPA*, 604 U.S. 334, 350 (2025) (emphasizing that it is a "fundamental canon of statutory construction" that words of a statute must be "read in their context and with a view to their place in the overall statutory scheme"). Although Section 1182(f)'s use of the word "'any'" demands a "broad interpretation," it does not give the President license to upend the statutory scheme. *See Small v. United States*, 544 U.S. 385, 388 (2005); *id.* at 388-89 (holding, based on context, that "any court" does not include courts outside the United States); *Nixon v. Missouri Mun. League*, 541 U.S. 125, 132 (2004) (explaining that "'any'" means "different things depending upon the setting"). That is especially true when, as here, the President's invocation of that authority is simply a disagreement with Congress's decision about how to address the very same issues that animate the Proclamation.

In the INA, Congress established constraints to address each of the concerns raised in the Proclamation, many of which are administered by the Secretary of Labor, whom the President appoints. The Proclamation first faults employers for

using the H-1B program to hire "relatively low-wage workers."  90 Fed. Reg. 46027, 46028 (Sept. 19, 2025).  But Congress chose to allow international workers performing any "specialty occupation" to benefit from H-1B visas, even if that occupation is relatively low-wage.  *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b); *id.* § 1184(i)(1) (defining "specialty occupation" to require "theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty").  Congress did not specify that occupations had to earn a certain minimum salary or be in a highly profitable field to be eligible.  The Proclamation's $100,000 fee renders H-1B visas practically unavailable to all but the highest-wage occupations, contrary to Congressional design.

Second, the Proclamation suggests that the H-1B program is hurting the American workforce.  90 Fed. Reg. at 46028.  But Congress structured the program *around* workforce need, including to ensure that H-1B visa workers do not deprive American workers of job opportunities.  International workers seeking to enter the United States on H-1B and other employment-based visas are "inadmissible" *unless* the Secretary of Labor (whom the President appoints) determines and certifies that "there are not sufficient workers who are able, willing, qualified . . . and available at the time of application for a visa and admission to the United States."  8 U.S.C. § 1182(a)(5)(A)(i); *see, e.g.*, 20 C.F.R. § 656.5 (certifying that there are an

insufficient number of United States nurses who are "able, willing, qualified, and available"). For employers that hire many H-1B workers,[31] Congress imposed an additional requirement that the employer show it "has taken good faith steps to recruit in the United States" and that it has "offered the job to any [qualified] United States worker who applies." 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G)(i). The employer also must show that it did not and will not displace a U.S. worker within the 180-day period surrounding the date of the application. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G). In this way, Congress established a baseline that H-1B workers cannot be hired for jobs when there are enough workers for that kind of job in the United States and imposed heightened scrutiny and requirements on employers hiring the most H-1B workers. Congress thus designed the program to limit the likelihood that H-1B workers would harm the competitiveness of U.S. workers while ensuring that the United States could benefit from skilled workers. The Proclamation upends Congress's chosen balance.

Third, the Proclamation asserts that the H-1B program is hurting wages for American workers. 90 Fed. Reg. at 46028. Congress has already addressed that issue, as well. To obtain an H-1B visa, an employer must certify that it will pay "at

---

[31] Such employers are known as "H-1B dependent employer[s]." *See* 8 U.S.C. § 1182(n)(3)(A). The threshold varies by number of employees. *Id.* For employers with at least 51 full-time employees in the United States, an employer qualifies if at least 15 percent of its employees are H-1B visa recipients. *Id.* § 1182(n)(3)(A)(iii).

least" the greater of "the actual wage level paid" to employees with "similar experience and qualifications for the specific employment in question" or the "prevailing wage level for the occupational classification in the area of employment" determined by the Department of Labor. 8 U.S.C. § 1182(n)(1)(A)(i); 20 C.F.R. § 655.731(a). By establishing the prevailing wage as a wage floor, Congress ensured that H-1B workers would be paid no less than the "arithmetic mean . . . of the wages of workers similarly employed in the area of intended employment." 20 C.F.R. § 656.40(b)(2).

