**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5473**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND
AMERICAN ASSOCIATION OF UNIVERSITIES,

Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY *et al.*,

Defendants-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
Civil No. 25-cv-3675, Hon. Beryl A Howell

_____

**APPELLEES' BRIEF**

_____

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration

**Tiberius Davis**
Counsel to the Assistant Attorney General

**Glenn Girdharry**
Acting Deputy Director

**Alexandra McTague**
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 718-0483

*Counsel for Defendants-Appellees*

# APPELLEES' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Circuit Rule 28(a)(1)(A) – Parties

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

The following amici have appeared in this court:
Consumer Technology Association; American Association of International Healthcare Recruitment; Fragomen, Del Rey, Bernsen & Loewy, LLP; the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, the Commonwealth of Massachusetts, and the District of Columbia.

## B.    Circuit Rule 28(a)(1)(B) – Rulings under Review

Reference to the ruling at issue appears in the Brief for Appellants

## C.    Circuit Rule 28(a)(1)(C) – Related Cases

This case has not previously been before this Court. Counsel is not aware of any cases pending in this Court or any other appellate court or any court in the District of Columbia.

# GLOSSARY

| | |
|---|---|
| AAU | Plaintiff-Appellant American Association of Universities |
| Br. | Appellants' Opening Brief, filed February 20, 2025 |
| Chamber | Plaintiff-Appellant Chamber of Commerce of the U.S. |
| H-1B | Temporary Nonimmigrant worker classification defined in 8 U.S.C. § 1101(a)(15)(H)(i)(b) |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix prepared by Plaintiffs-Appellants |
| USCIS | United States Citizenship and Immigration Services |
| Proclamation | Presidential Proclamation 10973, Restriction on Entry of certain Nonimmigrant Workers, 90 Fed. Reg. 46027 (Sept. 24, 2025) |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION..................................................................4

STATEMENT OF THE ISSUE.........................................................................4

STATUTES .......................................................................................................4

STATEMENT OF THE CASE...........................................................................4

I.      The Executive's Broad Authority...........................................................4

II.     H-1B Nonimmigrant Classification ........................................................5

III.    Presidential Proclamation 10973............................................................8

IV.     Agency Guidance and Memoranda. ......................................................11

V.      The District Court Litigation ................................................................13

SUMMARY OF THE ARGUMENT. .............................................................14

STANDARD OF REVIEW .............................................................................16

ARGUMENT ..................................................................................................17

I.      The Proclamation Is Lawful. ................................................................17

        A.      The Proclamation Falls Well Within the President's Broad Authority
                Under Section 1182(f) and § 1185(a).........................................17

        B.      The Proclamation Does Not Conflict with the INA..........................21

        C.      The Proclamation Does Not Contravene Congress's Taxing
                Power........................................................................................26

i

II.    In the Alternative, the District Court's Decision Can Be Affirmed
       Because Plaintiffs' Claims Are Not Justiciable...............................................35

       A.    Plaintiffs' Claims are Barred by Principles of Non-reviewability......35

       B.    Plaintiffs Did Not Make the Threshold Showing Required for
             An *Ultra Vires* Claim. .......................................................................37

       C.    There is No Final Agency Action and the Agency Implementations
             Merely Carry Out the Presidential Directive ......................................44

III.   Plaintiffs Failed to Meet the Required Showing for an Injunction. ..............50

CONCLUSION ........................................................................................................54

CERTIFICATE OF COMPLIANCE........................................................................55

CERTIFICATE OF SERVICE .................................................................................56

# TABLE OF AUTHORITIES

## CASES

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986) ................................................................. 33, 36

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978) ..............................................................54

*Am. Butterfly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020) ...........................................................43

*Am. Foreign Serv. Ass'n v. Trump*,
    792 F. Supp. 3d 116 (D.D.C. 2025) .....................................................48

*Am. Foreign Serv. Ass'n v. Trump*,
    2025 WL 1742853 (D.C. Cir. June 20, 2025)................................. 37, 38

*Am. Forest Res. Council v. United States*,
    77 F.4th 787 (D.C. Cir. 2023) ..............................................................38

*Am. Trucking Ass'ns, Inc. v. United States*,
    627 F.2d 1313 (D.C. Cir. 1980) ...........................................................14

*Ancient Coin Collectors Guild v. CBP*,
    801 F. Supp. 2d 383 (D. Md. 2011) ............................................... 44, 45

*Bailey v. Drexel Furniture Co.*,
    259 U.S. 20 (1922).................................................................................27

*Bennett v. Spear*,
    520 U.S. 177 (1997)...............................................................................46

*Biden v. Nebraska*,
    600 U.S. 477 (2023)...............................................................................33

*Biden v. Texas*,
    597 U.S. 785 (2022)...............................................................................23

*Bradford v. United States DOL*,
  101 F.4th 707 (10th Cir. 2024) ................................................................47

*Caremax Inc. v. Holder*,
  40 F. Supp. 3d 1182 (N.D. Cal. 2014) ....................................................6

*Center for Biological Diversity v. United States Dep't of the Interior*,
  144 F.4th 296 (D.C. Cir. 2025) ..............................................................48

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ...............................................................50

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ...............................................................................46

*Coney Island Prep v. HHS*,
  506 F. Supp. 3d 203 (S.D.N.Y. 2020) .....................................................51

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ...............................................................................48

*Dakota Central Telephone Co. v. South Dakota ex rel. Payne*,
  250 U.S. 163 (1919) .......................................................................... 40, 41

*Dalton v. Specter*,
  511 U.S. 462 (1994) ...................................................................... 16, 38, 40

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ..............................................................53

*Department of State v. Muñoz*,
  144 S. Ct. 1812 (2024) .................................................................... 35, 36

*Detroit Int'l Bridge Co. v. Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016) .................................... 45, 47, 49, 50

*Doe #1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020) ................................................................22

*Doe #1 v. Trump*,
  984 F.3d 848 (9th Cir. 2020)...........................................................22, 32

*Doe #1 v. Biden,*,
  2 F.4th 1284 (9th Cir. 2021)...........................................................22, 32

*Doe Co. v. Cordray*,
  849 F. 3d 1129 (D.C. Cir. 2017)...........................................................51

*EEOC v. Aramark Corp.*,
  208 F.3d 266 (D.C. Cir. 2000)...........................................................16

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
  606 U.S. 656 (2025)...........................................................15, 28, 32

*Fed. Express Corp. v. U.S. Dep't of Commerce*,
  39 F.4th 756, (D.C. Cir. 2022)...........................................................43

*Fiallo v. Bell*,
  430 U.S. 792 (1997)...........................................................18, 35, 41

*Ford v. Mabus,*
  629 F.3d 198 (D.C. Cir. 2010)...........................................................28

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)...........................................................44

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)...........................................................42

*Goodluck v. Biden*,
  104 F.4th 920 (D.C. Cir. 2024)...........................................................52

*Haig v. Agee*,
  453 U.S. 280 (1981)...........................................................41

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952)...........................................................17, 18

*Henderson v. Mayor of New York*,
   92 U.S. 259 (1875)..................................................................27

*Igas Holdings, Inc. v. EPA*,
   146 F.4th 1126 (D.C. Cir. 2025) ...........................................34

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972)..............................................................36

*Learning Res., Inc. v. Trump*,
   784 F. Supp. 3d 209 (D.D.C. 2025) .......................................34

*Li v. Blinken*,
   2023 WL 4044487 (D.C. Cir. June 16, 2023).........................52

*Lujan v. National Wildlife Federation*,
   497 U.S. 871 (1990)..............................................................49

*Make The Rd. New York v. Wolf*,
   962 F.3d 612 (D.C. Cir. 2020) ....................................... 47, 49

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892)..............................................................29

*Maryland v. King*,
   567 U.S. 1301 (2012)............................................................54

*Matushkina v. Nielsen*,
   877 F.3d 289 (7th Cir. 2017).................................................36

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)..............................................................50

*Mow Sun Wong v. Campbell*,
   626 F.2d 739 (9th Cir. 1980).................................................29

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)....................................................... 26, 27

*Nken v. Holder*,
    556 U.S. 418 (2009) ...........................................................53

*Norton v. S.Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................49

*NRC v. Texas*,
    605 U.S. 665 (2025) ........................................... 16, 38, 42, 44

*Nyunt v. Chairman, Broad. Bd. of Govs.*,
    589 F.3d 445 (D.C. Cir. 2009) .............................................43

*Pacito v. Trump*,
    152 F.4th 1082 (9th Cir. 2025).................................. 22, 31, 33

*Pennsylvania Dept. of Corrections v. Yeskey*,
    524 U.S. 206 (1998)...........................................................21

*Pietersen v. United States Dep't of State*,
    138 F.4th 552 (D.C. Cir. 2025) ...........................................37

*Pietersen v. United States Dep't of State*,
    138 F.4th 552 (D.C. Cir. 2025) ...........................................37

*Potter v. District of Columbia*,
    558 F.3d 542 (D.C. Cir. 2009) ............................................46

*Pub. Citizen v. U.S. Trade Representative*,
    5 F.3d 549 (D.C. Cir. 1993) ...............................................45

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012).........................................................20

*Rahmani v. Yellen*,
    2024 WL 1701681 (D.D.C. Apr. 19, 2024) .........................36

*Rainbow Nav., Inc. v. Dep't of Navy*,
    783 F.2d 1072 (D.C. Cir. 1986) ..........................................39

*Royal Siam Corp. v. Chertoff,*
    484 F.3d 139 (1st Cir. 2007) ................................................................5

*Saavedra Bruno v. Albright,*
    197 F.3d 1153 (D.C. Cir. 1999)..........................................................49

*Safari Club Int'l v. Salazar,*
    852 F. Supp. 2d 102 (D.D.C. 2012) ....................................................52

*Sale v. Haitian Centers Council, Inc.,*
    509 U.S. 155 (1993)............................................................................31

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953)............................................................................41

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012) ...........................................................47

*Sierra Club v. Env't Prot. Agency,*
    955 F.3d 56 (D.C. Cir. 2020) .............................................................47

*Skinner v. Mid-American Pipeline Co.,*
    490 U.S. 212 (1989)..................................................................... 28, 29

