## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA, *et al.*,

*Plaintiffs -Appellants*,

v.

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants – Appellees*.

On Appeal from the United States District Court for the District of Columbia
Case No. 1:25-cv-03675-BAH, Honorable Beryl A. Howell, District Judge

**BRIEF OF *AMICUS CURIAE* FEDERATION FOR AMERICAN
IMMIGRATION REFORM IN SUPPORT OF DEFENDANTS-APPELLEES
AND AFFIRMANCE OF THE DISTRICT COURT'S JUDGMENT**

CHRISTOPHER J. HAJEC
*Counsel of Record*
MATT A. CRAPO
JOHN MIANO
*On the Brief*
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Ste 330
Washington, DC 20001
(202) 328-7004
chajec@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the Federation for American Immigration Reform is a 501(c)(3) not for profit charitable organization incorporated in the District of Columbia. The Federation for American Immigration Reform has no parent corporation. It does not issue stock.

## RULE 29 STATEMENT

All parties have consented to the filing of this brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Chamber | Plaintiff-Appellant Chamber of Commerce of the U.S. |
| FAIR | Federation for American Immigration Reform |
| H-1B | Temporary Nonimmigrant worker classification defined in 8 U.S.C. § 1101(a)(15)(H)(i)(b) |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix prepared by Plaintiffs-Appellants |

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

Rule 29 Statement ..................................................................................... i

Glossary..................................................................................................... ii

Table of Authorities................................................................................... iv

Statement of Interest ................................................................................ 1

Summary of the Argument ........................................................................ 1

Argument.................................................................................................... 3

    I.    The President is not subject to the APA, nor are his actions here
        otherwise reviewable.......................................................................... 4

    II.   Even if the President's judgment were subject to judicial scrutiny,
        it would clearly meet the statutory standard ............................................. 11

Conclusion ................................................................................................ 17

Certificate of Compliance with Rule 32(A)

Certificate of Service

# TABLE OF AUTHORITIES

**Cases:**

*Am. Foreign Serv. Ass'n v. Trump*,
  2025 U.S. App. LEXIS 15297 (D.C. Cir. 2025)...................................................4

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948)....................................................................................4, 5

*Dalton v. Specter*,
  511 U.S. 462 (1994)....................................................................................8, 10

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  883 F.3d 895 (D.C. Cir. 2018)........................................................................5, 8

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016)....................................................................9

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)...................................................................................4, 5, 9

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952)....................................................................................3, 7

*Hernandez v. Mesa*,
  589 U.S 93 (2020)...........................................................................................3

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)....................................................................................4, 8

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ..........................................................................5

*Mississippi v. Johnson*,
  71 U.S. 475 (1867)......................................................................................5, 6

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010)........................................................................5

*Trump v. Hawaii*,
  585 U.S. 667 (2018)...................................................................................3, 6, 7

*Trump v. United States*,
  603 U.S. 593 (2024)....................................................................................3, 5

*Tulare Cty. v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001) ...................................................................... 10

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ........................................................................................... 3

*United States v. George S. Bush & Co.*,
    310 U.S. 371 (1940) ........................................................................................... 6

*Webster v. Doe*,
    486 U.S. 592 (1988) ........................................................................................... 4

**Statutes:**

8 U.S.C. § 1101(a)(15)(H)(i)(B) ............................................................................ 11

8 U.S.C. § 1182(f) ........................................................................................... 4, 6

8 U.S.C. § 1182(n)(1)(E) ..................................................................................... 11

8 U.S.C. § 1182(n)(1)(F) ..................................................................................... 11

8 U.S.C. § 1184(i) ............................................................................................. 11

**Other Authorities:**

Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*,
    90 Fed. Reg. 46027 (Sept. 24, 2025) ................................ 4, 7, 10, 12, 13, 14, 15

## STATEMENT OF INTEREST

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to advocate for immigration policy that is in America's best interest. FAIR has been involved in more than 100 legal cases since 1980, either as a party or *amicus curiae*, with the aim of advancing this mission.