These provisions also reinforce that the program is intended to be open to specialty occupations as defined by Congress—not a limited subset of specialty occupations that offer what the Proclamation would deem a high-paying salary. When assessing eligibility and ensuring adequate wages, Congress chose to compare salaries "for the specific employment in question," 8 U.S.C. § 1182(n)(1)(A)(i), not to salaries for *other* specialty occupations. That method of assessment ensures that H-1B visas remain accessible for an occupation like nursing, where a severe shortage exists, even though other specialty occupations might earn more than nurses. Again, if the President believes that the current rules on the prevailing wage are not up to the task, the proper approach is to adjust the prevailing wage administered by the

President's own Secretary of Labor (as the Proclamation does) or work with Congress to change the law.[32]

Congress contemplated that some employers might nevertheless abuse the system and established a mechanism to address such abuses in the H-1B Visa Reform Act of 2004 ("Reform Act"), Pub. L. No. 108-447, tit. IV, subtit. B, 118 Stat. 2809, 3353-61 (Dec. 8, 2004).  Before enacting the Reform Act, Congress studied the costs and benefits of the H-1B program.  It heard testimony about the dwindling number of American workers in science, technology, engineering and math-related jobs; potential abuse by IT companies; and national security—the same concerns cited in the Proclamation.[33]  The Government Accountability Office

---

[32] *See* 90 Fed. Reg. at 46029 (directing the Secretary of Labor to "initiate a rulemaking to revise the prevailing wage levels to levels consistent with the policy goals of this proclamation").

[33] Examining the Importance of the H-1B Visa to the American Economy: Hearing before the S. Comm. on the Judiciary, 108th Cong. 11-14 (Sept. 16, 2003) (statement of John W. Steadman, President-Elect, Institute of Electrical and Electronics Engineers) (asserting that the "H-1B visa program is exacerbating the problem of engineering unemployment in the United States," asserting that the Department of Labor should have authority to "reduce abuse," and raising concerns of national security); Testimony of Stephen Yale-Loehr, Adjunct Professor of Law, Cornell Law School Before the Subcomm. on Immigr. & Border Sec. of the S. Comm. on the Judiciary Regarding the L-1 Visa Program and American Interests in the 21st Century Global Economy (July 29, 2003), https://www.judiciary.senate.gov/ imo/media/doc/yale-loehr_testimony_07_29_03.pdf (discussing the H-1B and L-1B visa programs and the "slower growth in overall IT employment resulting from global competition"); Testimony of Stephen Yale-Loher Before the S. Comm. of the Judiciary on Examining the Importance of the H-1B Visa to the American Economy at 7 (Sept. 16, 2003), https://www.judiciary.senate.gov/imo/media/doc/yale-

("GAO") conducted studies on the H-1B program, specifically identifying concerns surrounding the "decrease[] within information technology (IT) occupations." U.S. Gov't Accountability Off., GAO-03-883, Report to the Ranking Minority Member, Subcomm. on Env't, Tech. & Sci., *H-1B Foreign Workers: Better Tracking Needed to Help Determine H-1B Program's Effects on U.S. Workforce* at 1 (Sept. 2003). Members of Congress recognized that limited abuses were occurring, *e.g.*, Examining the Importance of the H-1B Visa to the American Economy: Hearing before the S. Comm. on the Judiciary, 108th Cong. 32 (Sept. 16, 2003) (statement of Sen. Saxby Chambliss) ("I think it is pretty clear just from statements we have heard . . . [that] the H-1B [program is] abused by some companies . . . ."), and stepped in to curb them and realign the program to its preferred balance.[34]

In addition to updating the prevailing wage requirement and imposing various reporting requirements so that Congress could monitor the H-1B program,[35]

_____

loehr_testimony_09_16_03.pdf (discussing the reasons for the dwindling number of information technology jobs in the United States).