*Smith v. Turner,*
    48 U.S. 283 (1849).............................................................................27

*Tate v. Pompeo,*
    513 F. Supp. 3d 132 (D.D.C. 2021) ....................................................46

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025)............................................................................54

*Trump v. Hawaii,*
    585 U.S. 667 (2018).............2, 5, 14, 18, 19, 20, 21, 26, 28, 31, 33, 36, 37, 38, 49

*Trump v. Orr,*
    223 L.Ed.2d 180 (U.S. 2025)..............................................................47

*Tulare County v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001) ................................................................ 44, 45

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) .................................................... 17, 18, 35, 36, 39

*United States v. Ju Toy*,
    198 U.S. 253 (1905) ................................................................. 36

*United States v. Rahimi*,
    602 U.S. 680 (2024) ................................................................. 34

*V.O.S. Selections, Inc. v. Trump*,
    149 F.4th 1312 (Fed. Cir. 2025) ................................................. 34

*Webster v. Doe*,
    486 U.S. 592 (1988) ............................................................. 39, 40

*Widakuswara v. Lake*,
    2025 WL 1288817 (D.C. Cir. May 3, 2025) ................................. 48

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................. 18

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ................................................................... 29

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................. 41, 42

## STATUTES

5 U.S.C. § 701(a)(2) ................................................................. 49

5 U.S.C. § 702(1) ..................................................................... 49

5 U.S.C. § 704 ......................................................................... 46

5 U.S.C. § 551 ......................................................................... 13

8 U.S.C. § 1101(a)(4) ........................................................................4

8 U.S.C. § 1101(a)(15)(H)(i)(b) ............................................ 2, 5, 8, 32

8 U.S.C. § 1103(a)(4) ........................................................................4

8 U.S.C. § 1181 .................................................................................4

8 U.S.C. § 1182(a) ..............................................................5, 10, 11, 12, 33

8 U.S.C. § 1182(a)(7)(A)(i) ................................................................5

8 U.S.C. § 1182(B)(i)(II) ...................................................................4

8 U.S.C. § 1182(f) ....................... 1, 2, 4, 5, 10, 13, 14, 15, 23, 28, 33, 36

8 U.S.C. § 1184(a)(1) .........................................................................6

8 U.S.C. § 1184(c)(1) ................................................................. 5, 8, 31

8 U.S.C. § 1184(g)(1)(A) ...................................................................7

8 U.S.C. § 1184(g)(5)(A) ................................................................7, 8

8 U.S.C. § 1184(g)(5)(C) ..................................................................7,

8 U.S.C. § 1184(g)(7) ........................................................................7

8 U.S.C. § 1184(i)(1) ........................................................................25

8 U.S.C. § 1185 .................................................................................4

8 U.S.C. § 1185(a) ...................................................... 5, 10, 13, 14, 36

8 U.S.C. § 1185(a)(1) ................................................................. 19, 39

8 U.S.C. § 1201(h) .............................................................................4

8 U.S.C. § 1203 .................................................................................4

x

8 U.S.C. § 1356(e)(3) ..................................................................23

8 U.S.C. § 1356(s)(1) ..................................................................24

8 U.S.C. § 1356(u)(1) ..................................................................24

28 U.S.C. § 1291 ..........................................................................4

## REGULATIONS

8 C.F.R. § 214.2(h)(2)(i)(A) ........................................................31

8 C.F.R. § 214.2(h)(4)(iii)(B)(1) ..................................................31

8 C.F.R. § 214.2(h)(8)(iii) .............................................................7

8 C.F.R. § 214.2(h)(8)(iii)(A)(1) ....................................................7

8 C.F.R. § 214.2(h)(8)(iii)(A)(5)(ii) ...............................................8

8 C.F.R. § 214.2(h)(8)(iii)(A)(6)(ii) ...............................................8

8 C.F.R. § 214.2(h)(4)(iii)(B)(1) ....................................................8

8 C.F.R. § 214.2(h)(8)(iii)(C) .........................................................8

8 C.F.R. § 214.2(h)(8)(iii)(D) .........................................................8

8 C.F.R. § 214.2(h)(9)(i) ................................................................8

8 C.F.R. § 214.2(h)(10)(ii) .............................................................8

8 C.F.R. § 214.2(h)(11) ..................................................................8

8 C.F.R. § 214.2(h)(13)(iii)(D) .......................................................7

8 C.F.R. § 214.2(h)(13)(iii)(E) .......................................................7

8 C.F.R. § 248.3(f) .........................................................................8

## PUBLIC LAW

Pub. L. 104–208 ....................................................................30

Pub. L. 113-114 ....................................................................24

## FEDERAL REGISTER

85 Fed. Reg. 34,353 ................................................... 22, 31, 32

90 Fed. Reg. 8,459 ................................................................22

90 Fed. Reg. 46,027 ...........................................................1, 8

90 Fed. Reg. 46,029 .............................................................48

## PRESIDENTIAL PROCLAMATION

Proclamation No. 10973 (Sept. 19, 2025) ...........................1, 8

## MISCELLANEOUS

U.S. Dept. of Labor, *H-1B Program*, available at
    https://www.dol.gov/agencies/whd/immigration/h1b (last visited Jan. 30, 2026) .6

**INTRODUCTION**

Though the H-1B nonimmigrant worker visa program was originally created by Congress to fill gaps in the U.S. labor market with qualified foreign workers, it has been exploited by corporations and aliens to import lower-paid, lower-skilled workers—thereby artificially depressing wages and employment opportunities for skilled U.S. citizens. Responding to this pervasive abuse of the H-1B system, President Trump issued Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (the "Proclamation") pursuant to his sweeping congressionally granted authority in 8 U.S.C. §§ 1182(f) and 1185(a). In the Proclamation, the President determined that "[t]he large-scale replacement of American workers through systemic abuse of the [H-1B] program has undermined both [the United States'] economic and national security." *Id*. The President explained that "[t]he high numbers of relatively low-wage workers in the H-1B program" undercut the program's integrity and "are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated." *Id*. at 46,028. And "abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields." *Id*. As a result, the President found that "the unrestricted entry" into the country of certain H-1B temporary workers "would be detrimental to the interests of

1

the United States because such entry would harm American workers, including by undercutting their wages[.]" *Id.*

Based on these findings, the President invoked his broad authority under Sections 1182(f) and 1185(a)(1) to temporarily adopt "reasonable rules, regulations, and orders" and/or to suspend or restrict "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation" under 8 U.S.C. § 1101(a)(15)(H)(i)(b) "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000—subject to the exceptions set forth" in the Proclamation. JA169. The Supreme Court has repeatedly confirmed that this delegated authority is "sweeping," subject only to the requirement that the President identify a class of aliens whose entry is detrimental to the interests of the nation. *Trump v. Hawaii*, 585 U.S. 667, 684–88 (2018). The Proclamation readily satisfies that standard. Indeed, on appeal Plaintiffs do not even contest this.

Plaintiffs the Chamber of Commerce of the United States of America ("Chamber") and the American Association of Universities (AAU), both associations that do not directly petition U.S. Citizenship and Immigration Services ("USCIS") for H-1B temporary workers, challenged the Proclamation as *ultra vires* and alleged its implementation by the agencies violated the Administrative Procedure Act ("APA"). The district court correctly rejected both challenges, granting summary judgment to the government.

2

The President's power under §§ 1182(f) and 1185(a) is broad and under a plain reading of those sections, the Proclamation is authorized. The Proclamation does not exceed the President's authority, conflict with the Immigration and Nationality Act ("INA"), usurp Congress's taxing authority, or violate the APA. The Proclamation is not a revenue-raising tax, it is a temporary measure determined by the President to be necessary to protect American workers and national security. Plaintiffs' own member proved it is working as designed: incentivizing businesses to hire and train American graduates.

Though the issue was not reached by the district court, the Proclamation is also unreviewable under principles of consular non-reviewability. Similarly, Plaintiffs lack an *ultra vires* cause of action or an APA cause of action because the Proclamation is a discretionary action of the President without a meaningful standard of review. The President is not the one violating the separation of powers; it is Plaintiffs seeking to inject the judiciary into core Executive questions of foreign affairs, national security, and immigration that threatens the separation of powers. The Proclamation is a lawful exercise of the President's authority to restrict the admission of aliens into the United States. This Court should affirm the district court's judgment.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject-matter jurisdiction under 28 U.S.C. § 1331. Br.4. The district court granted summary judgment to the government on December 23, 2025. Plaintiffs timely appealed on December 29, 2025. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court was correct to grant summary judgment to the government on all claims because the Proclamation is a lawful exercise of the President's authority under both 8 U.S.C. § 1182(f) and § 1185(a), and the agencies' ministerial implementations of the Proclamation's terms are likewise lawful.

## STATUTES

The addendum contains the pertinent statutes.

## STATEMENT OF THE CASE

### I.   The Executive's Broad Authority.

Admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1185, 1203. A visa is typically necessary, though not sufficient, for admission; the alien still must be found admissible upon inspection at a port of entry. 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see also* 8 U.S.C. § 1101(a)(4).

The INA establishes myriad bases of inadmissibility and visa ineligibility. *See,*

*e.g.*, 8 U.S.C. §§ 1182(a), 1201(g). Congress has also accorded the President broad discretionary authority to suspend or impose restrictions on the entry of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. The Supreme Court has thus "observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a). Presidents have invoked that authority to advance national-security and foreign-policy objectives over 90 times since its passage.

## II. H-1B Nonimmigrant Classification.

The H-1B nonimmigrant classification is for qualified temporary foreign workers who are coming to the United States to perform services in a "specialty occupation" based "upon petition of the importing employer." 8 U.S.C. §§ 1101(a)(15)(H)(i)(b); 1184(c)(1); *see also Royal Siam Corp. v. Chertoff,* 484 F.3d

139, 144 (1st Cir. 2007) (discussing eligibility requirements). The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General (and, since the Homeland Security Act of 2002, the Secretary of Homeland Security) may prescribe by regulations. 8 U.S.C. §§ 1184(a)(1), 1103(a)(1). "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." www.dol.gov/agencies/whd/immigration/h1b; *see also Caremax Inc. v. Holder*, 40 F. Supp. 3d 1182, 1187 (N.D. Cal. 2014) ("Fundamentally, an H-1B visa allows an employer … to fill a temporary position because of a special need, presumably one that cannot be easily fulfilled within the U.S.").