## SUMMARY OF THE ARGUMENT

The Constitution vests Congress and the President with the responsibility to superintend immigration, naturalization, foreign policy, and national security. Courts have long recognized that the authority of these branches over these subjects is plenary and, generally, not subject to review when they exercise discretion.

The H-1B program falls within the President's authority to exclude aliens or place conditions on their admittance. In fact, by requiring program participants to secure a visa, Congress has placed them initially within the class of inadmissible aliens. Only when individuals meet very specific requirements may they qualify for a visa. Even then, the Immigration and Naturalization Act (INA) grants the President very broad authority to exclude or "suspend the entry of all aliens or any class of aliens" "or impose on the entry of aliens any restriction he may deem to be

appropriate." The only prerequisite to exercising this power is that the President issue a proclamation finding that the entry of such aliens would be detrimental to the interests of the United States. Because such a determination is a matter of judgment entrusted to the President in his discretion, and the President is not an agency, the Administrative Procedure Act (APA) does not apply, and courts are otherwise not equipped to second-guess the President's determination.

The APA, likewise, does not apply to actions of subordinate executive officers to implement a President's Proclamation suspending the entry of aliens. When the President acts, he must always do so through subordinates, such as cabinet secretaries. When executive subordinates do not only act pursuant to authority conferred on them by statute, but act pursuant to an order of the President issued under authority conferred on him by statute or the Constitution, these subordinates' actions are presidential actions immune from APA review.

Even if the President's judgment that excessive H-1B workers are detrimental to the interests of the United States were subject to judicial scrutiny, the President's judgment would clearly meet the statutory standard. The United States faces an immigration crisis caused, in part, by the H-1B nonimmigrant visa program. Most alien H-1B guestworkers are employed in computer occupations, and the number of H-1B workers imported each year exceeds the number of computer jobs created in the entire country. The saturation of the job market with

foreign workers creates unacceptably high unemployment for American graduates and the displacement of experienced Americans.

## ARGUMENT

The President's authority over immigration flows from constitutional provisions empowering him to regulate in the areas of foreign commerce, foreign relations, and national security. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 607 (2024) (holding that immigration falls within the president's "important foreign relations responsibilities" conferred on him by the Constitution), *Hernandez v. Mesa*, 589 U.S 93, 104 (2020) (noting that governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"), *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (recognizing that immigration related decisions "implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of republican form of government."); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950) (recognizing that the right to control immigration and naturalization "stems not alone from legislative power but is inherent in the executive power to control

the foreign affairs of the nation"); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs.").

Properly exercising his power under 8 U.S.C. § 1182(f), President Trump issued Proclamation 10973 (published at 90 Fed. Reg. 46027), finding that the H-1B visa program was adversely affecting American workers, and imposed a $100,000 fee on new H-1B admissions to restrict H-1B visas to highly skilled workers. He and his subordinates are immune to review for this discretionary act.

## I. The President is not subject to the APA, nor are his actions here otherwise reviewable.

The district court presumed that an agency's implementation of a presidential directive is reviewable under the APA and concluded that Plaintiffs' APA claim failed on the merits. JA 469-76. Although the district court avoided the question of justiciability, this Court should affirm on this alternative ground.

The APA applies only to agencies. *E.g. Lincoln v. Vigil*, 508 U.S. 182, 190-92 (1993); *Webster v. Doe*, 486 U.S. 592, 599 (1988) (holding that the APA applies only to a "final agency action"). The President, though, is not an agency, and thus the APA does not apply to him or his actions. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Am. Foreign Serv. Ass'n v. Trump*, 2025 U.S. App. LEXIS 15297, *45 (D.C. Cir. 2025).

The concept that courts may not review the President's exercise of discretion has its roots in the earliest days of the Republic. In 1803, the Supreme Court noted that "[w]here the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170-71 (1803). It has continued to the modern era, with the Supreme Court noting that "the courts have no power to control the President's discretion when he acts pursuant to the powers invested exclusively in him by the Constitution." *Trump*, 603 U.S. at 607 (citation modified).