[34] Elizabeth K. Ottman, *It's Time to Open up the L-1B: How the Emergence of Open Source Technology Will Impact the L-1B Visa Program*, 66 Cath. U. L. Rev. 907, 919 n.102 (2017) (Reform Act was passed "[b]ased on the belief that many IT companies were misusing" temporary visa programs).

[35] The Reform Act increased employers' prevailing wage obligations and made the prevailing-wage systems more precise by increasing the number of wage levels for each occupation from two to four. Pub. L. No. 108-447, § 423, 118 Stat. at 3353-54 (codified at 8 U.S.C. § 1182(p)(3)-(4)). The Reform Act also required annual reports about certain H-1B beneficiaries (including compensation and education) and the Secretary of Labor's use of the new investigative authority. *Id.* § 424(c),

Congress created an anti-fraud program funded by a $500 anti-fraud fee and authorized the Secretary of Labor to initiate investigations into employers under defined circumstances. Pub. L. No. 108-447, § 426(a), 118 Stat. at 3357 (codified at 8 U.S.C. § 1184(c)(12)); *id.* § 424(a)(1), 118 Stat. at 3354 (codified at 8 U.S.C. § 1182(n)(2)(G)(i)). Before initiating any investigation, Congress required the Secretary to have "reasonable cause to believe that the employer is not in compliance" with the labor requirements of the H-1B program. Pub. L. No. § 424(a)(1), 118 Stat. at 3354 (codified at 8 U.S.C. § 1182(n)(2)(G)(i)). Congress specified what types of "specific credible information" from specific persons constituted reasonable cause; the time limitations on conducting an investigation, what needs to be included in the notice to the employer; the requirements for finding that an employer has "committed a willful failure" to meet a condition of the statute or engaged in a "pattern or practice of failure[s]"; and the post-investigation rights of the employer. *Id.* § 424(a), 118 Stat. at 3354-55 (codified at 8 U.S.C. § 1182(n)(2)(G)). What Congress did not do was authorize imposing a $100,000 fee on each H-1B petition that would alter the H-1B program beyond recognition.[36]

---

118 Stat. at 3356 (codified at 8 U.S.C. § 1381); *id.* § 425(b), 118 Stat. at 3356 (codified at 8 U.S.C. § 1184 note).

[36] At the same time, Congress sought to equip Americans to work in high-growth areas of the economy that were undergoing technological changes. Pub. L. No. 108-447, § 428, 118 Stat. at 3358-60 (codified at 29 U.S.C. § 2916a, transferred to 29 U.S.C. § 3224a).

These requirements are not a fluke.  They reflect careful Congressional study of how to ensure that our Nation has access to the skilled workers it needs while mitigating any potential negative effects on the American workforce.  Considering the broader context of the INA shows that the $100,000 H-1B fee lies beyond Section 1182(f)'s grant of authority.  Although the President is not limited to "specific fast-breaking exigencies" when using Section 1182(f), *Trump v. Hawaii*, 585 U.S. 667, 696-97 (2018) (citation omitted), the best reading of the statute must respect the INA's overall design.  Here, that means that the President cannot use Section 1182(f) to fundamentally alter eligibility for H-1B visas by imposing a $100,000 fee simply because he disagrees with Congress about the best way to balance the interests of American workers with the need for skilled international labor.  Whatever the boundaries of Section 1182(f), the power to bypass Congress based on policy disagreement lies beyond them.  The district court's contrary decision should be reversed.

## CONCLUSION

AAIHR respectfully urges the Court to reverse.

January 16, 2026

Respectfully submitted,

*/s/ Andrew D. Prins*
Andrew D. Prins
Jonathan L. Williams
Cherish A. Drain
Dorothy M. Canevari*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
andrew.prins@lw.com

*Admitted to practice in New York only.  All work supervised by a member of the D.C. Bar.

*Counsel for* Amicus Curiae *American Association of International Healthcare Recruitment*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

1.      This document complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because this document contains 5329 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman Font.


*/s/ Andrew D. Prins*
Andrew D. Prins

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I caused the foregoing brief to be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

_/s/ Andrew D. Prins_
Andrew D. Prins