Consistent with that intent, with certain exceptions, most H-1B jobs and applicants must meet the "specialty occupation" requirement as a minimum qualification for eligibility. A specialty occupation is defined as an occupation that requires (A) "theoretical and practical application of a body of highly specialized knowledge" and (B) "attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1).

By statute, H-1B petitions fall into two broad categories: cap-subject petitions

and cap-exempt petitions. Cap-subject petitions are counted against the strict numerical limitations created by Congress, which is 65,000 per fiscal year, with an additional 20,000 for individuals with a master's or higher degree from an American institution of higher education, for a total of 85,000. *See* 8 U.S.C. § 1184(g)(1)(A); § 1184(g)(5)(C). Once a beneficiary has been counted towards the numerical allocations, the beneficiary may be eligible for up to a six-year period of H-1B admission, and longer if pursuing lawful permanent resident status. *See* 8 U.S.C. § 1184(g)(7); 8 CFR § 214.2(h)(13)(iii)(D) and (E). Some H-1B petitions are cap-exempt based on the nature of the petitioning employer or work location. *See* 8 U.S.C. § 1184(g)(5)(A) and (B). The demand for initial H-1B status invariably exceeds the congressionally imposed numerical limitations each year, so DHS regulations create a "lottery" as an H-1B cap selection process. *See* 8 C.F.R. § 214.2(h)(8)(iii).

Before an employer is eligible to submit a Form I-129, Petition for a Nonimmigrant Worker ("H-1B petition"), requesting H-1B classification on behalf of a beneficiary who is subject to the H-1B cap, the employer must register for the H-1B cap lottery. *See* 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). When USCIS determines that it has received sufficient registrations, it closes the registration period and randomly selects, through a computer-generated program, the number of unique beneficiaries deemed necessary to meet the cap among the registrations properly

submitted. *See id.* at §§ 214.2(h)(8)(iii)(A)(5)(ii); 214.2(h)(8)(iii)(A)(6)(ii). Employers are notified if a beneficiary is selected in the lottery. 8 C.F.R § 214.2(h)(8)(iii)(C) and (D).

The employer must then file an H-1B cap-subject petition and obtain authorization to employ the beneficiary. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(4)(iii)(B)(1). USCIS notifies the employer of the approval, denial, intent to revoke, and revocation of any H-1B petitions. 8 C.F.R. § 214.2(h)(9)(i), (h)(10)(ii), (h)(11). If the petition is approved and the alien beneficiary is outside the United States or requested or requires consular processing, the alien must apply for a visa at a U.S. consulate abroad (unless visa exempt) before applying for admission as an H-1B nonimmigrant. *See* 8 U.S.C. § 1184(c)(1) (providing that an H-1B petition "shall be made and approved before the visa is granted."). If the alien is in the United States and was approved for a change of status, the change to H-1B status is generally effective upon the petition validity start date. 8 C.F.R. § 248.3(f).

### III.    Presidential Proclamation 10973.

President Donald J. Trump issued the Proclamation on September 19, 2025. The Proclamation explained that abuse of the H-1B nonimmigrant worker program has led to "[t]he large-scale replacement of American workers," "suppress[ed] wages," and "a disadvantageous labor market for American citizens," which "has undermined both our economic and national security." 90 Fed. Reg. at 46,027. The

influx of H-1B workers has had the "largest impact" in Science, Technology, Engineering, and Mathematics (STEM) fields. *Id.* In particular, information technology outsourcing firms have abused the H-1B system, using H-1B workers for entry-level positions at a 36% discount over American workers. *Id.*

As the number of H-1B workers in STEM fields has increased, so too has the unemployment rate for recent college graduates in those fields; numerous domestic tech companies have laid off thousands of American workers while simultaneously hiring thousands of H-1B workers. *Id.* at 46,027-28. In some cases, American workers were forced to train their H-1B replacements. *Id.* at 46,028. Employing H-1B workers in entry-level positions at discounted rates undercuts American worker wages and opportunities, and is antithetical to the purpose of the H-1B program, which is "to fill jobs for which highly skilled and educated American workers are unavailable." *Id.*

Not only are H-1B program abuses detrimental to American workers, the Proclamation also explains that such abuses are a national security threat because they reduce American wages and "discourag[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response" and that "unrestricted entry into the United States of certain foreign

9

workers … would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." *Id.* The President accordingly determined that it was "therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.*

To that end, the Proclamation imposed entry restrictions on H-1B workers pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a). In particular, it restricted entry to petitions accompanied by or supplemented by a payment of $100,000 and ordered the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers under section 101(a)(15)(H)(i)(b) of the INA, who are currently outside the United States, for 12 months following the effective date of this proclamation." *Id.* By its nature as a restriction, regulation, or suspension on entry, the Proclamation does not apply to aliens already in the country applying for a H-1B visa, seeking an extension, or filing for a change of status. The Proclamation allows the Secretary of Homeland Security, in her discretion, to except any individual alien or aliens whose employment is "in the national interest and do not pose a threat to the security or welfare of the United States." *Id.* at 46,029.

The Proclamation instructed the Secretary of State to confirm payment of the

10

$100,000 before addressing any visa application. *Id.* at 46,028-29. It also instructed the Department of State and the Department of Homeland Security to take all necessary steps to implement the Proclamation and deny entry to the United States of any H-1B nonimmigrant whose employer has not made the payment. *Id.* at 46,029. The Proclamation also instructed the Department of Labor and the Department of Homeland Security to engage in rulemaking on issues relating to the prevailing wage and the H-1B lottery. *Id.*

The restrictions are set to expire after 12 months, absent an extension. *Id.* at 46,028.

## IV.    Agency Guidance and Memoranda.

The day after the Proclamation, USCIS issued a two-paragraph Memorandum explaining the contours of the Proclamation. JA173. USCIS explained that the Proclamation applied prospectively to petitions filed after the Proclamation took effect and did not impact the ability of any current visa holder to travel to or from the United States. JA173. USCIS also updated its website to explain that the Proclamation "applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa." JA180. It explained that the $100,000 payment can be submitted through pay.gov, that "[p]ayment must be made prior to filing a petition with USCIS," that "petitioners must submit proof that the

11

payment has been scheduled" or evidence that they received a waiver, and that "[p]etitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied." *Id.* It further provided information on where to submit a request for an exception. *Id.*

U.S. Customs and Border Protection ("CBP") also issued brief guidance on September 20, 2025, stating that the Proclamation applies only to new H-1B petitions and does not impact aliens who are the beneficiary of approved petitions or who hold a valid H-1B visa. JA175. It explained that "[t]he Proclamation does not impact the ability of any current visa holder to travel to or from the United States" and that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." JA175.

The State Department issued two paragraphs of guidance on its website explaining that the Proclamation "restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation" and "restricts the issuance of H-1B visas, except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000." JA361. The State Department unequivocally stated that "[n]o visas have been revoked pursuant to the Proclamation." *Id.* In FAQs, the State Department referenced the USCIS and CBP

12

guidance and stated that it had "posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance." JA178.

## V.    The District Court Litigation.

Plaintiffs asserted two claims against defendants: first, that the Proclamation and its implementation are beyond the President's legal authority and thus *ultra vires*, and second, that the Proclamation's implementation by the agencies violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* JA62-65. They sought preliminary and permanent injunctive relief. JA65.[1]

After expedited briefing on the merits, the district court correctly entered summary judgment for defendants on both claims, finding, in a well-reasoned and detailed 56-page opinion, that "[t]he lawfulness of the Proclamation and its implementation rests on a straightforward reading of congressional statutes giving the President broad authority to regulate entry into the United States for immigrants and nonimmigrants alike." JA424. The district court found that the President acted within his broad statutory grant of authority found in 8 U.S.C. § 1182(f) and § 1185(a), and that the Proclamation does not "contravene statutory terms in the INA nor even congressional policy. JA452-54. It rejected Chamber and AAU's arguments

---

[1] Though Count I appears to apply only to the President, at oral argument Plaintiffs stated that the *ultra vires* claim applies to the agencies too. JA469.

that a specific delegation in the statute was required to give the President authority to impose a payment restriction on entry and that the Proclamation payment conflicted with the statutory fee structure already in place. JA457-58, JA465-68. Because the agencies' implementation of the Proclamation followed presidential directives, Plaintiffs' APA claim likewise failed. JA474.

The district court granted summary judgment to Defendants on all claims. JA422. This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.A.** The Proclamation is a lawful exercise of the President's authority granted to him by Congress under 8 U.S.C. § 1182(f) and § 1185(a). Those provisions "exude deference" to the President, and when he acts pursuant to a statutory grant of authority, his power is at its zenith. *Am. Trucking Ass'ns, Inc. v. United States*, 627 F.2d 1313, 1320 (D.C. Cir. 1980). The district court correctly held that the Proclamation satisfies the threshold requirements of § 1182(f), and is a lawful exercise of the President's authority under that statute and § 1185(a).

**B.** The Proclamation does not conflict with the INA. As the Supreme Court explained, "§ 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. Plaintiffs point to existing fees to claim Congress occupied the space, but none of those fees prohibit additional payments, have been overridden, nor address

the abuses targeted by the Proclamation. *See id.* at 690-91 (rejecting similar arguments). The same is true for Plaintiffs' argument that rhetoric about seeking the "best of the best" overrides the H-1B qualifications. The qualifications remain untouched. And again, none of the provisions Plaintiffs point to have been overridden, exclude the payment here, or address the issues the Proclamation seeks to remedy. So the district court correctly held that the Proclamation does not conflict with or override the INA.

**C.** The Proclamation also does not usurp Congress's taxing power. Section 1182(f) is a broad grant of authority to the President to impose "*any* restriction he may *deem* appropriate." 8 U.S.C. § 1182(f) (emphasis added). The payment is not a tax seeking to raise revenue; it is a restriction on entry to deter abuses of the H-1B program that harm American workers. In any event, Congress delegated broad authority to the President to restrict, suspend, or regulate entry of aliens, which naturally includes a temporary payment requirement. The Supreme Court recently explained that there is not a higher standard for delegation of the taxing power. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025). This law is sufficiently clear. On the other hand, the power is limited by temporary restrictions on the entry of aliens, so there is no major question. The district court also correctly held that Plaintiffs' APA claim fails, as they conceded at oral argument that if the *ultra vires* claim failed, so too did their APA claim. JA474.