Furthermore, courts may not "enjoin the President in the performance of his official duties." *Franklin*, 505 U.S. at 802-03. *See also*, *Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 903 (D.C. Cir. 2018) (holding that the court lacks a standard of review "[i]n the foreign affairs arena"), *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (same). The President's immunity from injunction serves a critical role: ensuring that the President is protected in the prosecution of his constitutional responsibilities. Allowing courts to enjoin the President would turn the judiciary into a branch that micromanages the Executive. *See, e.g., Chicago & Southern Air Lines*, 333 U.S. at 114 (holding that it is improper for courts effectively to issue "advisory opinions" to the President); *Mississippi v.*

*Johnson*, 71 U.S. 475, 499 (1867) (warning that attempts by the judiciary to "enforce the performance" of the President's duties is "an absurd and excessive extravagance"). To permit judicial review of a President's discretion would invade both his executive authority—in this case, his inherent authority over the conduct of foreign affairs and the related interests of the United States—and the measured judgment of Congress to recognize his authority. *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940). Thus, where the Constitution delegates a power to the President and where the statute defers to the President's discretion, judicial review is not available. And that the President may not be compelled to perform his responsibilities as others see fit applies equally when individuals challenge the unconstitutionality of an executive action. *Mississippi*, 71 U.S. at 499 ("It is true that in the instance before us the interposition of the court is not sought to enforce action by the Executive under constitutional legislation, but to restrain such action under legislation alleged to be unconstitutional. But we are unable to perceive that this circumstance takes the case out of the general principles which forbid judicial interference with the exercise of Executive discretion.").

In this case, Congress, recognizing the President's inherent authority under the Constitution to exclude aliens, enacted legislation that "excudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Specifically, under 8 U.S.C. § 1182(f), the President, when he "finds that the entry of any alien or of

any class of aliens … would be detrimental to the interests of the United States" may "by proclamation … impose on the entry of any alien *any restriction* he may deem to be appropriate" (emphasis added). *See also Hawaii*, 585 U.S. at 685 (recognizing that the statute's "sole prerequisite" is that the entry of the aliens "would be detrimental to the interests of the United States").

The President exercised his discretion when determining, among other things, that the H-1B program has been "deliberately exploited to replace, rather than supplement American workers." The results of the program have "undermined both our economic and national security" by "artificially suppress[ing] wages, resulting in a disadvantageous labor market for American citizens" and "ma[king] it even more challenging for college graduates to find IT jobs." Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 24, 2025).

Courts cannot review this exercise of Presidential discretion. Decisions about whether to exclude aliens or place preconditions on their entry are, fundamentally, foreign policy decisions. *Harisiades*, 342 U.S. at 588-589 (observing that immigration and naturalization policies are "interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). And this Circuit, for example, has recognized that courts cannot review the President's

discretion "on questions of foreign policy and national interests." *Detroit Int'l Bridge Co*., 883 F.3d at 903-04. Courts will also refrain from exercising jurisdiction, whether under the APA or otherwise, where Congress drafted a statute "so that a court would have no meaningful standard against which to judge" the exercise of discretion. *Lincoln*, 508 U.S. at 191. When a statute deprives the court of a meaningful standard, "the statute can be taken to have committed the decisionmaking to the agency's judgment absolutely." *Id*.

Thus, between the President's general immunity against injunctions, the long-recognized inherent Executive constitutional power to decide whether to exclude aliens or to impose conditions on their entry, and Congress's decision to implement this power so that it is to be exercised in the President's sole discretion, not only is the President not subject to the APA, courts also lack jurisdiction to enjoin his Proclamation.