15

**II.**    Finally, the district court can be affirmed on alternate grounds. **A.** First, Plaintiffs' claims are not justiciable under principles of consular non-reviewability because they challenge the executive's decisions on admitting and excluding aliens. **B.** Plaintiffs lack an *ultra vires* cause of action because the laws confer discretion on the President and Plaintiffs cannot argue the Proclamation is wholly outside of the statutes. *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *NRC v. Texas*, 605 U.S. 665 (2025). **C.** Plaintiffs also lack an APA cause of action because the challenged agency memoranda simply implement the Proclamation, there is no agency action beyond that, Plaintiffs are not injured by the agency guidance, and any agency action is committed to the agency's discretion.

**III.**    Finally, Plaintiffs have not made the required showings to obtain an injunction including irreparable harm, lack of a remedy at law, balance of hardships, and public interest, particularly since all of the alleged harm boils down to a decision not to participate in the H-1B program and the attendant results, such as an inability to recruit or hire foreign H-1B workers.

The district court's judgment should be affirmed.

## STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment *de novo.* *EEOC v. Aramark Corp*., 208 F.3d 266, 268 (D.C. Cir. 2000). Because this court

reviews "the district court's judgment, not its reasoning" it "may affirm on any ground properly raised." *Id.*

## ARGUMENT

### I. The Proclamation Is Lawful.

The district court correctly granted summary judgment to the government on Plaintiffs' claims because the Proclamation is plainly within the bounds of the authority granted to the President by Sections 1182(f) and 1185(a) and not contrary to the INA.

### A.    The Proclamation Falls Well Within the President's Broad Authority Under Section 1182(f) and § 1185(a).

**1.**    The controlling background principle of this case is that the exclusion of foreign nationals is a sovereign prerogative. As the Supreme Court has repeatedly emphasized, "the political branches" possess near-plenary authority in the immigration context, and "any policy toward aliens" is "so exclusively entrusted to the political branches as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952).

Plaintiffs suggest that Congress possesses exclusive authority over immigration. Br.16-17. That is wrong. The "right" to exclude aliens "stems not alone from legislative power but is *inherent in the executive power* to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added). That makes sense. "[A]ny policy toward aliens is vitally

and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government"—all core executive functions. *Harisiades*, 342 U.S. at 588-89. Indeed, "[w]hen Congress prescribes a procedure concerning the admissibility of aliens," it is "implementing an inherent executive power." *Knauff*, 338 U.S. at 542.

Against this backdrop, "Congress may in broad terms authorize the executive to exercise the power" over entry. *Id*. at 543; *see also Hawaii*, 585 U.S. at 702 (quoting *Fiallo*, 430 U.S. at 792, for same reasoning). That is exactly what Congress did in Sections 1182(f) and 1185(a), by providing a "comprehensive delegation" to suspend, restrict, or regulate the entry of any aliens. *Hawaii*, 585 U.S. at 685. Given the President's inherent authority over immigration and Congress's "express . . . authorization," the President's "authority is at its maximum" here. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

**2.**    Section 1182(f) provides a grant of broad discretion to the President to "suspend the entry of all aliens or any class of aliens" or "impose on the entry of aliens *any* restrictions *he may deem to be appropriate*" "[w]henever the *President finds*" that entry of such aliens or class of aliens "would be *detrimental to the interests of the United States*." 8 U.S.C. § 1182(f) (emphasis added). "By its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. The Supreme Court has thus "observed that § 1182(f) vests the President with

18

'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* The President lawfully used this broad authority to temporarily suspend or restrict the entrance of those seeking H-1B visas subject to a $100,000 payment to address severe abuses and detriments to American works. JA168-171.

The district court correctly held that the Proclamation was facially valid, finding that it contains the necessary predicate findings, regulates a class of aliens, and creates a valid entry restriction. JA447-51. Wisely, Plaintiffs no longer argue that the Proclamation makes the wrong findings or does not apply to a class of aliens. Instead, Plaintiffs focus on whether the Proclamation imposes a "tax" that overrides the INA. As will be discussed, the district court correctly rejected those arguments as well. JA457-459.

**3.** Section 1185(a)(1) also supports the Proclamation because it allows the President to set "reasonable rules, regulations and orders" for the entry and exit of aliens, subject to "such limitations and exceptions as the President may prescribe." *See* 8 U.S.C. § 1185(a)(1). The payment can easily be supported as a reasonable regulation, or a limitation, on entry under Section 1185(a)(1) alone.

Plaintiffs argue that § 1185(a) is narrower than Section § 1182(f) and therefore cannot authorize the Proclamation. Br.44-45. That would impermissibly render the separate provision superfluous. *See RadLAX Gateway Hotel, LLC v. Amalgamated*

19

*Bank*, 566 U.S. 639, 645 (2012). As the district court correctly explained, § 1185(a) is broader in many respects than § 1182(f): it can be used for departure regulations and it does not require the predicate findings of § 1182(f); indeed, such requirements were removed over time. JA444-46 (discussing history). On the other hand, Section 1182(f) allows for the complete suspension of entry, which is temporary but more prohibitive than a regulation, limitation, or order. In saying the laws "substantially overlap," the Supreme Court simply noted that it agreed with the government that it "need not resolve … the precise relationship between the two statutes" because all agreed the proclamation was a suspension on entry. *Hawaii*, 585 U.S. at 683 n.1. Here, Plaintiffs argue the Proclamation is not a suspension or restriction under Section 1182(f), which raises the distinct issue of whether this is an order, regulation, or limitation under Section 1185(a)(1).

Plaintiffs argue that § 1185(a) is limited to "Travel control of citizens and aliens." Br.45-46. The Proclamation is a suspension, restriction, regulation, limitation, or order on entry into the country, which is a "travel control." *See Hawaii*, 585 U.S. at 694 (discussing ban in terms of "travel"). So regardless of the precise scope of either section, the Proclamation falls squarely within both § 1182(f) and § 1185(a). To the extent Plaintiffs are arguing that the section is limited to "travel documentation" for entry and departure they are wrong. Br.45-46. Section 1185(a)(1) is not so limited. It allows the President to make it "unlawful" for "any

20

alien to depart from or enter" the nation "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." That is a broad authority to regulate the entry of any aliens in the President's sole discretion. And this focus on entrance regulation is buttressed by subsection 1185(a)(2), which makes it unlawful to knowingly transport someone "into the United States" if the person's entry is restricted by such rules, regulations, or orders. That is not simply about documents and their integrity. Whatever "the title of a statute" might be, it "cannot limit the plain meaning of the text." *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). In any event, petitions for a visa to seek entry are documents relating to travel control and this is a regulation or limitation on that travel document.

## B.    The Proclamation Does Not Conflict with the INA.

Congress layered the President's §§ 1182(f) and 1185(a)(1) authority on top of his authority under the INA to prescribe restrictions on alien admissions. Indeed, *Hawaii* explained that "§ 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." 585 U.S. at 684 (emphasis added). The Supreme Court rebuked the plaintiffs there for adopting a "cramped" reading of the President's authority and rejected the Ninth Circuit's argument that Congress had created a "reticulated regulatory scheme" for security vetting and visa waivers that the proclamation overrode. *Id.* at 681, 691.

21

Plaintiffs make the exact same arguments here, claiming the Proclamation "expressly overrides" Congress's scheme for H-1B visas and related fees. Br.21-22.[2]

But Plaintiffs cannot point to any specific prohibition or provision that the Proclamation fully displaces. Instead, their basic argument is that since Congress provided for certain fees and requirements for H-1B, this implicitly precludes any other restrictions. Br.21-34. Plaintiffs' argument would eviscerate Sections 1182(f) and 1185(a). Section 1182 is replete with conditions on who is and is not admissible, as are most visa provisions. If adding any additional restrictions overrode the INA, then most proclamations would be invalid, especially for visas. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas); *Pacito v. Trump*, 152 F.4th 1082, 1087 (9th Cir. 2025) (rejecting similar argument for refugees, 90 Fed. Reg. 8459). The district court correctly rejected this argument. JA444-46.

**1.** Plaintiffs first find a purported conflict in certain statutory fees that can be levied on H-1B petitions. Br.24-29. Plaintiffs claim this proves Congress set a specific cost for the visa and any other payments override that choice. *Id.* Again,

---

[2] Plaintiffs cite *RAICES v. Noem*, 25-5243, (D.C. Cir. Aug. 1, 2025) and *Doe #1 v. Trump,* 957 F.3d 1050 (9th Cir. 2020) to argue that the Proclamation cannot conflict with the INA. Both were stay decisions. In *RAICES* this Court allowed an entry restriction for those seeking asylum and only denied the stay for *removals* within the country, which is irrelevant here. The merits panel in *Doe #1* disagreed, holding that there was no conflict and the Proclamation satisfied section 1182(f) despite domestic impacts. *Doe #1*, 984 F.3d at 868, 870. That opinion was vacated in the denial of en banc due to mootness. *Biden*, 2 F.4th 1284 (9th Cir. 2021).

Plaintiffs' extraordinary argument is that the existence of *some* fees precludes *all* other payments. That is wrong. None of those fees are exhaustive or prohibitive of other payments or restrictions. Congress knows how to preclude imposing fees but did not do so here. *See, e.g.,* 8 U.S.C. § 1356(e)(3) (fee requirement "shall not apply").

Start with Section 1356(m), which gives the Attorney General discretion to impose "fees for providing adjudication and naturalization services," which "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." Br.25. As the district court ruled, the Proclamation does not impose a fee to cover costs, does not displace that fee, is not collected or used in the same manner, and is not precluded by that recouperation fee. JA444-46; JA356-58. Instead, the Proclamation is designed to address "abuses" in the H-1B program where low wage workers take important jobs from Americans. *Id.* Moreover, subsection (m) uses the permissive word "may" and in no way precludes different payments. JA444-46 (citing *Biden v. Texas*, 597 U.S. 785, 802 (2022) ("'may' clearly connotes discretion.")). The legislative history supports this, as the fee was increased to cover costs without congressional funds, so it "would be passing strange" for that provision to cap other payments or restriction under Sections 1182(f) or 1185(a)(1). *Id.* Furthermore, subsection (m) is a general provision, not a fee schedule specific to

H-1B petitions. It would be a significant limit to suggest this foreclosed any payment restriction under 1182(f) or 1185(a)(1) absent an express prohibition.