The fact that the President's actions were carried out by agency personnel does not make the actions reviewable under the APA. Because Presidents must always act through subordinates, whether an action is that of the President or the head of an agency, for purposes of APA reviewability, hinges not on whether agency personnel help perform a given action, but on whether the authority to take that action is statutorily or constitutionally entrusted to the Executive or delegated by Congress to an agency. *See, a fortiori, Dalton v. Specter,* 511 U.S. 462, 477

(1994) ("Where a statute … commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."). Here, the President issued a proclamation under both his inherent authority to superintend foreign policy and his statutory authority granted by Congress. To the extent that Secretaries Noem and Rubio, and their respective departments, must act, they do so solely to implement the proclamation and are without discretion to tailor the proclamation or otherwise ignore it.

Just as courts cannot enjoin the President, neither can they enjoin executive branch officials when they are carrying out an order of the President issued under authority granted to him either by statute or the Constitution.

> [A]n unreviewable presidential action must involve the exercise of discretionary authority vested in the President; an agency acting on behalf of the President is not sufficient by itself. Since the Constitution vests the powers of the Executive Branch in one unitary chief executive officer, *i.e.*, the President, an agency always acts on behalf of the President. Nonetheless, there is a difference between actions involving discretionary authority delegated by Congress to the President and actions involving authority delegated by Congress to an agency. Courts lack jurisdiction to review an APA challenge in the former circumstances, regardless of whether the President or the agency takes the final action. However, "[w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).

*Detroit Int'l Bridge Co. v. Gov't of Can.,* 189 F. Supp. 3d 85, 101-04 (D.D.C. 2016). *See also, Franklin*, 505 U.S. at 800-01 (determining that, although the

"President is not explicitly excluded from the APA's purview" nor "explicitly included," "[o]ut of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA"); *Tulare Cty. v. Bush,* 185 F. Supp. 2d 18, 28 (D.D.C. 2001) ("A court has subject-matter jurisdiction to review an agency action under the APA only when a final agency action exists. Because the President is not a federal agency within the meaning of the APA, presidential actions are not subject to review pursuant to the APA.") (citing *Dalton,* 511 U.S. at 470) (other internal citations omitted).

In this case, the State Department, DHS, and their respective Secretaries all lack discretion to implement the Proclamation. The President directed Secretary Noem to "restrict decisions on petitions not accompanied by a $100,000 payment." Proclamation No. 10973, Sec. 1(b), 90 Fed. Reg. at 46028.[1] Similarly, the Secretary of State is directed only to "verify the receipt of payment… and shall approve only those visa petitions for which the filing employer has made the payment." *Id*. at Sec. 2(b). Any effort to enjoin their compliance with the Proclamation, therefore, is a *de facto* enjoining of the President.

---

[1] The President provided the Secretary a measure of discretion only to exempt certain aliens if "the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." Proclamation No. 10973 at Sec. 1(c).

## II. Even if the President's judgment were subject to judicial scrutiny, it would clearly meet the statutory standard.

The H-1B visa is a nonimmigrant guestworker visa for specialty occupations. 8 U.S.C. § 1101(a)(15)(H)(i)(B). A specialty occupation is defined as an occupation that requires "theoretical and practical application of a body of highly specialized knowledge" and "attainment of a bachelor's or higher degree in the specific specialty." 8 U.S.C. § 1184(i).

The H-1B visa is detrimental to American workers because its terms permit replacing Americans with H-1B workers. 8 U.S.C. § 1182(n)(1)(E)–(F) (making it unlawful to displace Americans only under a combination of conditions that can never occur). And, by allowing employers to determine the prevailing wage, the temporary worker visa system results in H-1B wages significantly lower than U.S. wages for the same occupation and location. Daniel Costa & Ron Hira, *H-1B visas and prevailing wage levels*, Economic Policy Institute, May 4, 2020 ("A majority of H-1B employers—including major U.S. tech firms—use the program to pay migrant workers well below market wages."). Consequently, the H-1B program provides incentives for employers to replace Americans with H-1B workers on a massive scale, often hundreds at a time. *E.g.*, Patrick Thibodeau, *Southern California Edison IT workers 'beyond furious' over H-1B replacements*, ComputerWorld, Feb. 4, 2015 (describing 400 Americans' losing their jobs and having to train their H-1B replacements).