Indeed, Plaintiffs acknowledge that many other fees can apply to H-1B petitions, none of which exclude additional payments. Br.24. For example, 8 U.S.C. § 1356(u)(1), "authorize[s]" the Secretary to "establish and collect a premium fee," acknowledging payments "in addition to any other fees authorized by law." That also does not address the concerns in the Proclamation and it expressly acknowledges other fees. Plaintiffs point to other fees for fraud and businesses that hire many H-1B petitioners to argue that Congress directly addressed the abuses raised by the Proclamation. Br.26. Again, the fraud prevention fee in §1184(c)(12) is "in addition to any other fees authorized by law" and both that and the initial petition fee are to be deposited in accordance with § 1356(s)(1), which refers to them as "offsetting receipts." *See* 8 U.S.C. § 1356(s)(1). This does not preclude additional payments or occupy the same field as the Proclamation. Neither does the temporary $4,000 fee for businesses with 50% noncitizen employees say anything limiting other fees or suggest that it seeks to address the particular harms stated in the Proclamation. *See* Pub. L. 113-114 (Dec. 18, 2015), 129 Stat. 3000 § 401 (part of the reauthorization of the 9-11 Victim's Fund). Nowhere did Congress suggest that it was imposing fees specifically to address the harms cited by the Proclamation, nor did it state that the fees it authorized by statute are exhaustive. JA465-66.

Plaintiffs' argument that Sections 1182(f) and 1185(a) would render the existing fees meaningless is meritless. Br.27-28. The Proclamation cannot and does not override these precise fees or address the same issues. And any payment would be temporary, where most of the statutory fees are permanent and often subject to rulemaking. The Proclamation's payment is not prohibited nor does it displace any existing fee, so it cannot override the INA.

**2.**    The Proclamation also does not "eviscerate" H-1B's qualifications by limiting petitions to the "best of the best." Br. 22, 29-34. Plaintiffs' seizure on that rhetoric does nothing for them. As the district court explained, the "best of the best" argument is strained because the statutory requirements for a "specialty occupation" remains in effect. JA469. The Proclamation makes no changes to statutory requirements a beneficiary must meet to qualify for an H-1B visa, including that the job opportunity requires "theoretical and practical application of a body of highly specialized knowledge, and attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); JA168-71. Plaintiffs' jaunt through legislative history does not change this either, as entry level aliens can still petition. Br.31-34.

The Proclamation also does not change the caps (which are ceilings not floors) or that certain industries are cap exempt. Instead, the Proclamation supplements the INA by temporarily imposing a $100,000 payment for certain petitions to "impose

higher costs on companies seeking to use the H-1B program in order to address the abuse of that program." JA169. As the district court found, this is consistent with and *furthers* a key policy goal of the H-1B program in "protecting the American workers from displacement by imported labor." JA468. Plaintiffs say other provisions reflecting these policy concerns support their position. But the Proclamation does not conflict with those provisions. Br.32. Nor is it limited to prevailing wages or employers who repeatedly committed fraud—rather, it seeks to help Americans get important STEM and national security jobs. Like the arguments rejected in *Hawaii*, this is not a situation in which Congress occupied the space to address the same problem. 585 U.S. at 690-91. The district court was correct that the Proclamation is a lawful exercise of the President's authority and does not conflict with or supplant provisions of the INA.

### C.    The Proclamation Does Not Contravene Congress's Taxing Power.

Nor is the payment restriction an unconstitutional tax. The payment is not a tax to begin with. Even if it was, the district court correctly ruled that Section 1182(f)'s broad delegation could encompass such a limited tax. JA458. The payment is clearly a restriction, regulation, or suspension on entry and does not run afoul of the major questions doctrine.

**1.**    The Supreme Court continues to recognize that not all payments are taxes, distinguishing them, in part, on how high the payment is and who collects it. *NFIB*

*v. Sebelius*, 567 U.S. 519, 565–66 (2012) (citing *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 36–37 (1922)). Unlike *NFIB*, the fee here is collected by USCIS, not the IRS. *Id.* And in *NFIB* the tax could never be more than insurance. But here Plaintiffs' core argument is that the payment is excessive in relation to H-1B petition fees (purposefully so) and this causes them irreparable harm because it is allegedly ruinous. *Id.* Plaintiffs cannot have it both ways; if the payment is so large it can be "prohibitory," it is more likely a penalty or fee rather than a tax. *Id.* The payment is a suspension or restriction on entry, not a tax. Plaintiffs never explain why it must be a tax other than baselessly implying it raises revenue. Br.34. But the purpose of the payment is to increase employment and wages of Americans, especially in national security related industries.

Plaintiffs' only other meaningful argument is to rely on *Smith v. Turner* 48 U.S. 283, 405 (1849) and *Henderson v. Mayor of New York*, 92 U.S. 259, 272-73 (1875). Br.20. But those cases merely concluded that *states* could not impose a payment on immigrants because it unconstitutionally intruded on the *Commerce Clause*. *Smith*, 48 U.S. at 421; *Henderson*, 92 U.S. at 270. As Plaintiffs acknowledge, the fractured Court in *Smith* could not decide on what to label the payment (Br.20), but it did not matter because the issue was usurping the foreign commerce power, not the taxing power. There is no similar question of the commerce power or powers reserved to the states here. The district court rejected reliance on such cases, raised

27

for the first time at oral argument, for much the same reasons. JA458. Plaintiffs'
conclusory assertion that the $100,000 payment is a tax should not carry the day.

**2.**     Even if the Proclamation imposes a tax (it does not), the INA clearly
authorizes it. In Sections 1182(f) and 1185(a), Congress delegated the President
sweeping discretion to impose "any restrictions he may deem to be appropriate" or
"reasonable rules, [and] regulations" in the realm of "immigration" and "foreign
affairs." *Hawaii*, 585 U.S. at 684, 708. As the district court correctly ruled, Section
1182(f)'s delegation used "exceeding[ly] broad language" that encompassed a
restriction requiring an "additional payment obligation for entry of a nonimmigrant
H-1B visa worker." JA 458. Rather than narrow the scope of this broad language,
Congress chose to use the expansive term "any." JA455; *see also Ford v. Mabus*,
629 F.3d 198, 206 (D.C. Cir. 2010). A temporary payment is certainly "any"
restriction, regulation, or suspension.

Plaintiffs rely (Br.18-21, 34-38) on *Skinner v. Mid-American Pipeline Co.*,
490 U.S. 212 (1989) to argue that the Proclamation imposes a tax that was not clearly
delegated by Congress. But as the district court correctly ruled, *Skinner* expressly
declined to create a "stricter nondelegation doctrine in cases where Congress
delegates discretionary authority to the Executive under its taxing power." JA458
(citing *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025)).
Plaintiffs say this ignores the clarity with which a delegation must be made (Br.43-

44), but *Skinner* stated that Congress does not have to be clearer than with other delegations. 490 U.S. at 222-23.

Given the breadth of Congress's express delegations in Sections 1182(f) and 1185(a) to suspend, restrict, or regulate the entry of aliens, a temporary tax or fee would easily be encompassed. At a minimum, a payment is surely a lesser restriction on entry than total suspension. *See Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 (9th Cir. 1980) (Section 1182(f) confers "the extreme power to prevent the entry of any alien or groups of aliens into this country as well as the lesser power to grant entry to such person or persons with any restriction on their entry as he may deem to be appropriate."). That is especially so given the intersection of foreign affairs and immigration, where the President wields significant "authority," so Congress "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965); *see also Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892).

**3.** Plaintiffs respond by trying to unduly cabin the meaning of suspend, restrict, or regulate, arguing those terms cannot include the power to tax domestic businesses. Br.34-39. Plaintiffs are wrong twice over. *First*, a suspension, regulation, or restriction can easily encompass a tax, fee, or payment. The Proclamation literally restricts, regulates, or suspends the entry of petitioners seeking H-1B visas unless the payment is made. They cannot enter absent meeting that condition. The

Proclamation falls within the common definition for "restriction" which is "A limitation imposed upon a person or thing; a condition or regulation of this nature." Oxford English Dictionary (2d. Ed. 1989). It is at least a condition imposed on a person. And even under Plaintiffs' definition of "restrict," the Proclamation clearly "limits," "confines," or "restrains with bounds" entry into the United States for those who do not satisfy the restriction. Br.37 n.5.

The fact aliens can enter in other ways or if they meet the restrictions does not somehow negate the fact it is still a restriction on the aliens' ability to enter. Plaintiffs' argument is essentially that the Proclamation must *ban* entry. But that would render any restriction or regulation superfluous compared to suspension. Plaintiffs have no explanation for these distinct terms.

Plaintiffs' citation to the 1952 definition of "entry" to limit any restrictions to the border is also unpersuasive. That definition was repealed in 1996. Pub. L. 104–208, §301(a). The Supreme Court has held that § 1182(f)'s use of the language "any restrictions he may deem to be appropriate" "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA," including restricting entry via a "naval blockade" while the older definition was still

operative. *Hawaii*, 585 U.S. at 684 (quoting *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993)).[3]

Nor does it matter that the same aliens can enter other ways or overcome the restriction. The Proclamation in *Hawaii* allowed restricted aliens to enter for other purposes, included exceptions, and allowed countries to satisfy conditions to reestablish entry. 585 U.S. at 685, 680. This is often true for proclamations; the same aliens can have entry restricted for one visa but not others. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for Chinese students, but they could enter other ways); *Pacito*, 152 F.4th at 1087 (proclamation suspending refugees even though aliens could enter other ways).