While Proclamation 10973 lacks citations to sources, every grim claim it makes is easily verifiable. Even under the false premise that that a proclamation made under 8 U.S.C § 1182(f) were judicially reviewable, the facts conclusively support the findings made in Proclamation 10973.

The President found that "abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields." 90 Fed. Reg. at 46028. The available data clearly support such a finding. The majority of H-1B beneficiaries are in computer occupations. *Characteristics of H-1B Specialty Occupation Workers*, USCIS, Apr. 25, 2025, p. 9.[2] In fiscal year 2025, about 77,000 H-1B visas were approved for computer workers. *Id*. at 10. This figure has no basis in economic need. Between May 2023 and May 2024, the United States *lost* over 18,000 jobs in computer occupations. Bureau of Labor Statistics, *Occupational Employment and Wage Statistics*, May 2024 & May 2023.[3]

---

[2] Available at: https://www.uscis.gov/sites/default/files/document/reports/ola_signed_h1b_characteristics_congressional_report_FY24.pdf (last visited Feb. 5, 2026).

[3] Compare the employment numbers for "Computer Occupations (15-1200)" for May 2024 (available at: https://data.bls.gov/oes/#/industry/000000) with employment numbers for the same occupation for May 2023 (available at: https://www.bls.gov/oes/2023/may/oes_nat.htm#15-1200) (last visited Feb. 5, 2026).

The saturation of the computer job market by H-1B and other similar programs has had a devastating impact on recent graduates. Recent computer science graduates have an unemployment rate of 6.1% and recent computer engineering graduates are unemployed at a rate of 7.5%. Federal Reserve Bank of New York, *The Labor Market for Recent College Graduates*, Dec. 17, 2025.[4] These unemployment rates are more than double that of art history majors (3%). *Id.* When the H-1B program is importing more than enough foreign workers to fill every new computer job in the country, the massive unemployment for Americans in that field is a natural consequence, and that job environment is likely to discourage Americans from pursuing study in that field. *E.g.*, Erica Blom *et al.*, *Investment over the Business Cycle: Insights from College Major Choice*, IZA Discussion Paper No. 9167, July 2015 (explaining that, when unemployment rises, students tend to shift into fields that historically have better employment prospects.). Right now, 25% of unemployed Americans have four-year college degrees, the highest percentage since tracking began. Matthew Boesler, *Americans With Four-Year Degrees Now Comprise a Record 25% of Unemployed Workers*, Bloomberg, Nov. 21, 2025.

Likewise, Proclamation 10973 quotes a study (without citation) that found H-1B workers are paid 36% less than Americans. 90 Fed. Reg. at 40027. Indeed, a

---

[4] *See also* 90 Fed. Reg. at 46027.

study supports that assertion. Daniel Costa & Ron Hira, *H-1B visas and prevailing wage levels, Economic Policy Institute*, May 4, 2020. This is consistent with a plethora of other studies finding H-1B workers are paid substantially less than Americans. *E.g.*, Crisil, *Bulging staff cost, shrinking margins*, May 2019 (finding local workers cost 25–30% more than H-1B workers); Thomas Bourveau *et al., H-1B Visas and Wages in Accounting: Evidence from Big 4 Payroll and the Ethics of H-1B Visas*, Journal of Business Ethics (2024). Proclamation 10973 states that "[o]ne software company was approved for over 5,000 H-1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees." 90 Fed. Reg. at 46027-28. Microsoft received 5,198 H-1B visas in fiscal year 2025. Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Washington Post, Sept. 24, 2025. Microsoft had laid off over 15,000 employees during that time period. Jim Edwards, *Microsoft lays off 9,000 in AI drive, bringing total job cuts to 15,000 this year*, Fortune, July 2, 2025. The proclamation also states that "[a]nother IT firm was approved for nearly 1,700 H-1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July." 90 Fed. Reg. 46028. Indeed, Intel announced it was laying off 2,400 Americans in Oregon. Allison Frost, *Mass Intel layoffs will hit Oregon economy hard*, Oregon Public Radio, July 24, 2025. Likewise, Intel received 1,698 H-1B visas in FY 2025. Economic Times,