*Second*, Plaintiffs' insistence that the Proclamation imposes an impermissible tax or exaction on domestic businesses for domestic purposes (Br.37, 44) reflects a myopic view of the Proclamation and the H-1B program. JA459-60. In the H-1B program it is the employer who offers the job, obtains the labor certification, recruits the temporary foreign workers, and files the petition on behalf of the alien beneficiary, all of which are necessary steps for the alien to apply for admission as

---

[3] The district court rightly rejected this because the process for entry by an alien requires far more than simply presenting at the border. JA454. With respect to aliens seeking H-1B status in particular, an employer must file a petition on the alien's behalf establishing that the alien and the job opportunity meet the statutory requirements of the program. 8 U.S.C. §§ 1184(c)(1) and (i), 8 C.F.R. §§ 214.2(h)(2)(i)(A) and (h)(4)(iii)(B)(1).

an H-1B. *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b); 1184(c)(1). By Plaintiffs' logic no

visa that relies on a domestic sponsor could ever be restricted because it would

impact domestic entities. But it takes two to tango for many visas that have been

restricted before. *See* 85 Fed. Reg. 34,353 (suspending F or J visas for Chinese

students, which requires a domestic sponsor). In any event, the fact that the intent or

effect might be primarily domestic is of no moment, as the detriment is still the entry

of the aliens and that is almost always the case. *See Doe #1 v. Trump*, 984 F.3d 848,

870 (9th Cir. 2020), *vacated on denial of reh'g en banc sub nom. Doe #1 v. Biden*, 2

F.4th 1284 (9th Cir. 2021) ("all such restrictions may be characterized as reflecting

"domestic" policy concerns to a greater or lesser degree.").

**4.**      Plaintiffs then shift to arguing that this raises a "major question" because it

could result in a sweeping power and extends beyond historical practice.[4] Br.19-20,

39-43. Wrong again. *First*, the doctrine applies "in the domestic sphere," but not

here in "the national security or foreign policy contexts" because "Congress intends

to give the President substantial authority and flexibility to protect America and the

American people." *Consumers' Research*, 606 U.S. at 706-07 (Kavanaugh, J.,

concurring).

---

[4] The district court correctly found the argument forfeited because plaintiffs
addressed the major questions doctrine in one sentence in their opening brief, four
sentences in reply, and made no mention of it at oral argument. JA458 n.8.

*Second*, there must be a "'mismatch[]'" between the breadth of the asserted power and the "narrow[ness]" of the statute. *Biden v. Nebraska*, 600 U.S. 477, 517-518 (2023) (Barrett, J., concurring). The opposite is true here. Sections 1182(f) and 1185(a) confer "sweeping proclamation power." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). But it is not unlimited; nor is the Proclamation. As the district court noted, the Proclamation only applies (1) temporarily to (2) aliens (3) whose entry would be (4) detrimental to the United States. JA462-63; 8 U.S.C. § 1182(f). Plaintiffs' parade of horribles is not before this Court. Br.42-43. Even so, they all rely on restrictions on the entry of aliens, which significantly limits the implications. *Id.* Aliens have no right to enter the country, so placing payment restrictions on their entry under a statute the Supreme Court has said confers "facially broad grant of power" with "broad discretion" is hardly hiding an elephant in a mousehole. *Hawaii*, 585 U.S. at 683-84, 688. Congress purposefully and clearly placed this gazelle in the savannah where it belongs.

*Third*, the unique nature of this Proclamation is not "damning." Even Plaintiffs acknowledge that various Presidents have used proclamations to address new issues in novel ways. Br.40-41; *see Pacito*, 152 F.4th at 1087 (permitting suspension of all refugees). This is no different. The prior proclamations identified by Plaintiffs do not identify harms that could readily be corrected by a payment as these harms. *Id.* The Proclamation here identifies a specific harm to American workers caused by

abuse of the H-1B program and entry of low skilled aliens. JA168-71. Rather than fully suspend the program, the Proclamation imposes an entry restriction—a payment—tied directly to the harm identified because it increases the costs of hiring an H-1B worker over an American. JA169. The payment is effective and works as intended, as shown by Chamber's own member who hired an American after claiming it could not. JA410-11. As Justice Barrett has said, historical practice can be relevant, but one cannot assume previous Presidents exercised their power "maximally" and previous regulations cannot give us "a law trapped in amber," preventing all innovations to address new challenges. *United States v. Rahimi*, 602 U.S. 680, 739 (2024) (Barrett, J., concurring). Yet that is precisely what Plaintiffs seek; to ossify the proclamation power based on past practice.

Nor is Plaintiffs' reliance on recent tariff cases persuasive. Br.38 (citing *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209, 224–29 (D.D.C. 2025); *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1332–36 (Fed. Cir. 2025)). Statutory interpretation depends on "text, . . . context, purpose, and history." *Igas Holdings, Inc. v. EPA*, 146 F.4th 1126, 1138 (D.C. Cir. 2025). Under those considerations, Plaintiffs give no reason why the meaning of "regulate . . . importation" under the International Emergency Economic Powers Act has any bearing on what "any restrictions [the President] may deem to be appropriate" under § 1182(f) or "reasonable rules, regulations, and orders" under § 1185(a)(1) mean. In any event,

the non-binding tariff cases are actively being litigated, and this Court should not rely on them.

The district court also correctly held that Plaintiffs' APA claim failed on the merits for the same reason, as "Plaintiffs concede that if issuance of the Proclamation is not ultra vires, then their APA claim would similarly fail." JA 474.

## II. In the Alternative, the District Court's Decision Can Be Affirmed Because Plaintiffs' Claims Are Not Justiciable.

### A. Plaintiffs' Claims are Barred by Principles of Non-reviewability.

The Proclamation is not reviewable under principles of consular non-reviewability. "The admission and exclusion of foreign nationals is a fundamental sovereign attribute" that is "largely immune from judicial control." *Department of State v. Muñoz*, 144 S. Ct. 1812, 1820 (2024) (quotations omitted). Importantly "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo*, 430 U.S. at 796 (citation omitted). Review of entry decisions is "not within the province of any court, unless expressly authorized by Congress." *Knauff*, 338 U.S. at 543.  On the flip side, "Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference" and "[w]hen it does so, the action of an executive officer to admit or to exclude an alien

is final and conclusive." *Muñoz*, 144 S. Ct. at 1820 (quotations omitted).[5]

Plaintiffs' claims challenging the President's Proclamation are non-justiciable on both fronts. Congress has clearly not authorized the review of entry decisions. *Knauff*, 338 U.S. at 543. Since "[t]he [INA] does not authorize judicial review of a consular officer's denial of a visa; [] as a rule, the federal courts cannot review those decisions" under the "doctrine of consular nonreviewability." *Muñoz*, 144 S. Ct. at 1820 (quotations omitted). Instead, Congress has delegated sweeping "discretionary authority" over whether to admit aliens. *Id.* Congress made a policy choice in 8 U.S.C. §§ 1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk*, 785 F.2d at 1049 n.2 (R.B. Ginsburg, J.); *see supra* I.A. "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions. *Hawaii*, 585 U.S. at 682, 684.

Plaintiffs' only response is to briefly claim that consular non-reviewability

---

[5] Consular non-reviewability is not limited to consular officials, it can apply to any executive official involved in entry determinations. *See e.g., Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("enforced exclusively through executive officers, without judicial intervention," including the Attorney General); *Rahmani v. Yellen*, 2024 WL 1701681, at \*14–15 (D.D.C. Apr. 19, 2024) (Treasury); *United States v. Ju Toy*, 198 U.S. 253, 261 (1905) ("Secretary of Commerce and Labor"); *Matushkina v. Nielsen*, 877 F.3d 289, 295-96 (7th Cir. 2017) (CBP).

does not apply to "forward-looking challenges to the lawfulness of regulations or policies governing [such] consular decisions" under *Pietersen v. United States Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025). Br.48.[6] That case involved an APA challenge to a "reason to believe" standard set by the State Department in its Foreign Affairs Manual. *Id.* at 554. But the Proclamation is not an agency regulation or policy, it is a presidential Proclamation wholly within the President's discretion. And the agencies are not setting a new standard for reviewing visas; at most the agencies issued guidance simply implementing the Proclamation. *See infra* II.C. The Proclamation set the standard and policy here, and that cannot be challenged in the same way as an agency policy. This is why the Supreme Court noted that the question of reviewability was a "difficult question." *Hawaii*, 585 U.S. at 682. This Court did not resolve that difficulty in *Pietersen*.

### B.    Plaintiffs Did Not Make the Threshold Showing Required for an *Ultra Vires* Claim.

In granting summary judgment to the government on Plaintiffs' *ultra vires* claim, the district court considered the merits to avoid questions of justiciability on that claim. But it is doubtful that *ultra vires* review is available to challenge presidential actions at all for at least two reasons. *See Am. Foreign Serv. Ass'n v.*

---

[6] Defendants respectfully disagree with the Court's decision in *Pietersen* and reserve challenges for future review. Defendants also agree with Judge Pan that the plaintiffs did not properly raise APA claims to challenge the policy to begin with. *Pietersen*, 138 F.4th at 563 (Pan, J., dissenting).

*Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam). First, "longstanding authority holds" that *ultra vires* review of executive action is "not available" when, as here, "the statute in question commits the decision to the discretion of the President." *Dalton*, 511 U.S. at 474; *see Am. Foreign Serv.*, 2025 WL 1742853, at *2. Second, Plaintiffs cannot meet the high standard for non-statutory review set by the Supreme Court in *Nuclear Regul. Comm'n (NRC) v. Texas*, 145 S. Ct. 1762, 1776 (2025).

**1.**    It is well established that review of executive action is "not available" when "the statute in question commits the decision to the discretion of the President." *Dalton*, 511 U.S. at 474. Section 1182(f) is the paradigmatic example of such a statute. *See supra* I.A.2. Plaintiffs acknowledge the breadth of this discretion but simply argue that this Court allowed review of a similarly deferential statute in *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023). Br.49. But the plaintiffs there argued that the President violated the clear mandate in the statute at issue that the relevant land "shall be managed ... for permanent forest production." *Am. Forest Res. Council*, 77 F.4th at 795 (quoting 43 U.S.C. § 2601). Plaintiffs point to no similar mandatory language here. And unlike the Antiquities Act, "§ 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684.