*Amazon leads H-1B visa approvals in early 2025*, Sept. 27, 2025. The

proclamation describes the direct displacement of Americans by H-1B workers,

and how the Americans have to train their foreign replacements. 90 Fed. Reg. at

46028. Replacements of Americans by H-1B workers on a massive scale have been

extensively documented. *E.g.*, Reuters, *Lawmakers seek answers from major US*

*firms over H-1B visa use amid layoffs*, Sept. 25, 2025 (Members of Congress

questioned why Apple, Amazon, and JP Morgan were laying of thousands of

Americans while hiring thousands of H-1B workers.); Julia Preston, *Laid-Off*

*Americans, Required to Zip Lips on Way Out, Grow Bolder*, NY Times, June 11,

2016 (describing Americans replaced by H-1B workers at Abbott Labs and

Eversource Energy).

The restriction on H-1B workers imposed by Proclamation 10973, moreover,

is eminently reasonable. Rather than imposing a total ban on H-1B visas, as

permitted under 8 U.S.C. § 1182(f), the Proclamation attempts to limit such visas

only to workers who truly are highly skilled and thus will "supplement" the U.S.

workforce. 90 Fed. Reg. at 46027. The obvious way to separate the wheat from the

chaff flowing into the labor market is to impose a fee.

It is not as though the companies cannot afford it. Amazon currently is the

largest user of H-1B visas. Harriet Torry *et al*. *Who Uses H-1B Visas the Most, in*

*Charts*, Wall Street Journal, Sept. 30, 2025. Amazon's CEO was compensated

$40.1 million in 2024. Amazon, Notice of 2025 Annual Meeting.[5] The disputed H-1B fee amounts to less than one fourth of one percent of Amazon's CEO compensation.

The story is the same among the top U.S. employers of H-1B workers. In 2025, Microsoft's CEO was compensated $96.5 million. Jessica Coacci, *Microsoft CEO Satya Nadella's pay hits a record $96.5 million*, Fortune, Oct. 22, 2025. Apple's CEO compensation was $74.6 million in 2025. Apple, Inc., Proxy Statement Pursuant to Section 14(a), p. 61. And million-dollar salaries are not uncommon among senior technology workers in the United States. *E.g.*, Anna Tong & Kenrick Cai, *OpenAI, Google and xAI battle for superstar AI talent, shelling out millions*, Reuters, May 21, 2025; Times of India, *Microsoft salary packages leaked: From entry-level to multi-million dollar paychecks,* Aug. 2, 2025 (top level engineers can earn $2.7 million a year). By industry compensation standards, the $100,000 fee is entirely reasonable to restrict H-1B visas to highly skilled workers that supplement—rather than displace—American workers.

[5] Available at: https://s2.q4cdn.com/299287126/files/doc_financials/2025/ar/Amazon-2025-Proxy-Statement.pdf (last visited Feb. 4, 2026).

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: February 5, 2026          Respectfully submitted,

/s/ Christopher J. Hajec
CHRISTOPHER J. HAJEC
D.C. Bar No. 492551
MATT A. CRAPO
D.C. Bar No. 473355
JOHN MIANO
D.C. Bar No. 1003068
Federation for American Immigration Reform
25 Massachusetts Ave., N.W., Ste. 330
Washington, D.C. 20001
(202) 328-7004
chajec@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

## CERTIFICATE OF COMPLIANCE WITH
## RULE 32(A)

This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because that brief contains 3,792 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because that brief was prepared in a proportionally spaced typeface using Microsoft Word using 14 pt. Times New Roman font.

/s/ Christopher J. Hajec

**CERTIFICATE OF SERVICE**

I certify that on February 5, 2026, I filed this Amicus Brief with the ECF system that will provide notice and copies to all parties.

<u>/s/ Christopher J. Hajec</u>