38

The discretion in section 1185(a)(1) is equally clear, as it allows the President to set "reasonable rules, regulations, and orders, and subject to such limitations and exceptions as *the President may* prescribe." 8 U.S.C. § 1185(a)(1) (emphasis added). Plaintiffs strangely argue that this language is less discretionary because reasonableness is a judicially manageable standard. Br.49. But the statute provides no baseline or metric. Plaintiffs point to this Court's holding that a standard of "fair" or "excessive" profit was not committed to agency discretion given a long history of rate regulations and monopoly laws. *Rainbow Nav., Inc. v. Dep't of Navy*, 783 F.2d 1072, 1079 (D.C. Cir. 1986). However, Plaintiffs point to no similar baseline or history here. Indeed, Plaintiffs say the Supreme Court reviewed regulations under this provision before, but the relevant case focused on the fact that admission is "a matter of privilege" "inherent in the executive department of the sovereign." *Knauff*, 338 U.S. at 543-44. That *favors* non-reviewability.

The Supreme Court previously addressed parallel language in § 102(c) of the Foreign Services Act, which allowed termination of a CIA employee whenever the Director "shall *deem* such termination necessary or *advisable in the interests of the United States*" finding that language, too, "fairly exudes deference" to the President. *Webster v. Doe,* 486 U.S. 592, 600 (1988) (emphasis added). The Court found that the provision "appears … to foreclose the application of any meaningful judicial standard of review." *Id.* So too here. Sections 1182(f) and 1185(a) foreclose review

because they do not require evidence that such entry *is* detrimental to the interests of the United States, only that the President finds that it would be. *See id.* at 600. "How the President chooses to exercise the discretion Congress has granted him" in Sections 1182(f) and 1185(a)(1) of the INA is thus "not a matter for [a court's] review." *Dalton*, 511 U.S. at 476.

That prohibition on review also extends to any claim that "concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power" because "the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion." *Id.* at 474 (quoting *Dakota Central Telephone Co.* v. *South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)). Here, at best, Plaintiffs claim the Proclamation is a mere excess or abuse of discretion in exerting power that falls squarely within § 1182(f) and § 1185(a) and fail to state an *ultra vires* claim. Thus, the Proclamation, which was issued pursuant to a broad grant of discretionary authority in sections 1182(f) and 1185(a)(1), is not subject to review via an *ultra vires* claim. That is particularly true here because the President's determination addresses issues of both immigration and national security. *See supra* I.A. For many of the same reasons that consular non-reviewability bars Plaintiffs' claims (*see supra* II.A.), review of the President's discretionary determination should also be limited.

The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). It is "wholly outside the power of this Court to control" the power to expel or exclude aliens, including "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based." *Id*. at 796 (citation omitted). Likewise, "[n]ational-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Dakota Central Telephone Co.*, 250 U.S. at 184 (refusing to consider claim that President abused discretion based upon statutory provision giving President power to control telephone lines if he "deem[ed] it necessary for the national security or defense"). Courts are therefore "'reluctant to intrude upon'" an exercise of that national-security authority "unless 'Congress specifically has provided otherwise,'" *Ziglar*,

582 U.S. at 143, and an *ultra vires* claim like Plaintiffs assert here necessarily lacks congressional authorization.

**2.**     The district court's judgment can also be affirmed because Plaintiffs failed to meet the standard articulated in *NRC v. Texas*, that an *ultra vires* challenge based on a statute "applies only when an agency has taken action entirely in excess of its delegated powers," and "contrary to a specific prohibition in a statute." 145 S. Ct. at 1776 (internal quotation marks omitted). As discussed, the action here is consistent with both §§ 1182(f) and 1185(a) and complies with the INA. Plaintiffs have not identified any "specific prohibition in a statute" that would render the Proclamation "entirely in excess of [the President's] delegated powers." *Id*. That alone is fatal to their claims. *Id.*

Plaintiffs argue that the standard of *NRC* and *Kyne* "applies only when Congress has impliedly precluded judicial review," (Br. 50), but *NRC* contains no such distinction, and this Court has applied the standard more broadly. *See Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (Appellants "point to no specific prohibition the defendants have violated to an extreme and nearly jurisdictional degree."). Even so, as explained, both consular non-reviewability and *Dalton* otherwise preclude judicial review of the President's actions or agency implementation because the authority is solely committed to the President's

42

discretion under Sections 1182(f) and 1185(a). Therefore there is an implicit bar on review in the statute.

Regardless, even if *NRC's* test does not apply, that does not mean *ultra vires* claims can be brought for any statutory violation. Congress knows how to create a cause of action but did not do so here. Plaintiffs' argument would render Congress's choice not to create a cause of action void. At most, even a broader view of *ultra vires* claims requires the statutory violation to be "obviously beyond the terms of the statute" or "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (finding the statute did not preclude review and then denying *ultra vires* claim). As a result, *ultra vires* claims "rarely succeed." *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). Plaintiffs' claims certainly do not here and do not even grapple with this standard. Br.50. The Proclamation was clearly lawful. But at most, given the broad delegation and deference at issue, this is a close and contestable issue on the margins, as Plaintiffs must show more than "routine error in statutory interpretation" to support such a claim. *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763, (D.C. Cir. 2022). Plaintiffs' novel theories, even if ultimately right (they are not), are insufficient for any non-statutory *ultra vires* claims.

Similarly, the agency memoranda and guidance discussing the Proclamation are likewise unreviewable through an *ultra vires* claim. Those documents do little

more than quote and explain the Proclamation. JA172-182; JA475. To allow review of such documents via an *ultra vires* claim, when the Proclamation itself is unreviewable, would result in the absurd notion that any agency statement or action about, or in accordance with, a Presidential Proclamation somehow renders the Proclamation itself subject to an *ultra vires* challenge. And, once again, there is no "specific prohibition" on the agency actions. *NRC*, 145 S. Ct. at 1776.

### C. There is No Final Agency Action and the Agency Implementations Merely Carry Out the Presidential Directive.

The APA also does not provide a cause of action for judicial review of the President's Proclamation. Mere agency implementation of a presidential proclamation cannot be challenged. In any event, there is no final agency action here. And any action would be committed to agency discretion. Each problem with Plaintiffs' cause of action provides an alternative ground for affirmance.

**1.** To start, the President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). As a result, agency implementations of a presidential proclamation are an "extension of the President's action" and thus cannot be challenged under the APA because those actions are "merely carrying out directives of the President." *Tulare County v. Bush*, 185 F. Supp. 2d 18, 21 (D.D.C. 2001), *aff'd on other grounds*, 306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Forest Service is merely carrying out directives of the President, and the APA does not apply to presidential action"); *see also Ancient Coin Collectors*

*Guild v. CBP,* 801 F. Supp. 2d 383, 403 (D. Md. 2011) (no APA review was available where agency was "acting on behalf of the President.").

Chamber and AAU challenged short explanatory memoranda as the necessary final agency actions. JA60; Br.51 n.14. The memoranda explain that the Proclamation applies prospectively, which is consistent with the Proclamation itself (JA169-170), and provide information on how to pay the $100,000 payment required by the Proclamation. JA172-79. Since those memoranda simply implement the Proclamation, there is no final agency action to challenge. *See Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016). Plaintiffs argue that simple implementation is sufficient unless the President takes the "final step necessary for the agency action directly to affect the parties." Br.52 (quoting *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993)). That is precisely the case here; the President issued a detailed Proclamation and the agencies are simply implementing it and providing guidance to the public.

If one takes Plaintiffs' argument seriously, it would suggest "the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Tulare County,* 185 F. Supp. 2d at 21. That would circumvent *Franklin*. This is not to say all implementations of a presidential directive are unreviewable; rather, there is no reviewable action here because "mere ministerial implementation of

presidential action" is not reviewable. *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021). The agency memorandum here involved no independent decision-making and did not expand the scope of the Proclamation. *Id.*

Plaintiffs now, for the first time, argue that each application is a decision not to provide an exception. Br.52. This argument is obviously waived; indeed the district court chastised Plaintiffs for *not* making that argument. JA476; *Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009). Moreover, one must seek an exception for it to be denied, as consideration of an exception is not attendant to every application. Plaintiffs would need to challenge each discrete denial, which they have not done.

**2.** For similar reasons, even if implementing a presidential proclamation did not preclude APA review by itself, the agency memoranda cannot constitute "final agency action." Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. To be final (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,'" or from which "'legal consequences will flow[.]'" *Bennett*, 520 U.S. at 177–78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

Plaintiffs' claim fails both prongs. Plaintiffs seek to enjoin the H-1B Proclamation in its entirety. Yet no agency set the $100,000 restriction on its own statutory authority. None of the memoranda reflect any decision-making by the agencies, as they were bound to abide by the President's Proclamation. *See Trump v. Orr*, 223 L.Ed.2d 180, 181 (U.S. 2025); *Make The Rd. New York v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020); *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100. The district court correctly held that the agencies must follow a Presidential Proclamation. JA475-476 (citing *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012) (an agency "may not simply disregard" a binding presidential directive)). For the same reason, the district court correctly held that a failure to engage in notice-and-comment rulemaking was harmless error because public comments on the $100,000 payment would not relieve the agencies of their requirement to follow the Proclamation. *Id.*; *see also Bradford v. United States DOL*, 101 F.4th 707, 731 (10th Cir. 2024) (rescission required by executive order not arbitrary and capricious because agency had no discretion to act otherwise). Similarly, any rights or consequences flow from the Proclamation, not the memoranda themselves. *See Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 62-65 (D.C. Cir. 2020). Even if the memoranda were vacated, the Proclamation, which is lawful, would still exist and have the exact same impact on Plaintiffs.

47

**3.**     Plaintiffs argue that the guidance did alter the Proclamation by not applying it to status changes or pre-Proclamation petitions, or by preventing travel by visa holders. Br.52. But all of that is apparent on the face of the Proclamation, which had an effective date, only applied to petitions, and only applies to entry—not those within the country. JA168-171.

Even if those were changes, these arguments raise serious standing issues. Plaintiffs "must demonstrate standing for each claim" they seek to press "and 'for each form of relief sought,' even if the various claims are derived from similar facts or raise similar legal questions." *Center for Biological Diversity v. United States Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). They cannot "aggregate" various actions and challenge them as one. *Id.* at 300; *see also Widakuswara v. Lake*, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (rejecting aggregating multiple agency actions into a single action); *Am. Foreign Serv. Ass'n v. Trump*, 792 F. Supp. 3d 116, 128 (D.D.C. 2025) (same). Plaintiffs are obviously not harmed by allegedly *narrowing* the Proclamation. Indeed, they are not harmed by the memoranda at all— it is the Proclamation which restricts entry subject to the $100,000 payment. 90 Fed. Reg. 46029 § 2 (explaining how petitions must comply). Absent the memoranda, Chamber and AAU would face the same harms but clearly have nothing to challenge other than the Proclamation itself. Plaintiffs' arguments to the contrary prove that

48

they are raising an impermissible programmatic challenge. *See Norton v. S.Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 877 (1990).

**4.** Even if APA review were generally available for Presidential actions or agency implementations of Proclamations, it would still be unavailable here. The APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. § 702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens*, see supra* I.A.; *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999). The APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Norton*, 542 U.S. at 64.

There is no statute or other law to gauge the agency action against, only the President's Proclamation under §§ 1182(f) and 1185(a)(1), which "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684; *supra* I.A., JA168-171. Thus, the President's determination of whether and how to suspend, restrict, or regulate entry is inherently committed to his discretion and is therefore unreviewable under the APA. *See Make The Rd. New York*, 962 F.3d at 633 (similar discretion given to Secretary of DHS is unreviewable). By transitive property, that discretion is carried over to the agencies that comply with the Proclamation. *See Detroit Int'l*

*Bridge Co.*, 189 F. Supp. 3d at 105-06. Thus, the Proclamation is the relevant source of law for the agencies, foreclosing judicial review.

## III.    Plaintiffs Failed to Meet the Required Showing for an Injunction.

A plaintiff seeking a permanent injunction must actually succeed on the merits and demonstrate that (1) he has suffered an irreparable injury; (2) remedies available at law, like monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the parties warrants equitable relief; and (4) the injunction is not against the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010). As explained, Plaintiffs fail on the merits for a myriad of reasons. Even so, Plaintiffs cannot satisfy the remaining requirements for a permanent injunction. The Court should thus reject Plaintiffs' request (Br.53-54) to enter an injunction on appeal in the first instance. In any event, the district court did not balance the injunction factors, so a remand would be more appropriate. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 305 (D.C. Cir. 2006).

**1.**    Fundamentally, Plaintiffs cannot show irreparable injury or that they lack adequate relief at law. This case is about whether Plaintiffs should have to pay $100,000 to participate in the *optional* H-1B program within the next year (the current timeframe of the Proclamation), whether through a cap-exempt petition or through the lottery in March 2026.

To the extent Plaintiffs claim economic loss, that, in and of itself, does not constitute irreparable harm. *Doe Co. v. Cordray*, 849 F. 3d 1129, 1134 (D.C. Cir. 2017). And the payment is set up to be refundable, so Plaintiffs that pay may have an adequate monetary remedy. At most, Chamber speculates that some members may not be able to afford the fee which will disrupt projects during the coming year. Br.55-56. AAU cannot plausibly claim that universities with billions in endowments cannot pay $100,000 to petition for H-1B visas. Simply having to adjust budgets or divert resources is hardly irreparable, as that is true of most cases involving money. *See Coney Island Prep v. HHS*, 506 F. Supp. 3d 203, 215 (S.D.N.Y. 2020) (diversion of resources often is not an injury much less an irreparable one).

Chamber and AAU claim remedies at law are inadequate for members who are unable to afford the $100,000 payment. Br.57. It is not entirely clear who those members are or what standard of "affordability" Chamber and AAU apply, and for how many H-1B petitions. At any rate, to the extent the only members who can show lack of an adequate remedy at law are those who cannot afford the $100,000 payment, any injunction would have to be narrowly crafted as to those members.

Chamber and AAU allege that the imposition of the fee has destroyed their members' ability to recruit and retain talent. Br.55. The cases they cite are inapposite because here Plaintiffs and their members *can* continue to recruit and retain H-1B talent as they had before—if they choose to make the $100,000 payment per new

51

petition or hire H-1B workers who are already within the country. If Plaintiffs' members choose not to participate in the H-1B program because they do not want to make the payment, the resulting harms are of their own making. *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (failure to obtain necessary permits was self-inflicted injury and not irreparable). In addition, Plaintiffs' members can seek H-1B's for aliens already within the country to avoid the Proclamation. There are thus many ways to avoid the alleged harms.

As to the lottery, this case is unlikely to be decided before the lottery occurs in March 2026. After the lottery occurs, any claims of irreparable harm or remedy will vanish. *See Li v. Blinken*, 2023 WL 4044487, at *2 (D.C. Cir. June 16, 2023) (appeal moot because Appellants' "own identified deadline for averting irreparable harm—September 30, 2022—has long since come and gone. There is no injunctive relief that could retroactively remedy or stem the harm they asserted would occur after that date"); *Goodluck v. Biden*, 104 F.4th 920, 927 (D.C. Cir. 2024) (a court cannot enter "a remedy despite the clear eligibility cutoff at the end of the fiscal year" for a visa). And it is speculative that Plaintiffs or their members would receive all of the H-1B workers they seek given the lottery.

Moreover, it is not apparent that Plaintiffs cannot simply hire Americans to fulfil their labor needs. Indeed, one of Chamber's members did just that, proving that the Proclamation works and that business can find domestic talent if they try. JA441,

JA410. Thus, Chamber and AAU cannot show irreparable harm during the timeframe of the Proclamation.

**2.**    The balance of hardships and public interest also weigh in favor of the Government. Where the Government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs hardly engage with these factors (Br.57); certainly not enough to justify an injunction without remand. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (on a motion for a preliminary injunction, "the movant has the burden to show that all four factors, taken together, weigh in [his] favor"). By challenging the Proclamation, Chamber and AAU seek to block an exercise of the President's broad authority to suspend or regulate the entry of aliens whose entry he determined would be detrimental to the nation's interests. Here, the Proclamation is directed at resolving "[t]he large-scale replacement of American workers", "suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." *Id.* at 46027. The abuse of the H-1B program is a national security threat because it reduces American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* Those are quintessential national interests, and an injunction severely impedes the Executive's ability to safeguard them. Such relief "deeply

intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978).

And while Plaintiffs have failed to show irreparable harm, the government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does. *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Every day an injunction is in place, the President loses valuable time to implement his policies. So the balance of equities and public interest weigh decidedly in Defendants' favor.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's grant of summary judgment in the government's favor.

Respectfully submitted,

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration

**Tiberius Davis**
Counsel to the Assistant Attorney General

**Glenn Girdharry**
Acting Deputy Director

By: */s/ Alexandra McTague*
**Alexandra McTague**
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 718-0483
alexandra.mctague2@usdoj.gov

*Counsel for Defendants-Appellees*

54

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,965 words, excluding the parts of the brief exempted under Rule 32(f) and D.C. Cir Rule 32(e), according to the count of Microsoft Word.

*/s/ Alexandra McTague*
Alexandra McTague
Senior Litigation Counsel
U.S. Department of Justice
Civil Division

# CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and services will be accomplished by the CM/ECF system.

*/s/ Alexandra McTague*
Alexandra McTague
Senior Litigation Counsel
U.S. Department of Justice
Civil Division

# ADDENDUM OF STATUTES

## Table of Contents

8 U.S.C. § 1182(f) ........................................................................ Add. 1

8 U.S.C. § 1185(a) ....................................................................... Add. 2

8 U.S.C. § 1356(e)(3) ................................................................... Add. 3

8 U.S.C. § 1356(m) ...................................................................... Add. 3

8 U.S.C. § 1356(s)(1) ................................................................... Add. 4

8 U.S.C. § 1356(u)(1) ................................................................... Add. 5

**8 U.S.C. § 1182. Inadmissible aliens**

**(f) Suspension of entry or imposition of restrictions by President.** Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

**8 U.S.C. § 1185. Travel control of citizens and aliens**

**(a) Restrictions and prohibitions.** Unless otherwise ordered by the President, it shall be unlawful—

(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe;

## § 1356. Disposition of moneys collected under the provisions of this title

*    *    *

**(e) Limitations on fees.**

*    *    *

**(3)** The Attorney General shall charge and collect $3 per individual for the immigration inspection or pre-inspection of each commercial vessel passenger whose journey originated in the United States or in any place set forth in paragraph (1): *Provided,* That this requirement shall not apply to immigration inspection at designated ports of entry of passengers arriving by ferry, or by Great Lakes vessels on the Great Lakes and connecting waterways when operating on a regular schedule. For the purposes of this paragraph, the term "ferry" means a vessel, in other than ocean or coastwise service, having provisions only for deck passengers and/or vehicles, operating on a short run on a frequent schedule between two points over the most direct water route, and offering a public service of a type normally attributed to a bridge or tunnel.

*    *    *

**(m)  Immigration  Examinations  Fee  Account.** Notwithstanding  any  other provisions of law, all adjudication fees as are designated by the Attorney General in regulations shall be deposited as offsetting receipts into a separate account entitled "Immigration Examinations Fee Account" in the Treasury of the United States,

Add. 3

whether collected directly by the Attorney General or through clerks of courts: *Provided, however,* That all fees received by the Attorney General from applicants residing in the Virgin Islands of the United States, and in Guam, under this subsection shall be paid over to the treasury of the Virgin Islands and to the treasury of Guam: *Provided further,* That fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.

\*     \*     \*

**(s) H-1B Nonimmigrant Petitioner Account.**

**(1) In general.** There is established in the general fund of the Treasury a separate account, which shall be known as the "H-1B Nonimmigrant Petitioner Account". Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the account all fees collected under paragraphs (9) and (11) of section 214(c) [8 USCS § 1184(c)].

\*     \*     \*

**(u) Premium fee for certain immigration benefit types.**

**(1)** In general. The Secretary of Homeland Security is authorized to establish and collect a premium fee for the immigration benefit types described in paragraph (2). Such fee shall be paid in addition to any other fees authorized by law, deposited as offsetting receipts in the Immigration Examinations Fee Account established under subsection (m), and used for the purposes described in paragraph (4).

*    *    *